IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WYETH,

              Plaintiff,

              v.

WATSON LABORATORIES, INC. and
WATSON PHARMACEUTICALS, INC.,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 08-145 (JJF)

REDACTED

**PLAINTIFF WYETH'S OPENING BRIEF
IN SUPPORT OF ITS MOTION TO DISQUALIFY KENYON & KENYON LLP
AND AMY HULINA AS COUNSEL FOR DEFENDANTS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com
jparrett@mnat.com

*Attorneys for Plaintiff Wyeth*

OF COUNSEL:

Anthony Herman
Jeffrey B. Elikan
Eric R. Sonnenschein
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000

June 6, 2008

Original Filing Date: June 6, 2008
Redacted Filing Date: June 13, 2008

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

NATURE AND STAGE OF THE PROCEEDING ................................................ 1

SUMMARY OF THE ARGUMENT ........................................................... 2

STATEMENT OF FACTS ................................................................. 3

    A.    Kenyon's Adverse Representation of Watson. ............................. 5

    B.    Kenyon's Prior Representations of Wyeth. ............................... 6

        1.    The 1990 Ortho Pharmaceuticals Oral Contraceptive Litigation. ....................................... 6

        2.    The Novo Nordisk Two-Hormone Hormone Replacement Therapy Litigation. ...................................... 6

        3.    The '878 Application and the Pickar-Wolfe Inventorship Dispute. ........................................... 7

    C.    Kenyon's Unilateral Decision to Drop Wyeth As a Client. ............ 9

ARGUMENT .......................................................................... 11

    I.    THERE IS A SUBSTANTIAL RELATIONSHIP BETWEEN KENYON'S PREVIOUS REPRESENTATIONS OF WYETH AND THIS CASE. ............................................. 13

        1.    The nature and scope of the prior representation; .......... 13

        2.    The nature and scope of the current representation; and .............................................. 13

        3.    The possibility that confidences were disclosed during the previous representation that could be relevant to the current action and detrimental to the former client in the current litigation. .................. 13

    II.    WYETH WOULD BE IRREPARABLY PREJUDICED BY KENYON'S REPRESENTATION OF WATSON, AND THE HARM TO WATSON FROM KENYON'S DISQUALIFICATION WOULD BE RELATIVELY SLIGHT. ................. 18

|     |     |     |
| --- | --- | --- |
| A.  | In the Absence of Disqualification, Wyeth Would Suffer Substantial Harm. | 18 |
| B.  | At this Early Stage of the Case, Kenyon's Disqualification Would Cause Watson Relatively Little Harm. | 19 |
| C.  | A Screen Would Not Adequately Address the Conflict. | 20 |
| D.  | Ms. Hulina Should Be Disqualified Because of Her Involvement with the '878 Patent Application. | 22 |

CONCLUSION ........................................................................................................22

TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Home Prods. et al. v. Novo Nordisk Pharm., Inc. et al.,*
    Civ. No. 99-3162 (GEB) (D.N.J. July 6, 1999) ...................................................6, 17

*Analytica, Inc. v. NPD Research, Inc.,*
    708 F.2d 1263 (7th Cir. 1983) .......................................................................16

*Colorpix Sys. of Am. v. Broan Mfg. Co.,*
    131 F. Supp.2d 331 (D. Conn. 2001) ..........................................................19, 22

*Emmis Operating Co. v. CBS Radio, Inc.,*
    480 F. Supp.2d 1111 (S.D. Ind. 2007) .............................................................16

*Express Scripts, Inc. v. Crawford,*
    2007 WL 417193 (Del. Ch. 2007) .....................................................................20

*FMC Tech., Inc. v. Edwards,*
    420 F. Supp.2d 1153 (W.D. Wash. 2006) .........................................................16

*Kabi Pharmacia AB v. Alcon Surgical, Inc.,*
    803 F. Supp. 957 (D. Del. 1992) ......................................................................11

*Koch v. Koch Indus.,*
    798 F. Supp. 1525 (D. Kan. 1992) ...................................................................18

*Madukwe v. Delaware State Univ.,*
    2008 WL 2020021 (D. Del. May 5, 2008)................................................*Passim*

*McNeil Labs., Inc. v. Am. Home Prods. Corp.,*
    416 F. Supp. 804 (D.N.J. 1976) ...........................................................................3

*Murphy v. Simmons,*
    2008 WL 65174 (D.N.J. Jan. 3, 2008) ........................................................13, 18

*Nemours Found. v. Gilbane Aetna. Fed. Ins. Co.,*
    632 F. Supp. 418 (D. Del. 1986) ................................................................12, 20

*Ortho Pharm Corp. v. Smith,*
    959 F.2d 936 (Fed. Cir. 1996)............................................................................6

*Ortho Pharm. Corp. v. Smith et al.,*
    1990 WL 121353 (E.D. Pa. 1990) ..............................................................6, 17

*Reliant Pharm., Inc. v. Par Pharm., Inc.*,
   2008 WL 1826036 (D. Del. Apr. 23, 2008)............................................................................20

*Satellite Fin. Planning Corp. v. First National Bank of Wilmington*,
   652 F. Supp. 1281 (D. Del. 1987)........................................................................... 13-15

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
   141 F. Supp.2d 616 (W.D.N.C. 2001) ....................................................................17

*T.C. Theatre Corp. v. Warner Bros. Pictures*,
   113 F. Supp. 265 (S.D.N.Y. 1953).........................................................................13

*Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.*,
   491 F. Supp.2d 510 (D. Del. 2007)................................................................... 20-21

*Trone v. Smith*,
   621 F.2d 994 (9th Cir. 1980) .................................................................................16

*U.S. v. Moscony*,
   927 F.2d 742 (3d Cir. 1991).....................................................................................16

*Webb v. E.I. DuPont de Nemours & Co.*,
   811 F. Supp. 158 (D. Del. 1992) ...............................................................13, 19

**RULES**

LR 83.6(d)(2) ..................................................................................................................11

Rule of Professional Conduct 1.9 ............................................................. 1-2, 12, 20

Rule of Professional Conduct 1.9, comment 3 ................................................................13

Rule of Professional Conduct 1.9: ......................................................................................11

Rule of Professional Conduct 1.10(a)....................................................................................12

Rules of Professional Conduct 1.9 and 1.10 ........................................................................20

## NATURE AND STAGE OF THE PROCEEDING

The law firm of Kenyon & Kenyon LLP ("Kenyon") serves as defendants' principal outside counsel in this Hatch-Waxman lawsuit, in which Wyeth accuses defendants of infringing its patent covering LYBREL®, a prescription oral contraceptive product developed and marketed by Wyeth. This litigation centers on the validity of Wyeth's U.S. Patent No. 6,500,814 ("the '814 patent"), which claims the continuous and uninterrupted administration of an estrogen and a gestagen for use as an oral contraceptive.

Until about one year ago, when Kenyon unilaterally terminated its relationship with Wyeth, Kenyon served as one of Wyeth's principal outside law firms on patent litigation and prosecution matters – for <u>at least</u> 17 years. Since 2001 alone, at least 30 different Kenyon lawyers represented Wyeth in patent matters, 22 of whom remain with the firm today – including a partner representing defendants in this case.

Before switching sides, Kenyon represented Wyeth in a large array of patent prosecution, interference, opinion, investigation, and at least six patent litigation matters, including litigation involving women's health and oral contraceptive patent issues. Kenyon represented Wyeth on several matters involving patents that – like the '814 patent at issue here – claimed the continuous and uninterrupted use of an estrogen and a gestagen.

Given Kenyon's 17-year access to Wyeth's confidential and privileged information in matters substantially related to issues in this litigation, its representation of defendants violates Model Rule of Professional Conduct 1.9. That ethical violation, unless remedied by disqualification, will cause irreparable prejudice to Wyeth. In sharp contrast, given

- 1 -

the very early stage of this case, defendants will suffer little harm as a result of Kenyon's disqualification. Kenyon therefore should be disqualified.

In addition, Amy Hulina, a former Kenyon attorney who worked as a lawyer for Wyeth on a substantially related matter, is involved in the current litigation as in-house intellectual property and patent counsel for defendants. Ms. Hulina's involvement in this case will cause Wyeth irreparable harm and taint any outside (or in-house) counsel with whom she works. Ms. Hulina should therefore be disqualified as well.

<u>SUMMARY OF THE ARGUMENT</u>

1.    Kenyon's history of serving as one of Wyeth's chief outside patent firms includes prior representations that have a substantial relationship to the subject matter of this litigation.

2.    As a lawyer at Kenyon, Amy Hulina performed work for Wyeth on a substantially related matter.

3.    Kenyon and Ms. Hulina's work on this case violates Model Rule of Professional Conduct 1.9.

4.    Because of the extensive confidences Wyeth shared with Kenyon during their long and close relationship, Wyeth would be irreparably prejudiced by Kenyon's representation of defendants in this litigation. Wyeth also would be irreparably prejudiced by Amy Hulina's involvement as in-house counsel in this litigation. By contrast, the harm to defendants arising from Kenyon and Ms. Hulina's disqualifications in this case would be relatively slight, because this litigation is still in an early stage.

5.    Given the extensive relationship that Kenyon had with Wyeth, and the fact that no fewer than 22 Kenyon attorneys who represented Wyeth remain at the law firm –

including a Kenyon partner who represents the defendants in this case – no screen would adequately protect Wyeth's confidences in this litigation.

<div align="center">STATEMENT OF FACTS</div>

A review of the public record shows that Kenyon began representing Wyeth as early as 1976 – more than 30 years ago – when Kenyon represented Wyeth in a trademark infringement case. *See McNeil Labs., Inc. v. Am. Home Prods. Corp.*, 416 F. Supp. 804 (D.N.J. 1976). By at least August of 1990, Kenyon had begun representing Wyeth (then known as American Home Products ("AHP")) in patent matters. During the course of its almost two-decade relationship with Wyeth, Kenyon served as one of the company's principal outside patent litigation and prosecution firms.

From 1990 to 2007, Kenyon represented Wyeth in a wide variety of patent prosecution, interference, opinion, investigation, and litigation matters, including matters pertaining to women's health care and oral contraceptives. Kenyon, for example, represented Wyeth in litigation regarding a Wyeth patent that claimed an                 oral contraceptive hormonal component. Kenyon also represented Wyeth in the prosecution of patents claiming combination estrogen-gestagen hormone replacement therapy for menopausal women, in an investigation                                                                          and in litigation concerning patents claiming combination hormone therapy for treating symptoms of menopause.                 Kenyon represented Wyeth in at least six patent litigation matters. All of these representations allowed Kenyon to gain intimate knowledge of Wyeth's philosophy, strategy and outlook in patent prosecution, patent litigation, and development of products for its women's health care product line.

<div align="center">- 3 -</div>

As part of its lengthy attorney-client relationship with Wyeth, Kenyon enjoyed extensive access to Wyeth, its personnel, and Wyeth's confidential and privileged information. Kenyon routinely interacted with Wyeth employees, including in-house counsel responsible for patent prosecution, opinions, interferences and the full gamut of litigation. Kenyon worked in tandem with in-house counsel on all aspects of litigation matters, including issues pertaining to litigation strategy and settlement. Moreover, in the course of representing Wyeth, Kenyon attorneys routinely interviewed inventors and other employees who are involved in virtually every facet of Wyeth's business.

During its representation of Wyeth, Kenyon reviewed highly confidential documents belonging to Wyeth.

Now, scarcely one year later and without Wyeth's consent, Kenyon is representing Wyeth's adversaries in this litigation, defendants Watson Laboratories,

- 4 -

Inc. and Watson Pharmaceuticals, Inc. (collectively "Watson"), in attacking a Wyeth patent covering a women's health product.

      A.    <u>Kenyon's Adverse Representation of Watson.</u>

On February 1, 2008, Wyeth received a Paragraph IV notice letter from Watson informing Wyeth that Watson had filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration to market a generic version of Wyeth's approved LYBREL® oral contraceptive product. (Ex. E). Watson's letter directed that all requests in response to the Offer of Confidential Access be directed to Amy Hulina, Vice President, Intellectual Property and Patent Counsel at Watson Pharmaceuticals, Inc. (*Id.* at 5.)

In the letter, Watson does <u>not</u> assert that its generic copy of LYBREL® does not infringe the '814 patent, which claims the "<u>continuous and uninterrupted</u> [<u>administration</u> for a] period of greater than 110 days" of certain hormonal compounds, namely <u>estrogens and gestagens</u>, for the purpose of oral contraception. '814 patent, col. 7, l. 10 - col. 8, l. 24. Rather, it contends that the '814 patent is invalid, because it is obvious in light of the prior art.[1]

Wyeth responded to the notice letter by filing the complaint in this case on March 12, asserting that the '814 patent was infringed by Watson's ANDA for a generic version of LYBREL®. On March 27, Wyeth learned for the first time that Kenyon would serve as its adversaries' lead counsel. The only meaningful activity in the case occurred on April 25, when Watson submitted motions to dismiss Wyeth's complaint.

---

[1]     It also asserts that the patent is invalid under Section 112 for failure to contain an adequate written description.

On May 28, Wyeth sent Kenyon a letter requesting that it withdraw from its adverse representation of Wyeth. (Ex. F). On June 3, Kenyon wrote back declining to withdraw. (Ex. G).

B.    Kenyon's Prior Representations of Wyeth.

1.    The 1990 Ortho Pharmaceuticals Oral Contraceptive Litigation.

As early as 1990, Kenyon represented Wyeth in

patent actions involving oral contraceptives. The patent at issue claimed various hormonal compounds used in several of Wyeth's oral contraceptive products. *See generally Ortho Pharm. Corp. v. Smith et al.*, 1990 WL 121353 (E.D. Pa. 1990) (affirmed by *Ortho Pharm Corp. v. Smith*, 959 F.2d 936 (Fed. Cir. 1996)) (unreported case with Kenyon as counsel for Defendant and Counterclaim Plaintiff AHP). At issue in the *Ortho* litigation was the validity, enforceability, and infringement of Wyeth's U.S. Patent No. 3,959,322 ("the '322 patent"). As part of the representation, Kenyon was afforded access to Wyeth's highly sensitive and confidential information regarding the '322 patent and, more generally, Wyeth's line of oral contraceptive products and its women's health business.

2.    The Novo Nordisk Two-Hormone Hormone Replacement Therapy Litigation.

Throughout the 1990s, Kenyon continued to represent Wyeth on women's oral contraceptive and health-related patent issues. Beginning in July 1999, for example, Kenyon represented Wyeth in its suit against Novo Nordisk Pharmaceuticals, Inc. ("Novo Nordisk") for the infringement of U.S. Patent No. RE36,247 ("the Wolfe-Plunkett patent"). *See* Complaint, *Am. Home Prods. et al. v. Novo Nordisk Pharm., Inc. et al.*, Civ. No. 99-3162 (GEB) (D.N.J. July 6, 1999) (Ex. H). The Wolfe-Plunkett patent claimed a treatment for menopause that

- 6 -

included a claim – akin to the claims in the '814 patent here – that covered administering "continuously and uninterrupted[ly] both progestogen [gestagen] and estrogen." *See* U.S. Patent No. RE36,247 (Ex. I). The Wolfe-Plunkett patent is listed as prior art to the '814 patent-in-suit on the face of the patent itself.

The Wolfe-Plunkett patent claims covered Wyeth's PremPro™ hormone replacement product, a    component of Wyeth's women's health care Premarin product line, which has accounted for as much as $2 billion of Wyeth's revenue.[2] Advised by Kenyon, Wyeth settled the litigation against Novo Nordisk in June of 2000.

> 3.    The '878 Application and the Pickar-Wolfe Inventorship Dispute.

Represented by Kenyon, in 2001 Wyeth submitted an application to the U.S. Patent and Trademark Office ("PTO"), U.S. Serial No. 09/808,878 ("the '878 application"). Also like the '814 patent, the '878 application claimed the "continuous and uninterrupted" administration of an estrogen and a gestagen for the treatment of "menopausal or postmenopausal disorders in a perimenopausal, menopausal, or postmenopausal woman in need thereof."[3] (*See* Ex. J).

The '878 application was rejected by the Patent Office on obviousness grounds, and Kenyon lawyers

represented Wyeth in seeking to overcome the examiner's rejection.

---

[2]    Wyeth 2001 10-K March 29, 2002, p. 3.

[3]    The '878 application never issued as a U.S. patent and was abandoned on December 12, 2007.

After the '878 application published on October 25, 2001, one of the inventors of the Wolfe-Plunkett patent, Dr. Bernard Wolfe, contacted Wyeth and claimed that he should have been listed as a co-inventor on the '878 patent application.

Between late 2001 and 2004, represented by Kenyon, Wyeth engaged in negotiations and discussions with Dr. Wolfe regarding his inventorship claims.             During this           Kenyon had access to numerous Wyeth privileged, proprietary and confidential documents.

---

[4]      Wyeth will submit the billing records for *in camera* inspection at the Court's request.

C.     Kenyon's Unilateral Decision to Drop Wyeth As a Client.

---

[5]     The identity of these witnesses is subject to the attorney-client and work product privileges in the pending "Wolfe litigation." At the Court's request, Wyeth will submit the names of the witnesses and the roles they played in the development of LYBREL® for *in camera* inspection.

Despite its February 2007 assertions, Kenyon's long-term relationship with Wyeth was no small matter. Kenyon had represented Wyeth for almost two decades and was afforded access to thousands of confidential and sensitive documents

For most of those nearly two decades, Kenyon was one of Wyeth's principal outside patent litigation and prosecution firms, allowing Kenyon to get an unrestricted view into Wyeth's philosophy regarding its intellectual property position and patent litigation. This exclusive access allowed Kenyon to learn Wyeth's general approach to its women's health care business. Kenyon also learned Wyeth's strategy and philosophy regarding both the prosecution of patents before the PTO and the assertion of patents in litigation.

Even today, Kenyon continues to tout its legal work on behalf of Wyeth on its website, both in an "About Us" section highlighting some of the firm's successes in prominent patent litigation

matters, and in the biographies of four different Kenyon attorneys. (*See* Manspeizer Decl. ¶10; Ex. K).

<div align="center">ARGUMENT</div>

Having formerly represented Wyeth in substantially related matters – for many years – Kenyon cannot now represent Watson without Wyeth's consent. Having failed to obtain Wyeth's consent to its adverse representation, Kenyon should be disqualified from representing defendants in this case. *See Madukwe v. Delaware State Univ.*, 2008 WL 2020021 (D. Del. May 5, 2008) (disqualifying law firm because of "the length and breath of the" prior representation, the fact that the prior representation involved "identical types of litigation," and the fact that the prior representation ended only one year earlier).

Applying the Model Rules of Professional Conduct, *see* D. Del. LR 83.6(d)(2), this "Court has inherent authority to supervise the professional conduct of attorneys appearing before it." *Id.* at *4 (citing *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980)). This power includes the authority to disqualify lawyers whose conduct breaches the Model Rules. *See Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957, 961 (D. Del. 1992). Although motions to disqualify are generally disfavored, "any doubts about whether disqualification is appropriate should be resolved in favor of the party moving for disqualification in order to ensure the protection of client confidences." *Madukwe*, 2008 WL 2020021 at *5 (citations omitted).

Under Model Rule of Professional Conduct 1.9:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a <u>substantially related matter</u> in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

<div align="center">- 11 -</div>

(emphasis added.) Thus, a lawyer who previously represented a client violates this ethical rule where (1) the lawyer's prior representation is the same or "substantially related" to the current matter; (2) the interests of the lawyer's former client and its current client are materially adverse; and (3) the former client has not consented to the representation after consultation. *Nemours Found. v. Gilbane Aetna. Fed. Ins. Co.*, 632 F. Supp. 418, 422 (D. Del. 1986).   Under Model Rule of Professional Conduct 1.10(a), an individual lawyer's conflict of interest under Rule 1.9 is imputed to the entire firm.

In this case, it is beyond dispute that Kenyon and Wyeth had a previous attorney-client relationship.  It is equally undebatable that Kenyon's representation of Watson is adverse to Wyeth and that Kenyon never asked for and Wyeth never gave consent.  And the facts make clear that Kenyon's previous representations of Wyeth bear a "substantial relationship" to this litigation.  Wyeth would suffer irreparable harm, whereas Watson would suffer relatively little if Kenyon is disqualified.  Accordingly, Kenyon should be barred from representing Watson in this case.

Likewise, while at Kenyon, Ms. Hulina was Wyeth's lawyer on a matter that is substantially related to the current litigation.  As in-house counsel for Watson, Ms. Hulina is adverse to Wyeth and Wyeth was neither asked for nor gave consent to this representation.  Wyeth would suffer irreparable harm as a result of Ms. Hulina's involvement in this litigation.  As a consequence, Ms. Hulina also should be disqualified from serving as a Watson lawyer in this case.

I.    THERE IS A SUBSTANTIAL RELATIONSHIP BETWEEN KENYON'S PREVIOUS REPRESENTATIONS OF WYETH AND THIS CASE.

In determining whether a substantial relationship exists, courts consider three factors:

1.    The nature and scope of the prior representation;

2.    The nature and scope of the current representation; and

3.    The possibility that confidences were disclosed during the previous representation that could be relevant to the current action and detrimental to the former client in the current litigation.

*Satellite Fin. Planning Corp. v. First National Bank of Wilmington*, 652 F. Supp. 1281, 1282-83 (D. Del. 1987) (citing *INA Underwriters v. Nalibotsky*, 594 F. Supp. 1199, 1206 (E.D. Pa. 1984)).[6]  "[I]n attempting to determine whether a 'substantial relationship' exists,

---

[6]    Courts have recognized that, where a substantial relationship between two matters is shown, it will be presumed that client and attorney shared confidences bearing on the subject matter of the substantially related previous representation. *See, e.g., Webb v. E.I. DuPont de Nemours & Co.*, 811 F. Supp. 158, 162 (D. Del. 1992) ("Courts may assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation without inquiring into their nature and extent") (quoting *Ullrich v. Hearst Corp.*, 809 F. Supp. 229 (S.D.N.Y.1992)); *Murphy v. Simmons*, 2008 WL 65174 at *17-18 (D.N.J. Jan. 3, 2008) (once similarity of representations is shown, a sharing of confidences between former client and attorney is presumed); *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265, 268-69 (S.D.N.Y. 1953) (seminal former client conflict of interest case presuming the sharing of confidence in previous representations and asserting that, "Only [with this presumption] can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained."); *see also* Model Rule of Professional Conduct 1.9, comment 3 ("A former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter. A conclusion about the possession of such information may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services.").

- 13 -

'disqualification is proper when the similarity in the two representations is enough to raise a common-sense inference that what the lawyer learned from his former client will prove useful in his representation of another client whose interests are adverse to those of the former client.'" *Madukwe*, 2008 WL 2020021 at * 5 (quoting *Cardona v. Gen. Motors Corp.*, 942 F. Supp. 968, 973 (D.N.J.1996)). There is clearly a substantial relationship here.

In its previous representations of Wyeth, Kenyon served as the company's lawyers in a variety of women's health patent matters – ranging from the defense of claims related to oral contraceptives to the defense and prosecution of claims related to hormone replacement therapy for menopause – for at least 17 years. Kenyon's previous representations of Wyeth evidence a substantial overlap with this litigation for at least four reasons.

First, there is a close resemblance between key patent terms in the patent claims at issue in Kenyon's previous representations of Wyeth and the patent claims at issue in this case. The Wolfe-Plunkett patent, which was at issue in the Novo Nordisk litigation, claims "continuous[ ] and uninterrupted" administration of an estrogen and a gestagen for the treatment of "menopausal or post-menopausal" disorders. The '878 patent application at the heart of the Pickar-Wolfe inventorship dispute claims "continuously and uninterruptedly" administering a conjugated estrogen and a specific gestagen for the treatment of "menopausal or postmenopausal disorders" to a "perimenopausal, menopausal, or postmenopausal woman." And the patent at issue here, the '814 patent, claims the administration of an estrogen and a gestagen for "a continuous and uninterrupted administration period of greater than 110 days" for the purpose of contraception. All of these patents claim: (a) continuous and uninterrupted administration; (b) the administration of an estrogen and a gestagen; and (c) a women's health indication. Accordingly, in defending the Wolfe-Plunkett patent and prosecuting the '878 application,

- 14 -

Kenyon clearly had access to confidential Wyeth information that could be important in this litigation.

Thus, there can be no doubt that the confidences that were disclosed during the previous representation "could be relevant to the current action and detrimental to the former client in the current litigation." *Satellite Fin. Planning Corp.*, 652 F. Supp. at 1282-83; *see also Madukwe*, 2008 WL 2020021 at * 5 ("As the Third Circuit has explained, M.R.P.C. 1.9 exists for the purpose of preventing 'even the potential that a former client's confidences and secrets may be used against him. . . .'") (quoting *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir.1984)) (emphasis added).

LYBREL® and who are likely to be fact witnesses in this case. In the course of Kenyon's interviews, the law firm was afforded access to sensitive and confidential information

And Kenyon's interactions with these Wyeth employees as clients

- 15 -

would give Kenyon a critical – and unfair – advantage in conducting cross examinations in deposition and at trial. Third Circuit case law recognizes that such an overlap of fact witnesses (especially fact witnesses who are former clients and may be cross-examined by their former lawyers) strongly supports disqualification. *See U.S. v. Moscony*, 927 F.2d 742 (3d Cir. 1991) (the prospect of cross-examination of former client witnesses supported disqualification); *see also Emmis Operating Co. v. CBS Radio, Inc.*, 480 F. Supp.2d 1111 (S.D. Ind. 2007) (same); *FMC Tech., Inc. v. Edwards*, 420 F. Supp.2d 1153 (W.D. Wash. 2006) (same).

Third, as a result of its prior representations, Kenyon was given access to highly sensitive strategic and financial information that may be relevant to this case.

*See Trone v. Smith*, 621 F.2d 994, 1000 (9th Cir. 1980) (a substantial relationship exists when the previous representation produced information "vitally related" to the instant litigation); *see also Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1267 (7th Cir. 1983) (confidential financial information gained in previous representations can be sufficient to create a substantial relationship where that information is "germane" to subsequent litigation).

Fourth, for at least 17 years, Kenyon was one of Wyeth's principal outside patent firms. Kenyon's previous representations focused on Wyeth's women's health care and oral contraceptive product lines – the same product lines at issue in this litigation. In the *Ortho*

- 16 -

litigation, Wyeth entrusted Kenyon with the defense of a patent that protected various Wyeth oral contraceptives. In *Novo Nordisk*, the '878 patent application, and the Pickar-Wolfe inventorship dispute, Wyeth retained Kenyon to protect its patent interests in hormone replacement therapies for menopause. Through these representations, Kenyon gained important insights into Wyeth's litigation and intellectual property strategy as it relates to its women's health care product line – providing Kenyon an unfair advantage in this litigation. "Knowledge of this type of 'playbook information'– for example, 'what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject' . . . is a basis for disqualification." *Madukwe*, 2008 WL 2020021 at * 9 (quoting *Webb v. E.I. du Pont de Nemours & Co.*, 811 F. Supp. 158, 162 (D. Del. 1992) (citing *Cardona*, 942 F. Supp. at 972-73) (disqualifying outside counsel because it was "aware of former clients' litigation philosophy as well as methods and procedures for defending claims").

        During Kenyon's 17-year representation of Wyeth, the law firm has represented the company in many matters with a substantial amount of overlap with the subject matter at issue here. This extensive overlap also supports a finding that there is a substantial relationship between Kenyon's prior representations of Wyeth and this litigation. *See Madukwe*, 2008 WL 2020021 (counsel disqualified in part because it had represented the former client in the same types of actions, at times that overlapped with the time period at issue in the subsequent litigation); *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 141 F. Supp.2d 616, 622-23 (W.D.N.C. 2001) (counsel disqualified in part because of his extensive knowledge of a former client's intellectual property strategy, patents and internal operations); *see also Murphy v. Simmons*, 2008 WL 65174 at *15-16 (knowledge of a former client's "claims, litigation

philosophy, and methods and procedures for defending claims" can support disqualification of counsel).

In short, there plainly is a "substantial relationship" between Kenyon's prior representations of Wyeth and this litigation. Kenyon's 17-year "prior representation" of Wyeth "was broad in scope, encompassing within it representation . . . in . . . actions involving legal issues identical to those presented in" this case. *Madukwe*, 2008 WL 2020021 at *6; *see also Koch v. Koch Indus.*, 798 F. Supp. 1525, 1538 (D. Kan. 1992) ("length and breadth" of seven-year attorney-client relationship is a contributing factor in determining a substantial relationship between prior representations and current litigation). Kenyon should not be permitted to" switch to the other side of the table, to face off against their former client." *Madukwe*, 2008 WL 2020021 at * 7.

II.     WYETH WOULD BE IRREPARABLY PREJUDICED BY KENYON'S REPRESENTATION OF WATSON, AND THE HARM TO WATSON FROM KENYON'S DISQUALIFICATION WOULD BE RELATIVELY SLIGHT.

   A.     In the Absence of Disqualification, Wyeth Would Suffer Substantial Harm.

Without the disqualification of Kenyon from this case, Wyeth would be irreparably prejudiced. The confidences shared during the prosecution of the '878 application suffice by themselves to demonstrate irreparable prejudice if Kenyon (and Ms. Hulina) are not precluded from representing Watson. And there is far more.

Kenyon spent many years and thousands of hours representing Wyeth on women's health intellectual property issues. Furthermore, since 2001, no fewer than 30 lawyers at Kenyon have billed time to Wyeth matters. Of the Kenyon attorneys that have represented

Wyeth in the past, at least 22 still practice law at Kenyon.[7]    As a result, Kenyon still retains knowledge of the confidences shared during its representation of Wyeth, giving it the unfair advantage in this litigation of knowing in advance "what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject." *Webb v. E.I. du Pont de Nemours & Co.*, 811 F. Supp. 158, 162 (D. Del. 1992) (disqualifying counsel due to the unfair advantage counsel would have gained because of previous representations) (quotation omitted).

Accordingly, allowing Kenyon to represent Watson would put Wyeth at a marked and undeserved disadvantage. For that reason alone, Kenyon should be disqualified from representing Watson in this litigation. *See Colorpix Sys. of Am. v. Broan Mfg. Co.*, 131 F. Supp.2d 331, 339-40 (D. Conn. 2001) (disqualification is necessary where an attorney, working on the same kind of case against a former client, is in the position to use a former client's confidences and thus create an unfair disadvantage for the former client) (citing *Board of Education of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).

B.    At this Early Stage of the Case, Kenyon's Disqualification Would Cause Watson Relatively Little Harm.

The prejudice likely to be suffered by Wyeth resulting from Kenyon's representation of Watson far outweighs any harm Watson would suffer by Kenyon's

---

[7]    Those attorneys are: Zeba Ali; George Badenoch; Patrick Birde; Lawrence Casson; Robert Cerwinski; Joseph Coppola; Richard DeLucia; Anita Pamintuan Fusco; James Galbraith; Christopher Glynn; Kevin Godlewski; Elizabeth Holland; Stephen J. Lee; Michael Levy; C. Kyle Musgrove; Maria Luisa Palmese; Craig Puckett; Deborah Somerville; Aimee Soucie; Robert Vroom; King Wong; and Huiya Wu. (Manspeizer Decl. ¶ 3).

- 19 -

disqualification. Wyeth has submitted its motion promptly and early in the case – within just a few months of filing its initial complaint and learning that Kenyon was retained as counsel for Watson, and before the parties have engaged in meaningful discovery. Accordingly, there can be no credible argument that Wyeth is practicing gamesmanship or that the stage of this litigation is so far advanced that Watson would suffer great harm as a result of Kenyon's disqualification. *Cf., e.g., Express Scripts, Inc. v. Crawford*, 2007 WL 417193 (Del. Ch. 2007) (unreported case applying Delaware Rule 1.9 in denying motion to disqualify due, in part, to the late stage of the litigation and the movant's delay in seeking disqualification).

   **C.**  <u>A Screen Would Not Adequately Address the Conflict.</u>

   This Court has held that the screening of conflicted attorneys in a law firm (or the placing of those attorneys in a "cone of silence") may suffice to cure conflicts of interest arising out of Model Rules of Professional Conduct 1.9 and 1.10. *See, e.g., Nemours Found.*, 632 F. Supp. at 425-28. But those cases are inapposite and have no place here.

   In those cases, conflicts arose because of migrating lateral lawyers who brought a conflict from a previous representation into a new law firm or because of minor representations in which lawyers at a law firm did not extensively represent the parties moving to disqualify them. *See id.; see also Reliant Pharm., Inc. v. Par Pharm., Inc.*, 2008 WL 1826036 (D. Del. Apr. 23, 2008); *Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.*, 491 F. Supp.2d 510, 513 (D. Del. 2007). Here, by contrast, Wyeth moves for the disqualification of the same law firm that represented it for at least 17 years – and served as one of its most important outside patent firms. That law firm received a broad and deep mass of Wyeth's most sensitive and confidential information relating to its patents covering oral contraceptives, hormone replacement therapy and women's health products. And after 17 years, millions of dollars worth of billings, and

- 20 -

thousands of hours of work, that same law firm unilaterally severed its relationship with Wyeth just one year before the start of this litigation because the relationship was "not sufficiently profitable."

At least 22 Kenyon lawyers who represented Wyeth in the past still work at Kenyon. One of those attorneys, Kenyon partner C. Kyle Musgrove, represents Watson in this very case. Among the prior cases that Mr. Musgrove features in his biography on the Kenyon web site is his representation of Wyeth. [8] And like at least 21 other current Kenyon attorneys, Mr. Musgrove has represented Wyeth on patent matters in the recent past.

As Mr. Musgrove's representation of Wyeth illustrates, the ties between Wyeth and Kenyon were far too deep, far too broad, and far too long-standing for a screen to ensure the protection of Wyeth's confidences.

Moreover, unlike the conflicts at issue in *Nemours Foundation*, *Reliant Pharmaceuticals*, and *Talecris Biotherapeutics*, this conflict was of Kenyon's own making. Kenyon unilaterally chose to sever its relationship with Wyeth, and over Wyeth's objection. At most a year removed from that decision, Kenyon decided to switch sides and to represent Wyeth's adversary in this case. This conflict was not thrust upon Kenyon; it was one that Kenyon chose for itself. Accordingly, Kenyon should bear the burden of its own decision and be disqualified from representing a litigant adverse to its former client.

---

[8]    *See* http://www.kenyon.com/attorneys/bio.aspx?attid=320993405 (Ex. L) (citing to *Evans Med. Ltd. v. Am. Cyanamid Co.*, 215 F.3d 1347, 1999 WL 594310 (Fed. Cir. 1999) (unpublished), in which American Home Products was a defendant).

D.    Ms. Hulina Should Be Disqualified Because of Her
Involvement with the '878 Patent Application.

Ms. Hulina also gained insight into Wyeth's view on how to distinguish prior art substantially related to the prior art that may be at issue in this case.

Due to her prior representation of Wyeth, Ms. Hulina, and through her, Watson, has an unfair advantage in this litigation. *See Colorpix Sys.*, 131 F. Supp.2d at 339-40.   Ms. Hulina's work on prior substantial related matters irreparably infects any outside (and in-house) counsel with whom she works. Ms. Hulina also should be disqualified.

## CONCLUSION

Because of its long and extensive previous attorney-client relationship with Wyeth in a number of substantially related matters, and because the extreme prejudice to Wyeth of Kenyon's representation of Watson far outweighs any slight harm that could accrue to Watson resulting from Kenyon's disqualification at this early stage of litigation, Kenyon should be disqualified. For the same reasons, Amy Hulina also should be disqualified.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com
jparrett@mnat.com

*Attorneys for Plaintiff Wyeth*

OF COUNSEL:

Anthony Herman
Jeffrey B. Elikan
Eric R. Sonnenschein
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000

June 6, 2008
2357034

- 23 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 6, 2008 I electronically filed the foregoing with the

Clerk of the Court using CM/ECF, which will send notification of such filing to:

Richard K. Herrmann, Esquire
Mary B. Matterer, Esquire
MORRIS JAMES LLP

I further certify that I caused to be served copies of the foregoing document on

June 6, 2008 upon the following in the manner indicated:

Richard K. Herrmann, Esquire                    *VIA ELECTRONIC MAIL*
Mary B. Matterer, Esquire                        *and HAND DELIVERY*
MORRIS JAMES LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801

John W. Bateman, Esquire                        *VIA ELECTRONIC MAIL*
C. Kyle Musgrove, Esquire
Nicholas J. Nowak, Esquire
Thomas M. Huff, Esquire
KENYON & KENYON LLP
1500 K. Street, N.W.
Washington, DC 20005

/s/ *Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2008 I electronically filed the foregoing with the

Clerk of the Court using CM/ECF, which will send notification of such filing to:

> Richard K. Herrmann, Esquire
> Mary B. Matterer, Esquire
> MORRIS JAMES LLP

I further certify that I caused to be served copies of the foregoing document on

June 13, 2008 upon the following in the manner indicated:

Richard K. Herrmann, Esquire                                *VIA ELECTRONIC MAIL*
Mary B. Matterer, Esquire
MORRIS JAMES LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801

John W. Bateman, Esquire                                     *VIA ELECTRONIC MAIL*
C. Kyle Musgrove, Esquire
Nicholas J. Nowak, Esquire
Thomas M. Huff, Esquire
KENYON & KENYON LLP
1500 K. Street, N.W.
Washington, DC 20005

*/s/ Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)

Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WYETH,                                     )
                                           )
      Plaintiff,                         )
                                           )
      v.                                 )     Civil Action No. 08-145-JJF
                                           )
WATSON LABORATORIES, INC., and             )
WATSON PHARMACEUTICALS, INC.               )
                                           )
      Defendants.                        )


**DECLARATION OF DAVID A. MANSPEIZER**



I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.  Executed on June 6, 2008.

David A. Manspeizer

Exhibit 1

Kenyon & Kenyon LLP                                                    Page 1 of 3

---

## Cross, Anna

**From:** Duncan, Elizabeth [EDuncan@kenyon.com] on behalf of Kenyon & Kenyon [Newsletters@kenyon.com]

**Sent:** Tuesday, May 20, 2008 3:49 PM

**To:** Kenyon & Kenyon

**Subject:** Insignia



SPRING/SUMMER 2008

Upcoming Speaking Engagements & Events

Latest News at Kenyon

Learn More About Our Services

Register to Receive this Newsletter

Send Us Your Comments

Unsubscribe to this Newsletter

For inquires, contact:
Kerstin Isaacs
Marketing Manager
kisaacs@kenyon.com
212.908.6853

©2008 Kenyon & Kenyon LLP

**Welcome to the Spring/Summer edition of the Insignia newsletter.**

Insignia offers updates on current trademark news. Since our last edition, much has transpired at Kenyon. We were one of only four firms nominated for *Managing Intellectual Property's* "Full-Service IP Firm of the Year" award, and we ranked in the top 15% in *Minority Law Journal's* "Diversity Scorecard"; issue. One of our trademark partners, Michelle Mancino Marsh, was also selected as one of the best intellectual property attorneys in the United States under the age of 45, in *IP Law and Business* magazine's "Top 50 Under 45" list published this month. To read more about these stories and other recent firm news, please click here.

**HOT LICENSING ISSUES IN THE VIDEO GAME INDUSTRY**

By James E. Rosini, Michelle Mancino Marsh, and Mimi K. Rupp

The video game industry has come a long way from the days when *Pong* was played in wood paneled and shag carpeted rec rooms. Last year, the U.S. video gaming industry was almost a $13 billion industry, and by all indications, it continues to grow. U.S. computer and video game software sales were $7.4 billion last year – nearly tripling industry software sales since 1996. Both the industry and the games themselves are more sophisticated than anyone could have imagined in the early 1980s when *Asteroids* and *Space Invaders* ruled the arcade. With the amount of money at stake in 2007 and beyond, licensing in the video game industry is a crucial component to the industry's continued success.

MORE ➤

**AMERICAN EXPRESS GETS CREDIT FOR 'MY LIFE. MY CARD'**

By Howard J. Shire and David Silverstein

In American Express Co v Goetz (Case 06-2184, February 4 2008), the US Court of Appeals for the Second Circuit has affirmed a district court's decision finding that Stephen Goetz's use of the slogan 'My Life, My Card' did not confer any enforceable rights senior to American Express Co's MY LIFE, MY CARD trademark. The court's decision is notable not only because it underscores the distinctions between trademark and copyright law, but also because it provides a dramatic illustration of how the marketing copy of a supplier of intermediate goods and services does not constitute trademark use.
**MORE >**

### THE INTRICACIES INVOLVED IN CHOOSING A PHARMACEUTICAL TRADEMARK
By Dana R. Kaplan and Michael J. Freno

In addition to extensive research as to the chemical composition of a new pharmaceutical product, pharmaceutical companies often face another hurdle when it comes to naming their product. Pharmaceutical companies must consider not only what might be an attractive trademark for their product, but also how that mark fits with the chemical and generic names for the compounds in that product.
**MORE >**

### THE SECOND LIFE PTO: DO REAL-WORLD TRADEMARK OFFICES HAVE COMPETITION?
By Michelle Mancino Marsh and Mimi K. Rupp

Second Life (SL) is an online virtual world with more than 10 million members. It permits users to create online personas who can interact with one another and their environments. SL is owned and operated by a company called Linden Lab, which distinguishes itself from other virtual-world games by giving its members intellectual property rights to the content that they create in SL. SL members can create and sell virtual "goods and services" as diverse as home furnishings, cars, jewelry, tattoos, clothes and shoes. SL members who develop goods for use "in-world" are known as "content creators." In-game currency, called Linden dollars, is easily exchanged for actual legal tender. Therefore, not surprisingly, business within SL is booming. In 2006, SL-related transactions totaled more than US $20 million. See Alan Sipress, "Where Real Money Meets Virtual Reality, the Jury Is Still Out," *Washington Post*, Dec. 26, 2006, at A1.
**MORE >**

### U.S. CHAPTER – TRADEMARK LITIGATION
By Joseph F. Nicholson and Maria Luisa Palmese

The principal sources of law are both statutory and common law. In the US, there are two types of statutory law - federal laws enacted by the US Congress and state laws enacted by individual states. Trademark law is governed by both federal and state laws. Unlike patent and copyright law, trademark law is not expressly authorized

Kenyon & Kenyon LLP                                                      Page 3 of 3

in the US Constitution. Rather, the US Congress has federal power
over trademarks only indirectly through the broad Commerce Clause
in the Constitution, which grants the power to regulate commerce
with foreign nations, among the states, and with Native American
Tribes. The federal trademark laws are embodied in Title 15, Chapter
22 of the United States Code, originally passed as the Lanham Act in
1946. In addition to the federal laws which reach only foreign and
interstate commerce, most states have substantive trademark laws
for trademarks used within the state. Most state trademark laws are
construed in the same way as the corresponding federal trademark
laws. The federal laws of Title 15 also give certain rights to trademark
owners from countries who share membership with the US in
international trademark treaties or countries who otherwise
reciprocate trademark rights to the US. The most prominent of these
international trademark treaties is the Paris Convention treaty, which
has over 110 member countries.

MORE ➤

See important legal disclaimer

## Elikan, Jeffrey

**From:** Ryan Walsh [walshr2@wyeth.com]
**Sent:** Tuesday, May 20, 2008 4:40 PM
**To:** Elikan, Jeffrey; Herman, Tony; Zerhouni, William
**Subject:** Fwd: Kenyon & Kenyon Reception - June 3rd

>>> "Delk, Jonelle" <Jdelk@kenyon.com> 5/20/2008 11:23 AM >>>
As the RSVP deadline is approaching, we thought we'd send out a friendly reminder for our
reception on June 3rd celebrating our partner Anthony Giaccio becoming President of NYIPLA.
Please respond to this email letting us know if you are able to attend or not.  If you have any
questions, please don't hesitate to ask.

Thanks,

Jonelle Delk



**Jonelle D. Delk** | Senior Marketing Coordinator
**Kenyon & Kenyon LLP**
One Broadway | New York, NY 10004

6/6/2008

Direct 212.908.6314 | Fax 212.425.5288 | Cell 973.885.4162
jdelk@kenyon.com | **www.kenyon.com**

This message, including any attachments, may contain confidential, attorney-client privileged, attorney work product, or business confidential information, and is only for the use of the intended recipient(s). Any review, use or distribution by others is prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

6/6/2008

Exhibit 2



**Attorneys ∀**



## JAMES GALBRAITH
Partner | New York

James Galbraith has more than 30 years experience in intellectual property litigation, including trials and appeals of patent, trademark and trade secret misappropriation cases. Mr. Galbraith's litigation practice includes a variety of technical areas. In patent litigation he has represented polymer manufacturers in cases involving plastics and catalysts, manufacturers of pharmaceuticals, agricultural chemical producers, and producers of computer products and components, including Agilent Technologies, Alliant Techsystems, Applera, Aristech Chemical, Bristol-Myers Squibb, Colgate, Hercules, Hewlett-Packard, Novartis, Syngenta, Teva Pharmaceuticals and Wyeth. Mr. Galbraith also counsels clients on intellectual property issues, including validity and infringement of intellectual property rights, and the transfer of intellectual property.

Active in bar associations, Mr. Galbraith is a member of the American Bar Association, the New York Intellectual Property Law Association and the Association of the Bar of the City of New York. He has served on the Committee on Patents of the City Bar Association and has contributed to the Association's official publication. Mr. Galbraith is an active lecturer before bar associations and industry groups on a variety of topics related to intellectual property litigation, and is a co-author of *Patent Litigation*, published by the Practising Law Institute.

Mr. Galbraith has argued a number of appeals before the United States Court of Appeals for the Federal Circuit, including the following:

> * *J.P. Stevens & Co. v. Lex Tex Ltd.*, 887 F.2d 1047 (1984)
> * *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770 (1993)
> * *Ciba-Geigy Corp. v. Alza, Inc.*, 37 U.S.P.Q.2d 1337 (1995)
> * *Eli Lilly and Co. v. American Cyanamid Co.*, 82 F.3d 1568 (1996)
> * *Abbott Laboratories v. Geneva Pharmaceuticals, Inc.*, 104 F.3d 1305 (1997)
> * *Studiengesellschaft Kohle mbH v. Hercules, Incorporated*, 105 F.3d 629 (1997)
> * *Phillips Petroleum Co. v. Huntsman Chemical Co.*, 157 F.3d 866 (1998)
> * *Abbott Laboratories v. Geneva Pharmaceuticals, Inc.*, 182 F.3d 1315 (1999)
> * *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 347 F.3d 1367 (2003)
> * *In re Curtis*, 354 F.3d 1347 (2004)
> * *Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (2005)
> * *Sicom Systems, Ltd. v. Agilent Technologies, Inc.*, 427 F.3d 971 (2005)
> * *Abbott Laboratories v. Teva Pharmaceuticals USA, Inc.*, 452 F.3d 1331 (2006)
> * *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157 (2007)

Representative trial experience includes:

One Broadway
New York, NY 10004-1007
**Tel** 212.908.6317
**Fax** 212.425.5288
jgalbraith@kenyon.com

> ➤ Download V-Card

> ➤ Intellectual Property Litigation
> ➤ Patents
> ➤ Life Sciences

> ➤ Biotechnology and Pharmaceuticals
> ➤ Chemical and Materials
> ➤ Biomedical
> ➤ Electrical and Computer

J.D., with Honors, University of North Carolina, 1976
Editorial Board, *North Carolina Law Review*

M.A., Chemistry, Duke University, 1973

B.S., Chemistry, University of North Carolina at Chapel Hill, 1968

> ➤ View Events
> ➤ View Publications

> *Polaroid Corp. v. Eastman Kodak Co.* (D. Mass. 1981)
> *Phillips Petroleum Co. v. United States Steel Co.* (D. Del. 1986)
> *In re Certain Cefadroxil Monohydrate* (U.S. International Trade Comm'n 1990)
> *Bristol-Myers Squibb Co. v. Kalipharma, Inc.* (D.N.J. 1990)
> *Joy Technologies, Inc. v. Flakt, Inc.* (D. Del. 1992)
> *Miles, Inc. v. Cookson Pigments, Inc.* (Del. Chancery 1994)
> *Studiengesellschaft Kohle mbH v. Hercules, Incorporated* (D. Del. 1994);
> *Eli Lilly and Co. v. American Cyanamid Co.* (S.D. Ind. 1995)
> *AptarGroup, Inc. v. Summit Packaging Systems, Inc.* (N.D. Ill. 1997)
> *Cordant Technologies, Inc. v. Alliant Techsystems, Inc.* (D. Del. 1998).
> *Merck & Co. v. Teva Pharmaceuticals USA, Inc.* (D. Del. 2001)
> *Applera Corp. v. Micromass U.K. Ltd.* (D. Del. 2002)
> *Merck & Co. v. Teva Pharmaceuticals USA, Inc.* (D. Del. 2003)
> *SmithKline Beecham, Inc. v. Teva Pharmaceuticals USA, Inc.* (D.N.J. 2005)
> *Procter & Gamble Co. v. Teva Pharmaceuticals USA, Inc.* (D. Del. 2006)

**BAR AND COURT ADMISSIONS**
> New York
> Registered Patent Attorney: U.S. Patent and Trademark Office
> U.S. Court of Appeals for the Federal Circuit
> U.S. Court of Appeals for the Fifth Circuit
> U.S. Court of Federal Claims
> U.S. District Court for the Eastern District of New York
> U.S. District Court for the Southern District of New York
> U.S. District Court for the Western District of New York
> U.S. Supreme Court

**PROFESSIONAL ORGANIZATIONS**
The American Bar Association; the New York Intellectual Property Law Association; the Association of the Bar of the City of New York

Kenyon & Kenyon - Attorneys - Maria Luisa Palmese                                                Page 1 of 2



**Attorneys ∀**



## MARIA LUISA PALMESE
Partner | New York

Maria Luisa Palmese joined Kenyon & Kenyon in 1990. She focuses primarily on patent litigation, mainly in the chemical, pharmaceutical, and biological fields. Representative cases she has been involved in include:

» *Merck & Co. v. Teva Pharmaceutical U.S.A., Inc.* (D. Del. 2003) (osteoporosis medication)
» *De Simone v. Vesely* (D.D.C. 2002) (probiotics)
» *Merck & Co. v. Teva Pharmaceuticals USA, Inc.* (D. Del. 2001) (osteoporosis medication)
» *Revlon v. Estee Lauder* (S.D.N.Y. 2000) (cosmetic emulsions)
» *American Home Products v. Medeva Pharma* (D.Del.2000) (vaccine)
» *Cordant Technologies, Inc. v. Alliant Techsystems, Inc.* (D. Del. 1998) (rocket motor insulation)
» *Eli Lilly and Co. v. American Cyanamid Co.* (S.D. Ind. 1995) (antibiotic)
» *Hoechst v. Warner Lambert* (D. Del. 1993) (Alzheimer's disease medication)

Ms. Palmese also has extensive experience in patent prosecution in various fields, including pharmaceuticals, nutritional products, agricultural machinery, mosaic design, and roofing. In addition Ms. Palmese regularly counsels clients on validity, enforceability and infringement issues, as well as licensing and due diligence investigations. She also has a keen interest in the protection of trademarks and designs, and has counseled clients regarding trademark and design protection. Her thesis for her LLM degrees from Munich Intellectual Property center in Munich, Germany, is "Much Ado, Yet Nothing Done About Design Protection in the U.S.: Has The Time Finally Come for a U.S. Design Law?" Ms. Palmese is bilingual in English and Italian, and fluent in French and Spanish. As a result, Ms. Palmese's practice includes both U.S. and international clients, and a significant portion of her practice is directed to the representation of Italian companies with respect to their intellectual property issues in the United States.

### BAR AND COURT ADMISSIONS
» New York
» Registered Patent Attorney: U.S. Patent and Trademark Office
» U.S. Court of Appeals for the Federal Circuit
» U.S. District Court for the Southern District of New York

### LANGUAGES
» French
» Italian
» Spanish

### PROFESSIONAL ORGANIZATIONS
The Federal Circuit Bar Association; the International Intellectual Property Association; the International Association for the Protection of Intellectual Property; the International Bar Association and the European Trademark Owners Association "Marques

One Broadway
New York, NY 10004-1007
**Tel** 212.908.6444
**Fax** 212.425.5288
mpalmese@kenyon.com

» Download V-Card

» Patents
» Life Sciences
» Intellectual Property Litigation
» International Experience
» Trademarks
» Unfair Competition and Trade

» Biotechnology and Pharmaceuticals
» Chemical and Materials
» Biomedical

LL.M. IP, Munich Intellectual Property Law Center, 2004

J.D., Columbia University, 1990

S.B., Chemistry, Massachusetts Institute of Technology, 1987

S.B., Humanities and Science (French Language and Literature), Massachusetts Institute of Technology, 1987

» View Events
» View Publications

Kenyon & Kenyon - Attorneys - Maria Luisa Palmese                    Page 2 of 2



**Attorneys ▼**



### STEVEN J. LEE, PH.D.
Partner | New York

Dr. Lee had been practicing chemistry for eleven years when, in 1984 he exchanged a position of associate professor of Chemistry at Fordham University for a position as associate attorney at Cahill Gordon & Reindel in New York City, specializing in commercial litigation , mostly defending allegedly negligent accountants . In 1986 he joined Kenyon & Kenyon where he is now one of the senior members of the Chemical/Life Sciences practice group.

Dr. Lee's current practice covers all areas of pharmaceutical patents: litigation, interferences, counseling, prosecution. He has been involved in generic drug litigations from A to Z, involving generic versions of Allegra, Augmentin, Claritin, Gemzar, Hytrin, Neurontin, Oxycontin, Paxil, Procardia, Relafen, Sarafem, Seldane, Ticlid, Zantac and Zithromax; other pharmaceutical litigations involving Duracef, Kadian, Lovenox, Ortho-Cyclen and Xalatan; monoclonal antibodies for septic shock and against stem cells, machines for the synthesis of DNA, and transdermal drug delivery systems; as well as other chemical related litigations ranging from coatings for aluminium cans, paints for automobiles, and striped toothpaste. He also prosecutes patent applications in these areas, counsels inventors and patent owners on the scope and validity of their intellectual properties and advises clients introducing new products and services as to any potential for infringement of the patent rights of others. Typical clients include pharmaceutical companies, both generic and brand-name, biotechnology companies, and other chemical-related industries.

Dr. Lee is a frequent lecturer and author of many articles pertaining to intellectual property law and litigation. Some recent publications include an article in the Fordham Intellectual Property, Media & Entertainment Law Journal, Vol. XVII, number 4, pages 915-932 (2007) on the U.S. law of obviousness ; a chapter in the ABA's Patent Litigation Strategies Handbook on "Waxman-Hatch Litigation From the Perspective of the Generic Pharmaceutical Industry" (2005) and a chapter in BNA's International Pharmaceutical Law and Practice, 2nd Ed. (2005) on U.S. patent law.

Dr. Lee argued the following appeals before the United States Court of Appeals for the Federal Circuit Court:

*GlaxoSmithKline v. Impax* 365 F.3d 1348 *(Fed. Cir. 2004)*

*SmithKline Beecham Corp. v. Copley. et. al.* 154 F. Supp. 2d 157 *(D.Mass 2001), aff'd* 45 Fed. Appx. 915, 2002 U.S. App. LEXIS 16594 *(Fed. Cir. August 15, 2002)*

*Berman v. Housey* 291 F.3d 1345 (Fed. Cir. 2002)

*Purdue Pharma LP et ano. v. Faulding Inc.* 48 F.Supp.2d 420 (D. Del. 1999), *affirmed* 56 U.S.P.Q.2d 1481, 2000 WL 1582737 (Fed. Cir. 2000)

---

One Broadway
New York, NY 10004-1007
**Tel** 212.908.6305
**Fax** 212.425.5288
slee@kenyon.com

➤ Download V-Card

➤ Life Sciences
➤ Intellectual Property Litigation
➤ Patents

➤ Biotechnology and Pharmaceuticals
➤ Chemical and Materials

J.D., Fordham University, 1983
Law Review

Ph.D., Organic Chemistry, University of Rochester, 1973

A.B., Chemistry, Cornell University, 1969

➤ View Events
➤ View Publications

*Glaxo v. Geneva Pharmaceuticals et al., 45USPQ2D 1702* (D.N.J. 1997)

*Granutec Inc. v. Shalala 139F.3d. 889, 46USPQ2d 1398* (4th Cir. 1997)

Representative litigation experience includes:

*SmithKline Beecham v. Teva Pharmaceuticals (consolidated as In re '639 Litigation)* (D. Mass 2001)

*Johns Hopkins University, Baxter Intern. and Becton Dickinson v. CellPro 894 F. Supp. 819* (D. Del.); 160 F.R.D. 30, 34 USPQ2s 1276 (D. Del. 1995);
931 F. Supp. 303 (1996); 99 F3d. 1159, 1996 WL 597805 (Fed. Cir. 1996)

*In re Certain Diltiazem Hydrochloride and Diltiazem Preparations, Inv.* 337-TA-349, 1995 ITC LEXIS 253

*MMD v. American Cyanamid & Co.* 36 USPQ2d 1036 (D.N.J. 1994); 1994 U.S. Dist. LEXIS 11495 (D.N.J. 1994)

Other representative cases include:

*R-Tech Ueno v. Pharmacia* (D.D.C. 2000)

*Ortho v. Smith 959 F.2d 936* (Fed. Cir. 1992), affirming 18 USPQ2d 1977 (E.D.Pa. 1990)

*American Home Products v. Johnson & Johnson* 25 USPQ2d 1954 (1992); 22 USPQ2d 1561 (E.D.Pa 1991)

*Byron et al. v. Aronhime et al., Interference* 105,384

*Li et al. v. Singer et ano, Interference* 105,366

*Berman v. Housey, Interference* 104,347

**BAR AND COURT ADMISSIONS**
- New Jersey
- New York
- Registered Patent Attorney: U.S. Patent and Trademark Office
- U.S. Court of Appeals for the Federal Circuit
- U.S. Court of Appeals for the Fourth Circuit
- U.S. District Court for the District of New Jersey
- U.S. District Court for the Eastern District of New York
- U.S. District Court for the Southern District of New York
- U.S. Supreme Court



**Attorneys ▼**



## C. KYLE MUSGROVE
Partner | Washington, DC

Kyle Musgrove has been litigating intellectual property cases for over a decade. Patent litigation is the primary focus of his practice with an emphasis in the pharmaceutical, medical device, biological, and chemical arts. More particularly, Mr. Musgrove's practice over the last several years has involved pharmaceutical litigation related to the Hatch-Waxman Act. Mr. Musgrove has primarily represented the ANDA applicants in such proceedings. In addition to his Hatch-Waxman practice, he has also litigated cases in various fields including paper and pulp bleaching, optics, cervical collars, vaccines, medical devices and medical imaging, nutritional supplements and methods of drug delivery. Mr. Musgrove's practice includes the representation of both patentees and alleged infringers.

Mr. Musgrove's experience relates both to the presentation of a case at trial and all facets of litigation pre-trial (*e.g.* Markman Hearings or summary judgment arguments), and also includes appellate argument and briefing. He is also experienced in conducting interference proceedings before the United States Patent and Trademark Office.

Further aspects of Mr. Musgrove's practice include counseling clients regarding possible infringement or validity issues. Mr. Musgrove is also involved in managing patent prosecution portfolios for major international clients. He is experienced in transactional work relating to intellectual property such as the negotiation of license and settlement agreements.

Mr. Musgrove provides an annually updated chapter relating to the intersection of the Patent and Antitrust Laws for Aspen Publishing. He has previously been a co-editor of Unfair Competition and the ITC, a handbook on practice before the ITC in Section 337 investigations. Mr. Musgrove is also involved in many of the firm's *pro bono* initiatives.

Representative Appellate Work :

> - *Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.,* 468 F.3d 1366 (Fed. Cir. 2006) (argued) (Vacating finding of no anticipation after trial and remanding for further proceedings)
> - *On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GmbH,* 386 F.3d 1133 (Fed. Cir. 2004) (Affirming summary judgment dismissing state law claims for which damages of approximately $100 million dollars had been alleged against our clients)
> - *Geneva Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc. v. GlaxoSmithKline, PLC,* 349 F.3d 1373 (Fed. Cir. 2003) (Affirming invalidity of seven GSK patents in favor of client)
> - *Evans Medical Ltd. v. American Cyanamid Co.,* 215 F.3d 1347 (unpublished) (Affirming summary judgment of noninfringement on behalf of client)

Representative Trial Experience :

---

1500 K Street, NW
Washington, DC 20005-1257
Tel 202.220.4237
Fax 202.220.4201
cmusgrove@kenyon.com

> ➤ Download V-Card

> ➤ Intellectual Property Litigation
> ➤ Patents
> ➤ Trade Secrets
> ➤ Licensing and Transactions
> ➤ Life Sciences

> ➤ Biotechnology and Pharmaceuticals
> ➤ Chemical and Materials
> ➤ Mechanical Products and Processes
> ➤ Biomedical

J.D., University of North Carolina at Chapel Hill, *with honors,* 1995
Order of the Coif
*Journal of International Law & Commercial Regulation*
Holderness Moot Court Bench

B.S., Chemical Engineering, Tulane University, 1992
Omega Chi Epsilon Honor Society

> ➤ View Publications

> * *Pfizer, Inc. v. Synthon Holdings BV, et al.* (M.D.N.C. 2006)
> * *SmithKline Beecham Corp. v. Teva Pharmaceuticals USA, Inc.* (D.N.J. 2005)
> * *Teva Pharmaceuticals USA, Inc. v. GlaxoSmithKline, PLC* (E.D. Va. 2002)

Other Representative Matters:

> * *Abbott Laboratories v. Impax Laboratories, Inc.,* (D. Del. 2007) (Pending)
> * *Certain Endodontic Instruments, Inc.* No. 337-TA-610 (ITC 2007) (Pending)
> * *Alza Corp v. Andrx Pharmaceuticals, LLC,* (D. Del. 2005) (Pending)
> * *Abbott Laboratories, et al. v. Impax Laboratories, Inc.* (D. Del. 2003) (Infringement portion of case dismissed with prejudice; client's antitrust counterclaims pending)
> * *On-Line Technologies, Inc. v. Perkin-Elmer Corp, et al.* (D. Ct. 1999) (Settled favorably after partial summary judgment of invalidity granted on behalf of client)
> * *Air Liquide America v. P.H. Glatfelter* (M.D. Pa. 2004) (Settled favorably)
> * *Shire Laboratories Inc. v. Impax Laboratories, Inc.* (D. Del. 2003) (Settled)
> * *Philadelphia Cervical Collar v. Laerdal Medical Corp.* (D.N.J. 1999) (Settled favorably)
> * *Alcon Labs. v. Bausch & Lomb* (N.D. Tex. 1999) (Settled favorably after preliminary injunction was granted on behalf of client)
> * *Petrides v. Marshall* (interference) (Settled with award of priority to client)
> * *Eckhardt, et al. v. Novotny, et al.* (interference) (Settled)
> * *Allen v. Leibinger* (interference) (Other parties issued claims held unpatentable)

**BAR AND COURT ADMISSIONS**
> * District of Columbia
> * New York
> * Registered Patent Attorney: U.S. Patent and Trademark Office
> * U.S. Court of Appeals for the Federal Circuit
> * U.S. District Court for the District of Columbia

**PROFESSIONAL ORGANIZATIONS**
The American Bar Association, Sections on Intellectual Property Law and Litigation, ITC Trial Lawyers Association, the New York State Bar Association and the District of Columbia Bar Association

# EXHIBIT B

## FULLY REDACTED

# EXHIBIT C

## FULLY REDACTED

# EXHIBIT D

## FULLY REDACTED

Exhibit E

02/01/08  11:43 FAX 4848658480                    KEVIN BRADY                                      ☒002



CONFIDENTIAL

January 28, 2008

<u>Via Certified Mail, Return Receipt Requested</u>

Chief Executive Officer                    Chief Executive Officer
Wyeth Pharmaceuticals                      Wyeth Pharmaceuticals
500 Arcola Road                            5 Giralda Farms
Collegeville, PA 19426                     Madison, New Jersey 07940

Re:    Notification of Certification of Invalidity, Unenforceability and/or
       Non-infringement for U.S. Patent No. 6,500,814 Pursuant to
       Section 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act

Dear Madam or Sir:

        Pursuant to Section 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act
and 21 C.F.R. § 314.95, we hereby provide notice of the following information to Wyeth
Pharmaceuticals (hereinafter, "Wyeth"), as both holder of approved New Drug Application
("NDA") No. 21-864 for Lybrel® (levonorgestrel and ethinyl estradiol tablets, 0.09 mg/0.02 mg)
tablets, according to the records of the U.S. Food and Drug Administration ("FDA") and owner
of U.S. Patent No. 6,500,814 ("the '814 patent"), according to the records of the U.S. Patent and
Trademark Office ("PTO").

        1.      Pursuant to 21 U.S.C. § 355(j)(2)(B)(iv)(I) and 21 C.F.R. § 314.95(c)(1),
we advise you that FDA has received an Abbreviated New Drug Application ("ANDA") from
Watson for levonorgestrel and ethinyl estradiol tablets, 0.09 mg/0.02 mg.  The ANDA contains
the required bioavailability and/or bioequivalence data from studies on the levonorgestrel and
ethinyl estradiol drug product that is the subject of the ANDA.  The ANDA was submitted under
21 U.S.C. § 355(j)(1) and (2)(A), with a paragraph IV certification to obtain approval to engage
in the commercial manufacture, use or sale of levonorgestrel and ethinyl estradiol tablets, 0.09
mg/0.02 mg, before the expiration of the '814 patent, which is listed in the Patent and
Exclusivity Information Addendum of FDA's publication, *Approved Drug Products with
Therapeutic Equivalence Evaluations* (commonly known as "the Orange Book").

Wyeth Pharmaceuticals
January 28, 2008
Page 2 of 5

II.     Pursuant to 21 C.F.R. § 314.95(c)(2), we advise you that FDA has assigned Watson's ANDA the number 79-218.

III.    Pursuant to 21 C.F.R. § 314.95(c)(3), we advise you that the established name of the drug product that is the subject of Watson's ANDA No. 79-218 is levonorgestrel and ethinyl estradiol tablets, 0.09 mg/0.02 mg.

IV.     Pursuant to 21 C.F.R. § 314.95(c)(4), we advise you that the active ingredients in the proposed drug product are levonorgestrel and ethinyl estradiol; the strength of the proposed drug product is 0.09 mg levonorgestrel and 0.02 mg ethinyl estradiol; and the dosage form of the proposed drug product is a tablet.

V.      Pursuant to 21 C.F.R. § 314.95(c)(5), we advise you that the patent alleged to be invalid, unenforceable and/or not infringed in the paragraph IV certification is the '814 patent, which is listed in the Orange Book in connection with Wyeth's approved NDA No. 21-864 for Lybrel® (levonorgestrel and ethinyl estradiol tablets, 0.09 mg/0.02 mg). According to information provided by Wyeth to FDA that is published in the Orange Book, the '814 patent is set to expire on or about September 3, 2018. No pediatric exclusivity is listed.

VI.     Watson alleges, and has certified to FDA, that in Watson's opinion and to the best of its knowledge, the '814 patent is invalid, unenforceable and/or will not be infringed by the commercial manufacture, use or sale of the drug product described in Watson's ANDA. Therefore, pursuant to 21 U.S.C. § 355(j)(2)(B)(iv)(II) and 21 C.F.R. § 314.95(c)(6), Watson's detailed statement of the legal and factual basis for the paragraph IV certification set forth in Watson's ANDA is attached hereto and made a part hereof.

VII.    Pursuant to 21 U.S.C. § 355(j)(5)(C), this notice letter includes an Offer of Confidential Access to Application. As required by § 355(j)(5)(C)(i)(III), Watson offers to provide confidential access to certain information from its ANDA No. 79-218 for the sole and exclusive purpose of determining whether an infringement action referred to in § 355(j)(5)(B)(iii) can be brought.

Section 355(j)(5)(C)(i)(III) allows Watson to impose restrictions "as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information." That provision also grants Watson the right to redact its ANDA in response to a request for Confidential Access under this offer.

Wyeth Pharmaceuticals
January 28, 2008
Page 3 of 5

As permitted by statute, Watson imposes the following terms and restrictions on its Offer of Confidential Access:

## OFFER OF CONFIDENTIAL ACCESS TO
## WATSON LABORATORIES, INC.'S ANDA NO. 79-218

(1)     Watson will permit confidential access to certain information from its proprietary ANDA No. 79-218 to attorneys from one outside law firm representing Wyeth, provided, however, that such attorneys do not engage, formally or informally, in any patent prosecution for Wyeth or any FDA counseling, litigation or other work before or involving FDA. As appropriate, such information (hereinafter, "Confidential Watson Information") shall be marked with the legend "CONFIDENTIAL."

(2)     The attorneys from the outside law firm representing Wyeth shall not disclose any Confidential Watson Information to any other person or entity, including Wyeth employees, outside scientific consultants, and/or other outside counsel retained by Wyeth, without the prior written consent of Watson.

(3)     As provided by § 355(j)(5)(C)(i)(III), Wyeth's outside law firm shall make use of the Confidential Watson Information for the sole and exclusive purpose of determining whether an action referred to in § 355(j)(5)(B)(iii) can be brought and for no other purpose. By way of example only, the Confidential Watson Information shall not be used to prepare or prosecute any future or pending patent application by Wyeth, in connection with any filing to, or communication with, FDA relating to Watson's ANDA No. 79-218, or in connection with any filing to, or communication with, the United States Pharmacopeia or any similar organization. Wyeth's outside law firm agrees to take all measures necessary to prevent unauthorized disclosure or use of the Confidential Watson Information, and that all Confidential Watson Information shall be kept confidential and not disclosed in any manner inconsistent with this Offer of Confidential Access.

(4)     The Confidential Watson Information disclosed is, and remains, the property of Watson. By providing the Confidential Watson Information, Watson does not grant Wyeth and/or its outside law firm any interest in or license for the Confidential Watson Information.

Watson Pharmaceuticals          311 Bonnie Circle, Corona, CA 92880-2882   T 951.493.5300   www.watson.com

02/01/08  11:44  FAX 4848856480          KEVIN BRADY                    ☑005

Wyeth Pharmaceuticals
January 28, 2008
Page 4 of 5

(5)    Wyeth's outside law firm shall, within thirty-five (35) days from the date that it first receives the Confidential Watson Information, return to Watson all Confidential Watson Information and any copies thereof.  Wyeth's outside law firm shall return all Confidential Watson Information to Watson before any infringement suit is filed by Wyeth, if suit is commenced before this 35-day period expires.  In the event that Wyeth opts to file suit, none of the information contained in or obtained from any Confidential Watson Information that Watson provides shall be included in any publicly-available complaint or other pleading.

(6)    Nothing in this Offer of Confidential Access shall be construed as an admission by Watson regarding the validity, enforceability, and/or infringement of any U.S. patent.  Further, nothing herein shall be construed as an agreement or admission by Watson with respect to the competency, relevance, or materiality of any such Confidential Watson Information, document, or thing.  The fact that Watson provides Confidential Watson Information upon request of Wyeth shall not be construed as an admission by Watson that such Confidential Watson Information is relevant to the disposition of any issue relating to any alleged infringement of any patent, or to the validity or enforceability of any patent.

(7)    The attorneys from Wyeth's outside law firm shall acknowledge in writing their receipt of a copy of these terms and restrictions prior to production of any Confidential Watson Information.  Such written acknowledgement shall be provided to Watson.

(8)    This Offer of Confidential Access shall be governed by the laws of the State of California.

Section 355(j)(5)(C)(i)(III) provides that any request for access that Wyeth makes under this Offer of Confidential Access "shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and disposition of any information accessed, contained in [this] offer of confidential access" and that the "restrictions and other terms of [this] offer of confidential access shall be considered terms of an enforceable contract."  Thus, to the extent that Wyeth requests access to Confidential Watson Information, it necessarily accepts the terms and restrictions outlined above.  Written notice requesting access under this Offer of Confidential Access should be made to:

02/01/08  11:44 FAX 4848656480          KEVIN BRADY                    @006

Wyeth Pharmaceuticals
January 28, 2008
Page 5 of 5

Amy Hulina
Vice President, Intellectual Property and Patent Counsel
Watson Pharmaceuticals, Inc.
311 Bonnie Circle
Corona, CA 92880
(951) 493-5956
ahulina@watson.com

By providing this Offer of Confidential Access to Application, Watson maintains the right and ability to bring and maintain a Declaratory Judgment action under 28 U.S.C. § 2201 et seq., pursuant to 21 U.S.C. § 355(j)(5)(C).

Sincerely,

Ernest Lengle, Ph.D.
Executive Director
Regulatory Affairs
Watson Laboratories, Inc.

Enclosure:  Watson Laboratories, Inc.'s Confidential Detailed Factual and Legal Bases for
            Watson's Paragraph IV Certification that U.S. Patent No. 6,500,814 Is Invalid,
            Unenforceable and/or Will Not Be Infringed.

02/01/08  11:44  FAX 4846656480              KEVIN BRADY                                    ☑ 007

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

Pursuant to Section 505(j)(2)(B)(iv)(II) of the Federal Food, Drug, and Cosmetic
Act and 21 C.F.R. § 314.95(c)(6), this document is the detailed factual and legal basis
for the paragraph IV certification of Watson Laboratories, Inc. ("Watson") that, in its
opinion and to the best of its knowledge, U.S. Patent No. 6,500,814 ("the '814 patent")
is invalid, unenforceable and/or will not be infringed by the commercial manufacture,
use, sale, offer for sale or importation of the drug product described in Watson's ANDA
No. 79-218. Watson reserves all rights to raise any additional defenses relating to
invalidity, unenforceability, and non-infringement should litigation ensue.

All claims in the '814 patent (i.e., Claims 1-3) are invalid under 35 U.S.C. § 103
as being obvious in view of the prior art, as well as invalid under 35 U.S.C. § 112, for
lack of written description for administration over a "period of greater than 110 days."

The detailed basis for our opinion follows.

I.    **BACKGROUND**

      A.    LYBREL® (90 µG LEVONORGESTREL AND
            20 µG ETHINYL ESTRADIOL TABLETS)

      LYBREL® is a monophasic oral contraceptive consisting of 28 active pills, each
containing 0.09 mg levonorgestrel and 0.02 mg ethinyl estradiol.  This product is to be
taken daily, 365 days a year, without a placebo phase or pill-free interval.

      This product is marketed in the United States by Wyeth Pharmaceuticals, Inc.
This product was granted FDA approval on May 22, 2007 and is indicated for use in the
prevention of pregnancy.

      Levonorgestrel is a progestogen, which is a white, odorless crystalline powder.
Chemically, levonorgestrel is (-)-13β-ethyl-17β-hydroxy-18,19-dinor-17α-pregn-4-en-
20-yn-3 and has the following chemical structure:



      Ethinyl estradiol is an estrogen, which is a white to creamy white, odorless,
crystalline powder.  Chemically, ethinyl estradiol is 19-nor-17α-pregna-1,3,5(10)-trien-
20-yne-3,17-diol and has the following chemical structure:

02/01/08   11:35 FAX 4848858480          KEVIN BRADY                                    ☒008

## WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,844 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED

### B.    WATSON'S ANDA PRODUCT

Watson's generic version of 0.090 mg levonorgestrel and 0.02 mg ethinyl estradiol tablets will be marketed for the same indications as the reference drug, LYBREL® and with a substantially identical label. Like the LYBREL® label, the label indication for Watson's generic version of levonorgestrel and ethinyl estradiol tablets will be for "the prevention of pregnancy in women who elect to use oral contraceptives as a method of contraception."

## II.    LEGAL STANDARDS

### A.    OBVIOUSNESS

A claim is invalid if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103(a).

The consistent criterion of determination of obviousness is whether the prior art would have suggested to one of ordinary skill in the art that this process should be carried out and would have a reasonable likelihood of success, viewed in light of the prior art.

*Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1124 (Fed. Cir. 2000). These three prongs of the criterion for obviousness are sometimes referred to as "suggestion or teaching in the prior art," "motivation," and "reasonable expectation of success." This inquiry is a question of law based on factual inquiries.

[u]nder § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

02/01/08  11:45 FAX 4848656480          KEVIN BRADY                    Ø009

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

*Graham*, 383 U.S. at 17-18; *KSR Int'l Co. v. Teleflex, Inc.*, No. 04-1350 (2007); *see also Ruiz v. AB Chance Co.*, 234 F.3d 654, 663 (Fed. Cir. 2000) ("Our precedent clearly establishes that the district court must make *Graham* findings before invalidating a patent for obviousness."); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000). Thus, *Graham* sets out a four-part inquiry comprising not only the three elements of the primary consideration of obviousness (scope and content of the prior art, differences between the prior art and the claims at issue, and level of ordinary skill in the pertinent art), but also evidence of secondary considerations when such evidence is present. *Ruiz*, 234 F.3d at 663; *SIBIA*, 225 F.3d at 1356.

A claim may be proven obvious in view of a single prior art reference, or in view of a combination of prior art references. When the prior art references are combined to invalidate a claim under 35 U.S.C. § 103, there must be some teaching in the prior art that would motivate a person having ordinary skill in the art to do so, but that teaching need not be expressly stated in one or all of the references used to show obviousness. *See KSR*, No. 04-1350, slip op. at 14. Motivation "may flow from the prior art references themselves, the knowledge of one of ordinary skill in the art, or, in some cases, from the nature of the problem to be solved." *Ruiz*, 234 F.3d at 665; *Brown & Williamson*, 229 F.3d at 1125.

One of ordinary skill is not bound to use prior art elements for the reasons taught in the prior art. *KSR*, No. 04-1350, slip op. at 16. The problem itself may provide the motivation to combine where there is a design need or market pressure. *Id.*

[When] there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reasons to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance, the fact that a combination was obvious to try might show that it was obvious under section §103.

*See id.* at 17. The person of ordinary skill in the art can be creative and "be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 16-17. There need not be an explicit statement in the prior that suggests combining the references in the particular way claimed, i.e. a clear teaching, suggestion or motivation in the prior art to combine. *KSR*, No. 04-1350, slip op. at 11. "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 17.

Finally, it must also be shown that there existed a reasonable expectation of success in making the necessary combination or modification. However,

[o]bviousness does not require absolute predictability of success. Indeed, for many inventions that seem quite obvious, there is no absolute predictability of success until the invention is reduced to practice. There is always at least a possibility of unexpected results, that would then provide

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

an objective basis for showing that the invention, although apparently
obvious, was in law nonobvious. For obviousness under § 103, all that is
required is a reasonable expectation of success.

*In re O'Farrell*, 853 F.2d 894, 903-4 (Fed. Cir. 1988) (citations omitted).

**a.    LEVEL OF SKILL IN THE ART**

The hypothetical person of ordinary skill in the art is a person who is not
extraordinarily innovative, nor a researcher of inexhaustible patience, but is a person
who thinks conventionally in matters affecting the art in which he or she is skilled.
*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985); *accord Life
Techs., Inc. v. Clontech Lab., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000). Ordinary skill
means at least the ability to understand the technology and make modest adaptations
or advances. *See, e.g., In re Mahurkar Patent Lit.*, 831 F.Supp. 1354, 1374 (N.D. Ill.
1993), *aff'd*, 71 F.2d 1573 (Fed. Cir. 1995). "Factors that may be considered in
determining level of ordinary skill in the art include: (1) the types of problems
encountered in the art; (2) the prior art solutions to those problems; (3) the rapidity with
which innovations are made; (4) the sophistication of the technology; and (5)
educational level of active workers in the field." *Ruiz*, 234 F.3d at 666-67 (Fed. Cir.
2000). Typically, courts also credit the hypothetical person of ordinary skill in the art
with several years of experience. *See, e.g., E.I. DuPont de Nemours & Co. v.
Monsanto*, 903 F.Supp. 680, 751 (D. Del. 1995), *aff'd*, 92 F.3d 1208 (Fed. Cir. 1996);
*WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1357-58 (Fed. Cir. 1999) (level
of ordinary skill stipulated by parties). The hypothetical person of ordinary skill in the art
is assumed to be aware of all pertinent prior art. *Custom Accessories, Inc. v. Jeffrey
Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

**b.    SCOPE AND CONTENT OF THE PRIOR ART**

As a preliminary matter the scope of the prior art must be considered. "Before
answering *Graham's* content inquiry, it must be known whether a patent or publication
is in the prior art under 35 U.S.C. § 102." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d
1561, 1568 (Fed Cir. 1987), *cert. denied*, 481 U.S. 1052 (1987). Any disclosure that
qualifies as prior art under § 102 can be used in support of a rejection under § 103
including a prior sale or public use that qualifies as prior art under § 102(b). *See In re
Kaslow*, 707 F.2d 1366, 1374 (Fed. Cir. 1983), *Ex parte Andresen*, 212 U.S.P.Q. 100,
102 (B.P.A.I. 1981). Relevant prior art is that which is within the field of endeavor of the
inventor, or that is reasonably pertinent to the particular problem being addressed by
the inventor. *In re Dillon*, 919 F.2d at 694. In addition, a party's admissions can create
valid prior art. *See, e.g., Riverwood Int'l Corp.*, 324 F.3d at 1354; *Constant* 848 F.2d at
1570 ("A statement in a patent that something was in the prior is binding on the
applicant and patentee for determination of anticipation and obviousness.").

02/01/08  11:46 FAX 4848856480          KEVIN BRADY                        ☒011

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

### c.    DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMED INVENTION

The differences between the prior art and the claimed invention must be ascertained in order to define those aspects of the claimed subject matter as a whole as to which the determination of obviousness or nonobviousness must be made. *Graham*, 383 U.S. at 22-23; *see also Brown & Williamson*, 229 F.3d at 1126 ("The question thus before us is whether one skilled in the art of cigarette design would have recognized at the time of the Luke invention that a reduction in circumference of the thinnest cigarette then on the market would yield a cigarette which burns tobacco more efficiently ...")

### d.    OBJECTIVE INDICIA OF NON-OBVIOUSNESS

A court must consider any objective indicia (also called "secondary considerations") of non-obviousness, when present, as they may often be the most probative evidence in the record. *Ruiz*, 234 F.3d at 667; *Rockwell Int'l Corp. v. U.S.*, 147 F.3d 1358, 1366 (Fed. Cir. 1998). Such secondary considerations include commercial success of the invention, whether the invention solved a long felt but unresolved need in the art, copying of the invention by others in the field, initial expressions of disbelief by experts in the field, and failure of others to solve the problem that the inventor solved. *See Graham*, 383 U.S. at 17-18; *Brown & Williamson*, 229 F.3d at 1129. However, for such secondary considerations to be given substantial weight, a nexus must be established between the merits of the claimed invention and the alleged objective indicium of non-obviousness. *See, e.g., In re GPAC, Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995); *SIBIA Neurosciences Inc.*, 225 F.3d at 1358. The patentee bears the burden of establishing a prima facie case of such a nexus. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). Evidence of objective indicia of non-obviousness must be commensurate in scope with the claimed invention. *See, e.g., In re Hiniker Co.*, 150 F.3d 1362, 1368-69 (Fed. Cir. 1998); *see also Sandt Tech., Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1355 (Fed. Cir. 2001).

The objective indicia of non-obviousness, however, do not control the analysis when there is an otherwise strong case of obviousness, such as one based upon art not considered by the USPTO during prosecution. *See Sandt*, 264 F.3d at 1355 ("We see no error in the district court's conclusion . . . that the secondary considerations cannot overcome the strong prima facie evidence of obviousness presented."); *Brown & Williamson*, 229 F.3d at 1131.

### B.    WRITTEN DESCRIPTION

35 U.S.C. § 112, first paragraph, states:

The specification shall contain a *written description of the invention*, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

which it pertains, or with which it is most nearly connected, to make and
use the same, and shall set forth the best mode contemplated by the
inventor of carrying out his invention.

(Emphasis added).

The written description of the invention may support claims not limited to the
disclosed preferred embodiments. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d
1473, 1479 (Fed. Cir. 1998). However, claims directed to a "distinct invention from that
disclosed in the specification" are not supported by a written description in compliance
with § 112, first paragraph. *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572
(Fed. Cir. 1997). Thus, within the constraints imposed by the prior art, an applicant is
entitled to claims *as broad but no broader than his disclosure will allow*. *Gentry
Gallery*, 134 F.3d at 1480 (citing *In re Rasmussen*, 650 F.2d 1212, 1214 (CCPA 1981)).

To satisfy the written description requirement of 35 U.S.C. §112, first paragraph,
"the applicant must describe the subject matter of the [claim] in terms that establish that
he was in possession of the later-claimed invention, including *all of the elements and
limitations presented in the [later claim]*" at the time of filing. *Hyatt v. Boone*, 146
F.3d 1348, 1353 (Fed. Cir. 1998) (emphasis added). The specification *must
"unambiguously" describe all of the limitations of the claim. Id.* (emphasis added).
The policy behind this requirement is to prevent overreaching and *post hoc* claims that
were not part of the original invention:

Adequate description of the invention guards against the inventor's
overreaching by insisting that he recount his invention in such detail that
his future claims can be determined to be encompassed within his original
creation.

*Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 65 (Fed. Cir. 1991) (citing *Rengo Co. v.
Molins Mach. Co.*, 657 F.2d 535, 551 (3d Cir.), *cert. denied*, 454 U.S. 1055 (1981)).
*See also, Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320 (Fed. Cir. 2000), citing
*Waldemar Link GmbH & Co. v. Osteonics Corp.*, 32 F.3d 556, 558, 31 USPQ2d 1855,
1857 (Fed. Cir. 1994) ("Put another way, one skilled in the art, reading the original
disclosure, must 'immediately discern the limitation at issue' in the claims.").

"Although the exact terms need not be used *in haec verba*, . . . . *the
specification must contain an equivalent description* of the [later] claimed subject
matter." *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 72 (Fed. Cir. 1997)
(emphasis added); *see also, Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320 (Fed.
Cir. 2000). In determining whether the written description requirement has been
satisfied, the specification as a whole must be considered. *In re Wright*, 866 F.2d 422
(Fed. Cir. 1989).

02/01/08  11:47 FAX 4848558480          KEVIN BRADY                              ☑013

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

"While the meaning of terms, phrases, or diagrams in a disclosure is to be explained or interpreted from the vantage point of one skilled in the art, *all the limitations must appear in the specification*." *Id.* (emphasis added). Hence, "[o]ne shows that one is 'in possession' of *the invention*, by describing *the invention*, with all its claimed limitations, not that which makes it obvious." *Lockwood*, 107 F.3d at 1572. "The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification." *Id.*

Furthermore, the written description requirement is separate and distinct from the enablement requirement also found in §112, first paragraph. *Vas-Cath Inc.*, 935 F.2d at 1563. "The purpose of the 'written description' requirement is broader than to merely explain how to 'make and use'; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Id.* at 1563, 64. "[I]t is possible for a specification to *enable* the practice of an invention as broadly as it is claimed, and still not *describe* that invention." *Id.* at 1562 (citing *In re DiLeone*, 436 F.2d 1404, 1405 (CCPA 1971)). *See also, Application of Blaser*, 556 F.2d 534, 538 (CCPA 1977) ("[E]nablement and obviousness are not the issues; description of the invention is.")

III.    ANALYSIS OF U.S. PATENT NO. 6,500,814

A.    INTRODUCTION

United States Patent No. 6,500,814 ("the '814 patent"), entitled "HORMONAL CONTRACEPTIVE", issued on December 31, 2002 from Application Serial No. 09/508,648 that was filed on June 5, 2000.

B.    CLAIMS AND SPECIFICATION

The '814 patent contains 3 claims, which are reproduced below:

1. A method for hormonal contraception, comprising:

administering orally, transdermally or via depot to a mammal in need thereof,

for a continuous and uninterrupted administration period of greater than 110 days,

a contraceptive product comprising:

a gestagen selected from the group consisting of progesterone, chlormadinone acetate, norethisterone acetate, cyproterone acetate, desogestrel, and levonorgestrel, and

## WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED

an estrogen selected from the group consisting of ethinyl estradiol, mestranol, estradiol, estriol, estrone, and estrane;

wherein said gestagen and said estrogen are present in said contraceptive product at unchanged dosages throughout the administration period, and

when said estrogen is ethinyl estradiol, the dosage of ethinyl estradiol is not greater than 20 µg per day.

2. The method of hormonal contraception of claim 1 wherein the dosage of ethinyl estradiol is between 1 and 20 µg per day.

3. A method for continuous suppression of the menstrual cycle, comprising:

administering orally, transdermally or via depot to a mammal in need thereof,

for a continuous and uninterrupted administration period of greater than 110 days,

a contraceptive product comprising:

a gestagen selected from the group consisting of progesterone, chlormadinone acetate, northisterone acetate, cyproterone acetate, desogestrel, and levonorgestrel; and

an estrogen selected from the group consisting of ethinyl estradiol, mestranol, estradiol, estriol, estrone, and estrane;

wherein said gestagen and said estrogen are present in said contraceptive product at unchanged dosages throughout the administration period, and

wherein the dosage of ethinyl estradiol is not greater than 20 µg per day,

such that the menstrual cycle is continuously suppressed throughout the administration period.

The specification of the '814 patent notes that traditionally, oral contraceptive products included a pill-free or hormone-free week, during which a withdrawal bleed would occur. *See* column 1, lines 10-36. In contrast, the Applicant's invention was said to be directed to a hormonal contraceptive product and method of use, for continuous, combined administration comprising a first hormonal component comprising at least one gestagen and a second hormonal component of comprising at least one estrogen." *See* column 2, lines 6-15. This product is said to be used for inhibiting ovulation and the treatment and/or prophylaxis of breast tumors. *See* column 2, lines 16-20.

## WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED

The continuous administration of combination hormone products by postmenopausal women to alleviate symptoms of aging such as osteoporosis were distinguished by the Applicant as being "unsuitable for ovulation inhibition." See column 1, lines 36-50.

The Applicant asserted that high contraceptive reliability can be achieved using their invention, for example, at column 3, lines 7-12.

The invention is based on the surprising finding that as a result of the continuous, combined administration of a product comprising two hormonal components, namely a first hormonal component comprising at least one gestagen and a second hormonal component comprising at least one estrogen, a high contraceptive reliability can be achieved.

The Applicant further stated that the claimed product provides contraception and inhibition of ovulation at very low doses of ethinyl estradiol. In particular, the Applicant stated at column 4, lines 26-26-48:

It has surprisingly also been found that on administering the product according to the invention there is a reliable continuous suppression of the menstrual cycle and menstruation in the case of a very low dosage. Without wishing to be bound by this explanation, the combination of the two indicated hormonal components and, in particular the low estrogen dosage would appear to be suitable for eliminating the otherwise conventional side effects of ethinyl estradiol and to drop below the administrations of more than 15 µg of ethinyl estradiol otherwise considered typically necessary in prior art contraceptives.

The low dosage of the two hormonal components and in particular the estrogen component is made possible by the additive action of the two hormonal components, without there being any limitation to the action of the product according to the invention with respect to its contraceptive and ovulation-inhibition properties.

The ovulation inhibition and menstrual cycle suppression reliably ensured by the product according to the invention is of great significance for certain patients, such as e.g. for top sports women, dancers and business women, who wish to exclude any reduction in their physical, intellectual and emotional efficiency as a result of the menstrual cycle....

## C.     FILE HISTORY

The claims that were initially examined were drawn to merely a "product for hormonal contraception" having at least one gestagen and at least one estrogen, either

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,600,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

present in amounts effective to suppress the menstrual cycle (*i.e.*, claim 22 as presented during prosecution) or for continuous administration (*i.e.*, claim 35 as presented during prosecution). The estrogens and gestagens were known compounds which were known for use in oral contraceptives.

In order to overcome prior art references such as EP 309263 ("*Casper*"), U.S. Patent No. 4,855,305 ("*Cohen*") and U.S. Patent No. 5,418,228 ("*Bennink*"), the claims were initially amended to exclude multiphasic oral contraceptive dosing regimes (*i.e.*, the claims were amended to recite "wherein said amount is unchanged throughout the menstrual cycle") and products having placebo or a hormone free interval (*i.e.*, the claims recited "continuous administration" or "continuous suppression of the menstrual cycle").

Next, the claims were rejected over U.S. Patent No. 5,898,032 ("*Hodgen*"), which taught monophasic administration of low-dose oral contraceptive pills for a "continuous" period of 60–110 consecutive days. In response, the Applicants adopted the "administration period of greater than 110 days" limitation into the claims to distinguish over *Hodgen*. The Examiner withdrew the anticipation rejection over *Hodgen* and the obviousness rejection based on *Cohen* in view of *Hodgen*, and issued a Notice of Allowance, stating that "Applicant argued the prior art does not teach a continuous and uninterrupted administration period of greater than 110 days."

D.    **THE SCOPE AND CONTENT OF THE PRIOR ART**

1.    **Prior Art Relating To Extended Oral Contraceptive Regimes**

a.    *SZAREWSKI*

Anne Szarewski and John Guillebaud, Contraception: A User's Handbook, Oxford University Press, Great Britain, 1994 ("*Szarewski*") discloses that continuous administration of oral contraceptives, without a break, can be useful to treat symptoms of endometriosis or epilepsy. Szarewski teaches that the progestogen-dominant brands of pills include: Loestrin 30 (30 mcg ethinyloestradiol, 1.5 mg norethisterone), Microgynon/Ovranette (30 mcg ethinyloestradiol, 150 mcg levonorgestrel) and Loestrin 20 (20 mcg ethinyloestradiol, 1 mg norethisterone acetate). Progestogen-dominant triphasics are said to include Trinordiol/Logynon, which comprises 6 tablets of 30 mcg ethinyloestradiol and 50 mcg levonorgestrel, 5 tablets of 40 mcg ethinyloestradiol and 75 mcg levonorgestrel, and 10 tablets containing 30 mcg ethinyloestradiol and 125 mcg levonorgestrel.

The author also suggests that it is not necessary to stop taking the pill for purposes of inducing a withdrawal bleed, and even states that in the case of patients with endometriosis or epilepsy, that continuous administration is preferred. Alternatively, if continuous administration is not used, then a "possible compromise is the concept of tricycling."

## WATSON LABORATORIES, INC'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED

### b.    RIZK

Rizk, et al., "*Congenital Afibrinogenemia: Treatment of Excessive Menstrual Bleeding with Continuous Oral Contraceptive*," American J. Hematology, 52(3):237-238 (July 1996) ("*Rizk*") relates to the treatment of excessive menstrual bleeding in patients with congenital afibrinogenemia[1] through the use of continuous oral contraception. The authors describe an example in which *0.03 mg ethinylestradiol and 150 mg levonorgestrel tablets were presented without a break in pill taking*. Bleeding stopped 2 days later without further menstrual periods over a 3-month follow-up, and concluded that *oral contraceptive treatment is better given continuously to induce amenorrhea* in women with congenital afibrinogenemia presenting with excessive menstrual blood loss.

### c.    CASTAMAN

Castaman, G. et al., "*Congenital Afibrinogenemia: Successful Prevention of Recurrent Hemoperitoneum during Ovulation by Oral Contraceptive*," Am. J. Hematol. 49:363 (1995) ("*Castaman*") relates to the inhibition of ovulation by oral contraceptive in patients with congenital afibrinogenemia, in order to prevent bleeding complications such as hemoperitoneum. The authors disclose the "long-term beneficial effect of oral contraception" for such disorders, based on their experience with a patient, who was treated for hemoperitoneum caused by rupture of the corpus luteum and later "discharged on oral contraceptive treatment (0.02 mg ethinyl estradiol, 0.15 mg desogestrel) without further episodes of hemoperitoneum over a 5-year follow-up period." In particular, the authors state that "*[l]ong-term treatment with oral contraceptives, therefore, seems a practical, safe and cost-effective prophylaxys for hemoperitoneum in menstruating women with congenital afibrinogenemia and, possibly, with other severe inherited coagulopathies*."

### d.    WO PATENT PUBLICATION 93/17686

WO 93/17686 ("WO '686") was published on September 16, 1993 and notes that "during the over 30 year history of combined estrogen/progestin oral contraception, there has been a steady downward adjustment of the daily estrogen dosage, both for oral contraceptive purposes in premenopausal female and for estrogen replacement therapy in postmenopausal females." See page 1, lines 19-24.

WO '686 stated that the invention seeks to solve the bleeding control problem associated with a reduction in the daily doses of estrogen and/or progestin by periodically administering an antiprogestin. WO '686 discloses a method and kit for the

---

[1]    According to Stedman's Concise Medical Dictionary for the Health Professions, 4th Edition, Lippincott Williams & Wilkins, Baltimore, MD, 2001, afibrinogenemia is defined as "the absence of fibrinogen in the plasma."

02/01/08　11:48 FAX 4848658480　　　　　KEVIN BRADY　　　　　　　Ø018

## WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED

continuous administration of oral contraceptive pills for extended periods of time, including up to 180 active pills or more.

On page 8, lines 13-23, examples of progestins are listed, and include the following (*emphasis added*):

Examples of progestins which can be employed in this invention are micronized *progesterone* (15-50 mg/day), norethindrone and esters, e.g., acetate, thereof (0.10-0.75 mg/day), norethynodrel (0.3-0.6 mg/day); ethynodiol diacetate (0.3-0.75 mg/day), norgestrel (0.05-0.2 mg) and levo-norgestrel (0.03-0.15 mg/day), chlormadinone acetate, cyproterone, *cyproterone acetate, norethindrone, desogestrel*, norgestimate, dihydrospirenone, *levonorgestrel*, and gestodene (Schering Ag, Berlin; U.S. Patent 4,081,537) (equivalent to 0.03-0.15 mg [levonorgestrel])

On page 8, line 35-page 9, line 2, examples of estrogens are listed, which include the following (*emphasis added*):

Examples of estrogens which can be employed in this invention are *ethinyl estradiol* and *estradiol* and their esters, e.g., acetate, valerate, benzoate and undecylate, (5-15 mcg.) mestranol (20-25 mcg/day), and conjugated estrogens (5-15 mcg/day)

### e.　COUTINHO

Coutinho, *et al.*, "*Comparative Study on Intermittent Versus Continuous Use of a Contraceptive Pill Administered by Vaginal Route*," Contraception, 51:355-358 (1995) ("*Coutinho*") reports a trial where a contraceptive pill containing 250 μg levonorgestrel and 50μg ethinyl estradiol was administered on a continuous (*i.e.*, daily) basis by the vaginal route for a period of one year, as compared to the use of 21 days of active pills followed by 7 days of placebo. The authors report that in the first trimester of use, 67.6% of patients in the continuous use group achieved amenorrhea, in the second trimester of use, 82.4% of patients in the continuous use group achieved amenorrhea, in the third trimester of use, 89.1% of patients in the continuous use group achieved amenorrhea, and in the fourth trimester of use, 87.5% of patients in the continuous use group achieved amenorrhea. See page 356, second column to page 357, first column.

The authors note on page 358, second column that:

This study shows that continuous use of vaginal contraceptive pills may offer some advantage over the traditional intermittent use and could be recommended to women who bleed excessively during menstruation. It may also be more beneficial for anemic women.

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

2.    PRIOR ART RELATING TO A 20µg DOSAGE OF ETHINYL
ESTRADIOL

a.    *LUNELL*

Lunell, *et al.*, "*Ovulation Inhibition with a Combined Oral Contraceptive
Containing 20µg Ethinyl Estradiol and 250µg Levonorgestrel*," Acta. Obstet. Gynecol.
Scand. Suppl., 88: 17-21 (1979) ("*Lunell*") reports that ovulation inhibition is obtained
with a combined oral contraceptive containing 20µg ethinyl estradiol and 250µg
levonorgestrel. The authors state that "a combination pill composed of only 20µg ethinyl
estradiol and 250µg levonorgestrel is capable of suppressing ovulation. Consequently,
reliable contraception can be achieved with combined oral contraceptives containing
less than 30µg ethinyl estradiol."

b.    *TUIMALA*

Tuimala, *et al.* "*A Clinical Comparison in Finland of Two Oral Contraceptives
Containing 0.150 mg Desogestrel in Combination with 0.020 mg or 0.030 mg Ethinyl
Estradiol*," Acta. Obstet. Gynecol. Scand. Suppl., 144:7-12 (1987) ("*Tuimala*") discusses
two open multicenter studies on two oral contraceptives containing 0.150 mg desogestrel
in combination with either 0.020 mg or 0.030 mg ethinyl estradiol. The authors found
that:

Both combinations showed a good cycle control and were well tolerated.
There were no marked differences between the two preparations with
respect to bleeding patterns, body weight, side effects, or drug related
drop-outs. The good efficacy of the lowest estrogen-dose combination
was substantiated by the results of the hormone determinations; all 5
volunteers displayed an anovulatory treatment cycle. It is concluded that
despite its lower estrogen content, the clinical use of the 0.150/0.020 mg
desogestrel/EE combination is as good as that of the 0.150/0.030 mg
desogestrel/EE combination.

c.    *HODGEN*

U.S. Patent No. 5,898,032 entitled "*Ultra Low Dose Oral Contraceptives with
Less Menstrual Bleeding and Sustained Efficacy*," ("*Hodgen*") teaches that "ultra low
dose oral contraceptives" can be effective in extended oral contraceptive regimens.
*See, e.g.*, column 3, lines 23-50. In particular, *Hodgen* discloses a method for female
contraception involving administering a combination of estrogen and progestin for 60-
110 consecutive days. *See, e.g.*, Abstract and column 3, line 49. There is no
menstruation during the continuous administration period. *See* column 3, lines 55-57.

Watson Pharmaceuticals                311 Bonnie Circle, Corona, CA 92880-2882    T 951.493.5300    www.watson.com

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

*Hodgen* discloses at column 3, lines 52-57 and 62-63 that the daily amount of estrogen is about 5-35 mcg of ethinyl estradiol, and that the preferred daily dosage is about 10-20 mcg.

E.    **OBVIOUSNESS ANALYSIS**

1.    **THE LEVEL OF SKILL IN THE ART**

The subject matter of the '814 patent falls within the development field of pharmaceutical sciences. The person of ordinary skill to whom the '814 patent is directed is a medicinal chemist or pharmaceutical chemist involved in the research and development of oral contraceptives and has a Masters or Ph.D. degree and several years of experience in the field; the amount of post-graduate experience depending upon the level of formal education. *E.I. DuPont de Nemours & Co. v. Monsanto*, 903 F. Supp. 680, 751 (D.Del. 1995), aff'd, 92 F.3d 1208 (Fed. Cir. 1996). A person of ordinary skill in the art would easily have understood the prior art references referred to herein, and would have the capability to draw inferences from them.

2.    **CLAIMS 1-3 OF THE '814 PATENT ARE OBVIOUS OVER
*SZAREWSKI***

a.    **DIFFERENCES BETWEEN THE PRIOR ART AND THE
CLAIMS AT ISSUE**

*Szarewski* discloses continuous administration of oral contraceptive pills for women when having a monthly withdrawal bleed is undesirable, *e.g.*, as in the case of women suffering from endometriosis or epilepsy. *Szarewski* teaches that these women "should take the pill without any breaks, to avoid bleeding" and use "a progestogen-dominant brand."

The progestogen-dominant brands listed in this book include Loestrin 20 (20 mcg ethinyloestradiol, 1 mg norethisterone acetate). However, some of the brands listed have 30μg ethinyl estradiol or 40μg ethinyl estradiol, which is more than 20μg ethinyl estradiol.

b.    **APPLICATION OF THE PRIOR ART TO THE '814
PATENT CLAIMS**

The progestogen-dominant brands suggested in *Szarewski* include Loestrin 20, which contains 20 mcg ethinyl estradiol. Elsewhere the prior art teaches that dosage amounts of 20μg ethinyl estradiol will provide inhibition of ovulation and good cycle control. *See, e.g., Lunell* and *Hodgen*. *Tuimali* teaches that 20μg ethinyl estradiol is comparable to 30μg ethinyl estradiol in efficacy and in good cycle control. Applicant's admission that amounts of "more than 15μg of ethinyl estradiol" were "considered typically necessary in prior art contraceptives," see column 4, lines 34-36 of the '814

02/01/08   11:50 FAX 4848656480          IRWIN BRADY                                    ☒021

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

patent, suggests that 20µg ethinyl estradiol, for example, would have been considered an appropriate amount for use in oral contraceptives in the prior art.

The skilled artisan would have been motivated to use an oral contraceptive having the lowest possible dosage of estrogen, for at least two reasons: (1) cost, and (2) safety. A reduction in the amount of ethinyl estradiol of 1/3 or more (from 30-50 µg to 20 µg) would reduce the cost of manufacture, as well as the ultimate price to the consumer. Furthermore, as oral contraceptives would be administered on a continuous basis, it would be advantageous to use the lowest dosage possible for achieving efficacy, while minimizing any unwanted adverse effects. Side effects linked with oral contraceptives use were known at the time the application for the '814 patent was filed, and included: increased risk for cardiovascular disease (heart and blood vessels), blood clotting, elevated blood sugars, liver disease, and certain cancers. See e.g., Szarewski at pages 21-36. Szarewski notes that it was possible to reduce such risks by using a low-dosage estrogen product. WO '686 also mentions that in view of the "known adverse side-effects associated with long term contraception . . . especially in women who smoke in the 40-44 age group, over the years interest in achieving contraception at lower estrogen doses has developed." See page 1, lines 10-18. Therefore, the skilled artisan would have been motivated to adjust the amount of estrogen to the lowest amount that was known to be effective.

Determining optimal dosage ranges is within the ability of the skilled artisan. Slight differences in the dosage amounts of the estrogen component will not support the patentability of subject matter encompassed by the prior art, unless there is evidence indicating such dosages are critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955). There is no indication in the disclosure of the '814 patent that this dosage imparts any criticality to the claims.

Finally, no patentable significance with respect to 20µg ethinyl estradiol over those prior art products suggested by *Szarewski* that contain more than 20µg ethinyl estradiol was demonstrated or suggested within the '814 patent.

Accordingly, Claims 1-3 of the '814 patent are invalid as obvious over *Szarewski* alone, or in combination with any or all of Lunell, *Hodgen* or *Tulman*.

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

3.    **CLAIMS 1-3 OF THE '814 PATENT ARE OBVIOUS OVER *RIZK*
IN VIEW OF *CASTAMAN*, *LUNELL*, *HODGEN*, OR *TUIMALI***

a.    **DIFFERENCES BETWEEN THE PRIOR ART AND THE
CLAIMS AT ISSUE**

*Rizk* relates to the treatment of excessive menstrual bleeding in patients with congenital afibrinogenemia through the use of continuous oral contraception, which prevents menstruation and ovulation.

However, *Rizk* used an oral contraceptive having 0.03 mg ethinyl estradiol and 150 mg levonorgestrel, which contains more than 20µg ethinyl estradiol.

b.    **APPLICATION OF THE PRIOR ART TO THE '814
PATENT CLAIMS**

It would have been obvious for the skilled artisan to select an oral contraceptive pill having an appropriate dosage for achieving contraception and to supress the menstrual cycle. In particular, determining optimal dosage ranges is within the ability of the skilled artisan. Slight differences in the dosage amounts of the estrogen component will not support the patentability of subject matter encompassed by the prior art; unless there is evidence indicating such dosages are critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955). There is no indication in the disclosure of the '814 patent that this dosage imparts any criticality to the claims.

In fact, *Castaman* reports the inhibition of ovulation by oral contraceptive, using an oral contraceptive treatment having 0.02 mg ethinyl estradiol and 0.15 mg desogestrel. Since *Castaman* also relates to treating patients with congenital afibrinogenemia, it would have been obvious to use a contraceptive having 0.02 mg ethinyl estradiol and 0.15 mg desogestrel in the method disclosed by *Rizk*, with a reasonable expectation of success.

Moreover, elsewhere the prior art teaches that dosage amounts of 20µg ethinyl estradiol will provide inhibition of ovulation and good cycle control. *See, e.g., Lunell* and *Hodgen*. In fact, *Tuimali* teaches that 20µg ethinyl estradiol is comparable to 30µg ethinyl estradiol in efficacy and in good cycle control. In fact, by the Applicant's own admission, amounts of "more than 15µg of ethinyl estradiol" were "considered typically necessary in prior art contraceptives." See column 4, lines 34-36 of the '814 patent. This suggests that 20µg ethinyl estradiol, for example, would have been considered an appropriate amount for use in oral contraceptives in the prior art. Accordingly, Claims 1-3 of the '814 patent are invalid as obvious over *Rizk* in view of *Castaman*.

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,600,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

4.    **CLAIMS 1-3 OF THE '814 PATENT ARE OBVIOUS OVER
*CASTAMAN* IN VIEW OF *RIZK***

a.    **DIFFERENCES BETWEEN THE PRIOR ART AND THE
CLAIMS AT ISSUE**

*Castaman* relates to the inhibition of ovulation by oral contraceptive in patients
with congenital afibrinogenemia, in order to prevent bleeding complications.  (Since
ovulation is inhibited, it follows that the menstrual cycle is also suppressed.)  They
report the continuous use of an oral contraceptive treatment having 0.02 mg ethinyl
estradiol and 0.15 mg desogestrel.

The authors are silent with respect to whether such administration was taken
without any break (*i.e.*, without any placebo or any hormone-free intervals).

b.    **APPLICATION OF THE PRIOR ART TO THE '814
PATENT CLAIMS**

It would have been obvious for the skilled artisan to use oral contraceptives
continuously in order to avoid complications in women having excessive menstrual
bleeding.  In this regard, *Rizk* also relates to the treatment of excessive menstrual
bleeding in patients with congenital afibrinogenemia through the use of continuous oral
contraception.  As such, a skilled artisan would administer oral contraceptive pills
continuously without any break to not only suppress ovulation, but also to avoid any
withdrawal bleeding associated with placebo or hormone-free intervals, with a
reasonable expectation of success.  Accordingly, all claims of the '814 patent are invalid
as obvious over *Castaman* in view of *Rizk*.

5.    **CLAIMS 1-3 OF THE '814 PATENT ARE OBVIOUS OVER WO
'686 IN VIEW OF ANY OR ALL OF LUNELL, HODGEN, OR
TUIMALI.**

a.    **DIFFERENCES BETWEEN THE PRIOR ART AND THE
CLAIMS AT ISSUE**

WO '686 teaches that oral contraceptive pills can be administered for an
extended period of time.  For individuals who wish to extend the length of their medically
regulated menstrual cycles beyond the usual 4 week term, the number of
estrogen/progestin-combination oral dosage units can be increased, *e.g.*, to 21 or more,
*e.g.*, 20 or up to 180 units or more.  *See, e.g.*, page 6, lines 32-page 7, line 2.  Also, the
daily doses can be the same throughout the month or can vary from week to week.
*See, e.g.*, page 7, lines 30-31.

The dosage of ethinyl estradiol is about 5 to 35μg of ethinyl estradiol, which
encompasses an amount of ethinyl estradiol of "not greater than 20μg per day."

Watson Pharmaceuticals          311 Bonnie Circle, Corona, CA 92880-2882   T 951.493.5300   www.watson.com

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

> **b.    APPLICATION OF THE PRIOR ART TO THE '814 PATENT CLAIMS**

It would have been obvious for the skilled artisan to select an oral contraceptive pill having an appropriate dosage for achieving contraception and to suppress the menstrual cycle. In particular, determining optimal dosage ranges is within the ability of the skilled artisan. Slight differences in the dosage amounts of the estrogen component will not support the patentability of subject matter encompassed by the prior art, unless there is evidence indicating such dosages are critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955). There is no indication in the disclosure of the '814 patent that this dosage imparts any criticality to the claims.

Moreover, elsewhere the prior art teaches that dosage amounts of 20µg ethinyl estradiol will provide inhibition of ovulation and good cycle control. *See, e.g.*, *Lunell* and *Hodgen*. In fact, *Tuimali* teaches that 20µg ethinyl estradiol is comparable to 30µg ethinyl estradiol in efficacy and in good cycle control. In fact, by the Applicant's own admission, amounts of "more than 15µg of ethinyl estradiol" were "considered typically necessary in prior art contraceptives." See column 4, lines 34-36 of the '814 patent. This suggests that 20µg ethinyl estradiol, for example, would have been considered an appropriate amount for use in oral contraceptives in the prior art. Accordingly, Claims 1-3 of the '814 patent are invalid as obvious over WO '686 alone or in view of Lunell, Hodgen, or Tuimali.

> **6.    CLAIMS 1-3 OF THE '814 PATENT ARE OBVIOUS IN VIEW OF COUTINHO IN VIEW OF ANY OF LUNELL, HODGEN, OR TUIMALI.**

>> **a.    DIFFERENCES BETWEEN THE PRIOR ART AND THE CLAIMS AT ISSUE**

*Coutinho* reports a trial where a contraceptive pill containing 250 µg levonorgestrel and 50µg ethinyl estradiol was administered on a continuous (*i.e.*, daily) basis by the vaginal route for a period of one year.

The dosage of ethinyl estradiol is 50µg, which is "greater than 20µg per day" and the pills are administered by the vaginal route.

>> **b.    APPLICATION OF THE PRIOR ART TO THE '814 PATENT CLAIMS**

It would have been obvious for the skilled artisan to select an oral contraceptive pill having an appropriate dosage of ethinyl estradiol, as well as oral administration.

**WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED
FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV
CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS
INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED**

For example, the skilled artisan would have a reasonable expectation of success that oral administration of this regimen would also be effective. For example, WO '686 teaches that pills may be administered by any conventional manner, including orally, intramuscular injection, transdermally and by way of vaginal ring. The '814 patent does not demonstrate any criticality with respect to the mode of administration. In fact, the Applicant states that their product can be administered intravaginally at column 2, line 59.

It would have been obvious for the skilled artisan to select an oral contraceptive pill having an appropriate dosage for achieving contraception and to suppress the menstrual cycle. In particular, determining optimal dosage ranges is within the ability of the skilled artisan. Slight differences in the dosage amounts of the estrogen component will not support the patentability of subject matter encompassed by the prior art, unless there is evidence indicating such dosages are critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." *In re Aller*, 220 F.2d 454, 456 (CCPA 1955). There is no indication in the disclosure of the '814 patent that this dosage imparts any criticality to the claims.

Moreover, elsewhere the prior art teaches that dosage amounts of 20µg ethinyl estradiol will provide inhibition of ovulation and good cycle control. *See, e.g. Lunell* and *Hodgen*. In fact, *Tuimall* teaches that 20µg ethinyl estradiol is comparable to 30µg ethinyl estradiol in efficacy and in good cycle control. In fact, by the Applicant's own admission, amounts of "more than 15µg of ethinyl estradiol" were "considered typically necessary in prior art contraceptives." See column 4, lines 34-36 of the '814 patent. This suggests that 20µg ethinyl estradiol, for example, would have been considered an appropriate amount for use in oral contraceptives in the prior art. Accordingly, all claims of the '814 patent are invalid as obvious over Coutinho in view of any of *Lunell*, *Hodgen*, or *Tuimall*.

II.   **CLAIMS 1-3 OF THE '814 PATENT ARE INVALID UNDER 35 U.S.C. § 112, FIRST PARAGRAPH, FOR LACK OF WRITTEN DESCRIPTION**

In the November 9, 2001 response during prosecution of the patent application that later issued as the '814 patent, the claims were amended to recite an "administration period of greater than 110 days." This amendment was made to avoid a prior art reference, *Hodgen*, which taught administration for 110 days, and which was asserted in a rejection based on 35 U.S.C. § 102(e). No written description support exists in the originally-filed application for an "administration period of greater than 110 days."

The specification does not contain any specific disclosure of an "administration period of greater than 110 days." The Applicant argued that the amendment was supported by the originally-filed specification because it "clearly conveys the concept of

02/01/08  11:52 FAX 4848656480              KEVIN BRADY                              ✉ 028

## WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED

contraception in which administration is continuous regardless of the administration period." In particular, the Applicant stated that:

In order to satisfy the written description requirement of 35 U.S.C. § 112, first paragraph, the originally-filed disclosure need not provide *in haec verba* support for the claimed subject matter, but the disclosure must convey, with reasonable clarity to those skilled in the art, that the inventor was in possession of the invention as claimed. *Purdue Pharma L.P. v. Faulding, Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000). Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims. *Id.* In this case, because there is no *in haec verba* support for the term "administration period of greater than 110 days," the question becomes whether one of ordinary skill in the art would immediately have discerned, from the originally-filed disclosure, the "administration period of greater than 110 days" element. It is our opinion that this element would not have immediately been discerned from the originally-filed disclosure.

Nothing in the originally-filed specification would have directed one of ordinary skill in the art to conclude that "administration period of greater than 110 days" was an important defining aspect of the disclosed invention. Other than falling within the timeframes set forth in the prior art *Hodgen* disclosure, there is nothing to suggest that 110 days has any importance.

Here, although one skilled in the art may be able to infer from the recitation of the generic timeframes, that an "administration period of greater than 110 days" would be feasible, there is no other disclosure in the specification that would indicate that an "administration period of greater than 110 days" was contemplated. *See, e.g., In re Gosteli*, 872 F.2d 1008 (Fed. Cir. 1989)(Holding that disclosure of a subgenus of chemical compounds did not provide a written description of an encompassing genus); *Vas Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991)("[t]he description of a single embodiment of broadly claimed subject matter constitutes a description of the invention for anticipation purposes ... , whereas the same information in a specification might not alone be enough to provide a description of that invention for purposes of adequate disclosure.").

Therefore, the application, as originally filed, does not provide written description for "administration period of greater than 110 days" as recited in Claims 1 and 3. Claim 2 depends from Claims 1 and 3, respectively. The element of "administration period of greater than 110 days" is included in claim 2 by virtue of dependency. Hence, Claim 2 is also invalid under 35 U.S.C. § 112, first paragraph for failing to meet the written description requirement with respect to this claim element. Consequently, Claims 1-3 of the '814 patent are invalid under 35 U.S.C. § 112, first paragraph.

Watson Pharmaceuticals          311 Bonnie Circle, Corona, CA 92880-2882  T 951.493.5300  www.watson.com

## WATSON LABORATORIES, INC.'S CONFIDENTIAL DETAILED FACTUAL AND LEGAL BASES FOR WATSON'S PARAGRAPH IV CERTIFICATION THAT U.S. PATENT NO. 6,500,814 IS INVALID, UNENFORCEABLE AND/OR WILL NOT BE INFRINGED

Watson reserves all rights to raise any additional defenses relating to invalidity, unenforceability, and non-infringement.

# EXHIBIT F

## FULLY REDACTED

# EXHIBIT G

## FULLY REDACTED

Exhibit H



DONALD A. ROBINSON (DAR/8000)
ROBINSON, LAPIDUS & LIVELLI
Two Penn Plaza East
Newark, New Jersey 07105-2237
973-690-5400
Attorneys for Plaintiffs
American Home Products Corporation,
Woco Investments Ltd. and Pre Jay
Holdings Ltd.



**FILED**

JUL  6 1999

\T 8:30____ M
WILLIAM T. WALSH
CLERK

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMERICAN HOME PRODUCTS CORPORATION, WOCO INVESTMENTS LTD. and PRE JAY HOLDINGS LTD., <br><br> Plaintiffs, <br><br> v. <br><br> NOVO NORDISK PHARMACEUTICALS, INC., NOVO NORDISK OF NORTH AMERICA and NOVO NORDISK A/S, <br><br> Defendants. | Civ. Action No. 99-3162 (GEB) <br><br> COMPLAINT |

## COMPLAINT

Plaintiffs AMERICAN HOME PRODUCTS CORPORATION ("AHP"), WOCO

INVESTMENTS LTD. ("Woco") and PRE JAY HOLDINGS LTD. ("Pre Jay") (collectively,

"Plaintiffs"), through their undersigned attorneys, bring this Complaint against Defendants

NOVO NORDISK PHARMACEUTICALS, INC. ("Novo Nordisk Pharmaceuticals"), NOVO

NORDISK OF NORTH AMERICA ("Novo Nordisk N.A.") and NOVO NORDISK A/S ("Novo

Nordisk A/S") (collectively, "Defendants").

    1.    This action arises under the Patent Laws of the United States, Title 35 of

NY01 202741 v 1

the United States Code, seeking permanent injunctive relief under 35 U.S.C. §§ 281 through 285

for infringement of United States Letters Patent No. RE 36,247, granted July 6, 1999 (hereinafter

the "Reissue Patent" attached) from United States Letters Patent No. 4,826,831, granted May 2,

1989 (hereinafter the "831 Patent") and entitled "Method of Hormonal Treatment for

Menopausal or Post-Menopausal Disorders and a Multi-Preparation Pack Therefor".


## PARTIES

2.    Plaintiff AHP is a corporation organized and existing under the laws of the

State of Delaware, having an office and principal place of business at Five Giralda Farms,

Madison, New Jersey 07940.

3.    Plaintiff Woco is a corporation organized and existing under the laws of

Canada, having an office and principal place of business at 17 Metamora Crescent, London,

Ontario N6G 1R2.

4.    Plaintiff Pre Jay is a corporation organized and existing under the laws of

Canada, having an office and principal place of business at 9282 Elviage Drive, London Ontario

N6K 4N5.

5.    On information and belief, Defendant Novo Nordisk Pharmaceuticals is a

corporation organized and existing under the laws of Delaware, having an office and principal

place of business at 100 Overlook Center, Suite 200, Princeton, NJ 08540.

6.    On information and belief, Defendant Novo Nordisk N.A. is a corporation

organized and existing under the laws of Delaware, having an office and principal place of

business at 405 Lexington Avenue, Suite 6400, New York, NY 10174.

7.    On information and belief, Defendant Novo Nordisk A/S is a corporation

organized and existing under the laws of Denmark, having an office and principal place of business at Novo Alle, DK-2880, Bagsvard, Copenhagen, Denmark.

## JURISDICTION

8.    This Court has personal jurisdiction over each of the Defendants, because on information and belief, each of the Defendants directly and through its agents regularly solicit, transact and generally do business in New Jersey and have committed acts and/or threaten to commit acts of infringement in New Jersey.

9.    This Court has jurisdiction over the subject matter hereof under 28 U.S.C. §§ 1331, 1338, 2201 and 2202.

10.    Venue in this Judicial District is proper under the provisions of 28 U.S.C. §§ 1391 and 1400(b).

## ACTS GIVING RISE TO THE COMPLAINT

11.    This case presents an actual controversy between the parties with respect to the infringement of claims 22, 24, 47, 48, 49, 52 and 55 ( the "Asserted Claims") of the Reissue Patent.

12.    The subject matter of the '831 Patent and the Reissue Patent ( the "Invention") was invented by Drs. Earl R. Plunkett and Bernard M. J.Wolfe.

13.    The '831 Patent issued on May 2, 1989  to the inventors Drs. Earl R. Plunkett and Bernard M. J. Wolfe.

14.    Pursuant to agreements dated March 20, 1986 and Aug. 12, 1988 , Dr. Plunkett assigned his rights to the Invention and to what is now the '831 Patent and the Reissue Patent to Plaintiff Pre Jay.

15.    Pursuant to agreements dated  November 17, 1984 and August 3, 1988,

Dr. Wolfe assigned his rights to the Invention and to what is now the '831 Patent and the Reissue Patent to Plaintiff Woco.

16.    On December 9, 1992, Woco and Pre Jay, pursuant to an agreement with Dr. Wolfe, exclusively licensed rights in and to the '831 patent and to what is now the Reissue Patent to AHP. Plaintiff AHP is thus the exclusive licensee of the Reissue Patent, with the right to sue for infringement of the Asserted Claims.,

17.    On information and belief, Novo Nordisk Pharmaceuticals is a subsidiary of Novo Nordisk N.A., which is in turn a subsidiary of Novo Nordisk A/S.

18.    On information and belief, Novo Nordisk Pharmaceuticals obtained FDA approval on or about November 18, 1998 to market in the United States a product called Activelle, comprising tablets of 1 mg 17B-estradiol and 0.5 mg norethindrone acetate, for the treatment of menopausal or post-menopausal disorders in accordance with the methods of the Asserted Claims of the Reissue Patent. Activelle is especially made and adapted for use in the method set forth in the Asserted Claims and has no other substantial or FDA-approved use.

19.    On information and belief, Novo Nordisk Pharmaceuticals is offering for sale and/or preparing to offer for sale, or using, and inducing or preparing to induce others to use Activelle in the United States in the method of the Asserted Claims of the Reissue Patent.

20.    On information and belief, Novo Nordisk A/S and/or Novo Nordisk N.A., on behalf of Novo Nordisk Pharmaceuticals, is making and importing or preparing to make and import Activelle and/or is offering for sale or preparing to offer for sale Activelle in the United States to be used in the method of the Asserted Claims of the Reissue Patent, and otherwise inducing Novo Nordisk Pharmaceuticals to use the method of the Asserted Claims of the Reissue Patent in the United States.

## COUNT I - INFRINGEMENT

21.     Plaintiffs repeat and reallege each of paragraphs 1-20 above.

22.     The foregoing acts of the Defendants infringe the Asserted Claims of the Reissue Patent under 35 U.S.C. §§271(a), (b) and/or (c) in this District and elsewhere.

23.     On information and belief, Defendants' infringement of the Asserted Claims of the Reissue Patent has been willful, wanton and deliberate, without license, and carried on with full knowledge of Plaintiffs' patent rights.

## COUNT II - DECLARATORY JUDGMENT OF INFRINGEMENT

24.     Plaintiffs repeat and reallege each of paragraphs 1-20 and 22-23 above.

25.     In view of the imminent threat of further infringements as set forth above, Plaintiffs are in need of a judicial determination and declaration of the infringement by Defendants of the Asserted Claims of the Reissue Patent.

26.     On information and belief, Defendants' imminent threat of further infringement of the Asserted Claims of the Reissue Patent will continue to be willful, wanton and deliberate, without license, and carried out with full knowledge of Plaintiffs' patent rights.

WHEREFORE Plaintiffs pray for a declaration and judgment that:

A.     Defendants will infringe or have infringed the Asserted Claims of the Reissue Patent and will continue to infringe unless enjoined;

B.     Defendants, their officers, directors, employees, agents, licensees, servants, successors and assigns, and any and all persons acting in privity or in concert with them, be permanently enjoined from further threats to infringe, and infringement of the Asserted

Claims of the Reissue Patent;

C.    Plaintiffs be awarded their costs and disbursements in this action;

D.    Plaintiffs be awarded their attorneys fees;

E.    Plaintiffs be awarded such other and further equitable relief as this Court

may deem just and proper.

Respectfully Submitted,

ROBINSON, LAPIDUS & LIVELLI

Attorneys for Plaintiffs
American Home Products Corporation,
Woco Investments Ltd. and
Pre Jay Holdings Ltd.

By:    _____
       DONALD A. ROBINSON

Dated:  July 6, 1999

Of Counsel:

Paul H. Heller
Deborah A. Somerville
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 425-7200

Egon E. Berg
Lawrence Alaburda
AMERICAN HOME PRODUCTS CORPORATION
One Campus Drive
Parsippany, New Jersey  07054
973-683-2125

US00RE36247B

# United States Patent [19]

Plunkett et al.

[11] E    Patent Number:    Re. 36,247

[45] Reissued    Date of Patent:    Jul. 6, 1999

[54] METHOD OF HORMONAL TREATMENT FOR MENOPAUSAL OR POST-MENOPAUSAL DISORDERS INVOLVING CONTINUOUS ADMINISTRATION OF PROGESTOGENS AND ESTROGENS

[75] Inventors: Earl K. Plunkett; Bernard M. J. Wolfe, both of London, Canada

[73] Assignees: WOCO Investments, Ltd.; Pre JAY Holdings, Limited, both of Canada

[21] Appl. No.: 08/842,941

[22] Filed: Oct. 13, 1995

**Related U.S. Patent Documents**

Reissue of:
[64] Patent No.: 4,826,831
    Issued: May 2, 1989
    Appl. No.: 06/635,236
    Filed: Jan. 24, 1984

U.S. Applications:
[63] Continuation-in-part of application No. 08/520,854, Aug. 5, 1983, abandoned.

[52] Int. Cl.⁶ .................................. A61K 31/56
[52] U.S. Cl. ..................................... 514/178
[58] Field of Search ......................... 514/170

[56]    **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,636,600 | 2/1972 | Hendrix . |
| 3,733,407 | 5/1973 | Segre . |
| 3,836,651 | 9/1974 | Ruelel et al. ........... 514/170 |
| 3,957,982 | 5/1976 | Laskett-Pisson et al. .... 514/170 |
| 4,018,919 | 4/1977 | Black . |
| 4,425,339 | 1/1984 | Pitchford ............... 514/170 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 08 2645307 | of 0000 | Germany . |
| 1578346 | 11/1980 | United Kingdom . |
| 2096462 | 10/1982 | United Kingdom . |

OTHER PUBLICATIONS

*Acta Obstet. Gynecol. Scand.*, 59, 327–329 (1980) [Mugglestone].

Abstract—Paper delivered by Dr. Magos to the 23rd British Congress on the Menopause, Royal College of Obstetrics and Gynecology, Birmingham, Jul. 1983 [Magos].

*1984 Physicians' Desk Reference* (PDR) pp. 222, 545, 658, 1205, 1513 and 2044.

*Maturitas*, 3, 145–156 (1981) [Sialaqi].

English translation of Plunkett's Oct. 28, 1993 reply in an opposition proceeding in the Danish patent application [Danish Patent Application No. 3770/84 (163,390)] equivalent to Plunkett.

*BLSS.* 459 (Mar. 1984) (Pharmaceutical Specialties in Sweden) [Sweden].

English translation of, *BLSS.* 459 (Mar. 1984) (Pharmaceutical Specialities in Sweden) [Sweden], item (A).

*Minerva Ginecologica*, 21(4), 193–7 (1969) [GOISIS].
English translation of *Minerva Ginecologica*, 21(4), 193–7 (1969) [GOISIS], item (C).

*Akt. N. Z. J. Obstet. Gynaec.*, 23, 43 (1983) [Smith].

Report from Workshop, 157–165 (Aug. 1982)—Socialstyrelsen komite' for lakemedelsinformation, workshop, Menopaus Substitutionsbehandling med ostrogen, Aug. 30–31, 1982 (published Jan. 1983) [Workshop report].

English translation of, Report from Workshop, 157–165 (Aug. 1982)—Socialstyrelsen komiter' for lakemedelsinformation, workshop, Menopaus Substitutionsbehandling med ostrogen, Aug. 30–31, 1982 (published Jan. 1983) [Workshop Report], item (F).

Novo Nordisk's Supplementary Opposition Statement filed Jul. 16, 1997 in Danish Patent Application No. 3770/84.

English translation of, Novo Nordisk's Supplementary Opposition Statement filed Jul. 16, 1997 in Danish Patent Application No. 3770/84, item (H).

Applicants' Agents' Request for Revival and Comments filed Nov. 15, 1996 in Danish Patent Application No. 3770/84 (165,390).

English translation of, Applicants' Agents' Request for Revival and Comments filed Nov. 15, 1996, item (J).

Declaration of Dr. Adam L. Magos signed Jun. 5, 1997.

Declaration of Ms. Caroline B. Roncy signed June. 10, 1997.

Mugglestone et al., "Combined Estrogen and Progestogen For The Menopause", Acta Obstet. Gynecol. Scand. 59:327–329, 1980.

Magos et al., 23rd British Congress, Royal College of Obstetrics and Gynecology, Birmingham, p. 156, Jul. 1993. Chemical Abstracts, vol. 83, No. 9, Sep. 1, 1975, p. 142, Abstract No. 72528M.

Novo Industri AD, "Kliogest®: Ostrogenpreparat med gestagentilsats" Mar. 1984 (Translation provided).

Eiken, P., N. Kolikoff and S. Pors Nielsen, "Ten Years Effects of Hormonal Replacement Therapy On Bone Mineral Content in Post-Menopausal Women," Department of Clinical Physiology, Hilleroed Hospital, DK-3400 Hilleroed, Denmark (1996).

(List continued on next page.)

*Primary Examiner*—Raymond J. Henley, III
*Attorney, Agent, or Firm*—Pillsbury Madison & Sutro LLP

[57]    **ABSTRACT**

A method of hormonally treating menopausal (including perimenopausal and post-menopausal) disorders in women, a composition, and a multi-preparation pack therefor. The administrative regimen to which the pack is particularly adapted comprises continuously and uninterruptedly administering a progestogen in a woman while cyclically administering an estrogen by using a repetitive dosage regimen. This regimen calls for administering the estrogen continuously for a period of time between about 20 and about 120 days, followed by terminating administering the estrogen for a period of time between about 3 and about 7 days. Alternatively, both the progestogen and estrogen may be administered for the full treatment period without interruption. The regimen avoids many of the problems associated with the administration of estrogen alone or with progestogen administered according to conventional regimens, and also avoids problems associated with such conventional regimens by maintaining the estrogen and progestogen at low daily dosage levels of between 0.005 mg and 2.5 mg estrogen and 0.25 mg and 30 mg progestogen.

**46 Claims, 1 Drawing Sheet**

## Re. 36,247

Page 2

### OTHER PUBLICATIONS

Riiss, E, N. Kolthoff, S. Foss Nielsen and O. Bacacholt, "Eight Years Effects of Hormonal Replacement Therapy on Mineral Content in Post–Menopausal Women," Department of Clinical Physiology and Nuclear Medicine, Hillerod Sygehus, Helsevej 2, DK-3400 Hillerod (1995).

Eiken, P. and K. Kolthoff, "Compliance with long-term oral hormonal replacement therapy," Maturitas, vol. 22: 97–103, Sep. 1995.

Geisis M. "Treatment of Pre-climacteric and Climacteric introducing a New Estrogen-progestin Association" Miorava Ginecologie, 21 pages 193–197 (1969).

Lakartidningen, vol. 81, No. 12, Mar 22, 1984 (translation provided).

Madsen V., Postmenopausal Estrogen Treatment, Manedsskift for Praktisk Laegegering, vol. 45 (8) 1967 (translation provided).

Magos AL, et al "Amenorrhoea and Endometrial Atrophy with Continuous Oral Estrogen and Progestogen Therapy in Post–Menopausal Women", Obstet. gynecol 67:496 (1985).

Maschak CA, et al "Comparison of pharmacodynamic properties of various estrogen formulations". Am. J. Obstet. Gynecol 144:51 (1982).

Smith M, et al, "A Double–Blind Trial of Ethinyloestradiol and Norethisterone Separately and Together, in Menopausal Women", Aust N.Z. J. Obstet. Gynaec. 23: 43 (1983).

Workshop, Menopause, Substitutional Treatment with Estrogen, Socialsyrelsens Kommittee for lakemedelsinformation, 1983 (translation provided).

Mann JI, Vessey MP, Thorogood M, Doll R. Myocardial infarction in young women with special reference to oral contraceptive practice, Brit Med J 1975;2:241–245.

Mattsson L–A, Samsioe G, Oestrogen-gestrogen replacement in climacteric women, particularly as regards a new type of continuous regimen, Acta Obstet Gynecol Scand Suppl 1985;130:23–58.

Plunkett EK, Contraceptive steroids, age, and the cardiovascular system, Am J Obstet Gynecol 1982;142:747–751.

Stadley PD, Tonascia JA, Tockman MS, et al, Thrombosis with low-estrogen oral contraceptives, Am J Epidemiol 1975;102:197–208.

Silfverstolpe G, Gustafson A, Samsioe G, Svanborg A, Lipid metabolic studies in oophorectomized women: effects induced by two different estrogens on serum lipids and lipoproteins, Gynecol obstet Invest 1980;11:161–169.

Tietze C, Lewit S, Life risks associated with reversible methods of fertility regulation, Int J Gynecol Obstet 1979;16:456–459.

Heiss G, Tamir I, Davis CE, et al., Lipoprotein-cholesterol distributions in selected North American populations: The Lipid Research Clinics Program Prevalence Study, Circulation, 1980;61:302–315.

Hirvonen E, Malkonen M, Manninen V, Effects of different progestogens on lipoproteins during postmenopausal replacement therapy, N Engl J Med, 1981;304:560–563 (1981).

Kay CR, The happiness pill? J Roy Coll Gen Pract, 1980;30:8–19.

Khoo SK, Hacker N, Chang A, An incremental-dose combined oestrogen-progestagen oral contraceptive: effects on body weight, blood pressure, and biochemical parameters, Aust N Z J Obstet Gynecol 1980;20:1712–176.

Larsson-Cohn U, Fahraeus L, Wallentin L, Zador G, Lipoprotein changes may be minimized by proper composition of a combined oral contraceptive, Fertil Steril, 1981;35:173–179.

Mann JI, Inman WHW, Oral contraceptives and death from myocardial infarction, Brit Med J, 1975;2:245–248.

Staland B, Continuous Treatment with Natural Oestrogens and Progestogens, A Method to Avoid Endometrial Stimulation, Maturitas 1981;3:145–156.

Mattsson L–A, Cullberg G, Samsioe G, Evaluation of a Continuous oestrogen-progestogen regimen for climacteric complaints, Maturitas 1982;4:95–102.

Mosk B, The effect of cyclical administration of levonorgestrel and ethinyl-oestradiol on blood pressure, body mass, blood glucose and serum triglyceride, S Afr Med J 1979;56:586–570.

Boston Collaborative Drug Surveillance Program, Boston University Medical Center, Surgically confirmed gallbladder disease, venous thromboembolism and breast tumors in relation to postmenopausal estrogen therapy, N Engl J Med 1974;290:15–19

Collaborative Group for the Study of Stroke in Young Men, Oral contraception and increased risk of cerebral ischemia or thrombosis, N Engl J Med 1973;288:871–878.

Gambrell RD Jr, Maier RC, Sanders BI, Decreased incidence of breast cancer in postmenopausal estrogen-progestogen users, Obstet Gynecol 1983;62:435–443.

Gambrell RD Jr, Bagnell CA, Greenblatt RB, Role of estrogens and progesterone in the etiology and prevention of endometrial cancer: review, Am J Obstet Gynecol 1983;146:696–707.

Gordon T, Castelli WP, Hjortland MC, Kannel WB, The prediction of coronary heart disease by high–density and other lipoproteins: an historical perspective, in Kannel WB, (1977).

Archer, DH et al., Bleeding Patterns in Postmenopausal Women Taking Continuous Combined or Sequential Regimens of Conjugated Estrogens With Medroxyprogesterone Acetate, Obstet. Gynecol., V. 83, No. 5, pp. 686–692 (May 1994) (33–4).

Bewers, Cibenda et al., Endometrial Histology and Bleeding Patterns in Menopausal Women Treated With Estrogen and Continuous Cyclic Progestin, J. Reproductive Med., vol. 33, No. 2, pp. 202–208 (Feb. 1988) (218).

Bocces, LA, et al., Assessment of Incremental Dosage Regimen of Combined Estrogen-Progestogen Oral Contraceptives, Bri Med. J., vol. 4(5945), pp. 643–645 (1974) (216).

Christiansen, C et al., Does Oestriol Add to the Beneficial Effect of Combined Hormonal Prophylactic Against Early Postmenopausal Osteoporosis, Brit. J. Obstet. Gynecol., vol. 91, pp. 489–493 (May 1984) (245).

Clark, James H et al., Nuclear Binding and Retention of the Receptor Estrogen Complex: Relation to the Agonistic and Antagonistic Properties of Estriol, Endo, vol. 1, No. 1, pp. 91–96 (1977) (227).

Clisham, P. Ronald et al., Comparison of Continuous Versus Sequential Estrogen and Progestin Therapy in Postmenopausal Women, Obstet. Gynecol., vol. 77, No. 2, pp. 241–246 (Feb. 1991) (229).

Dammleini, Lorraine et al., Menopausal Hot Flushes: A Double Blind Comparison of Placebo, Ethinyl Oestradiol and Norgestrel, Brit J. Obstet. Gynecol., vol. 85, pp. 852–856 (Nov. 1978) (231).

**Re. 36,247**
Page 3

Dennerstein, Lorraine et al., Hormone Therapy and Affect, Maturitas, vol. 1, pp. 247–259 (1979) (P31a).

Dennerstein, Lorraine et al., Plasma Levels of Ethinyl Oestradiol and Norgestrel During Hormone Replacement Therapy, Maturitas, vol. 2, pp. 147–154 (1980) (P32).

Dickey, Richard R. & Stone, Sergio C., Progestational Potency of Oral Contraceptives, Obstet. Gynecol., vol. 47, No. 1, pp. 106–112 (Jan. 1976) (P9).

Dickey, Richard E., Reply to Paper by Dr. Edgren on "Progestational Potency of Oral Contraceptives: a Polemic", Int. J. Fertil., vol. 23(3), pp. 170–174 (1978) (P11).

Edgren, Richard A., Progestational Potency of Oral Contraceptives: a Polemic, Int. J. Fertil., vol. 23(3), pp. 162–169 (1978) (P10).

Eiermann, U. et al., Abstract: Continuous Treatment of Menopausal Symptoms With an Estrogen/Progestogen Combination. Results of a Multicenter Trial, J. Steroid. Biochem., vol. 17, No. 3, 1982, p. 306 (6th International Congress on Hormonal Steroids, Jerusalem, Israel, Sep. 5–10, 1982) (P36).

Englund, D.E. & Johansson, E.D.B., Endometrial Effect of Oral Estriol Treatment in Postmenopausal Women, Acta Obstet. Gynecol. Scand. vol. 59, pp. 449–451 (1980) (P24).

Hammond, Charles B. et al., Effects of Long Term Estrogen Replacement Therapy, Am. J. Obstet. Gynecol. vol. 133, No. 5, pp. 537–547 (Mar. 1, 1979) (P17).

Hallberg, D. & Nilsson, S., Comparison of Triphasic Oestradiol/Norethisterone Acetate Preparation With and Without Oestriol Component in the Treatment of Climacteric Complaints, Maturitas, Vol 5, pp. 233–243 (1984) (P44).

Hillard, T.C. et al., Continuous Combined Conjugated Equine Estrogen-Progestogen Therapy: Effects of Medroxyprogesterone Acetate and Norethindrone Acetate on Bleeding Patterns and Endometrial Histologic Diagnosis, Am J. Obstet. Gynecol., vol. 167, No. 3, pp. 1–7 (Jul. 1992) (E8).

Johansson, Elof D.B., Oestrogens Och Gestagens Substansers Effekter Pa Tumorer I Reproduktionsorganen (The Effects of Estrogens and Gestagenic Substances on Tumours in the Reproductory Organs), Report from Workshop: Menopaus, pp. 129–141 (1982) [with translation] (Part of P2).

Johansson, Elof D.B., Nagra Utvecklingslinjer Kring Substitutions-Behandling Efter Menopaus (A few Courses of Development for the Substitution Treatment After Menopause), Report from Workshop: Menopaus, pp. 157–164 (1982) [with translation] (Part of P2).

King, Roger J.B. & Whitehead, Malcom I., Assessment of the Potency of Orally Administered Progestins in Women, Fertility & Sterility, vol. 46, No. 6, pp. 1062–1065 (Dec. 1986) (E19).

Lacey, R.W. et al., Safety of Progestin: Effects of Dydrogesterone on Blood Lipids, Br. J. Clin. Pract. Suppl. 24, pp. 4–10 (1983) (P23).

Lewart, Seth G. & Barnes, Randall B., Pharmacology of Estrogens, in Treatment of Postmenopausal Women: Basic and Clinical Aspects, ch. 6, pp. 57–67 (Rogerio A. Lobo ed., 1994) (P27).

Lilliefberg, L. et al., Effect of a Sequential Oestrogen-Progestin Therapy on the Plasma Level of Oestrogens and Lipids in Post-Menopausal Women, Acta Endocrinologica, vol. 92, pp. 319–329 (1979) (P21).

Luciano, Anthony Adolph et al., Clinical and Metabolic Responses of Menopausal Women to Sequential Versus Continuous Estrogen and Progestin Replacement Therapy, Obstet. Gynecol., vol. 71, No. 1, pp. 39–43 (Jan. 1988) (E11).

Luciano, Anthony A. et al., Evaluation of Low-Dose Estrogen and Progestin Therapy in Postmenopausal Women, J. Reproductive Med., vol. 38, No. 3, pp. 207–214 (Mar. 1993) (E7).

Mayor, A.L., Endometrial and Menopausal Response to Continuous Oestrogen Progestogen Therapy in Post-Menopausal Women, Summary of Paper to be Presented at Advances in the Management of Menopause Symposium on Friday, 9th Dec., 1983 (P28).

Mattsson, L.-A. et al., Effects of a Continuous Estrogen-Progestogen Therapy for Climacteric Symptoms on Circulating Sex Steroids and Gonadotrophins, Arch. Gynecol., vol. 235, pp. 104–107 (1983) (P41).

Merck, pp. C1278, C3102, 454, 3648–49, 3654–55 (1983) (P34).

Merck, p. 493 (1989) (E23).

Nand, S.L. et al., Continuous Combined Piperazine Oestrone Sulphate and Medroxyprogesterone Acetate Hormone Replacement Therapy—A Study of Bleeding Pattern, Endometrial Response, Serum Lipid and Bone Density Changes, Aust. and N.Z. J. Obstet. Gynaecol., pp. 92–96 (1995) (E5).

Neumann, Von F. et al., Probleme der Dosisfindung: Sexualhormone, Drug. Res., pp. 296–318 (1977) (P29).

Neumann, F., The physiological Action of Progesterone and the Pharmacological Effects of Progestogens—a Short Review, Postgraduate Med. J., vol. 54 (Suppl. 2), pp. 11–24 (1978) (P48).

Notelovitz, Morris et al., Oestrogen-Progestin Therapy and the Lipid Balance of Post-Menopausal Women, Maturitas, vol. 4, pp. 301–308 (1982) (P47).

Notelovitz, Morris et al., Combination Estrogen and Progestogen Replacement Therapy Does Not Adversely Affect Coagulation, Obstet. Gynecol., vol. 62, No. 5, pp. 596–600 (Nov. 1983) (P46).

Padwick, M.L. et al., Oestriol With Oestradiol Versus Oestradiol Alone: A Comparison of Endometrial, Symptomatic and Psychological Effects, British J. Obstet. Gynaecol., vol. 93, pp. 606–612 (Jun. 1986) (E28).

Physicians' Desk Reference 38th Ed., pp. 424, 1487–1495 (1984) (P26).

Rozenbaum, H., Progestatifs de Synthese et Metabolisme Lipidique, Contraception-Fertilite-Sexualite, Supp. vol. 12, No. 3, pp. 173–180 (1984) (P22).

Siphion, S., Plasm Oestrone, Oestradiol and Gonadotrophin Concentrations in Postmenopausal Patients Treated With Oestradiol or With a Combination of Oestradiol and Oestriol, Annals of Clinical Research, vol. 11, pp. 173–178 (1979) (P5).

Siphion, Seppo et al., Silastic Implants Releasing Estrone in the Treatment of Climacteric Complaints, Maturitas, vol. 2, pp. 213–224 (1980) (P35).

Socialstyrelsens Kommitter for Lakemedelsinformation (Health Board Committee on Medical Information), Menopaus, Substitutional Treatment with Estrogen, Workshop, Aug. 30–31, 1982, pp. 27, 30 (published 1983) [with translation] (Part of P2).

# Re. 36,247

Page 4

---

Socialstyrelsens Kommitteo for Lakemedelsinformation (Health Board Committee on Medical Information), Menopaus, Substitutionel Treatment with Estrogen, Workshop, Aug. 30-31, 1982, pp. 121, 161, 167-168 (published 1983) [with translation] (Part of P2).

Sporrong, T. et al., Comparison of Four Continuously Administered Progestogen Plus Oestradiol Combinations for Climacteric Complaints, Brittsh J. Obstet. Gynaecol, vol. 95, pp. 1042-1048 (Oct. 1988) (E12).

Staland, B., Continuous Treatment With a Combination of Estrogen and Gestagen—A way of Avoiding Endometrial Stimulation, Acta Obstet Gynecol Scand Suppl 130, pp. 29-35 (1985) (E29).

Staland, B., Treatment of Menopausal Oestrogen Deficiency Symptoms in Hysterectomized Women by Means of 17β-Oestradiol Pellet Implants, Acta. Obstet. Gynecol. Scand, vol. 57, pp. 281-285 (1978) (P13).

Stanczyk, Frank Z., Structure-Function Relationships, Potency and Pharmacokinetics of Progestogens, in Treatment of Postmenopausal Women: Basic and Clinical Aspects, ch. 7, pp. 69-89 (Rogerio A. Lobo ed., 1994) (E20).

Saurbe, D.W. et al., Relations Between Bleeding Pattern, Endometrial Histology, and Oestrogen Treatment in Menopausal Women, Brit. Med. J., pp. 1575-1577 (Jun. 17, 1978) (P33).

Swyer, G.I.M., Potency of Progestogens in Oral Contraceptives—Further Delay of Menstral Data, Contraception, vol. 26, No. 1, pp. 23-27 (Jul. 1982) (P19).

Swyer, G.I.M., Determination of Progestational Potency: A Review, J. Roy. Soc. Med., vol. 77, pp. 406-409 (1984) (P59).

Teak, Marius, Pharmakologie der Hormone, pp. 83-87, 122-129 (1979) (P25).

Upton, Virginia G., Therapeutic Considerations in the Management of Climacteric: A Critical Analysis of Prevalent Treatments, J. Reprod. Med., vol. 29, No. 2, pp. 71-80 (Feb. 1984) (P13).

Whitehead, M.I. et al., The Effects of Cyclical Oestrogen Therapy and Sequential Oestrogen/Progestogen Therapy on the Endometrium of Post-Menopausal Women, Acta Obstet. Gynecol. Scand, Suppl. 65, pp. 91-101 (1977) (P49).

Whitehead, M.I. & Campbell, S., Endometrial Histology, Uterine Bleeding and Oestrogen Levels in Menopausal Women Receiving Oestrogen Therapy and Oestrogen/Progestogen Therapy, Proceedings on the 2nd Int'l Meeting on Endometrial Cancer and Related Topics, pp. 65-80 (1978) (P50).

Whitehead, M.I. et al., Effects of Estrogens and Progestins on the Biochemistry and Morphology of the Postmenopausal Endometrium, New Eng. J. Med., vol. 305, No. 27, pp. 1599-1605 (Dec. 31, 1981) (P40).

Whitehead, M.I. et al., Actions of Progestins on the Morphology and Biochemistry of the Endometrium of Postmenopausal Women Receiving Low-Dose Estrogen Therapy, Am. J. Obstet. Gynecol., pp. 791-795 (Mar. 15, 1982) (P4).

Roger J.B. King, Aug. 29, 1995 (E25).

Curt Ross, Sep. 24, 1997 (E1 & E17).

Birgit Kroovyist, Sep. 17, 1997 (with translation) (E2).

Ralf Skoog, Feb. 3, 1997 (with translation) (E3).

Malcom Ian Whitehead, Oct. 15, 1997 (E22).

David W. Stanice, Nov. 10, 1997 (E30).

Ove Heide-Jorgensen, Feb. 8, 1998 (with translation) (E31).

Ib Windfeld, Feb. 4, 1998 (with translation) (E32).

Bertil Staland, Nov. 24, 1997 (E33).

DUPHAR International Research B.V. Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 04).

Novartis AG, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 03).

Novo Nordisk A/S, Notice of Opposition to a European Patent, Oct. 16, 1997 (Party No. 01).

Novo Nordisk A/S, Supplemental Notice of Opposition to a European Patent, Oct. 15, 1997 (Party No. 01).

Novo Nordisk A/S, Supplemental Notice of Opposition to a European Patent, Nov. 18, 1997 (Party No. 01).

Novo Nordisk A/S, Supplemental Notice of Opposition to a European Patent, Feb. 25, 1998 (Party No. 01).

Orion Pharma, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 10).

Ortho Pharmaceutical Corporation, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 07).

Pharmacia & Upjohn, Notice of Opposition to a European Patent, Oct. 21, 1997 (Party No. 06).

The Procter & Gamble Company, Notice of Opposition to a European Patent, Oct. 21, 1997 (Party No. 05).

M.F. Schrer Limited, Notice of Opposition to a European Patent, Oct. 17, 1997 (Party No. 02).

Schering AG, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 09).

Shin Pharmaceutical Contracts Limited, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 08).

Warner-Lambert Company, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 11).

Gonzenbacr G. et al., Treatment of Menopausal Syndrome, Med. Akt. 8:618-419 (1982) (with English translation).

Kaiser, R., Hormonale Behandlung von Zyklusstorungen, 4th rev., p. 115 (1970).

Mackay-Hart, D., A Comparative Trial of Kliogest With and Without Oestriol for the Prevention of Vasomotor Symptoms. Adverse Lipid Profile Changes and Osteoporosis in Postmenopausal Women (Dec. 15, 1993).

Mackay-Hart, D., A Comparative Trial of Kliogest With and Without Oestriol Versus Cyclical Hormone Replacement Therapy in Treatment on Postmenopausal Women (Dec. 15, 1993).

Nishino, Y. and Neumann, F., Sialic Acid Content in Mouse Female Reproductive Organs as a Quantitative Parameter for Testing the Estrogenicand Antiestrogenic Depot Effect and Dissociated Effect of Estrogens on the Uterus and Vagina, Acta Endocrinologica (Copenhagen) Suppl, vol 76 (187), p. 62 (1974) (Abstract).

Paterson, M.E.L. et al., Endometrial Disease After Treatment with Oestrogens and Progestogens in the Climacteric, Br. Med. J. vol. 280 (6217), pp. 822-824 (Mar. 22, 1980).

Physicians' Desk Reference 37th Ed., pp. 118, 405, 445-449 (1983).

Socialstyrelsens Kommittee for Lakemedelsinformation (Health Board Committee on Medical Information), Menopaus, Substitutionel Treatment with Estrogen, Workshop, Aug. 30-31, 1982, pp. 1-164, 166 (published 1983).

Staland, B., Treatment of Climacteric Symptoms by Natural Oestrogen Without Stimulation of the Endometrium, Cancer Treatment Reports, vol. 63, No. 7, Abstr. No. 369 (Jul. 1979).

Whitehead, M.I., The Effects of Estrogens and Progestogens on the Postmenopausal Endometrium, Maturitas, vol. 1, No. 2, pp. 87-98 (1978) (Abstract).

Re. 35,247
Page 5

Yksulo, Ferri et al., Scrum Bile Acids and Lipids During Treatment of Climacteric Symptoms with Natural Estrogen-Progestin Combinations, Maturitas, vol. 3, No. 1, pp. 21–24 (1981).

SDM, Swedish Drug Market, I/1984 and II/1984.

Merck, p. 360 (1968).

Unlisted Drugs, vol. 22, No. 10, Oct. 1970, p. 149; Chatham, New Jersey, US; p. 149c: "Cyclo-Progynova".

Unlisted Drugs, vol. 25, No. 10, Oct. 1973, p. 160; Chatham, New Jersey, US; p. 160k: "Microgynon".

Unlisted Drugs, vol. 26, No. 11, Nov. 1974, p. 170; Chatham, New Jersey, US; p. 170b: "WL-20".

Unlisted Drugs, vol. 27, No. 8, Aug. 1975, p. 130; Chatham, New Jersey, US; p. 130g: "Nordiol".

Unlisted Drugs, vol. 28, No. 2, Feb. 1976, p. 20; Chatham, New Jersey, US; p. 26j: "Minidril".

Unlisted Drugs, vol. 29, No. 3, Mar. 1977, p. 41; Chatham, New Jersey, US; p. 41g: "Adepal".

Obstetrics and Gynecology, 63(6), 759–763 (Jun. 1984).

**U.S. Patent**              Jul. 6, 1999              Re. 36,247



FIG. 2

FIG. 1

## Re. 36,247

**1**

### METHOD OF HORMONAL TREATMENT FOR MENOPAUSAL OR POST-MENOPAUSAL DISORDERS INVOLVING CONTINUOUS ADMINISTRATION OF PROGESTOGENS AND ESTROGENS

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of the reissue specification; matter printed in italics indicates the additions made by reissue.

This is a continuation-in-part of U.S. Ser. No. 520,834, filed Aug. 5, 1983, now abandoned.

This invention relates to a method of hormonal treatment for menopausal (including perimenopausal) and post-menopausal) disorders in women, and particularly to a treatment involving the continuous administration of a progestogen in conjunction with an estrogen. The invention further relates to a pharmaceutical composition comprising selected dosage units of progestogen and estrogen. In another aspect, the invention is concerned with a regimen comprising the continuous administration of progestogen in conjunction with the cyclical administration of estrogen and to a multi-preparation pack containing selected dosage units of progestogen and estrogen and particularly adapted to such regimens.

Perimenopausal (i.e. over approximately forty years of age), menopausal and post-menopausal women frequently experience a large variety of conditions and disorders which have been attributed to estrogen deprivation due to ovarian failure. The duration of these disorders can be extremely variable, and include hot flushes which can be devastating in some women and very mild in others. Dryness of the vagina associated with susceptibility to minor infections, and frequently associated with discomfort during intercourse, is another symptom which may be directly related to the decrease in estrogen availability.

In a long-term sense, one of the most health-threatening aspects of the menopause is the loss of mineral from bone (osteoporosis) which produces a decrease in bone mass and generates a serious risk of fractures. For example, evidence exists that there is a six-fold increase in fractures in post-menopausal women as opposed to men of the same age (Garraway et al, Mayo Clinic Proceedings, 54, 701–707, 1979). These fractures, of course, carry a high complication rate among older people, a marked increase in disability and general morbidity, and certainly an increased risk of mortality.

Another serious health-threatening aspect of the menopause is the imperative loss of protection against heart attacks which is enjoyed by younger women up to the age of 50, when compared to men of the same age. The steep increase in mean serum cholesterol concentration which occurs around the menopause (during the fourth and fifth decades) may contribute importantly to the progressive increase in death from ischemic heart disease in older women. In the eighth and ninth decades, the incidence of deaths from ischemic heart disease, approaches that of men (Havlik, R.J. and Manning-Feinleib, F.H. 1979, NIH Publication No. 79-1610, U.S. Department of HEW).

In addition to the above-mentioned major physical problems, some women experience a larger variety of other symptoms ranging from depression, insomnia, and nervousness, to symptoms of arthritis and so forth.

It is generally agreed that estrogen is the most effective agent for the control or prevention of menopausal flushes and vaginal atrophy. It is effective in retarding or preventing the appearance of clinical evidence of osteoporosis. In

**2**

appropriate doses, when combined with di-norgestrel (or laevo-norgestrel), a favourable effect upon blood lipids is also seen. Problems with estrogen therapy do exist, however, and have been widely explored and documented in the medical literature. The means by which estrogen has been administered, generally speaking, involves either the use of estrogen [alone] alone or estrogen plus a progestogen.

Estrogen [along] alone, given in small doses over a continuous basis, is effective in most patients for the control of the above symptoms and problems associated therewith. However, although the vast majority of women taking continuous low-dose estrogen will not have bleeding for many months or even years, there is a distinct risk posed by this routine of silently (i.e. exhibiting no overt symptoms) developing "hyperplasia of the endometrium". This term refers, of course, to an overstimulation of the lining of the uterus which can become pre-malignant, coupled with the possibility that the patient will eventually develop cancer of the uterine lining even under such a low-dose regimen (Gusberg et al, Obstetrics and Gynaecology, 17, 397–412, 1961).

Estrogen [along] alone can also be given in cycles, usually 21–25 days on treatment and 5–7 days off treatment. Again, if small doses of estrogen are required to control the symptoms and it is used in this fashion, only about 10% of women will experience withdrawal bleeding between the cycles of actual treatment. However, one must again be concerned by the risk of developing endometrial hyperplasia and by the increased relative risk of developing cancer of the uterus (Research on the Menopause: Report of a W.H.O. Scientific Group, 52–68, 1981).

The addition of progestogen for the last 7–10 days of each estrogen cycle will virtually eliminate the concern about developing endometrial hyperplasia and probably reduce the risk of developing endometrial carcinoma below that of the untreated general population. However, withdrawal bleeding will occur regularly in this routine and this is highly unacceptable to most older women (Whitehead, Am. J. Obs/Gyn. 142.6, 791–795, 1982).

Still another routine for estrogen administration would involve a formulation such as those found in birth control pills which contain relatively small doses of estrogen over the full 20–21 day treatment cycle, plus very substantial doses of potent progestogen over the same period of time. This routine, of course, not only produces withdrawal bleeding on each cycle, but is further unacceptable because such formulations have been shown to carry an increased risk of developing arterial complications such as stroke or myocardial infarction in older women about the age of 35–40. This is especially true if the individual is a smoker of cigarettes (Plunkett, Am. J. Obs/Gyn. 142, 6, 747–751, 1982).

Therapeutic regimens employing a progestogen along-together with relatively large doses in order to control hot flushes. Moreover, use of a progestogen alone does not prevent atrophy of the vaginal mucosa, although it may help to prevent osteoporosis. However, a progestogen administered in large doses, together with large amounts of a synthetic estrogen, induces changes in blood lipids which may promote arteriosclerotic changes and have been implicated in the appearance of strokes and myocardial infarction among women taking oral contraceptives in their later reproductive years, (Plunkett, supra).

The present invention provides a novel therapeutic method and composition involving the use of low dosage levels of estrogen and progestogen, which method is designed to avoid or minimize bleeding and prevent over-stimulation of the lining of the uterus while producing

Re. 36,247

3

favourable changes in blood lipids. In particular, the method involves continuous and uninterrupted administration of very small doses of a progestogen along with administration of an estrogen, the latter being cyclical, where required (for example, with perimenopausal women). The method specifically provides for treatment of menopausal or post-menopausal disorders in a women comprising either:

A. continuously and uninterruptedly administering a progestogen and an estrogen to said women, or

B. continuously and uninterruptedly administering a progestogen and cyclically administering an estrogen to said woman by repetitively using a dosage regimen comprising:

(i) administering said estrogen continuously for period of time between about 20 and about 120 days, followed by a period

(ii) terminating administering said estrogen for a period of time between about 3 and about 7 days.

The term "perimenopausal" refers to women of approximately forty years of age and older, who have not yet definitely arrived at menopause but who are experiencing symptoms associated with menopause.

The term "continuous" as applied in the specification and the claims to "administration" means that the frequency of administration is at least once daily. Thus, administration e.g. every other day or once every third day, is not "continuous" for purposes of this invention. Note, however, that the frequency of administration may be greater than once daily and still be "continuous", e.g. twice or even three times daily so long as the dosage level as specified herein is not exceeded.

The term "uninterrupted" means that there is no break in the treatment. Thus "continuous, uninterrupted administration" of a progestogen would mean that the progestogen is administered at least once daily essentially in perpetuity or until the entire treatment is ended. In this regard, it should be noted that "cyclical" administration means that there is a break in administration and that, therefore, by definition, cyclical administration cannot be "uninterrupted".

The term "dosage level" means the total amount of estrogen or progestogen administered per day. Thus, for example, the "continuous administration" of a progestogen to a woman at a "dosage level" of 75 micrograms means that the women receives a total of 75 micrograms of progestogen on a daily basis, whether the progestogen is administered as a single 75 microgram dose or, e.g. three separate 25 microgram doses. It is noted that the most conventional means of continuously administering an estrogen or progestogen is as a single daily oral dose at the prescribed dosage level. Parenteral modes of administration, which provide a slow release of the progestogen, could be substituted for the oral route.

Thus, the invention realizes the objects of providing a therapeutic method allowing for the administration of an estrogen, controlling hot flushes, restoring the vaginal mucosa to a healthier state, preventing the development of the demineralization of bones as well as preventing change in lipids which predispose to cardiovascular disease, over long periods of treatment, which method does not, however, initiate bleeding or increase the risk of endometrial carcinoma.

In another aspect, the invention provides a pharmaceutical composition for hormonal treatment of menopausal or post-menopausal disorders in a woman, which comprises a dosage unit of a progestogen and a dosage unit of an estrogen for continuous administration wherein the units comprise a progestogen in the range of 0.025 to 30 mg and an estrogen in the range of 0.005 to 2.5 mg together with a pharmaceutically acceptable inert carrier.

4

The actual unit dosages are selected according to conventionally known methods, e.g. body weight of patient and biological activity of the hormones, with the ultimate goal of producing the desired result with the minimum quantities of hormones.

The interruption of the estrogen administration is required in perimenopausal women to maintain normal periods and may be required in certain jurisdictions due to health concerns—particularly overstimulation of the lining of the uterus to cause a pre-malignant condition. The absence of estrogen for a short period allows the lining of the uterus to be sloughed and any pre-malignancy thus avoided. However, the inventors believe that even with continuous administration of estrogen, the presence of progestogen will give rise to sufficient sloughing of the uterus that no such condition would be likely to occur.

A further and important object of the invention is to provide the means whereby a woman may receive the proper quantities and dosage units of the progestogen and estrogen for adherence to the prescribed regimen wherein the dosage of estrogen is cyclically administered. Such means takes the form of a multi-preparation pack, which facilitates administration by a nurse or physical in appropriate circumstances or, more usually, self-administration by the woman.

The multi-preparation pack contains sufficient dosage units of progestogen and estrogen for continuous administration of both said progestogen and said estrogen for a period of from about 20 to 120 days plus an additional number of dosage units of progestogen for administration for an additional period of time of from about 3 to about 7 days during which administration of said estrogen is terminated.

The estrogen used in the present disclosure may be those which are orally active and are suitable for oral counterception and selected from natural estrogens such as estradiol, estradiol-17β, estradiol valerate, conjugated equine estrogens, piperazine estrone sulphate, estrone, estriol, estriol succinate and polyestriol phosphates, or from synthetic estrogens such as ethinyl estradiol, quinestanol and mestranol. The natural estrogens are preferred.

The progestogen is again selected from those which are orally active and suitable for oral contraceptives and may be, [blank] for example, di-norgestrel, levo-norgestrel, norethindrone (norethisterone), norethindrone acetate, ethynodiol diacetate, medroxyprogesterone acetate, cyproterone acetate or norethynodrel.

In the following Tables IA and IB are listed preferred unit dosages, minimum unit dosages and maximum unit dosages for the estrogens and progestogens useful in this invention. The quantities are determined by the biological activities of the particular substances are obtained commercially from sources that normally supply them in micronized form.

TABLE IA

ESTROGENS

| | Preferred | Dosage Minimum | (mg/day) Maximum |
|---|---|---|---|
| Natural estrogens (steroids) | | | |
| Estradiol | 1 | 0.500 | 2 |
| Estradiol-17β | 1 | 0.500 | 2 |
| Estradiol valerate | 1 | 0.500 | 2 |
| Conjugated equine estrogens | 0.600 | 0.300 | 2.5 |
| Estrone | 0.800 | 0.300 | 2.5 |

Re. 36,247

**5**

### TABLE 1A-continued

#### ESTRONE

| | Preferred | Dosage Minimum | (mg/day) Maximum |
|---|---|---|---|
| Piperazine estrone sulphate (estropipate) | 0.200 | 0.200 | 2.5 |
| Estrone* | 0.100 | 0.050 | 0.500 |
| Estriol succinate* | 0.300 | 0.050 | 0.500 |
| Polyestriol phosphate* | 0.100 | 0.050 | 0.300 |
| Synthetic estrogens (steroidal) | | | |
| Ethinyl estradiol | 0.010 | 0.005 | 0.020 |
| Mestranol | 0.015 | 0.005 | 0.040 |
| Quinestrol | 0.010 | 0.005 | 0.020 |

It may be noted that the estrogens of Table 1A, the estriol preparations marked with an asterisk (*) have lower preference than estradiols or estrones because they fail to spare bone in post-menopausal women. However, they could be combined with natural or synthetic estrogens for the purpose of the invention. Also, it is preferable that the following non-steroidal estrogens—although useful in this invention—be avoided for women who have not definitely arrived at menopause (who could become pregnant)—estrogens of this type being known to induce vaginal cancer and other abnormalities in offspring if taken during pregnancy:

| | Preferred | Dosage Minimum | (mg/day) Maximum |
|---|---|---|---|
| Stilboestrol | 0.100 | 0.020 | 2 |
| Stilboestrol diphosphate | 0.100 | 0.020 | 2 |
| Diethylstilboestrol | 1 | 9.400 | 2.5 |
| Chlorotrianisen | 2 | 1 | 2.5 |
| Hexestrol | 2 | 0.5 | 2.5 |
| Dienoestrol | 0.300 | 0.300 | 2.5 |
| Hexestrol | 0.300 | 0.300 | 2.5 |
| Methallenoestril | 1 | 0.300 | 0.5 |

### TABLE 1B

#### PROGESTERONE

| | Preferred | Dosage Minimum | (mg/day) Maximum |
|---|---|---|---|
| Laevo-norgestrel | 0.050 | 0.025 | 0.075 |
| d-norgestrel | 0.300 | 0.050 | 0.150 |
| Norethindrone (norethisterone) | 0.50 | 0.25 | 1.0 |
| Norethindrone (norethisterone) | 0.30 | 0.30 | 1.0 |
| Others | | | |
| Dydrogesterone | 10 | 5 | 30 |
| Medroxyprogesterone acetate | 2.5 | 2 | 15 |
| Norethynodrel | 1 | 0.300 | 5 |
| Allyloestrenol | 2 | 1 | 20 |
| Lynoestrenol | 0.300 | 0.300 | 2 |
| Oxogestrol acetate | 0.300 | 0.050 | 1 |
| Medrogestone | 2 | 1 | 10 |
| Norgestrienone | 0.050 | 0.020 | 0.300 |
| Dimethisterone | 1 | 0.300 | 15 |
| Ethisterone | 2.5 | 1 | 25 |
| Cyproterone acetate | 0.300 | 0.100 | 10 |
| Chlormadinone acetate | 0.300 | 0.300 | 2 |
| Megestrol acetate | 1 | 0.500 | 10 |

Although chlormadinone acetate and megestrol are useful in the context of this invention, it has been speculated that these progestogens may pre-dispose breast tumors, although no clinical proof exists to that effect. However, unless and until such suspicions are proven to be without foundation, these compounds are clearly of lower preference.

**6**

The estrogen/progestogen combinations may be administered non-orally by implants or intramuscular injection. Generally speaking, the required dosages are based upon somewhat lower daily dosage levels than those required for the orally administered estrogens and progestogens, for the simple reason that the former are directly released into the bloodstream with consequently greater activity than the same compounds when orally ingested.

Estradiol, estradiol valerate and estradiol 17-β are suitable candidates for estrogen implants, in maximum and minimum amounts of 100 mg and 20 mg, with 100 mg preferred. These quantities will be suitable for slow-release implants intended for replacement every 3 to 12 months.

Suitable progestogen implants and intramuscular injections are set forth in Table 1C.

### TABLE 1C

| | Period | Ideal Quantity (mg) Pre-ferred | Min-imum | Max-imum |
|---|---|---|---|---|
| Progestogen implants | | | | |
| Levonorgestrel | every 2-5 yr. | 100 | 25 | 100 |
| dl-norgestrel | every 2-5 yr. | 100 | 50 | 200 |
| Norgestrienone | every 1-2 yr. | 100 | 25 | 200 |
| Norethindrone acetate | every 3-4 mos. | 100 | 25 | 200 |
| Progestogen injections (depot) | | | | |
| Medroxyprogesterone acetate | every 3 mon. | 150 | 50 | 500 |
| Norethindrone enanthate | every 3 mon. | 200 | 50 | 400 |
| Oestradiol undecanoate | every 3 mon. | 100 | 50 | 400 |
| Algestone acetophenide | monthly | 50 | 20 | 300 |
| Hydroxyprogesterone hexanoate | weekly | 150 | 50 | 150 |
| Hydroxyprogesterone caproate | bi-weekly | 100 | 50 | 250 |

dl-Norgestrel, laevo norgestrel (the common name for d-13β-ethyl-17α-ethinyl-17β-hydroxygon-4-en-3-one), norethindrone (common name for 17-hydroxy-19-nor-17α-pregn-4-en-20-yn-3-one), ethynodiol diacetate (common name for 19-nor-17α-pregn-4-en-20-yne-3β, 17-diol diacetate), norethindrone acetate, and cyproterone acetate may also be administered by injection. It will be readily appreciated by those skilled in the art that any other synthetic progestogen which is orally active or effective for use in conjunction with contraception is also suitable for use in this invention.

Any of the suitable estrogens and progestogens (particularly those listed in the foregoing tables) may be combined with one another in the quantities recited to give estrogen/progestogen combinations within the purview of the invention. Especially preferred combinations are those containing the estradiols or conjugated equine estrogens and the progestogen norethindrone, or medroxyprogesterone. Thus, especially preferred combinations are:

Estradiol/Laevo-norgestrel
Estradiol 17β/Laevo-norgestrel
Estradiol valerate/Laevo-norgestrel
Conjugated equine estrogens/Laevo-norgestrel
Estradiol/dl-norgestrel
Estradiol 17β/dl-norgestrel
Estradiol valerate/dl-norgestrel
Conjugated equine estrogens/dl-norgestrel
Estradiol/Norethindrone (norethisterone)
Estradiol 17β/Norethindrone (norethisterone)
Estradiol valerate/Norethindrone (norethisterone)
Conjugated equine estrogens/Norethindrone (norethisterone)

Re. 36,247

7

Estradiol/Norethindrone (norethisterone) acetate
Estradiol 17β/Norethindrone (acorethisterone) acetate
Estradiol valerate/Norethindrone (acorethisterone) acetate
Conjugated equine estrogen/Norethindrone (acorethisterone) acetate
Estradiol/Medroxyprogesterone acetate
Estradiol 17β/Medroxyprogesterone acetate
Estradiol valerate/medroxyprogesterone acetate
Conjugated equine estrogen/Medroxyprogesterone acetate

The maximum, minimum and preferred dosage levels for the respective estrogens and progestogens in the foregoing combinations are as recited in the tables.

The comparisons of the invention is usually administered orally in admixture with a pharmaceutically acceptable inert carrier. The estrogen and progestogen can be compounded in any pharmaceutically acceptable inert (non-toxic) form. The packaging can be any system convenient for proper delivery. With the preferred orally administrable form, the pharmaceutical carrier can be of any of the conventionally employed carriers, for example pharmaceutically grades of mannitol, lactose, starch, magnesium stearate, sodium saccharin, talcum cellulose, glucose, sucrose, magnesium carbonate, and similar substances. The compositions may be formulated into solutions, suspensions, tablets, pills, capsules, powders, sustained release formulations, etc.

One of the unique aspects of this invention is the adaptation of the multi-preparation pack to the continuous uninterrupted administration of a progestogen and an estrogen is administered in a cyclic fashion. The duration of the estrogen cycle can be very variable, with continuous administration ranging between 20 and 120 days followed by a break (i.e. interruption) in estrogen administration ranging anywhere from about 3 to about 7 days. However, if the estrogen is discontinued for a period longer than 5 days, recurrence of hot flushes is most likely to occur, in a number of patients.

The multi-pack dispensing system may be accommodated by conventional packaging equipments, e.g. transparent strip foil packages conditionally arranged in daily dosages or other conventional means in the art. Where the multi-pack is employed for the cyclical administration of an estrogen in combination with a progestogen, the pack would conveniently comprise a transparent strip foil package with the combined unit daily dosages arranged continuously with, for example, up to a total of 120 unit dosages, the 3 to 7 unit dosages of progestogen being located at the end of the combined daily unit dosages whereby they would be taken at the end of the series.

The inventors have developed clinical evidence from this routine that the amounts of estrogen and progestogen required to control hot flushes, vaginal symptoms and associated subjective symptoms are very small. Preliminary metabolic responses of the subjects indicative favourable changes toward the lower blood lipid levels found in younger premenopausal women.

EXAMPLE 1

An experimental study of thirty women was instituted under a randomized double blind protocol with crossover and involved the administration of placebos, progestogen only, estrogen only and the combination of the continuous, uninterrupted progestogen/cyclic estrogen treatment. Treatment comprised administering each hormone and the combination as follows: (1) estrogen alone for two months; (2) progestogen alone for two months; (3) combination therapy using (1) and (2) for six months. Each period of administ-

8

tering a hormone of the combination was followed by a one month period of placebo (substance with no endocrine activity) administration. The estrogen was administered 17β-estradiol administered at a daily dosage level of 1 milligram, while the progestogen was di-norgestrel administered at a dosage level of 75 micrograms.

Of 30 women who have completed this study, 22, on the basis of their responses throughout the fourteen months of observation, selected the combination treatment and requested to continue it. This represents a high level of acceptability.

EXAMPLE 2

In a follow-up phase of observation, 17 subjects (with intact uterus) have completed a total of 125 lunar months of the combination therapy (continuous, uninterrupted administration of di-norgestrel, cyclic administration of 17β-estradiol). None of the patients experienced "bleeding" which required protection. 1.6 percent of the cycles involved spotting requiring no protection. 98.4 percent of the cycles were completely clear.

The combination therapy has been associated with no evidence whatsoever of endometrial hyperplasia (over-stimulation of the lining of the uterus). One patient, after the 2-month phase of taking estrogen only (in the double blind study) did show evidence not only of hyperplasia of the endometrium but also had a typical findings which could be interpreted as indicative of a premalignant change. Addition of the small (75 microgram) dosage level of progestogen (di-norgestrel) for two weeks only followed by full dilatation and curettage revealed that the endometrium had become completely atrophic once again and a total reversal of the previous findings were noted.

As an alternative to di-norgestrel, laevo-norgestrel may be used. Since the di-norgestrel consists of equal parts of the dextro (inactive) and laevo (active) forms, only half the quantity of laevo-norgestrel is used with the same effect. Thus, if laevo-norgestrel is substituted for di-norgestrel in the foregoing examples, the laevo-norgestrel dosage level is 37.5 micrograms.

At least five cases of young women who required removal of ovaries and uterus because of severe endometriosis have also been successfully treated by the above combination. These women rarely have total removal of the endometriotic tissue. It is important to treat these patients with estrogen replacement therapy to prevent the early appearance of bone demineralization (osteoporosis), elevation of cholesterol and triglycerides and to control severe hot flushes and vaginal atrophy. If patients such as these are treated with estrogen alone, they frequently develop recurrence of pain symptoms due to residual endometriosis being restimulated by the administered estrogen. Because the inventors' combination therapy tends to promote atrophy of the lining of the uterus (endometrium) no matter whether it is located normally within the uterus or in the endometriotic tissue in the pelvis, it is found that these patients tolerate the treatment very well and do not have a recurrence or reactive of their endometriosis. Furthermore, even small doses of estrogen in combination with the continuous progestogen routine is sufficient to control the severe hot flushes which such patients experience.

Thus this invention permits control of menopausal disorders including hot flushes and vaginal atrophy along with many of the subjective symptoms. Further, given that both components of the combination therapy are considered to be effective in retarding osteoporosis, long term therapy to prevent this disabling disease should be effective.

## Re. 36,247

**9**

Additionally, the risk of developing endometrial (uterine) cancer from the combination therapy should, at a minimum, be reduced to the normal incidence of the general population as opposed to the increased risk which has in fact been demonstrated to occur using estrogen-only treatment. The inventors have in fact developed some evidence suggestive that the combination therapy reduces the risk of presently past endometrial changes, which may reduce the risk of developing endometrial cancer. The reduction in bleeding or spotting in patients taking the combination therapy makes it much more desirable relative to known treatments, particularly to older women.

The following describes directions which may be applied to a multi-preparation pack specifically adapted to the cyclical administration of estrogen together with the continuous administration of progestogen in accordance with one embodiment of the invention:

### ABOUT THESE TABLETS

(The tablet set herein) is used to control menopausal symptoms. It is not a birth control pill and cannot be relied upon to prevent pregnancy.

Oral contraceptives should not be taken at the same time as these tablets and, if necessary, you should therefore ask your doctor about alternative means of mechanical protection.

When treatment is first started, tingling of the breasts slight nausea or occasional vaginal bleeding may occur—this should settle after a short time.

If you have any unusual symptoms, contact your doctor.

To be taken under medical supervision.

### HOW TO USE THIS PACK

Whether you are menstruating regularly or not, take the first tablet on a day suitable to yourself until all the tablets have been consumed.

The last seven tablets of the different colour, are to be taken only when all others have been consumed.

Alternatively, the foregoing instructions may be printed as a leaflet, and the package instruction modified as follows:

Before commencing treatment please read the enclosed instruction leaflet carefully. If you have any difficulties following the instructions please ask your doctor for assistance.

### DIRECTIONS

To remove a tablet, press firmly with your thumb on the appropriate clear plastic bubble. This may be helped by holding the card so that your fingers surround the aluminium foil through which the tablet will emerge.

### BRIEF DESCRIPTION OF THE DRAWINGS

A multi-preparation pack suitable for administration of tablets in accordance with the regimen described above is illustrated in FIGS. 1 and 2 of the drawings. A bubble pack 10 (which may be folded along the line 10a) is sold in a protective sleeve 11, upon the rear of which are printed the directions for use and salient facts concerning the tablets, as indicated at 12 in the drawing. When removed from the protective sleeve by the consumer, the bubble pack contains as many tablets as the number of days which the pack is intended to cover (in this example, one hundred and twenty days). Optionally, the individual bubble segments may be numbered from one to one hundred and twenty but it is

**10**

important that the last few segments, which contains the progestogen-only tablets, be clearly distinguished from the remainder of these segments. In the present example, the segments 13 containing the first one hundred and thirteen tablets (combination progestogen/estrogen) are a light colour (for example, white) whilst the last seven segments 14, containing the progestogen-only tablets are a dark colour (red, for example). By following the directions on the sleeve and observing the colours on the bubble pack (and the "day numbers", if present) the consumer will take the combination tablets for the first one hundred and thirteen days and the progestogen tablets for the last seven days. Thereafter, a new package would be opened, whereby the cycle is repeated.

Although only a few exemplary embodiments of this invention have been described in detail above, those skilled in the art will readily appreciate that many modifications are possible in the exemplary embodiments without materially departing from the novel teachings and advantages of this invention.

We claim:

[1. A method of hormonally treating menopausal or post-menopausal disorders in a woman, comprising administering to said woman continuously and uninterrupted both progestogen and estrogen in daily dosage units of progestogen equivalent to levo-norgestrel dosages of from about 0.025 mg to about 0.075 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2.0 mg.]

[2. The method of claim 1 wherein said estrogen is 17 β-estradiol and said progestogen is levo-norgestrel, the daily dosage level of said 17 β-estradiol being about 1 mg, the daily dosage level of said di-norgestrel (where present) being about 100 micrograms, and the daily dosage of said levo-norgestrel (where present) being about 50 micrograms.]

3. A method of hormonally treating perimenopausal, menopausal or post-menopausal disorders in a woman, comprising:

A. continuously and uninterruptedly administering a progestogen to said woman in daily dosage units of progestogen equivalent to levo-norgestrel dosages of from about 0.025 mg to about 0.075 mg, and

B. cyclically administering an estrogen to said woman by repetitively using a dosage regimen comprising:

(i) administering said estrogen continuously for a period of time between about 20 and about 120 days in daily dosage units of estrogen equivalent to estradiol dosages of from about 0.500 mg to about 2 mg, followed by

(ii) terminating administering said estrogen for a period of time between about 3 and about 7 days.

4. The method of claim 3 wherein said progestogen is selected from the following group, with respective maximum and minimum daily dosage levels as follows:

| | Dosage Minimum | (mg/day) Maximum |
|---|---|---|
| Levo-norgestrel | about 0.025 | about 0.075 |
| d-norgestrel | about 0.050 | about 0.150 |
| Norethindrone (norethisterone) | about 0.15 | about 1.0 |
| Norethindrone (norethisterone) acetate | about 0.10 | about 1.0 |
| Polyestriol dianate | about 0.10 | about 1.0 |
| Dydrogesterone | about 5 | about 30 |
| Medroxyprogesterone acetate | about 2 | about 15 |

Re. 36,247

## 11
-continued

| | Dosage Minimum (mg/day) | (mg/day) Maximum |
|---|---|---|
| Norethindrel | about 0.500 | about 5 |
| Allylestrenol | about 5 | about 20 |
| Lynestrenol | about 0.300 | about 5 |
| Quingestanol acetate | about 0.050 | about 1 |
| Medrogestone | about 1 | about 10 |
| Norgestrienone | about 0.020 | about 0.200 |
| Dimethisterone | about 0.500 | about 25 |
| Ethisterone | about 1 | about 25 |
| Cyproterone acetate | about 0.500 | about 20 |

5. The method of claim 3 wherein said estrogen is selected from the following group, with respective maximum and minimum daily dosage levels as follows:

| | Dosage Minimum (mg/day) | (mg/day) Maximum |
|---|---|---|
| Estradiol | about 0.500 | about 2 |
| Estradiol-17β | about 0.500 | about 2 |
| Estradiol valerate | about 0.500 | about 2 |
| Conjugated equine estrogens | about 0.300 | about 2.5 |
| Estrone | about 0.300 | about 2.5 |
| Piperazine estrone sulphate (estropipate) | about 0.250 | about 2.5 |
| Ethinyl estradiol | about 0.005 | about 0.020 |
| Mestranol | about 0.006 | about 0.030 |
| [Quinestranol] Quinestrol | about 0.007 | about 0.040 |

6. The method of claim 5 or claim 4 wherein said estrogen is selected from the following group, with respective daily dosage levels as follows:

| | Dosage (mg/day) |
|---|---|
| Estradiol | about 1 |
| Estradiol-17β | about 1 |
| Estradiol valerate | about 1 |
| Conjugated equine estrogens | about 0.600 |
| Estrone | about 0.600 |
| Piperazine estrone sulphate (estropipate) | about 0.500 |
| Ethinyl estradiol | about 0.020 |
| Mestranol | about 0.025 |
| [Quinestranol] Quinestrol | about 0.030 |

7. The method of claim 5 wherein said progestogen is selected from the following group, with respective daily dosage levels as follows:

| | Dosage (mg/day) |
|---|---|
| Laevo-norgestrel | about 0.050 |
| d-norgestrel | about 0.100 |
| Norethisterone (norethindrone) | about 0.30 |
| Norethindrone (norethisterone) | about 0.30 |
| Dihydrodiol diacetate | about 0.30 |
| Dydrogesterone | about 10 |
| Medroxyprogesterone acetate | about 2.5 |
| Norethynodrel | about 1 |
| Allylestrenol | about 2 |
| Lynestrenol | about 0.30 |
| Quingestanol acetate | about 0.200 |
| Medrogestone | about 3 |
| Norgestrienone | about 0.050 |
| Dimethisterone | about 2 |
| Ethisterone | about 2.5 |

8. The method of [any of claims] claim 5 wherein said estrogen and said progestogen are selected from the following combination:

## 12

Estradiol/Laevo-norgestrel
Estradiol 17β/Laevo-norgestrel
Conjugated equine estrogens/Laevo-norgestrel
Estradiol/dl-norgestrel
Estradiol 17β/dl-norgestrel
Estradiol valerate/Laevonorgestrel
Estradiol valerate/dl-norgestrel
Conjugated equine estrogens/dl-norgestrel
Estradiol/Norethindrone (norethisterone)
Estradiol 17β/Norethindrone (norethisterone)
Estradiol valerate/Norethindrone (norethisterone)
Conjugated equine estrogens/Norethindrone (norethisterone)
Estradiol/Norethindrone (norethisterone) acetate
Estradiol 17β/Norethindrone (norethisterone) acetate
Estradiol valerate/Norethindrone (norethisterone) acetate
Conjugated equine estrogen/Norethindrone (norethisterone) acetate
Estradiol/Medroxyprogesterone acetate
Estradiol 17β/Medroxyprogesterone acetate
Estradiol valerate/Medroxyprogesterone acetate
Conjugated equine estrogen/Medroxyprogesterone acetate

9. The method of claim 8 wherein said estrogen is 17β-estradiol and said progestogen is dl-norgestrel or laevo-norgestrel.

10. The method of claim 9 wherein the daily dosage level of said 17β-estradiol is between about 0.5 mg and about 2 mg, the daily dosage level of said dl-norgestrel, where present, is between about 50 and about 150 micrograms and the daily dosage level of said laevo-norgestrel, where present, is between about 25 and about 75 micrograms.

11. The method of claim 10 wherein the daily dosage level of said dl-norgestrel is about 75 micrograms.

[12. The method of claim 1 or 3 wherein said estrogen is a synthetic estrogen.]

[13. The method of claim 12 wherein said synthetic estrogen is selected from the group consisting of ethinyl estradiol, mestranol and quinestranol.]

[14. The method of claim 1 or 3 wherein said estrogen is a natural estrogen.]

[15. The method of claim 14 wherein said natural estrogen is selected from the group consisting of conjugated equine estrogen, estradiol, estradiol-17β estradiol valerate, estrone, piperazine estrone sulphate, estriol, estriol succinate and polyestriol phosphate.]

[16. The method of claim 1 or 2 wherein said progestogen is selected from the group consisting of laevo-norgestrel, dl-norgestrel, norethindrone (norethisterone), norethindrone (norethisterone) acetate, ethynodiol diacetate, dydrogesterone, medroxyprogesterone acetate, norethynodrel, allylestrenol, lynoestrenol, quingestanol acetate, medrogestone, norgestrienone, dimethisterone, ethisterone, and cyproterone acetate.]

[17. A pharmaceutical composition for the hormonal treatment of perimenopausal, menopausal and post-menopausal disorders in a woman, said composition being in implantable or intramuscularly injectable form and comprising, in association with a pharmaceutically acceptable carrier, sufficient progestogen and estrogen to provide dosage levels in said woman equivalent to orally administered daily dosages of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.075 mg and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2 mg.]

Re. 36,247

13

[18. The pharmaceutical composition of claim 17 in implantable form, wherein said estrogen is selected from the group consisting of estradiol, estradiol-17β, and estradiol valerate.]

[19. The pharmaceutical composition of claim 18 or 17 in implantable form, wherein said progestogen is selected from the group consisting of laevo-norgestrel, di-norgestrel, norgestienone, and norethindrone acetate.]

[20. The pharmaceutical composition of claim 17 in injectable form, wherein said progestogen is selected from the group consisting of medroxyprogesterone acetate, noresthindrone enanthate, gestronol hexanoate, and algestone acetophenide.]

21. A method of hormonally treating menopausal or postmenopausal disorders in a woman to prevent or retard the demineralization of bone, comprising administering continuously and uninterruptedly over the treatment period, in fixed daily dosages and at dosages and a duration sufficient to effectively retard or prevent the demineralization of bone while minimizing spotting and/or bleeding, both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.05 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2.0 mg.

22. A method of hormonally treating menopausal or postmenopausal disorders in a woman to prevent or retard the demineralization of bone, comprising administering continuously and uninterruptedly over the treatment period, in fixed daily dosages and at dosages and a duration sufficient to effectively retard or prevent the demineralization of bone while minimizing spotting and/or bleeding, both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.075 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2.0 mg, wherein the progestogen and the estrogen are combined in a single dosage form.

23. A method of hormonally treating menopausal or postmenopausal disorders in a woman, comprising administering continuously and uninterruptedly over the treatment period, in fixed daily dosages which minimize spotting and/or bleeding, both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.05 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 0.25 mg.

24. A method of hormonally treating menopausal or postmenopausal disorders in a woman, comprising administering continuously and uninterruptedly over the treatment period, in fixed daily dosages which minimize spotting and/or bleeding, both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.075 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2.0 mg, wherein the progestogen and the estrogen are combined in a single dose form.

25. The method of claim 21 or 23, wherein the progestogen and the estrogen are combined in a single dosage form.

26. The method of claim 21, 22, 23, 24 or 25, wherein the estrogen consists essentially of a bone-sparing estrogen.

27. The method of claim 21, 22, 23, 24 or 25, wherein the fixed daily dosages are administered over a treatment period of greater than 120 days.

28. The method of claim 21 or 22, wherein the dosage and duration of treatment are effective to prevent or retard osteoporosis.

29. The method of claim 21, 22, 23, 24 or 25, wherein the dosages and duration of treatment are sufficient to prevent

14

or retard changes in blood lipids which might otherwise predispose the woman to cardiovascular disease.

30. The method of claim 21, 22, 23, 24 or 25, wherein said progestogen is selected from the group consisting of laevo-norgestrel, di-norgestrel, ethynodiol diacetate, dydrogesterone, medroxyprogesterone acetate, norethynodrel, allylestrenol, lynoestrenol, quingestanol acetate, medrogestone, norgestrienone, dimethisterone, ethisterone, and cyproterone acetate.

31. The method of claim 22 or 24, wherein said progestogen is selected from the following group, with respective minimum and maximum daily dosage levels as follows:

| | Dosage (mg/day) Minimum | Dosage (mg/day) Maximum |
|---|---|---|
| Laevo-norgestrel | about 0.025 | about 0.075 |
| d-norgestrel | about 0.050 | about 0.150 |
| Ethynodiol diacetate | about 0.10 | about 1.9 |
| Dydrogesterone | about 5 | about 30 |
| Medroxyprogesterone acetate | about 1 | about 15 |
| Norethynodrel | about 2 | about 5 |
| Allylestrenol | about 2 | about 10 |
| Lynoestrenol | about 0.100 | about 5 |
| Quingestanol acetate | about 0.030 | about 2 |
| Medrogestone | about 2 | about 10 |
| Norgestrienone | about 0.010 | about 0.200 |
| Dimethisterone | about 0.540 | about 15 |
| Ethisterone | about 1 | about 25 |
| Cyproterone acetate | about 0.100 | about 10 |

32. The method of claim 21, 23, 25, wherein said progestogen is selected from the following group, with respective minimum and maximum daily dosage levels as follows:

| | Dosage (mg/day) Minimum | Dosage (mg/day) Maximum |
|---|---|---|
| Laevo-norgestrel | about 0.025 | about 0.050 |
| d-norgestrel | about 0.050 | about 0.100 |
| Ethynodiol diacetate | about 0.10 | about 1.0 |
| Dydrogesterone | about 5 | about 30 |
| Medroxyprogesterone acetate | about 1 | about 3.5 |
| Norethynodrel | about 0.100 | about 1 |
| Allylestrenol | about 1 | about 2 |
| Lynoestrenol | about 0.100 | about 2 |
| Quingestanol acetate | about 0.100 | about 0.200 |
| Medrogestone | about 0.050 | about 0.200 |
| Norgestrienone | about 1 | about 2 |
| Dimethisterone | about 0.020 | about 0.050 |
| Ethisterone | about 0.500 | about 1 |
| Cyproterone acetate | about 0.100 | about 0.500 |

33. The method of claim 21, 22, 23, 24 or 25, wherein said estrogen is selected from the group consisting of estradiol, estradiol-17β, conjugated equine estrogens, estradiol valerate, estrone, piperazine estrone sulphate, ethinyl estradiol, mestranol, and quinestrol.

34. The method of claim 33, wherein said estrogen is selected from the following group, with respective minimum and maximum daily dosage levels as follows:

| | Dosage (mg/day) Minimum | Dosage (mg/day) Maximum |
|---|---|---|
| Estradiol | about 0.500 | about 2 |
| Estradiol-17β | about 0.500 | about 2 |

Re. 36,247

### 15
continued

| | Dosage (mg/day) Minimum | Dosage (mg/day) Maximum |
|---|---|---|
| Estradiol valerate | about 0.500 | about 2 |
| Conjugated equine estrogens | about 0.300 | about 3.5 |
| Estrone | about 0.300 | about 2.5 |
| Piperazine estrone sulphate (estropipate) | about 0.250 | about 2.5 |
| Ethyl estradiol | about 0.005 | about 0.020 |
| Mestranol | about 0.005 | about 0.040 |
| Quinestrol | about 0.005 | about 0.030 |

35. The method of claim 34, wherein said estrogen is selected from the following group, with respective minimum and maximum daily dosage levels as follows:

| | Dosage (mg/day) Minimum | Dosage (mg/day) Maximum |
|---|---|---|
| Estradiol | about 0.500 | about 2 |
| Estradiol-17β | about 0.500 | about 2 |
| Estradiol valerate | about 0.500 | about 2 |
| Conjugated equine estrogens | about 0.300 | about 3.600 |
| Estrone | about 0.300 | about 2.600 |
| Piperazine estrone sulphate (estropipate) | about 0.500 | about 0.500 |
| Ethyl estradiol | about 0.005 | about 0.010 |
| Mestranol | about 0.005 | about 0.015 |
| Quinestrol | about 0.005 | about 0.020 |

36. The method of claim 30, 31, 32, 33, 34 or 35, wherein the fixed daily dosages are administered over a treatment period of greater than 120 days.

37. The method of claim 21, 23 or 25, wherein the progestogen is medroxyprogesterone acetate in an amount of from about 1 mg to about 2.5 mg.

38. The method of claim 21, 22, 23, 24 or 25, wherein the estrogen is conjugated equine estrogens in an amount of from about 0.300 mg to about 2.5 mg.

39. The method of claim 21, 23 or 25, wherein the progestogen is medroxyprogesterone acetate in an amount of from about 1 mg to about 2.5 mg, and the estrogen is conjugated equine estrogens in an amount of from about 0.500 mg to about 2.5 mg.

40. The method of claim 39, wherein the estrogen is conjugated equine estrogens in an amount of from about 0.300 to about 0.600.

41. The method of claim 39, wherein the progestogen is medroxyprogesterone acetate in an amount of about 2.5 mg and the estrogen is conjugated equine estrogens in an amount of about 0.600 mg.

42. The method of claim 39, wherein the progestogen is medroxyprogesterone acetate in an amount of about 2.5 mg

### 16

and the estrogen is conjugated equine estrogens in an amount of about 0.300 mg.

43. The method of claim 37, 38, 39, 40, 41 or 42, wherein the fixed daily dosages are administered over a treatment period of greater than 120 days.

44. The method of claim 37, 38, 39, 40, 41 or 42, wherein the dosages and duration of treatment are sufficient to prevent or retard changes in blood lipids which might otherwise predispose the woman to cardiovascular disease.

45. The method of claim 21, 23 or 25, wherein said progestogen is norethisterone (norethindrone) acetate in an amount of from about 0.10 mg to about 0.20 mg.

46. The method of claim 21, 22, 23, 24 or 25, wherein said estrogen is selected from the group consisting of estradiol, estradiol 17-β, or estradiol valerate and is in an amount of from about 0.500 to about 1 mg.

47. The method of claims 22 or 24, wherein the estrogen is estradiol-17β administered in fixed daily dosages of between about 0.500 and about 1 mg and the progestogen is norethisterone acetate.

48. The method of claim 47, wherein the fixed daily dosages are administered over a treatment period of greater than 120 days.

49. The method of claim 47, wherein the dosages and duration of treatment are sufficient to prevent or retard changes in blood lipids which might otherwise predispose the women to cardiovascular disease.

50. The method of claim 21, 23, 25 or 27, wherein said estrogen is piperazine estrone sulphate (estropipate).

51. The method of claim 21, 23, 25 or 27, wherein said estrogen is 17β-estradiol and said progestogen is dl-norgestrel or laevo-norgestrel, the daily dosage level of said 17β-estradiol being about 1 mg, the daily dosage level of said dl-norgestrel (where present) being about 100 micrograms, and the daily dosage of said laevo-norgestrel (where present) being about 50 micrograms.

52. The method of claim 21, 22, 23, 24 or 25 wherein the selected dosages are the minimum effective quantities of progestogen and estrogen.

53. The method of claim 21 or 29, wherein said daily dosages of progestogen and estrogen are administered once daily.

54. The method of claim 22, 24 or 25, wherein said single dosage form is a tablet.

55. The method of claim 21, 22, 23 or 24, wherein said progestogen is in micronized form.

56. The method of claim 21, 22, 23 or 24, wherein said estrogen is a synthetic estrogen.

57. The method of claim 21, 22, 23 or 24, wherein the estrogen is a natural estrogen.

\* \* \* \* \*

Exhibit I

US00RE36247E

# United States Patent [19]

**Plunkett et al.**

[11] E    Patent Number:    Re. 36,247

[45] Reissued  Date of Patent:    Jul. 6, 1999

[54] **METHOD OF HORMONAL TREATMENT FOR MENOPAUSAL OR POST-MENOPAUSAL DISORDERS INVOLVING CONTINUOUS ADMINISTRATION OF PROGESTOGENS AND ESTROGENS**

[75] Inventors: **Earl E. Plunkett; Bernard M. J. Wolfe**, both of London, Canada

[73] Assignees: **WOCO Investments, Ltd.; Pre JAY Holdings, Limited**, both of Canada

[21] Appl. No.: **08/542,941**

[22] Filed: **Oct. 13, 1995**

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.: **4,826,831**
     Issued: **May 2, 1989**
     Appl. No.: **06/635,236**
     Filed: **Jul. 24, 1984**

U.S. Applications:
[63] Continuation-in-part of application No. 06/520,834, Aug. 5, 1983, abandoned.

[51] Int. Cl.$^6$ ............................................... A61K 31/56
[52] U.S. Cl. ............................................................ 514/170
[58] Field of Search .......................................... 514/170

[56]         **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,639,600 | 2/1972 | Hendrix . |
| 3,733,407 | 5/1973 | Segre . |
| 3,836,651 | 9/1974 | Rudel et al. .................... 514/170 |
| 3,957,982 | 5/1976 | Lachnit-Fixson et al. ........... 514/170 |
| 4,018,919 | 4/1977 | Black . |
| 4,425,339 | 1/1984 | Pitchford .................... 514/170 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| OS 2645307 | of 0000 | Germany . |
| 1578340 | 11/1980 | United Kingdom . |
| 2096462 | 10/1982 | United Kingdom . |

#### OTHER PUBLICATIONS

*Acta Obstet. Gynecol. Sand.*, 59, 327–329 (1980) [Mugglestone].

Abstract—Paper delivered by Dr. Magos to the 23rd British Congress on the Menopause, Royal College of Obstetrics and Gynecology, Birmingham, Jul. 1983 [Magos].

1984 Physicians' Desk Reference (PDR) pp. 222, 545, 658, 1205, 1513 and 2044.

*Maturitas*, 3, 145–156 (1981) [Staland].

English translation of Plunkett's Oct. 28, 1993 reply in an opposition proceeding in the Danish patent application [Danish Patent Application No. 3770/84 (165,390)] equivalent to Plunkett.

*FASS*, 459 (Mar. 1984) (Pharmaceutical Specialties in Sweden) [Sweden].

English translation of, *FASS*, 459 (Mar. 1984) (Pharmaceutical Specialities in Sweden) [Sweden], item (A).

*Minerva Ginecologica*, 21(4), 193–7 (1969) [GOISIS].

English translation of *Minerva Ginecologica*, 21(4), 193–7 (1969) [GOISIS], item (C).

*Aust. N. Z. J. Obstet. Gynaec.*, 23, 43 (1983) [Smith].

*Report from Workshop*, 157–165 (Aug. 1982)—Socialstyrelsens komite' for lakemedelsinformation, workshop, Menopaus Substitutionsbehandling med ostrogen, Aug. 30–31, 1982 (published Jan. 1983) [Workshop report].

English translation of, *Report from Workshop*, 157–165 (Aug. 1982)—Socialstyrelsens komitte' for lakemedelsinformation, workshop, Menopaus Substitutionsbehandling med ostrogen, Aug. 30–31, 1982 (published Jan. 1983) [Workshop Report], item (F).

Novo Nordisk's Supplementary Opposition Statement filed Jul. 16, 1997 in Danish Patent Application No. 3770/84.

English translation of, Novo Nordisk's Supplementary Opposition Statement filed Jul. 16, 1997 in Danish Patent Application No. 3770/84, item (H).

Applicants' Agents' Request for Revival and Comments filed Nov. 15, 1996 in Danish Patent Application No. 3770/84 (165,390).

English translation of, Applicants' Agents' Request for Revival and Comments filed Nov. 15, 1996, item (J).

Declaration of Dr. Adam L. Magos signed Jun. 5, 1997.

Declaration of Ms. Caroline B. Roney signed June 10, 1997.

Mugglestone et al., "Combined Estrogen and Progestogen For The Menopause", Acta Obstet. Gynecol. Scand. 59:327–329, 1980.

Magos et al., 23rd British Congress, Royal College of Obstetrics and Gynecology, Birmingham, p. 156, Jul. 1993.

Chemical Abstracts, vol. 83, No. 9, Sep. 1, 1975, p. 142, Abstract No. 725288.

Novo Industri AB, "Kliogest®: Ostrogenpreparat med gestagentillsats" Mar. 1984 (Translation provided).

Eiken, P., N. Kolthoff and S. Pors Nielsen, "Ten Years Effects of Hormonal Replacement Therapy On Bone Mineral Content in Post-Menopausal Women," Department of Clinical Physiology, Hillerod Hospital, DK–3400 Hillerod, Denmark (1996).

(List continued on next page.)

*Primary Examiner*—Raymond J. Henley, III
*Attorney, Agent, or Firm*—Pillsbury Madison & Sutro LLP

[57]         **ABSTRACT**

A method of hormonally treating menopausal (including perimenopausal and post-menopausal) disorders in women, a composition, and a multi-preparation pack therefor. The administrative regimen to which the pack is particularly adapted comprises continuously and uninterruptedly administering a progestogen to a woman while cyclically administering an estrogen by using a repetitive dosage regimen. This regimen calls for administering the estrogen continuously for a period of time between about 20 and about 120 days, followed by terminating administering the estrogen for a period of time between about 3 and about 7 days. Alternatively, both the progestogen and estrogen may be administered for the full treatment period without interruption. The regimen avoids many of the problems associated with the administration of estrogen alone or with progestogen administered according to conventional regimens, and also avoids problems associated with such conventional regimens by maintaining the estrogen and progestogen at low daily dosage levels of between 0.005 mg and 2.5 mg estrogen and 0.25 mg and 30 mg progestogen.

**46 Claims, 1 Drawing Sheet**

Re. 36,247
Page 2

## OTHER PUBLICATIONS

Eiken, P., N. Kolthoff, S. Pors Nielsen and O. Barenholdt, "Eight Years Effects of Hormonal Replacement Therapy on Mineral Content in Post–Menopausal Women." Department of Clinical Physiology and Nuclear Medicine, Hillerod Sygebus, Helsevej 2. DK–3400 Hillerod (1995).

Eiken, P. and N. Kolthoff, "Compliance with long–term oral hormonal replacement therapy," Maturitas, vol. 22: 97–103, Sep. 1995.

Goisis M. "Treatment of Pre–climacteric and Climacteric introducing a New Estrogen–progestin Association" Minerva Ginecologica, 21 pages 193–197 (1969).

Lakartidaningen, vol. 81, No. 12, Mar. 21, 1984 (translation provided).

Madsen V., Postmenopausal Estrogen Treatment, Manedsskrift for Praktisk Laegegering, vol. 45 (8) 1967 (translation provided).

Magos AL, et al "Amenorrhea and Endometrial Atrophy with Continuous Oral Estrogen and Progestogen Therapy in Post–Menopausal Women", Obstet. gynecol 65:496 (1985).

Maschak CA, et al "Comparison of pharmaceodynamic properties of various estrogen formulations", Am. J. Obstet. Gynecol. 144:51 (1982).

Smith M, et al. "A Double–Blind Trial of Ethinyloestradio and Norethisterone Separately and Together, in Menopausal Women", Aust. N.Z. J. Obstet. Gynaec. 23: 43 (1983).

Workshop, Menopause, Substitutional Treatment with Estrogen, Socialstyrelsens Kommittee for lakemedelsinformation, 1983 (translation provided).

Mann JL Vessey MP, Thorogood M, Doll R, Myocardial infarction in young women with special reference to oral contraceptive practice, Brit Med J 1975;2:241–245.

Mattsson L–Å, Samsioe G, Estrogen–progestogen replacement in climacteric women, particularly as regards a new type of continuous regimen, Acta Obstet Gynecol Scand Suppl 1985;130:53–58.

Plunkett ER, Contraceptive steroids, age, and the cardiovascular system, Am J Obstet Gynecol 1982;142:747–751.

Stolley PD, Tonascia JA, Tockman MS, et al, Thrombosis with low–estrogen oral contraceptives, Am J Epidemiol 1975;102:197–208.

Silfverstolpe G, Gustafson A, Samsioe G, Svanborg A, Lipid metabolic studies in oophorectomized women: effects induced by two different estrogens on serum lipids and lipoproteins, Gynecol obstet Invest 1980;11:161–169.

Tietze C, Lewit S, Life risks associated with reversible methods of fertility regulation, Int J Gynaecol Obstet 1979;16:456–459.

Heiss G, Tamir I, Davis CE, et al., Lipoprotein–cholesterol distributions in selected North American population: The Lipid Research Clinics Program Prevalence Study, Circulation, 1980;61:302–315.

Hiryonen E, Mälkönen M, Mannien V, Effects of different progestogens on lipoproteins during postmenopausal replacement therapy, N Engl J Med 1981;304:560–563 (1981).

Kay CR, The happiness pill? J Roy Coll Gen Pract, 1980;30:8–19.

Khoo SK, Hacker N, Chang A, An incremental–dose combined oestrogen–progestogen oral contraceptive: effects on body weight, blood pressure, and biochemical parameters, Aust N Z J Obstet Gynaec, 1980;20:1712–176.

Larsson–Cohn U, Fåhraeus L, Wallentin L, Zador G, Lipoprotein changes may be minimized by proper composition of a combined oral contraceptive, Fertil Steril, 1981;35:172–179.

Mann JL Inman WHW, Oral contraceptives and death from myocardial infarction, Brit Med J, 1975;2:245–248.

Staland B, Continuous Treatment with Natural Oestrogens and Progestogens, A Method to Avoid Endometrial Stimulation, Maturitas 1981;3:145–156.

Mattsson L–Å, Callberg G, Samsioe G, Evaluation of a Continuous oestrogen–progestogen regimen for climacteric complaints, Maturitas 1982;4:95–102.

Bloch B., The effect of cyclical administration of levonorgestrel and ethinyloestradiol on blood pressure, body mass, blood glucose and serum triglycerides, S Afr Med J 1979;56:568–570.

Boston Collaborative Drug Surveillance Program, Boston University Medical Center, Surgically confirmed gallbladder disease, venous thromboembolism and breast tumors in relation to postmenopausal estrogen therapy, N Engl J Med 1974;290:15–19

Collaborative Group for the Study of Stroke in Young Men, Oral contraception and increased risk of cerebral ischemia or thrombosis, N Engl J Med 1973;288:871–878.

Gambrell RD Jr, Maier RC, Sanders BI, Decreased incidence of breast cancer in postmenopausal estrogen–progestogen users, Obstet Gynecol 1983;62:435–443.

Gambrell RD Jr, Bagnell CA, Greenblatt RB, Role of estrogens and progesterone in the etiology and prevention of endometrial cancer: review, Am J Obstet Gynecol 1983;146:696–707.

Gordon T, Castelli WP, Hjortland MC, Kannel WB, The prediction of coronary heart disease by high–density and other lipoproteins: an historical perspective, In:Rifkind BM, (1977).

Archer, D.F. et al., Bleeding Patterns in Postmenopausal Women Taking Continuous Combined or Sequential Regimens of Conjugated Estrogens With Medroxyprogesterone Acetate, Obstet. Gynecol., Vo. 83, No. 5, pp. 686–692 (May 1994) (E14).

Bewtra, Chhanda et al., Endometrial Histology and Bleeding Patterns in Menopausal Women Treated With Estrogen and Continuous Cyclic Progestin, J. Reproductive Med., vol. 33, No. 2, pp. 205–208 (Feb. 1988) (E10).

Brosens, I.A. et al., Assessment of Incremental Dosage Regimen of Combined Estrogen–Progestogen Oral Contraceptives, Br. Med. J., vol. 4(5945), pp. 643–645 (1974) (P56).

Christiansen, C.et al., Does Oestriol Add to the Beneficial Effect of Combined Hormonal Prophylaxis Against Early Postmenopausal Osteoporosis, Brit. J. Obstet. Gynaecol., vol. 91, pp. 489–493 (May 1984) (P45).

Clark, James H. et al., Nuclear Binding and Retention of the Receptor Estrogen Complex: Relation to the Agnostic and Antagonistic Properties of Estriol, Endo, vol. 1, No. 1, pp. 91–96 (1977) (P27).

Clisham, P. Ronald et al., Comparison of Continuous Versus Sequential Estrogen and Progestin Therapy in Postmenopausal Women, Obstet. Gynecol., vol. 77, No. 2, pp. 241–242 (Feb. 1991) (E9).

Dennerstein, Lorraine et al., Menopausal Hot Flushes: A Double Blind Comparison of Placebo, Ethinyl Oestradiol and Norgestrel, Brit.J. Obstet. Gynecol., vol. 85, pp. 852–856 (Nov. 1978) (P31).

Re. 36,247
Page 3

Dennerstein, Lorraine et al., Hormone Therapy and Affect, Maturitas, vol. 1, pp. 247–259 (1979) (P31a).

Dennerstein, Lorraine et al., Plasma Levels of Ethinyl Oestradiol and Norgestrel During Hormone Replacement Therapy, Maturitas, vol. 2, pp. 147–154 (1980) (P32).

Dickey, Richard P. & Stone, Sergio C., Progestational Potency of Oral Contraceptives, Obstet. Gynecol., vol. 47, No. 1, pp. 106–112 (Jan. 1976) (P9).

Dickey, Richard P., Reply to Paper by Dr. Edgren on "Progestational Potency of Oral Contraceptives: a Polemic", Int. J. Fertil., vol. 23(3), pp. 170–174 (1978) (P11).

Edgren, Richard A., Progestational Potency of Oral Contraceptives: a Polemic, Int. J. Fertil., vol. 23(3), pp. 162–169 (1978) (P10).

Eizemann, U et al., Abstract: Continuous Treatment of Menopausal Symptoms with an Estrogen/Progestogen Combinations. Results of a Multicenter Trial, J. Steroid. Biochem., vol. 17, No. 3, 1982, p. 306 (6th International Congress on Hormonal Steroids, Jerusalem, Israel, Sep. 5–10, 1982) (P36).

Englund, D.E. & Johansson, E.D.B., Endometrial Effect of Oral Estriol Treatment in Postmenopausal Women, Acta Obstet. Gynecol. Scand, vol. 59, pp. 449–451 (1980) (P26).

Hammond, Charles B. et al., Effects of Long Term Estrogen Replacement Therapy, Am. J. Obstet. Gynecol, vol. 133, No. 5, pp. 537–547 (Mar. 1, 1979) (P17).

Hellberg, D. & Nilsson, S., Comparison of Triphasic Oestradiol/Norethisterone Acetate Preparation With and Without Oestriol Component in the Treatment of Climacteric Complaints, Maturitas, Vol 5, pp. 233–243 (1984) (P44).

Hillard, T.C. et al., Continuous Combined Conjugated Equine Estrogen–Progestogen Therapy: Effects of Medroxyprogesterone Acetate and Norethindrone Acetate on Bleeding Patterns and Endometrial Histologic Diagnosis, Am J. Obstet. Gynecol., vol. 167, No. 1, pp. 1–7 (Jul. 1992) (E8).

Johansson, Elof D.B., Ostrogena Och Gestagena Substansers Effekter Pa Tumorer I Reproduktionsorganen (The Effects of Estrogenic and Gestagenic Substances on Tumours in the Reproductory Organs), Report from Workshop: Menopaus, pp. 129–141 (1982) [with translation] (Part of P2).

Johansson, Elof D.B., Nagra Utvecklingslinjer Kring Substitutions–Behandling Efter Menopaus (A few Courses of Development for the Substitution Treatment After Menopause), Report from Workshop: Menopaus, pp. 157–164 (1982) [with translation] (Part of P2).

King, Roger J.B. & Whitehead, Malcom I., Assessment of the Potency of Orally Administered Progestins in Women, Fertility & Sterility, vol. 48, No. 6, pp. 1062–1066 (Dec. 1986) (E19).

Lacey, R.W. et al., Safety of Progestins: Effects of Dydrogesterone on Blood Lipids, Br. J. Clin. Pract. Suppl. 24, pp. 4–10 (1983) (P23).

Levrant, Seth G. & Barnes, Randall B., Pharmacology of Estrogens, in Treatment of Postmenopausal Women: Basic and Clinical Aspects, ch. 6, pp. 57–67 (Rogerio A. Lobo ed., 1994) (E27).

Lillienberg, L et al., Effect of a Sequential Oestrogen–Progestin Therapy on the Plasma Level of Oestrogens and Lipids in Post–Menopausal Women, Acta Endocrinologica, vol. 92, pp. 319–329 (1979) (P21).

Luciano, Anthony Adolph et al., Clinical and Metabolic Responses of Menopausal Women to Sequential Versus Continuous Estrogen and Progestin Replacement Therapy, Obstet. Gynecol., vol. 71, No. 1, pp. 39–43 (Jan. 1988) (E11).

Luciano, Anthony A. et al., Evaluation of Low–Dose Estrogen and Progestin Therapy in Postmenopausal Women, J. Reproductive Med., vol. 38, No. 3, pp. 207–214 (Mar. 1993) (E7).

Magos, A.L., Endometrial and Menopausal Response to Continuous Oestrogen Progestogen Therapy in Post–Menopausal Women, Summary of Paper to be Presented at Advances in the Management of Menopause Symposium on Friday, 9th Dec., 1983 (P28).

Mattsson, L.–A. et al., Effects of a Continuous Estrogen–Progestogen Therapy for Climacteric Symptoms on Circulating Sex Steroids and Gonadotrophins, Arch. Gynecol., vol. 233, pp. 101–107 (1983) (P41).

Merck, pp. CI278, CI102, 454, 3648–49, 3654–55 (1983) (P34).

Merck, p. 493 (1989) (E23).

Nand, S.L. et al., Continuous Combined Piperazine Oestrone Sulphate and Medroxyprogesterone Acetate Hormone Replacement Therapy—A Study of Bleeding Pattern, Endometrial Response, Serum Lipid and Bone Density Changes, Aust. and N.Z. J. Obstet. Gynaecol., pp. 92–96 (1995) (E6).

Neumann, Von F. et al., Probleme der Dosisfindung: Sexualhormone, Drug. Res., pp. 296–318 (1977) (P20).

Neumann, F., The physiological Action of Progesterone and the Pharmacological Effects of Progestogens—a Short Review, Postgraduate Med. J., vol. 54 (Suppl. 2), pp. 11–24 (1978) (P48).

Notelovitz, Morris et al., Oestrogen–Progestin Therapy and the Lipid Balance of Post–Menopausal Women, Maturitas, vol. 4, pp. 301–308 (1982) (P47).

Notelovitz, Morris et al., Combination Estrogen and Progestogen Replacement Therapy Does Not Adversely Affect Coagulation, Obstet. Gynecol., vol. 62, No. 5, pp. 596–600 (Nov. 1983) (P46).

Padwick, M.L. et al., Oestriol With Oestradiol Versus Oestradiol Alone: A Comparison of Endometrial, Symptomatic and Psychological Effects, British J. Obstet. Gynaecol., vol. 93, pp. 606–612 (Jun. 1986) (E28).

Physicians' Desk Reference 38th Ed., pp. 424, 1487–1495 (1984) (P29).

Rozenbaum, H., Progestatifs de Synthese et Metabolisme Lipidique, Contraception–Fertilite–Sexualite, Supp. vol. 12, No. 1, pp. 173–180 (1984) (P22).

Sipinen, S., Plasm Oestrone, Oestradiol and Gonadotrophin Concentrations in Postmenopausal Patients Treated With Oestradiol or With a Combination of Oestradiol and Oestriol, Annals of Clinical Research, vol. 11, pp. 172–178 (1979) (P3).

Sipinen, Seppo et al., Silastic Implants Releasing Estrone in the Treatment of Climacteric Complaints, Maturitas, vol. 2, pp. 213–224 (1980) (P35).

Socialstyrelsens Kommittee for Lakemedelsinformation (Health Board Committee on Medical Information), Menopaus, Substitutional Treatment with Estrogen, Workshop, Aug. 30–31, 1982, pp. 27, 30 (published 1983) [with translation] (Part of P2).

Re. 36,247
Page 4

Socialstyrelsens Kommittee for Lakemedelsinformation (Health Board Committee on Medical Information), Menopaus, Substitutional Treatment with Estrogen, Workshop, Aug. 30–31, 1982, pp. 121, 161, 167–168 (published 1983) [with translation] (Part of P2).

Sporrong, T. et al., Comparison of Four Continuously Administered Progestogen Plus Oestradiol Combinations for Climacteric Complaints, British J. Obstet. Gynaecol., vol. 95, pp. 1042–1048 (Oct. 1988) (E12).

Staland, B., Continuous Treatment With a Combination of Estrogen and Gestagen—A way of Avoiding Endometrial Stimulation, Acta Obstet Gynecol Scand Suppl 130, pp. 29–35 (1985) (E29).

Staland, B., Treatment of Menopausal Oestrogen Deficiency Symptoms in Hysterectomised Women by Means of 17β–Oestradiol Pellet Implants, Acta. Obstet. Gynecol. Scand., vol. 57, pp. 281–285 (1978) (P18).

Stanczyk, Frank Z., Structure–Function Relationships, Potency, and Pharmacokinetics of Progestogens, in Treatment of Postmenopausal Women: Basic and Clinical Aspects, ch. 7, pp. 69–89 (Rogerio A. Lobo ed., 1994) (E26).

Sturdee, D.W. et al., Relations Between Bleeding Pattern, Endometrial Histology, and Oestrogen Treatment in Menopausal Women, Brit. Med. J., pp. 1575–1577 (Jun. 17, 1978) (P38).

Swyer, G.I.M., Potency of Progestogens in Oral Contraceptives—Further Delay of Menses Data, Contraception, vol. 26, No. 1, pp. 23–27 (Jul. 1982) (P19).

Swyer, G.I.M., Determination of Progestational Potency: A Review, J. Roy. Soc. Med., vol. 77, pp. 406–409 (1984) (P59).

Tausk, Marius, Pharmakologie der Hormone, pp. 83–87, 122–123 (1979) (P25).

Upton, Virginia G., Therapeutic Considerations in the Management fo Climacteric: A Critical Analysis of Prevalent Treatments, J. Reprod. Med., vol. 29, No. 2, pp. 71–80 (Feb. 1984) (P16).

Whitehead, M.I. et al., The Effects of Cyclical Oestrogen Therapy and Sequential Oestrogen/Progestogen Therapy on the Endometrium of Post–Menopausal Women, Acta Obstet. Gynecol. Scand. Suppl. 65, pp. 91–101 (1977) (P49).

Whitehead, M.I. & Campbell, S., Endometrial Histology, Uterine Bleeding and Oestrogen Levels in Menopausal Women Receiving Oestrogen Therapy and Oestrogen/Progestogen Therapy, Proceedings on the 2nd Int'l Meeting on Endometrial Cancer and Related Topics, pp. 65–80 (1978) (P50).

Whitehead, M.I. et al., Effects of Estrogens and Progestins on the Biochemistry and Morphology of the Postmenopausal Endometrium, New Eng. J. Med., vol. 305, No. 27, pp. 1599–1605 (Dec. 31, 1981) (P40).

Whitehead, M.I. et al., Actions of Progestins on the Morphology and Biochemistry of the Endometrium of Postmenopausal Women Receiving Low–Dose Estrogen Therapy, Am. J. Obstet. Gynecol., pp. 791–795 (Mar. 15, 1982) (P4).

Roger J.B. King, Aug. 29, 1995 (E25).

Curt Rune, Sep. 24, 1997 (E1 & E17).

Birgit Kronqvist, Sep. 17, 1997 (with translation) (E2).

Ruth Skoog, Feb. 3, 1997 (with translation) (E3).

Malcom Ian Whitehead, Oct. 15, 1997 (E22).

David W. Sturdee, Nov. 10, 1997 (E30).

Ove Heide–Jorgensen, Feb. 8, 1998 (with translation) (E31).

Ib Windfeld, Feb. 4, 1998 (with translation) (E32).

Bertil Staland, Nov. 24, 1997 (E33).

DUPHAR International Research B.V., Notice of Opposition to a European Patent, Oct. 21, 1997 (Party No. 04).

Novartis AG, Notice of Opposition to a European Patent, Oct. 20, 1997 (Party No. 03).

Novo Nordisk A/S, Notice of Opposition to a European Patent, Oct. 14, 1997 (Party No. 01).

Novo Nordisk A/S, Supplemental Notice of Opposition to a European Patent, Oct. 15, 1997 (Party No. 01).

Novo Nordisk A/S, Supplemental Notice of Opposition to a European Patent, Nov. 18, 1997 (Party No. 01).

Novo Nordisk A/S, Supplemental Notice of Opposition to a European Patent, Feb. 25, 1998 (Party No. 01).

Orion Pharma, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 10).

Ortho Pharmaceutical Corporation, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 07).

Pharmacia & Upjohn, Notice of Opposition to a European Patent, Oct. 21, 1997 (Party No. 06).

The Procter & Gamble Company, Notice of Opposition to a European Patent, Oct. 21, 1997 (Party No. 05).

R.P. Scherer Limited, Notice of Opposition to a European Patent, Oct. 17, 1997 (Party No. 02).

Schering AG, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 09).

Shire Pharmaceutical Contracts Limited, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 08).

Warner–Lambert Company, Notice of Opposition to a European Patent, Oct. 22, 1997 (Party No. 11).

Goretzlehner G. et al., Treatment of Menopausal Syndrome, Med. Akt., 8:418–419 (1982) (with English translation).

Kaiser, R., Hormonale Behandlung von Zyklusstorungen, 4th rev., p. 115 (1970).

McKay–Hart, D., A Comparative Trial of Kliogest With and Without Oestriol for the Prevention of Vasomotor Symptoms, Adverse Lipid Profile Changes and Oestoporosis in Postmenopausal Women (Dec. 15, 1993).

McKay–Hart, D., A Comparative Trial of Kliogest With and Without Oestriol Versus Cyclical Hormone Replacement Therapy in Treatment on Postmenopausal Women (Dec. 15, 1993).

Nishimo, Y. and Neumann, F., Sialic Acid Content in Mouse Female Reproductive Organs as a Quantitative Parameter for Testing the Estrogenicand Antiestrogenic Depot Effect, and Dissociated Effect of Estrogens on the Uterus and Vagina, Acta Endocrinologica (Copenhagen) Suppl., vol. 76 (187), p. 62 (1974) (Abstract).

Paterson, M.E.L. et al., Endometrial Disease After Treatment with Oestrogens and Progestogens in the Climacteric, Br. Med. J. vol. 280 (6217), pp. 822–824 (Mar. 22, 1980).

Physicians' Desk Reference 37th Ed., pp. 118, 405, 645–649 (1983).

Socialstyrelsens Kommittee for Lakemedelsinformation (Health Board Committee on Medical Information), Menopaus, Substitutional Treatment with Estrogen, Workshop, Aug. 30–31, 1982, pp. 1–164, 166 (published 1983).

Staland, B., Treatment of Climacteric Symptoms by Natural Oestrogens Without Stimulation of the Endometrium, Cancer Treatment Reports, vol. 63, No. 7, Abstr. No. 389 (Jul. 1979).

Whitehead, M.I., The Effects of Estrogens and Progestogens on the Postmenopausal Endometrium, Maturitas, vol. 1, No. 2, pp. 87–98 (1978) (Abstract).

**Re. 36,247**
Page 5

Ylostalo, Perra et al., Serum Bile Acids and Lipids During Treatment of Climacteric Symptoms with Natural Estrogen–Progestin Combinations, Maturitas, vol. 3, No. 1, pp. 21–24 (1981).

SDM, Swedish Drug Market, I/1984 and II/1984.

Merck, p. 360 (1968).

Unlisted Drugs, vol. 22, No. 10, Oct. 1970, p. 149; Chatham, New Jersey, US; p. 149e: "Cyclo–Progynova".

Unlisted Drugs, vol. 25, No. 10, Oct. 1973, p. 160; Chatham, New Jersey, US; p. 160a: "Microgynon".

Unlisted Drugs, vol. 26, No. 11, Nov. 1974, p. 170; Chatham, New Jersey, US; p. 170b: "WL–20".

Unlisted Drugs, vol. 27, No. 8, Aug. 1975, p. 130; Chatham, New Jersey, US; p. 130g: "Nordiol".

Unlisted Drugs, vol. 28, No. 2, Feb. 1976, p. 20; Chatham, New Jersey, US; p. 26j: "Minidrill".

Unlisted Drugs, vol. 29, No. 3, Mar. 1977, p. 41; Chatham, New Jersey, US; p. 41g: "Adepal".

*Obstetrics and Gyneocology*, 63(6), 759–763 (Jun. 1984).



FIG. 2

FIG. 1

Re. 36,247

| 1 | 2 |

# METHOD OF HORMONAL TREATMENT FOR MENOPAUSAL OR POST-MENOPAUSAL DISORDERS INVOLVING CONTINUOUS ADMINISTRATION OF PROGESTOGENS AND ESTROGENS

**Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.**

This is a continuation-in-part of U.S. Ser. No. 520,834, filed Aug. 5, 1983, now abandoned.

This invention relates to a method of hormonal treatment for menopausal (including perimenopausal and post-menopausal) disorders in women, and particularly to a treatment involving the continuous administration of a progestogen in conjunction with an estrogen. The invention further relates to a pharmaceutical composition comprising selected dosage units of progestogen and estrogen. In another aspect, the invention is concerned with a regimen comprising the continuous administration of progestogen in conjunction with the cyclical administration of estrogen and to a multi-preparation pack containing selected dosage units of progestogen and estrogen and particularly adapted to such regimen.

Perimenopausal (i.e. over approximately forty years of age), menopausal and post-menopausal women frequently experience a large variety of conditions and disorders which have been attributed to estrogen deprivation due to ovarian failure. The duration of these disorders can be extremely variable, and include hot flushes which can be devastating in some women and very mild in others. Dryness of the vagina associated with susceptibility to minor infections, and frequently associated with discomfort during intercourse, is another symptom which may be directly related to the decrease is estrogen availability.

In a long-term sense, one of the most health-threatening aspects of the menopause is the loss of mineral from bone (osteoporosis) which produces a decrease in bone mass and generates a serious risk of fractures. For example, evidence exists that there is a six-fold increase in fractures in post-menopausal women as opposed to men of the same age (Garraway et al, Mayo Clinic Proceedings, 54, 701–707, 1979). These fractures, of course, carry a high complication rate among older people, a marked increase in disability and general morbidity, and certainly an increased risk of mortality.

Another serious health-threatening aspect of the menopause the impressive loss of protection against heart attacks which is enjoyed by younger women up to the age of 60, when compared to men of the same age. The steep increase in mean serum cholesterol concentration which occurs around the menopause (during the fourth and fifth decades) may contribute importantly to the progressive increase in death from ischemic heart disease in older women. In the eighth and ninth decades, the incidence of deaths from ischemic heart disease, approaches that of men (Havlik, R.J. and Manning-Feinleid, P.H. 1979, NIH Publication No. 79-1610, U.S. Department of HEW).

In addition to the above-mentioned major physical problems, some women experience a larger variety of other symptoms ranging from depression, isomnia, and nervousness, to symptoms of arthritis and so forth.

It is generally agreed that estrogen is the most effective agent for the control or prevention of menopausal flushes and vaginal atrophy. It is effective in retarding or preventing the appearance of clinical evidence of osteoporosis. In appropriate doses, when combined with dl-norgestrel (or laevo-norgestrel), a favourable effect upon blood lipids is also seen. Problems with estrogen therapy do exist, however, and have been widely explored and documented in the medical literature. The means by which estrogen has been administered, generally speaking, involves either the use of estrogen [along] *alone* or estrogen plus a progestogen.

Estrogen [along] *alone*, given in small doses on a continuous basis, is effective in most patients for the control of the above symptoms and problems associated therewith. However, although the vast majority of women taking continuous low-dose estrogen will not have bleeding for many months or even years, there is a distinct risk posed by this routine of silently (i.e. exhibiting no overt symptoms) developing "hyperplasia of the endometrium". This term refers, of course, to an overstimulation of the lining of the uterus which can become pre-malignant, coupled with the possibility that the patient will eventually develop cancer of the uterine lining even under such a low-dose regimen (Gusberg et al, Obstetrics and Gynaecology, 17, 397–412, 1961).

Estrogen [along] *alone* can also be given in cycles, usually 21–25 days on treatment and 5–7 days off treatment. Again, if small doses of estrogen are required to control the symptoms and it is used to this fashion, only about 10% of women will experience withdrawal bleeding between the cycles of actual treatment. However, one must again be concerned by the risk of developing endometrial hyperplasia and by the increased relative risk of developing cancer of the uterus (Research on the Menopause: Report of a W.H.O. Scientific Group, 53–68, 1981).

The addition of progestogen for the last 7–10 days of each estrogen cycle will virtually eliminate the concern about developing endometrial hyperplasia and probably reduce the risk of developing endometrial carcinoma below that of the untreated general population. However, withdrawal bleeding will occur regularly in this routine and this is highly unacceptable to most older women (Whitehead, Am. J. Obs/Gyn., 142,6, 791–795, 1982).

Still another routine for estrogen administration would involve a formulation such as those found in birth control pills which contain relatively small doses of estrogen over the full 20–21 day treatment cycle, plus very substantial doses of potent progestogens over the same period of time. This routine, of course, not only produces withdrawal bleeding on each cycle, but is further unacceptable because such formulations have been shown to carry an increased risk of developing arterial complications such as stroke or myocardial infarction in older women about the age of 35–40. This is especially true if the individual is a smoker of cigarettes (Plunkett, Am. J. Obs/Gyn. 142, 6, 747–751, 1982).

Therapeutic regimens employing a progestogen along require relatively large doses in order to control hot flushes. Moreover, use of a progestogen alone does not prevent atrophy of the vaginal mucosa, although it may help to prevent osteoporosis. However, a progestogen administered in large doses, together with large amounts of a synthetic estrogen, induces changes in blood lipids which may promote arteriosclerotic changes and have been implicated in the appearance of strokes and myocardial infarction among women taking oral contraceptives in their later reproductive years, (Plunkett, supra).

The present invention provides a novel therapeutic method and composition involving the use of low dosage levels of estrogens and progestogens, which method is designed to avoid or minimize bleeding and prevent over-stimulation of the lining of the uterus while producing

Re. 36,247

**3**

favourable changes in blood lipids. In particular, the method involves continuous and uninterrupted administration of very small doses of a progestogen along with administration of an estrogen, the latter being cyclical, where required (for example, with perimenopausal women). The method specifically provides for treatment of menopausal or postmenopausal disorders in a women comprising either:

A. continuously and uninterruptedly administering a progestogen and an estrogen to said woman, or

B. continuously and uninterruptedly administering a progestogen and cyclically administering an estrogen to said woman by repetitively using a dosage regimen comprising:

(i) administering said estrogen continuously for period of time between about 20 and about 120 days, followed by

(ii) terminating administering said estrogen for a period of time between about 3 and about 7 days.

The term "perimenopausal" refers to women of approximately forty years of age and older, who have not yet definitely arrived at menopause but who are experiencing symptoms associated with menopause.

The term "continuous" as applied in the specification and the claims to "administration" means that the frequency of administration is at least once daily. Thus, administration, e.g. every other day or once every third day, is not "continuous" for purposes of this invention. Note, however, that the frequency of administration may be greater than once daily and still be "continuous", e.g. twice or even three times daily so long as the dosage level as specified herein is not exceeded.

The term "uninterrupted" means that there is no break in the treatment. Thus "continuous, uninterrupted administration" of a progestogen would mean that the progestogen is administered at least once daily essentially in perpetuity or until the entire treatment is ended. In this regard, it should be noted that "cyclical" administration means that there is a break in administration and that, therefore, by definition, cyclical administration cannot be "uninterrupted".

The term "dosage level" means the total amount of estrogen or progestogen administered per day. Thus, for example, the "continuous administration" of a progestogen to a women at a "dosage level" of 75 micrograms means that the women receives a total of 75 micrograms of progestogen on a daily basis, whether the progestogen is administered as a single 75 microgram dose or, e.g. three separate 25 microgram doses. It is noted that the most conventional means of continuously administering an estrogen or progestogen is as a single daily oral dose at the prescribed dosage level. Parenteral modes of administration, which provide a slow release of the progestogen, could be substituted for the oral route.

Thus, the invention realizes the objects of providing a therapeutic method allowing for the administration of an estrogen, controlling hot flushes, restoring the vaginal mucosa to a healthier state, preventing the development of the dimineralization of bones as well as preventing changes in lipids which predispose to cardiovascular disease, over long periods of treatment, which method does not, however, initiate bleeding or increase the risk of endometrial carcinoma.

In another aspect, the invention provides a pharmaceutical composition for hormonal treatment of menopausal or post-menopausal disorders in a woman, which comprises a dosage unit of a progestogen and a dosage unit of an estrogen for continuous administration wherein the units comprise a progestogen in the range of 0.025 to 30 mg and an estrogen in the range of 0.005 to 2.5 mg together with a pharmaceutically acceptable inert carrier.

**4**

The actual unit dosages are selected according to conventionally known methods, e.g. body weight of patient and biological activity of the hormones, with the ultimate goal of producing the desired result with the minimum quantities of hormones.

The interruption of the estrogen administration is required in perimenopausal women to maintain normal periods and may be required in certain jurisdictions due to health concerns—particularly overstimulation of the lining of the uterus to cause a pre-malignant condition. The absence of estrogen for a short period allows the lining of the uterus to be sloughed and any pre-malignancy thus avoided. However, the inventors believe that even with continuous administration of estrogen, the presence of progestogen will give rise to sufficient atrification of the uterus that no such condition would be likely to occur.

A further and important object of the invention is to provide the means whereby a woman may receive the proper quantities and dosage units of the progestogen and estrogen for adherence to the prescribed regimen wherein the dosage of estrogen is cyclically administered. Such means takes the form of a multi-preparation pack, which facilitates administration by a nurse or physical in appropriate circumstances or, more usually, self-administration by the woman.

The multi-preparation pack contains sufficient dosage units of progestogen and estrogen for continuous administration of both said progestogen and said estrogen for a period of from about 20 to 120 days plus an additional number of dosage units of progestogen for administration for an additional period of time of from about 3 to about 7 days during which administration of said estrogen is terminated.

The estrogen used in the present disclosure may be those which are orally active and are suitable for oral contraception and selected from natural estrogens such as estradiol, estradiol-17β, estradiol valerate, conjugated equine estrogens, piperazine estrone sulphate, estrone, estriol, estriol succinate and polyestriol phosphate, or from synthetic estrogens such as ethinyl estradiol, quinestranol and mestranol. The natural estrogens are preferred.

The progestogen is again selected from those which are orally active and suitable for oral contraceptives and may be, [foro] for example, dl-norgestrel, laevo-norgestrel, norethindrone (norethisterone), norethindrone acetate, ethynodiol diacetate, medroxyprogesterone acetate, cyproterone acetate or norethynodrel.

In the following Tables 1A and 1B are listed preferred unit dosages, minimum unit dosages and maximum unit dosages for the estrogens and progestogens useful in this invention. The quantities are determined by the biological activities of the particular substances as obtained commercially from sources that normally supply them in micronized form.

TABLE 1A

| | ESTROGENS | | |
|---|---|---|---|
| | Preferred | Dosage Minimum | (mg/day) Maximum |
| Natural estrogens (steroids) | | | |
| Estradiol | 1 | 0.500 | 2 |
| Estradiol-17β | 1 | 0.500 | 2 |
| Estradiol valerate | 1 | 0.500 | 2 |
| Conjugated equine estrogens | 0.600 | 0.300 | 2.5 |
| Estrone | 0.600 | 0.300 | 2.5 |

Re. 36,247

5

### TABLE 1A-continued

ESTROGENS

| | Preferred | Dosage Minimum | (mg/day) Maximum |
|---|---|---|---|
| Piperazine estrone sulphate (estropipate) | 0.500 | 0.250 | 2.5 |
| Estriol* | 0.100 | 0.050 | 0.500 |
| Estriol succinate* | 0.100 | 0.050 | 0.500 |
| Polyestriol phosphate* | 0.100 | 0.050 | 0.500 |
| Synthetic estrogens (steroids) | | | |
| Ethinyl estradiol | 0.010 | 0.005 | 0.020 |
| Mestranol | 0.015 | 0.005 | 0.040 |
| [Quinestranol] Quinestrol | 0.010 | 0.005 | 0.030 |

It may be noted that of the estrogens of Table 1A, the estriol preparations marked with an asterisk (*) have lower preference than estradiols or estrones because they fail to spare bone in post-menopausal women. However, they could be combined with natural or synthetic estrogens for the purpose of the invention. Also, it is preferable that the following non-steroidal estrogens—although useful in this invention—be avoided for women who have not definitely arrived at menopause (who could become pregnant)— estrogens of this type being known to induce vaginal cancer and other abnormalities in offspring if taken during the pregnancy:

| | Preferred | Dosage Minimum | (mg/day) Maximum |
|---|---|---|---|
| Stilboestrol | 0.100 | 0.020 | 2 |
| Stilboestrol dipropionate | 0.100 | 0.020 | 2 |
| Diethylstilboestrol | 1 | 0.400 | 2.5 |
| Chlorotrianiscos | 2 | 1 | 2.5 |
| Benzoestrol | 2 | 0.5 | 2.5 |
| Dienoestrol | 0.500 | 0.200 | 2.5 |
| Hexoestrol | 0.500 | 0.200 | 2.5 |
| Methallenoestril | 1 | 0.500 | 2.5 |

### TABLE 1B

PROGESTOGENS

| | Preferred | Dosage Minimum | (mg/day) Maximum |
|---|---|---|---|
| Laevo-norgestrel | 0.050 | 0.025 | 0.075 |
| dl-norgestrel | 0.100 | 0.050 | 0.150 |
| Norethindrone (norethisterone) | 0.30 | 0.15 | 1.0 |
| Norethindrone (norethisterone) acetate | 0.20 | 0.10 | 1.0 |
| Dydrogesterone | 10 | 5 | 30 |
| Medroxyprogesterone acetate | 2.5 | 1 | 15. |
| Norethynodrel | 1 | 0.200 | 5 |
| Allylestrenol | 2 | 1 | 30 |
| Lynoestrenol | 0.200 | 0.100 | 2 |
| Quingestanol acetate | 0.200 | 0.050 | 1 |
| Medrogestone | 2 | 1 | 10 |
| Norgestrienone | 0.050 | 0.020 | 0.200 |
| Dimethisterone | 1 | 0.500 | 15 |
| Ethisterone | 2.5 | 1 | 25 |
| Cyproterone acetate | 0.500 | 0.100 | 10 |
| Chlormadinone acetate | 0.300 | 0.100 | 1 |
| Megestrol acetate | 1 | 0.100 | 10 |

Although chlormadinone acetate and megestrol are useful in the context of this invention, it has been speculated that these progestogens may pre-dispose breast tumors, although no clinical proof exists to that effect. However, unless and until such suspicions are proven to be without foundation, these compounds are clearly of lower preference.

6

The estrogen/progestogen combinations may be administered non-orally by implants or intramuscular injections. Generally speaking, the required dosages are based upon somewhat lower daily dosage levels that those required for the orally administered estrogens and progestogens, for the simple reason that the former are directly released into the bloodstream with consequently greater activity than the same compounds when orally ingested.

Estradiol, estradiol valerate and estradiol 17-β are suitable candidates for estrogen implants, in maximum and minimum amounts of 100 mg and 20 mg, with 100 mg preferred. These quantities will be suitable for slow-release implants intended for replacement every 3 to 12 months.

Suitable progestogen implants and intramuscular injections are set forth in Table 1C.

### TABLE 1C

| | | Total Quantity (mg) | | |
|---|---|---|---|---|
| | Period | Pre-ferred | Min-imum | Max-imum |
| Progestogen implants | | | | |
| Loevonorgestrel | every 2–5 yr. | 50 | 25 | 100 |
| dl-norgestrel | every 2–5 yr. | 100 | 50 | 200 |
| Norgestrienone | every 1–2 yr. | 100 | 25 | 200 |
| Norethindrone acetate | every 2–4 mon. | 100 | 25 | 200 |
| Intramuscular progestogen depots | | | | |
| Medroxyprogesterone acetate | every 3 mon. | 150 | 50 | 500 |
| Norethindrone enanthate | every 3 mon. | 50 | 20 | 400 |
| Gestrool hexanoate | every 3 mon. | 100 | 50 | 400 |
| Algestone acetophenide | monthly | 50 | 20 | 300 |
| Hydroxyprogesterone hexanoate | weekly | 100 | 50 | 250 |
| Hydroxyprogesterone caproate | bi-weekly | 100 | 50 | 250 |

dl-Norgestrel, laevo norgestrel (the common name for d-13β-ethyl-17α-ethinyl-17β-hydroxygon-4-en-3-one), norethindrone (common name for 17-hydroxy-19-nor-17α-pregn-4-en-20-yn-3-one), ethynodiol diacetate (common name for 19-nor-17α-pregn-4-en-20-yne-3β, 17-diol diacetate), norethindrone acetate, and cyproterone acetate may also be administered by injection. It will be readily appreciated by those skilled in the art thay any other synthetic progestogen which is orally active or effective for use in conjunction with contraception is also suitable for use in this invention.

Any of the suitable estrogens and progestogens (particularly those listed in the foregoing tables) may be combined with one another in the quantities recited to give estrogen/progestogen combinations within the purview of the invention. Especially preferred combinations are those containing the estradiols or conjugated equine estrogens and the norgestrels norethindrones, or medroxyprogesterones. Thus, especially preferred combinations are:

Estradiol/Laevo-norgestrel
Estradiol 17β/Laevo-norgestrel
Estradiol valerate/Laevo-norgestrel
Conjugated equine estrogens/Laevo-norgestrel
Estradiol/dl-norgestrel
Estradiol 17β/dl-norgestrel
Estradiol valerate/dl-norgestrel
Conjugated equine estrogens/dl-norgestrel
Estradiol/Norethindrone (norethisteron)
Estradiol 17β/Norethindrone (norethisterone)
Estradiol valerate/Norethindrone (norethisterone)
Conjugated equine estrogens/Norethindrone (norethisterone)

Re. 36,247

<div style="display:flex"><div>

**7**

Estradiol/Norethindrone (norethisterone) acetate

Estradiol 17β/Norethindrone (norethisterone) acetate

Estradiol valerate/Norethindrone (norethisterone) acetate

Conjugated equine estrogen/Norethindrone (norethisterone) acetate

Estradiol/Medroxyprogesterone acetate

Estradiol 17β/Medroxyprogesterone acetate

Estradiol valerate/medroxyprogesterone acetate

Conjugated equine estrogen/Medroxyprogesterone acetate

The maximum, minimum and preferred dosage levels for the respective estrogens and progestogens in the foregoing combinations are as recited in the tables.

The comparison of the invention is usually administered orally in admixture with a pharmaceutically acceptable inert carrier. The estrogen and progestogen can be compounded in any pharmaceutically acceptable inert (non-toxic) form. The packaging can be any system convenient for proper delivery. With the preferred orally administrable form, the pharmaceutical carrier can be of any of the conventionally employed carriers, for example pharmaceutically grades of mannitol, lactose, starch, magnesium stearate, sodium saccharin, talcum cellulose, glucose, sucrose, magnesium carbonate, and similar substances. The compositions may be formulated into solutions, suspensions, tablets, pills, capsules, powders, sustained release formulations, etc.

One of the unique aspects of this invention is the adaptation of the multi-preparation pact to the continuous uninterrupted administration of a progestogen and an estrogen is administered in a cyclic fashion. The duration of the estrogen cycle can be very variable, with continuous administration ranging between 20 and 120 days followed by a break (i.e. interruption) in estrogen administration ranging anywhere from about 3 to about 7 days. However, if the estrogen is discontinued for a period longer than 5 days, recurrence of hot flushes is most likely to occur, in a number of patients.

The multi-pack dispensing system may be accommodated by conventional packaging equipment, e.g. transparent strip foil packages continuously arranged in daily dosages or other conventional means in the art. Where the multi-pack is employed for the cyclical administration of an estrogen in combination with a progestogen, the pack would conveniently comprise a transparent strip foil package with the combined unit daily dosages arranged continuously with, for example, up to a total of 120 such dosages, the 3 to 7 unit dosages of progestogen being located at the end of the combined daily unit dosages whereby they would be taken at the end of the series.

The inventors have been developed clinical evidence from this routine that the amounts of estrogen and progestogen required to control flushes, vaginal symptoms and associated subjective symptoms are very small. Preliminary metabolic responses of the subjects indicative favourable changes toward the lower blood lipid levels found in younger premenopausal women.

**EXAMPLE 1**

An experimental study of thirty women was instituted under a randomized double blind protocol with crossover and involved the administration of placebos, progestogen only, estrogen only and the combination of the continuous, uninterrupted progestogen/cyclic estrogen treatment. Treatment comprised administering each hormone and the combination as follows: (1) estrogen alone for two months; (2) progestogen alone for two months; (3) combination therapy using (1) and (2) for six months. Each period of adminis-

</div><div>

**8**

tering a hormone of the combination was followed by a one month period of placebo (substance with no endocrine activity) administration. The estrogen was micronized 17β-estradiol administered at a daily dosage level of 1 milligram, while the progestogen was dl-norgestrel administered at a dosage level of 75 micrograms.

Of 30 women who have completed this study, 22, on the basis of their responses throughout the fourteen months of observation, selected the combination treatment and requested to continue it. This represents a high level of acceptability.

**EXAMPLE 2**

In a follow-up phase of observation, 17 subjects (with intact uterus) have completed a total of 125 lunar months of the combination therapy (continuous, uninterrupted administration of dl-norgestrel, cyclic administration of 17β-estradiol). None of the patients experienced "bleeding" which required protection. 1.6 percent of the cycles involved spotting requiring no protection. 98.4 percent of the cycles were completely clear.

The combination therapy has been associated with no evidence whatsoever of endometrial hyperplasia (overstimulation of the lining of the uterus). One patient, after the 2-month phase of taking estrogen only (in the double blind study) did show evidence not only of hyperplasia of the endometrium but also had a typical findings which could be interpreted as indicative of a premalignant change. Addition of the small (75 microgram) dosage level of progestogen (dl-norgestrel) for two weeks only followed by full dilatation and curettage revealed that the endometrium had become completely atrophic once again and a total reversal of the previous findings were noted.

As an alternative to dl-norgestrol, laevo-norgestral may be used. Since the dl-norgestrol consists of equal parts of the dextro (inactive) and laevo (active) forms, only half the quantity of laevo-norgestrol is used with the same effect. Thus, if laevo-norgestrol is substituted for dl-norgestrol in the foregoing examples, the laevo-norgestrol dosage level is 37.5 micrograms.

At least five cases of young women who required removal of ovaries and uterus because of severe endometriosis have also been successfully treated by the above combination. These women rarely have total removal of the endometriotic tissue. It is important to treat these patients with estrogen replacement therapy to prevent the early appearance of bone demineralization (osteoporosis), elevation of cholesterol and triglycerides and to control sever hot flushes and vaginal atrophy. If patients such as these are treated with estrogen alone, they frequently develop recurrence of pain symptoms due to residual endometriosis being restimulated by the administered estrogen. Because the inventors' combination therapy tends to promote atrophy of the lining of the uterus (endometrium) no matter whether it is located normally within the uterus or in the endometriotic tissue in the pelvis, it is found that these patients tolerate the treatment very well and do not have a recurrence or reactive of their endometriosis. Furthermore, even small doses of estrogen in combination with the continuous progestogen routine is sufficient to control the severe hot flushes which such patients experience.

Thus this invention permits control of menopausal disorders including hot flushes and vaginal atrophy along with many of the subjective symptoms. Further, given that both components of the combination therapy are considered to be effective in retarding osteoporosis, long term therapy to prevent this disabling disease should be effective.

</div></div>

Re. 36,247

**9**

Additionally, the risk of developing endometrial (uterine) cancer from the combination therapy should, at a minimum, be reduced to the normal incidence of the general population as opposed to the increased risk which has in fact been demonstrated to occur using estrogen-only treatment. The inventors have in fact developed some evidence suggestive that the combination therapy reduces the risk of premalignant endometrial changes, which may reduce the risk of developing endometrial cancer. The reduction in bleeding or spotting in patients taking the combination therapy makes it much more desirable relative to known treatments, particularly to older women.

The following describes directions which may be applied to a multi-preparation pack specifically adapted to the cyclical administration of estrogen together with the continuous administration of progestogen in accordance with one embodiment of the invention:

ABOUT THESE TABLETS

(The tablet set herein) is used to control menopausal symptoms. It is not a birth control pill and cannot be relied upon to prevent pregnancy.

Oral contraceptives should not be taken at the same time as these tablets and, if necessary, you should therefore ask your doctor about alternative means of mechanical protection.

When treatment is first started, tingling of the breasts slight nausea or occasional vaginal bleeding may occur—this should settle after a short time.

If you have any unusual symptoms, contact your doctor.

To be taken under medical supervision.

HOW TO USE THIS PACK

Whether you are menstruating regularly or not, take the first tablet on a day suitable to yourself until all the tablets have been consumed.

The last seven tablets of the different colour are to be taken only when all others have been consumed.

Alternatively, the foregoing instructions may be printed as a leaflet, and the package instruction modified as follows:

Before commencing treatment please read the enclosed instruction leaflet carefully. If you have any difficulties following the instructions please ask your doctor for assistance.

DIRECTIONS

To remove a tablet, press firmly with your thumb on the appropriate clear plastic bubble. This may be helped by holding the card so that your fingers surround the aluminum foil through which the tablet will emerge.

*BRIEF DESCRIPTION OF THE DRAWINGS*

A multi-preparation pack suitable for administration of tablets in accordance with the regimen described above is illustrated in FIGS. 1 and 2 of the drawings. A bubble pack 10 (which may be folded along the line 10a) is sold in a protective sleeve 11, upon the rear of which are printed the directions for use and salient facts concerning the tablets, as indicated at 12 in the drawing. When removed from the protective sleeve by the consumer, the bubble pack contains as many tablets as the number of days which the pack is intended to cover (in this example, one hundred and twenty days). Optionally, the individual bubble segments may be numbered from one to one hundred and twenty but it is

**10**

important that the last few segments, which contains the progestogen-only tablets, be clearly distinguished from the remainder of these segments. In the present example, the segments 13 containing the first one hundred and thirteen tablets (combination progestogen/estrogen) are a light colour (for example, white) whilst the last seven segments 14, containing the progestogen-only tablets are a dark colour (red, for example). By following the directions on the sleeve and observing the colours on the bubble pack (and the "day numbers", if present) the consumer will take the combination tablets for the first one hundred and thirteen days and the progestogen tablets for the last seven days. Thereafter, a new package would be opened, whereby the cycle is repeated.

Although only a few exemplary embodiments of this invention have been described in detail above, those skilled in the art will readily appreciate that many modifications are possible in the exemplary embodiments without materially departing from the novel teachings and advantages of this invention.

We claim:

[1. A method of hormonally treating menopausal or post-menopausal disorders in a woman, comprising administering to said woman continuously and uninterrupted both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.075 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2.0 mg.]

[2. The method of claim 1 wherein said estrogen is 17 β-estradiol and said progestogen is dl-norgestrel or laevo-norgestrel, the daily dosage level of said 17 β-estradiol being about 1 mg, the daily dosage level of said dl-norgestrel (where present) being about 100 micrograms, and the daily dosage of said laevo-norgestrel (where present being about 50 micrograms.]

3. A method of hormonally treating perimenopausal, menopausal or post-menopausal disorders in a woman, comprising:

A. continuously and uninterruptedly administering a progestogen to said woman in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.075 mg, and

B. cyclically administering an estrogen to said woman by repetitively using a dosage regimen comprising:
   (i) administering said estrogen continuously for a period of time between about 20 and about 120 days in daily dosage units of estrogen equivalent to estradiol dosages of from about 0.500 mg to about 2 mg, followed by
   (ii) terminating administering said estrogen for a period of time between about 3 and about 7 days.

4. The method of claim 3 wherein said progestogen is selected from the following group, with respective maximum and minimum daily dosage levels as follows:

|  | Dosage Minimum | (mg/day) Maximum |
|---|---|---|
| Laevo-norgestrel | about 0.025 | about 0.075 |
| dl-norgestrel | about 0.050 | about 0.150 |
| Norethindrone (norethisterone) | about 0.15 | about 1.0 |
| Norethindrone (norethisterone) acetate | about 0.10 | about 1.0 |
| Ethynodiol diacetate | about 0.10 | about 1.0 |
| Dydrogesterone | about 5 | about 30 |
| Medroxyprogesterone acetate | about 1 | about 15 |

Re. 36,247

**11**

-continued

|  | Dosage Minimum | (mg/day) Maximum |
|---|---|---|
| Norethynodrel | about 0.203 | about 5 |
| Allylestrenol | about 1 | about 10 |
| Lynoestrenol | about 0.300 | about 2 |
| Quingestanol acetate | about 0.050 | about 2 |
| Medrogestone | about 1 | about 10 |
| Norgestrienone | about 0.020 | about 0.200 |
| Dimethisterone | about 0.500 | about 15 |
| Ethisterone | about 1 | about 25 |
| Cyproterone acetate | about 0.300 | about 10. |

5. The method of claim 3 wherein said estrogen is selected from the following group, with respective maximum and minimum daily dosage levels as follows:

|  | Dosage Minimum | (mg/day) Maximum |
|---|---|---|
| Estradiol | about 0.500 | about 2 |
| Estradiol-17β | about 0.500 | about 2 |
| Estradiol valerate | about 0.500 | about 2 |
| Conjugated equine estrogens | about 0.300 | about 2.5 |
| Estrone | about 0.300 | about 2.5 |
| Piperazine estrone sulphate (estropipate) | about 0.250 | about 2.5 |
| Ethinyl estradiol | about 0.005 | about 0.020 |
| Mestranol | about 0.005 | about 0.030 |
| [Quinestranol] *Quinestrol* | about 0.005 | about 0.020. |

6. The method of claim 5 or claim 4 wherein said estrogen is selected from the following group, with respective daily dosage levels as follows:

|  | Dosage (mg/day) |
|---|---|
| Estradiol | about 1 |
| Estradiol-17β | about 1 |
| Estradiol valerate | about 1 |
| Conjugated equine estrogens | about 0.600 |
| Estrone | about 0.600 |
| Piperazine estrone sulphate (estropipate) | about 0.500 |
| Ethinyl estradiol | about 0.010 |
| Mestranol | about 0.015 |
| [Quinestranol] *Quinestrol* | about 0.010. |

7. The method of claim 5 wherein said progestogen is selected from the following group, with respective daily dosage levels as follows:

|  | Dosage (mg/day) |
|---|---|
| Laevo-norgestrel | about 0.050 |
| dl-norgestrel | about 0.100 |
| Norethindrone (norethisterone) | about 0.30 |
| Norethindrone (norethisterone) | about 0.30 |
| Ethynodiol diacetate | about 0.30 |
| Dydrogestrone | about 10 |
| Medroxyprogesterone acetate | about 2.5 |
| Norethynodrel | about 1 |
| Allylestrenol | about 1 |
| Lynoestrenol | about 0.200 |
| Quingestanol acetate | about 0.200 |
| Medrogestone | about 2 |
| Norgestrienone | about 0.050 |
| Dimethisterone | about 1 |
| Ethisterone | about 2.5. |

8. The method of [any of claims] *claim 5* wherein said estrogen and said progestogen are selected from the following combination:

**12**

Estradiol/Laevo-norgestrel
Estradiol 17β/Laevo-norgestrel
Conjugated equine estrogens/Lacvo-norgestrel
Estradiol/dl-norgestrel
Estradiol 17β/dl-norgestrel
Estradiol valerate/Laevonorgestrel
Estradiol valerate/dl-norgestrel
Conjugated equine estrogens/dl-norgestrel
Estradiol/Norethindrone (noretisteron)
Estradiol 17β/Norethindrone (norethisterone)
Estradiol valerate/Norethindrone (norethisterone)
Conjugated equine estrogens/Norethindrone (norethisterone)
Estradiol/Norethindrone (norethisterone) acetate
Estradiol 17β/Norethindrone (norethisterone) acetate
Estradiol valerate/Norethindrone (norethisterone) acetate
Conjugated equine estrogen/Norethindrone (norethisterone) acetate
Estradiol/Medroxyprogesterone acetate
Estradiol 17β/Medroxyprogesterone acetate
Estradiol valerate/Medroxyprogesterone acetate
Conjugated equine estrogen/Medroxyprogesterone acetate.

9. The method of claim 8 wherein said estrogen is 17β-estradiol and said progestogen is dl-norgestrel or laevo-norgestrel.

10. The method of claim 9 wherein the daily dosage level of said 17β-estradiol is between about 0.5 mg and about 2 mg, the daily dosage level of said dl-norgestrel, where present, is between about 50 and about 150 micrograms and the daily dosage level of said laevo-norgestrel, where present, is between about 25 and about 75 micrograms.

11. The method of claim 10 wherein the daily dosage level of said dl-norgestrel is about 75 micrograms.

[12. The method of claim 1 or 3 wherein said estrogen is a synthetic estrogen.]

[13. The method of claim 12 wherein said synthetic estrogen is selected from the group consisting of ethinyl estradiol, mestranol and quinestranol.]

[14. The method of claim 1 or 3 wherein said estrogen is a natural estrogen.]

[15. The method of claim 14 wherein said natural estrogen is selected from the group consisting of conjugated equine estrogens, estradiol, estradiol-17β estradiol valerate, estrone, piperazine estrone sulphate, estriol, estriol succinate and polyestrol phosphate.]

[16. The method of claim 1 or 3, wherein said progestogen is selected from the group consisting of laevo-norgestrel, dl-norge, trel, norethindrone (norethisterone), norethindrone (norethisteron) acetate, ethynodiol diacetate, dydrogesterone, medroxyprogesterone acetate, norethynodrel, allylestrenol, lynoestrenol, quingestanol acetate, medrogestone, norgestrienone, dimethisterone, ethisterone, and cyprotecone acetate.]

[17. A pharmaceutical composition for the hormonal treatment of perimenopausal, menopausal and post-menopausal disorders in a woman, said composition being in implantable or intramuscularly injectable form and comprising, in association with a pharmaceutically acceptable barrier, sufficient progestogen and estrogen to provide dosage levels to said woman equivalent to orally administered daily dosages of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.075 mg and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2 mg.]

Re. 36,247

13

[18. The pharmaceutical composition of claim 17 in implantable form, wherein said estrogen is selected from the group consisting of estradiol, estradiol-17β, and estradiol valerate.]

[19. The pharmaceutical composition of claim 18 or 17 in implantable form, wherein said progestogen is selected from the group consisting of laevo-norgestrel, dl-norgestrel, norgestrienone, and norethindrone acetate.]

[20. The pharmaceutical composition of claim 17 in injectable form, wherein said progestogen is selected from the group consisting of medroxyprogesterone acetate, norethindrone enanthate, gestronol hexanoate, and algestone acetophenide.]

21. *A method of hormonally treating menopausal or postmenopausal disorders in a woman to prevent or retard the demineralization of bone, comprising administering continuously and uninterruptedly over the treatment period, in fixed daily dosages and at dosages and a duration sufficient to effectively retard or prevent the demineralization of bone while minimizing spotting and/or bleeding, both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.05 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2.0 mg.*

22. *A method of hormonally treating menopausal or postmenopausal disorders in a woman to prevent or retard the demineralization of bone, comprising administering continuously and uninterruptedly over the treatment period, in fixed daily dosages and at dosages and a duration sufficient to effectively retard or prevent the demineralization of bone while minimizing spotting and/or bleeding, both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.075 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2.0 mg, wherein the progestogen and the estrogen are combined in a single dosage form.*

23. *A method of hormonally treating menopausal or postmenopausal disorders in a woman, comprising administering continuously and uninterruptedly over the treatment period, in fixed daily dosages which minimize spotting and/or bleeding, both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.05 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 0.25 mg.*

24. *A method of hormonally treating menopausal or postmenopausal disorders in a woman, comprising administering continuously and uninterruptedly over the treatment period, in fixed daily dosages which minimize spotting and/or bleeding, both progestogen and estrogen in daily dosage units of progestogen equivalent to laevo-norgestrel dosages of from about 0.025 mg to about 0.075 mg, and of estrogen equivalent to estradiol dosages of about 0.5 mg to about 2.0 mg, wherein the progestogen and the estrogen are combined in a single dose form.*

25. *The method of claim 21 or 23, wherein the progestogen and the estrogen are combined in a single dosage form.*

26. *The method of claim 21, 22, 23, 24 or 25, wherein the estrogen consists essentially of a bone-sparing estrogen.*

27. *The method of claim 21, 22, 23, 24 or 25, wherein the fixed daily dosages are administered over a treatment period of greater than 120 days.*

28. *The method of claim 21 or 22, wherein the dosages and duration of treatment are effective to prevent or retard osteoporosis.*

29. *The method of claim 21, 22, 23, 24 or 25, wherein the dosages and duration of treatment are sufficient to prevent*

14

*or retard changes in blood lipids which might otherwise predispose the woman to cardiovascular disease.*

30. *The method of claim 21, 22, 23, 24 or 25, wherein said progestogen is selected from the group consisting of laevo-norgestrel, dl-norgestrel, ethynodiol diacetate, dydrogesterone, medroxyprogesterone acetate, norethynodrel, allylestrenol, lynoestrenol, quingestanol acetate, medrogestone, norgestrienone, dimethisterone, ethisterone, and cyproterone acetate.*

31. *The method of claim 22 or 24, wherein said progestogen is selected from the following group, with respective minimum and maximum daily dosage levels as follows:*

| | Dosage (mg/day) Minimum | Dosage (mg/day) Maximum |
|---|---|---|
| Laevo-norgestrel | about 0.025 | about 0.075 |
| dl-norgestrel | about 0.050 | about 0.150 |
| Ethynodiol diacetate | about 0.10 | about 1.0 |
| Dydrogesterone | about 5 | about 30 |
| Medroxyprogesterone acetate | about 1 | about 15 |
| Norethynodrel | about 0.200 | about 5 |
| Allylestrenol | about 1 | about 10 |
| Lynoestrenol | about 0.100 | about 1 |
| Quingestanol acetate | about 0.050 | about 1 |
| Medrogestone | about 1 | about 10 |
| Norgestrienone | about 0.020 | about 0.200 |
| Dimethisterone | about 0.500 | about 15 |
| Ethisterone | about 1 | about 3 |
| Cyproterone acetate | about 0.100 | about 10. |

32. *The method of claim 21, 23, 25, wherein said progestogen is selected from the following group, with respective minimum and maximum daily dosage levels as follows:*

| | Dosage (mg/day) Minimum | Dosage (mg/day) Maximum |
|---|---|---|
| Laevo-norgestrel | about 0.025 | about 0.050 |
| dl-norgestrel | about 0.050 | about 0.100 |
| Ethynodiol diacetate | about 0.10 | about 0.30 |
| Dydrogesterone | about 5 | about 10 |
| Medroxyprogesterone acetate | about 1 | about 2.5 |
| Norethynodrel | about 0.200 | about 1 |
| Allylestrenol | about 1 | about 2 |
| Lynoestrenol | about 0.100 | about 0.200 |
| Quingestanol acetate | about 0.050 | about 0.200 |
| Medrogestone | about 1 | about 2 |
| Norgestrienone | about 0.020 | about 0.050 |
| Dimethisterone | about 0.500 | about 1 |
| Ethisterone | about 1 | about 2.5 |
| Cyproterone acetate | about 0.100 | about 0.500. |

33. *The method of claim 21, 22, 23, 24 or 25, wherein said estrogen is selected from the group consisting of estradiol, estradiol-17β, conjugated equine estrogens, estradiol valerate, estrone, piperazine estrone sulphate, ethinyl estradiol, mestranol, and quinestrol.*

34. *The method of claim 33, wherein said estrogen is selected from the following group, with respective minimum and maximum daily dosage levels as follows:*

| | Dosage (mg/day) Minimum | Dosage (mg/day) Maximum |
|---|---|---|
| Estradiol | about 0.500 | about 2 |
| Estradiol-17β | about 0.500 | about 2 |

Re. 36,247

<table>
<tr><td colspan="3">15</td></tr>
<tr><td colspan="3">-continued</td></tr>
<tr><td></td><td>Dosage (mg/day)<br>Minimum</td><td>Dosage (mg/day)<br>Maximum</td></tr>
<tr><td>Estradiol valerate</td><td>about 0.500</td><td>about 2</td></tr>
<tr><td>Conjugated equine estrogens</td><td>about 0.300</td><td>about 2.5</td></tr>
<tr><td>Estrone</td><td>about 0.300</td><td>about 2.5</td></tr>
<tr><td>Piperazine estrone sulphate<br>(estropipate)</td><td>about 0.250</td><td>about 2.5</td></tr>
<tr><td>Ethinyl estradiol</td><td>about 0.005</td><td>about 0.020</td></tr>
<tr><td>Mestranol</td><td>about 0.005</td><td>about 0.040</td></tr>
<tr><td>Quinestrol</td><td>about 0.005</td><td>about 0.030.</td></tr>
</table>

35. The method of claim 34, wherein said estrogen is selected from the following group, with respective minimum and maximum daily dosage levels as follows:

<table>
<tr><td></td><td>Dosage (mg/day)<br>Minimum</td><td>Dosage (mg/day)<br>Maximum</td></tr>
<tr><td>Estradiol</td><td>about 0.500</td><td>about 1</td></tr>
<tr><td>Estradiol-17β</td><td>about 0.500</td><td>about 1</td></tr>
<tr><td>Estradiol valerate</td><td>about 0.500</td><td>about 1</td></tr>
<tr><td>Conjugated equine estrogens</td><td>about 0.300</td><td>about 0.600</td></tr>
<tr><td>Estrone</td><td>about 0.300</td><td>about 0.600</td></tr>
<tr><td>Piperazine estrone sulphate<br>(estropipate)</td><td>about 0.250</td><td>about 0.500</td></tr>
<tr><td>Ethinyl estradiol</td><td>about 0.005</td><td>about 0.010</td></tr>
<tr><td>Mestranol</td><td>about 0.005</td><td>about 0.015</td></tr>
<tr><td>Quinestrol</td><td>about 0.005</td><td>about 0.010.</td></tr>
</table>

36. The method of claim 30, 31, 32, 33, 34 or 35, wherein the fixed daily dosages are administered over a treatment period of greater than 120 days.

37. The method of claim 21, 23 or 25, wherein the progestogen is medroxyprogesterone acetate in an amount of from about 1 mg to about 2.5 mg.

38. The method of claim 21, 22, 23, 24 or 25, wherein the estrogen is conjugated equine estrogens in an amount of from about 0.300 mg to about 2.5 mg.

39. The method of claim 21, 23 or 25, wherein the progestogen is medroxyprogesterone acetate in an amount of from about 1 mg to about 2.5 mg, and the estrogen is conjugated equine estrogens in an amount of from about 0.300 mg to about 2.5 mg.

40. The method of claim 39, wherein the estrogen is conjugated equine estrogens in an amount of from about 0.300 to about 0.600.

41. The method of claim 39, wherein the progestogen is medroxyprogesterone acetate in an amount of about 2.5 mg and the estrogen is conjugated equine estrogens in an amount of about 0.600 mg.

42. The method of claim 39, wherein the progestogen is medroxyprogesterone acetate in an amount of about 2.5 mg

16

and the estrogen is conjugated equine estrogens in an amount of about 0.300 mg.

43. The method of claim 37, 38, 39, 40, 41 or 42, wherein the fixed daily dosages are administered over a treatment period of greater than 120 days.

44. The method of claim 37, 38, 39, 40, 41 or 42, wherein the dosages and duration of treatment are sufficient to prevent or retard changes in blood lipids which might otherwise predispose the woman to cardiovascular disease.

45. The method of claim 21, 23 or 25, wherein said progestogen is norethindrone (norethisterone) acetate in an amount of from 0.10 mg to about 0.20 mg.

46. The method of claim 21, 22, 23, 24 or 25, wherein said estrogen is selected from the group consisting of estradiol, estradiol 17-β, or estradiol valerate and is in an amount of from about 0.500 to about 1 mg.

47. The method of claims 22 or 24, wherein the estrogen is estradiol-17β administered in fixed daily dosages of between about 0.500 and about 1 mg and the progestogen is norethindrone acetate.

48. The method of claim 47, wherein the fixed daily dosages are administered over a treatment period of greater than 120 days.

49. The method of claim 47, wherein the dosages and duration of treatment are sufficient to prevent or retard changes in blood lipids which might otherwise predispose the woman to cardiovascular disease.

50. The method of claim 21, 23, 25 or 27, wherein said estrogen is piperazine estrone sulphate (estropipate).

51. The method of claim 21, 23, 25 or 27, wherein said estrogen is 17β-estradiol and said progestogen is dl-norgestrel or laevo-norgestrel, the daily dosage level of said 17β-estradiol being about 1 mg, the daily dosage level of said dl-norgestrel (where present) being about 100 micrograms, and the daily dosage of said laevo-norgestrel (where present) being about 50 micrograms.

52. The method of claim 21, 22, 23, 24 or 25 wherein the selected dosages are the minimum effective quantities of progestogen and estrogen.

53. The method of claim 21 or 23, wherein said daily dosages of progestogen and estrogen are administered once daily.

54. The method of claim 22, 24 or 25, wherein said single dosage form is a tablet.

55. The method of claim 21, 22, 23 or 24, wherein said progestogen is in micronized form.

56. The method of claim 21, 22, 23 or 24, wherein said estrogen is a synthetic estrogen.

57. The method of claim 21, 22, 23 or 24, wherein the estrogen is a natural estrogen.

*  *  *  *  *

Exhibit J

US 20010034340A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2001/0034340 A1**

Pickar (43) Pub. Date: **Oct. 25, 2001**

(54) **HORMONE REPLACEMENT THERAPY**

(75) Inventor: **James H. Pickar**, Springfield, PA (US)

Correspondence Address:
**Egon E. Berg**
**American Home Products Corporation**
**Patent Law Department**
**Five Giralda Farms**
**Madison, NJ 07940 (US)**

(73) Assignee: **American Home Products Corpora-tion**, Five Giralda Farms, Madison, NJ

(21) Appl. No.: **09/808,878**

(22) Filed: **Mar. 15, 2001**

**Related U.S. Application Data**

(63) Non-provisional of provisional application No. 60/268,607, filed on Feb. 14, 2001, which is a non-provisional of provisional application No. 60/190,630, filed on Mar. 20, 2000.

**Publication Classification**

(51) Int. Cl.$^7$ ..................... A61K 31/57; A61K 31/565
(52) U.S. Cl. ..................................... 514/177; 514/182

(57) **ABSTRACT**

This invention relates to methods and pharmaceutical compositions for providing hormone replacement therapy in perimenopausal, menopausal, and postmenopausal women through the continuous administration of combinations of conjugated estrogens and medroxyprogesterone acetate.

Patent Application Publication     Oct. 25, 2001  Sheet 1 of 3        US 2001/0034340 A1



MEAN NUMBER OF HOT FLUSHES PER DAY

FIG.1



FIG.2



PERCENTAGE OF PATIENTS WITH AMENORRHEA

Group
● B: 0.625/2.5
▲ E: 0.45/1.5
■ G: 0.3/1.5
+ H: Placebo

FIG.3

US 2001/0034340 A1

Oct. 25, 2001

1

# HORMONE REPLACEMENT THERAPY

[0001]  This application claims the benefit of U.S. Provisional Application No. 60/268,607, filed Feb. 14, 2001, and U.S. Provisional Application No. 60/190,630, filed Mar. 20, 2000.

## BACKGROUND

[0002]  This invention relates to methods and pharmaceutical compositions for providing hormone replacement therapy in perimenopausal, menopausal, and postmenopausal women through the continuous administration of combinations of conjugated estrogens and medroxyprogesterone acetate.

[0003]  Menopause is generally defined as the last natural menstrual period and is characterized by the cessation of ovarian function, leading to the substantial diminution of circulating estrogen in the bloodstream. Menopause is usually identified, in retrospect, after 12 months of amenorrhea. It is not a sudden event, but is often preceded by a time of irregular menstrual cycles prior to eventual cessation of menses. Following the cessation of menstruation, the decline in endogenous estrogen concentrations is typically rapid. There is a decrease in serum estrogens from circulating levels ranging from 40-250 pg/mL of estradiol and 40-170 pg/mL of estrone during ovulatory cycles to less than 15 pg/mL of estradiol and 30 pg/mL of estrone in postmenopausal women.

[0004]  As these estrogens decline during the time preceding (perimenopause) and following the menopause (postmenopause), various physiological changes may result, including vulvar and vaginal atrophy causing vaginal dryness, pruritus and dyspareunia, and vasomotor instability manifested as hot flushes. Other menopausal disturbances may include depression, insomnia, and nervousness. The long-term physiologic effects of postmenopausal estrogen deprivation may result in significant morbidity and mortality due to increase in the risk factors for cardiovascular disease and osteoporosis. Menopausal changes in blood lipid levels, a major component of the pathogenesis of coronary heart disease (CHD), may be precursors to increased incidence of ischemic heart disease, atherosclerosis, and other cardiovascular disease. A rapid decrease in bone mass of both cortical (spine) and trabecular (hip) bone can be seen immediately after the menopause, with a total bone mass loss of 1% to 5% per year, continuing for 10 to 15 years.

[0005]  Estrogen replacement therapy (ERT) is beneficial for symptomatic relief of hot flushes and genital atrophy and for prevention of postmenopausal osteoporosis. ERT has been recognized as an advantageous treatment for relief of vasomotor symptoms. There is no acceptable alternative to estrogen treatment for the atrophic changes in the vagina; estrogen therapy increases the vaginal mucosa and decreases vaginal dryness. Long term ERT is the key to preventing osteoporosis because it decreases bone loss, reduces spine and hip fracture, and prevents loss of height. In addition, ERT has been shown to be effective in increasing high density lipoprotein-cholesterol (HDL-C) and in reducing low density lipoprotein cholesterol (LDL-C), affording possible protection against CHD. ERT also can provide antioxidant protection against free radical mediated disorders or disease states. Estrogens have also been reported to confer neuroprotection, and inhibit neurodegenerative disorders, such as Alzheimer's disease (see U.S. Pat. No. 5,554,601, which is hereby incorporated by reference). The following table contains a list of estrogen preparations currently available.

| Estrogen replacement therapies available in the United States and/or Europe | | |
|---|---|---|
| Generic Name | Brand Name | Strength |
| Oral estrogens | | |
| Conjugated equine estrogens (natural) | Premarin | 0.3, 0.625, 0.9, 1.25, 2.5 mg |
| Conjugated estrogens (synthetic) | Cenestin | 0.625, 0.9 mg |
| Esterified estrogens (75–80% estrone sulfate 6–15% equilin sulfate derived from plant sterols) | Estratab | 0.3, 0.625, 1.25, 2.5 mg |
| Estropipate (Piperazine estrone sulfate) | Ogen Ortho-Est | 0.625, 1.25, 2.5 mg |
| Micronized estradiol | Estrace | 0.5, 1.0, 2.0 mg |
| Raloxifene (selective estrogen receptor modulator) | Evista | 60 mg |
| Esterified estrogens and methyltestosterone | Estratest | 1.25 mg esterified estrogen and 2.5 mg methyltestosterone |
| | Estratest HS | 0.625 mg esterified estrogen and 1.25 mg methyltestosterone |
| Estradiol valerate | Climaval | 1 mg, 2 mg |
| Estradiol | Elleste Solo | 1 mg, 2 mg |
| Estradiol | Estrofem | 2 mg |
| Estradiol | Estrofem Forte | 4 mg |
| Piperazine estrone sulfate | Harmogen | 1.5 mg |
| Combination: Estrone | Hormonin | 1.4 mg |
| Estradiol | | 0.6 mg |
| Estriol | | 0.27 mg |
| Estradiol valerate | Progynova | 1 mg, 2 mg |
| Estradiol | Zumenon | 1 mg, 2 mg |
| Transdermal estrogens | | |
| Estradiol | Alora (twice weekly) | 0.025, 0.0375, 0.05, 0.075, |
| | Climara (weekly) | 0.1 mg of estradiol released |

-continued

Estrogen replacement therapies available in the United States and/or Europe

| Generic Name | Brand Name | Strength |
|---|---|---|
| | Estraderm (2x weekly)<br>Fem Patch (weekly)<br>Vivelle (twice weekly) | daily (dose options for various products) |
| Estradiol | Dermestril | 25, 50, 100 μg |
| Estradiol | Estraderm | 25, 50, 100 μg |
| Estradiol | Evorel (Systen) | 25, 50, 75, 100 μg |
| Estradiol | Fematrix | 40, 80 μg |
| Estradiol | Menorest | 25, 37.5, 50, 75 μg |
| Estradiol | Progynova TS<br>And TS Forte (Climara) | 50, 100 μg |
| Vaginal estrogens | | |
| Conjugated equine estrogens | Premarin vaginal cream | 0.625 mg/g |
| Dienestrol | Ortho dienestrol cream | 0.1 mg/g |
| Estradiol | Estring | 7.5 μg |
| Estropipate | Ogen vaginal cream | |
| Micronized estradiol | Estrace vaginal cream | 1.5 mg/g<br>1.0 mg/g |

[0006] To minimize the occurrence of estrogen-related side effects and to maximize the benefit-risk ratio, the lowest dose effective in relief of symptoms and prevention of osteoporosis should be used. Although ERT reduces the relative risk (RR) for ischemic heart disease (RR, 0.50) and osteoporosis (RR, 0.40), the relative risk of endometrial cancer for postmenopausal women with a uterus may be increased. There are extensive clinical data showing that the relative risk of endometrial cancer can be reduced by the addition of a progestin, either sequentially or continuously. The addition of a progestin to estrogen therapy prevents estrogen-induced endometrial proliferation. Continuous combined hormone replacement therapy (HRT), with appropriate doses of daily estrogen and progestin, has been shown to be effective in relieving vaginal atrophy and vasomotor symptoms, preventing postmenopausal osteoporosis, and reducing the risk of endometrial cancer by prevention of endometrial hyperplasia. The following table contains a list of some currently available oral combination HRT products.

Oral Combination HRT Products

| Brand Name | Estrogen/Progestin | Strengths |
|---|---|---|
| Activelle | Estradiol<br>Norethisterone acetate (NETA) | 1 mg<br>0.5 mg |
| Climagest | Estradiol valerate (Climaval)<br>Norethisterone (NET) | 1 or 2 mg<br>1 mg days 17–28 |
| Cyclo Progynova | Estradiol valerate<br>Levonorgestrel | 1 or 2 mg, days 1–21<br>250 or 500 μg, days 2–21 |
| Elleste Duet | Estradiol<br>Norethisterone acetate | 1 or 2 mg<br>1 mg days 17–28 |
| Femoston | Estradiol<br>Dydrogesterone | 1 or 2 mg<br>10 or 20 mg |
| Kliogest | Estradiol<br>Norethisterone acetate | 2 mg<br>1 mg |
| Improvera | Piperazine estrone sulfate<br>Medroxyprogesterone acetate (MPA) | 1.5 mg<br>10 mg, days 17–28 |
| Nuvelle | Estradiol valerate (Progynova)<br>Levonorgestrel | 2 mg<br>75 μg, days 17–28 |
| Premphase | Conjugated estrogens<br>MPA | 0.625 mg<br>5.0 mg |
| Prempro | Conjugated estrogens<br>MPA | 0.625 mg<br>2.5 or 5.0 mg |
| Trisequens<br>And<br>Trisequens Forte | Estradiol<br>Norethisterone | 2 or 4 mg, days 1–22<br>1 mg, days 23–28<br>1 mg, days 13–22 |
| Ortho-Prefest | Estradiol<br>Nogestimate | 1.0 mg, days 1–6<br>0.09 mg, days 4–6 |
| Femhrt 1/5 | Ethinyl estradiol<br>Norethindrone acetate | 1.0 mg<br>5 μg |

[0007] Since it is possible that progestins ameliorate of the favorable estrogen effects on lipids and may potentially impair of glucose tolerance, it is desirable, and an objective to find the lowest dose estrogen plus progestin HRT product, which also minimizes or eliminates endometrial hyperplasia. In addition, a major factor affecting a woman's decision to start and to continue taking HRT is vaginal bleeding, and many women would prefer a bleed-free product. Therefore, another objective is to provide the lowest effective dose which provides an acceptable bleeding pattern. Doses as low as NETA 0.5 mg, NET 0.35 mg, MPA 2.5 mg, levonorgesterel 0.25 mg, and dydrogesterone 5 mg have been used previously in continuous uninterrupted HRT regimens.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0008] FIG. 1 shows the mean number of hot flushes per day in patients receiving PREMARIN plus MPA combinations or placebo.

[0009] FIG. 2 shows the mean severity of hot flushes in patients receiving PREMARIN plus MPA combinations or placebo.

[0010] FIG. 3 shows the percentage of patients with amenorrhea in patients receiving PREMARIN plus MPA combinations or placebo.

## DESCRIPTION OF THE INVENTION

[0011] The purpose of this invention is to provide the significant benefits of a commercially successful HRT product, such as PREMPRO (0.625 mg conjugated equine estrogens, USP plus 2.5 mg MPA), while lowering the dosage of MPA below that which has previously been demonstrated to be effective, and preferably also lowering the dosage of the conjugated estrogens. This invention provides a method of treating or inhibiting menopausal or postmenopausal disorders in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises providing to said woman, continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens (natural or synthetic) and a daily dosage of about 1.5 medroxyprogesterone acetate (MPA). The dosage is preferably provided as a pharmaceutical composition for use in treating menopausal or postmenopausal disorders which comprises a combination of conjugated estrogens and a dosage of about 1.5 mg MPA. This invention further provides a pharmaceutical pack containing the daily dosage units of conjugated estrogen and MPA for continuous daily administration.

[0012] Conjugated estrogens refer to estrogenic steroidal substances in which one or more functional groups (typically hydroxyl groups) on the steroid exists as a conjugate (typically a sulfate or glucuronide). The conjugated estrogens may be a single conjugated estrogen, or may consist of mixtures of various conjugated estrogens. Numerous conjugated estrogens are described in the literature or are commercially available that are capable of being formulated for use in this invention either as a unitary estrogen, or may be mixed together with other synthetic and/or natural estrogens.

[0013] Conjugated estrogens may also contain other steroidal or non-steroidal compounds, which may, or may not, contribute to the overall biological effect. Such compounds include, but are not limited to, unconjugated estrogens,

androstanes, and pregnanes. Preferred conjugated estrogens for use in this invention are PREMARIN (conjugated equine estrogens, USP) and CENESTIN (synthetic conjugated estrogens, A).

[0014] PREMARIN (conjugated estrogens tablets, USP) for oral administration contains a mixture of estrogens obtained exclusively from natural sources, occurring as the sodium salts of water-soluble estrogen sulfates blended to represent the average composition of material derived from pregnant mares' urine. It is a mixture of sodium estrone sulfate and sodium equilin sulfate, and at least the following 8 concomitant components, also as sodium sulfate conjugates: 17α-dihydroequilin, 17α-estradiol, Δ8,9-dehydroestrone, 17β-dihydroequilin, 17β-estradiol, equilenin, 17α-dihydroequilenin, and 17β-dihydroequilenin. The make up of PREMARIN of PREMARIN is currently being analyzed, and other components as in the process of being identified and characterized. PREMARIN is indicated in the treatment of moderate to severe vasomotor symptoms associated with the menopause; treatment of vulvar and vaginal atrophy; and prevention of osteoporosis, as well as other indications approved for estrogen products.

[0015] CENESTIN (synthetic conjugated estrogens, A) tablets for oral administration contain a blend of 9 synthetic estrogenic substances: sodium estrone sulfate, sodium 17α-dihydroequilin sulfate, sodium 17α-estradiol sulfate, sodium equilenin sulfate, sodium 17α-dihydroequilenin sulfate, sodium equilin sulfate, sodium 17β-dihydroequilin sulfate, sodium 17β-estradiol sulfate, sodium 17α-dihydroequilenin sulfate. CENESTIN is indicated in the treatment of moderate to severe vasomotor symptoms associated with the menopause.

[0016] PREMARIN, CENESTIN, and medroxyprogesterone acetate are all available from commercial sources (Wyeth-Ayerst—PREMARIN and medroxyprogesterone acetate; Duramed—CENESTIN). It is preferred that the dosage of MPA is about 1.5 mg per day. It is preferred that the conjugated estrogen constituent is PREMARIN. It is preferred that the dosage of PREMARIN is about 0.625 mg per day or less, and is more preferred that the dosage of PREMARIN is either about 0.45 mg per day or about 0.30 mg per day.

[0017] As used in accordance with this invention, the term "menopausal or postmenopausal disorder" refers to conditions, disorders, or disease states that are at least partially caused by the decreased estrogen production occurring during the perimenopausal, menopausal, or post-menopausal stages of a woman's life. Such disorders typically include, but are not limited to, one or more of, vaginal and vulvar atrophy, vasomotor instability, urinary incontinence, and increased risk of developing osteoporosis, cardiovascular disease, and diseases related to the oxidative damage from free radicals. As used herein, menopausal also includes conditions of decreased estrogen production that may be surgically, chemically, or be caused by a disease state which leads to premature diminution or cessation of ovarian function.

[0018] The term "daily" means that the dosage is to be administered at least once daily. The frequency may is preferred to be once daily, but may be more than once daily, provided that any specified daily dosage is not exceeded.

[0019] The term "combination" of conjugated estrogens and MPA means that the daily dosage of each of the

4

components of the combination is administered during the treatment day. The components of the combination are preferably administered at the same time; either as a unitary dosage form containing both components, or as separate dosage units; the components of the combination can be administered at different times during the day, provided that the desired daily dosage is achieved.

[0020] The term "continuous and uninterrupted" means that there is no break in the treatment regimen, during the treatment period. Thus, "continuous, uninterrupted administration" of a combination, means that the combination is administered at least once daily during the entire treatment period. It is expected that the treatment period for the combination of conjugated estrogens and MPA will be for at least 30 days, preferably 120 days, and most preferably as long term treatment, and possibly indefinite, as one of the primary reasons for administering combinations of conjugated estrogens and MPA is to treat or inhibit menopausal or postmenopausal disorders. Treatment periods also may vary depending on the symptoms to be treated. For example, for the treatment of vasomotor symptoms, it is preferred that the treatment may last from one month to several years, depending on the severity and duration of the symptoms. Physician evaluation along with patient interaction will assist the determination of the duration of treatment. For the treatment or inhibition of osteoporosis, it is preferred that the treatment period could last from six months to a number of years, or indefinitely.

[0021] This invention, also covers short term treatments or treatments of a finite term, that may be less than the 30 day preferred treatment period. It is anticipated that a patient may miss, or forget to take, one or a few dosages during the course of a treatment regimen, however, such patient is still considered to be receiving continuous, uninterrupted administration.

[0022] The term "fixed daily dosage" means that the same dosage is given every day during the treatment period. It is preferred that the MPA is given in a fixed daily dosage of about 1.5 mg, with an appropriate dose of conjugated estrogens, preferably equivalent to about 0.45 mg or about 0.30 PREMARIN. One aspect of this invention also covers situations in which a fixed daily dosage of the conjugated estrogens plus MPA combination is not given every day during the treatment period. For example, the dosage of a patient may need to be adjusted (either up or down), to achieve the desired effect during the middle of a treatment period.

[0023] The term "providing," with respect to providing a dosage of one or both of the components of this invention, means either directly administering such a component of this invention, or administering a prodrug, derivative, or analog which will form the equivalent amount of the component within the body.

[0024] It is preferred that the conjugated estrogens plus MPA combinations of this invention are provided orally. The specific dosages of conjugated estrogens plus MPA combinations of this invention that are disclosed herein are oral dosages.

[0025] The ability of the conjugated estrogens plus MPA combinations of this invention to treat or inhibit menopausal or postmenopausal disorders was confirmed in a double

blind clinical study of postmenopausal women using combinations of PREMARIN plus MPA, or placebo. In this study, patients received continuous and uninterrupted treatment for 13 cycles (1 year). The relief of vasomotor symptoms, prevention of endometrial hyperplasia, and effects on lipids, vaginal bleeding were measured throughout the study. Additionally, the effect on bone mineral density was evaluated in patients who received continuous and uninterrupted treatment for up to 26 cycles (2 years).

[0026] Vasomotor instability is a menopausal or postmenopausal disorder which is often manifested as hot flushes. In the clinical study described above, relief of vasomotor symptoms was analyzed in a subset of patients who experienced at least an average of 7-8 moderate-to-severe hot flushes per day during the 7-day period just prior to the initiation of treatment in this study. The results obtained are summarized in the tables below. The first table shows the mean number of flushes, and the second table shows the mean daily severity of the flushes. These results are also shown in FIGS. 1 and 2.

| | Mean Number (± S.E.) of Hot Flushes Per Day | | | |
|---|---|---|---|---|
| | | Treatment Group | | |
| Week | Placebo | 0.625 P + 2.5 M* | 0.45 P + 1.5 M | 0.3 P + 1.5 M |
| 1 | 9.41 ± 0.81 | 9.50 ± 0.73 | 9.99 ± 0.79 | 10.60 ± 0.76 |
| 2 | 8.55 ± 0.80 | 6.38 ± 0.72 | 6.98 ± 0.80 | 6.88 ± 0.74 |
| 3 | 8.51 ± 0.76 | 4.47 ± 0.69 | 4.47 ± 0.76 | 4.62 ± 0.71 |
| 4 | 8.09 ± 0.72 | 3.38 ± 0.66 | 3.23 ± 0.72 | 3.84 ± 0.67 |
| 8 | 7.10 ± 0.65 | 1.55 ± 0.61 | 1.49 ± 0.65 | 2.41 ± 0.60 |
| 12 | 5.36 ± 0.55 | 1.16 ± 0.49 | 0.94 ± 0.53 | 1.13 ± 0.50 |

*Daily dosages of P (PREMARIN) and M (MPA).

[0027]

| | Mean Severity (± S.E.) of Hot Flushes | | | |
|---|---|---|---|---|
| | | Treatment Group | | |
| Week | Placebo | 0.625 P + 2.5 M* | 0.45 P + 1.5 M | 0.3 P + 1.5 M |
| 1 | 2.10 ± 0.10 | 2.08 ± 0.09 | 2.14 ± 0.10 | 2.07 ± 0.10 |
| 2 | 2.06 ± 0.13 | 1.75 ± 0.12 | 1.78 ± 0.13 | 1.73 ± 0.12 |
| 3 | 1.97 ± 0.14 | 1.36 ± 0.13 | 1.42 ± 0.15 | 1.48 ± 0.14 |
| 4 | 2.03 ± 0.15 | 1.07 ± 0.14 | 1.21 ± 0.15 | 1.45 ± 0.14 |
| 8 | 1.75 ± 0.16 | 0.54 ± 0.14 | 0.70 ± 0.16 | 0.87 ± 0.14 |
| 12 | 1.57 ± 0.16 | 0.51 ± 0.14 | 0.51 ± 0.16 | 0.56 ± 0.14 |

*Daily dosages of P (PREMARIN) and M (MPA).

[0028] As shown in both tables and Figures, all dosages of PREMARIN plus MPA reduced the number and severity of hot flushes experienced by the women in this clinical study compared with women taking placebo. All differences from placebo were significant (p<0.05) by weeks 3-4. It was unexpected, however, that the lower dosages of PREMARIN (0.45 and 0.3 mg) and MPA (1.5 mg), would rapidly reduce the number and severity of hot flushes to the same extent as the higher dose combination containing 0.625 mg PREMARIN plus 2.5 mg MPA.

[0029] Vaginal atrophy is a common menopausal or postmenopausal disorder leading to vaginal dryness, pruritus,

US 2001/0034340 A1

5

Oct. 25, 2001

and dyspareunia. Vaginal atrophy results from a sloughing of vaginal epithelial cells which are not replaced, leading to a thinning of the vaginal lining. The effects of the lower dose conjugated estrogen plus MPA regimens on vaginal atrophy were evaluated by comparing the vaginal maturation index of superficial cells at baseline, and after cycles 6 and 13 of treatment. The vaginal maturation index is a measure of the number of superficial vaginal epithelial cells. An increase (positive number) in the vaginal maturation index indicates a reversal (successful treatment) of vaginal atrophy. The following table summarizes the results obtained.

| Vaginal Maturation Index for Superficial Cells - Median Change from Baseline | | |
|---|---|---|
| Treatment Group | Cycle 6 | Cycle 13 |
| 0.625 P + 2.5 M* | 10 | 10 |
| 0.45 P + 1.5 M | 10 | 10 |
| 0.3 P + 1.5 M | 10 | 10 |
| Placebo | 0 | 0 |

*Daily dosages of P (PREMARIN) and M (MPA).

[0030] These data show that all the evaluated dosages of conjugated estrogens plus MPA provided significant (p<0.001) improvement in the vaginal maturation index versus placebo, demonstrating their ability to successfully treat or inhibit vaginal atrophy. It is notable that the lower dosages of conjugated estrogens plus MPA were as equally as effective as the 0.625 mg PREMARIN plus 2.5 mg MPA dosage in facilitating the growth of the vaginal superficial cells.

[0031] As HRT using estrogens alone has been shown to increase the relative risk of endometrial hyperplasia in postmenopausal women with a uterus, the incidence of endometrial hyperplasia was evaluated in the clinical study for patients treated with PREMARIN plus MPA treated groups and placebo. Two independent pathologists evaluated endometrial biopsies in a blinded fashion. A patient was considered to have endometrial hyperplasia if both of the primary pathologists agreed on the diagnosis. If they disagreed, a third pathologist was consulted, and the diagnosis of hyperplasia was based on the diagnosis of the majority. The following table summarizes the results obtained after 13 cycles of treatment.

| Percent of Patients Developing Endometrial Hyperplasia | | | |
|---|---|---|---|
| Treatment Group (Dosage)* | No. Hyperplasias | No. Patients/Group | Hyperplasia Rate (%) |
| Placebo | 0 | 261 | 0.00 |
| PREMARIN/MPA (0.625/2.5) | 0 | 278 | 0.00 |
| PREMARIN/MPA (0.45/1.5) | 1 | 272 | 0.37 |
| PREMARIN/MPA (0.3/1.5) | 1 | 272 | 0.37 |

*All dosages are in mg/day

[0032] These results showed that that the use of conjugated equine estrogens/MPA at a dosage of 0.625/2.5 mg/day effectively prevented the development of endometrial hyperplasia. The results also show the unexpected result that lowering the dosage of MPA to 1.5 mg/day in PRE-

MARIN plus MPA combinations, also continued to effectively inhibit the development of endometrial hyperplasia. The difference between the results obtained in the 1.5 mg MPA treatment groups and 2.5 mg MPA treatment groups was not statistically significant.

[0033] In providing an HRT regimen that will be acceptable to menopausal or postmenopausal women, it is highly desirable that the regimen produce a high rate of amenorrhea, as most of these women prefer a product which does not cause spotting or breakthrough bleeding. The following table shows the percent of women experiencing amenorrheic cycles at during cycles 1, 3, 6, 9, and 13.

| | Percent Cycles of Amenorrhea | | | |
|---|---|---|---|---|
| | | Treatment Group | | |
| Cycle | Placebo | 0.625 P + 2.5 M | 0.45 P + 1.5 M | 0.3 P + 1.5 M |
| 1 | 91.1 | 51.3 | 71.1 | 75.2 |
| 3 | 96.4 | 54.9 | 70.3 | 80.4 |
| 6 | 91.8 | 68.4 | 72.8 | 85.1 |
| 9 | 93.6 | 70.8 | 80.5 | 86.6 |
| 13 | 95.2 | 77.4 | 79.8 | 88.4 |

*Daily dosages of P (PREMARIN) and M (MPA).

[0034] The results show that greater than 90 percent of women receiving placebo were amenorrheic throughout the study. While the percent of amenorrheic women receiving daily dosages of 0.625 mg PREMARIN plus 2.5 mg MPA is satisfactory, as measured by the commercial success of PREMPRO (0.625 mg conjugated equine estrogens plus 2.5 mg MPA), lowering the dosages of PREMARIN to either 0.45 mg or 0.3 mg and MPA to 1.5 mg, produced an equal, if not significantly better (0.3 mg PREMARIN plus 1.5 mg MPA) percent of women achieving amenorrhea, while still maintaining the other benefits of HRT. Additionally, as shown in the above table, and in FIG. 3, a higher percentage of amenorrhea was achieved more rapidly with the lower dose combinations.

[0035] It is well known that the addition of progestins to ERT regimens may ameliorate some of the beneficial cardioprotective effects conferred by the estrogen, or even produce deleterious effects on the lipid levels. In this study total cholesterol (TC), HDL, HDL$_2$, and LDL levels were measured. There was a general dose-response trend between treatment groups, that showed more favorable lipid profiles with higher doses of PREMARIN and lower doses of MPA. Patients receiving 0.625 mg PREMARIN+2.5 mg MPA had slight reductions in TC, significant increases in HDL and

$HDL_2$, and significant decreases in levels of LDL. The 0.45 mg PREMARIN plus 1.5 mg MPA dosage produced a similar favorable profile (but of less magnitude) to 0.625 mg PREMARIN+2.5 mg MPA treated women. Women treated with 0.3 mg PREMARIN plus 1.5 mg MPA had a less favorable lipid profile (TC, HDL, $HDL_2$, and LDL), than women treated, with 0.625 mg PREMARIN plus 2.5 mg MPA, however, this profile was still better than those receiving placebo.

[0036]  During the study, adverse events were recorded and analyzed. Treatment emergent adverse events were consistent with those seen with hormone therapy. With the exception of breast pain, the side effect profile was comparable between the PREMARIN plus MPA treatment groups. Women receiving the daily dosage of 0.3 mg PREMARIN plus 1.5 mg MPA experienced significantly less breast pain than the women taking 0.625 mg PREMARIN plus 2.5 mg MPA.

[0037]  In summary the results of the clinical study demonstrated that conjugated estrogen HRT regimens containing dosages of 1.5 mg/day of MPA were equally effective in treating menopausal or postmenopausal disorders as the regimens containing the higher dose of 2.5 mg MPA (0.625 mg PREMARIN plus 2.5 mg MPA, in particular). Higher rates of amenorrhea were also achieved more rapidly.. Additionally, less breast tenderness was observed in women taking 0.3 mg PREMARIN plus 1.5 mg MPA, than in women taking the commercially available 0.625 mg PREMARIN plus 2.5 mg MPA combination.

[0038]  It is well known that a rapid decrease in bone mass of both cortical (spine) and trabecular (hip) bone can be seen immediately after the menopause, with a total bone mass loss of 1% to 5% per year, continuing for 10 to 15 years. In the clinical study described above, bone mineral density (BMD) was determined using dual energy x-ray absorptiometry (DEXA) measurements of the lumbar spine (L2-L4), femoral neck, trochanter, and total body. BMD measurements were made at least twice pre-study (7-14 days apart but not to exceed 3 weeks), during cycles 6, 13, 19, and twice during cycle 26 (7-14 days apart but not to exceed 3 weeks). The final visit results (cycle 26) are summarized in the table below.

gated estrogens plus MPA inhibited or retarded bone demineralization. These data also show that combinations of conjugated estrogens plus MPA actually increased the bone mineral density relative to pre-study baseline levels, and also relative to patients receiving placebo.

[0040]  Based on the results observed in the clinical study described above, it has been found that the continuous and uninterrupted administration of a combination conjugated estrogens plus a dosage of about mg per of medroxyprogesterone acetate is useful in treating or inhibiting menopausal or postmenopausal disorders in perimenopausal, menopausal, or postmenopausal women. More particularly, the combinations described herein are useful in treating or inhibiting vaginal or vulvar atrophy; atrophic vaginitis; vaginal dryness; pruritus; dyspareunia; dysuria; frequent urination; urinary incontinence; urinary tract infections; vasomotor symptoms, including hot flushes, myalgia, arthralgia, insomnia, irritability, and the like; inhibiting or retarding bone demineralization; increasing bone mineral density; and treating or inhibiting osteoporosis.

[0041]  The combinations of this invention also exert a cardioprotective effect in perimenopausal, menopausal, and postmenopausal women, and are therefore useful in lowering cholesterol, triglycerides, Lp(a), and LDL levels; inhibiting or treating hypercholesteremia; hyperlipidemia; cardiovascular disease; atherosclerosis; peripheral vascular disease; restenosis, and vasospasm; and inhibiting vascular wall damage from cellular events leading toward immune mediated vascular damage.

[0042]  The combinations of this invention are antioxidants, and are therefore useful in inhibiting disorders or disease states which involve free radicals. More particularly, the combinations of this invention are useful in treating or inhibiting free radical involvement in the development of cancers, central nervous system disorders, Alzheimer's disease, bone disease, aging, inflammatory disorders, peripheral vascular disease, rheumatoid arthritis, autoimmune diseases, respiratory distress, emphysema, prevention of reperfusion injury, viral hepatitis, chronic active hepatitis, tuberculosis, psoriasis, systemic lupus erythematosus, amyotrophic lateral sclerosis, aging effects, adult respiratory distress syndrome, central nervous system trauma and stroke, or injury during reperfusion procedures.

| Percent BMD Change (± S.E.) From Baseline at Final Visit | | | | |
|---|---|---|---|---|
| Treatment Group | Lumbar Spine | Femoral Neck | Trochanter | Total Body |
| Placebo | −2.63 ± 0.37[*] | −1.97 ± 0.46[*] | 0.82 ± 0.58 | −1.56 ± 0.17[+] |
| 0.625 P + 2.5 M[*] | 3.77 ± 0.37[+,#] | 1.67 ± 0.46[+,#] | 4.05 ± 0.59[*,#] | 0.96 ± 0.18[*,#] |
| 0.45 P + 1.5 M | 2.45 ± 0.37[+,#] | 1.43 ± 0.47[+,#] | 3.60 ± 0.59[*,#] | 0.56 ± 0.18[*,#] |
| 0.3 P + 1.5 M | 1.77 ± 0.36[+,#] | 1.51 ± 0.44[*,#] | 4.66 ± 0.56[+,#] | 0.55 ± 0.17[+,#] |

[*]Daily dosages of P (PREMARIN) and M (MPA).
[+]Statistically significant (p < 0.001) change from baseline.
[++]Statistically significant (p = 0.004) change from baseline.
[#]Statistically significant (p < 0.001) difference from placebo.

[0039]  The results showed that all dosages of PREMARIN plus MPA significantly increased the BMD versus baseline and placebo in the lumbar spine, femoral neck, trochanter, and total body demonstrating that combinations of conju-

[0043]  The combinations of this invention are useful in treating or inhibiting dementias, neurodegenerative disorders, and Alzheimer's disease; providing neuroprotection or cognition enhancement.

7

[0044] The conjugated estrogens and medroxyprogesterone acetate described in this invention can be either formulated as separate tablets or as a unitary combination tablet.

[0045] Either of the components or the combination may be formulated neat or may be combined with one or more pharmaceutically acceptable carriers for administration. For example, solid carriers include starch, lactose, dicalcium phosphate, microcrystalline cellulose, sucrose and kaolin, while liquid carriers include sterile water, polyethylene glycols, non-ionic surfactants and edible oils such as corn, peanut and sesame oils, as are appropriate to the nature of the active ingredient and the particular form of administration desired. Adjuvants customarily employed in the preparation of pharmaceutical compositions may be advantageously included, such as flavoring agents, coloring agents, preserving agents, and antioxidants, for example, vitamin E, ascorbic acid, BHT and BHA.

[0046] The preferred pharmaceutical compositions from the standpoint of ease of preparation and administration are solid compositions, particularly tablets and hard- filled or liquid-filled capsules. Oral administration of the compounds is preferred.

[0047] Conjugated estrogens and MPA can be formulated in a number of ways to provide a single combination dosage form. Conjugated estrogens can be incorporated within the core of a compressed tablet and the progestin can be placed in an overcoating consisting of a compressed, film or sugar coat, as described in U.S. Pat. No. 5,547,948, which is hereby incorporated by reference. The tablets described in U.S. Pat. No. 5,547,948 are suitable for formulation of the conjugated estrogens and MPA described in this invention as a unitary tablet. U.S. Pat. No. 5,908,638, which is hereby incorporated by reference, also describes combination tablets which are suitable for formulation of the conjugated estrogens and MPA described in this invention as a unitary tablet.

[0048] Conjugated estrogens may be formulated in a core containing the conjugated estrogens, and several components including alcohol, hydroxypropyl methyl cellulose, lactose monohydrate, magnesium stearate, and starch. The core can be covered with a coating made from components such as ethylcellulose, and triethyl citrate.

[0049] Both components can be incorporated in the compressed tablet core or in a tablet coating formulated to maintain drug stability and provide adequate oral bioavailability. For example, the progestin can be micronized.

[0050] Conjugated estrogens can be incorporated in granules, spheroids or other multiparticulate forms, and, if necessary, coated to provide adequate stability. These multiparticulates can be combined, in the appropriate proportions, with a powder blend, granulation or multiparticulates containing the progestin and incorporated into hard gelatin capsules.

[0051] This invention also provides a pharmaceutical dose pack, containing any number of daily pharmaceutical dosage units. Preferably, and conventionally, the pack contains 28 tablets or multiples thereof. The pack should indicate that the dosage units are to be taken consecutively on a daily basis until the treatment period has ended, or until the pack has been completed. The next pack should be started on the next consecutive day. For combinations containing a unitary

dosage tablet containing both conjugated estrogens and MPA, it is preferable that the pack contain one tablet corresponding to each day of administration. For combinations containing separate dosage units of conjugated estrogens and MPA, it is preferable that each one tablet of each correspond to each given day's administration, as indicated on the pill pack.

1. A method of treating or inhibiting menopausal or postmenopausal disorders in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

2. The method according to claim 1, wherein the conjugated estrogens is conjugated equine estrogens, USP.

3. The method according to claim 2, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

4. The method according to claim 3, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

5. The method according to claim 4, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

6. The method according to claim 1, wherein the conjugated estrogens is synthetic conjugated estrogens, A.

7. A method of treating or inhibiting vasomotor symptoms in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

8. The method according to claim 7, wherein the conjugated estrogens is conjugated equine estrogens, USP.

9. The method according to claim 8, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

10. The method according to claim 9, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

11. The method according to claim 10, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

12. The method according to claim 8, wherein the vasomotor symptom is hot flushes.

13. The method according to claim 7, wherein the conjugated estrogens is synthetic conjugated estrogens, A.

14. The method according to claim 13, wherein the vasomotor symptom is hot flushes.

15. A method of inhibiting or retarding bone demineralization or treating or inhibiting osteoporosis in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

16. The method according to claim 15, wherein the conjugated estrogens is conjugated equine estrogens, USP.

17. The method according to claim 16, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

18. The method according to claim 17, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

US 2001/0034340 A1

8

Oct. 25, 2001

19. The method according to claim 18, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

20. A method of treating or inhibiting vaginal or vulvar atrophy; atrophic vaginitis; vaginal dryness; pruritus; dyspareunia; dysuria; frequent urination; urinary incontinence; urinary tract infections in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

21. The method according to claim 20, wherein the conjugated estrogens is conjugated equine estrogens, USP.

22. The method according to claim 21, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

23. The method according to claim 22, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

24. The method according to claim 23, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

27. A method of lowering cholesterol, triglycerides, Lp(a), or LDL levels; inhibiting or treating hypercholesteremia; hyperlipidemia; cardiovascular disease; atherosclerosis; peripheral vascular disease; restenosis, vasospasm; or inhibiting vascular wall damage from cellular events leading toward immune mediated vascular damage, in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

28. The method according to claim 27, wherein the conjugated estrogens is conjugated equine estrogens, USP.

29. The method according to claim 28, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

30. The method according to claim 29, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

31. The method according to claim 30, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

32. A method of treating or inhibiting free radical involvement in the development of cancers, central nervous system disorders, Alzheimer's disease, bone disease, aging, inflammatory disorders, peripheral vascular disease, rheumatoid arthritis, autoimmune diseases, respiratory distress, emphysema, prevention of reperfusion injury, viral hepatitis, chronic active hepatitis, tuberculosis, psoriasis, systemic lupus erythematosus, amyotrophic lateral sclerosis, aging effects, adult respiratory distress syndrome, central nervous system trauma and stroke, or injury during reperfusion procedures in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

33. The method according to claim 32, wherein the conjugated estrogens is conjugated equine estrogens, USP.

34. The method according to claim 33, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

35. The method according to claim 34, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

36. The method according to claim 35, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

37. A method of treating or inhibiting dementias, neuro-degenerative disorders, and Alzheimer's disease; providing neuroprotection or cognition enhancement in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

38. The method according to claim 37, wherein the conjugated estrogens is conjugated equine estrogens, USP.

39. The method according to claim 38, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

40. The method according to claim 39, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

41. The method according to claim 40, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

42. A pharmaceutical composition for use in treating menopausal or postmenopausal disorders, which comprises conjugated estrogens, a dosage of about 1.5 mg medroxyprogesterone acetate, and a pharmaceutical carrier.

43. The composition according to claim 42, wherein the conjugated estrogens is conjugated equine estrogens, USP.

44. The composition according to claim 43, wherein the dosage of conjugated equine estrogens, USP is about 0.45 mg.

45. The composition according to claim 43, wherein the dosage of conjugated equine estrogens, USP is about 0.30 mg.

46. A pharmaceutical oral dosage unit which comprises which comprises conjugated estrogens, a dosage of about 1.5 mg of medroxyprogesterone acetate, and a pharmaceutical carrier.

47. The dosage unit according to claim 46, wherein the conjugated estrogens is conjugated equine estrogens, USP.

48. The dosage unit according to claim 47, wherein the medroxyprogesterone acetate is micronized.

49. The dosage unit according to claim 47, wherein the dosage of conjugated equine estrogens, USP is about 0.45 mg.

50. The dosage unit according to claim 47, wherein the dosage of conjugated equine estrogens, USP is about 0.30 mg.

51. A method of minimizing or reducing levels of breast pain in a woman receiving hormone replacement therapy, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

52. The method according to claim 51, wherein the conjugated estrogens is conjugated equine estrogens, USP.

53. The method according to claim 52, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

54. The method according to claim 53, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

55. The method according to claim 54, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

56. A method of minimizing spotting or breakthrough bleeding; or achieving amenorrhea in a woman receiving hormone replacement therapy, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

57. The method according to claim 56, wherein the time for minimizing spotting or breakthrough bleeding or achieving the onset of amenorrhea is hastened.

58. The method according to claim 57, wherein the conjugated estrogens is conjugated equine estrogens, USP.

59. The method according to claim 58, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

60. The method according to claim 59, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

61. The method according to claim 60, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

62. A method of increasing bone mineral density in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

63. The method according to claim 62, wherein the conjugated estrogens is conjugated equine estrogens, USP.

64. The method according to claim 63, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

65. The method according to claim 64, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

66. The method according to claim 65, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

67. The pharmaceutical composition according to claim 42, wherein the conjugated estrogens is synthetic conjugated estrogens, A.

68. The pharmaceutical dosage unit according to claim 46, wherein the conjugated estrogens is synthetic conjugated estrogens, A.

*  *  *  *  *

Exhibit K

Show



**New York:**
One Broadway
New York, NY 10004
Tel: 212-425-7200
Fax: 212-425-5288

**Washington:**
1500 K Street, N.W.,
Suite 700
Washington, DC 20005
Tel: 202-220-4200
Fax: 202-220-4201

**Silicon Valley:**
RiverPark Towers
333 West San Carlos St.
Suite 600
San Jose, CA 95110
Tel: 408-975-5700
Fax: 408-975-7501

**Website**: www.kenyon.com

## Overview

With more than 200 lawyers, Kenyon & Kenyon is one of the largest and most diversified law firms in the country concentrating on the practice of intellectual property. Founded in 1879 and with offices in New York, Washington DC, and Silicon Valley, the Firm provides litigation, prosecution, licensing and counseling services relating to patents, trademarks, copyrights, trade secrets and related matters, such as unfair business and unfair trade practices.

## Perspective

Kenyon & Kenyon is committed to comprehending our clients' products, processes and services in the context of their industries. Understanding their businesses enables us to design and implement legal strategies to protect innovation essential to the health of those businesses. We help clients identify the appropriate form or forms of protection for their assets, whether it be patents, copyrights, trademarks, trade secrets, licenses, or a combination of these. We protect the value of these assets in court and at the United States International Trade Commission, and we defend clients against claims by others.

## Industry Experience

The Firm's experience spans the business spectrum. We have represented clients in such technological areas as computers (both hardware and software), biotechnology products and processes, machinery, pharmaceuticals and plastics. Additionally, we have provided services to clients in aerospace, photography, medical devices, metallurgy, basic chemicals and petrochemicals, environmental processes, food and beverages, transportation vehicles, agribio products, robotics and telecommunications. We have also represented clients in entertainment and the arts, toys, publishing, travel, sports, marketing and advertising.

Our lawyers address intellectual property matters in virtually every jurisdiction worldwide. To assist us abroad, the Firm maintains a large network of foreign associates who assist in acquiring and protecting the intellectual property of our clients in their respective countries, and with whom we can consult about foreign intellectual property law.

Our Silicon Valley office enables us to better serve both our clients on the West Coast and those clients with litigation in California courts. Our Washington, DC office gives us direct

access to the nearby Patent and Trademark Office, the Copyright Office, the International Trade Commission and the Court of Appeals for the Federal Circuit.

**Clients**
Kenyon & Kenyon clients reflect a broad range of industries and geographic regions. Our clients include domestic and foreign businesses, multinational corporations; growth companies focused on emerging technologies, universities, research institutes, and individual inventors. They are located in North America, Europe, Asia, Africa, South America, and in virtually every developed or developing nation in the world, including the nations emerging from the former Soviet bloc. Accordingly, the Firm includes lawyers proficient in German, Italian, French, Spanish, Hebrew, Dutch, Japanese, Russian, and Chinese.

**We have successfully represented both plaintiffs and defendants in a variety of recent jury and non-jury case**

*Sony Corp. of Am. v. Soundview Corp. of Am.,* 61 U.S.P.Q.2d 1538 (D. Conn. 2002) (motion for summary judgment of noninfringement relating to v-chip technology granted to Sony and their companion plaintiffs)

- *Robert Bosch GmbH v. Japan Battery Storage Company, Ltd.*, 2002 U.S. Dist. LEXIS 19068 (C.D. Cal. 2002) (granting Bosch's motion for summary judgment of noninfringement, applying the U.S. Supreme Court's recent *Festo* decision)

*Cordis Corp. v. Boston Scientific Corp.,* 194 F.Supp.2d 323 and 2002 U.S. Dist. LEXIS 9083 (D. Del. 2002) (secured jury verdict finding that five out of six asserted claims in four different Johnson & Johnson patents were invalid or not infringed by the accused products of clients Boston Scientific and Medinol; secured a Court determination that two of those four patents were unenforceable due to inequitable conduct; and subsequently secured Court decision that not only confirmed those portions of the verdict in clients' favor, but also overturned the unfavorable portion of the verdict and ordered a new trial on the single claim previously found by the jury to be valid and infringed by the client under the doctrine of equivalents)

*Applera Corp. v. Micromass UK Ltd.,* 204 F.Supp.2d 724 (D. Del. 2002) (jury found client's patent in suit to be valid and infringed and awarded lost profits of $47.5M. The court also entered a permanent injunction that prevents the sale or importation into the U.S. of Micromass Quattro Ultima™ mass spectrometer systems)

*Teva Pharmaceuticals USA, Inc. v. GlaxoSmithKline PLC,* 213 F.Supp.2d 597 (E.D. Va. 2002) (judgment invalidating three GSK patents covering Augmentin®. This decision follows up on a March 2002 decision invalidating three other GSK patents and a December 2001 decision invalidating a seventh patent)

*Super Natural Distributors, Inc. v. MuscleTech Research and Development*, 196 F.Supp.2d 761 (E.D.Wisc. 2002) (summary judgment in favor of our client dismissing claim under Wisconsin Fair Dealership Law on the ground that plaintiff was not a "dealer" and was not "situated" in Wisconsin for purposes of the statute)

*Twentieth Century Fox. v. Marvel,* 155 F.Supp.2d. 1 (2001) (our client, Marvel Enterprises, successfully defeated Fox's motion for a preliminary injunction seeking to deny the broadcast of the syndicated television series "Mutant X"), *aff'd*, 277 F.3d 253 (2d Cir. 2002) (upholding denial of preliminary injunction)

- ***Michael Tracy v. The Coca-Cola Company, Pow Wow Productions, Charlie Ahearn and Burrell Communications Group,*** (N.Y. Supreme Court, Bronx 2002) (summary judgment dismissing plaintiff's complaint for unfair competition and related claims granted in its entirety)
- ***Freudenbock-Nok v. BASF Corp.,*** (E.D.Mich. 2001) (BASF's motion for summary judgment of non-infringement of patent granted)
- ***SmithKline Beecham v. Teva Pharmaceuticals,*** (D. Mass. 2001) (SKB patent found invalid and unenforceable ***Mark Nutritionals, Inc. v. Momax, Inc.*** (W.D. Texas 2001) (temporary restraining order issued against defendant's use of infringing trademark and trade dress)
- ***Feuling Advanced Techs., Inc. v. DaimlerChrysler AG***, 99-CV-374 (S.D. Cal. 2000-2001) (obtained dismissal for lack of standing, as well as an award of attorneys' fees against plaintiff)
- ***Dow Chemical Co. v. Astro Valcour, Inc***., 110 F.Supp.2d 104 (N.D.N.Y 2000), *aff'd,* 267 F.3d 1334 (Fed. Cir. 2001), *cert. Denied,* 152 L.Ed.2d 470 (2002) (court invalidated the asserted claims of three Dow patents relating to isobutane blown polyethylene foam and the method of making that foam based on the prior invention of our client, Astro-Valcour)
- ***Robotic Vision Systems, Inc. v. View, Inc.,*** (C.D. Cal. 1999) (our client, Robotic Vision, Systems successfully asserted patent related to devices for inspecting chips using laser technology)
- ***Purdue Pharma L.P. v. Faulding, Inc.,*** 48 F.Supp.2d 420, *aff'd,* 230 F.3d 1320 (Fed. Cir. 2000) (D. Del. 1999) (patent asserted against firm client held invalid for lack of written description)
- ***Abbey v. Mercedes-Benz of North America, Inc.***, 74 F.Supp.2d 1217 and 74 F.Supp.2d 1221 (S.D. Fl. 1999) (obtained summary judgment of non-infringement for our client, Mercedes-Benz, and obtained an order preventing retroactive enforcement of reexamined patent)
- ***Cordant Technologies, Inc. v. Alliant Techsystems, Inc.***, 45 F.Supp.2d 398 (D. Del. 1999) (decision in favor of our client, Alliant, in which plaintiff's patent on rocket motor insulation held invalid)
- ***America Online, Inc. v. AT&T Corp.***, 64 F.Supp.2d 549 (E.D. Va. 1999), *aff'd in part, vacated in part,* 243 F.3d 812 (4th Cir. 2001) (service marks asserted against firm client, AT&T, declared generic)
- ***Evans Medical, Ltd. v. American Cyanamid Co. and Takeda Chemicals Industries***, 11 F. Supp.2d 338 (S.D.N.Y. 1998), *aff'd,* 215 F.3d 1347 (Fed. Cir. 1999) (our clients, American Home Products and Takeda, granted summary judgment of non-infringement)
- ***Heidelberg Harris, Inc. v. Mitsubishi Heavy Industries***, 49 U.S.P.Q.2d 1053 (N.D. Ill. 1998) (our client, Heidelberg Harris, successfully asserted patents related to printing press technology and obtained over $11M in damages)
- ***Kirsch, Inc. v. Comfortex Corp.,*** (W.D. Mi. 1998) (design patent of our client, Kirsch, held valid and infringed)
- ***Smith Ind. Medical Systems, Inc. v. Vital Signs, Inc***., 45 U.S.P.Q.2d 1512 (N.D. Ill. 1997) (patent related to respiratory device asserted against our client, Vital Signs, was held invalid)
- ***Studiengesellschaft Kohle mbH v. Hercules Incorporated***, (D. Del. 1995), *aff'd,* 105 F.3d 629 (Fed. Cir. 1997) (our client, Hercules, held entitled to license under patent in suit claiming a polyolefin process)
- ***Texas Instruments, Inc. v. Cypress Semiconductor Corp.***, 39 U.S.P.Q.2d 1481 (N.D. Texas 1995), *aff'd,* 90 F.3d 1558 (Fed. Cir. 1996) (our client held not to have

infringed Texas Instruments patent on integrated circuit manufacturing process)

- **BASF Corp. v. E.I. DuPont de Nemours & Co**, 903 F. Supp. 680 (D. Del. 1995), *aff'd*, 92 F.3d 1208 (Fed. Cir. 1996) (DuPont patent relating to manufacture of pigmented nylon asserted against our client, BASF, held invalid)
- **Kearns v. Ferrari**, E.D. Mich, Cit.No. 85-70459, order dated Feb. 4, 1994, *aff'd*, 39 F.3d 1194 (Fed. Cir. 1994) *cert den*. 516 US 820 (1995) (acted as lead counsel for 22 foreign automobile companies and secured dismissal of patent infringement claim that had been successful in prior cases)
- **Oscar Mayer Foods Corp. v. ConAgra, Inc**., 31 U.S.P.Q.2d 1173 (W.D. Wis. 1993), *aff'd*, 35 U.S.P.Q.2d 1278 (Fed. Cir. 1994) (ConAgra held liable for infringement of our client's patent relating to prevention of botulism)

**Appellate Practice**

**Novo Nordisk A/S v. Bio-Technology General Corp. and Teva Pharmaceuticals USA, Inc.**, 2002 U.S. App. LEXIS 25389 (Fed. Cir. 2002) (vacating preliminary injunction on sale of recombinant human growth hormone)

- **Bionx Implants, Inc. v. Linvatec Corporation**, 299 F.3d 1378 (Fed. Cir. 2002) (court vacated district court order granting summary judgment of non-infringement involving orthopedic device patent and remanded case back to district court for further proceedings)

**Smithkline Beecham Corporation v. Copley Pharmaceutical, Inc. and Teva Pharmaceuticals USA, Inc.**, 2002 U.S. App. LEXIS 16594 (Fed. Cir. 2002) (affirming the invalidity of SmithKline Beecham's patent on nabumetone)

**Enzo Biochem, Inc. v. Gen-Probe, Inc.**, 296 F.3d 1316 (Fed. Cir. 2002) (court granted Enzo's petition for rehearing, vacated its prior decision, and reversed the district court's grant of summary judgment that Enzo's claims are invalid for lack of written description, holding that deposits of biological materials with the ATCC may be used to satisfy the written-description requirement)

**Berman v. Housey**, 291 F.3d 1345 (Fed. Cir. May 29, 2002) (in a precedential opinion, a panel of the Federal Circuit unanimously affirmed a decision of the United States Patent and Trademark Office's Board of Patent Appeals and Interferences rejecting an attempt by Genentech to bring an Interference to challenge patents owned by Housey Pharmaceuticals claiming methods of screening for new drugs)

**Datapoint Corporation v. Standard Microsystems Corporation**, 31 Fed. Appx. 685 (Fed. Cir. 2002) (non-precedential) (court affirmed summary of judgment of non-infringement based on finding that district court correctly construed claims of patents-in-suit) (Kenyon & Kenyon represented Intel Corporation and led the defense team for the 16 defendants/appellees, both in the district court and on appeal)

- **Dow Chemical Co. v. Astro-Valcour, Inc.**, 267 F.3d 1334, (Fed. Cir. 2001), *cert. denied*, 152 L.Ed.2d 470 (2002) (court affirmed district court's decision in favor of our client invalidating certain claims of three patents assigned to plaintiff)
- **Medtronic, Inc. v. Boston Scientific Corp.**, 61 U.S.P.Q.2d 1447 (Fed. Cir 2001) (court affirmed a judgment of non-infringement in our client's favor)
- **Ecolab, Inc. v. Envirochem, Inc.**, 264 F.3d 1358 (Fed. Cir. 2001) (court vacated judgment of infringement against firm client)
- **Purdue Pharma L.P. v. Faulding, Inc.**, 230 F.3d 1320 (Fed. Cir. 2000) (court affirmed district court's holding in favor of our client that plaintiff's patent was invalid)

About Kenyon & Kenyon                                                          Page 5 of 5

- ***Heidelberg Harris Inc. v. Mitsubishi Heavy Industries Ltd.,*** 56 U.S.P.Q.2d 1714 (Fed. Cir. 2000) (court affirmed entry of judgment in client's favor on jury's patent infringement damage award)
- ***Abbott Laboratories v. Geneva Pharmaceuticals, Inc.,*** 182 F.3d 1315 (1999), *cert. denied*, ___ U.S. ____ (2000) (court affirmed holding that plaintiff's pharmaceutical patent invalid)
- ***Evans Medical Ltd. v. American Cyanamid Co. and Takeda Chemicals Industries***, 215 F.3d 1347 (Fed. Cir. 1999) (court affirmed summary judgment that client's vaccine product did not infringe)
- ***Abbey v. Mercedes-Benz of North America, Inc.,*** 1999 U.S. App. LEXIS 24813 (Fed. Cir. 1999) (court affirmed summary judgment of non-infringement and affirmed order preventing retroactive enforcement of reexamined patent)
- ***Phillips Petroleum Co. v. Huntsman Chemical Co.,*** 157 F.3d 866 (Fed. Cir. 1998) (court affirmed judgment that client's polymer process did not infringe plaintiff's patent)
- ***Studiengesellschaft Kohle mbH v. Hercules Incorporated,*** 105 F.3d 629 (Fed. Cir. 1997) (court affirmed a district court's ruling that clients Hercules and Himont were entitled to a license under patent in suit that related to polyolefin processes)
- ***Abbott Laboratories v. Geneva Pharmaceuticals, Inc.,*** 104 F.3d 1305 (Fed. Cir. 1997) (court affirmed district court's precedent-setting injunction in favor of firm client Geneva requiring Abbott to remove patent in suit from FDA "Orange Book" list of patents covering drug product)
- ***Texas Instruments, Inc. v. Cypress Semiconductor Corp.,*** 90 F.3d 1558 (Fed. Cir. 1996) (court construed patent not to cover client's integrated circuit manufacturing process, despite earlier Federal Circuit construction to the contrary)
- ***BASF Corp. v. E.I. DuPont de Nemours & Co.,*** 92 F.3d 1208 (Fed. Cir. 1996) (court affirmed decision in client's favor holding DuPont patent invalid)
- ***Eli Lilly & Co. v. American Cyanamid Co. and Biochimica Opos, S.p.A.,*** 82 F.3d 1568 (Fed. Cir. 1996) (in leading case interpreting 35 U.S.C. § 271(g), court held that firm client's importation of antibiotic drug did not infringe Eli Lilly process patents)
- ***Ciba-Geigy Corp. v. Alza Corp.,*** 37 U.S.P.Q.2d 1337 (Fed. Cir. 1995) (court reversed district court holding that certain claims of firm client Ciba-Geigy's patent relating to transdermal nicotine patch were invalid)
- ***Oscar Mayer Foods Corp. v. ConAgra, Inc.,*** 45 F.3d 443 (Fed. Cir. 1994) (court affirmed large jury award in favor of firm client, Oscar Mayer, for infringement of patent related to prevention of botulism)

Exhibit L



**Intellectual Property Law**

Attorneys ⋁



## C. KYLE MUSGROVE
Partner | Washington, DC

Kyle Musgrove has been litigating intellectual property cases for over a decade. Patent litigation is the primary focus of his practice with an emphasis in the pharmaceutical, medical device, biological, and chemical arts. More particularly, Mr. Musgrove's practice over the last several years has involved pharmaceutical litigation related to the Hatch-Waxman Act. Mr. Musgrove has primarily represented the ANDA applicants in such proceedings. In addition to his Hatch-Waxman practice, he has also litigated cases in various fields including paper and pulp bleaching, optics, cervical collars, vaccines, medical devices and medical imaging, nutritional supplements and methods of drug delivery. Mr. Musgrove's practice includes the representation of both patentees and alleged infringers.

Mr. Musgrove's experience relates both to the presentation of a case at trial and all facets of litigation pre-trial (*e.g.* Markman Hearings or summary judgment arguments), and also includes appellate argument and briefing. He is also experienced in conducting interference proceedings before the United States Patent and Trademark Office.

Further aspects of Mr. Musgrove's practice include counseling clients regarding possible infringement or validity issues. Mr. Musgrove is also involved in managing patent prosecution portfolios for major international clients. He is experienced in transactional work relating to intellectual property such as the negotiation of license and settlement agreements.

Mr. Musgrove provides an annually updated chapter relating to the intersection of the Patent and Antitrust Laws for Aspen Publishing. He has previously been a co-editor of Unfair Competition and the ITC, a handbook on practice before the ITC in Section 337 investigations. Mr. Musgrove is also involved in many of the firm's *pro bono* initiatives.

Representative Appellate Work :

» *Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.*, 468 F.3d 1366 (Fed. Cir. 2006) (argued) (Vacating finding of no anticipation after trial and remanding for further proceedings)
» *On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133 (Fed. Cir. 2004) (Affirming summary judgment dismissing state law claims for which damages of approximately $100 million dollars had been alleged against our clients)
» *Geneva Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc. v. GlaxoSmithKline, PLC*, 349 F.3d 1373 (Fed. Cir. 2003) (Affirming invalidity of seven GSK patents in favor of client)
» *Evans Medical Ltd. v. American Cyanamid Co.*, 215 F.3d 1347 (unpublished) (Affirming summary judgment of noninfringement on behalf of client)

Representative Trial Experience :

### Contact Information

1500 K Street, NW
Washington, DC 20005-1257
Tel
**202.220.4237**
Fax 202.220.4201
cmusgrove@kenyon.com

» Download V-Card

### Practice Areas

» Intellectual Property Litigation
» Patents
» Trade Secrets
» Licensing and Transactions
» Life Sciences

### Industries

» Biotechnology and Pharmaceuticals
» Chemical and Materials
» Mechanical Products and Processes
» Biomedical

### Education

J.D., University of North Carolina at Chapel Hill, *with honors*, 1995
Order of the Coif
*Journal of International Law & Commercial Regulation*
Holderness Moot Court Bench

B.S., Chemical Engineering, Tulane University, 1992
Omega Chi Epsilon Honor Society

### Speeches & Articles

» View Publications

» *Pfizer, Inc. v. Synthon Holdings BV, et al.* (M.D.N.C. 2006)
» *SmithKline Beecham Corp. v. Teva Pharmaceuticals USA, Inc.* (D.N.J. 2005)
» *Teva Pharmaceuticals USA, Inc. v. GlaxoSmithKline, PLC* (E.D. Va. 2002)

Other Representative Matters:

» *Abbott Laboratories v. Impax Laboratories, Inc.,* (D. Del. 2007) (Pending)
» *Certain Endodontic Instruments, Inc.* No. 337-TA-610 (ITC 2007) (Pending)
» *Alza Corp v. Andrx Pharmaceuticals, LLC,* (D. Del. 2005) (Pending)
» *Abbott Laboratories, et al. v. Impax Laboratories, Inc.* (D. Del. 2003) (Infringement portion of case dismissed with prejudice; client's antitrust counterclaims pending)
» *On-Line Technologies, Inc. v. Perkin-Elmer Corp, et al.* (D. Ct. 1999) (Settled favorably after partial summary judgment of invalidity granted on behalf of client)
» *Air Liquide America v. P.H. Glatfelter* (M.D. Pa. 2004) (Settled favorably)
» *Shire Laboratories Inc. v. Impax Laboratories, Inc.* (D. Del. 2003) (Settled)
» *Philadelphia Cervical Collar v. Laerdal Medical Corp.* (D.N.J. 1999) (Settled favorably)
» *Alcon Labs. v. Bausch & Lomb* (N.D. Tex. 1999) (Settled favorably after preliminary injunction was granted on behalf of client)
» *Petrides v. Marshall* (interference) (Settled with award of priority to client)
» *Eckhardt, et al. v. Novotny, et al.* (interference) (Settled)
» *Allen v. Leibinger* (interference) (Other parties issued claims held unpatentable)

**BAR AND COURT ADMISSIONS**
» District of Columbia
» New York
» Registered Patent Attorney: U.S. Patent and Trademark Office
» U.S. Court of Appeals for the Federal Circuit
» U.S. District Court for the District of Columbia

**PROFESSIONAL ORGANIZATIONS**
The American Bar Association, Sections on Intellectual Property Law and Litigation, ITC Trial Lawyers Association, the New York State Bar Association and the District of Columbia Bar Association