**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WYETH,
*Plaintiff,*

v.

WATSON LABORATORIES, INC. *and* WATSON PHARMACEUTICALS, INC.,
*Defendants.*

Civil Action No. 08-cv-00145-JJF

**REDACTED PUBLIC VERSION**

# DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO WYETH'S MOTION TO DISQUALIFY KENYON & KENYON LLP AND AMY HULINA AS COUNSEL FOR DEFENDANTS

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
Amy Arnott Quinlan (I.D. #3021)
MORRIS JAMES LLP
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801-1494
Tel: (302) 888-6960
mmatterer@morrisjames.com

*Attorneys for Defendants*

OF COUNSEL
John W. Bateman
C. Kyle Musgrove
Nicholas J. Nowak
Thomas M. Huff
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
(202) 220-4200

Originally filed: June 30, 2008
Public version filed: July 9, 2008

## TABLE OF CONTENTS

Page


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

NATURE AND STAGE OF THE PROCEEDING ........ 2

SUMMARY OF THE ARGUMENT ........ 2

STATEMENT OF FACTS ........ 3

I. There Are Significant Differences Between Oral Contraceptives and Hormone Replacement Therapy Products ........ 3

II. The Patent-in-Suit and the Present Action Concern Oral Contraceptives ........ 4

III. The RE ’247 Patent on Hormone Replacement Therapy Has Not Been Considered Relevant to the Validity of the Claims of the Patent-in-Suit ........ 5

A. The PTO Did Not Rely on the RE ’247 Patent as Prior Art During the Prosecution of the Application That Issued as the ’814 Patent ........ 5

B. The PTO Has Not Relied on the RE ’247 Patent in Rejecting Claims in Subsequent Applications Claiming Priority to the ’814 Patent That Are Very Similar to the Claims of the ’814 Patent ........ 6

C. Akzo Nobel Did Not Rely on the RE ’247 Patent in Its Opposition to the European Counterpart to the Patent-in-Suit ........ 7

D. Neither Watson Nor Sandoz Relied on the RE ’247 Patent in Their Notice Letters Regarding the Patent-in-Suit ........ 7

IV. The Present Action Is Not Substantially Related to Any of the Four Previous Matters Identified By Wyeth ........ 8

A. The *AHP v. J&J* Litigation Involved Patents on Chemical Compounds to Be Used in Oral Contraceptives ....8

B. The *AHP v. Novo Nordisk* Case Involved a Patent on Hormone Replacement Therapy ....9

C. The '878 Application and the Inventorship Dispute Involved Hormone Replacement Therapy ....10

V. Overview of Kenyon's Work for AHP/Wyeth ....13

VI. Work By Specific Kenyon Attorneys Referred to in Wyeth's Motion ....16

ARGUMENT ....17

I. Legal Background ....17

II. The Present Action Is Not "Substantially Related" to Any of the Four Previous Matters Identified By Wyeth ....19

A. The *AHP v. J&J* Litigation Involved Patents on Chemical Compounds to Be Used in Oral Contraceptives ....19

B. The *AHP v. Novo Nordisk* Case Involved the RE '247 Patent on Hormone Replacement Therapy ....21

C. The '878 Application Involved Hormone Replacement Therapy ....25

D The Inventorship Dispute Relating to the '878 Application Was Very Fact-Specific ....27

III. Wyeth's Arguments For Why the Present Action Is "Substantially Related" to Kenyon's Previous Work for Wyeth Should Be Rejected ....28

A. The Similarity Between Some of the Language in the Claims of the RE '247 Patent, the '878 Applications and the Patent-in-Suit Is Just the Type of Superficial Resemblance That This Court Has Said Should Be Ignored in Determining Whether Matters Are "Substantially Related" ....28

B. Wyeth's Unsubstantiated Allegation That Kenyon Interviewed Witnesses Likely to Be Witnesses in This Case Is a Red Herring Because Any Such Interviews Did Not Concern Subject Matter Relevant to the Present Action ................................29

C. Even If Kenyon Received Confidential Information About Wyeth's Business Strategy and Finances in Previous Matters, That Would Be Irrelevant Because Such Information Would Be Obtained in Discovery By the Watson Defendants Regardless of What Firm Was Representing Them ..........................................................................32

D. Wyeth's Argument That Kenyon Gained Knowledge of Wyeth's General Litigation Strategy Through the Previous Matters, and That This Knowledge Makes the Previous Matters "Substantially Related," Should Be Rejected....................................33

IV. Allowing Kenyon to Continue to Represent the Watson Defendants Would Not Prejudice Wyeth, While Disqualifying Kenyon Would Prejudice the Watson Defendants ..................................................................37

V. Wyeth's Effort to Disqualify Amy Hulina Is Specious .............................................38

CONCLUSION..................................................................................................................40

# TABLE OF AUTHORITIES

**Cases** **Page**


*Am. Home Prods. Corp. v. Johnson & Johnson*,
Nos. 94-1209, 94-1210, 1995 U.S. App. LEXIS 16128 (Fed. Cir. Jun. 29, 1995)....9

*Am. Sterilizer Co. v. Surgikos, Inc.*,
No. 4-89-238-Y, 1992 U.S. Dist. LEXIS 21542 (N.D. Tex. Jun. 12, 1992)....27

*Arctic Cat, Inc. v. Polaris Sales, Inc.*,
No. 04-3419, 2004 U.S. Dist. LEXIS 25463 (D. Minn. Dec. 20, 2004)....37

*Astrazeneca Pharms. LP v. Mayne Pharma (USA) Inc.*,
2005 U.S. Dist. LEXIS 26196 (S.D.N.Y. Nov. 2, 2005), *aff'd*, 467 F.3d 1370 (Fed. Cir. 2006)....13

*Brice v. Hess Oil Islands Corp.*,
769 F. Supp. 193 (D.V.I. 1990)....32

*Cardona v. Gen. Motors Corp.*,
942 F. Supp. 968 (D.N.J. 1996)....35, 36

*Colorpix Sys. Of Am. V. Broan Mfg. Co.*,
131 F. Supp. 2d 331 (D. Conn. 2001)....35

*Cohen v. Oasin*,
844 F. Supp. 1065 (E.D. Pa. 1994)....32

*Duncan v. Merrill Lynch, Pierce, Fenner & Smith*,
646 F.2d 1020 (5th Cir. 1981)....28, 34, 36

*Emmis Operating Co. v. CBS Radio, Inc.*,
480 F. Supp. 2d 1111 (S.D. Ind. 2007)....30

*Fina Oil & Chem. Co. v. Ewen*,
123 F.3d 1466 (Fed. Cir. 1997)....27

*FMC Techs., Inc. v. Edwards*,
420 F. Supp. 2d 1153 (W.D. Wash. 2006)....30

*Integrated Health Services of Cliff Manor, Inc. v. THCI Co.*,
2005 U.S. Dist. LEXIS 14218 (D. Del. Jul. 18, 2005) ....................................31, 32

*Koch v. Koch Indus.*,
798 F. Supp. 1525 (D. Kan. 1992)..............................................................35

*Kaminski Bros., Inc. v. Detroit Diesel Allison Div. of Gen. Motors Corp.*,
638 F. Supp. 414 (M.D. Pa. 1985)..............................................................18

*Madukwe v. Del. State Univ.*,
Nos. 07-775-GMS-LPS, 07-804-SLR-LPS, 2008 WL 2020021 (D. Del. May 5, 2008) ....................................35, 36

*Murphy v. Simmons*,
No. 06-1535, 2008 WL 65174 (D. Del. Jan. 3, 2008) ....................................35

*Nilssen v. Osram Sylvania, Inc.*,
504 F.3d 1223 (Fed. Cir. 2007)..............................................................27

*Ortho Pharmaceutical Corp. v. Smith*,
959 F.2d 936 (Fed. Cir. 1992)..............................................................8

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
2002 U.S. Dist. LEXIS 27557 (E.D. Tex. Sep. 30, 2002) ..............................24, 28, 29

*Reliant Pharms., Inc. v. Par Pharm., Inc.*,
No. 06-774-JJF, 2008 WL 1826036 (D. Del. Apr. 23, 2008)..............................18, 25

*Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*,
652 F. Supp. 1281 (D. Del. 1987)......................................17, 18, 20, 28, 30, 34

*Superguide Corp. v. DirectTV Enters., Inc.*,
141 F. Supp. 2d 616 (W.D.N.C. 2001). ....................................18, 35, 36

*Talecris Biotherapeutics, Inc. v. Baxter Int'l, Inc.*,
491 F. Supp. 2d 510 (D. Del. 2007)......................................24, 25, 32, 37

*U.S. v. Moscony*,
927 F. 2d 742 (3d Cir. 1991)..............................................................30

*Webb v. E.I. Du Pont de Nemours & Co.*,
811 F. Supp. 158 (D. Del. 1992)..............................................................35

*Wyeth v. Wolfe*,
2008 U.S. Dist. LEXIS 37502 (E.D. Pa. May 8, 2008). ....................................13

**Other Authorities**

ABA Model Rule of Professional Conduct 1.9(a) ........................................................17

ABA Model Rule of Professional Conduct 1.9, comment 2..............................................18

ABA Model Rule of Professional Conduct 1.9, comment 3..............................20, 23, 33, 36

## INTRODUCTION

In its moving papers, Wyeth argues that Kenyon & Kenyon LLP should be disqualified from representing Watson in the present action because Kenyon previously handled four matters for Wyeth that are "substantially related" to the present action. Wyeth's motion should be denied because the previous matters and the present action are not "substantially related."

