**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

WYETH,

      *Plaintiff,*

   v.

WATSON LABORATORIES, INC. *and*
WATSON PHARMACEUTICALS, INC.,
     *Defendants.*

Civil Action No. 08-cv-00145-JJF

**REDACTED PUBLIC VERSION**

---

**EXHIBITS TO DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO
WYETH'S MOTION TO DISQUALIFY KENYON & KENYON LLP AND
AMY HULINA AS COUNSEL FOR DEFENDANTS
VOLUME I OF VII**

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
Amy Arnott Quinlan (I.D. #3021)
MORRIS JAMES LLP
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801-1494
Tel: (302) 888-6960
mmatterer@morrisjames.com

*Attorneys for Defendants*

OF COUNSEL
John W. Bateman
C. Kyle Musgrove
Nicholas J. Nowak
Thomas M. Huff
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
(202) 220-4200

Originally filed: June 30, 2008
Public version filed: July 9, 2008

# EXHIBIT   A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WYETH,<br><br>      *Plaintiff,*<br><br>      v.<br><br>WATSON LABORATORIES, INC., *and*<br>WATSON PHARMACEUTICALS, INC.,<br>      *Defendants.* | Civil Action No. 08-cv-00145-JJF<br><br>**CONFIDENTIAL – FILED UNDER SEAL** |

## DECLARATION OF JOHN W. BATEMAN

1.      I am John W. Bateman.  I am a partner of Kenyon & Kenyon LLP in Kenyon's

Washington, DC office.  I am a member of the bar of the District of Columbia, of various district

courts, of the U.S. Court of Appeals for the Federal Circuit, and of the U.S. Supreme Court.

2.      I am one of the attorneys responsible for the handling the present litigation on

behalf of the Watson entities.

3.      I have read the papers submitted by Wyeth in support of its motion to disqualify

Kenyon & Kenyon LLP and Amy Hulina.  Wyeth argues that the present action is "substantially

related" to four matters that Kenyon previously handled for Wyeth.  These four matters are the

*AHP v. J&J* litigation, the *AHP v. Novo Nordisk* case, the prosecution of U.S. Patent Application

No. 09/808,878 and the related inventorship dispute.

Redacted

**Redacted**

6.     I did not work on the *AHP v. Novo Nordisk* case, the prosecution of U.S. Patent Application No. 09/808,878 or the related inventorship dispute.

7.     Based on the publicly available information relating to the matters identified by Wyeth and my work to present on the present litigation, I do not believe that any of the previous matters that Wyeth alleges are "substantially related" to the present action are in fact "substantially related" to the present action. Nevertheless, I will not communicate with any of the Kenyon attorneys who worked on those matters for Wyeth about the present litigation or those matters with the exception of (i) my partner C. Kyle Musgrove, who also worked on the *AHP v. J&J* litigation, and who is also one of the attorneys responsible for handling this case, and (ii) Amy Hulina, who is now in-house counsel for the Watson entities. I will not communicate, however, with Mr. Musgrove or Ms. Hulina about our work for Wyeth.

8.     I have reviewed certain of Kenyon's billing records in connection with responding to Wyeth's motion to disqualify. I have also reviewed a list of the matters that Kenyon handled for Wyeth.

**Redacted**



That case was closed in May 2001 pursuant to a consent judgment. *See Medeva Pharma Ltd. v. Am. Home Prods. Corp.*, No. 00-396-GMS (D. Del. complaint filed April 12, 2000).

In both of these cases, Wyeth's ESI-Lederle, Inc. affiliate had filed an ANDA seeking approval to make a generic version of a brand name drug product.

13.    Very few attorneys who represented Wyeth in connection with the matters that Wyeth alleges are "substantially related" to the present action are still at Kenyon other than attorneys who worked on the *AHP v. J&J* litigation, which ended in 1997.

3



16.    Amy Hulina was an associate at Kenyon from 2001 to 2004.    Redacted

Redacted



19.     Nicholas Nowak and Thomas Huff are associates in Kenyon's Washington, DC office who are working on the present action.  Mr. Nowak and Mr. Huff will not communicate with any of the Kenyon attorneys who worked on those prior matters for Wyeth about the present litigation or those prior matters with the exception of (i) me and my partner C. Kyle Musgrove, and (ii) Amy Hulina, who is now in-house counsel for the Watson entities.  They will not communicate, however, with me, Mr. Musgrove or Ms. Hulina about our work for Wyeth.   If additional Kenyon attorneys are added to the group representing the Watson entities, the same policy will of course apply to them.

20.     Attached as Exhibit 1 is a copy of U.S. Patent No. 6,500,814 B1 ("the '814 patent"), which is the patent-in-suit in the present action.

21.    Attached as Exhibit 2 is a copy of a CV for Rolf-Dieter Hesch, which I downloaded from the following Internet site: http://www.wolfsberg.com/documents/Rolf-Dieter_Hesch_CV.pdf, and a certified English translation of that CV.

22.    Attached as Exhibit 3 is a copy of the complaint from *Wyeth v. Hesch*, No. 07-967 (S.D.N.Y. complaint filed February 9, 2007).

23.    Attached as Exhibit 4 is a copy of  the assignment of the '814 patent from Dr. Hesch to Wyeth.  This document is publicly available.

24.    Attached as Exhibit 5 is a copy of the prosecution history for the application that issued as the '814 patent.  Numbers have been added in the bottom left-hand corner of each page for ease of reference.

25.    Attached as Exhibit 6 is a copy of the docket sheet for *Wyeth v. Hesch*, No. 07-967 (S.D.N.Y. complaint filed February 9, 2007).

26.    Attached as Exhibit 7 is a copy of Wyeth's Notice of Voluntary Dismissal Without Prejudice from *Wyeth v. Hesch*, No. 07-967 (S.D.N.Y. complaint filed February 9, 2007).

Redacted

28.    Attached as Exhibit 9 is a copy of U.S. Patent No. RE 36,247.

29.    Attached as Exhibit 10 is a copy of a page from the web site of the U.S. Patent and Trademark Office identifying the applications that claim priority to the application that issued as the '814 patent.

30.    Attached as Exhibit 11 is a copy of excerpts from the prosecution history of U.S. Patent Application No. 10/299,628, which claims priority to the application that issued as the

'814 patent. These papers are publicly available. Numbers have been added in the bottom left-hand corner of each page for ease of reference.

31.    Attached as Exhibit 12 is a copy of excerpts from the prosecution history of U.S. Patent Application No. 10/841,278, which claims priority to the application that issued as the '814 patent. These papers are publicly available. Numbers have been added in the bottom left-hand corner of each page for ease of reference.

32.    Attached as Exhibit 13 is a copy of excerpts from the prosecution history of U.S. Patent Application No. 10/867,954, which claims priority to the application that issued as the '814 patent. These papers are publicly available. Numbers have been added in the bottom left-hand corner of each page for ease of reference.