This is a patent case brought under the Hatch-Waxman Act in which Wyeth asserts that Watson has infringed its U.S. Patent No. 6,500,814 ("the '814 patent") by filing an Abbreviated New Drug Application ("ANDA") seeking approval to market a generic version of Wyeth's Lybrel drug product. None of the previous matters involved the '814 patent or Wyeth's Lybrel drug product in any way. Thus, to try to create the impression that the previous matters and the present action have something in common, Wyeth is forced to come up with a very broad, general category into which all the matters fall – specifically, Wyeth argues that all of the matters involve products in Wyeth's "women's health care product line." This Court has rejected the notion that such a "superficial resemblance" is enough to make two matters "substantially related," and held that one must make a "careful comparison" between the previous matters and the present action. When one performs that comparison here, it is abundantly clear that the previous matters and the present action are not "substantially related." The previous matters involved different patents, different technical subject matter, different time periods, different prior art, different products, different people and different issues from the present action.

In any event, the drastic remedy of disqualification is not warranted here because there is no risk that any of Wyeth's information will be used against it. The matters that Wyeth alleges are "substantially related" to the present action ended years ago. For this reason, there are very few attorneys still at Kenyon who had substantial involvement in those matters. The attorneys

handling the present action for Wyeth have been walled off from the attorneys who handled the previous matters for Wyeth – indeed, the two groups are located in different cities. In contrast, disqualification will create a hardship on Watson, since Kenyon has already devoted a significant amount of time to this case. This includes the work it has spent in connection with the two motions to dismiss that it has filed, both of which are currently pending.

## NATURE AND STAGE OF THE PROCEEDING

The complaint was filed March 12, 2008. (D.I. 1.) On April 25, 2008, Watson Laboratories filed a motion to dismiss for lack of personal jurisdiction (D.I. 15), and Watson Pharmaceuticals filed a motion to dismiss for lack of subject matter jurisdiction (because it did not submit the ANDA at issue). (D.I. 12.) Discovery on those motions is currently ongoing.

On June 6, 2008, Wyeth filed its motion to disqualify. (D.I. 27.)

## SUMMARY OF THE ARGUMENT

Wyeth's motion should be denied because the previous matters in which Kenyon represented Wyeth that it contends are "substantially related" to the present action are not "substantially related" to the present action. The present action involves whether the claims of Wyeth's '814 patent are valid and infringed by a generic version of Wyeth's Lybrel® oral contraceptive drug product. None of the previous matters involved the '814 patent or Wyeth's Lybrel® drug product. Indeed, the only matter that involved oral contraceptives at all – the *AHP v. J&J* litigation – ended in 1997 and involved patents on a new class of chemical compounds useful as oral contraceptives with filing dates in the early 1960s, while the present action involves a patent on a method of using oral contraceptives continuously so as to avoid having menstrual periods with a 1997 filing date.

Moreover, disqualification is not warranted because Kenyon's representation of the Watson defendants will not prejudice Wyeth. The Kenyon attorneys handling the present action

were not involved in the previous matters that Wyeth alleges are "substantially related" except for the *AHP v. J&J* litigation, which ended in 1997 and involved very different subject matter. And they have walled themselves off from the few attorneys remaining at Kenyon who were involved in the previous matters. Thus, there is no danger of Wyeth's confidential information being used against it. In contrast, disqualification will be prejudicial for the Watson defendants, in that Kenyon has already spent a substantial amount of time preparing for this action.

## STATEMENT OF FACTS

### I. There Are Significant Differences Between Oral Contraceptives and Hormone Replacement Therapy Products

Oral contraceptives are products taken orally by women capable of becoming pregnant to prevent conception and thus to avoid becoming pregnant. Almost all oral contraceptives include two hormones – an estrogen and a progestin – that "trick" a woman's body into not ovulating, and thereby prevent conception. (*See generally* Ex. 1[1] at col. 1, ll. 3-67; Ex. 39.)

When a woman reaches a certain age, she stops ovulating and thus can no longer become pregnant. This period is known as "menopause." At this point, the woman's body stops producing certain hormones, including certain estrogens. This may cause a number of negative symptoms that are associated with menopause, such as hot flashes and osteoporosis. To combat these symptoms, a number of hormone replacement therapy ("HRT") products have been developed, which generally try to prevent the symptoms of menopause by replacing the hormones previously produced by the woman's body before menopause with artificial hormones. (*See generally* Ex. 29 at [0001] – [0007].)

1 The numbered exhibits cited herein are attached to the Declaration of John W. Bateman ("Bateman Decl."), which is itself Exhibit A.

Women who use oral contraceptives have not yet entered menopause. The goal of taking such products is the prevention of pregnancy. Women who use hormone replacement therapy products are going through menopause, and are thus not capable of becoming pregnant. The goal of taking such products is the reduction of the symptoms of menopause.

## II. The Patent-in-Suit and the Present Action Concern Oral Contraceptives

This is a patent case brought under the Hatch-Waxman Act. As is typical in such cases, the plaintiff (Wyeth) is a company that sells a brand name drug product (Lybrel), while the proper defendant (Watson Laboratories, Inc. (Nevada)) is a company that has filed an ANDA seeking approval to market a generic version of that drug product, but has not yet commercialized its product. The plaintiff asserts that the generic version infringes a patent (the '814 patent) that it has listed in the Orange Book in connection with its product.

The '814 patent is generally directed to a method of contraception in which an estrogen and a gestagen (*i.e.*, a progestin) are administered continuously for more than 110 days. (Ex. 1, claims 1-3.) Traditional oral contraceptives came in kits having 21 active pills and 7 placebo pills. (Ex. 1, col. 1, ll. 15-23.) A woman experienced a menstrual period while taking the placebo pills. (*Id.*) The gist of the invention described in the patent is eliminating menstrual periods by eliminating the placebo pills. (Ex. 1, col. 2, ll. 1-11, col. 3, ll. 7-12, col. 3, ll. 47-52.)

The named inventor on the '814 patent is Dr. Rolf-Dieter Hesch. (Ex. 1.) On information and belief,[2] Dr. Hesch has never worked for Wyeth. (Exs. 2-4.) The first application leading to the '814 patent was a German application filed in 1997. (Ex. 1.) On information and belief, Dr. Hesch was a professor at a university in Europe at that time, and the

---

2 The information about Dr. Hesch in this paragraph was obtained from publicly available sources, including a resume of Dr. Hesch found on the Internet (Ex. 2) and the complaint in a suit filed by Wyeth against Dr. Hesch in 2007. (Ex. 3.)

work leading to the '814 patent occurred there. (Ex. 2.) The first U.S. application leading to the '814 patent was filed in 2000, and was prosecuted by the Knobbe Martens law firm. (Exs. 1, 5.) In March 2002, while the application leading to the '814 patent was still pending, Dr. Hesch sold his rights to that application to Wyeth. (Ex. 3 ¶¶ 8, 10.) In December 2002, the application – still prosecuted by Knobbe Martens – issued as the '814 patent, listing Wyeth as the assignee on its face. (Ex. 1.) Kenyon was not involved in any way in prosecuting the application that issued as the '814 patent, nor has Kenyon ever done any other type of work for Wyeth involving the '814 patent. (Ex. A [Bateman Decl.] ¶ 9, Ex. 5.)