33.    Attached as Exhibit 14 is a copy of EP 1 011 682 B1.

34.    Attached as Exhibit 15 is a copy of excerpts from the papers submitted to the European Patent Office or received from the European Patent Office in connection with the opposition filed by Akzo Nobel, NV. to EP 1 011 682 B1. These papers are publicly available. Numbers have been added in the bottom left-hand corner of each page for ease of reference.

35.    Attached as Exhibit 16 is a copy of a list of the papers submitted to the European Patent Office or received from the European Patent Office in connection with the prosecution of EP 1 011 682 B1 and the opposition filed by Akzo Nobel, NV. to EP 1 011 682 B1.

36.    Attached as Exhibit 17 is a copy of the notice letter sent by Watson Laboratories, Inc. (Nevada) to Wyeth regarding the '814 patent.

37.    Attached as Exhibit 18 is a copy of the notice letter sent by Sandoz, Inc. to Wyeth regarding the '814 patent.

38.    Attached as Exhibit 19 is a copy of U.S. Patent No. 3,959,322.

39.     Attached as Exhibit 20 is a copy of U.S. Patent No. 4,002,746.

40.     Attached as Exhibit 21 is a copy of the Reexamination Certificate for U.S. Patent No. 4,002,746.

41.     Attached as Exhibit 22 is a copy of the prescribing information for Ortho-Cyclen® and Ortho Tri-Cyclen® oral contraceptive tablets.

42.     Attached as Exhibit 23 is a copy of the docket sheet for *Johnson & Johnson v. American Home Products, Inc.*, No. 94-1388 (E.D. Pa. complaint filed February 25, 1994.)

43.     Attached as Exhibit 24 is a copy of the docket sheet for *American Home Products Corp. v. Novo Nordisk Pharmaceuticals, Inc.*, No. 99-3162 (D.N.J. complaint filed July 6, 1999).

44.     Attached as Exhibit 25 is a copy of the complaint from *American Home Products Corp. v. Novo Nordisk Pharmaceuticals, Inc.*, No. 99-3162 (D.N.J. complaint filed July 6, 1999).

45.     Attached as Exhibit 26 is a copy of the prescribing information for the Activella® hormone replacement therapy product.

46.     Attached as Exhibit 27 is a copy of the opposition filed by Novo Nordisk A/S to the European counterpart to U.S. Patent No. 36,247.  These papers are publicly available. Numbers have been added in the bottom left-hand corner of each page for ease of reference.

47.     Attached as Exhibit 28 is a copy of excerpts from the prosecution history of the '878 application.  These papers are publicly available.  Numbers have been added at the bottom of each page for ease of reference.

48.     Attached as Exhibit 29 is a copy of U.S. Patent Application Publication No. 2001/0034340 A1, which is the published version of the '878 application.

49.     Attached as Exhibit 30 is a copy of Wyeth's complaint from *Wyeth v. Wolfe*, No. 08-754 (E.D. Pa. complaint filed February 15, 2008).

50.      Attached as Exhibit 31 is a copy of Dr. Wolfe's answer from *Wyeth v. Wolfe*, No. 08-754 (E.D. Pa. complaint filed February 15, 2008).

51.      Attached as Exhibit 32 is a copy of a paper submitted to a Canadian tribunal on behalf of Dr. Wolfe in connection with the dispute between Dr. Wolfe and Wyeth regarding the inventorship on the '878 application.   This paper is publicly available.

52.      Attached as Exhibit 33 is a copy of another paper submitted to a Canadian tribunal on behalf of Dr. Wolfe in connection with the dispute between Dr. Wolfe and Wyeth regarding the inventorship on the '878 application.  This paper is publicly available.

53.      Attached as Exhibit 34 is a copy of a declaration from Dr. James H. Pickar, which was submitted to the Court by Wyeth in connection with *Wyeth v. Wolfe*, No. 08-754 (E.D. Pa. complaint filed February 15, 2008).  This paper is publicly available.

54.      Attached as Exhibit 35 is a copy of a declaration from Dr. Wolfe, which was submitted to the Court by Dr. Wolfe in connection with *Wyeth v. Wolfe*, No. 08-754 (E.D. Pa. complaint filed February 15, 2008).  This paper is publicly available.

55.      Attached as Exhibit 36 is a copy of the docket sheet for *Wyeth v. Wolfe*, No. 08-754 (E.D. Pa. complaint filed February 15, 2008).

56.      Attached as Exhibit 37 is a copy of the docket sheet for *Astrazeneca Pharmaceuticals LP v. Wyeth*, No. 02-7936 (S.D.N.Y. complaint filed October 4, 2002).

57.      Attached as Exhibit 38 is a copy of the docket sheet for *Key Pharmaceuticals, Inc. v. ESI-Lederle, Inc.*, No. 96-4510 (E.D. Pa. complaint filed June 20, 1996).

58.      Attached as Exhibit 39 is a copy of a page found on Wyeth's web site at http://www.wyeth.com/hcp/lybrel/moa.

59.    On June 27, 2008, Ms. Somerville was out of the office and was not available to sign her declaration.  Accordingly, after reviewing her declaration, she authorized me to sign her name on her behalf.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.

June 30, 2008

*John W. Bateman*
John W. Bateman

# EXHIBIT   1

US006500814B1

(12) **United States Patent**
Hesch

(10) Patent No.: **US 6,500,814 B1**
(45) Date of Patent: **Dec. 31, 2002**

(54) **HORMONAL CONTRACEPTIVE**

(75) Inventor: **Rolf-Dieter Hesch**, Constance (DE)

(73) Assignee: **Wyeth Pharmaceuticals**, St. Davids, PA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/508,648**

(22) PCT Filed: **Sep. 3, 1998**

(86) PCT No.: **PCT/DE98/02636**

§ 371 (c)(1),
(2), (4) Date: **Jun. 5, 2000**

(87) PCT Pub. No.: **WO99/12531**

PCT Pub. Date: **Mar. 18, 1999**

(30)     **Foreign Application Priority Data**

Sep. 11, 1997   (DE) ........................................ 197 39 916

(51) Int. Cl.[7] .................................................. A61K 31/56
(52) U.S. Cl. ........................ **514/170**; 514/841; 514/843
(58) Field of Search .................................. 514/170, 841, 514/843

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 4,855,305 | A | * | 8/1989 | Cohen | ........................ 514/171 |
| 5,418,228 | A | * | 5/1995 | Bennink | ..................... 514/182 |
| 5,898,032 | A | * | 4/1999 | Hodgen | ....................... 517/178 |
| RE36,247 | E | | 7/1999 | Plunkett et al. | |

FOREIGN PATENT DOCUMENTS

| EP | 0309263 | * | 3/1989 |
|---|---|---|---|
| EP | 0309263 | B1 | 3/1989 |
| EP | 0 309 263 | A1 | 3/1989 |
| EP | 0628312 | B1 | 12/1994 |

OTHER PUBLICATIONS

Coutinho, E.M., et al. (1995) *Comparative Study on Intermittent Versus Continuous use of a Contraceptive Pill Administered by Vaginal Route.* Contraception 51(6):355–8.