In 2007, Wyeth filed a complaint against Dr. Hesch in which it asked the Court to order him to produce all documents in his possession regarding the conception and reduction to practice of the subject matter claimed in the '814 patent, and to help prepare a declaration concerning the same subject. (Ex. 3, Prayer for Relief.) Wyeth asserted that the value of the '814 patent was significantly impaired without these materials (Ex. 3 ¶ 14), suggesting that Wyeth did not have information about the conception and reduction to practice of the subject matter claimed in the '814 patent as of that time. The case quickly settled. (Exs. 6, 7.) Redacted

Redacted

## III. The RE '247 Patent on Hormone Replacement Therapy Has Not Been Considered Relevant to the Validity of the Claims of the Patent-in-Suit

### A. The PTO Did Not Rely on the RE '247 Patent as Prior Art During the Prosecution of the Application That Issued as the '814 Patent

One of the patents listed as prior art on the face of the '814 patent is the RE '247 patent. (Ex. 1.) The RE '247 patent, which is discussed in more detail below, is generally directed to a method of treating the symptoms of menopause via hormone replacement therapy. (Ex. 9.) In

March 2002, Wyeth acquired rights to the application that issued as the '814 patent. (Ex. 3 ¶ 8.) Prior to that time, the RE '247 patent had not been cited during prosecution of the application that issued as the '814 patent, either by Dr. Hesch or by the PTO. (Ex. 5.) The RE '247 patent was cited for the first and only time in May 2002, when applicant submitted it and several other references that it had become aware of "during diligence searching by Applicant's licensee" (*i.e.*, searching by Wyeth). (Ex. 5 at 273-74, 275-77.) Applicant dismissed the RE '247 patent and these other new references, stating that "none of these references adversely affect patentability of new method claims 69-71."[3] (Ex. 5 at 274.) The claims were allowed immediately thereafter. (Ex. 5 at 293-97.) Thus, during the prosecution of the application leading to the patent-in-suit, the PTO never commented on the RE '247 patent nor relied on it in rejecting any claims.

**B. The PTO Has Not Relied on the RE '247 Patent in Rejecting Claims in Subsequent Applications Claiming Priority to the '814 Patent That Are Very Similar to the Claims of the '814 Patent**

Wyeth has filed three subsequent applications claiming priority to the application that issued as the '814 patent. (Exs. 10-13.) Two of these applications are still pending, while the third was abandoned. (Ex. 10.) Two of these applications included claims directed to methods of contraception very similar to that claimed in the '814 patent (Ex. 11 at 13-14; Ex. 13 at 15-16), while the third included claims directed to a method of treating pre-menstrual syndrome. (Ex. 12 at 20-22.) In each of those applications, Wyeth submitted an IDS disclosing a large number of references – including the RE '247 patent – to the PTO shortly after filing the application. (Ex. 11 at 17-18; Ex. 12 at 24-27; Ex. 13 at 18-21.) But the PTO has never relied on the RE '247 patent in rejecting any claims, and there has never been any discussion of the RE '247 patent during the prosecution of these applications. (*See, e.g.*, Ex. 11 at 19-24; Ex. 12 at

[3] Notably, applicant included a separate section regarding one of these new references (Coutinho), but included no such section regarding the RE '247 patent. (Ex. 5 at 273.)

32-38, 56-62, 70-76, 82-87; Ex. 13 at 26-32, 49-54.) In short, the PTO has treated the RE '247 patent as irrelevant to the pending applications claiming priority to the patent-in-suit, including the one with claims that are very similar to the claims of the patent-in-suit.

### C. Akzo Nobel Did Not Rely on the RE '247 Patent in Its Opposition to the European Counterpart to the Patent-in-Suit

Dr. Hesch filed European patent applications that correspond to the patent-in-suit, and one of those applications issued as a European patent (EP 1 011 682 B1) in 2003. (Ex. 14.) That patent has claims that are similar to those in the '814 patent. (Ex. 14, col. 10, l. 51 – col. 11, l. 33.) In 2004, Akzo Nobel N.V. filed an opposition to that European counterpart patent. (Ex. 15 at 1-7.) That opposition is still pending.[4] (Ex. 16.) Akzo Nobel relied on many different pieces of prior art in that opposition, and Wyeth relied on many exhibits of its own in responding to the opposition. (*See*, *e.g.*, Ex. 15 at 2, 9.) Indeed, the file wrapper for the opposition is more than a thousand pages long. (Ex. 16.) During that entire opposition proceeding, neither party ever brought the RE '247 patent to the attention of the European Patent Office, showing that neither party considered it at all relevant to the validity of the European counterpart to the patent-in-suit. (Ex. 15.)

### D. Neither Watson Nor Sandoz Relied on the RE '247 Patent in Their Notice Letters Regarding the Patent-in-Suit

Watson sent its notice letter to Wyeth setting forth its position on the '814 patent in March 2008. (Ex. 17.) In that notice letter, Watson relies on a number of prior art references to support its position that the claims of that patent are invalid for obviousness. (Ex. 17 at 10-14.) However, Watson did not rely in any way on the RE '247 patent.

---

4 In a 2007 decision, the EPO revoked the claims in the patent as issued, but it allowed Wyeth to substitute certain narrower claims in their place. (Ex. 15 at 51-59.) Both parties have appealed that decision. (Ex. 15 at 60-62.) That appeal is pending. (Ex. 16.)

Sandoz, Inc. ("Sandoz") also filed an ANDA seeking to make a generic version of Wyeth's Lybrel product. Sandoz sent Wyeth a notice letter setting forth its position on the '814 patent in April 2008 (Ex. 18),[5] and Wyeth promptly sued it in this Court. *See Wyeth v. Sandoz, Inc.*, No. 08-317-JJF (D. Del. complaint filed May 28, 2008). Like Watson, Sandoz contends that the patent-in-suit is invalid due to obviousness over a number of prior art references. (Ex. 18 at 9.) And like Watson, Sandoz did not even mention the RE '247 patent in its notice letter.

## IV. The Present Action Is Not Substantially Related to Any of the Four Previous Matters Identified By Wyeth

### A. The *AHP v. J&J* Litigation Involved Patents on Chemical Compounds to Be Used in Oral Contraceptives

Kenyon represented American Home Products ("AHP"), which later became Wyeth, in the *AHP v. J&J* litigation. This litigation actually included three separate federal court actions.

In the first, which Wyeth refers to in its papers, AHP asserted U.S. Patent No. 3,959,322 ("the '322 patent) against Ortho, an affiliate of Johnson & Johnson ("J&J"). The '322 patent described and claimed a particular class of chemical compounds to be used in oral contraceptives. (Ex. 19, claim 1.) The primary issue was whether the claims of the '322 patent were invalid for obviousness-type double patenting in view of other AHP patents. After a bench trial, the district court found in AHP's favor in 1990, and the Federal Circuit affirmed in 1992. *See Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936 (Fed. Cir. 1992).

In the second federal court action, AHP asserted another patent – U.S. Patent No. 4,002,746 ("the '746 patent") – against J&J. The claims of the '746 patent were generally directed to a method of using some of the specific chemical compounds described and claimed in the '322 patent. (Exs. 20, 21.) The primary issue in this action was whether the claimed

[5] Watson was able to obtain a copy of Sandoz's notice letter because Wyeth submitted it to the PTO during prosecution of one of its pending applications. (Ex. 13 at 83-86.)

chemical compounds were produced in the body when J&J's Ortho-Cyclen and Tri-Cyclen oral contraceptive products (Ex. 22) were taken by women. The district court issued a preliminary injunction against J&J's products in 1991, but the Federal Circuit vacated the injunction in 1992. J&J prevailed on non-infringement at a jury trial on the merits in 1993, and the Federal Circuit upheld the verdict in 1995. *See Am. Home Prods. Corp. v. Johnson & Johnson*, Nos. 94-1209, 94-1210, 1995 U.S. App. LEXIS 16128 (Fed. Cir. Jun. 29, 1995).

In the third federal court action, J&J sought damages from AHP for being wrongfully enjoined via the preliminary injunction vacated by the Federal Circuit. *See Johnson & Johnson v. Am. Home Prods., Inc.*, No. 94-1388 (E.D. Pa. complaint filed February 25, 1994.) That case settled in 1997. (Ex. 23.) Redacted

Redacted

None of these three actions were brought under the Hatch-Waxman Act. J&J had not filed an ANDA seeking to market a generic version of an AHP product, but rather was seeking to market its own, branded product. Neither the '322 patent nor the '746 patent described and claimed a particular dosage regimen, such as the traditional regimen of 21 active pills and 7 inactive pills. (Exs. 19-21.) Rather, as indicated above, the '322 patent was directed to a particular class of chemical compounds (Ex. 19), while the '746 patent was directed to a method of using certain of those compounds. (Exs. 20, 21.) The first application in the chain leading to the '322 patent was filed in 1962 (Ex. 19), and the first application in the chain leading to the '746 patent was filed in 1959. (Ex. 20.)