Davies, Graham C., et al. (1992) *Ovarian Activity and Bleeding Patterns During Extended Continuous Use of a Combined Contraceptive Vaginal Ring.* Contraception 46(3):269–278.

Rizk, Diaa E.E., and Kumar, Rachana M., (1996) *Congenital Afibrinogenemia: Treatment of excessive Menstrual Bleeding with Continuous Oral Contraceptive.* American J. Hematology 52(3):237–238.

* cited by examiner

*Primary Examiner*—Barbara P. Badio
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear, LLP

(57)              **ABSTRACT**

The present invention relates to a hormonal contraceptive product having two hormonal components, an estrogen and a gestagen, and a process for the combined, continuous administration of the product of the invention.

**3 Claims, No Drawings**

US 6,500,814 B1

1

## HORMONAL CONTRACEPTIVE

This application is the U.S. National Phase under 35 U.S.C. §371 of International Application PCT/DE98/02636, filed Sep. 3, 1998, which claims priority of German application DE 19739916.9, filed Sep. 11, 1997.

The present invention relates to a hormonal contraceptive product with two hormonal components, the use thereof and a hormonal contraception process.

Since hormonal contraceptives became available in the 1960's, a number of hormonal components have been investigated with regards to their suitability in the most varied administration diagrams. A fundamental subdivision into combination and sequential products is possible.

For example, if the desired cycle time is 28 days, in the case of the known combination products administration takes place over 21 days in a constant or varying absolute and/or relative dosage of a combination of an estrogen product and a gestagen product, in which the estrogen product can e.g. be natural estrogen or synthetic ethinyl estradiol and the taking of the aforementioned 21 daily units is followed by a seven-day interval where there is a withdrawal bleeding simulating natural menstruation.

In the known sequential products, once again for a desired cycle time of 28 days, administration takes place for 7 days of a pure estrogen product and then for 15 days of a combination of an estrogen product and a gestagen product and here again there is then a taking-free period of e.g. 6 days when withdrawal bleeding occurs. It is admittedly already known to bridge the inherent taking intervals of combination and sequential products in the interest of greater taking security by administering within the days in question placebos. However, it has hitherto always been assumed that during the roughly one-week taking interval no hormones of the present type should be administered, in order to ensure a reliable withdrawal bleeding. Only in the case of substitution products in the menopause of older women have hormones been administered throughout the cycle, e.g. in the sequence 10 days estrogen product, 11 days combination of estrogen and gestagen product, 7 days estrogen product, 7 days gestagen product in a particularly low dosage, but said substitution products are unsuitable for ovulation inhibition.

The sequential products used in substitution therapy are in particular unsuitable for contraception because the natural estradiol does not prevent ovulation in the dosage administered and the phase in which gestagen is administered is too short, being only 11 days. However, in the case of the substitution products, the above-described sequential system guarantees a relatively good cycle control.

German patent 43 08 406 discloses a combination contraceptive product, which comprises one or more stages. At least one stage contains the combination of three components, namely a biogenous estrogen, a synthetic estrogen and a gestagen and the further stages in each case comprise a pharmaceutically unobjectionable placebo or a biogenous or synthetic gestagen, or a biogenous or synthetic estrogen, or a combination of two components, namely a biogenous estrogen, a synthetic estrogen and a gestagen or a combination of synthetic estrogen and a gestagen.

The description of the above document makes it clear that in the stage concept described therein there is typically a change of state over the period of time. Such a state change can take place in that the composition of the phases forming the stage is modified with respect to the components used and in that only the concentrations of the components used in the phases forming the stage undergo changes.

2

The problem of the invention is to provide a hormonal contraceptive product, which ensures high contraceptive safety or reliability and prevents inter-menstrual bleeding. There is also to be a further reduction in the side effects otherwise observed in hormonal contraceptive products.

According to the invention this problem is solved by a hormonal contraceptive product having two hormonal components, the agent comprising for continuous, combined administration a first hormonal component comprising at least one gestagen and a second hormonal component comprising at least one estrogen.

The problem is also solved by a hormonal contraception process, in which a product, which comprises at least one gestagen, and a second hormonal component comprising at least one estrogen is continuously administered.

According to another aspect of the invention the product according to the invention is used for inhibiting ovulation.

According to a further aspect of the invention the product according to the invention is used for the treatment and/or prophylaxis of breast tumours.

According to another embodiment the invention proposes that gestagen as the first hormonal component is chosen from the group comprising progesterone, chlormadinone acetate, norethisterone acetate, cyproterone acetate, desogestrel, levenorgestrel, other natural and/or synthetic gestagens, anti-gestagens and hormonal analogs with gestagen or antigestagen action, as well as hormonal compounds which rapidly split off at least one gestagen following taking.

In the product according to the invention, the estrogen as the second hormonal component can be selected from the group comprising synthetic estrogens, biogenous estrogens, antiestrogens and hormonal analogs with estrogen or anti-estrogen action.

In a preferred embodiment the synthetic estrogen is selected from the group comprising ethinyl estradiol, mestranol and the like, as well as hormonal compounds rapidly splitting off at least one synthetic estrogen following taking.

In particularly preferred manner the synthetic estrogen is ethinyl estradiol.

In preferred embodiments the daily administered ethinyl estradiol quantity is 1 to 20 μg. In particularly preferred manner, the daily administered ethinyl estradiol quantity is 5 to 10 μg.

According to the invention the biogenous estrogen is selected from the group comprising estradiol, estriol, estrone, estrane, etc., as well as hormonal compounds rapidly splitting off at least one biogenous estrogen after taking.

According to an embodiment the estradiol comprises 17-α-estradiol and/or 17-β-estradiol.

According to another embodiment the daily administered biogenous estrogen quantity in the case of estradiol, particularly α and β-estradiol, is 0.1 to 2 mg and in the case of conjugate estrogens 0.05 to 0.5 mg.

In an embodiment the product according to the invention can be administered orally.

In an alternative embodiment the product according to the invention can be administered transdermally.

In a second alternative embodiment the product according to the invention can be administered intravaginally.

In a third alternative embodiment the product according to the invention can be in depot injection form.

In a fourth alternative embodiment the product according to the invention can be administered as a hormonal implant.

Finally, the daily units in each case comprising both hormonal components, are placed in spatially separated and individually removable manner in a packaging unit.

3

In an embodiment of the process according to the invention the first hormonal component can be administered in combination with the second hormonal component.

In another embodiment of the process according to the invention the product according to the invention is administered.