### B. The *AHP v. Novo Nordisk* Case Involved a Patent on Hormone Replacement Therapy

Kenyon represented American Home Products in the *AHP v. Novo Nordisk* case, in which AHP asserted that Novo Nordisk's Activella hormone replacement therapy product

infringed U.S. Patent No. RE36,247 ("the RE '247 patent"). (Ex. 25 ¶¶ 18-10; Ex. 26.) The complaint was filed in July 1999, and the case was dismissed pursuant to a settlement agreement in June 2000, less than a year later.[6] (Ex. 24.) Redacted

Redacted

symptoms of menopause via hormone replacement therapy, and not to a method of contraception. (Ex. 9.) Indeed, the patent indicated that the following directions could be used with one embodiment of the invention: "(The tablet set herein) is used to control menopausal symptoms. It is not a birth control pill and cannot be relied upon to prevent pregnancy." (Ex. 9, col. 9, ll. 20-22.) The first application leading to the RE '247 patent was filed in 1983. (Ex. 9.)

This was not a case brought under the Hatch-Waxman Act. Novo Nordisk had not filed an ANDA seeking FDA approval to market a generic version of an AHP product, but rather had filed its own NDA.

### C. The '878 Application and the Inventorship Dispute Involved Hormone Replacement Therapy

In March 2000 and February 2001, Wyeth filed provisional applications on a method for treating the symptoms of menopause with a specific combination of a particular estrogen and a particular progestin – namely, conjugated estrogens and medroxyprogesterone acetate. (Ex. 29.) Later in 2001, the '878 application was filed claiming priority to these provisionals. (*Id.*) The title of the invention described in the '878 application is "Hormone Replacement Therapy." (*Id.*)

After several rejections, Kenyon took over as counsel of record in the '878 application in April 2003. (Ex. 28 at 100.) The primary piece of prior art at issue during the prosecution of the

---

6 In 1997, Novo Nordisk had filed an opposition to the European counterpart to the RE '247 patent, alleging that the patent was invalid on various grounds. (Ex. 27.) This provides some insight into the likely issues in the U.S. litigation. In that opposition, Novo Nordisk contended that the European counterpart was invalid due to prior art very different from that at issue in the present action. (Ex. 27 at 42-43.)

'878 application was the RE '247 patent, which also disclosed a method of treating menopausal symptoms. (Ex. 19; Ex. 28.) The main issue was whether the specific combination claimed in the '878 application – and the specific daily dosages claimed therein – were disclosed by the RE '247 patent. (*See*, *e.g.*, Ex. 28 at 135-36, 149-50.) Kenyon was counsel of record until May 2006, when its power of attorney was revoked. (Ex. 28 at 154-57.) Ultimately, the PTO did not allow any claims in the '878 application, and the application was abandoned in December 2007. (Ex. 28 at 196.)

Although the patent-in-suit is indisputably prior art to the '878 application,[7] that patent was not cited to the PTO as prior art during the prosecution of the '878 application. (Ex. 28 at 33-40, 47-50, 83-85, 119.) This is despite the facts that (i) Dr. Arnold Milowsky, in-house counsel for Wyeth, was indisputably aware of the patent-in-suit by at least 2003 because he signed the paper recording the assignment of that patent to Wyeth in 2003 (Ex. 4), and (ii) Dr. Milowsky was substantively involved in the prosecution of the '878 application (Ex. 28 at 69, 154), which did not end until December 2007. Moreover, during the prosecution of the '878 application, Wyeth did not give the PTO any of the prior art references that had been relied on by Akzo Nobel in the opposition to the European counterpart to the patent-in-suit, even though most of those references were identified in Akzo Nobel's initial opposition papers in February 2004. (Ex. 15 at 2.)

After the '878 application was published in 2001 (Ex. 29), one of the two named inventors on the RE '247 patent (Dr. Bernard Wolfe) contacted Wyeth and indicated that he

---

7 The specification of the patent-in-suit was first published on March 18, 1999 when the PCT application leading to the patent-in-suit was published (Ex. 1 ["PCT Pub. Date: Mar. 18, 1999"]), while the first application from which the '878 application claims priority was filed on March 20, 2000. (Ex. 29.) Thus, the specification of the patent-in-suit is prior art to the '878 application under 35 U.S.C. § 102(b).

believed that he should be an inventor on the '878 application.[8] (Ex. 30 ¶ 22.) Dr. Wolfe had made the hormone replacement therapy invention described and claimed in the RE '247 patent while a university professor in Canada during the early 1980s, and then sold his rights to that invention to Wyeth pursuant to a series of agreements. (Ex. 9; Ex. 30 ¶¶ 10-12 [referring to U.S. Patent No. 4,826,831, which was reissued as the RE '247 patent]; Ex. 35 ¶ 3.) Dr. Wolfe alleged that he had conceived of the hormone replacement therapy invention described and claimed in the '878 application during the early 1990s while performing additional hormone replacement therapy work, and then communicated that invention to individuals at Wyeth to fulfill his ongoing disclosure obligations set forth in the agreements. (Ex. 30 ¶¶ 22-26; Ex. 32 ¶¶ 18-24; Ex. 33 ¶¶ 17, 18.) Dr. Wolfe further alleged that Wyeth then used that information to conduct the clinical study underlying the '878 application. (Ex. 32 ¶ 24; Ex. 33 ¶¶ 17, 18.) Wyeth acknowledged that Dr. Wolfe had communicated some information about his hormone replacement therapy work to it during the early 1990s, but denied that that information in any way constituted a conception of the subject matter described and claimed in the '878 application, or that that information was included in the '878 application. (Ex. 30 ¶¶ 25-27; Ex. 34 ¶ 7.)

Redacted

Redacted Dr. Wolfe filed two actions in Canada by which he sought to have himself made an inventor on the Canadian equivalent to the '878 application. (Exs. 32, 33.) Wyeth responded by filing an action in the Eastern District of Pennsylvania by which it sought a declaratory judgment that Dr. Wolfe

8 Wyeth reported that contact to the PTO, and indicated that it believed the inventorship claim was without merit. (Ex. 28 at 69.)

was not an inventor on the '878 application.[9] (Ex. 30.) Those actions are pending. (Ex. 36.) *See, e.g.*, *Wyeth v. Wolfe*, 2008 U.S. Dist. LEXIS 37502 (E.D. Pa. May 8, 2008).

## V. Overview of Kenyon's Work for AHP/Wyeth

Redacted

Redacted

Redacted including the *AHP v. J&J* litigation involving patents to chemical compounds to be used in oral contraceptives and the *AHP v. Novo Nordisk* case involving a patent on a hormone replacement therapy method described above. Redacted

Redacted

Redacted which involved a drug product including propofol, an anesthetic. (Ex. A [Bateman Decl.] ¶ 11.) *See also Astrazeneca Pharms. LP v. Mayne Pharma (USA) Inc.*, 2005 U.S. Dist. LEXIS 26196 (S.D.N.Y. Nov. 2, 2005), *aff'd*, 467 F.3d 1370 (Fed. Cir. 2006). The complaint in the propofol case was filed in October 2002, and Wyeth was dismissed as a

---

9 Through this action, a number of the papers relating to the inventorship dispute have become a matter of public record.

10 Redacted

Redacted

defendant four months later, in February 2003. (Ex. 37.) Redacted

Redacted



Redacted

Redacted

Redacted In both of these cases, Wyeth's ESI-Lederle affiliate was ***the ANDA applicant***, and was seeking approval to market a generic version of a brand name drug product. (*Id.*) In contrast, in the present case, Wyeth is on the brand side. The first case involved an ANDA seeking to market a generic version of a potassium supplement, and was dismissed pursuant to a settlement agreement in 1998 (Ex. 38), and the second case involved an ANDA seeking to market a generic version of a propofol-containing anesthetic, Redacted

---

11 Redacted

Redacted

Redacted

Very few attorneys who devoted substantial time to the matters that Wyeth alleges are "substantially related" to the present action are still at Kenyon. (Ex. A [Bateman Decl.] ¶ 13.)

Redacted

Redacted None of the attorneys handling the present action for Watson were in any way involved in the *AHP v. Novo Nordisk* litigation, the prosecution of the '878 application or the related inventorship dispute. (Exs. A, E.) Mr. Bateman and Mr. Musgrove were involved in the *AHP v. J&J* litigation, but that litigation ended more than a decade ago.