The invention is based on the surprising finding that as a result of the continuous, combined administration of a product comprising two hormonal components, namely a first hormonal component comprising at least one gestagen and a second hormonal component comprising at least one estrogen, a high contraceptive reliability can be achieved.

In accordance with common opinion, estrogens are not understood to cover steroid molecules, which preferably evolve their action in that they in different ways exert a biological effect at different cell locations in different organs. Estrogens can act (1) on the cellular membrane, (2) intracellular, cytoplasmic proteins and (3) specific nuclear receptors. It has recently become known that besides the standard estrogen receptor type 1 there is a second estrogen receptor type 2, whose organ distribution is different from that of the estrogen receptor type 1.

Thus, the above definition also covers the compounds known as "designer hormones", which have the aforementioned characteristics.

Thus, biogenous estrogens are steroid molecules, which evolve an estrogen-like action on the membrane, cytoplasmic proteins and nuclear receptors for hydrophobic ring substances and consequently trigger biological effects corresponding to a hydrophobic steroid ring structure able to initiate an estrogen-like action in cells, organs and the complete organism.

The term biogenous estrogens also covers those estrogens which are produced by the human body and consequently include endogenic estrogens. The biogenous estrogens used in specific embodiments of the product according to the invention are typically those which are chemically synthesized. However, it is fundamentally also possible to use compounds isolated from an organism.

Biogenous estrogens also cover conjugate, biogenous estrogens such as e.g. estradiol valerate and estrone sulphate.

The term antiestrogens is here understood to mean hydrophobic ring structure substances and other substances able to specifically and selectively counteract the above-described estrogen action on cells, organs or the overall organism.

Continuous administration is here understood to mean an administration uninterrupted over the use period, in which there are no hormonal component taking-free intervals. This means that there is no interruption of the administration of the product by administering placebos in place of the hormonal product. Thus, over the administration period typically lasting several months to years there are no changes to the fundamental composition of the hormonal components. Instead over the entire administration period the hormonal components forming the hormonal product according to the invention are administered uninterrupted and unchanged with no modification to the concentration. However, it is conceivable for the concentration of estrogen, understood in the full breadth of the concept defined here, and gestagen, also understood in the full breadth of the term defined here, can be changed for older women compared with younger women. This can also take place in such a way that over the continuous administration period initially there is a start with a specific composition and this is then adapted over a period of weeks, months and years to the changed biological needs of the women through the administration of

4

a subsequent product, but which also comprises a product according to the present invention.

As a result of the continuous administration of said hormonal components it is ensured that the natural hormonal processes taking place in the female organism do not interrupt the contraceptive security.

As a result of the estrogen component, respectively by specific action of hydrophobic ring substances with an estrogen-like action, there can be a suppression of gonadotropins. This is desirable. The resulting suppression of the ovarial function is compensated by an adequate substitution of estrogen action. This prevents the development of osteoporosis, the favourable vascular effects of estrogens are maintained and there is no unfavourable influence on the lipid metabolism. By interrupting the cycle-dependent instability in the hormone system, the premenstrual syndrome can be favourably influenced. In addition, the physiological equilibrium of the coagulation system is not disturbed, because the unstable equilibrium in which the coagulation system occurs is not activated and deactivated by the up and down of hormone fluctuations. Thus, the hormonal product according to the invention is particularly suitable for women aged more than 40, where the risk of circulatory disturbances is known to increase with increasing age. There is also a reduction in the thrombosis risk, which has of late acquired considerable significance in contraceptive therapy.

It has surprisingly also been found that on administering the product according to the invention there is a reliable continuous suppression of the menstrual cycle and menstruation in the case of a very low dosage. Without wishing to be bound by this explanation, the combination of the two indicated hormonal components and in particular the low estrogen dosage would appear to be suitable for eliminating the otherwise conventional side effects of ethinyl estradiol and to drop below the administrations of more than 15 $\mu$g of ethinyl estradiol otherwise considered typically necessary in prior art contraceptives.

The low dosage of the two hormonal components and in particular the estrogen component is made possible by the additive action of the two hormonal components, without there being any limitation to the action of the product according to the invention with respect to its contraceptive and ovulation-inhibition properties.

The ovulation inhibition and menstrual cycle suppression reliably ensured by the product according to the invention is of great significance for certain patients, such as e.g. for top sports women, dancers and business women, who wish to exclude any reduction in their physical, intellectual and emotional efficiency as a result of the menstrual cycle. As a result of the combined, continuous administration of the two hormonal components of the product according to the invention it is possible to administer the same either orally, transdermally, intravaginally, by depot injections or hormone implants. Here again the advantages observed for the particular administration forms are obtained.

Possible oral administration forms are all the forms known from the prior art such as e.g. tablets, dragees, pills or capsules, which are produced using conventional adjuvants and carrier substances.

In the transdermal administration of the product according to the invention the two hormonal components forming the product can e.g. be applied to a plaster or also can be applied by transdermal, therapeutic systems and are consequently supplied to the organism. For example an already prepared combination of the two hormonal components or the latter individually can be introduced into such a system, which is based on ionotherapy or diffusion or optionally a combination of these effects.

US 6,500,814 B1

5

In the case of oral administration it has proved appropriate to place the daily units, which in case comprise a combination of the two hormonal components, in a spatially separated and individually removable manner in a packaging unit, so that it is easy to check whether the typically daily taken, oral administration form has in fact been taken. It is important to ensure that there are no taking-free days. Depot injections can be administered at 1 to 6 months or longer intervals. Hormonal implants contain both hormonal components and deliver the same over a period of preferably 3 to 6 months.

When using the product according to the invention it has surprisingly been found that the treatment and/or prophylaxis of breast tumours is possible. The latest breast cancer risk research has revealed that mutations, which can be hereditary or acquired, occur in certain risk genes. Modern cancer therapy assumes that a cancerogenic mutation is present on one of the two allels of a gene which is initially controlled by the other, healthy allel. If a further mutation occurs in a specific organ cell on the second allel, then uncontrolled, malignant growth can occur.

Mutations on the second allel particularly frequently occur in given phases of the cell cycle, namely in the G1 phase. Every four weeks the menstrual cycle drives the breast cell in a cell cycle, "opens" the genome for mutations, which are either repaired or apoptotically "removed". Under the conditions of the conventional combined or sequential contraception treatment a women can have 500 to 700 cycles over her life span, whereas under natural conditions a women has a maximum of 20 to 30 cycles. Thus, in an unusually frequently number of cell cycles over in each case 8 days a considerable mutation risk is introduced into the stimulated breast tissue. If the menstrual cycle is suppressed, as is possible with the product according to the invention, the breast cells are brought into a "rest phase" and it is scientifically ensured that in the rest phase less cancerogenic mutations are introduced into a tissue than in a stimulated tissue. This reduces by a multiple mutagenesis, i.e. the breast cancer risk.