Redacted

## VI. Work By Specific Kenyon Attorneys Referred to in Wyeth's Motion

The two specific attorneys who Wyeth identified as having previously done work for Wyeth who are in any way involved in this case are C. Kyle Musgrove and Amy L. Hulina. The facts regarding the work of each of these individuals for Wyeth are as follows.

Mr. Musgrove joined Kenyon in 1995 and became a partner in 2003. He is one of the attorneys who is primarily involved in handling this case for Watson. Redacted

Redacted

Ms. Hulina was an associate at Kenyon from 2001 to 2004. (Ex. G [Hulina Decl.] ¶ 4.)

Redacted

Redacted

## ARGUMENT

### I. Legal Background

Wyeth seeks disqualification of Kenyon under Rule 1.9(a) of the Model Rules of Professional Conduct, which reads as follows:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

ABA Model Rule of Professional Conduct 1.9(a).

Thus, in determining whether Rule 1.9 is applicable, one must assess whether the current matter is "substantially related" to the prior matter. In evaluating whether two matters are "substantially related," the Court must consider:

1. The nature and scope of the prior representation.
2. The nature and scope of the current representation; and
3. The possibility that confidences were disclosed during the previous representation that could be relevant to the current action and detrimental to the former client in the current litigation.

*Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 652 F. Supp. 1281, 1282-83 (D. Del. 1987).

The third prong of the substantial relationship inquiry links the prior and present representations by determining whether facts relevant to the present litigation might have been disclosed in the prior representation. *Id.* In determining whether a fact might have been disclosed, the Court should consider whether a client and lawyer ought to have discussed the relevant facts or whether it would not have been unusual for the lawyer and client to have

discussed the relevant facts. *Id.* at 1284. In *Satellite*, this Court stated that the court "should not allow its imagination to run free" in evaluating this third prong:

> ***When resolving this third question, "the court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information 'might' have been disclosed which would be relevant to the present suit."*** *INA Underwriters*, 594 F.Supp. at 1206. In order to find that relevant confidential information might have been communicated in the instant case, this Court would be forced to hypothesize such an unlikely situation. In short, Tuthill's role in incorporating Satellite-Delaware and in establishing DCO as the registered agent is not substantially related to the present litigation against Satellite-Delaware.

*Id.* at 1284-85 (emphasis added); *see also Kaminski Bros., Inc. v. Detroit Diesel Allison Div. of Gen. Motors Corp.*, 638 F. Supp. 414, 417 (M.D. Pa. 1985) ("'Might' is a very broad word and were it applied liberally virtually any prior representation of a current adversary could serve as grounds for disqualification.").

The comments to the Model Rules make it clear that, in evaluating whether two matters are "substantially related" within the meaning of Rule 1.9(a), "[t]he underlying question is whether the lawyer was so involved in the matter that the subsequent representation can justly be regarded as the changing of sides in the matter in question." ABA Model Rule 1.9, comment 2. "Substantially related" has been interpreted to mean "identical" or "essentially the same." *See Superguide Corp. v. DirectTV Enters., Inc.*, 141 F. Supp. 2d 616, 620 (W.D.N.C. 2001).

Because public policy favors allowing a litigant to choose his or her own counsel, motions to disqualify are generally disfavored. *See Reliant Pharms., Inc. v. Par Pharm., Inc.*, No. 06-774-JJF, 2008 WL 1826036, *2 (D. Del. Apr. 23, 2008). Motions to disqualify are also treated cautiously by courts because they have increasingly been used as one weapon in the litigation arsenal. *Id.* As a result, the burden rests on the moving party to clearly show that a substantial relationship exists such that the continued representation is impermissible. *Id.*

## II. The Present Action Is Not "Substantially Related" to Any of the Four Previous Matters Identified by Wyeth

As explained below, the present action is not "substantially related" to any of the four specific matters identified by Wyeth.

### A. The *AHP v. J&J* Litigation Involved Patents on Chemical Compounds to Be Used In Oral Contraceptives

For a number of different reasons, the present action is not "substantially related" to the *AHP v. J&J* litigation.

First, the technical subject matter of the patent-in-suit here is very different from the technical subject matter of the patents at issue in the *AHP v. J&J* litigation. Although the patents all related to oral contraceptives, the similarities end there. The patent-in-suit is directed to an oral contraceptive dosage regimen (*i.e.*, taking an oral contraceptive every day for more than 110 days). In contrast, the patents at issue in the *AHP v. J&J* litigation were directed to a class of chemical compounds and a method of using them.

Second, the effective filing dates of the patents at issue in the two matters are more than three decades apart. The effective filing date of the '322 patent is in 1962, while the effective filing date of the '746 patent is in 1959. In contrast, the earliest possible effective filing date for the patent-in-suit is in 1997. Thus, the individuals knowledgeable about the alleged inventions in the patents at issue are very different, and the technology at issue is very different.

Third, because of the above two differences, the prior art relevant to the patents at issue in the *AHP v. J&J* litigation and the prior art relevant in the present action is completely different. Indeed, none of the hundreds of prior art references that are listed on the face of the '322 and '746 patents were (i) cited during the prosecution of the application leading to the patent-in-suit, (ii) cited during the opposition to the European counterpart to the patent-in-suit, or (iii) cited in the Watson or Sandoz notice letters.

Fourth, the issues in the two matters are very different. The primary issues in the present action are likely to be whether the claims in the patent-in-suit are invalid on various grounds. In contrast, the primary issues in the *AHP v. J&J* litigation were (i) whether the class of chemical compounds claimed in the '322 patent was patentably distinct from chemical compounds claimed in an earlier AHP patent, (ii) whether the chemical compounds referred to in the claims of the '746 patent were produced inside a woman's body when J&J's product was taken by a woman, and (iii) the amount of damages that J&J had suffered by being preliminarily enjoined for infringement of the '746 patent.

Fifth, the present action was brought under the Hatch-Waxman Act, and the accused product is a generic version of Wyeth's Lybrel product. In contrast, none of the cases in the *AHP v. J&J* litigation was brought under the Hatch-Waxman Act, and the accused product was not a generic version of an AHP product.

Sixth, the *AHP v. J&J* litigation ended more than ten (10) years ago. This is approximately five (5) years before Wyeth acquired an interest from Dr. Hesch in the application leading to the '814 patent. Thus, any information that Kenyon attorneys may have acquired during that litigation is extremely out-of-date.[14] This demonstrates that the two matters are not "substantially related."[15] *See* ABA Model Rule 1.9, comment 3 ("Information acquired in a prior

---

Redacted

15 One of the factors to be considered in assessing whether a "substantial relationship" exists is "[t]he possibility that confidences were disclosed during the previous representation that could be relevant to the current action and detrimental to the former client in the current litigation." *Satellite*, 652 F. Supp. at 1282-83. Where, as here, the previous representation occurred many years ago, the possibility that confidences were disclosed during the previous representation that would be relevant to the current litigation is de minimis.

representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related.")[16]

### B. The *AHP v. Novo Nordisk* Case Involved the RE '247 Patent on Hormone Replacement Therapy

For a number of different reasons, the present action is not "substantially related" to the *AHP v. Novo Nordisk* case.

First, the patent-in-suit is very different from the patent at issue in the *AHP v. Novo Nordisk* case, and thus the accused products in the two cases were very different. In the present action, the patent-in-suit is directed to oral contraceptives, and the accused product is an oral contraceptive. In contrast, in the *AHP v. Novo Nordisk* case, the patent-in-suit (the RE '247 patent) was directed to a hormone replacement therapy product, and the accused product (Novo Nordisk's Activella product) was a hormone replacement therapy product.

Second, the effective filing dates of the patents at issue in the two matters are about 14 years apart. The earliest possible effective filing date of the patent-in-suit is in 1997, while the effective filing date of the RE '247 patent is in 1983. Thus, the individuals knowledgeable about the alleged inventions in the patents at issue are very different, and the technology at issue is very different.

---

Redacted

Third, because of the above two differences, the prior art relevant to the patent at issue in the *AHP v. Novo Nordisk* case and the prior art relevant in the present action is completely different. Indeed, none of the hundreds of prior art references that are listed on the "face" of the RE '247 patent (which is 5 pages long) were (i) cited during the prosecution of the application leading to the patent-in-suit, (ii) cited during the opposition to the European counterpart to the patent-in-suit, or (iii) cited in the Watson or Sandoz notice letters.