The aforementioned use of the product according to the invention for the treatment and/or prophylaxis of breast cancers is in particular associated with special advantages if the users of the product are high-risk subjects, such as e.g. those with a high family breast cancer risk.

The quantity of administered gestagens and estrogens substantially corresponds to the quantity of comparable prior art products. The examples provide further information concerning the quantities to be administered daily of the different compounds forming the first and/or second hormonal components.

The invention is explained in greater detail hereinafter relative to examples revealing further features, advantages and embodiments of the present invention.

EXAMPLE 1

For contraceptive treatment use was made of a product which per daily unit in table form contained 5 $\mu$g of ethinyl estradiol and 2 mg of norethisterone acetate. It is noteworthy that norethisterone acetate can be used in a concentration range of 0.5 to 5 mg. The product was administered for 9 months and revealed a very good contraceptive reliability whilst completely suppressing the menstrual cycle with no side effects. Within the framework of the present investigation it was ensured that the test persons took the product daily, i.e. without any taking interval, over the entire aforementioned time period.

EXAMPLE 2

For contraceptive treatment use was made of a product which per daily unit in table form contains 0.5 mg of estriol

6

and 2 mg of chlormadinone acetate. It is noteworthy that estriol can be used in a concentration range of 0.5 to 3 mg and chlormadinone acetate in a concentration range of 0.75 to 5 mg. The product was administered for 12 months without any taking interval. The mode of action corresponded to that of example 1.

EXAMPLE 3

For contraceptive treatment use was made of a product which in each daily unit in tablet form contained 0.5 mg of estradiol valerate and 2 mg of lynestrenol. It is noteworthy that estradiol valerate can be used in a concentration range of 0.5 to 5 mg and lynestrenol in a concentration range of 0.5 to 4.5 mg. The product was administered for 12 months without any taking interval. The mode of action corresponded to that of example 1.

EXAMPLE 4

For contraceptive treatment use was made of a product containing per daily unit in tablet form 7.5 $\mu$g of ethinyl estradiol and 75 ug of desogestrel. It is noteworthy that desogestrel can be used in a concentration range of 50 to 200 $\mu$g. The product was administered for 12 months without any taking interval. The mode of action corresponded to that of example 1.

EXAMPLE 5

For contraceptive treatment use was made of a product containing per daily unit in tablet form 20 mg of tamoxifen and 2 mg of lutenyl. It is noteworthy that tamoxifen can be used in a concentration range of 10 to 50 mg and lutenyl in a concentration range of 1 to 5 mg. This product is preferably suitable for contraception in women with a family breast cancer risk. The product was administered for 12 months without any taking interval and the mode of action corresponded to that of example 1.

EXAMPLE 6

For contraceptive treatment use was made of a product containing per daily unit in tablet form 50 mg of raloxifen and 2.5 mg of medroxyprogesterone acetate (MPA). It is noteworthy that raloxifen can be used in a concentration range of 30 to 100 mg and medroxyprogesterone acetate in a concentration range of 2 to 10 mg. This combination is preferably suitable for women with a family breast cancer risk and young women who have suffered breast cancer. The product was administered for 12 months without any taking interval and the mode of action corresponded to that of example 1.

EXAMPLE 7

For contraceptive treatment use was made of an agent containing per daily unit in tablet form 10 $\mu$g of ethinyl estradiol and tibolone in a daily concentration of 2 mg. It is noteworthy that tibolone can be used with a concentration of 1 to 10 mg. The product was administered without any taking interval for 12 months and the mode of action corresponded to that of example 1.

EXAMPLE 8

For contraceptive treatment use was made of a product containing per daily unit in tablet form 10 $\mu$g of ethinyl estradiol and as the antiestrogen substance Ro486 in a concentration of 2.5 mg. It is noteworthy that R0486 can be

US 6,500,814 B1

7

used in a concentration range of 1 to 7.5 mg. The product was administered without any taking interval over a period of 12 months and the mode of action corresponded to that of example 1.

The features of the invention described in the description and claims can be essential individually and in random combination for the implementation of the different embodiments of the invention.

What is claimed is:

1. A method for hormonal contraception, comprising:

administering orally, transdermally or via depot to a mammal in need thereof, for a continuous and uninterrupted administration period of greater than 110 days, a contraceptive product comprising:

a gestagen selected from the group consisting of progesterone, chlormadinone acetate, norethisterone acetate, cyproterone acetate, desogestrel, and levonorgestrel; and

an estrogen selected from the group consisting of ethinyl estradiol, mestranol, estradiol, estriol, estrone, and estrane;

wherein said gestagen and said estrogen are present in said contraceptive product at unchanged dosages throughout the administration period, and when said estrogen is ethinyl estradiol, the dosage of ethinyl estradiol is not greater than 20 $\mu$g per day.

8

2. The method of hormonal contraception of claim 1 wherein the dosage of ethinyl estradiol is between 1 and 20 $\mu$g per day.

3. A method for continuous suppression of the menstrual cycle, comprising:

administering orally, transdermally or via depot to a mammal in need thereof, for a continuous and uninterrupted administration period of greater than 110 days, a contraceptive product comprising:

a gestagen selected from the group consisting of progesterone, chlormadinone acetate, northisterone acetate, cyproterone acetate, desogestrel, and levonorgestrel; and

an estrogen selected from the group consisting of ethinyl estradiol, mestranol, estradiol, estriol, estrone, and estrane;

wherein said gestagen and said estrogen are present in said contraceptive product at unchanged dosages throughout the administration period, and wherein the dosage of ethinyl estradiol is not greater than 20 $\mu$g per day, such that the menstrual cycle is continuously suppressed throughout the administration period.