Fifth, the issues in the two matters are very different. As noted above, the primary issues in the present action are likely to be whether the claims in the patent-in-suit would have been invalid on various grounds. In contrast, the primary issue in the *AHP v. Novo Nordisk* case was whether the subject matter claimed in the RE '247 patent would have been obvious. Although the two cases involve the issue of obviousness, they involve different patents-in-suit and different prior art: the present action focuses on pre-1997 prior art regarding oral contraceptives, while the *AHP v. Novo Nordisk* case focused on pre-1983 art regarding hormone replacement therapy.

Fifth, the present action was brought under the Hatch-Waxman Act, and the accused product is a generic version of Wyeth's Lybrel product. In contrast, the *AHP v. Novo Nordisk* case was not brought under the Hatch-Waxman Act, and the accused Activella product was not a generic version of an AHP product.

Sixth, the *AHP v. Novo Nordisk* case ended almost eight (8) years ago. Thus, any information that Kenyon attorneys may have acquired during that litigation is extremely out-of-date. This demonstrates that the two matters are not "substantially related." *See* ABA Model Rule 1.9, comment 3.

In arguing that the present action and the hormone replacement therapy matters that Kenyon handled for Wyeth (*i.e.*, the *AHP v. Novo Nordisk* case, the prosecution of the '878 application, and the related interference), Wyeth makes much of the fact that the RE '247 patent is listed as prior art on the face of the patent-in-suit. Wyeth argues that this shows that the *AHP v. Novo Nordisk* case (wherein Wyeth asserted the RE '247 patent against Novo Nordisk) and the prosecution of the '878 patent application (wherein the RE '247 patent was the primary piece of prior art) must be "substantially related" to the present action. Wyeth creates the impression that the RE '247 patent is likely to be an important piece of prior art in the present case. Wyeth is wrong, both factually and legally.

For one thing, all of the evidence indicates that the RE '247 patent will not be relied upon as prior art in this case. Neither Watson nor Sandoz cited it in their notice letters. It was not mentioned in the Akzo Nobel opposition to the European counterpart of the patent-in-suit, even though that proceeding involved many pieces of prior art. It was not relied upon by the PTO during the prosecution of the application leading to the patent-in-suit, and has not been relied upon by the PTO in rejecting claims in Wyeth's pending patent applications, which are very similar to the claims of the patent-in-suit. Indeed, the only reason that the RE '247 patent was even cited during the prosecution of the application leading to the patent-in-suit is that, late in prosecution, Wyeth brought the patent to the attention of Dr. Hesch and his representatives, who then disclosed it to the PTO out of an excess of caution, while dismissing it as irrelevant. Thus, it is highly unlikely that the present case will in any way involve the RE '247 patent as prior art.

Moreover, even if Watson was relying on the RE '247 patent as prior art, that would not mean that there was a substantial relationship between Kenyon's prior work for Wyeth involving the RE '247 patent and the present case. This Court recently addressed a very similar situation in

*Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510 (D. Del. 2007) and found that there was no substantial relationship and thus no conflict. In *Talecris*, a lawyer (Ms. Spaeth) at a firm (Townsend) had previously represented an affiliate of the plaintiff (Bayer) in which the affiliate asserted that its "Tenold patent" was infringed by another. That lawyer and that firm now represented the defendant (Baxter) in the present action, in which the defendant was asserting that the patent-in-suit (the '191 patent) was invalid based on various prior art references, including the Tenold patent. The Tenold patent was listed as prior art on the face of the patent-in-suit. This Court denied plaintiff's motion to disqualify the firm, stating that the alleged relationship between the two matters was "tenuous":

> As Baxter points out, the relevance of the Tenold patent is evident from the face of the '191 patent and its prosecution history. As such, it cannot be reasonably inferred that Baxter's reliance on the Tenold patent is a result of Ms. Spaeth's involvement in the prior litigation. Given that it is the validity of the '191 patent, and not the validity of the Tenold patent, that is at issue in the present litigation, any confidential information Townsend might have learned about the Tenold patent during its brief representation of Miles is not relevant to the validity of the '191 patent. The court thus finds that the substantive relationship between the two litigations is tenuous. The plaintiffs have not shown that Townsend's continued representation of Baxter would be impermissible.

491 F. Supp.2d at 515 (footnotes omitted); *see also Power Mosfet Techs., L.L.C. v. Siemens AG*, 2002 U.S. Dist. LEXIS 27557, *11 (E.D. Tex. Sep. 30, 2002) (denying motion to disqualify where firm had provided opinions to former client that its current client was relying on as background prior art).

Thus, in *Talecris*, the Court found that the previous and current matters were not "substantially related" even though the patent asserted in the previous matter and listed as prior art on the face of the patent-in-suit ***was*** being relied upon as prior art in the current matter. In contrast, here, as noted above, there is absolutely no reason to think that Watson will be relying on the RE '247 patent as prior art, and all of the evidence is to the contrary. Consequently, there

is even less of a relationship here than there was in *Talecris*, where the Court found the alleged relationship to be "tenuous."[17]

**C. The '878 Application Involved Hormone Replacement Therapy**

For a number of different reasons, the present action is not "substantially related" to the prosecution of the '878 application.

First, the technical subject matter of the patent-in-suit is very different from the technical subject matter of the '878 application. More particularly, the patent-in-suit is directed to oral contraceptives, while the '878 application was directed to a hormone replacement therapy product.

Second, the work leading to the patent-in-suit was apparently done in Europe by an individual (Dr. Hesch) who was not affiliated with Wyeth, and virtually all of the prosecution leading to that patent was conducted before Wyeth acquired rights to the patent. Redacted

Redacted

Redacted Thus, the individuals knowledgeable about the conception and reduction to practice of the alleged invention claimed in the patent-in-suit and the prosecution leading to the patent-in-suit are completely different from the individuals knowledgeable about those subjects for the '878 application.

Third, the prior art relevant to the '878 application and the prior art relevant in the present action is completely different. Indeed, none of the thirty-five (35) prior art references that were

---

17 *See also Reliant*, 2008 WL 1826036 (prior work on due diligence of transaction in which plaintiff acquired a patent was not "substantially related" to representation of defendant in subsequent infringement action involving that patent).

cited during prosecution of the '878 application were (i) cited during the opposition to the European counterpart to the patent-in-suit, or (ii) cited in the Watson or Sandoz notice letters.

Redacted

Fourth, the issues in the two matters are very different. As noted above, the primary issues in the present action are likely to be whether claims in the patent-in-suit are invalid on various grounds. In contrast, the primary issue during the prosecution of the '878 application was whether the subject matter claimed in that application was anticipated by or would have been obvious from the RE '247 patent. Although the two matters involve the issue of obviousness, they involve different claims and different prior art: the present action focuses on pre-1997 prior art regarding oral contraceptives, while the '878 application focused on pre-2001 art regarding hormone replacement therapy.

Wyeth's own actions show that it does not consider the patent-in-suit – and thus the present action – to be "substantially related" to the '878 application. During the prosecution of the '878 application, Wyeth did not disclose to the PTO (i) the patent-in-suit, or (ii) the

---

18 Redacted Redacted Redacted This could not possibly be an issue in the present action, since the claims of the patent-in-suit do not require specific daily dosages of these hormones. Notably, the "continuous and uninterrupted" language found in the claims of the '878 application – to which Wyeth attributes great significance because similar language is found in the claims of the patent-in-suit – was not relied upon in distinguishing the RE '247 patent.

references cited during the opposition to the European counterpart to the patent-in-suit. If Wyeth had believed that the patent-in-suit or any of this prior art was material to the patentability of the '878 application, it would have been duty-bound to disclose these materials to the PTO. *See Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1234-35 (Fed. Cir. 2007). Wyeth's non-disclosure demonstrates the lack of overlap between the present action and the prosecution of the '878 application. *See Am. Sterilizer Co. v. Surgikos, Inc.*, No. 4-89-238-Y, 1992 U.S. Dist. LEXIS 21542, *12 (N.D. Tex. Jun. 12, 1992) (finding previous matter to not be "substantially related" where, during the present action, defendant had refused to provide discovery on patent involved in previous matter and argued that such discovery was irrelevant).

### D. The Inventorship Dispute Relating to the '878 Application Was Very Fact-Specific

For a number of different reasons, the present action is not "substantially related" to the inventorship dispute relating to the '878 application.

First, as explained above, the '878 application relates to hormone replacement therapy, while the patent-in-suit relates to oral contraceptives.