*  *  *  *  *

# EXHIBIT   2

**CV Rolf-Dieter Hesch, apl. Prof. Dr. med. Prof. biol. (h.c.)**

Schulbesuch in Radolfzell
Abitur
Studium Mathematik, dann Medizin in Tübingen und Berlin
Staatsexamen und Ernennung zum Arzt in Berlin
Dissertation über das Thema "Osteoporose" - Forschung auf dem Gebiet der Osteoporose
Beginn der ärztlichen Ausbildung im Krankenhaus Bethesda Basel 1965
Ausbildung zum Nuklearmediziner in Göttingen, danach Ausbildung zum Internisten an der
Medizinischen Universitätsklinik Göttingen
Habilitation über Schilddrüsenhormonstoffwechsel an der Universität Göttingen
Forschung auf dem Gebiet Schilddrüsenhormone
1975 Wechsel an die medizinische Hochschule Hannover
16 Jahre Oberarzt und Leitende Funktion im Zentrum Innere Medizin der Medizinischen Hochschule
Hannover bis 1991
Über die ganze Zeit Leitung der endokrinologischen Poliklinik und parallel dazu internistisch klinische
Tätigkeit auf dem Gebiet der Gastroenterologie, Rheumatologie, Immunologie, Nephrologie,
Onkologie, Angiologie, Intensivmedizin (Leitung der Intensivstation über 2 Jahre) und allgemeine
Poliklinik
Von 1975 bis 1991 internistischer Konsilarius in der Hals- Nasen- Ohrenklinik der Medizinischen
Hochschule Hannover
Forschungstätigkeit in Frankreich, England und USA
Außerplanmäßiger Professor für Innere Medizin an der Med. Hochschule Hannover
Leiter des molekular-endokrinologischen Labors im Max Planck Institut in Hannover
Von August 1991 bis Ende 1993 freier Arzt (Internist, Endokrinologie/ Rheumatologie/Molekulare
Medizin) und Wissenschaftler in Konstanz
Honorarprofessor der Biologischen Fakultät der Universität Konstanz
Leiter des Steinbeis-Transferlabor für Biomolekulare Medizin an der Universität Konstanz bis
Dezember 2001
Freier Arzt bis Ende 2003.

Ab 1.1.2004 Medizinische Beratungspraxis (Medical Consulting)
Mövenweg 87
CH 8597 Landschlacht
Tel. 0041716711192
FAX 0041716711193
e-mail: dieter@hesch.ch
**Sekreteriat in Deutschland:**
Frau Sonja Schuster
Hizlerstr. 5
88662 Überlingen
Tel. + 49 (0) 7551 / 948694
Fax +49 (0) 7551 / 948695
e-mail: info@hesch.ch

**Forschungsgebiete**

Schilddrüsenerkrankungen
Das weibliche Hormonsystem
Osteoporose
Molekulare Medizin
Systemtheorie der biologischen Informationsübertragung
Evolutionsbiologie
Gründer der "Internationale Substitutionsschule Konstanz", Ausbildung in Gynäkologischer
Endokrinologie. Leitung Prof. Dr. Dr. Huber, Prof. Dr. Birkhäuser, Prof. Dr. Druckmann
Männermedizin; Gründer von HOMMAGE und der HOMMAGE-Academy zur Ausbildung
"Männerarzt"

**Bücherliste**

The low T3-Syndrome, Pergamon Press
Renale Osteopathie, Thieme Verlag
Peptides in Immunology, Pergamon Press
Endokrinologie in 2 Bänden, Textbuch + Handbuch, Urban & Schwarzenberg
Absolut Mann, Midena Verlag, Droemer Weltbild Verlag
Absolut Frau, Midena Verlag, Droemer Weltbild Verlag
Absolut Fit, Midena Verlag, Droemer Wedltbild Verlag



# TRANSLATOR CERTIFICATION

450 7th Ave I 6th Floor I New York, NY 10123 I Tel 212.643.8800 I Fax 212.643.0005 I www.mside.com

**Morningside** ! Translations

I, Terrence Coe, a translator fluent in the German and English languages, on behalf of Morningside Evaluations and Consulting, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

### MORNINGSIDE EVALUATIONS AND CONSULTING

_____
Signature of Translator

Date: June 27, 2008

Description of Documents Translated:

## Resume of Rolf-Dieter Hesch

Innovative Language Solutions Worldwide 

**CV Rolf-Dieter Hesch, apl. Prof. Dr. med. Prof. biol. (h.c.)**
Primary/Secondary Education in Radolfzell
Secondary School Leaving Certificate (*Abitur*)
Study of Mathematics, then Medicine in Tübingen and Berlin
Government examinations and certification as physician in Berlin
Dissertation on the topic "Osteoporosis" - Research on osteoporosis
Beginning of physician training in Bethesda Basel Hospital 1965
Training as Nuclear Medicine Physician in Göttingen, then training as Internist at
Medical University Clinic of Göttingen
Habilitation on Thyroid Hormone Metabolism at University of Göttingen
Research on thyroid hormones
1975 Change to Hannover Medical School
16 years as attending physician (*Oberarzt*) and executive position at the Center for Internal
Medicine at Hannover Medical School until 1991
Throughout this entire period, Director of Endocrinology Polyclinic and concurrently clinical
activity as Internist in Gastroenterology, Rheumatology, Immunology, Nephrology, Oncology,
Angiology, Intensive Care Medicine (Director of Intensive Care Unit for 2 years) and general
polyclinic activities
From 1975 to 1991, Consulting Internist (*Konsilarius*) in Ear-Nose-Throat Clinic at Hannover
Medical School
Research activity in France, England, and the USA
Adjunct Professor (*Außerplanmäßiger Professor*) for Internal Medicine at Hannover Medical
School
Director of Molecular-Endocrinology Laboratory at Max Planck Institute in Hannover
From August 1991 to the end of 1993, physician in private practice (*freier Arzt*) (Internist,
Endocrinology/ Rheumatology/Molecular Medicine) and researcher in Konstanz
Honorary Professor in Biology Faculty at University of Konstanz
Director of Steinbeis-Transfer Laboratory for Biomolecular Medicine at University of
Konstanz until December 2001
Physician in private practice until end of 2003.
Medical consulting practice as of January 1, 2004
Mövenweg 87
CH 8597 Landschlacht
Tel.: 0041716711192
Fax: 0041716711193
e-mail: dieter@hesch.ch
**Secretary in Germany:**
Ms. Sonja Schuster
Hizlerstr. 5
88662 Überlingen
Tel. + 49 (0) 7551 / 948694
Fax +49 (0) 7551 / 948695
e-mail: info@hesch.ch

**Fields of Research**
Diseases of the thyroid
The female hormone system
Osteoporosis
Molecular Medicine
Systems theory of biological information transfer
Evolutionary Biology
Founder of "International Substitution School of Konstanz," training in Gynecological
Endocrinology. Directors  Prof. Dr. Dr. Huber, Prof. Dr. Birkhäuser, Prof. Dr. Druckmann
Male Medicine (*Männermedizin*); Founder of HOMMAGE and the HOMMAGE Academy for
training as "Physician for Men" (*Männerarzt*)

**Publications**

The Low T3-Syndrome, Pergamon Press
Renal Osteopathy (*Renale Osteopathie*), Thieme Verlag
Peptides in Immunology, Pergamon Press
Endocrinology in 2 Volumes, Textbook and Handbook (*Endokrinologie in 2 Bänden,
Textbuch + Handbuch*), Urban & Schwarzenberg
The Absolute Man (*Absolut Mann*), Midena Verlag, Droemer Weltbild Verlag
The Absolute Woman (*Absolut Frau*), Midena Verlag, Droemer Weltbild Verlag
Absolutely Fit (*Absolut Fit*), Midena Verlag, Droemer Wedltbild Verlag

# EXHIBIT  3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WYETH,

               Plaintiff,

-against-

ROLF-DIETER HESCH,

               Defendant.