Second, inventorship disputes are generally very fact-specific, and revolve around "who contributed what ideas" during the specific work leading to the patent or application at issue. *See Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1473 (Fed. Cir. 1997) ("The determination of whether a person is a joint inventor is fact specific. . ."). The inventorship dispute relating to the '878 application is no different. Thus, whatever information Kenyon would have learned from handling the inventorship dispute would be essentially irrelevant to any other matter. Redacted

Redacted

Redacted

## III. Wyeth's Arguments For Why the Present Action Is "Substantially Related" to Kenyon's Previous Work for Wyeth Should Be Rejected

Wyeth makes several arguments for why the present action is "substantially related" to Kenyon's previous work for Wyeth. As explained below, each of these should be rejected.

### A. The Similarity Between Some of the Language in the Claims of the RE '247 Patent, the '878 Application and the Patent-in-Suit Is Just the Type of Superficial Resemblance That This Court Has Said Should Be Ignored in Determining Whether Matters Are "Substantially Related"

Wyeth observes that the claims of the RE '247 patent, the '878 application and the patent-in-suit all require the "continuous and uninterrupted" administration of an estrogen and a progestin for a "women's health indication,' and argues that this shows that all three must be "substantially related." But this superficial similarity is belied by the fact that, as explained above, the prior art that has been found relevant to the patent-in-suit is completely different from the prior art that has been found relevant to the RE '247 patent and the '878 application. In *Satellite*, this Court cautioned against taking such a superficial approach:

> In *Duncan*, *supra*, the court reversed the district court's disqualification order, despite the fact that plaintiff's attorney had represented the defendant ten times over a ten year period. The Fifth Circuit's opinion stated that the mere facial similarity between prior and present representation is insufficient to justify disqualification. Instead, "the focus of the district court's inquiry should be on the precise nature of the relationship between the present and former representation ... Merely pointing to a superficial resemblance between the present and prior representation will not substitute for the careful comparison demanded by our cases." Id. at 1029.

652 F. Supp. at 1285 (*quoting Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1029 (5th Cir.1981)); *see also Power Mosfet*, 2002 U.S. Dist. LEXIS 27557, * 10 ("Just because

---

[19] But even if there were an inventorship dispute in the present action, that would not matter, since such disputes are very fact-specific.

two devices fall into the same general category, e.g., photocopiers or Power MOSFETS, does not necessarily mean patent infringement cases in the same category will be substantially related.").

Moreover, Wyeth has not shown that the "continuous and uninterrupted" language was at all important to the *AHP v. Novo Nordisk* litigation or the prosecution of the '878 application,

Redacted

Redacted Indeed, as explained above, a review of the prosecution history of the '878 application shows that the key question during prosecution was ***not*** whether any prior art disclosed a "continuous and uninterrupted" regimen, but rather whether the RE '247 patent disclosed the use of 0.3 to 0.45 mg of "conjugated equine estrogens" and 1.5 mg of "medroxyprogesterone acetate," which was required by the claims of the '878 application.

Further, Wyeth's position on the meaning of the "continuous and uninterrupted" language in the claims in the patent-in-suit is no secret. In the opposition to the European counterpart, Wyeth disclosed its position on the meaning of that language and how it could be used to distinguish prior art, and thus even assuming *arguendo* that Kenyon had some information about how Wyeth interpreted that language in connection with other patents and patent applications, that would provide no advantage here.

**B. Wyeth's Unsubstantiated Allegation That Kenyon Interviewed Witnesses Likely to Be Witnesses in This Case Is a Red Herring Because Any Such Interviews Did Not Concern Subject Matter Relevant to the Present Action**

Redacted

Redacted This should be rejected for several reasons.



*See Satellite*, 652 F. Supp. at 1284. As this Court stated in *Satellite*, the Court "should not allow its imagination to run free" in evaluating whether relevant information might have disclosed in the previous representation. *Id.*



In addition, this case does not involve the development of the Lybrel® product. Rather, this case involves whether '814 patent is valid and infringed by Watson's generic version of Wyeth's Lybrel® product. This is not a case where the work leading to the patent-in-suit and the

---

Redacted

[21] *See U.S. v. Moscony*, 927 F.2d 742 (3d Cir. 1991) (attorney had interviewed former clients about facts surrounding fraud allegations at issue in present action); *Emmis Operating Co. v. CBS Radio, Inc.*, 480 F. Supp. 2d 1111 (S.D. Ind. 2007) (attorney had interviewed former client about employment contract at issue in present action); *FMC Techs., Inc. v. Edwards*, 420 F. Supp. 2d 1153 (W.D. Wash. 2006) (attorney had interviewed former client about facts surrounding trade secret misappropriation allegations at issue in present action).

development of the patented product are one and the same. Here, the work leading to the '814 patent did not even occur at Wyeth, was not performed by Wyeth employees, took place in Europe, and occurred at least 5 years before Wyeth even acquired rights to the patent-in-suit. The development of the Lybrel product apparently occurred years later at Wyeth in the United States, and was done by different individuals. Redacted Redacted Redacted The facts surrounding the work leading to the patent-in-suit may very well turn out to be relevant to the validity of the '814 patent. However, it is difficult to understand how the development of ***the Lybrel product*** – as opposed to the patent-in-suit – will be relevant here, and Wyeth provides no explanation as to how such information would be relevant.

Further, Wyeth has not even identified the employees it alleges will be witnesses here or their connection to the previous matters, and thus it is difficult for the Court to assess the likelihood that Kenyon received information from them that it can use in cross-examining them in the present action. In contrast, in each of the cases cited by Wyeth, the specific witnesses at issue had been identified, and thus the Court could better assess the likelihood that the individuals would be witnesses and that the disqualified attorneys had received confidences in the first matter that would be relevant to the second matter. Watson recognizes that a party need not disclose the specific confidences at issue to support a claim of disqualification, but submits that the party seeking disqualification must provide enough non-privileged information, such as the identity of the witnesses, to enable the Court to assess the likelihood that such confidences were disclosed. *See Integrated Health Services of Cliff Manor, Inc. v. THCI Co.*, 2005 U.S. Dist. LEXIS 14218, *6-7 (D. Del. Jul. 18, 2005) ("The party seeking disqualification must 'clearly

show[] that continued representation would be impermissible.' *Id.* As such, 'vague and unsupported allegations are not sufficient to meet this standard.'") (*quoting Cohen v. Oasin*, 844 F. Supp. 1065, 1067 (E.D. Pa. 1994)). Wyeth has not met this standard here.

**C. Even If Kenyon Received Confidential Information About Wyeth's Business Strategy and Finances in the Previous Matters, That Would Be Irrelevant Because Such Information Would Be Obtained in Discovery By the Watson Defendants Regardless of What Firm Was Representing Them**

Redacted

Redacted The short answer to this allegation is that any such information would not be privileged, and thus Watson would be able to get that information in discovery from Wyeth regardless of who was representing it. Thus, assuming *arguendo* that Kenyon received such information, it would not give Watson an unfair advantage. In *Talecris*, this Court rejected a similar argument on this basis, stating:

> Talecris also contends that Townsend had knowledge from the previous litigation of individuals who are witnesses in the instant litigation, as well as access to confidential licensing agreements that were subject matter of the prior litigation and are now subject matter of the instant litigation. ***Talecris does not, however, provide any evidence that, but for Townsend's previous representation, such witnesses and licensing agreements would not have become known and available through the normal course of discovery.***

491 F. Supp.2d at 515 n. 2 (emphasis added); *see also Brice v. Hess Oil Islands Corp.*, 769 F. Supp. 193, 197 (D.V.I. 1990) (denying motion to disqualify because "[a]ny knowledge that Ms. Rohen gained during her representation of HOVIC. . . is discoverable during the normal course of the litigation.").

Moreover, as is typical in Hatch-Waxman cases, Watson does not yet have an approved product, and thus Wyeth is not seeking damages. In these circumstances, Watson questions the value of the information about Wyeth's business strategy and finances referred to the issues in

the present action.[22] Redacted

Redacted

Redacted and the public record reveals that Kenyon stopped working on the '878 application in May 2006, Redacted

Redacted

**D. Wyeth's Argument That Kenyon Gained Knowledge of Wyeth's General Litigation Strategy Through the Previous Matters, and That This Knowledge Makes the Previous Matters "Substantially Related," Should Be Rejected**

Wyeth argues that Kenyon should be disqualified because it "gained important insights into Wyeth's litigation and intellectual property strategy as it relates to its women's health care product line" from its work for Wyeth. (D.I. 28 at 17.) This cannot withstand scrutiny.