Civil Action No.

07 CV 967

COMPLAINT

RECEIVED
FEB 09 2007
U.S.D.C. S.D. N.Y.
CASHIERS

       Plaintiff Wyeth, by and through its attorneys, Arnold & Porter LLP, hereby states and alleges as follows:

### NATURE OF THE ACTION

       1.     This action arises from the failure of Defendant Dr. Rolf-Dieter Hesch ("Dr. Hesch") to comply with his obligations under a License and Assignment Agreement and Assignment of Invention agreement. Pursuant to these agreements, Dr. Hesch assigned his invention, and all related patent rights, to Wyeth and agreed to assist Wyeth in obtaining patents covering his invention. Wyeth paid Dr. Hesch substantial consideration for the rights to his invention. Dr. Hesch has refused to comply with his obligations under the agreements.

       2.     Through this action, Wyeth seeks an order requiring Dr. Hesch to perform under the parties' agreements and live up to his contractual obligations.

### PARTIES

       3.     Plaintiff Wyeth is a Delaware corporation with its principal place of business in Madison, New Jersey. Wyeth was formerly known as American Home Products Corporation, but changed its name to "Wyeth" on March 11, 2002.

4.      Defendant Dr. Rolf-Dieter Hesch is an individual and, upon information and belief, is a German citizen currently residing at Movenweg 87-89, CH-8597 Landschlacht, Switzerland.

## JURISDICTION AND VENUE

5.      The Court has subject-matter jurisdiction in this case pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      The Court has personal jurisdiction over the parties pursuant to Section 11.10 of the Patent License and Assignment Agreement, in which Dr. Hesch consented to the jurisdiction of this Court.

7.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## FACTS

8.      Wyeth and Dr. Hesch are parties to a License and Assignment Agreement dated March 1, 2002 (the "Agreement") under which Dr. Hesch agreed to assign to Wyeth his rights in an invention and all related patent rights.  Pursuant to the terms of the Agreement, Dr. Hesch executed an Assignment of Invention to Wyeth on May 26, 2003 (the "Assignment").  *See* Agreement § 2.2.  The Assignment explicitly transferred to Wyeth Dr. Hesch's entire right, title and interest in and to his invention and to specific patents and patent applications covering the invention.  *See* Assignment at 1.  The  Assignment also transferred to Wyeth, *inter alia*, the rights in any continuation patent applications that would subsequently be filed by Wyeth relating to the assigned invention and patents.  *Id.* at 1, 2.

9.      Under the terms of the Agreement and Assignment, Dr. Hesch is obligated to assist Wyeth in obtaining patent rights covering the assigned invention, including providing

2

documents and/or declarations concerning his invention. *See, e.g.,* Agreement §§ 3.1, 7.1, 11.11; Assignment at 2.

10. As consideration for the assignment of his invention and related patent rights, and the other promises and obligations undertaken by Dr. Hesch in the Agreement and Assignment, Wyeth paid Dr. Hesch several million dollars.

11. Dr. Hesch's above-described obligations to assist Wyeth in procuring patent rights to the assigned invention are continuing in nature and survived Wyeth's payments to Hesch.

12. Pursuant to the terms of the Agreement and Assignment, Wyeth has requested Dr. Hesch's assistance with regard to Wyeth's efforts to obtain patent rights covering the assigned invention.

13. Despite his clear and continuing obligation to assist Wyeth, Dr. Hesch has refused Wyeth's request.

14. Dr. Hesch's refusal to assist Wyeth significantly impairs the value of the rights assigned to Wyeth by Dr. Hesch.

<u>**Count 1**</u>

**BREACH OF CONTRACT**

15. Wyeth repeats and realleges paragraphs 1 through 14.

16. Wyeth has performed its obligations to Dr. Hesch.

17. Pursuant to the terms of the Agreement and Assignment, Wyeth has requested that Dr. Hesch assist Wyeth in obtaining patents covering the assigned invention by producing to Wyeth documents relating to the conception and reduction to practice of his invention and the prosecution of certain patents covering his invention. Wyeth has also requested, pursuant to the

3

terms of the Agreement and Assignment, that Dr. Hesch assist in the preparation of, and execute, a declaration concerning his invention.

18.    Under the terms of the Agreement and the Assignment, Dr. Hesch is required to produce the requested documentation and assist with the declaration to support Wyeth's efforts to obtain patents covering the assigned invention. Dr. Hesch is required to provide this assistance without further compensation from Wyeth. *See* Agreement § 4.3; Assignment at 2.

19.    Dr. Hesch breached the Agreement by refusing to provide the requested assistance.

20.    Wyeth has been damaged as a result of Dr. Hesch's breach. Dr. Hesch's refusal to assist Wyeth significantly impairs the value of the assigned invention rights

## PRAYER FOR RELIEF

**WHEREFORE,** Wyeth seeks a Court Order requiring specific performance wherein Dr. Hesch is required to comply with his contractual obligations and assist Wyeth in obtaining patents covering the assigned invention. Specifically, Wyeth requests a Court Order as follows:

1.    Ordering Dr. Hesch to produce to Wyeth all documents in his custody, possession or control, including documents currently in the possession of his attorney, Dr. Heinz Goddar, concerning the conception and reduction to practice of his invention and/or relating to the prosecution of patents covering the assigned invention;

2.    Ordering Dr. Hesch to assist in the preparation of, and to execute, a declaration concerning the conception and reduction to practice of his invention; and

3.    Such other and further relief as this Court deems just and proper.

4

Dated:  February 9, 2007

ARNOLD & PORTER LLP

By:_____
    Anand Agneshwar, Esq. (AA-4961)
    Pamela A. Miller, Esq. (PAM-9886)
    David G. Kleiman, Esq. (DK-7704)
    399 Park Avenue
    New York, New York  10022-4690
    Tel:  (212) 715-1000
    Fax:  (212) 715-1399

*Counsel for Plaintiff Wyeth*

5

# EXHIBIT  4

# Patent Assignment Abstract of Title

**NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.**

**Total Assignments: 1**

**Patent #:** 6500814       **Issue Dt:** 12/31/2002     **Application #:** 09508648       **Filing Dt:** 06/05/2000

**Inventor:** ROLF-DIETER HESCH

**Title:** HORMONAL CONTRACEPTIVE

**Assignment: 1**

**Reel/Frame:** 014337 / 0871          **Recorded:** 08/04/2003               **Pages:** 4

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST (SEE DOCUMENT FOR DETAILS).