Redacted

Redacted *See* ABA Model Rules of Professional Conduct, Rule 1.9, comment 3 ("Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related.") To avoid this damaging fact, Wyeth lumps hormone

---

Redacted

replacement therapy matters together with oral contraceptive matters and argues that Kenyon has worked on more recent matters involving "Wyeth's women's health care product line." (D.I. 28 at 17.) However, one can always make two matters sound related if one chooses a category that is broad enough. For example, one could say that oral contraceptives and cardiovascular products are related because both are "pharmaceuticals," but that does not mean the two are sufficiently related to warrant disqualification. This Court has cautioned against relying on a "superficial resemblance" between previous and current matters when evaluating whether they are "substantially related." *See Satellite*, 652 F. Supp. at 1285 ("'Merely pointing to a superficial resemblance between the present and prior representation will not substitute for the careful comparison demanded by our cases.'") (*quoting Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1029 (5th Cir.1981)).

Redacted

Redacted And that litigation involved an anesthetic, not an oral contraceptive or even another product in Wyeth's women's health care product line.

Redacted

Redacted

Redacted This is

important because Hatch-Waxman cases are unique, and involve strategy that is very different from other patent cases.[23]

Notably, in the cases relied on by Wyeth, the firm or attorney in question had spent many years defending a client against a specific type of claim and now had begun working against that client on the exact same type of claim. The matters were generally the type where there are a large number of factually similar matters.[24] *See Madukwe v. Del. State Univ.*, Nos. 07-775-GMS-LPS, 07-804-SLR-LPS, 2008 WL 2020021, *1 (D. Del. May 5, 2008) (former representation involved employment discrimination cases "exactly like those now pressed by Plaintiffs"); *Webb v. E.I. Du Pont de Nemours & Co.*, 811 F. Supp. 158 (D. Del. 1992) (ERISA cases); *Cardona v. Gen. Motors Corp.*, 942 F. Supp. 968, 972-73 (D.N.J. 1996) (lemon law cases); *Murphy v. Simmons*, No. 06-1535, 2008 WL 65174 (D. Del. Jan. 3, 2008) (environmental cases); *Colorpix Sys. of Am. v. Broan Mfg. Co.*, 131 F. Supp. 2d 331, 339-40 (D. Conn. 2001) (fire subrogation cases). In these circumstances, a company may develop specific procedures – or even a manual – for handling that type of matter, and knowledge of those procedures may constitute specific factual information that is useful in litigating such a matter against that

---

23 For example, patent owners have a strong incentive to bring patent cases under the Hatch-Waxman Act even where the cases are very weak because bringing the suit generally prevents the FDA from approving the defendant's ANDA for 30 months. This incentive does not exist in more traditional cases. In addition, in Hatch-Waxman cases, the defendant generic companies are often reluctant to launch their products before they have prevailed in the case (even after the 30-month stay has expired) for fear of being found liable for huge damages if they launch "at risk" and are then found to infringe. For this reason, the patent owner in Hatch-Waxman cases generally seeks to proceed slowly, while the ANDA applicant is in more of a hurry. Traditional cases are just the opposite: the patent owner seeks to move quickly, while the defendant prefers delay. Moreover, any agreements settling such cases must be reviewed by the Federal Trade Commission ("FTC"), which changes the settlement dynamics.

24 The exceptions were *SuperGuide*, 141 F. Supp. 2d 616 and *Koch v. Koch Indus.*, 798 F. Supp. 1525 (D. Kan. 1992), wherein the attorneys in question were not disqualified because of their knowledge of the former client's general litigation philosophy, but rather because they had acquired knowledge of specific facts that could be used against the former client. *See* ABA Model Rules of Professional Conduct, Rule 1.9, comment 3.

company. *See Madukwe*, 2008 WL 2020021, *2 ("S&R attorneys at times participated in the drafting, revision and interpretation of DSU personnel policies."); *see also* ABA Model Rules of Professional Conduct, Rule 1.9, comment 3 ("In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation.") Moreover, because the matters are factually similar, the resolution of each individual matter is determined less by the facts of the matter. *See Cardona*, 942 F. Supp. at 973 (noting that the facts "take the back seat" in lemon law cases).

This is not at all like the present situation. For one thing, at the risk of sounding presumptuous, Watson submits that individual patent cases are not nearly as factually similar as the types of matters at issue in the cases relied upon by Wyeth. Put another way, the facts "do not take the back seat" in patent cases, but rather are front and center. Moreover, patent cases are not so fungible or numerous that companies develop a manual of procedures applicable to all such cases. Notably, in the only patent case cited by Wyeth on this issue, the attorney in question was disqualified not because of his knowledge of the former client's general litigation philosophy, but rather because he was likely to have specific factual knowledge about the disputed issues that was gained through his representation of the former client. *See Superguide*, 141 F. Supp. 2d at 622-23. As explained above, this simply is not the case here.

In the end, the crux of Wyeth's argument is that Kenyon should be disqualified because it represented Wyeth over a long period of time and on many matters. The Court rejected such an argument in *Duncan*, stating that "the fact that Smathers & Thompson used to represent Merrill Lynch, even on a variety of matters and over a relatively long period of time, is alone insufficient

to establish the required nexus with the present case." 646 F.2d at 1029; *see also Arctic Cat, Inc. v. Polaris Sales, Inc.*, No. 04-3419, 2004 U.S. Dist. LEXIS 25463, *10 (D. Minn. Dec. 20, 2004) (denying motion to disqualify where 200 lawyers from Robins firm had worked for Polaris and "provided substantial legal services" because "no evidence suggests Robins lawyers 'did any work for Polaris relating to the fender storage technology at issue in the current litigation. . .'".)

**IV. Allowing Kenyon to Continue to Represent the Watson Defendants Would Not Prejudice Wyeth, While Disqualifying Kenyon Would Prejudice the Watson Defendants**

Even when two matters are "substantially related," disqualification is not automatic. *See Talecris*, 491 F. Supp. 2d at 513. Wyeth argues that disqualification is appropriate here because Kenyon's continued representation of Wyeth would severely prejudice Wyeth. This is nonsense.

Redacted

Redacted It is highly unlikely any information from that case would be useful in this case in any way, both because the information is more than a decade old and because the case involved subject matter very different from the present case. The Kenyon attorneys involved in this case have not had discussions with, and now have been walled off from, the few attorneys remaining at Kenyon who worked on any of the other allegedly "substantially related" matters, so there is no actual danger that Wyeth confidential information will be used against Wyeth. (Exs. A-G.)

On the other hand, disqualifying Kenyon at this juncture would prejudice Watson. Kenyon is representing Watson on another case involving a patent on an oral contraceptive that is designed to reduce the number of periods that a woman experiences each year. *See Duramed Pharms., Inc. v. Sandoz, Inc.*, No. 07-5940 (D.N.J. complaint filed December 13, 2007). (Ex. G

[Hulina Decl.] ¶ 3.) That case involves Watson's generic version of Duramed's Seasonale drug product, which is sold under the mark "Quasense." (*Id.*) Kenyon has already performed substantial work on the Duramed case. (*Id.*) Watson had intended for Kenyon to handle both cases, and for some "economies of scale" to thereby be obtained. (*Id.*) If Kenyon is disqualified, that plan will be ruined. Transferring both this case and the Duramed case to another firm would waste the substantial effort that Kenyon has made in preparing for these cases.

Moreover, although Wyeth asserts that it acted promptly in raising this issue and that its motion should thus not be rejected on timeliness grounds, the fact of the matter is that Wyeth waited two months between the time that it first knew Kenyon was representing Watson to raise the conflict issue. (D.I. 28 at 5 and Ex. F.) During that time, Kenyon attorneys logged a considerable number of hours familiarizing themselves with the factual and legal issues underlying the two jurisdictional motions that Watson filed in April 2008. If Kenyon is disqualified now, at least some amount of that effort will have to be recreated by a new firm, thereby prejudicing Watson.

**V. Wyeth's Effort to Disqualify Amy Hulina Is Specious**




But

the '878 patent application and the relevant prior art are a matter of public record, and thus cannot constitute confidential information. Redacted



Redacted This should be dismissed out of hand for several reasons. For one thing, as explained above, the present action is not "substantially related" to the '878 application. Redacted



Redacted In short, disqualification of Ms. Hulina is not warranted.

## CONCLUSION

For the foregoing reasons, Wyeth's motion to disqualify should be denied.

June 30, 2008

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
Amy Arnott Quinlan (I.D. #3021)
MORRIS JAMES LLP
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801-1494
Tel: (302) 888-6960
Fax: (302) 571-1750
rherrmann@morrisjames.com
mmatterer@morrisjames.com
aquinlan@morrisjames.com

*Attorneys for Defendants*

OF COUNSEL

John W. Bateman
C. Kyle Musgrove
Nicholas J. Nowak
Thomas M. Huff
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
(202) 220-4200