**Assignor:** HESCH, ROLF-DIETER, PROFESSOR DR.        **Exec Dt:** 05/26/2003

**Assignee:** WYETH
FIVE GIRALDA FARMS
MADISON, NEW JERSEY 07940

**Correspondent:** WYETH
ARNOLD S. MILOWSKY
PATENT LAW DEPARTMENT
FIVE GIRALDA FARMS
MADISON, NJ 07940

Search Results as of: 06/19/2008 11:57 AM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: February 22, 2007 v.2.0

08-06-2003

| | | Docket No:  **AM101403** |
| | | Patent |

||||||||||||||| |||| ||||||||| |||| ||| |||||
102517743

Reco
Patents Only

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

To the Commissioner for Patents:  Please record the attached original documents or copy thereof.

1. Submission Type
   ☒ New
   ☐ Resubmission (Non-Recordation)
     Document ID #
   ☐ Correction of PTO Error
     Reel #          Frame #
   ☐ Corrective Document
     Reel #          Frame #

*8-4-03*

2. Conveyance Type:
   ☒ Assignment          ☐ License          ☐ Security Agreement
   ☐ Other               ☐ Change of Name   ☐ Merger

3. Conveying party(ies):
   **Professor Dr. Rolf-Dieter HESCH**

   Additional name(s) of conveying party(ies) attached:
   ☐ Yes
   ☒ No

   Execution Date:  **May 26, 2003**

4. Receiving party(ies):

   **Wyeth**
   Five Giralda Farms
   Madison, New Jersey 07940

   Additional name(s) and address(es) attached:
   ☐ Yes
   ☒ No

5. Correspondent address:

   Arnold S. Milowsky
   Wyeth
   Patent Law Department
   Five Giralda Farms
   Madison, NJ 07940
   Tel. No. (610) 902-2635

08/06/2003 BTDH11   00000290 011425   10299628
01 FC:8021        80.00 DA

AssignmentRecordationCover.dot – Rev 4/03        Page 1 of 2        Recordation Form Cover Sheet

**PATENT**
**REEL: 014337 FRAME: 0871**

Docket No: **AM101403**
Patent

6. ☐ If this document is being filed together with a new application, the execution date of the application is

Application number(s) or patent number(s):

☒ Patent Application Number(s): **10/299,628 filed on November 19, 2002   and**
☒ Patent Number(s): **6,500,814 issued on December 31, 2002**
☐ Patent Cooperation Treaty (PCT) Application Number(s) (only if a U.S. Application Number has not been assigned):

Additional numbers attached:
☐ Yes
☒ No

7. Pages: Enter the total number of pages of the attached conveyance document including any attachments: **2**

8. Total number of properties involved: **2**

9. Total Fee (37 CFR 3.41): **$80.00**
   ☐ Enclosed
   ☒ Authorized to be charged to deposit account.

10. Deposit Account Number: 01-1425
    Authorization is given to charge any additional fees to deposit account.
    (Attach duplicate copy of this page if paying by deposit account).

11. Statement and Signature:
    To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document. Charges to deposit account are authorized, as indicated herein.

_____August 4, 2003_____
Date

Arnold S. Milowsky
Attorney for Assignee
Reg. No. 35,288

---

**CERTIFICATE OF MAILING 37 CFR §1.10**

I hereby certify that this paper and the documents referred to as enclosed therein are being deposited with the United States Postal Service on the date written below in an envelope as "Express Mail Post Office to Addressee" Mailing Label Number EV 212534878 US addressed to Mail Stop Assignment Recordation Services, Director of the US Patent and Trademark Office, P. O. Box 1450, Alexandria, VA 22313-1450.

_____August 4, 2003_____
Date

Judith A. Johnston

---

**PATENT**
**REEL: 014337 FRAME: 0872**

PATENT

For: ☒ U.S. and/or ☒ Foreign Rights
For: ☒ U.S. Application or ☒ U.S. Patent

<u>Assignment of Invention</u>

    In acknowledgment of the payment by ASSIGNEE to ASSIGNOR of good and valuable consideration,

ASSIGNOR:

(1)    Full Name of Inventor:  Professor Dr. Rolf-Dieter Hesch
        Residence:  Alpsteinweg 8, D-78464 Konstanz, Germany
        Citizenship:  Germany

hereby sells, assigns and transfers to ASSIGNEE:

        Wyeth
        Five Giralda Farms
        Madison, NJ   07940

and the successors, assigns and legal representatives of the ASSIGNEE his entire right, title and interest for the United States and its territorial possessions and in all foreign countries, including all rights to claim priority, in and to the invention entitled:

**HORMONAL CONTRACEPTIVE**

and which is found in

    (a)    ☒    U.S. application Application No. 10/299,628 filed on November 19, 2002, which is a continuation of

    (b)    ☒    U.S. Patent No. 6,500,814 issued on December 31, 2002

            [Check (c) if foreign application(s) is also being assigned]

    (c)    ☒    and any legal equivalent thereof in a foreign country, including,
            European Patent No. 1 011 682
            European Patent Application No. 03 002 576.1
            European Patent Application No. 03 002 577.9
            German Patent No. 197 39 916

including the right to claim priority, including any and all improvements disclosed therein, and in and to all Letters Patent to be obtained for said invention by the above application or any subsequently filed provisional, nonprovisional, continuation, divisional, renewal, extension, or substitute thereof, and as to Letters Patent any reissue or re-examination thereof.

    ASSIGNOR hereby covenants that no assignment, sale, agreement or encumbrance has been or will be made or entered into which would conflict with this assignment.

**PATENT**
**REEL: 014337 FRAME: 0873**

PATENT

ASSIGNOR authorizes ASSIGNEE to make applications for and to receive Letters Patent for said invention in any of said countries in its own name, or in ASSIGNOR'S name, at its election.

ASSIGNOR covenants and agrees to execute or procure any further necessary assurance of the title to said invention and any Letters Patent which may issue therefor and to, at any time, upon the request and at the expense of ASSIGNEE deliver any testimony in any interference, litigation or proceeding related thereto and execute all papers that may be necessary or desirable to perfect the title to said invention or any Letters Patent which may be granted therefor in ASSIGNEE, its successors, assigns or other legal representatives, and that to, at any time, upon the request and at the expense of ASSIGNEE execute any continuations, continuations-in-part, divisional, renewal or substitute thereof, and as to Letters Patent and reissue or re-examination thereof, or any other additional applications for Letters Patent for said invention or any part or parts thereof, all of which applications and any Letters Patent issuing thereon are hereby assigned to ASSIGNEE, and will make all rightful oaths or declarations, and do all lawful acts requisite for procuring the same therein, without further compensation, but at the expense of ASSIGNEE, its successors, assigns or other legal representatives.

ASSIGNOR authorizes and requests the Commissioner of Patents to issue any and all Letters Patent of the United States for said invention, resulting from any of the aforesaid applications to its ASSIGNEE.

_____    21.1.13
Professor Dr. Rolf-Dieter Hesch    L.S.    Date

TWO WITNESSES:

_____
Name: Rolf GEHRICER

_____
Name: Virginia Demuro

PATENT
RECORDED: 08/04/2003    REEL: 014337 FRAME: 0874