# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WYETH,

       *Plaintiff,*

  v.

WATSON LABORATORIES, INC. *and*
WATSON PHARMACEUTICALS, INC.,
     *Defendants.*

Civil Action No. 08-cv-00145-JJF

**REDACTED PUBLIC VERSION**

---

# EXHIBITS TO DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO WYETH'S MOTION TO DISQUALIFY KENYON & KENYON LLP AND AMY HULINA AS COUNSEL FOR DEFENDANTS
## VOLUME IV OF VII

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
Amy Arnott Quinlan (I.D. #3021)
MORRIS JAMES LLP
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801-1494
Tel: (302) 888-6960
mmatterer@morrisjames.com

*Attorneys for Defendants*

OF COUNSEL
John W. Bateman
C. Kyle Musgrove
Nicholas J. Nowak
Thomas M. Huff
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
(202) 220-4200

Originally filed: June 30, 2008
Public version filed: July 9, 2008

# EXHIBIT   15

05/02 '04 15:54 FAX +31412650592    NV ORGANON PAT DEPT.    → EPO MÜNCHEN    ☑003



**AKZO NOBEL**                                        **Organon**

European Patent Office
Erhardstraße 27
D-80298 Munchen 2
Germany

| Your reference | Our reference | Direct line | Oss, |
|---|---|---|---|
| | 00OP.265 | tel.: +31 412 66 5426 | February 5, 2004 |
| | | fax: +31 412 65 0592 | |

**NOTICE OF OPPOSITION (Article 99 and Rule 55 EPC)**

Herewith Akzo Nobel N.V., Velperweg 76, 6824 BM Arnhem, the
Netherlands gives notice of opposition to:

**European Patent No. 1011682 B1**          98954135·4
**Proprietor: Wyeth Pharmaceuticals**
**Title: Hormonal contraceptive**

The opponent is represented under G.A. 59 by:

Leon van den Broek
P.O.Box 20
NL-5340 BH Oss
The Netherlands

You are hereby authorized to charge the opposition fee to our deposit
account no. 28090012.

We request that the above entire patent be revoked on the grounds laid
down in Article 100(a) and 100(b) EPC, as supported by the indication of
facts, evidence and arguments given below.

As a precautionary measure, oral proceedings are requested should the
opposition division not intend to comply with the above request.

With respect

Leon van den Broek

(Organon)

Global Patent Department
N.V. Organon
P.O. Box 20
Weth. van Eschstraat 1
5340 BH Oss
The Netherlands
Tel.: +31 412 666380
Telefax +31 412 650592
E-mail
patent@organon.com

1

C:\Tessa Organon\opposition Wyeth EP 1011682\notice of opposition.doc

Empf.zeit:05/02/2004 14:52                    Empf.nr.:009 P.003

05/02 '04 15:54 FAX +31412650592        NV ORGANON PAT DEPT.        → EPO MÜNCHEN        ☒004

## INDICATION OF FACTS, EVIDENCE AND ARGUMENTS

The following documents are cited and relied upon by the Opponent:

D1:    'Contraception a User's Handbook', Szarewski & Guillebaud (1994), Oxford
       University Press, pages 46, 53-54 and 84-87
D2:    EP 911029 B1
D3:    Omtzigt et al. (1996), European Journal of Contraception and Reproductive
       Health Care 1, 155
D4:    Cachrimanidou et al. (1993), Contraception 48, 205-216
D5:    Kovacs, G.T. (1994), The British Journal of Family Planning 19: 274-275
D6:    Vollebregt et al. (1985), Adv. Contraception 1, 207
D7     Sulak et al. (February 1997), Obstetrics & Gynecology 89: 179-182

**The claimed invention**

The claimed invention has a priority date of September 11, 1997 and relates to an
extended contraceptive regimen. For the full wording of the claims, reference is made
to claims 1-7.

**Non-patentability pursuant to Article 100(a) EPC**

### I.     Lack of novelty of claim 1

Independent claim 1 of the subject invention claims a use which comprises the four
essential features of :

- a combination of a single gestogen[1] and a single estrogen[2] as sole hormone
  components
- for the manufacture of a contraceptive means for continuously inhibiting
  ovulation and suppressing the menstrual cycle
- by uninterrupted
- oral, transdermal or depot administration

Dependent claims 2-7 further particularize the identity and the amount of the
estrogen, the manner of administration, the duration of administration and indications
other than contraception.

---

[1] *selected from the group consisting of progesterone, chlormadinone acetate, norethisterone acetate,
cyproterone acetate, desogestrel, levonorgestrel, antigestagens, hormone analogs with gestagen or
antigestagen effect, and hormone compounds which release at least one gestagen quickly after
administration*

[2] *selected from the group consisting of synthetic estrogen, namely ethynyl estradiol used in a daily
dosage of 1-20 µg, mestranol, and hormone compounds which quickly release at least one synthetic
estrogen after administration, biogenous estrogens, namely estradiol, estron, estran and hormone
compounds which quickly release at least one biogenous estrogen after administration*

2                                    1

Claim 1 does not limit the dosages of the hormones used, apart from the dosage of one of the synthetic estrogens listed, i.e. ethinyl estradiol, which cannot be higher than 20 µg.

Claim 1 does not limit the duration of administration to any specific period, but rather uses the term "uninterrupted". "Uninterrupted" is defined in the specification as meaning "uninterrupted over the use period"(column 5, 0020). The length of the "use period" is not specified. Therefore, "uninterrupted" could mean for 1 cycle (i.e. 28 days) but it may also mean for 2, 3, 4 or an infinite amount of cycles.

### D1 anticipates claim 1

D1 discloses all elements of claim 1:

On pages 46, 53 and 54 of D1, the following two commercially available oral contraceptives (OCs) are mentioned:

Loestrin 20 (20 µg ethinyl estradiol + 1 mg norethisterone acetate)
Mercilon (20 µg ethinyl estradiol + 150 µg desogestrel)

Both norethisterone acetate as well as desogestrel are listed in claim 1 as possible gestagens; ethinyl estradiol up to 20 µg is listed as a possible estrogen in claim 1.

Thus, claim 1 e.g. claims the use of commercially available OC's such as Loestrin 20 and Mercilon for uninterrupted oral administration!

Such regimens of uninterrupted oral administration are plainly recognizable by a person of average skill in the art as an extended regimen, e.g. the tri-cycle regimen, which was well known prior to September 11, 1997 for example from pages 84-87 of D1. Particularly, the sections entitled "Moving periods" on pages 84-86, "Why have withdrawal bleed at all?" on pages 86-87 and "Tri-cycling" on page 87 of D1. These pages of D1 confirm that bleeding can be deferred for as long as desired by simply taking commercially available OC pills for an extended period without a break. Tri-cycling is just a specific, well-known example of a convenient regimen that extends the monthly regimen of commercially available OC pills. Tri-cycling means taking three (i.e. 63 days) or four (i.e. 84 days) packages of OC pills in a row, i.e. uninterruptedly, prior to having a pill-free week.

Consequently, claim 1 can clearly be seen to be directed to a method which is simply extending the normal monthly OC pill regimen. Plainly, the Patentee cannot be permitted at a later date to claim and protect extended OC regimens that the world was already well aware of and freely using prior to the claimed priority date.

| Elements of claim 1 | D1 |
|---|---|
| a combination of a single gestogen and a single estrogen as sole hormone components | + (i.e. Mercilon, Loestrin 20) |
| for the manufacture of a contraceptive means for continuously inhibiting ovulation and suppressing the menstrual | + (i.e. Mercilon, Loestrin 20) |

3

2

05/02 '04 15:55 FAX +31412650592    NV ORGANON PAT DEPT.    → EPO MÜNCHEN    ☒006

| cycle | |
|---|---|
| By uninterrupted | + (uninterrupted as defined can mean one cycle as in e.g. Mercilon or can mean more than one cycle (see pages 84-87) |
| oral, transdermal or depot administration | + (Mercilon is an oral contraceptive) |

Thus, D1 alone discloses all elements of claim 1 and thus completely anticipates the claimed invention of claim 1. Therefore, the subject matter of claim 1 is not novel.

*D2 anticipates claim 1*

D2 discloses all elements of claim 1:

D2 discloses the use of *a progestin* (i.e. gestagen) and *an estrogen* for *oral contraceptive* use *uninterrupted* by a hormone-free period for 60-110 consecutive days (see page 3, lines 29-33). The term "uninterrupted" in opposed claim 1 also encompasses 60-110 days as in D2.

| Elements of claim 1 | D2 |
|---|---|
| a combination of a single gestogen and a single estrogen as sole hormone components | + (page 3, line 29 *"estrogen-progestin combination"*; page 29, lines 50-51 recite the preferred estrogen as 10-20 µg ethinyl estradiol and preferred gestogen as norethindrone acetate) |
| for the manufacture of a contraceptive means for continuously inhibiting ovulation and suppressing the menstrual cycle | + (page 3, line 30 *"contraceptive use"*) |
| By uninterrupted | + (page 3, line 46 uninterrupted *"for 60-110 consecutive days"*) |
| oral, transdermal or depot administration | + (page 29, line 30 *"oral contraceptive use"*) |

*D3 anticipates claim 1*

D3 discloses all elements of claim 1:

D3 discloses the use of a single progestin (desogestrel) and a single estrogen (20 mcg ethinyl estradiol) for oral contraceptive use uninterrupted by a hormone-free period for 42 days. The term "uninterrupted" in opposed claim 1 also encompasses 42 days as in D3.

*II.    Lack of novelty of claims 2-3*

Dependent **claim 2** of the opposed patent claims "The use of patent claim 1, characterized in that the estrogen ethinyl estradiol is used in a daily dosage of 5 to 10 µg.

4

3

As discussed above, D2 discloses all elements of claim 1. Claim 2 merely limits claim 1 in that as the estrogen ethinyl estradiol is used in a daily dosage of 5 to 10 µg. D2, page 3, line 48 discloses "equivalent to 5-35 mcg ethinyl estradiol", i.e. this includes the range 5-10 µg ethinyl estradiol. Moreover, the title of D2 reads "Ultra-low dose oral contraceptives...". Thus, D2 alone discloses all elements of dependent claim 2. Therefore the subject matter of claim 2 is not novel.

Dependent **claim 3** of the opposed patent claims "The use of claim 2, wherein the contraceptive means is intended for oral administration".

As discussed above, D2 discloses all elements of claim 2. Claim 3 merely limits claim 2 in that the contraceptive means is used for oral administration. D2, page 3, line 30 discloses "for oral contraceptive use". Thus, D2 alone discloses all elements of dependent claim 3. Therefore the subject matter of claim 3 is not novel.

### III.   Lack of Inventive Step

A use of a single gestagen and a single estrogen for the manufacture of a contraceptive means by uninterrupted oral, transdermal or depot administration as claimed in the opposed patent was easily derivable for a person skilled in the art at the time the invention was made from *inter alia* documents D1-D7.

The arguments above with respect to lack of novelty apply here as well with respect to inventive step. Therefore, the subject matter of claims 1-3 of the opposed patent are considered obvious in view of D1 and D2 and D3 each taken alone or in combination.

Exemplifying the lack of inventive step with D1 alone: D1, which is a handbook (textbook), can be considered as the closest prior art. The technical "problem" to be solved (see opposed patent page 3, column 4, [0012], lines 3-9) is to provide a hormonal contraceptive product, which ensures high contraceptive safety or reliability and prevents inter-menstrual bleeding. There is also to be a further reduction in the side effects otherwise observed in hormonal contraceptive products. The "solution" as claimed in claims 1-3 of the opposed patent would have been obvious to a person skilled in the art because of pages 46, 53 and 54 of D1 in view of pages 84-87 of D1. This is explained above in detail under sections I and II with respect to lack of novelty.

Similarly, when taking D2 and/or D3 as the closest prior art, also then the technical "problem" solved by the subject invention was obvious to the skilled person as detailed above under sections I and II with respect to lack of novelty.

In addition to the above arguments with respect to novelty and inventive step, the following documents also negate the inventive step of claims 1-7:

D4 in view of D1 and/or D2 renders claim 1 obvious:

D4 discloses the use of a combination of a single estrogen and a single progestin namely (30 mcg) ethynyl estradiol (EE) and (150 mcg) desogestrel (see abstract)

5

4

uninterruptedly for 9 consecutive weeks, i.e. 63 days (see abstract) for oral contraception (see abstract). As discussed above D1 and D2 disclose low dose OCs such as Mercilon and Loestrin 20 which contain only 20 µg ethinyl estradiol and which were commercially available long before the priority date of the opposed patent. Thus, D4 in view of D1 or D2 render claim 1 obvious.

The same holds for claims 2 and 3: The limitation to 5-10 µg ethynyl estradiol (claim 2) for oral administration (claim 3) is obvious over D4 in view of D2 which, as discussed above in detail, discloses ultra-low dose oral contraceptives wherein the ethinyl estradiol may range from 5-35 mcg.

D5 in view of D1 and/or D2 renders claim 1 obvious:
D5 discloses a use of a combination of an estrogen and a progestin (Nordette®) (see page 274, right column), namely (30 mcg) ethinyl estradiol (EE) and (150 mcg) levonorgestrel (see page 274, right column) uninterruptedly for 12 consecutive weeks, i.e. 84 days (see page 274, summary) for oral contraception. As discussed above D1 and D2 disclose low dose OCs such as Mercilon and Loestrin 20 which contain only 20 µg ethinyl estradiol and which were commercially available long before the priority date of the opposed patent. Thus, D5 in view of D1 and/or D2 render claim 1 obvious.

The same holds for claims 2 and 3: The limitation to 5-10 µg ethynyl estradiol (claim 2) for oral administration (claim 3) is obvious over D5 in view of D2 which, as discussed above in detail, discloses ultra-low dose oral contraceptives wherein the ethinyl estradiol may range from 5-35 mcg.

D6 in view of D1 and/or D2 renders claim 1 obvious:
D6 discloses a use of a combination of an estrogen (30 mcg ethynyl estradiol) and a progestin (150 mcg desogestrel or 150 mcg levonorgestrel) uninterruptedly for two pill cycles, i.e. 42 days for oral contraception. As discussed above D1 and D2 disclose low dose OCs such as Mercilon and Loestrin 20 which contain only 20 µg ethinyl estradiol and which were commercially available long before the priority date of the opposed patent. Thus, D6 in view of D1 and/or D2 render claim 1 obvious.

The same holds for claims 2 and 3: The limitation to 5-10 µg ethynyl estradiol (claim 2) for oral administration (claim 3) is obvious over D6 in view of D2 which, as discussed above in detail, discloses ultra-low dose oral contraceptives wherein the ethinyl estradiol may range from 5-35 mcg.

D7 in view of any one of any one of D1-D5 renders claim 7 obvious:

Claim 7 recites "The use of the hormone components of any of the claims 1-5 for the manufacture of a means for the treatment of the premenstrual syndrom". Claim 7 merely limits claims 1-5 in that the hormone components are to be used to treat premenstrual syndrom. As discussed above in detail, D1 and D2 and D3 alone and in combination render claims 1-3 obvious. D7 discloses the use of extended contraceptive regimens (page 180, Table 1 and references 1 and 4 on page 182 even refer to D4 and D5) for the treatment of premenstrual syndrome (PMS, see Table 2, page 181 and page 182 *discussion*). Thus, D7 in view of any one of D1-D5 renders claim 7 obvious.

6

05/02 '04 15:57 FAX +31412650592      NV ORGANON PAT DEPT.      → EPO MÜNCHEN      ☑009

## Insufficient disclosure of the invention, Art 100(b)EPC

There is insufficient disclosure in the description of the subject opposed patent to support the scope of claims 1-7.

The contraceptive treatments described in Examples 1-8 all relate to uninterrupted regimens of 9 or 12 months. However, claims 1-3 are not limited to such a time span, but rather recite "uninterrupted" which could mean anything within a "use period" from one day to an infinite number of days.

The grant of the subject opposed patent was *inter alia* the result of the statements of the applicant that there is no hormone free period in the claimed contraceptive regime. A question that arises when studying the examples of the subject application which all relate to a use period of 9 (Example 1) or 12 months (Examples 2-8), is what happens after these 9 or 12 months? Is there no hormone-free period then? In any case, there is no experimental support for uninterrupted administration apart from uninterrupted administration for 9 months or uninterrupted administration for 12 months.

Furthermore, the highest dose of ethinyl estradiol described in the examples is 10 μg (Examples 7 and 8). Claim 1 however recites a possible range of 1-20 μg ethinyl estradiol. This range is not supported by the contraceptive treatments in the examples.

Moreover, the estrogens listed in claim 1 (apart from ethinyl estradiol) and gestagens listed in claim 1 have no dosage limitation whatsoever. There is no experimental support for such a wide range of dosage possibilities.

In addition, none of the examples relate to the prophylaxis of osteoporosis as claimed in claim 6 nor to the treatment of premenstrual syndrome as claimed in claim 7. Therefore, there is no experimental support showing that the claimed combination of hormonal components is effective for the prophylaxis of osteoporosis or the treatment of premenstrual syndrome. All experimental examples relate to contraception only.

Moreover, claims 6 and 7 are dependent on claims 1-5 which relate to the use of a combination of hormone components for the manufacture of a contraceptive. The question thus arises whether the prophylaxis of osteoporosis as claimed in claim 6 and the treatment of premenstrual syndrome in claim 7 are respectively prophylaxis and treatment in conjunction with contraception? If this is the case, there is no description nor experimental support for the use of the subject hormonal components for the manufacture of a contraceptive means which is also prophylactic for osteoporosis nor is there support for the use of the subject hormonal components for the manufacture of a contraceptive means which is also a treatment for premenstrual syndrome.

Enclosures (all documents cited are enclosed in duplicate with the confirmation of this notice).

7

6

Wyeth Pharmaceuticals
Huntercombe Lane South
Taplow, Maidenhead
Berkshire, SL6 0PH

Patents & Trade Marks Department
Tel: +44 (0)1628 604377
Fax: +44 (0)1628 799038

# Wyeth

SKM/es
13 December 2004

**BY FAX**

The European Patent Office
D-80298
MUNCHEN
Germany

Dear Sirs

**European Patent No. 1 011 682**
**Proprietor: Wyeth**
**Our Ref: AM-101403**

We refer to the Communication of Notices of Opposition (R.57(1) EPC) dated 2 April 2004. The current extended date by which to respond to the opposition is 13 December 2004.

We enclose herewith the Proprietor's response which deals with all the objections raised by the Opponent. We enclose a faxed copy of the Declaration of Professor Guillebaud, an original version will follow shortly.

The Proprietor hereby requests maintenance of the patent on the basis of the claims as granted. If the Opposition Division considers granting any of the Opponent's requests, we request oral proceedings.

A form 1037 is enclosed with the confirmation copy of this letter for acknowledgement of receipt.

Yours faithfully

S K Mannion (Dr)
European Patent Attorney (GA 45314)

Encs.
Response to Notices of Opposition
Documents D8 to D14



John Wyeth & Brother Limited
Registered in England No. 135537
Registered Office: Huntercombe Lane South
Taplow, Maidenhead, Berkshire, SL6 0PH

Incorporating:  Wyeth Research

- 2 -

**European Patent EP-B 1 011 682**
**Proprietor's response to Notices of Opposition**

1.    Documents cited in the Opposition

1.1    Documents D1, D2 and D3 are cited for novelty purposes and documents D1 to D7 are cited by the Opponent for inventive step purposes. The Opposition Division is requested to note that D2 was unpublished at the priority date of the Patent and consequently is an Article 54(3) EPC document and not available for inventive step considerations.

1.2    New documents are enclosed with this response as follows :

D8: the Declaration of Dr. Anne Szarewski filed by Schering A.G. in their Opposition to EP 911 029 which was cited by the Opponents in this opposition as document D2.

D9: Continuous Combination Oral Contraceptive Pills to Eliminate Withdrawal Bleeding: A Randomized Trial. Leslie Miller M.D. and James P. Hughes, PhD. Obstetrics & Gynecology. Vol. 101, No. 4, April 2003.

D10: Contraception - Your questions answered. John Guillebaud MA FRCSE FRCOG, 2nd Edition, 1993, published by Churchill Livingstone. Pages 108-111 and pages 222-223.

D11: Loudon N, Foxwell M, Potts DM, Guild AL, Short RV. Acceptability of an oral contraceptive that reduces the frequency of menstruation: the tricycle regimen. BMJ 1977; 2:487-490.

D12: A consensus statement: enhancing patient compliance and oral contraceptive efficacy. The British Journal of Family Planning 1993; 18: p 126-129.

D13: Declaration of Professor John Guillebaud dated 12th December 2004.

D14: Seasonale® patient brochure.

9

- 3 -

## 2.    Subject Matter of the Invention

The invention relates to a specific combination of estrogen and progestogen to be administered orally, transdermally, or as a depot in an uninterrupted manner to provide continuous inhibition of ovulation and suppression of the menstrual cycle, prophylaxis against osteoporosis and treatment of pre-menstrual symptoms.

## 3.    Article 83 EPC – Sufficiency of Disclosure

3.1    The opponent states, without submitting any experimental or documentary evidence at least, that there is insufficient disclosure in the Patent to support the scope of claims 1-7. We disagree.

3.2    It is well established in the case law of the Technical Boards of Appeal of the EPO that in opposition proceedings the burden of proof to establish a lack of a sufficient (or enabling) disclosure is on the opponent (see, amongst many other examples, decision T 182/89 - "Extent of Opposition/Sumitomo"; not published in the O.J. EPO).

3.3    Furthermore, in order to establish a lack of sufficiency, there must be "serious doubts, substantiated by verifiable facts" that the claimed invention cannot be carried out by a person skilled in the art studying the patent and using his/her common general knowledge ("Onco-Mouse/Harvard", T 19/90, O.J. EPO 1990 476; cf. item 3.3 of the Reasons for the Decision). Thus, it does not suffice for an opponent to merely allege that an invention is insufficiently disclosed. Convincing evidence (based, for example, on experimental results) has to be submitted demonstrating that a skilled reader actually would not be enabled to practice the claimed invention (see T 182/89 cited above; see also T 242/92 - "Invasive Microorganisms/Leland Stanford Junior University", not published in the O.J. EPO).

3.4    The above high standard of evidence required to establish a lack of sufficiency of disclosure has been confirmed by decision T 998/97 - "Perfumed Products/Quest" (not published in the O.J. EPO), wherein the Board competent in that case held that:

> "merely to allege in the opposition statement [...] that "a nearly unlimited number of compounds" has to be tested to find antimicrobially effective perfume

- 4 -

ingredients and that, in carrying out the challenge test according to the patent in suit, "failures" (detection of ineffective ingredients) are the rule and "successes" (detection of effective ingredients) the exception, does not, in the absence of any evidence in support of these allegations, discharge the burden of proof." (Item 6.1 of the Reasons for the Decision.)

We submit that, in the present case, the opponents have utterly failed to meet any of the above requirements for establishing a case of insufficiency.

3.5    The Opponent also suggests that the range of dosages or the additional indications (i.e., those in addition to contraception) envisaged by the claims were not supported by the Examples in the opposed Patent. However, this submission, which merely amounts to (in our view unfounded) criticism of the breadth of the claims, is not supported by any experimental or documentary evidence, or at least plausible arguments, that would provide a reason as to why, despite the various Examples provided in the opposed Patent, the claimed invention could not be put into practice in connection with longer administration periods and the indications mentioned in claims 6 and 7. It follows that the Opponent's submissions regarding the alleged lack of sufficiency of disclosure are obviously of the type regularly criticized and rejected by the EPO Boards of Appeal (see, for example, the decisions cited above).

3.6    As further proof that the invention does work, we enclose herewith document D9 reporting the results of a randomised trial to compare the bleeding profiles of a traditional 28 day oral contraceptive pill cycle with daily continuous administration for 12 months. The pill contained 20 μg of ethinyl estradiol (EE) and 100 μg levonorgestrel (LNG) for 12 study cycles (336 days). The results show that the subjects taking the continuous administration resulted in significantly fewer bleeding days (see, e.g., the abstract of D9), which provides further evidence of the workability (and, by the way, the surprising advantages) of the claimed invention.

3.7    The Opponent implies at page 6 of the Notice of Opposition that the invention could not be put into practice with administration periods longer than 12 months, but fail to provide any explanation as to why extending the administration period to periods longer than those exemplified would be a problem. D9 shows that there is absolutely no reason to stop the continuous uninterrupted administration at 12 months, there being no contraindications at that time. Since the whole context of the invention is to provide a

- 5 -

contraceptive regimen which the woman may use for 10 years or so, the person skilled in this art understands that examples demonstrating administration periods of 9 and 12 months are illustrative of the long term acceptability of the regimen.

**4.**    <u>Article 54 EPC - Novelty</u>

**4.1**    The Opponent has based its novelty objections entirely on its interpretation of the word "uninterrupted" in claim 1. Referring to the definition in the specification of the opposed Patent the Opponent submits that "uninterrupted" means "uninterrupted over the use period" ("über den Anwendungszeitraum ununterbrochen[..]") and concludes that, since the use period is not further defined in this definition, the term *"uninterrupted" could mean for 1 cycle (i.e., 28 days) but it may also mean for 2, 3, 4, or an infinite amount of cycles*. We disagree with this construction of claim 1.

**4.2**    First of all, we submit the Opponent is mistaken to suggest that the use period over which the uninterrupted administration according to claim 1 is to occur is not defined in the description, and could be just 1 cycle of 28 days or even less.

The first three sentences of paragraph 20 in column 5 of the granted Patent read as follows:

> *"Unter kontinuierlicher Verabreichung wird hierin eine über den Anwendungszeitraum ununterbrochene Verabreichung verstanden, bei der keine bezüglich der Hormonkomponenten einnahmefreien Intervalle vorgesehen sind. Dies bedeutet auch, daß eine Unterbrechung der Verabreichung des Mittels durch Gabe von Placebos anstelle des hormonalen Mittels nicht vorgesehen ist. In der Folge kommt es über die gesamte, typischerweise die Zeitspanne mehrerer Monate bis Jahre umfassenden Verabreichungsdauer zu keinen Veränderungen der grundsätzlichen Zusammensetzung der Hormonkomponenten."*

<u>(Translation:</u> Continuous administration is herein understood to mean an administration uninterrupted over the period of use during which there are no administration-free intervals in respect of the hormonal component. This also means that an interruption of the administration of the product by administering

12

- 6 -

placebos in place of the hormonal product is not provided for. Thus, over the entire administration period which typically lasts several months to years there are no changes to the fundamental composition of the hormonal components.)

4.3    It is clear from the above passage that uninterrupted is "uninterrupted over the period of use" meaning the entire period of administration of the product, which according to the Patent typically lasts several months to years. According to this passage, it is this entire period of use during which administration is "uninterrupted". This obviously means there is no break in the administration of the product for the entire period that the product is in use. Therefore, continuous or uninterrupted administration does not involve any "cycles" whatsoever.

4.4    In fact, a consideration of the plain literal meaning of the above term demonstrates the point. The word "interrupted" (from which "uninterrupted" is derived) is composed of two words; "inter" (corresponding to the German "unter") means "between", and "rupted" or "rupture" (corresponding to the German "brochen" or "Bruch") means "broken" or "break". Thus, "interrupted" means breaks between two phases whereas "uninterrupted" means no breaks between phases. In the context of the present invention this means there are no breaks between phases or cycles. In fact, there are no cycles at all. However, the Opponent simply ignores this meaning of the claim feature requiring "uninterrupted" administration and suggests that situations where administration is discontinued for a short period but then restarted in a scheduled manner amounted to uninterrupted administration according to the Patent. This is obviously an illogical construction of the term "uninterrupted", both in respect of the plain literal meaning of this term as well as the context and teaching of the opposed Patent.

4.5    So the principal flaw of the Opponent's claim construction is that it exclusively focuses on their assertion that the meaning of the term "use period" ("Anwendungszeitraum") is not provided whereas the meaning of the term "uninterrupted" is conveniently ignored. Furthermore, in the context of the teaching of the claims and the specification, the term "uninterrupted" would obviously be understood by the skilled reader to distinguish the claimed use over prior art administration regimens that operated based on 28 day cycles and comprised phases of hormone administration that were interrupted (in German: unterbrochen) by hormone free intervals. Thus, an administration regime that is "uninterrupted" by a hormone free phase, as taught by and claimed in the opposed Patent, would obviously have to be longer than one cycle

- 7 -

(normal or extended), since it would otherwise be pointless to speak of uninterrupted
administration. Due to their erroneous approach to the construction of claim 1, the
Opponent's conclusions regarding the relevance of the cited documents for novelty and
inventive step are likewise erroneous, as will be explained in more detail below.

4.6    As mentioned above, the Opponent argues that one cycle or more than one cycle
is "uninterrupted". Firstly, the Opponent points to the disclosure of two commercially
available OCs, Loestrin 20 (20µg EE and 150µg norethisterone acetate) and Mercilon
(20µg EE and 150µg desogestrel) and simply combines this with the references to
"moving periods" and "tricycling" at pages 84-87. However, Loestrin 20 and Mercilon are
listed in D1 in amongst a dozen or so different OCs. Furthermore, there is no
connection between the disclosure of these pill formulations (which is made at pages 52
and 53 to D1) and the discussion at pages 84-87. The Opponent has been highly
selective in choosing disclosures from different parts of D1 and has attempted an
interpretation which just does not exist. The case law precludes such an approach. For
example, in T305/87 the Board competent in that case made it clear that it was not
possible to combine separate items belonging to different embodiments described in one
and the same document merely because they were disclosed in that one document,
unless such a combination had been specifically suggested there. T56/87 states that
the technical disclosure in a document should be considered in its entirety, as it would
be by a person skilled in the art, and that there could be no justification for arbitrarily
isolating parts of the document in order to derive therefrom an item of technical
information which would be distinct from or even contradict the integral teaching of the
document. To summarize, there is simply no disclosure in D1 that specifically teaches
tricycling or otherwise reducing the number of hormone-free phases in connection with
Loestrin 20 and Mercilon.

4.7    When discussing the disclosure at pages 84 to 87 of D1 the Opponent makes the
broad simplistic statement that these pages of D1 confirm that bleeding can be deferred
for as long as desired by simply taking commercially available OC pills for an extended
period without a break. Showing how simplistically the Opponent is looking at the
disclosure of D1 they say that tricycling is uninterrupted – prior to having a pill free week.
Applying the same logic, then 2, or 3 or 4 etc, pills in a row are uninterrupted prior to
having a pill free week. On this basis, every single OC regimen there has ever been
would be "uninterrupted". Clearly this is not logical, and particularly not logical in the
context of D1. "Uninterrupted" means continuous until there is no further administration

14

- 8 -

at all, not until there is a pill free week which is followed by another period of hormone administration. Therefore, any cycle, extended or otherwise, which involves a pill free interval before starting the next cycle is not an uninterrupted administration. Thus, even assuming Loestrin 20 and Mercilon were disclosed in the context of bi- or tricycling in D1 - which is not the case - Claim 1 would be novel over these pill formulations given in one or more "cycles" involving a pill free week, such as bicycling or tricycling.

4.8     The Opponent states that uninterrupted oral administration is plainly recognisable by a person of average skill in the art as an extended regimen, e.g., the tricycle regimen, known from pages 84-87 of D1. More particularly, the Opponent refers to the section entitled "Moving periods". This refers to the practice by women of missing a bleed or moving the timing of a bleed by a week or whatever is necessary. The Figure 5.5 of D1 shows how this works for triphasic pills. The point is that there is still a bleed before continuing with the conventional monthly cycle, i.e., there are repeated interruptions as opposed to the uninterrupted administration regimen described and claimed by the opposed Patent. At the end of this section of D1 it clearly states "There are no problems for most women in missing the occasional withdrawal bleed".

4.9     The Opponent also refers to the section entitled "Why have withdrawal bleeds at all". However, this section does not say that it is satisfactory or safe for the woman to avoid the pill free week and withdrawal bleeds altogether. On the one hand there are disadvantages to having a pill free week but on the other hand there were potential risks associated with omitting it. For example, it states in the last sentence of the first full paragraph at page 86 of D1:

"One major change that would result from giving up pill-free weeks is that three extra packets would be taken each year, but it is not clear whether this would pose any new health risks in the long term."

Thus, D1 does refer the <u>users</u> of oral contraceptives to potential health risks of a significantly larger dose of hormones. While this is done in a somewhat mild way in order not to evoke concern amongst those <u>users</u> who had occasionally missed, or were planning to occasionally miss the monthly withdrawal bleed, <u>practitioners</u> at the time in fact had reason to believe that leaving out the hormone-free intervals [or pill free interval 'PFI'] altogether would reduce patient compliance and furthermore involve potentially

15

- 9 -

significant health risks. This is confirmed in D12 in the second column on page 128 in the 3rd paragraph of the summary, where it states:

> "Physicians interested in becoming advocates for oral contraception are encouraged to take a leadership role .......; and (c) selecting formulations that are associated with the lowest risk of breakthrough bleeding, weight gain and the nuisance side effects that can cause patient discomfort and distress and discourage compliance."

Similar views are expressed in D13, the declaration of Prof. John Guillebaud. As explained by Prof. Guillebaud, he was of the opinion at the time that the pill-free week should continue to be recommended.

4.10    It is well worth noting that D1 is written as "The most complete & up-to-date guide for women today" (emphasis added). D1 was not written for the skilled man – i.e., it was not written for physicians who recommend and prescribe the combined oral contraceptive but for users. D10 is the corresponding book published before the priority date of the Patent, which is addressed to physicians. In paragraph 4.26 on page 109, the question is asked:

> "With all those snags, why do we continue to recommend the PFI to anyone?"

then there are listed 6 reasons. On page 110, at paragraph 4.27 the question is asked:

> "What do you conclude, given the advantages of the PFI ?"

> A    It can be useful to point out to a woman who wants to continue with the method but "someone has suggested" that she ought to 'take a break' from the pill after 10 years' use, that she has already taken 130 breaks..... Or, put another way, she has really only taken it for 7½ years!

> B    With the above list of 'pros' it would seem wise only to cut out the gap between packets when there are good indications. In the short term this can be done on request if the woman wishes to avoid a 'period' on special occasions like honeymoons – see Q4.163 and Figure 4.12 for the procedure if a phasic brand is in use. In the long term there are several special indications as in Table 4.2 for

- 10 -

*eliminating the PFI, so the tricycling regimen is then preferred: see Q4.28 and Figure 4.4.*

4.11    In fact – there is no suggestion whatsoever in D10 that long term use of continuous uninterrupted administration of pills with no pill free intervals is an acceptable method of contraception. The longest extension of the cycle suggested is tricycling for patients which have the indications given in Table 4.2. Significantly, in Q4.29 women with breakthrough bleeding before the scheduled bleed in the tricycling regimen are recommended to bicycle (two packets in a row) instead of tricycle. Therefore, while some indications are mentioned where the woman is advised to reduce the number of pill free intervals, D1 then goes on to put this in the context of health advantages of the pill free interval, and compromises by suggesting that tricycling is the better approach (page 87, last sentence of the 3rd paragraph and the paragraph entitled "Tricycling").

4.12    To summarise, tricycling is clearly not the same concept as uninterrupted administration. The latter is not an extended cycle, because it does not have a cycle. Consequently, D1 does not disclose a regimen of uninterrupted use (without pill free intervals) across the whole administration period (potentially up to 10 years), and moreover it does not disclose using dosages of estrogen between 1-20 μg of EE combined with progestogen. Therefore, Claim 1 is novel over D1.

4.13    According to the Opponent, Claim 1 is also anticipated by D2 and D3. However, D2 discloses a regimen of 60 to 110 days of administration followed by a 3-10 day pill free interval, so clearly this covers extended cycle regimens. D3 is a bicycle regimen in which two packets of pills were run together with the omission of a single pill free interval. Clearly D3 discloses a shorter extended cycle regimen. However, for the reasons given above, D2 and D3 do not anticipate an uninterrupted regimen which has no pill free interval. Claim 1 is novel, and so are the claims depending on it. Novelty of independent claims 6 and 7 has not been challenged, so there is no need to address it in the present response.

5.    Article 56 EPC – Inventive Step

5.1    The Opponent asserts that the claimed invention was easily derivable by the person skilled in the art from documents D1 to D7. We note that D2 was not published

- 11 -

before either the priority date or filing date of the Patent and is not available as a reference under Article 56 EPC.

5.2     Firstly the Opponent argues lack of inventive step over D1 alone. Under the section above with respect to novelty of Claim 1 over D1, we have explained the Opponent's erroneous interpretation of the word "uninterrupted" which clearly distinguishes over normal cycle and extended cycle regimens such as bicycling and tricycling which were well known in the art and recommended by physicians from time to time. The Opponent's argument refers us back to their comments on novelty which were based on the erroneous concept that extended cycles anticipated uninterrupted regimens. As a result, the Opponent's point regarding inventive step vis-à-vis D1 suffers from the same flaws. They state that the problem to be solved is to provide a hormonal contraceptive product, which ensures high contraceptive safety or reliability and prevents inter-menstrual bleeding while further reducing the side effects otherwise observed in hormonal contraceptive products. The solution is said to be obvious in view of the disclosure at pages 46, 53 and 54 of D1 (relating to Loestrin 20 and Mercilon) combined with the passages at pages 84-87 of D1 (relating to bi- or tricycling). However, even if the skilled person considered bi- or tricycling with these pill formulations (which is not the case, as is explained in more detail below) the result would merely be the teaching to bi- or tricycle Loestrin 20 or Mercilon. As explained above in the context of discussing novelty, this is quite different from the solution according to Claim 1, i.e., an uninterrupted rather than cyclic administration regime, which furthermore unexpectedly solves the problem of inter-menstrual (or breakthrough) bleeding. Thus, we cannot see how the Opponent can argue that D1, when taken alone, renders the claimed subject matter obvious.

5.3     The combinations of references proposed by the Opponent as rendering the claimed subject matter obvious are likewise unpersuasive. We already mentioned that D2, which is relied upon in the Opponent's inventive step arguments, is not even available as prior art for the purposes of Art. 56 EPC. Moreover, other references used by the Opponent to combine them with D1, i.e., references D3-D7, actually support the presence of an inventive step in respect of the claimed subject matter, as they demonstrate the consistent problem experienced in the art with extended cycle regimens, namely the potential lack of compliance due to increased breakthrough bleeding.

- 12 -

5.4     Indeed, it was entirely unexpected that it would be possible to avoid hormone-free intervals by uninterrupted administration and at the same time achieve the goals of ensuring high contraceptive safety or reliability, avoiding inter-menstrual bleeding (or at least keeping it within acceptable limits), and additionally reducing the hormone burden and keeping side effects typically associated with high hormonal doses at a minimum. This was clearly surprising in view of the expectations the skilled person had at the time (supported by the declaration of Professor Guillebaud - D13) and the prior art available, including the prior art relied upon by the Opponent.

5.5     In particular, it was well understood in the art that breakthrough bleeding is often associated with lower doses of estrogen. For example, in D3 more breakthrough bleeding was observed with 20μg EE/150μg desogestrel (Mercilon) than with 30μg EE/75μg gestodene. Also, in D8, the declaration of Dr. Anne Szarewski in paragraph 11, she states Loestrin 20 is a pill which gives very poor cycle control

    "... and I would therefore never suggest tricycling this pill as the chances of success in terms of cycle control are poor."

In fact, it is clear from D1 that both Mercilon and Loestrin 20 (both being low estrogen pills) may cause problems with breakthrough bleeding ("BTB") even when administered according to a schedule with "normal" cycles; and in respect of Loestrin 20, it is even stated that breakthrough bleeding is "almost universal", which is why "this pill has never been very popular" (see page 53, line 21 of D1). On the other hand in paragraph 10 of the Szarewski declaration, she states that Loestrin 30, which gives excellent cycle control, has always been an obvious pill to give a woman who wished to tricycle (or in any other way prolong her cycle length). Paragraph 9 of the declaration explains that poor cycle control is associated with breakthrough bleeding when an attempt is made to prolong the cycle length.

5.6     Therefore, an uninterrupted (no pill free interval) administration of combined hormone contraceptives containing 1-20μg EE (or equivalent) is doubly unobvious to the skilled man using his common general knowledge, both in view of D1 and in view of D1 taken together with D3. Similar considerations apply to combinations of D1 with any of D4-D7 as will be explained below.

- 13 -

5.7    In particular, we have already explained that D3 discloses a single bicycled regimen. The results show high levels of breakthrough bleeding and for the reasons given in the preceding paragraphs, the skilled man would have no motivation to omit the pill free interval altogether and extend the administration indefinitely because his expectation would have been poor cycle control from the start which deteriorates with the continued administration which would be expected to result in significant levels of breakthrough bleeding (see D8 paragraph 9). D4, D5 and D6 also disclose extended cycle regimens using combined oral contraceptive pills containing 30μg of EE. In order to work inside the scope of Claim 1 the skilled man would have to both omit the pill free interval indefinitely and reduce the EE content by a third to 20μg. Where is the motivation to make these two radical changes? There is no information which would provide the skilled man with an expectation that breakthrough bleeding could be minimised. In fact, D4-D6 already report an increase in breakthrough bleeding as a result of extending the cycle (see, e.g., the abstracts of D4 and D5, and the last paragraph of D6), so they anyway teach away from an uninterrupted administration regime. Moreover, further decreasing the EE content, and thereby, even further increasing the risk of breakthrough bleeding would be contra-indicated. D1 certainly does not provide the motivation to arrive at the claimed solution either, as it points to breakthrough bleeding problems with low dose pills, as mentioned above. Also, at best D1 promotes tricycling "as a compromise", but certainly does not suggest an uninterrupted administration regime.

5.8    Finally, D7 explores the acceptability of extended cycle regimens up to 84 days. If at any time a woman experienced breakthrough bleeding the cycle length was reduced. We therefore wonder how the disclosure of D7 can make it obvious to the skilled man to continue the administration past 84 days and omit the pill free interval altogether?

5.9    To summarize, the subject matter of Claim 1 is based on an inventive step because the prior art does not disclose or provide any information which would lead the skilled man to expect that uninterrupted regimens as claimed would be suitable to solve the above technical problem.

5.10    Claim 6 is not specifically addressed by the Opponent for lack of inventive step and none of the cited prior art even mentions prophylaxis of osteoporosis.

- 14 -

5.11    The Opponent cites D7 in view of any of D1 to D5 as rendering claim 7 obvious, referring specifically to Table 2 on page 181 and the discussion on page 182.  In fact, incidence of pre-menstrual syndrome was measured in the tricycling regimen tested in D7 stating on page 181, 2nd column, that there was "delayed onset and decreased severity of symptoms".  However, D7 cannot and does not indicate anything about whether pre-menstrual symptoms would be alleviated with an uninterrupted regimen of EE doses from 1 to 20 μg, which furthermore would have been a counter-intuitive administration regime at the time, as explained by Prof. Guillebaud in his declaration. Similar considerations apply to the remaining references relied upon by the Opponent, which would actually lead away from even considering non-cyclic uninterrupted administration without any hormone-free phase during the administration period. Accordingly, the subject matter of claim 7 is based on an inventive step.

30/11 '06 09:28 FAX +31412650592       NV ORGANON PAT DEPT.    → EPO MÜNCHEN       ☒001



**Telefax transmittal
cover sheet**

**AKZO NOBEL**

Date
30 November 2006
**Number of pages**
(incl. cover sheet)
5

| | | |
|---|---|---|
| **To**<br>Opposition Division<br>European Patent Office | **Company/Department**<br>European Patent Office | **Fax number**<br>0049-89-2399-4465 |
| **From**<br>Leon van den Broek | **Company/Department**<br>N.V. Organon<br>Global Patent Department | **Fax number**<br>0031-412-650592<br>**Phone number**<br>0031-412-665426<br>**Your reference**<br>98954135.4-<br>2123/1011682<br>**Our reference**<br>OPP265 |

**Subject**
**Opposition to EP 1011682 B1**

This message may contain confidential information and is intended only for the use by the individual and/or the entity to which it is addressed. Any unauthorized use, dissemination of, or copying of the information contained herein is <u>not</u> allowed and may lead to irreparable harm and damage for which you may be held liable. If you receive this message in error or if it is intended for someone else please notify the sender by telephone and destroy this message.

Dear Sirs,

Further to our letter of May 19, 2006, Opponent herewith requests simultaneous interpretation of German into English.

Opponent further requests permission – in accordance with G2/94 – to bring Mrs. Titia Mulders, Senior Director Development Contraception of N.V. Organon, and Mrs. Tessa Malamud-Cohen, a European patent attorney, as accompanying persons and for them to speak under my responsibility on any technical or legal issues raised during the Oral Proceedings.

Further to the R.71a EPC communication dated May 16, 2006 setting a due date of November 30, 2006 for further submissions, new documents are enclosed with this response as follows:

E15: bundle of publicly available FDA papers relating to marketing authorization for Seasonale®.

E16: Press release of Reuters dated December 30, 2004;

E17: Letter from FDA to Barr dated December 29, 2004;

E18: page from www.seasonale.com

Organon

22

N.V. Organon
P.O. Box 20
5340 BH Oss
The Netherlands

30/11 '06 09:28 FAX +31412650592     NV ORGANON PAT DEPT.     → EPO MÜNCHEN     ☑002



**AKZO NOBEL**

Page 2 of 5

### Objections under Art. 100(b)EPC

The Opposition Division states that it "*is inclined to accept sufficient disclosure according to Art. 83 EPC*".

The division further states that "*even without technical support over the entire width of a claim the skilled person can be quite capable of carrying out an invention over the entire width of the claim.*" Opponent agrees with that statement, but submits that with respect to the patent in suit the exact width of claim 1 is <u>not</u> described sufficiently clear and complete for it to be carried out by a person skilled in the art, as required by Art. 83 EPC. Page 8, last paragraph, of the application as filed refers to a "*typischerweise die Zeitspanne mehrerer Monate bis Jahre umfassenden Verabreichungsdauer*", however, claim 1 has **neither** a lower **nor** an upper time limit for said "kontinuierlichen Verabreichung". That is also why the Opposition Division comes to the conclusion that *inter alia* claim 1 lacks novelty (as further discussed below). Thus, Opponent maintains its position that the patent in suit does not meet with Art. 83 EPC.

### Objections under Art. 100(a)EPC

### Novelty

Opponent agrees with the Opposition Division that at least claims 1 and 3 lack novelty over E2 and E3 and claim 2 lacks novelty over E2 and that the granted patent is thus to be revoked. Opponent further agrees that E2 is prior art only under Art. 54(3) and (4) EPC.

Opponent however tends to disagree with the statement of the Opposition Division that "*the administering over two to three months in document E1 is not disclosed unequivocally for the active substances of the patent in dispute, since in the relevant passage there is only general talk of pills*".

Patentee has further asserted that the combining of pages 52-53 with pages 84-87 in E1 is not allowable under T305/87 since it is not possible to combine "*separate items belonging to different embodiments*".

Opponent would like to point out that E1 is a handbook which represents the common general knowledge at the time, i.e already in 1994!

T305/87 does not apply since the handbook is not a disclosure of "*separate items belonging to different embodiments*" which cannot be combined, but rather E1 represents the entire common general knowledge at the time in the field of female human contraception and should thus be seen as one item, one embodiment, one disclosure, namely the common general knowledge at the time.



Moreover, under the heading "*Tricycling*" on page 87 of E1 it is specifically taught that "*Any woman may tricycle, if she wishes so*", hence, no matter what contraceptive she uses. This is a clear teaching for tricycling – and of e.g. tricycling of Mercilon, which contraceptive is listed – as one out of <u>only</u> <u>four</u> suggested contraceptives – under the heading "*Your first time on the pill*"

23



**AKZO NOBEL**

on page 46 of E1 and not out of *"a dozen or so different OCs"* as stated by the patentee in item 4.6 of their letter dated December 13, 2004. Note that Mercilon (20 micrograms ethinyl estradiol and 150 micrograms desogestrel) has been on the market since 1987.

Further, under the heading *"Why have withdrawal bleeds at all?"* on page 86 of E1, it is explained that an argument against giving up the pill-free week is no longer relevant for the *"newest pills"*, such as the four contraceptives listed on page 46 of E1 including Mercilon, also named amongst one of the *"newest pills"* (page 46, line 13 of E1). Still further, on page 87 under the same heading, it is specifically disclosed that for women with some gynaecological conditions, such as endometriosis, continuous pill taking is to be preferred. Claim 1 as granted does **not** exclude the use in such women!

Furthermore, under the heading *"Moving Periods"* in the paragraph bridging pages 84 and 85 of E1, it is taught specifically for monophasic pills – such as Mercilon – that in order *"To prevent a period altogether you have only to miss out your pill-free week and carry on with the next packet"*.

There is only one conclusion possible: claim 1 lacks novelty over E1 as well. The Opposition Division is kindly requested to change its preliminary opinion and conclude the same.

**Inventive Step**

Opponent agrees with the Opposition Division that claims 6-7 are not inventive.

If the Opposition Division does not agree with the opponent that claim 1 also lacks novelty over E1 under Art. 54(2) as argued under Novelty above, then opponent submits that claim 1 certainly lacks an inventive step over E1.

Claim 1 lacks inventive step over E1:

*Closest prior art*: The closest prior art to subject claim 1 can be considered to be E1 which is a handbook (textbook) about contraception. In fact, as mentioned above under novelty, this handbook represents the common general knowledge about female contraception at the time. E1 also has the most features in common with claim 1 and is thus the most promising springboard for discussing the alleged invention.

E1, on pages 46, 53 and 54, describe the following two commercially available oral contraceptives:

Loestrin 20 (20 µg ethinyl estradiol + 1 mg norethisterone acetate)
Mercilon (20 µg ethinyl estradiol + 150 µg desogestrel), i.e. both low content estrogen combined oral contraceptives.

Both norethisterone acetate as well as desogestrel are listed in claim 1 as possible gestagens; ethinyl estradiol up to 20 µg is listed as a possible estrogen in claim 1.



24



**AKZO NOBEL**

E1 further has the sections entitled *"Moving periods"* on pages 84-86, *"Why have withdrawal bleed at all?"* on pages 86-87 and *"Tri-cycling"* on page 87 of E1. These pages of E1 confirm that withdrawal bleeding can be deferred for as long as desired by simply taking commercially available OC pills such as the ones mentioned above, for an extended period without a break. Tri-cycling is just a specific, well-known example of a convenient regimen that extends the monthly regimen of commercially available OC pills. Tri-cycling means taking three (i.e. 63 days) or four (i.e. 84 days) packages of OC pills in a row, i.e. uninterruptedly, prior to having a pill-free week.

**Distinguishing feature**: The only arguably distinct feature between E1 and claim 1 is that E1 relates to contraception for more than one cycle without a break (pages 84-87) whereas claim 1 uses the term *"uninterrupted"*.

**Problem to be solved**: The patentee asserts that the problem to be solved (see opposed patent page 3, column 4, [0012], lines 3-9) is to provide a hormonal contraceptive product, which ensures high contraceptive safety or reliability and prevents inter-menstrual bleeding. There is also to be a further reduction in the side effects otherwise observed in hormonal contraceptive products.

The known contra-indication for extended regimens, i.e. irregular breakthrough bleeding (also called inter-menstrual bleeding) as referred to by both Professor Guillebaud in his statement (E13) as well as in the statement of Dr. Szarewski (E8)) is also present when using the subject invention and the problem which the patentee asserts to have solved is not solved:

**Problem is not solved**: When studying E9 (which was enclosed by the patentee *"as further proof that the invention does work"* (see point 3.6 of the patentee's response to the notice of opposition)), one may be inclined to believe that the problem of inter-menstrual bleeding is being handled. This is <u>not</u> however the case, the reason being that in the analysis of the results the median, and not the mean, number of bleeding days is analyzed. By using the median, one is ignoring, for example, the women who dropped out of the study, because the inter-menstrual bleeding was not acceptable for them, thereby distorting the results.

This can be confirmed by looking at the bundle of publicly available FDA papers relating to market authorization for a now commercially available similar product, Seasonale®, (E15) referred to by the patentee's witness Professor John Guillebaud. Seasonale, as the Professor states in point 17 of his declaration, is a tri-cycle product containing active tablets of 150 µg levonorgestrel and 30 µg ethinyl estradiol. The dosing regimen of Seasonale is 84 days of active tablets followed by 7 inactive (placebo) tablets. Seasonale is covered by the claims of E2 which European patent was revoked after opposition due to lack of an inventive step over E5. This revocation was appealed by the Proprietor of E2 and the appeal is still pending.



The FDA medical officer has, in E15, made several remarks regarding distortion of the results due to the use of the median instead of the mean

25



**AKZO NOBEL**

number of bleeding days. For example, see page 52 (last paragraph) and 53 (paragraph before last) of the clinical review part of E15;

Moreover, Seasonale has a high amount of estrogen (30 µg EE ) and according to both professor Guillebaud (E13) and Dr. Szarewski (E8), the use of Seasonale is thus expected to result in less breakthrough bleeding than a product with 20 µg EE: *"...and that for example Loestrin 20 (a low estrogen product) would be unlikely to be successful because of its poor cycle control"* (see point 11 of the declaration of professor Guillebaud (E13)).

It is very clear from E15 that the problem of breakthrough bleeding (inter-menstrual bleeding) was in no way solved by the use of Seasonale, a product with a high estrogen content, see e.g. E15, clinical review, page 11 (last paragraph).

This irregular bleeding was in fact so high that the FDA issued a warning to Barr, the producer of Seasonale, on December 29, 2004 with respect to a television commercial of Barr promoting Seasonale without relating to the amount of breakthrough bleeding experienced by women taking Seasonale. The press release and the FDA warning are attached as E16 and E17, respectively.

There are many other remarks by the FDA Medical Officer throughout E15, in the clinical review of Seasonale with respect to the high amount of breakthrough bleeding, see pages 54, 55, 78 of the clinical review.

Also the website of Seasonale recites as follows: *"With Seasonale®, you get fewer pill periods-only 4 a year. But you're also more likely to have spotting and breakthrough bleeding between pill periods than with a 28-day birth control pill"* (attached as E18).

Thus, it is clear from E15 that the problem of breakthrough bleeding was not solved by Seasonale, a product with high estrogen content. How then can E9, which shows a similar study, but with a product with low estrogen content solve this problem? This is in fact not possible as evidenced by the patentee's own witness Professor Guillebaud and also by Dr. Szarewski whom already both stated that products with low estrogen content are even more associated with breakthrough bleeding than products with high estrogen content.

Thus, there is no technical effect observed when performing claim 1 uninterruptedly compared to performing contraception as laid out in E1 for several cycles without a break.

Since there is no technical effect, there is no inventive step.

Respectfully submitted,

Leon van den Broek

Enclosures (E15-E18) – via courier

26

**Wyeth Pharmaceuticals**
Huntercombe Lane South
Taplow, Maidenhead
Berkshire, SL6 0PH

**Patents & Trade Marks Department**
Tel: +44 (0)1628 604377
Fax: +44 (0)1628 799098

# Wyeth

SKM/lb
30 November 2006

**BY FAX**

The European Patent Office
D-80298
**MUNCHEN**
Germany

Dear Sirs

**European Patent No. 1 011 682**
**Proprietor: Wyeth**
**Our Ref: AM-101403**

We refer to the Summons to Oral Proceedings of May 16, 2006. In preparation of the oral proceedings, we herewith submit a New Main Request and Auxiliary Requests. The Proprietor hereby requests maintenance of the patent on the basis of the enclosed New Main Request, or failing that, on the basis of any of the enclosed Auxiliary Requests 1-4 We furthermore maintain our conditional request for oral proceedings.

During the oral proceedings scheduled for January 30, 2007, I will be accompanied by Dr. H. Ulrich Dörries of the law firm df-mp (Dörries, Frank-Molnia & Pohlman). A signed Power of Attorney form to enable Dr. Dörries to make oral submissions on behalf of the Patentee will follow. Both Dr. Dörries and I will make our submissions in English.

The amendments to claim 1 of Auxiliary Requests 1 and 2 have basis at page 8, 4th paragraph of the application as filed (see WO 99/12531). Auxiliary Requests 3 and 4 merely include the features of granted claims 4 and 5 into claim 1, respectively.

The subject matter of granted claim 6, which relates to the treatment of osteoporosis, has been deleted from the New Main Request and Auxiliary Requests 1-4. It is noted that this deletion is not to be construed as an admission or irrevocable abandonment of this subject matter. Rather, we reserve the right to pursue subject matter relating to granted claim 6 in the present opposition proceedings, via any of the two pending divisional applications relating to the opposed patent, or via (a) further divisional(s) yet to be filed from any of these divisional applications.

John Wyeth & Brother Limited
Registered in England No. 135937
Registered Office: Huntercombe Lane South
Taplow, Maidenhead, Berkshire, SL6 0PH

Incorporating:  Wyeth Research

2

**Wyeth**

Granted claim 7 has been reworded in order to make clear that the uninterrupted administration regime referred to in claim 1 also applies to this medical use claim (see claim 6 of the New Main Request and Auxiliary Requests 1 and 2; claim 5 of Auxiliary Request 3; and claim 4 of Auxiliary Request 4). Basis for these amendments may be found again at page 8, 4th paragraph of the application as filed, and in the paragraph bridging pages 9 and 10 thereof (see again WO 99/12531).

We reserve the right to file further Auxiliary Requests prior to, or during the oral hearing, including Auxiliary Requests in which we simply delete the claims corresponding to granted claim 7 in case the Opposition Division takes a negative view regarding the allowability of these claims.

As to the preliminary views expressed in the Communication that was attached to the Summons, we would like to offer the following comments:

1.  **Sufficiency of Disclosure**

    According to the Communication attached to the Summons the Opposition Division is inclined to accept sufficiency of disclosure in respect of the invention claimed in the opposed patent. It therefore seems that it is not necessary at this point to further comment on this ground of opposition.

2.  **Novelty**

2.1  *The New Main Request*

    The Communication attached to the Summons suggests that the administration regime provided for by the opposed patent encompasses an administration period of two or three months "before a pill-free phase" (page 5 of the Communication attached to the Summons). We respectfully disagree. While the Opposition Division is correct to conclude that the uninterrupted administration regime according to claim 1 of the patent would have to be longer than one cycle (contrary to the opponent's suggestions), we feel that the Division may have failed to have sufficient regard to the meaning of the term "uninterrupted", and the corresponding explanations in the patent specification.

    We believe the term "uninterrupted" clearly indicates that there are no pill-free phases, and thus, no cycles (normal or extended) in the entire period during which the contraceptive is used. This is clear from the plain literal meaning of the term itself, which would be understood to refer to a lack of breaks between phases of hormone administration (see also items 4.3 and 4.4 of our submission of

28

3

**Wyeth**

December 13, 2004). This is furthermore clear from the specification of the opposed patent, which clearly states in paragraph [0020] that the uninterrupted administration envisaged by the patent is devoid of any intake-free intervals <u>throughout the entire administration period</u>. In other words, uninterrupted administration in accordance with the opposed patent means continuous administration <u>until there is no further administration at all</u>, not until there is a pill-free week followed by another period of hormone administration.

Neither D2 nor D3 disclose (or suggest) such an administration regime. For example, D2 teaches extended phases of 60-110 "consecutive days" of hormone administration followed by a phase of "non-administration" for a period of 3-10 days (see, e.g., claim 1 of D2). Obviously, D2 would not speak of a phase of non-administration if administration should not be resumed thereafter, thus leading to a hormone-free interval between phases of hormone administration (see also page 3, line 47 of D2, which explicitly calls the hormone-free phase an "interval"). This administration regime is clearly contrary to the teaching of claim 1 of the opposed patent, which requires that there be no interruption by a hormone-free interval throughout the entire period during which the contraceptive is used.

Similar considerations apply to D3, which reports the effects of omitting the pill-free interval between cycles 6 and 7 of a total of 9 cycles, thus leading to an extended period of continuous hormone administration of 42 days. It is clear from D3 that the 42 day period of continuous hormone administration occurred in the course of an overall administration period that was much longer than that specific period, i.e., a total of at least 9 cycles. Thus, the 42 day period was preceded and followed by 21 day periods of continuous hormone administration separated by hormone-free intervals of 7 days. The overall period during which the contraceptive was applied (i.e., the entire administration period) therefore clearly encompassed hormone-free intervals. Again this is evidently different from the use according to claim 1 of the opposed patent, which requires that there be no interruption throughout the entire period of administration of the contraceptive.

In view of the above, we submit that the subject matter of claim 1 (and that of the other claims of the opposed patent) is clearly novel over D2 and D3.

29

4

**Wyeth**

2.2    *Auxiliary Requests 1-4*

Auxiliary Request 1 is identical to the New Main Request except for the fact that claims 1 and 6 thereof explicitly state that administration is uninterrupted over the entire period of administration of the contraceptive so that the period of administration does not comprise any intake-free intervals in respect of the hormone components ("*... Verabreichung, die über den gesamten Verabreichungszeitraum des Kontrazeptionsmittels ununterbrochen erfolgt, so dass der Verabreichungszeitraum keine bezüglich der hormonellen Wirkstoffe einnahmefreien Intervalle umfasst*").

Auxiliary Request 2 is identical to Auxiliary Request 1, except that it additionally provides in its claims 1 and 6 that the period of administration encompasses several months ("*... Verabreichung, die über den gesamten Verabreichungszeitraum des Kontrazeptionsmittels ununterbrochen erfolgt, so dass der Verabreichungszeitraum keine bezüglich der hormonellen Wirkstoffe einnahmefreien Intervalle umfasst, wobei der Verabreichungszeitraum mehrere Monate umfasst*"). Auxiliary Request 2 is filed in case the Opposition Division agrees with the Opponent that continuous administration in the course of a normal 28 day cycle is not sufficiently distinguished over the claimed use.

Auxiliary Requests 3 and 4 are identical to Auxiliary Request 2, except that they further specify in claims 1 and the claims corresponding to claim 6 of the New Main Request that the period of administration encompasses 9 months or 12 months, respectively. Auxiliary Requests 3 and 4 are filed in case the Opposition Division maintains that the use claimed in the Main Request or Auxiliary Requests 1 or 2 encompasses administration periods of two or three months separated from further administration periods by pill-free intervals, despite our explanations in the present and our previous submission. In view of the Opposition Division's remarks regarding granted claims 4 and 5, we trust that Auxiliary Requests 3 and 4 will be found to be novel over both D2 and D3 or any other administration regime mentioned in the prior art of record.

3.    **Inventive Step**

The Opposition Division seems to be of the preliminary opinion that the subject matter of granted claims 4 and 5 is based on an inventive step. We trust the same will apply to the subject matter of Auxiliary Requests 3 or 4.

30

5

**Wyeth**

Like Auxiliary Requests 3 and 4, the Main Request and Auxiliary Requests 1 and 2 require that there be no hormone free intervals throughout the entire period of administration of the contraceptive. In this regard, we note that none of the prior art references of record suggests that it would be satisfactory or safe for a woman to avoid the pill free week and thus, withdrawal bleeds altogether.

D1 at best mentions bi- or tricycling (although not in connection with compositions according to claim 1), which is not an uninterrupted administration regime according to claim 1, as explained above. D1 furthermore mentions potential health issues due to the additional hormone load associated with extended cycles (see the first full paragraph at page 86 of D1).

D12 points to the need to control breakthrough bleeding, weight gain and other side effects which would be known or assumed to be associated with reducing the number of pill free intervals (see also items 11-18 of the declaration by Prof. Guillebaud, D13).

D10, which in contrast to D1 is directed to the skilled artisan rather than the scientifically untrained average users of contraceptives, explicitly recommends not to omit the pill free interval altogether (see the 6 reasons listed at page 109 of D10 and the recommendation at page 110, paragraph 4.27 to cut out the gap between packets only when there are good indications). The longest acceptable cycle extension mentioned in D10 is tricycling for women having the indications listed in Table 4.2. In case breakthrough bleeding is encountered, D10 furthermore recommends to bicycle instead of tricycle, which would further teach away from the claimed use.

Finally, references D3-D7, which according to the opponent render the claimed subject matter obvious when combined with D1, actually further confirm that the skilled artisan would not consider to leave out pill free intervals altogether, since they explain the problems encountered in the art with extended cycle regimens such as breakthrough bleeding and spotting, which are major determinants for lack of patient compliance. For the sake of brevity, we refer to items 5.5 to 5.9 of our submission of December 13, 2004.

It was therefore entirely unexpected that it would be possible to completely avoid hormone free intervals by uninterrupted

31

6

**Wyeth**

administration and at the same time achieve the goals of ensuring high contraceptive reliability, avoiding inter-menstrual bleeding (or at least keeping it within acceptable limits), and additionally reducing the hormone burden and keeping side effects typically associated with high hormonal doses at a minimum.

Accordingly, the subject matter of the Main Request and Auxiliary Requests 1 and 2 is likewise based on an inventive step.

The objection for lack of inventive step of granted claim 6 does not need to be addressed here, since the subject matter of this claim is no longer contained in the New Main Request or any of Auxiliary Requests 1-4.

As to the objection raised against granted claim 7 (see the last paragraph at page 5 of the Communication attached to the Summons), we note that it is self-evident that the cycle dependent instability of the hormone system, and thus, the incidences of the premenstrual syndrome resulting therefrom, will be reduced by the uninterrupted administration regime according to claim 6 of the New Main Request (or claim 6 of Auxiliary Requests 1 and 2; claim 5 of Auxiliary Request 3; and claim 4 of Auxiliary Request 4). This is also explained in the paragraph bridging pages 9 and 10 of the application as filed (see again WO 99/12531). We therefore believe that an inventive step should be acknowledged in respect of these claims as well.

A form 1037 is enclosed with the confirmation copy of this letter for acknowledgement of receipt.

Yours faithfully

Sally K Mannion (Dr)
European Patent Attorney (GA 45314)

**Enclosures**

New Main Request
Auxiliary Requests 1-4

32

CONFIRMATION
with enclosures

**Telefax transmittal
cover sheet**


**AKZO NOBEL**

EPO - Munich
47

0 1. Dez. 2006

**Date**
30 November 2006

**Number of pages**
(incl. cover sheet)
5

**To**
Opposition Division
European Patent Office

**Company/Department**
European Patent Office

**Fax number**
0049-89-2399-4465

**From**
Leon van den Broek

**Company/Department**
N.V. Organon
Global Patent Department

**Fax number**
0031-412-650592
**Phone number**
0031-412-665426
**Your reference**
98954135.4-
2123/1011682
**Our reference**
OPP265

98954135. 4

os/
300207

**Subject**
**Opposition to EP 1011682 B1**

This message may contain confidential information and is intended only for the use by the individual and/or the entity to which it is addressed. Any unauthorized use, dissemination of, or copying of the information contained herein is not allowed and may lead to irreparable harm and damage for which you may be held liable. If you receive this message in error or if it is intended for someone else please notify the sender by telephone and destroy this message.

Dear Sirs,

Further to our letter of May 19, 2006, Opponent herewith requests simultaneous interpretation of German into English.

Opponent further requests permission – in accordance with G2/94 – to bring Mrs. Titia Mulders, Senior Director Development Contraception of N.V. Organon, and Mrs. Tessa Malamud-Cohen, a European patent attorney, as accompanying persons and for them to speak under my responsibility on any technical or legal issues raised during the Oral Proceedings.

Further to the R.71a EPC communication dated May 16, 2006 setting a due date of November 30, 2006 for further submissions, new documents are enclosed with this response as follows:

E15: bundle of publicly available FDA papers relating to marketing authorization for Seasonale®.

E16: Press release of Reuters dated December 30, 2004;

E17: Letter from FDA to Barr dated December 29, 2004;

E18: page from www.seasonale.com

Organon

N.V. Organon
P.O. Box 20
5340 BH Oss
The Netherlands

33

**AKZO NOBEL**

### Objections under Art. 100(b)EPC

The Opposition Division states that it "*is inclined to accept sufficient disclosure according to Art. 83 EPC*".

The division further states that "*even without technical support over the entire width of a claim the skilled person can be quite capable of carrying out an invention over the entire width of the claim.*" Opponent agrees with that statement, but submits that with respect to the patent in suit the exact width of claim 1 is <u>not</u> described sufficiently clear and complete for it to be carried out by a person skilled in the art, as required by Art. 83 EPC. Page 8, last paragraph, of the application as filed refers to a "*typischerweise die Zeitspanne mehrerer Monate bis Jahre umfassenden Verabreichungsdauer*", however, claim 1 has **neither** a lower **nor** an upper time limit for said "kontinuierlichen Verabreichung". That is also why the Opposition Division comes to the conclusion that *inter alia* claim 1 lacks novelty (as further discussed below). Thus, Opponent maintains its position that the patent in suit does not meet with Art. 83 EPC.

### Objections under Art. 100(a)EPC

### Novelty

Opponent agrees with the Opposition Division that at least claims 1 and 3 lack novelty over E2 and E3 and claim 2 lacks novelty over E2 and that the granted patent is thus to be revoked. Opponent further agrees that E2 is prior art only under Art. 54(3) and (4) EPC.

Opponent however tends to disagree with the statement of the Opposition Division that "*the administering over two to three months in document E1 is not disclosed unequivocally for the active substances of the patent in dispute, since in the relevant passage there is only general talk of pills*".

Patentee has further asserted that the combining of pages 52-53 with pages 84-87 in E1 is not allowable under T305/87 since it is not possible to combine "*separate items belonging to different embodiments*".

Opponent would like to point out that E1 is a handbook which represents the common general knowledge at the time, i.e already in 1994!

T305/87 does not apply since the handbook is not a disclosure of "*separate items belonging to different embodiments*" which cannot be combined, but rather E1 represents the entire common general knowledge at the time in the field of female human contraception and should thus be seen as one item, one embodiment, one disclosure, namely the common general knowledge at the time. 

Moreover, under the heading "*Tricycling*" on page 87 of E1 it is specifically taught that "*Any woman may tricycle, if she wishes so*", hence, no matter what contraceptive she uses. This is a clear teaching for tricycling – and of e.g. tricycling of Mercilon, which contraceptive is listed – as one out of <u>only four</u> suggested contraceptives - under the heading "*Your first time on the pill*"

**AKZO NOBEL**

Page 3 of 5

on page 46 of E1 and not out of *"a dozen or so different OCs"* as stated by the patentee in item 4.6 of their letter dated December 13, 2004. Note that Mercilon (20 micrograms ethinyl estradiol and 150 micrograms desogestrel) has been on the market since 1987.

Further, under the heading *"Why have withdrawal bleeds at all?"* on page 86 of E1, it is explained that an argument against giving up the pill-free week is no longer relevant for the *"newest pills"*, such as the four contraceptives listed on page 46 of E1 including Mercilon, also named amongst one of the *"newest pills"* (page 46, line 13 of E1). Still further, on page 87 under the same heading, it is specifically disclosed that for women with some gynaecological conditions, such as endometriosis, continuous pill taking is to be preferred. Claim 1 as granted does **not** exclude the use in such women!

Furthermore, under the heading *"Moving Periods"* in the paragraph bridging pages 84 and 85 of E1, it is taught specifically for monophasic pills – such as Mercilon – that in order  *"To prevent a period altogether you have only to miss out your pill-free week and carry on with the next packet".*

There is only one conclusion possible: claim 1 lacks novelty over E1 as well. The Opposition Division is kindly requested to change its preliminary opinion and conclude the same.

**Inventive Step**

Opponent agrees with the Opposition Division that claims 6-7 are not inventive.

If the Opposition Division does not agree with the opponent that claim 1 also lacks novelty over E1 under Art. 54(2) as argued under Novelty above, then opponent submits that claim 1 certainly lacks an inventive step over E1.

Claim 1 lacks inventive step over E1:

***Closest prior art***: The closest prior art to subject claim 1 can be considered to be E1 which is a handbook (textbook) about contraception. In fact, as mentioned above under novelty, this handbook represents the common general knowledge about female contraception at the time.  E1 also has the most features in common with claim 1 and is thus the most promising springboard for discussing the alleged invention.

E1, on pages 46, 53 and 54, describe the following two commercially available oral contraceptives:

Loestrin 20 (20 µg ethinyl estradiol + 1 mg norethisterone acetate)
Mercilon (20 µg ethinyl estradiol + 150 µg desogestrel), i.e. both low content estrogen combined oral contraceptives.



Both norethisterone acetate as well as desogestrel are listed in claim 1 as possible gestagens; ethinyl estradiol up to 20 µg is listed as a possible estrogen in claim 1.

35

**AKZO NOBEL**

E1 further has the sections entitled *"Moving periods"* on pages 84-86, *"Why have withdrawal bleed at all?"* on pages 86-87 and *"Tri-cycling"* on page 87 of E1. These pages of E1 confirm that withdrawal bleeding can be deferred for as long as desired by simply taking commercially available OC pills such as the ones mentioned above, for an extended period without a break. Tri-cycling is just a specific, well-known example of a convenient regimen that extends the monthly regimen of commercially available OC pills. Tri-cycling means taking three (i.e. 63 days) or four (i.e. 84 days) packages of OC pills in a row, i.e. uninterruptedly, prior to having a pill-free week.

**Distinguishing feature**: The only arguably distinct feature between E1 and claim 1 is that E1 relates to contraception for more than one cycle without a break (pages 84-87) whereas claim 1 uses the term *"uninterrupted"*.

**Problem to be solved**: The patentee asserts that the problem to be solved (see opposed patent page 3, column 4, [0012], lines 3-9) is to provide a hormonal contraceptive product, which ensures high contraceptive safety or reliability and prevents inter-menstrual bleeding. There is also to be a further reduction in the side effects otherwise observed in hormonal contraceptive products.

The known contra-indication for extended regimens, i.e. irregular breakthrough bleeding (also called inter-menstrual bleeding) as referred to by both Professor Guillebaud in his statement (E13) as well as in the statement of Dr. Szarewski (E8)) is also present when using the subject invention and the problem which the patentee asserts to have solved is not solved:

**Problem is not solved**: When studying E9 (which was enclosed by the patentee *"as further proof that the invention does work"* (see point 3.6 of the patentee's response to the notice of opposition)), one may be inclined to believe that the problem of inter-menstrual bleeding is being handled. This is not however the case, the reason being that in the analysis of the results the median, and not the mean, number of bleeding days is analyzed. By using the median, one is ignoring, for example, the women who dropped out of the study, because the inter-menstrual bleeding was not acceptable for them, thereby distorting the results.

This can be confirmed by looking at the bundle of publicly available FDA papers relating to market authorization for a now commercially available similar product, Seasonale®, (E15) referred to by the patentee's witness Professor John Guillebaud. Seasonale, as the Professor states in point 17 of his declaration, is a tri-cycle product containing active tablets of 150 µg levonorgestrel and 30 µg ethinyl estradiol. The dosing regimen of Seasonale is 84 days of active tablets followed by 7 inactive (placebo) tablets. Seasonale is covered by the claims of E2 which European patent was revoked after opposition due to lack of an inventive step over E5. This revocation was appealed by the Proprietor of E2 and the appeal is still pending. 

The FDA medical officer has, in E15, made several remarks regarding distortion of the results due to the use of the median instead of the mean



**AKZO NOBEL**

number of bleeding days. For example, see page 52 (last paragraph) and 53 (paragraph before last) of the clinical review part of E15;

Moreover, Seasonale has a high amount of estrogen (30 µg EE ) and according to both professor Guillebaud (E13) and Dr. Szarewski (E8), the use of Seasonale is thus expected to result in less breakthrough bleeding than a product with 20 µg EE: *"...and that for example Loestrin 20 (a low estrogen product) would be unlikely to be successful because of its poor cycle control"* (see point 11 of the declaration of professor Guillebaud (E13)).

It is very clear from E15 that the problem of breakthrough bleeding (inter-menstrual bleeding) was in no way solved by the use of Seasonale, a product with a high estrogen content, see e.g. E15, clinical review, page 11 (last paragraph).

This irregular bleeding was in fact so high that the FDA issued a warning to Barr, the producer of Seasonale, on December 29, 2004 with respect to a television commercial of Barr promoting Seasonale without relating to the amount of breakthrough bleeding experienced by women taking Seasonale. The press release and the FDA warning are attached as E16 and E17, respectively.

There are many other remarks by the FDA Medical Officer throughout E15, in the clinical review of Seasonale with respect to the high amount of breakthrough bleeding, see pages 54, 55, 78 of the clinical review.

Also the website of Seasonale recites as follows: *"With Seasonale®, you get fewer pill periods-only 4 a year. But you're also more likely to have spotting and breakthrough bleeding between pill periods than with a 28-day birth control pill"* (attached as E18).

Thus, it is clear from E15 that the problem of breakthrough bleeding was not solved by Seasonale, a product with high estrogen content. How then can E9, which shows a similar study, but with a product with low estrogen content solve this problem? This is in fact not possible as evidenced by the patentee's own witness Professor Guillebaud and also by Dr. Szarewski whom already both stated that products with low estrogen content are even more associated with breakthrough bleeding than products with high estrogen content.

Thus, there is no technical effect observed when performing claim 1 uninterruptedly compared to performing contraception as laid out in E1 for several cycles without a break.

Since there is no technical effect, there is no inventive step.

Respectfully submitted,

Leon van den Broek

Enclosures (E15-E18) – via courier

Organon

Wyeth Pharmaceuticals
Huntercombe Lane South
Taplow, Maidenhead
Berkshire, SL6 0PH

Patents & Trade Marks Department
Tel: +44 (0)1628 604377
Fax: +44 (0)1628 799098

# Wyeth

SKM/lb
30 November 2006

**BY FAX**

EPO - Munich
51
1 1. Dez. 2006

The European Patent Office
D-80298
**MUNCHEN**
Germany

Dear Sirs                    989541205.4

**European Patent No. 1 011 682**
**Proprietor: Wyeth**                    0 · P 300107
**Our Ref: AM-101403**

We refer to the Summons to Oral Proceedings of May 16, 2006. In preparation of the oral proceedings, we herewith submit a New Main Request and Auxiliary Requests. The Proprietor hereby requests maintenance of the patent on the basis of the enclosed New Main Request, or failing that, on the basis of any of the enclosed Auxiliary Requests 1-4 We furthermore maintain our conditional request for oral proceedings.

During the oral proceedings scheduled for January 30, 2007, I will be accompanied by Dr. H. Ulrich Dörries of the law firm df-mp (Dörries, Frank-Molnia & Pohlman). A signed Power of Attorney form to enable Dr. Dörries to make oral submissions on behalf of the Patentee will follow. Both Dr. Dörries and I will make our submissions in English.

The amendments to claim 1 of Auxiliary Requests 1 and 2 have basis at page 8, 4th paragraph of the application as filed (see WO 99/12531). Auxiliary Requests 3 and 4 merely include the features of granted claims 4 and 5 into claim 1, respectively.

The subject matter of granted claim 6, which relates to the treatment of osteoporosis, has been deleted from the New Main Request and Auxiliary Requests 1-4. It is noted that this deletion is not to be construed as an admission or irrevocable abandonment of this subject matter. Rather, we reserve the right to pursue subject matter relating to granted claim 6 in the present opposition proceedings, via any of the two pending divisional applications relating to the opposed patent, or via (a) further divisional(s) yet to be filed from any of these divisional applications.


John Wyeth & Brother Limited
Registered in England No. 135937
Registered Office: Huntercombe Lane South
Taplow, Maidenhead, Berkshire, SL6 0PH

Incorporating:   Wyeth Research

2

**Wyeth**

Granted claim 7 has been reworded in order to make clear that the uninterrupted administration regime referred to in claim 1 also applies to this medical use claim (see claim 6 of the New Main Request and Auxiliary Requests 1 and 2; claim 5 of Auxiliary Request 3; and claim 4 of Auxiliary Request 4). Basis for these amendments may be found again at page 8, 4th paragraph of the application as filed, and in the paragraph bridging pages 9 and 10 thereof (see again WO 99/12531).

We reserve the right to file further Auxiliary Requests prior to, or during the oral hearing, including Auxiliary Requests in which we simply delete the claims corresponding to granted claim 7 in case the Opposition Division takes a negative view regarding the allowability of these claims.

As to the preliminary views expressed in the Communication that was attached to the Summons, we would like to offer the following comments:

1. **Sufficiency of Disclosure**
According to the Communication attached to the Summons the Opposition Division is inclined to accept sufficiency of disclosure in respect of the invention claimed in the opposed patent. It therefore seems that it is not necessary at this point to further comment on this ground of opposition.

2. **Novelty**

2.1 _The New Main Request_
The Communication attached to the Summons suggests that the administration regime provided for by the opposed patent encompasses an administration period of two or three months "before a pill-free phase" (page 5 of the Communication attached to the Summons). We respectfully disagree. While the Opposition Division is correct to conclude that the uninterrupted administration regime according to claim 1 of the patent would have to be longer than one cycle (contrary to the opponent's suggestions), we feel that the Division may have failed to have sufficient regard to the meaning of the term "uninterrupted", and the corresponding explanations in the patent specification.

We believe the term "uninterrupted" clearly indicates that there are no pill-free phases, and thus, no cycles (normal or extended) in the entire period during which the contraceptive is used. This is clear from the plain literal meaning of the term itself, which would be understood to refer to a lack of breaks between phases of hormone administration (see also items 4.3 and 4.4 of our submission of

3

**Wyeth**

December 13, 2004). This is furthermore clear from the specification of the opposed patent, which clearly states in paragraph [0020] that the uninterrupted administration envisaged by the patent is devoid of any intake-free intervals throughout the entire administration period. In other words, uninterrupted administration in accordance with the opposed patent means continuous administration until there is no further administration at all, not until there is a pill-free week followed by another period of hormone administration.

Neither D2 nor D3 disclose (or suggest) such an administration regime. For example, D2 teaches extended phases of 60-110 "consecutive days" of hormone administration followed by a phase of "non-administration" for a period of 3-10 days (see, e.g., claim 1 of D2). Obviously, D2 would not speak of a phase of non-administration if administration should not be resumed thereafter, thus leading to a hormone-free interval between phases of hormone administration (see also page 3, line 47 of D2, which explicitly calls the hormone-free phase an "interval"). This administration regime is clearly contrary to the teaching of claim 1 of the opposed patent, which requires that there be no interruption by a hormone-free interval throughout the entire period during which the contraceptive is used.

Similar considerations apply to D3, which reports the effects of omitting the pill-free interval between cycles 6 and 7 of a total of 9 cycles, thus leading to an extended period of continuous hormone administration of 42 days. It is clear from D3 that the 42 day period of continuous hormone administration occurred in the course of an overall administration period that was much longer than that specific period, i.e., a total of at least 9 cycles. Thus, the 42 day period was preceded and followed by 21 day periods of continuous hormone administration separated by hormone-free intervals of 7 days. The overall period during which the contraceptive was applied (i.e., the entire administration period) therefore clearly encompassed hormone-free intervals. Again this is evidently different from the use according to claim 1 of the opposed patent, which requires that there be no interruption throughout the entire period of administration of the contraceptive.

In view of the above, we submit that the subject matter of claim 1 (and that of the other claims of the opposed patent) is clearly novel over D2 and D3.

4

**Wyeth**

2.2   *Auxiliary Requests 1-4*

Auxiliary Request 1 is identical to the New Main Request except for the fact that claims 1 and 6 thereof explicitly state that administration is uninterrupted over the entire period of administration of the contraceptive so that the period of administration does not comprise any intake-free intervals in respect of the hormone components ("... *Verabreichung, die über den gesamten Verabreichungszeitraum des Kontrazeptionsmittels ununterbrochen erfolgt, so dass der Verabreichungszeitraum keine bezüglich der hormonellen Wirkstoffe einnahmefreien Intervalle umfasst*").

Auxiliary Request 2 is identical to Auxiliary Request 1, except that it additionally provides in its claims 1 and 6 that the period of administration encompasses several months ("... *Verabreichung, die über den gesamten Verabreichungszeitraum des Kontrazeptionsmittels ununterbrochen erfolgt, so dass der Verabreichungszeitraum keine bezüglich der hormonellen Wirkstoffe einnahmefreien Intervalle umfasst, wobei der Verabreichungszeitraum mehrere Monate umfasst*"). Auxiliary Request 2 is filed in case the Opposition Division agrees with the Opponent that continuous administration in the course of a normal 28 day cycle is not sufficiently distinguished over the claimed use.

Auxiliary Requests 3 and 4 are identical to Auxiliary Request 2, except that they further specify in claims 1 and the claims corresponding to claim 6 of the New Main Request that the period of administration encompasses 9 months or 12 months, respectively. Auxiliary Requests 3 and 4 are filed in case the Opposition Division maintains that the use claimed in the Main Request or Auxiliary Requests 1 or 2 encompasses administration periods of two or three months separated from further administration periods by pill-free intervals, despite our explanations in the present and our previous submission. In view of the Opposition Division's remarks regarding granted claims 4 and 5, we trust that Auxiliary Requests 3 and 4 will be found to be novel over both D2 and D3 or any other administration regime mentioned in the prior art of record.

3.    **Inventive Step**

The Opposition Division seems to be of the preliminary opinion that the subject matter of granted claims 4 and 5 is based on an inventive step. We trust the same will apply to the subject matter of Auxiliary Requests 3 or 4.

41

5

**Wyeth**

Like Auxiliary Requests 3 and 4, the Main Request and Auxiliary Requests 1 and 2 require that there be no hormone free intervals throughout the entire period of administration of the contraceptive. In this regard, we note that none of the prior art references of record suggests that it would be satisfactory or safe for a woman to avoid the pill free week and thus, withdrawal bleeds altogether.

D1 at best mentions bi- or tricycling (although not in connection with compositions according to claim 1), which is <u>not</u> an uninterrupted administration regime according to claim 1, as explained above. D1 furthermore mentions potential health issues due to the additional hormone load associated with extended cycles (see the first full paragraph at page 86 of D1).

D12 points to the need to control breakthrough bleeding, weight gain and other side effects which would be known or assumed to be associated with reducing the number of pill free intervals (see also items 11-18 of the declaration by Prof. Guillebaud, D13).

D10, which in contrast to D1 is directed to the skilled artisan rather than the scientifically untrained average users of contraceptives, explicitly recommends not to omit the pill free interval altogether (see the 6 reasons listed at page 109 of D10 and the recommendation at page 110, paragraph 4.27 to cut out the gap between packets only when there are good indications). The longest acceptable cycle extension mentioned in D10 is tricycling for women having the indications listed in Table 4.2. In case breakthrough bleeding is encountered, D10 furthermore recommends to bicycle instead of tricycle, which would further teach away from the claimed use.

Finally, references D3-D7, which according to the opponent render the claimed subject matter obvious when combined with D1, actually further confirm that the skilled artisan would not consider to leave out pill free intervals altogether, since they explain the problems encountered in the art with extended cycle regimens such as breakthrough bleeding and spotting, which are major determinants for lack of patient compliance. For the sake of brevity, we refer to items 5.5 to 5.9 of our submission of December 13, 2004.

It was therefore entirely unexpected that it would be possible to completely avoid hormone free intervals by uninterrupted

6

**Wyeth**

administration and at the same time achieve the goals of ensuring high contraceptive reliability, avoiding inter-menstrual bleeding (or at least keeping it within acceptable limits), and additionally reducing the hormone burden and keeping side effects typically associated with high hormonal doses at a minimum.

Accordingly, the subject matter of the Main Request and Auxiliary Requests 1 and 2 is likewise based on an inventive step.

The objection for lack of inventive step of granted claim 6 does not need to be addressed here, since the subject matter of this claim is no longer contained in the New Main Request or any of Auxiliary Requests 1-4.

As to the objection raised against granted claim 7 (see the last paragraph at page 5 of the Communication attached to the Summons), we note that it is self-evident that the cycle dependent instability of the hormone system, and thus, the incidences of the premenstrual syndrome resulting therefrom, will be reduced by the uninterrupted administration regime according to claim 6 of the New Main Request (or claim 6 of Auxiliary Requests 1 and 2; claim 5 of Auxiliary Request 3; and claim 4 of Auxiliary Request 4). This is also explained in the paragraph bridging pages 9 and 10 of the application as filed (see again WO 99/12531). We therefore believe that an inventive step should be acknowledged in respect of these claims as well.

A form 1037 is enclosed with the confirmation copy of this letter for acknowledgement of receipt.

Yours faithfully

Sally K Mannion (Dr)
European Patent Attorney (GA 45314)

**Enclosures**

New Main Request
Auxiliary Requests 1-4

43



**Telefax transmittal
cover sheet**                    **AKZO NOBEL**

Date
13 December 2006
Number of pages
(incl. cover sheet)
3

**To**                          **Company/Department**            **Fax number**
Opposition Division             European Patent Office            0049-89-2399-4465
European Patent Office

**From**                        **Company/Department**            **Fax number**
Leon van den Broek              N.V. Organon                      0031-412-650592
                                Intellectual Property Department  **Phone number**
                                                                  0031-412-665426
                                                                  Your reference
                                                                  98954135.4-
                                                                  2123/1011682
                                                                  Our reference
                                                                  OPP265

**Subject**
**Opposition to EP 1011682 B1**

This message may contain confidential information and is intended only for the use by the individual and/or the entity
to which it is addressed. Any unauthorized use, dissemination of, or copying of the information contained herein is not
allowed and may lead to irreparable harm and damage for which you may be held liable. If you receive this message
in error or if it is intended for someone else please notify the sender by telephone and destroy this message

Dear Sirs,

Further to our submission under R.71a of November 30, 2006, Opponent
herewith submits as E19 a recent press release dated December 5, 2006
(i.e. this press release was published after the R 71a due date) titled
*"Suppressing your period: Drug makers offer new pills to manage monthly
cycle"* which is a *prima facie* novelty destroying document for all Patentee's
requests currently on the record.

In this press release Leslie Miller, also the author of E9, with reference to
several different types of "period management" contraceptives including
"Lybrel, a 365-day regimen from Wyeth" (the Patentee), states *"It's not a
new idea – it's just become newly popular....Female doctors have always
known you can skip your period on the pill"*.

Respectfully submitted,

Leon van den Broek

Enclosure: E19

N.V. Organon
P.O. Box 20
5340 BH Oss
The Netherlands

44

**Wyeth Pharmaceuticals**
Huntercombe Lane South
Taplow, Maidenhead
Berkshire, SL6 0PH

**Patents & Trade Marks Department**
Tel: +44 (0)1628 604377
Fax: +44 (0)1628 799098

# Wyeth

SKM/sb
17 January 2007

<u>URGENT</u>
<u>BY FAX</u>

The European Patent Office
D-80298
**MUNCHEN**
Germany

cc. L. van den Broek
N.V. Organon
Fax No. 00 31 412 650592

Dear Sirs

**European Patent No. 1 011 682**
**Proprietor: Wyeth**
**Our Ref: AM-101403**

This is further to the Opponent's written submissions which were filed on November 30 and December 13, 2006 in preparation for the oral proceedings. We believe the Opposition Division should exercise their discretion under Article 114 EPC to allow this submission to be entered into the proceedings in view of the submission made by the Opponent on the last day of the Rule 71a period enclosing papers which the Patentee could not reasonably have been expected to have foreseen, in particular the submission the FDA's review of Seasonale® and the arguments raised for the first time in respect of whether the invention solves a technical problem. Indeed, all the arguments previously presented by the Opponent were based on the obviousness of the solution of the problem. Moreover, the Opponents themselves raised a further submission after the Rule 71a date to which the Patentee does not intend to object.

I would like to inform you that, in addition to Dr. Dörries, I will be accompanied by Professor Sven O. Skouby of the Department of Obstetrics and Gynecology, Fredriksberg Hospital, University of Copenhagen. A short CV of Professor Skouby is attached. Professor Skouby was responsible for the Expert Report submitted to regulatory authorities in Europe with respect to obtaining marketing approval for Wyeth's continuous combined hormone contraceptive, Anya. If necessary, Professor Skouby will be able to address technical questions regarding the continuous uninterrupted administration regime described and claimed in the opposed patent, including questions regarding the significance of the comparison to Seasonale® that was made in the Opponent's submission of November 30, 2006.

45 ◯     John Wyeth & Brother Limited
Registered in England No. 135937
Registered Office: Huntercombe Lane South
Taplow, Maidenhead, Berkshire, SL6 0PH          Incorporating:  Wyeth Research
INVESTOR IN PEOPLE

2

# Wyeth

We believe the following comments regarding some of the allegations made in these submissions may be helpful for the Opposition Division:

I.    Novelty

On page 3, 2nd para. of their submission of November 30, 2006, the Opponent refers to page 87 of D1 (E1), where it is stated that "[t]here are some gynaecological conditions, such as endometriosis, in which continuous pill taking is to be preferred, since bleeding is to be discouraged". The Opponent furthermore suggests that claim 1 of the opposed patent does not exclude the use in such women.

First of all, while "continuous pill taking" is mentioned in the above passage of D1, it does not, of course, disclose or suggest an <u>uninterrupted</u> administration regime as claimed, let alone an uninterrupted administration regime using a product where the daily dose of ethinylestradiol is limited to 20 μg.

Furthermore, as will be apparent from an analysis of the wording of the above passage (which refers to "some gynaecological conditions, such as endometriosis"), it does not refer to the use of an oral contraceptive for any contraceptive purpose, but for the purpose of <u>treating endometriosis</u>. This is confirmed by an excerpt of Dr. Guillebaud's book "Contraception – Your Questions Answered", 2nd ed., which we submit as new document D20. (Another excerpt of this book had already been filed previously as D10).

As explained under item 4.99 of D20, COCs (i.e., <u>combined oral contraceptives</u>) were known to be indicated to "[c]ontrol endometriosis <u>as maintenance after first-line treatment</u> (progestagen-dominant brand, best using the tricycle regimen (see Qs 4.28 and 4.210))". (Emphasis added). Thus, in the context of endometriosis, oral contraceptives were given with the aim to treat this condition rather than to prevent pregnancy. This is different from the use claimed in claim 1 of the Main Request (or any of the Auxiliary Requests), where the claimed combination of a single gestagen and a single estrogen is used for the preparation of a pharmaceutical which is to be administered for contraceptive purposes.

D20 makes furthermore clear that an administration regime with pill-free intervals, such as tricycling, would have been envisaged in the context of treating endometriosis (see also the statements under item 4.28 and 4.210 of D20), thus confirming that the reader of D1 would in any event not have understood this document to propose omitting pill-free phases altogether. D20 also makes clear in item 4.210 that the recommended pill is a brand such as Eugynon 30 or Microgynon 30, i.e., 30 μg ethinyl estradiol (EE).

46

3

# Wyeth

## II.  Inventive Step

As explained in our submissions of November 30, 2006 and December 13, 2004, it was entirely unexpected that it would be possible to completely avoid hormone free intervals by using an uninterrupted administration regime and at the same time achieve the goals of ensuring high contraceptive reliability, avoiding inter-menstrual bleeding, or at least keeping it within acceptable limits, and additionally reducing the hormone burden and keeping side effects typically associated with high hormonal doses at a minimum.

In its submission of November 30, 2006 the Opponent suggests that the tricycling product Seasonale® was associated with unacceptable inter-menstrual (or breakthrough) bleeding problems, and that, therefore, the claimed administration regime had to suffer from such problems, too, despite the positive results reported in D9.

However, regardless of the discussion between the FDA and the Seasonale® manufacturer of how the breakthrough bleeding observed with this product compares to normal cyclic OC administration, and how this comparison should be qualified in the package insert or in TV commercials, it is clear that breakthrough bleeding with Seasonale® was nevertheless considered by the FDA to be within acceptable limits (see also the Conclusions and Recommendations at page 78 of the clinical review part of D15). Otherwise, Seasonale® would have hardly received marketing approval.

Furthermore, and more importantly, the results observed with Seasonale®, of course, do not call into question the positive results reported in D9 with an uninterrupted OC administration regime according to the invention. As explained by the Opponent, the dosing regime of Seasonale® is 84 days of active tablets followed by 7 inactive (placebo) tablets. In other words, every 84 days there is a pill-free period of 7 days during which the users are reset to hormone-free baseline status. This is quite different from the uninterrupted administration regime according to the invention, which avoids any pill-free intervals. Possible breakthrough bleeding problems observed with Seasonale® are, therefore, by no means indicative of an allegedly even higher risk of breakthrough bleeding in connection with the invention.

The Opponent's criticism regarding the reference to the median in D9 is likewise not justified. Determining study outcomes based on the median is normal in this technical field. In fact, the median is arguably a more

47

4

# Wyeth

appropriate indicator of central tendency of a study particularly when the sample size is relatively small. The mean value only becomes acceptable when the sample size is large and will be demonstrating a normal distribution in the population. The median value is important in sample sizes where the population is not exhibiting a normal distribution. In the case of the Miller paper (D9), the sample population size is relatively small and there is a low drop-out rate from the study which fully justifies the use of median values to assess the results.

According to the Opponent, the comments of the FDA medical officer reviewing Seasonale® indicate that any results expressed in terms of the median rather than the mean had to be distorted. This is, however, not what the FDA medical officer said. Rather, he merely speculated that in the particular case of the Seasonale® data, the improvement regarding total (or unscheduled) bleeding/spotting days observed over time may be partially explained by the discontinuation of subjects due to unacceptable bleeding (see page 52 of the clinical review part of D15; see also the FDA officer's comments on page 53). He did not say that expressing the results in terms of the mean would have avoided this potential problem (in fact, the mean likewise shows a decrease in total or unscheduled bleeding and/or spotting days over time in Tables 25 and 26), let alone that the median is generally an inappropriate way of expressing the results of a clinical study. Thus, FDA's comments should not be construed as a criticism of the way the Seasonale® data was presented because it is the usual method of presentation of data.

It is noteworthy in this regard that D9 reports only few drop-outs of the continuous arm of the study, which were, by the way, considerably lower in number than in the monthly arm of the study (see Figure 1 and the comments on page 659, right column, 1st full paragraph of D9). Thus, there is no reason to assume that the results in the continuous arm could not be fairly compared to those in the monthly arm of the study.

It is also noted that the results in Table 3 of D9 are not expressed in terms of the median. According to Table 3, 72% of the participants of the continuous arm who completed the first and last 84-day intervals of the entire study period experienced amenorrhea, i.e., neither bleeding nor spotting. This compares, by the way, favorably to the 9-16% cases of amenorrhea mentioned for Seasonale® at page 56 of the clinical review part of D15.

Thus, the Opponent's speculations that, contrary to the results reported in D9, the claimed uninterrupted OC administration regime was associated with unacceptable bleeding problems, do not have any basis.

48

5

# Wyeth

We do not understand why the Opponent believes that the statements by Professor Guillebaud and Dr. Szarewski would support their case. These statements relate to their expectation around the time the invention was made, and in the absence of any knowledge of the invention, that low estrogen OC products would be associated with poor cycle control when the normal cycle length was extended. The results reported in the opposed patent and D9 showing a lack of side effects and good or at least acceptable cycle control are indeed unexpected in this regard, which supports the presence of an inventive step. It is unclear, however, how Professor Guillebaud's and Dr. Szarewski's expectations could be evidence that the data reported in the patent and D9 were not accurate.

As mentioned above, a continuous OC regime (known as Anya or Lybrel) developed by the Proprietor of the opposed patent was recently approved for marketing in Finland on 26 October 2006 (we enclose a copy of the Finnish registration certificate and the Summary of Product Characteristics including the approved Patient Information Leaflet as D21). D21 provides a summary of the results of studies containing much larger numbers of users representing the general population.

The hormone load of Anya is lower than that associated with extended cycle and at least some approved normal cycle OC products. Anya contains 90 µg levonorgestrel (LNG) and 20 µg regimen ethinyl estradiol (EE) and is administered according to a continuous administration regime without any pill-free intervals. Anya thus results in a lower daily dose and lower cumulative dose per year of both LNG and EE compared to known extended-use OC and normal cycle OC products containing 150 µg LNG and 30 µg EE, as will as will be apparent from the following Table:

| Parameter | Anya/Lybrel | Nordette | Seasonale® |
|---|---|---|---|
| Regimen | Continuous uninterrupted | 21-Day cyclic | Extended cycle |
| Active tablets / intervals | 28/pill pack | 21/28 Day cycle | 84/91 Day interval |
| Active tablets / year | 364 | 273 | 336 |
| Dose/tablet LNG (µg) | 90 | 150 | 150 |
| Dose/tablet EE (µg) | 20 | 30 | 30 |
| Tablet dose / year LNG mg) | 32.76 | 40.95 | 50.40 |
| Tablet dose / year EE (mg) | 7.28 | 8.19 | 10.08 |

49

6

## Wyeth

In addition to the above considerations, there are further advantages associated with reduction of cycle related symptoms (page 12, section 5.1 of the Summary of Product Characteristics) due to the lack of variation in hormone levels which occur in the natural cycle and in OCs which have a 21-day or 84 day cycle. The claimed administration regime has the advantage of reducing dysmenorrhea and premenstrual syndrome as well as increasing average work productivity in the users. These are the results of a 3 pack substudy illustrating the advantage of being able to continue the regimen rather than cycling after 3 or 4 packs and inducing the cycle related symptoms and resetting the base line for improvement.

It should also be noted that these advantages are not achieved by accepting an overall considerably higher hormone load. Anya has a lower drug load than Nordette or Seasonale®, thus avoiding possible safety concerns related to comparatively high daily or cumulative doses of progestin or estrogen.

As to the remaining arguments advanced by the Opponent in the submissions of November 30 and December 13, 2006, we believe it will be sufficient to address these in the course of the oral hearing.

A form 1037 is enclosed with the confirmation copy of this letter for acknowledgement of receipt.

Yours faithfully

Sally K Mannion (Dr)
European Patent Attorney (GA 45314)

**Enclosures**
CV of Professor Sven O. Skouby
D20: (excerpt of "Contraception – Your Questions Answered", 2nd ed.)
D21: Finnish Certificate of registration and English translation along with Finnish Summary of Product Characteristics along with English translation.

50

Europäisches Patentamt  European Patent Office  Office européen des brevets
GD2-Einspruch  DG2 - Opposition  DG2 - Opposition


Application No.:     98 954 135.4

Patent No.:     EP-B-1011682


## Minutes of the oral proceedings before the OPPOSITION DIVISION

The proceedings were public.

**Proceedings opened on** 30.01.2007  at  9:00  hours

### Present as members of the opposition division:

Chairman:          Engl, Brigitte
1st member:        Langer, Astrid
2nd member:        Ludwig, Gerald

Minute writer:          Ludwig, Gerald

### Present as or for the party or parties:

- For the Proprietor(s):     Wyeth

Mr. H.Ulrich Dörries for the proprietor Wyeth Pharmaceuticals
accompagnied by Mrs. Sally Manion
and the expert Sven Olaf Skouby

- For the Opponent 1:     Akzo Nobel N.V.

Mrs. Tessa Mirjam Malamud-Cohen and
Mr.Van de Broek
accompagnied by the expert Mrs. Titia Mulders


The identity of the person/s (as well as, if applicable, that of the witness or witnesses) and, where necessary, the
authorisation to represent/authority to act were checked.

Essentials of the discussion and possible relevant statements of the parties:



| Bescheid/Protokoll (Anlage) | | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|---|
| Datum<br>Date<br>Date | **CODINGDATE** | Blatt<br>Sheet 1<br>Feuille | Anmelde-Nr.:<br>Application No.: 98 954 135.4<br>Demande n°: |

1.  Opposition proceedings were opened by the Chairman at 9:00.

2.  The parties to the oral proceedings agreed to use English as a procedural language to which the opposition Division agreed. Accordingly, the minutes of the proceedings are written in English.

3.  Asked by the chairman for their requests O affirmed his request for revocation of the patent in its entirety. P requested acceptance of his requests on file.

4.  Discussion started with novelty.

5.  O briefly summarized his objections brought forward in the written procedure based on documents D1, D2 (relevant under Art. 54(3) EPC) and D3.

6.  P answered by outlining his position as known from the written procedure in considerable detail.

    Para 20 of the patent defined a typical administration period of the hormones to be taken (several months or years). This was however not to be understood as a redefinition of the mode of administration which should be "ununterbrochen" i.e. without gaps.

    Such a mode of administration was not disclosed in D1 i.e. pages 84-87 of this document did not disclose uninterrupted adminitration. It was not appropriate to combine different and isolated bits from a book (= document D1) and put them together.

    According to D1 bleeding was only postponed (page 8) according to P but you still had it (page 86: ocasional withdrawal bleeding). What was advocated by D1 was tricycling (page 87) and continuous pill taking was only advocated for endometriosis and epilepsy but not for contraception.  The latter also was the case for D10.

    As to D2 P indicated that here also cyclic administration was disclosed. D3 extended one of the cycles in a row of nine cycles.



| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date **CODINGDATE** | Blatt<br>Sheet<br>Feuille  2 | Anmelde-Nr.:<br>Application No.: 98 954 135.4<br>Demande n°: |

7.   O replied by objecting that the term "uninterrupted" had no meaning if there was no beginning and no end. D1 disclosed continous pill taking for endometriosis which automatically prevented pregnancy. In line with this D19 (postpublished press release) indicated: "Female doctors have always known that you can skip your period on the pill".
O also indicated that there was no difference between the main request and the granted patent.

8.   After a further discussion of the parties the division decided after deliberation (11:00-11:16) that the Main request was not novel vis-a-vis document D2.

9.   P indicated that he now wanted to continue with the First Auxiliary request.
O brought forward objections under Art.84 EPC against this request.

10.   The chairman indicated that the passages objected to had been in the original patent and were therefore not open for objections under Art. 84 EPC. The chairman opened the discussion of novelty for this request.

11.   Having regard to the First Auxiliary request O indicated that there was no difference to claim 1 of the Main request. Now only a definition of the term uninterrupted was incorporated but no definition of time was given. Therefore D2 still fell under this definition and the situation for D1 and D3 was the same as before.

P stressed that D2 said you have to start again after the cycles and that you must have pill-free breaks in contrast to claim 1 of the First auxiliary request.

12.   O replied that the entire administration period could still be the (one) period in which only contraceptive was taken in document D2.

P retorted that the period of 60-110 days were only the definition of the hormone period and it did not make sense if you did not start again with a new hormone taking cycle. The teaching of D2 was about cycles and administration was to be longer than just one cycle. In the contested claim an upper and lower time limit was not needed. This was inappropriate if continuous administration was proposed.



| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum<br>Date **CODINGDATE**<br>Date | Blatt<br>Sheet 3<br>Feuille | Anmelde-Nr.:<br>Application No.: 98 954 135.4<br>Demande n°: |

13. O disagreed and said that D2 did not mention cycling and that there could also be no continuation after the 4 cycles of use (60-110 days) which corresponded to the period of several months of the patent.

   P argued on the contrary that the whole period of administration ("gesamte Verabreichungszeitraum") of the patent (para 20) corresponded to the whole period of intake.

14. After deliberation (13:00-13:10) of the division the chairman indicated that Auxiliary request 1 was held to lack novelty under Art. 54(3) EPC (document D2).

15. P indicated that in the given situation he would want a decision of the division on the novelty of Auxiliary request 2 as on file (i.e. which had the period of several months ["mehrere Monate"] in claim 1) but that he did not withdraw any requests.

16. After deliberation (13:19-13:29) the chairman indicated that the division held that Auxiliary request 2 was not novel over document D2.

17. As a consequence P indicated that he wanted to continue with Auxilary request 3. This claim contained the word "encompass" ("umfassen") which had been introduced in connection with the nine months period of drug administration.

18. To this word O objected under Arts. 123(2), 123(3) and 84 EPC.
   O indicated that the term "encompass" had not been in the patent as granted in connection with the nine months and was not disclosed in para 20 of the patent. Originally the patent only contained that the time period "is" ("beträgt") nine months.

   Claim 1 now also contained a generalistaion in that it now referred to all compounds in connection with the nine months period, in difference to before, which contravened Art. 123(3) EPC. In addition the term ning "months" was not clear since - without explanation in the patent - it was not known if 21, 28 days or a calender month were intended by the patent.

   P retorted that example 1 of the patent did not say that it stopped after 9 months which were only the examining period. Regarding Art. 123(3) this feature only



| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date   **CODINGDATE** | Blatt<br>Sheet<br>Feuille   4 | Anmelde-Nr.:<br>Application No.: 98 954 135.4<br>Demande n°: |

represented a limitation.

To O's objection of how it would be possible that 9 calender month could be transferred into a pill pack since 28 days represented a cycle P retorted that nine month represented nine cycle months.

19. After deliberation (14:00-14:10) the chairman indicated that Auxiliary request 3 was held to be novel vis-a-vis document D2 since the period of 9 months was already in the patent as granted, being an example and additional illustration for the period of several months to years disclosed in the patent so that Art. 123(2) was fulfilled. Art. 123(3) was also complied with since the indication of nine months represented a restriction vis-a-vis the granted patent. Lastly, the division held that the 9 months of the patent meant 9 calender months during which the pill was taken.

20. The chairman now opened the discussion of inventive step for Auxiliary Request 3.

21. O indicated that there were three different topics which had been confused by the patentee, i.e. withdrawal bleeding, breakthrough bleeding and spotting. D9 as cited by P therefore solved a different problem than the patent. Withdrawal bleeding and breakthrough bleeding had been intermixed by P and withdrawal bleeding was also different to menstrual bleeding. The advantages cited by P were not present and it was not clear which problem if any was solved. The advantages cited by P on the basis of D21 were based on a tricycle regimen and there was no proof that it could be continued since the study stopped after 84 days. Document D21 had a high dropout rate of 84% and there was no proper statistical analysis since the mean but not the median value should be used. Hence it was unclear which problem was solved, there was no technical effect present, the three-pack study was the only basis and after 9-12 months there was inevitably a hormone-free period.

P replied by indicating that the closest prior art was in his view D1 but the opposition division had defined it to be D2 (to be considered under Art. 54(3) EPC). Likewise D5 could be regarded as closest prior art which disclosed a



| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date  **CODINGDATE** | Blatt<br>Sheet   5<br>Feuille | Anmelde-Nr.:<br>Application No.: 98 954 135.4<br>Demande n°: |

trimonthly regimen followed by a pause. He indicated that he would be willig to discuss any of these documents as prior art if need be. He defined the problem to be solved by the patent as the *provision of a contraceptive treatment regimen with high contraceptive reliability and reduced breakthrough bleeding as compared to known cycling regimens.*

22.  P then presented a list of data cotaining a compilation of comparative data of the patent, D9 and D15 having regard to the issues under discussion such as inter alia  amenorrhoe and breakthrough bleeding. As P indicated this list only contained data of documents already on file in the proceedings and was presented for the purpose of facilitating discussion and comparison of the data between these documents.

23.  The list was acccepted to be introduced into the proceedings by the opposition division and is annexed to these minutes.

[For a better understanding of the list it is to be noted that the product Anja cited in D21 and that of Miller et al (D9), i.e. those listed the left and middle columns of the list correspond to P's product and that the right column listing Seasonale of D15 (=Nordette) is the state of the art product; explanation added by the minutes writer]

P indicated that having regard to amenorrhoe the patented product (D21 , D9) was superior to that of D15 which was also the case for breakthrough bleeding thus clearly showing the advantages of the patent.

24.  After a break to study the list submitted by P (15:25-15:45) O indicated that the problem in the patent was different to now and was not derivable from the original application. Bleeding was not excluded but only reduced. The examples of the patent only refered to the third subproblem and that the third element of the problem could not have been in existence at the time of the patent. According to D21 with Anja (=P's product) there was no scheduled bleeding but increased breakthrough bleeding or spotting. Hence bleeding was not eliminated.

P replied in view of the argument that the problem could not be derived from the patent that the issue was adressed and no different problem was created. An



| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum<br>Date    **CODINGDATE**<br>Date | Blatt<br>Sheet    6<br>Feuille | Anmelde-Nr.:<br>Application No.: 98 954 135.4<br>Demande n°: |

adjustment of the problem was usual especially in opposition proceedings. The patent did not refer to extended cycles but the problem was to exclude intermediate bleedings ("Zwischenblutungen"). Anja had a still reasonable dropout rate in the studies carried out and the studies were reasonably comparable. Many patients did very well with the product of the patent as compared to patients being on extended cycles and in 59% bleeding could be completely eliminated.

O replied that the closest state of the art document was D1. Tricycling was known and it was also known that having 20 microgram or 30 microgram of hormone in a pill did not make any difference. The only difference of the third Auxiliary request to D1 was the feature of 9 months but the problem of breakthrough bleeding still existed. It was therefore only an obvious modification with no technical effect. Furthermore it was known from D4 (page 209, lines 1-2) that there was a decrease of bleeding with time.

P stated in reply that the combination of documents D1 and D4 only suggested tricycling. The patent's solution of the problem was to have no hormone-free intervals, have a long treatment of at least 9 months and have reduced amounts of hormone. What was to be compared was the patent with uninterrupted administration versus tricycling in the prior art. D4 and D7 taught away from the patent since if there were problems with bleeding on the 12 weeks regimen the consequence was to go back to 9 months (D7, page 180, right column, lines 14-18 fom the bottom).

25. After deliberation (17:00-17:20) the chairman announced that Auxiliary request 3 was held to be be inventive because the prior art gave no hint to go beyond the tricycling regimen.

26. The chairman then opened the discussion of Art. 83 EPC.

27. O indicated that the term 9 months was not defined since it could be 21, 28 days or a calender month. Rule 29(2) EPC was not fulfilled since there was no justification for an independent claim for the premenstrual syndrome.

P replied that the term of 9 months was a clarity issue and that Rule 29(2) was not a ground for opposition.

EPA Form 2906 01.91CSX



| Bescheid/Protokoll (Anlage) | Communication/Minutes (Annex) | Notification/Procès-verbal (Annexe) |
|---|---|---|
| Datum<br>Date<br>Date  **CODINGDATE** | Blatt<br>Sheet     7<br>Feuille | Anmelde-Nr.:<br>Application No.: 98 954 135.4<br>Demande n°: |

28. After deliberation (17:36-17:46) the chairman announced that Art. 83 EPC was fulfilled since all definitions of months would make the invention work. The independency of claim 5 was rather an issue of Rule 57(a) EPC.

29. P replied in answer to this that the independency of claim 5 had been introduced in response to an objection under Art. 83 EPC raised by O and that Rule 57(a) was therefore fulfilled.

30. After a short deliberation the chairman annonced that Auxiliary request 2 was not novel for the given reasons and that Auxiliary request 3 met the requirements of the EPC. The description needed still to be adapted to the latter request.

31. The description was adapted by P after some discussion with O about the allowability of some passages of the patent (para 22,29,30) to remain in the adapted description. The chairman finally annouced that these passages could remain and that Rule 27(1)c was fulfilled.

32. At 18:38 the chairman announced the final decision that Auxiliary request 3 and the description adapted to it as filed during the proceedings met the artices of the EPC and closed the procedure.

Sheet 2/1                                          Application No.: 98 954 135.4

The chairman **closed the oral proceedings** on    30.01.2007    at    18:45    hours.

Eng., Brigitte
Chairman

Ludwig, Gerald
Minute Writer

Annex(es):

Form 2339.4

Wyeth Pharmaceuticals
Huntercombe Lane South
Taplow, Maidenhead
Berkshire, SL6 0PH

Patents & Trade Marks Department
Tel: +44 (0)1628 604377
Fax: +44 (0)1628 799098

# Wyeth

SKM/lb
18 May 2007

**BY FAX**

The European Patent Office
D-80298
**MUNCHEN**
Germany

Dear Sirs

**European Patent No. 1 011 682**
**Proprietor: Wyeth**
**Our Ref: AM-101403**

Wyeth hereby files Notice of Appeal against the Decision of the Opposition Division in respect of EP 1 011 682 dated 29 March 2007.

The Decision is appealed to the extent that the Opposition Division decided to reject the Main request and Auxiliary requests 1 and 2 filed on 30 November 2006.  In addition, the decision to consider EPC Rule 29(2) as a ground of opposition is also appealed.  The Proprietor maintains its original request that the Patent is maintained on the basis of the Main request or in the alternative one of Auxiliary requests 1 to 4 filed on 30 November 2006.

The Grounds of Appeal will be substantiated with argument and evidence in due course under Art 108 EPC.

Please debit our deposit account no. 2805.0053 for the fee for filing an Appeal as detailed in the enclosed form 1010.  If the fee indicated is insufficient, please debit the correct amount from our deposit account. A form 1037 accompanies the confirmatory copy of this fax letter for acknowledging receipt.

Yours faithfully

S K Mannion (Dr)
European Patent Attorney
GA 45314
Encl

60

John Wyeth & Brother Limited
Registered in England No. 135837
Registered Office: Huntercombe Lane South
Taplow, Maidenhead, Berkshire, SL6 0PH

Incorporating:  Wyeth Research



Organon

European Patent Office
Erhardstraße 27
D-80298 Munchen 2
Germany

| Your reference | Our reference | Direct line | Oss, |
|---|---|---|---|
| 98954135.4-2107/1011682/01 | 00OP.265 | tel.: +31 412 66 5426 | May 28, 2007 |
| | | fax: +31 412 65 0592 | |

## NOTICE OF APPEAL

**European Patent No. 1011682 B1**
**Title: Hormonal contraceptive**
**In the name of: Wyeth Pharmaceuticals**
**Opposed by: Akzo Nobel N.V.**
**Our reference: OPP265**

The opponent, Akzo Nobel N.V., Velperweg 76, 6800 SB Arnhem, the
Netherlands hereby files a notice of appeal according to Art. 106(3)EPC
against the Inerlocutory Decision of the Opposition Division dated March 29,
2007 in the above referenced matter.

The opponent requests:
- reversal of the Interlocutory Decision which decided that the
  patent and invention are found to meet the requirements of the
  Convention
- complete revocation of EP 1011682
- oral proceedings according to Article 116 in case reversal of the
  decision cannot be effected on the basis of the written documents
  only.

A written statement setting out the grounds of appeal will be filed in due
course (according to Article 108 EPC). In any case, we hereby refer to the
grounds as stated during the opposition procedure so far.

You are hereby authorized to charge the appeal fee to our deposit account
no. 28090012.



Global Patent Departmer
N.V. Organon
P.O. Box 20
Weth. van Eschstraat 1
5340 BH Oss
The Netherlands
Tel.: +31 412 666380
Telefax +31 412 65059
E-mail
patent@organon.com

61

D:\working offline\opp265\notice of appeal.doc
Received at the EPO on May 28, 2007 07:16:08. Page 1 of 2
Banker: ABN-AMRO Nijmegen (Account No. 45.30.65.837). C. Reg. 's-Hert.ogenbosch No. 16021751

05/28 '07 07:12 NO.929  02/02



Page 2 of 2

**Organon**

Please note that the opponent is represented under G.A. 59 by:

Tessa M. Malamud-Cohen
P.O.Box 20
NL-5340 BH Oss
The Netherlands

With respect

Tessa M. Malamud-Cohen



62

D:\working offline\opp265\notice of appeal.doc



**AKZO NOBEL**

EPO - Munich **Organon**
23

**3 1. Juli 2007**

European Patent Office
Erhardstraße 27
D-80298 Munchen
Germany



CONFIRMATION
(with enclosures)

| Your reference | Our reference | Direct line | Oss, |
|---|---|---|---|
| 98954135.4-2107/1011682/01 | 00OP.265 | tel.: +31 412 66 5426<br>fax: +31 412 65 0592 | July 29, 2007 |

## GROUNDS OF APPEAL

**European Patent No. 1011682 (application number 98954135.4)**
**Title: Hormonal contraceptive**
**In the name of: Wyeth Pharmaceuticals**
**Opposed by: Akzo Nobel N.V.**
**Our reference: OPP265**

Further to the Notice of Appeal dated May 28, 2007, concerning the above captioned case, Appellant hereby submits the written statement setting out the Grounds of Appeal in accordance with Article 108 EPC.

Requests

- Appellant contends that the Opposition Division was correct in its decision that the main request and the first and second auxiliary requests lack novelty on the basis of E2. However, appellant additionally contends that the main request and the first and second auxiliary requests also lack novelty on the basis of E1 and E3. Appellant maintains all arguments and submissions made in this respect.

- Appellant disagrees with the decision of the Opposition Division that the claims of the third auxiliary request meet the requirements of the EPC and request that the decision of the Opposition Division dated March 29, 2007 be set aside and the European patent be revoked in its entirety.

- Appellant requests oral proceedings in case the technical BoA does not intend to revoke the subject patent on the basis of the written documents only.



Global Patent Department
N.V. Organon
P.O. Box 20
Weth. van Eschstraat 1
5340 BH Oss
The Netherlands
Tel.: +31 412 666380
Telefax +31 412 650592
E-mail
patent@organon.com

Banker: ABN-AMRO Nijmegen (Account No. 45.30.63.837). C. Reg. 's-Hertogenbosch No. 16021731

New documents are enclosed with the confirmation copy of this response as follows:

- E22 – the entire E1;
- E23 – US drug approval package Lybrel
- E24 – The European Journal of Contraception and Reproductive Health Care 1998, 3, 169-178
- E25 – Declaration of Anne Szarewski dated May 15, 2005 which was filed by Schering AG in connection with T1063/04-332
- E26 – decision of the opposition division T1063/04-332
- E27- Norgeston

Background

Appellant submits, as is also clear from many of the documents in the record, that it has long been known that a woman can avoid her period by omitting the pill-free period for as long as she deems necessary. This is anecdotally evidenced by E19, a press-release of the patentee dated December 5, 2006 titled *"Suppressing your period: Drug makers offer new pills to manage monthly cycle"*. This press-release recites with reference to several different types of "period management" contraceptives including Lybrel (Anya), a 365-day regimen from Wyeth (the Patentee) which is encompassed by the scope of the claims of the patent in suit, *"It's not a new idea – it's just become newly popular....Female doctors have always known how you can skip your period on the pill"*. We submit that the use of extended oral contraceptive regimens was widely known and practiced before the priority date of the opposed European patent.

The lack of relevance of E9 and E21 relating to Anya (Lybrel)

The patentee has made reference to the product "Anya" (E21). Appellant contends that "Anya" has no relevance to any request. Anya is limited to 20 mcg ethinyl estradiol and 90 mcg of levonorgestrel, administered for 365 days. It cannot provide support for the full breadth of any claim.

The fact that the Finnish health authorities granted a product license to "Anya" has no relevance. The Finnish health authorities do not require a product it licenses to comply with the EPC. Meanwhile (since the hearing before the opposition division) also the US FDA has approved Lybrel which is identical to Anya (E23).

None of the requests of the patentee during the opposition were limited to "Anya". All requests allow for as little as 1 mcg of ethinyl estradiol to be used. "Anya" therefore contains 20 times as much this amount of ethinyl estradiol and so cannot provide any information in respect of performing the claimed use and achieving the required technical effect across its breadth.

Obtaining a product license is an expensive, but non-inventive act. It reflects a commercial decision. The decision to carry out a large scale clinical trial

(as required by any health authority such as the Finnish health authorities to obtain a product license) to demonstrate formally what is already known to the skilled worker is based on commercial considerations, for example, can money be made. Obtaining a product license does not therefore suggest that the product is new and inventive. In fact, commercial pharmaceutical products are not always the result of an invention. For those non-inventive products, regulatory data protection exists which allows companies some form of protection even when patent protection is not available.

Also E9, although not relating to a product license, is limited to a contraceptive of 20 mcg ethinyl estradiol and 100 mcg of levonorgestrel, administered for 336 days. It cannot provide support for the full breadth of any claim.

The claims as amended

Independent amended claim 1 (of the third auxiliary request) of the opposed patent claims a use which comprises the four essential features of:

- a combination of a single gestogen[1] and a single estrogen[2] as sole hormone components
- for the manufacture of a contraceptive means for continuously inhibiting ovulation and suppressing the menstrual cycle
- by oral, transdermal or depot administration
- where the total (gesamten) administration period of the contraceptive means is uninterruptedly carried out for (at least) 9 months (umfasst) without hormone-free intervals.

Dependent claims 2-5 further particularize the identity and the amount of the estrogen, the manner of administration, the duration of administration and indications other than contraception. For full wording of the claims, reference is made to amended claims 1-5.

Extension of subject matter (Art. 123(2) EPC)

Amended claim 1 relating to administration for 9 months extends the subject matter beyond the content of the application as filed because the application as filed discloses merely: "..over the administration period typically lasting several months to years there are no changes to the fundamental

---

[1] selected from the group consisting of progesterone, chlormadinone acetate, norethisterone acetate, cyproterone acetate, desogestrel, levonorgestrel, antigestagens, hormone analogs with gestagen or antigestagen effect, and hormone compounds which release at least one gestagen quickly after administration

[2] selected from the group consisting of synthetic estrogen, namely ethynyl estradiol used in a daily dosage of 1-20 μg, mestranol, and hormone compounds which quickly release at least one synthetic estrogen after administration, biogenous estrogens, namely estradiol, estriol, estron, estran and hormone compounds which quickly release at least one biogenous estrogen after administration

composition of the hormonal components" ("typischerweise die Zeitspanne mehrerer Monate bis Jahre umfassenden Verabreichungsdauer.....") (page 8, last paragraph). Administration for 9 months is mentioned only in one specific, exemplified embodiment, namely Example 1.

The limitation of 9 months was not even in the claims as originally filed. It was introduced during prosecution. Moreover, claim 4 as originally granted recites "....wherein the period of time for administration is 9 months" (Underlining added). In fact, that is still the wording in claim 4 defining the period as being for precisely 12 months, as exemplified in Examples 2-8. There is no support in the application as filed for "at least 9 months" or "comprising 9 months". During prosecution, the Examiner rightfully objected to the introduction of the term "wenigstens" with respect to claims 4 and 5 of the granted patent for not having a basis in the application as filed – and referred to Examples 1-2 – and said term was subsequently deleted by the patentee. Patentee should not be allowed to re-introduce it during opposition proceedings.

Claim 1 is thus a generalization that all compounds (and combinations thereof) mentioned in claim 1 can be used in the claimed regimen for at least 9 months. This provides an unlimited amount of possibilities which was not previously disclosed for all these compounds and combinations thereof but only for those present in Example 1 and cannot be derived directly and unambiguously from the application as filed (T194/84, G2/98).

The opposition division in its decision stated in point 5.1.3 that a "generalization of the treatment period of Example 1 to other active compound combinations and concentrations is admissible, since the claimed active compounds and their dosages within the field of hormonal contraception are sufficiently well known and they are so similar to one another in their mode of action that a person skilled in the art would transpose a treatment period from one active compound combination to others."

In traverse, amended claim 1 e.g. also recites a dosage range of 1-20 mcg of ethinyl estradiol. Please note that the lowest dose of ethinyl estradiol used in **combined** oral contraceptives is 15 mcg! No scientific evidence exists that combined oral contraceptives with a dose lower than 15 mcg ethinyl estradiol will still provide a contraceptive effect, let alone with a bleeding profile comparable to Anya.

Lack of inventive step of the claims of the third auxiliary request (Article 56 EPC)

Amended claim 1

**Closest prior art:** E1 is the closest prior art to amended claim 1. E1 is a handbook (textbook) about contraception in 1994. This handbook represents the common general knowledge about female contraception at that time. E1 also has the most features in common with claim 1 and is thus the most promising springboard for discussing the alleged invention.

E1, on pages 46, 53 and 54, describes the following two commercially available oral contraceptives (OCs):

Loestrin 20 (20 μg ethinyl estradiol + 1 mg norethisterone acetate); and Mercilon (20 μg ethinyl estradiol + 150 μg desogestrel), i.e. both low content estrogen combined oral contraceptives.

Both norethisterone acetate as well as desogestrel are listed in claim 1 as possible gestagens; ethinyl estradiol up to 20 μg is listed as a possible estrogen in claim 1.

E1 further has the sections entitled *"Moving periods"* on pages 84-86, *"Why have withdrawal bleed at all?"* on pages 86-87 and *"Tri-cycling"* on page 87 of E1. These pages of E1 confirm that withdrawal bleeding can be deferred for as long as desired by simply taking commercially available oral contraceptive (OC) pills such as the ones mentioned above, for an extended period without a break. Tri-cycling is just a specific, well-known example of a convenient regimen that extends the monthly regimen of commercially available oral contraceptive pills. Tri-cycling means taking three (i.e. 63 days) or four (i.e. 84 days) packages of oral contraceptive pills in a row, i.e. uninterruptedly, prior to having a pill-free week.

Under the heading *"Moving Periods"* in the paragraph bridging pages 84 and 85 of E1, it is taught specifically for monophasic pills – such as Mercilon – that in order *"To prevent a period altogether you have only to miss out your pill-free week and carry on with the next packet"*.

Further, under the heading *"Why have withdrawal bleeds at all?"* on page 86 of E1, it is explained that an argument against giving up the pill-free week is no longer relevant for the *"newest pills"*, such as the four (and not twelve! - see 2.1.2 of the decision) contraceptives listed on page 46 of E1 including Mercilon, also named amongst one of the *"newest pills"* (page 46, line 13 of E1).

Under the heading *"Tricycling"* on page 87 of E1 it is specifically taught that *"Any woman may tricycle, if she wishes so"*, hence, no matter what contraceptive she uses. This is a clear teaching for tricycling – and of e.g. tricycling of Mercilon, which contraceptive is, as said, listed – as one out of

only four suggested *("newest pills")* contraceptives - under the heading *"Your first time on the pill"* on page 46 of E1. Note that Mercilon (20 micrograms ethinyl estradiol and 150 micrograms desogestrel) has been on the market since 1987.

Still further, on page 87 under the same heading, it is specifically disclosed that for women with some gynecological conditions, such as endometriosis, **continuous** pill taking is even to be preferred. This paragraph on page 87 relates to the discouragement of bleeding in women who suffer from endometriosis. Note that there is no hormonal therapy to combat endometriosis, which is clear from E20, 4.99 which recites: *"Control endometriosis....."* In other words, the symptoms of endometriosis are to be controlled, i.e. cannot be eliminated by hormonal treatment.

It is however inevitable that when women suffering from endometriosis take the advice from E1 and continuously (such as for 9 months or longer) take the pill (such as Mercilon), they also prevent pregnancy. This is confirmed by D20 by the combination of points 4.98 and 4.99. 4.98 describes the principal use of oral contraceptives, namely prevention of pregnancy and 4.99 describes that oral contraceptives can also provide the additional benefit (not separate benefit) of controlling endometriosis. Even though point 4.210 of D20 recommends a pill brand with 30 mcg ethinyl estradiol, note that page 52 of E1 states that *"there is not enough difference between them to warrant changing from Mercilon to Marvelon".* Mercilon contains 20 mcg ethinyl estradiol and Marvelon contains 30 mcg ethinyl estradiol.

Thus, according to the contentions of the patentee, such women suffering from endometriosis when taking the pill such as Mercilon continuously for at least 9 months without a hormone-free period, must inherently achieve the alleged technical effect of reduced bleeding.

Moreover, the conclusion of the opposition division that E1 recommends tricycling (and not continuous administration) for endometriosis patients is not correct as the last sentence of this paragraph on page 87 of E1 is *"One possible **compromise** is the concept of tricycling".* In other words, tricycling was a compromise for actual *"continuous pill taking".*

Thus, the only distinguishing feature between amended claim 1 as maintained in the opposition and E1 is the limitation to an administration period comprising 9 months.

The **technical effect** to be obtained by this distinguishing feature is allegedly (according to the specification of the opposed patent) prolonged contraception with reduced interim bleeding ("zwischenblutungen") – see [0012].

However, the effect upon which ultimately the opposition division based its decision that the claims of the third auxiliary request have an inventive step was not *'prolonged contraception with reduced interim bleeding'*, but rather

the increase in women experiencing amenorrhea which effect was shown by the patentee in a table distributed during the hearing before the opposition division.

The technical effect of amenorrhea is not mentioned in the subject opposed patent as an object of the invention; in fact, this term is not mentioned anywhere in the specification!

Thus, it remains unclear what the **objective problem** allegedly solved is.

Note that in the art a distinction is made between withdrawal bleeding, breakthrough bleeding and spotting (see D4, 208-209); the latter two are also named intermenstrual bleeding (see opposed patent "Zwischenblutungen", [0012]). The patentee however confuses these three terms in their responses to the EPO as well as in E9 (the document submitted by Patentee to show that the alleged problem of the opposed patent was solved). E9 describes that *the goal of the study was to reduce bleeding days"* (p.655, right column) and the title of E9 states *"continuous combination oral contraceptive pills to eliminate withdrawal bleeding"*. Obviously, when taking oral contraceptive without stopping, there is no withdrawal bleeding and thus there is a reduction of bleeding days. This is not however the same as the reduction of intermenstrual bleeding, i.e. of breakthrough bleeding and/or spotting.

Thus, E9 does not relate to the problem the opposed patent asserts to solve, namely intermenstrual bleeding (see col.4, line 6 of the patent in suit). It relates to eliminating withdrawal bleeding which is obviously absent when having no hormone free intervals. Also in the submission of Patentee of November 30, 2006, reference is made to all terms at random: withdrawal bleeding, breakthrough bleeding, spotting and intermenstrual bleeding (e.g. see pages 5-6 of the submission). In fact, it is not clear which problem, if any, has been solved.

The subject patent and examples therein do not even mention, let alone solve, the alleged technical effect, namely eliminating intermenstrual bleeding when using the claimed contraceptive for 9 months.

The fact that breakthrough bleeding decreases over time in a prolonged regimen without hormone free intervals was long known, see e.g. D4 of 1993, page 209.

Patentee herself does not appear to know either what the objective problem in the opposed Patent is. In fact, in her submission of January 17, 2007, the Patentee on page 3, first paragraph defines the problem as:

*"to completely avoid hormone free intervals by using an uninterrupted administration regime and at the same time achieve the goals of (1) ensuring high contraceptive reliability, (2) avoiding intermenstrual bleeding, or (3) at least keeping it within acceptable limits, and (4) additionally reducing the*

hormone burden and (5) keeping side effects typically associated with high hormonal doses at a minimum", i.e. a combination of 5 goals.

The goal of "additionally reducing the hormone burden" is in fact plainly wrong with respect to the estrogen hormone burden: note that Mercilon (a product containing 150 mcg desogestrel and 20 mcg ethinyl estradiol on the market since 1987) has a yearly estrogen burden of 5460 mcg (20 x 21 x13) whereas Anya has an estrogen burden of 7300 mcg (20 x 365), i.e. more than 25% more estrogen on a yearly basis.

The Patentee further defines the problem on page 5, first paragraph:

"The results reported in the opposed Patent and D9 showed (6) a lack of side effects and (7) good or at least acceptable cycle control".

Note that there was no difference in side effects between the groups studied in E9.

Then on page 6, Patentee continues and states that

"the claimed administration regime has the advantage of (8) reducing dysmenhorrhea and (9) premenstrual syndrome as well as (10 ) increasing average work productivity in the users".

However, the opposed patent and specifically paragraph [0012] of the opposed patent refers only to the provision of a hormonal contraceptive with high contraceptive reliability which prevents intermenstrual bleeding and reduces side effects. The opposed patent does NOT however refer to at least keeping intermenstrual bleeding within acceptable limits (wherein acceptable limits" have not been defined), nor to reducing the hormone burden, nor to keeping side effects typically associated with high hormonal doses at a minimum" , nor to good or at least acceptable cycle control, nor to reducing dysmenhorrhea, nor to increasing average work productivity in the users" let alone a combination of all these goals.

No technical effects relating to any of these goals, let alone a combination thereof, are mentioned, let alone solved in the opposed Patent.

Thus, it remains unclear which problem, if any, has been solved.

According to the opposition division however, the problem to be solved is to provide oral contraception with high reliability and reduced interim bleeding (see 5.4.3 of the decision).

The opposition division decided that the alleged technical effect resulting from this problem is adequately documented in E9 and E21. Appellant respectfully disagrees. As said on page 2 above, neither E9 nor E21 can provide support for the full breadth of any claim. E21 (and E23) provide results for a combined oral contraceptive limited to 20 mcg ethinyl estradiol

and 90 mcg of levonorgestrel, administered for 365 days. E9 provides results for a combined oral contraceptive limited to a contraceptive of 20 mcg ethinyl estradiol and 100 mcg of levonorgestrel, administered for 336 days. Neither E21, nor E23 nor E9 can provide support for administration for 9 months of a product containing e.g 5 mcg ethinyl estradiol or in respect of a product administered for 9 months e.g. transdermally or by a depot. However, all these features are also encompassed by the claims.

The Opposition Division also considered the three tables submitted by the Patentee during the hearing on January 30, 2007. Table 1 e.g. refers to the percentage of amenorrhea in women on Anya allegedly as compared to the percentage of amenorrhea in women on Seasonale. However, the comparison is not valid: The last 84 days of women on Seasonale (i.e. the 4th cycle of Seasonale in one year) (59%) are compared to the last 28 days (the 13th cycle) of women on Lybrel (9-16%). A scientifically viable comparison may have been to compare the last 84 days of women on Seasonale with the last 84 days of women on Lybrel.

Moreover, Table 3 does not provide any data for Anya at all!

The known contra-indication for extended regimens, i.e. irregular breakthrough bleeding as referred to by both Professor Guillebaud in his statement (E13) as well as in the statement of Dr. Szarewski (E8)) is also present when using the subject invention and the problem which the patentee asserts to have solved is not solved.

***Problem is not solved***: Initially, please note that the Patentee submitted the document E9 *"as further proof that the invention does work"* (see point 3.6 of the patentee's response to the notice of opposition). Also note however, that the author of E9, Dr. Leslie Miller in a recent press release dated December 5, 2006 (E19) titled *"Suppressing your period: Drug makers offer new pills to manage monthly cycle"* stated with reference to several different types of "period management" contraceptives including Lybrel (Anya), a 365-day regimen from Wyeth (the Patentee) which is encompassed by the amended claims of the subject opposed patent: *"It's not a new idea – it's just become newly popular….Female doctors have always known you can skip your period on the pill"*.

When studying E9, one may be inclined to believe that the problem of inter-menstrual bleeding is being handled. This might not however be the case. Many women dropped out of the study, because the high intermenstrual bleeding was not acceptable for them, thereby distorting the results.

This can be confirmed by looking at the bundle of publicly available FDA papers relating to market authorization for a now commercially available similar product, Seasonale®, (E15) referred to by the patentee's witness Professor John Guillebaud. Seasonale, as the Professor states in point 17 of his declaration, is a tri-cycle product containing active tablets of 150 µg levonorgestrel and 30 µg ethinyl estradiol. The dosing regimen of Seasonale

71

is 84 days of active tablets followed by 7 inactive (placebo) tablets. Seasonale is covered by the claims of E2 which European patent was revoked by the opposition division for lack of an inventive step over E5 (E26). This revocation was upheld in the appeal hearing on July 17, 2007 (T1063/04).

The FDA medical officer has, in E15, made several remarks regarding distortion of the results due to drop-out of women due to unacceptable bleeding. For example, see page 52 (last paragraph) and 53 (paragraph before last) of the clinical review part of E15;

Moreover, Seasonale has a high amount of estrogen (30 μg ethinyl estradiol ) and according to both professor Guillebaud (E13) and Dr. Szarewski (E8), the use of Seasonale is thus expected to result in less breakthrough bleeding than a product with 20 μg ethinyl estradiol: *"...and that for example Loestrin 20 (a low estrogen product) would be unlikely to be successful because of its poor cycle control"* (see point 11 of the declaration of professor Guillebaud (E13)).

It is very clear from E15 that the problem of breakthrough bleeding (inter-menstrual bleeding) was in no way solved by the use of Seasonale, a product with a high estrogen content, see e.g. E15, clinical review, page 11 (last paragraph).

This irregular bleeding was in fact so high that the FDA issued a warning to Barr, the producer of Seasonale, on December 29, 2004 with respect to a television commercial of Barr promoting Seasonale without relating to the amount of breakthrough bleeding experienced by women taking Seasonale. (E16-E17).

There are many other remarks by the FDA Medical Officer throughout E15, in the clinical review of Seasonale with respect to the high amount of breakthrough bleeding, see pages 54, 55, 78 of the clinical review.

Also the website of Seasonale recites as follows: *"With Seasonale®, you get fewer pill periods-only 4 a year.  But you're also more likely to have spotting and breakthrough bleeding between pill periods than with a 28-day birth control pill"* (attached as E18).

Thus, it is clear from E15 that the problem of breakthrough bleeding was not solved by Seasonale, a product with high estrogen content.  How then can E9, E21 and E23, which show similar studies, but with a product with low estrogen content solve this problem?  This is in fact not possible as evidenced by the patentee's own witness Professor Guillebaud and also by Dr. Szarewski whom already both stated that products with low estrogen content are even more associated with breakthrough bleeding than products with high estrogen content.

72

The Patentee in her submission of January 17, 2007 states (in paragraph bridging pages 3-4) that *"..the median is arguably a more appropriate indicator of central tendency of a study particularly when the sample size is relatively small. The mean value only becomes acceptable when the sample size is large."* The Patentee then justifies the use of the median in E9 by stating that in *E9 "the sample population size is relatively small* (it is 39 women (see Figure 1)) *and there is a low drop out rate from the study..."*

E21, submitted by the Patentee relates to a study performed by the Patentee with 2134 women (see page 12 of the summary of product characteristics) with an 18% drop-out rate (see page 7 of the summary of product characteristics).

One skilled in the art would thus conclude that this study performed by Patentee in E21 relates to *"...much larger numbers of users representing the general population"*. However, E21 still uses the median! (See page 12 of the summary of product characteristics.) Thus, the Patentee contradicts herself.

Moreover, Patentee states on page 4 of the January 17, 2007 submission that Tables 25 and 26 in E15 do use the mean. This is true only because the FDA officer (and not the NDA applicant Barr) added the mean to these Tables, thereby showing that indeed the median might not be sufficient for proper representation of the data.

Table comparing discontinuation due to unacceptable bleeding

We now attach a table wherein we compare the discontinuation of women due to unacceptable bleeding upon administration of 7 different products:

| ANYA (E21) | Seasonale Ultra-Lo (E15) | Seasonale (E15) | Nordette (E15, E5) | Levlitte (E15) |
|---|---|---|---|---|
| **18%** | 13.8% | 7.7% | 1.8% | 0.9% |

| levonorgestrel Progestogen-Only-Pill E24 (table 2) | Cerazette E24 (table 2) |
|---|---|
| 18% | 22.5% |

1) Anya (E21)- 365 days of uninterrupted daily administration of 90 mcg levonorgestrel and 20 mcg ethinyl estradiol, i.e. a product encompassed by the claims of the opposed patent.

73

2) Seasonale Ultra-Lo (E15; especially see page 32 of the clinical review) – 84 days of uninterrupted daily administration of 150 mcg levonorgestrel and 20 mcg ethinyl estradiol;

3) Seasonale (E15; especially see page 32 of the clinical review) – 84 days of uninterrupted daily administration of 150 mcg levonorgestrel and 30 mcg ethinyl estradiol;

Note that Seasonale Ultra-Lo and Seasonale differ only in ethinyl estradiol content. Seasonale contains 30 mcg ethinyl estradiol whereas Seasonale Ultra-Lo contains 20 mcg ethinyl estradiol. The drop-out percentage for the 20 mcg containing Ultra-Lo product is almost twice as high as for the 30 mcg Seasonale product.

4) Nordette® the oral contraceptive from E5 –21 days of uninterrupted daily administration of Nordette® - 150 mcg levonorgestrel and 30 mcg ethinyl estradiol; the data were taken from E15 see especially see page 32 of the clinical review.

5) Levlitte (E15, medical review page 26) – 21 days of uninterrupted daily administration of 100 mcg levonorgestrel, 20 mcg ethinyl estradiol, i.e. same composition as the oral contraceptive from E9.

6) levonorgestrel Progestogen-Only-Pill (E24) – 30 mcg levonorgestrel; 0 mcg ethinyl estradiol (such a pill known as for example Norgeston, has been on the market since February 5, 1973 (page 9 of E27)). The levonorgestrel progestogen-only-pill is an oral contraceptive for continuous use, i.e. it is taken daily every day without hormone free periods. Note that the levonorgestrel progestogen-only-pill is very similar to the embodiment of 1 mcg of ethinyl estradiol which is encompassed by the amended claim 1.

7) Cerazette® (E24) - 75 mcg desogestrel, 0 mcg ethinyl estradiol. The Cerazette progestogen-Only-Pill is an oral contraceptive for continuous use, i.e. it is taken daily every day without hormone free periods. Note that also Cerazette is very similar to the embodiment of 1 mcg of ethinyl estradiol which is encompassed by the amended claim 1.

It is clear that the discontinuation of women due to unacceptable bleeding is much higher with Anya when compared to all other oral contraceptive combination products (18% vs. 13.8%, 7.7%, 1.8% and 0.9%)! Therefore, the assertion that Anya results in reduced interim bleeding when compared to other combined oral contraceptives is plainly wrong.

In fact, this table shows that the bleeding profile of Anya is similar to that of progestogen only pills (POPs) which are also taken continuously and one of which has been on the market since 1973! As said the only difference in estrogen content between the subject opposed patent and the levonorgestrel Progestogen-Only-Pill is merely 1 mcg of ethinyl estradiol!

74

The lack of the technical effect, i.e. the absence of the desired reduced interim bleeding, is confirmed by E23, the US approval package for Lybrel (the product encompassed by the scope of the claims), throughout which it is emphasized that when prescribing Lybrel, the convenience of having no scheduled menstrual bleeding should be weighed against the inconvenience of unscheduled bleeding and spotting (see pages 7, 14-16, 23, 28-30, 32, 38, and 40-41). It is clear from E23 that 18% of women dropped-out of the study due to unscheduled bleeding and spotting.

Note that similarly the Seasonale patient brochure (E14, page 9) also contains this almost identical warning with respect to unscheduled bleeding and spotting: *"With SEASONALE, while you get the convenience of having only 4 period a year, you are also likely to have more breakthrough bleeding and spotting between periods than with a 28-day birth control pill"*.

Furthermore, as said, E21 relates to one combination of hormones with specific dosages. There is no support in the opposed Patent to expect that similar results will be obtained with other combinations in other dosages, such as for example a combination wherein the ethinyl estradiol is 5 mcg or a combination which is administered by depot administration which is also encompassed by the claims!

The Patentee in her submission of November 30, 2006 distinguishes the alleged invention by stating that opposed to the prior art, the subject invention does not comprise a pill-free week. The question thus arises what does happen after for example 9 months (one of the embodiments encompassed by claim 1). The specification does not disclose whether after 9 months, the regimen is to be continued or stopped. Appellant submits that if you stop, then it is inevitable that after the claimed 9 months there is obviously a pill-free period where after the regimen can be resumed, i.e. an obvious modification of the known tricycling regimen (taking three (i.e. 63 days) or four (i.e. 84 days) packages of oral contraceptive pills in a row, i.e. uninterruptedly, prior to having a pill-free week (E1)).

Thus, E9 and E21 do not provide evidence of reduced interim bleeding when performing claim 1 for at least 9 months compared to performing contraception as laid out in E1 for several cycles without a break. In fact, the drop-out due to unacceptable bleeding is much higher than with a tricycling product such as Seasonale and Seasonale Ultra-Lo.

Since there is no technical effect as a result of the distinguishing feature, there is no inventive step.

In point 5.4.3 of the decision, the opposition division states that: *"The prior art does not contain any indications that the known administration time of three cycles should be prolonged. Various documents from the prior art (document E1), page 86; document E3; document E4, Abstract; document E7, page 180 )in fact teach away from this solution."*

75

In traverse, E1, page 86 does not at all teach away from the subject invention, in fact rather the opposite as already discussed in detail above. Under the heading *"Why have withdrawal bleeds at all?"* on page 86 of E1 it is e.g. clearly stated that one can have *"a period-free life"* (last sentence on page 86).

Further in traverse, E3 does not at all teach away from the subject invention, in fact rather the opposite. E3 discloses an extended oral contraceptive regimen of 42 days with 75 mcg gestodene and 30 mcg ethinyl estradiol or with 150 mcg desogestrel and 20 mcg ethinyl estradiol (Mercilon). E3 states that *"Both preparations were found to be well tolerated and no serious adverse events were reported"* As discussed above in detail, Mercilon is one of the oral contraceptives disclosed in E1. Dr. Szarewski (co-author of E1) in E25, point 9 relates to the fact that Mercilon is suitable for tricycling.

Moreover, Dr. Szarewski also states in point 10 of E25 that contraceptives containing **less than** 20 mcg ethinyl estradiol would not be appropriate due to increased breakthrough bleeding. She also states that she would not employ 5 or 10 mcg ethinyl estradiol in a pill to be used in an extended regimen. Please note that the subject claims encompass these dosages which according to Dr. Szarewski are **not appropriate** for this purpose due to excessive breakthrough bleeding.

As said in point 5.4.3 of the decision, the opposition division states that: *"document E4, Abstract teaches away from the subject invention.*
In traverse, neither E4 as a whole nor the abstract of E4 teaches away from the subject invention, in fact rather the opposite: E4 discloses an extended *"9 weeks on and 1 week off schedule"* contraceptive regimen of 150 mcg desogestrel and 30 mcg ethinyl estradiol compared to *"a traditional 3 weeks on, 1 week off schedule"*.

The last sentence of the abstract of E4 states that *"Sixty-three per cent of the women **preferred the studied alternative** and twenty-six per cent preferred the traditional OC".*(bolding added).

In fact, already in E4 of 1993 on page 207 it is stated that *"the total number of bleeding days was significantly (p<0.001) less in the group with prolonged regimen"*.

Also in E4 on page 209 it is stated that *"breakthrough bleeding occurred at any time during the pill strips but decreased during the study"*.

Also in E4 on page 210, last sentence, it is stated that *"after six months, there were significantly fewer bleeding days in the group with prolonged regimen"*. On page 214 it is stated that *"the number of days with irregular bleedings greatly decreased over time"*. It is fair to assume that if bleeding was decreasing after six months, it will also decrease after 9 months.

76

Further on page 214 of E4 it is stated that *"prolonged intervals between the menstrual periods might also offer an easier pill taking regimen with less risk to forget the pill in connection with the week off..."*

On page 206 of E4 it is pointed out that *"new contraceptive methods such as long-acting injectable gestagens (6) and hormonal IUDs (7), all giving prolonged intervals between the bleeding or even amenorrhea, have been well accepted by the women."*

In other words, E4 does not at all teach away from the subject invention, rather completely the opposite. E4 renders the subject invention obvious due to the fact that it shows that already in 1993 it was known that breakthrough bleeding decreases over time in a prolonged regimen without hormone free intervals and suggested to improve compliance by such extended regimens which are shown to already have been well accepted in other forms such as long-acting injectable gestagens (differing from the subject composition merely by 1 mcg of ethinyl estradiol!)

Further in traverse, E7 as a whole does not at all teach away from the subject invention, in fact rather the opposite. E7 discloses extended oral contraceptive regimens of 6 to 12 weeks of consecutive days.

E7, abstract concludes that *"delaying menses by extending the number of consecutive days of active pills is well tolerated and efficacious"*. On page 182 of E7 it is stated that *"extending the number of active pills taken to reduce the frequency of menstrual-related symptoms was well tolerated and effective with 74% of patients stabilized on an extended regimen"*.

Also on page 182 of E7 it is stated that *"the high rate of continued use of extended regimens suggests that with proper counseling, existing misconceptions could be corrected and women's fears alleyed"*.

<u>Claim 5</u>

E1 is the closest prior art with respect to claim 5 for the same reasons as put forward above with respect to claim 1. In addition to the discussion of E1 above, also note that page 38 of E1 (hereby attached) recites that: *"Monophasic pills .....can dramatically improve PMS symptoms"*.

Furthermore, page 65 of E1 (attached) recites: *"since the pill stops you ovulating, and therefore stops you menstruating (withdrawal bleeds are of course merely artificial), there should be no reason for a woman on the pill to suffer from PMS..."*

D7 furthermore discloses that extended oral contraceptive regimens have a positive effect on PMS. See page 181: *"All responded that a reduction in severity of symptoms occurred on extended regimens."* One of the *"symptoms"* described in Table 2 is PMS.

77

Thus, the only distinguishing feature between claim 5 and E1 is the same as between claim 1 and E1. Therefore, E1 in combination with E7 renders claim 5 obvious.

Appellant respectfully submits that the decision of the opposition division stated in point 5.4.3 with respect to claim 5 that: " *the solution to the technical problem is plausible, since inhibiting ovulation and suppressing menstruation (documents E9 and E21) also entail a reduction in premenstrual syndrome."* is erroneous as it was long known that extended oral contraceptive regimens have a positive effect on PMS.

<u>Lack of sufficiency (Art. 83 EPC)</u>

<u>Claim 1</u>

Amended claim 1 is not sufficiently clear for it to be carried out by a person skilled in the art because claim 1 not only claims the extended use of the combined contraceptive for oral administration, but also for transdermal and depot administration. There is not even one example in the opposed patent showing the invention by transdermal or depot administration and thus no way of knowing whether the alleged technical effect, whether it is *'prolonged contraception with reduced interim bleeding'* or *'an increase in amenorrhea'*, is in fact obtained by this alternative manner of administration.

Amended claim 1 is not sufficiently clear for it to be carried out by a person skilled in the art because the patentee claims a range of 1-20 mcg ethinyl estradiol. If one skilled in the art would chose to use 5 or 10 mcg ethinyl estradiol, the specification does not disclose the required amount of progestogen needed to obtain the alleged technical effect whether it is *'prolonged contraception with reduced interim bleeding'* or *'an increase in amenorrhea'*.

Moreover, the specification certainly does not disclose how to determine the required amount of progestogen needed in order to obtain the alleged technical effect when choosing 5 or 10 mcg ethinyl estradiol for transdermal or depot administration which is claimed as well.

Amended claim 1 is not sufficiently clear for it to be carried out by a person skilled in the art because the specification does not disclose for embodiments containing less than 20 mcg ethinyl estradiol how to obtain the alleged technical effect, whether it is *'prolonged contraception with reduced interim bleeding'* or *'an increase in amenorrhea'*. As noted above, Seasonale Ultra-Lo and Seasonale differ only in ethinyl estradiol content. Seasonale contains 30 mcg ethinyl estradiol whereas Seasonale Ultra-Lo contains 20 mcg ethinyl estradiol. The drop-out due to unacceptable bleeding for the 20 mcg containing Ultra-Lo product is almost twice as high as for the 30 mcg Seasonale product. This confirms that the lower the estrogen content the higher the unacceptable bleeding as was also confirmed by Dr. Guillebaud (E13) and Dr. Szarewski (E8). Therefore, it is clear that the alleged technical

effect can certainly not be achieved with any embodiments of claim 1 with less than 20 mcg ethinyl estradiol content.

Amended claim 1 is not sufficiently clear for it to be carried out by a person skilled in the art because the lower limit of the term "comprises 9 months" is not defined. What is the lower limit of 9 months, especially in view of the fact that claim 1 refers to the fact that there are no hormone-free intervals. Is the invention to be carried out for at least 9 x 21=189 days or for at least 9x28=252 days or for at least 9 calendar months, i.e. at least 273 days (when counting from January to September)? The invention in this regard is not sufficiently clear for it to be carried out by a person skilled in the art. There is a difference of at least 84 days between the first and the last interpretation, which in itself is an (administration) period of 4 additional contraceptive months!

### Claim 5

Amended claim 5 is not sufficiently clear for it to be carried out by a person skilled in the art because the alleged advantages (among which reduction in premenstrual syndrome) of the opposed patent are based on a "3-pack substudy", see E21, page 30 of fax. Such a 3-pack substudy consisted of 3x28 = 84 days (see page 32 of fax) , i.e. the exact amount of days oral contraceptive is taken without a hormone free interval as with Seasonale, named by the Patentee as a known tricycling regimen. Therefore, the Patentee draws its conclusions on the basis of a known tricycling regimen. There is no proof (as the Patentee suggests on page 6 of the January 17, 2007 submission) that the regimen can be continued rather than cycling after 3 or 4 packs, and keep its alleged advantages because the study was stopped after 84 days.

Respectfully submitted,

T.M. Malamud-Cohen

**Wyeth Pharmaceuticals**
Huntercombe Lane South
Taplow, Maidenhead
Berkshire, SL6 0PH

**Patents & Trade Marks Department**
Tel: +44 (0)1628 604377
Fax: +44 (0)1628 799098

# Wyeth

EPO - Munich
3Ω
**1 4. Aug. 2007**

SKM/lb
30 July 2007

**BY FAX**
**(CONFIRMATION COPY TO FOLLOW BY MAIL)**

The European Patent Office
D-80298
**MUNCHEN**
Germany

*CONFIRMATION*

Dear Sirs

**European Patent No. 1 011 682**
**Proprietor: Wyeth**          *98954135.4*
**Our Ref: AM-101403**

Further to our Notice of Appeal, which we filed on 18 May 2007, we herewith provide the Written Statement required under Article 108 EPC setting out the Grounds of Appeal.

**I.    Requests**

1.    It is requested that the Decision Revoking the European Patent of 29 March 2007 (hereinafter referred to as "the Decision"), which issued in respect of European Patent 1 011 682 (hereinafter referred to as "the Patent") be set aside, that the opposition be rejected, and that the Patent be maintained on the basis of the Main Request, or failing that, on the basis of the Auxiliary Requests 1–4 which are enclosed with the present appeal brief. These Requests are identical to the Main Request and Auxiliary Requests 1–4 filed with our letter of 30 November 2006 in preparation of oral proceedings before the Opposition Division.

2.    We reserve the right to request maintenance of the Patent on the basis of other claims or sets of claims to be filed in the further course of the appeal proceedings.

3.    In case the Board is of the opinion that the enclosed Main Request cannot serve as a basis for the maintenance of the Patent, oral proceedings according to Article 116 EPC are requested.



John Wyeth & Brother Limited
Registered in England No. 135937
Registered Office: Huntercombe Lane South
Taplow, Maidenhead, Berkshire, SL6 0PH

Incorporating:   Wyeth Research

INVESTOR IN PEOPLE
80

# Wyeth

4.    Finally, re-imbursement of the appeal fee under Rule 67 EPC is requested in view of a substantial procedural violation on the part of the Opposition Division (for details, see item II.3, below).

**II.    The Reasoning in the Appealed Decision regarding the Main Request and Auxiliary Requests 1 and 2 is both Legally and Factually Erroneous**

*1.    The Main Request*

1.1    The Opposition Division erred in holding that the subject matter of claim 1 of the Main Request before it (which is identical to the Main Request submitted herewith) lacked novelty vis-à-vis reference E2 (EP 0 911 029). The Opposition Division's reasoning regarding the alleged lack of novelty over E2 is based on

- a violation of the basic principles of novelty evaluation to be applied under Article 54 EPC;

- an erroneous construction of the terms of the claims of the Patent; and

- an erroneous interpretation of the disclosure content of Example 1 of E2.

1.2    As explained already in our submissions filed in the first instance, for the purpose of assessing novelty, it is first of all important to understand the meaning of the claims. Claim 1 of the Main Request reads as follows:

*"Verwendung einer Kombination aus einem einzelnen Gestagen, ...[]... und eines einzelnen Estrogens, ...[]... zur Herstellung eines Kontrazeptionsmittels zur <u>kontinuierlichen</u> Ovulationshemmung und Unterdrückung des Menstruationszyklus durch <u>ununterbrochene</u> orale, transdermale oder Depot-Verabreichung."*

1.3    Claim 1 and the terms used therein obviously **have to be read in the context** of how the invention is described in the patent specification, and **through the eyes of the reader skilled in the art of contraceptives**.

# Wyeth

Such a skilled reader would note the explanations of the patent description in paragraphs [0002]-[0004] regarding the background art and the standard way of how contraceptives had been applied up to then, i.e., **in 28 day cycles** comprised of **21 days administration** of a combination of an estrogen and a gestagen and a **7 day break** included with the goal to induce a scheduled withdrawal bleed.

1.4    It is this background against which the skilled person would read claim 1 and the paragraphs in the specification explaining it, in particular paragraphs [0020] and [0028]. The skilled person would particularly note the term "ununterbrochen" (uninterrupted) in claim 1, which contrasts the "unterbrochenen" (interrupted) administration regimes discussed in the section addressing the prior art, described as "Zyklen" (cycles) with their "siebentägigen Pausen" (seven-day breaks) or "Einnahmepausen" (intake breaks). He/she would then obviously conclude that "ununterbrochen" (uninterrupted) means "keine Zyklen" (no cycles) and "keine Pausen" (no breaks).

1.5    Thus, even without any further explanations, e.g., from paragraphs [0020] or [0028] of the Patent, the skilled reader would conclude that claim 1 of the Main Request **is to an administration regime where over the entire period of use, there are no administration or hormone-free phases, or in other words, no scheduled withdrawal bleeds.**

1.6    Any other interpretation of the term "ununterbrochen" would not make any sense. The skilled person would not attempt to give a claim a meaning that does not make any sense, **particularly when there is an interpretation, which clearly does makes sense.**

1.7    Even though this would not even be necessary in view of the skilled person's understanding of the claim language, the patent specification does in fact provide an explicit definition of what is to be understood by the term "ununterbrochen" (uninterrupted) in paragraph [0020]. In particular, it explains that the "ununterbrochene" (uninterrupted) administration according to the invention is an administration regime where

"... *keine* bezüglich der Hormonkomponenten *einnahmefreien Intervalle* vorgesehen sind. Dies bedeutet auch, daß *eine Unterbrechung der Verabreichung des Mittels* durch Gabe von Placebos anstelle des hormonalen Mittels **nicht vorgesehen** ist. In der Folge kommt es *über die gesamte, typischerweise die*

# Wyeth

*Zeitspanne mehrerer Monate bis Jahre umfassenden* **Verabreichungsdauer** *zu keinen Veränderungen der grundsätzlichen Zusammensetzung der Hormonkomponenten. Vielmehr werden* **über die gesamte Verabreichungsdauer ununterbrochen** *und unverändert die das erfindungsgemäße hormonale Mittel ausbildenden Hormonkomponenten in unverän- derter Konzentration verabreicht"* (Emphasis added.)

(English translation: *"... there are* **no administration-free intervals** *in respect of the hormonal component. This also means that* **an interruption of the administration of the product** *by administering placebos in place of the hormonal product* **is not provided for.** *Thus,* **over the entire administration period,** *which typically lasts several months to years there are no changes to the fundamental composition of the hormonal components. Rather, the hormonal components forming the hormonal preparation according to the invention are administered* **uninterruptedly** *and in an unchanged manner in an unchanged concentration* **over the entire administration period.**" (Emphasis added.))

Thus, apart from explaining that the typical administration period of the contraceptive treatment regime according to the invention is "several months or years", it **additionally** re-emphasizes (although the meaning of the term "ununterbrochen" anyway entails that) that during the above administration period of typically several months or years the administration is to be conducted **without any administration-free (or hormone-free) intervals**. Therefore, there are **no breaks** in the administration of the product, and thus, **no scheduled withdrawal bleeds**, and **no cycles**, for the **entire period** that the product is in use. This is even further supported by the explanations in paragraph [0028] of the Patent which provide that there be "keine einnahmefreien Tage" (no intake-free days).

1.8    It follows from the above that for a prior art document to be potentially novelty destroying in respect of claim 1, it must **clearly and unambiguously** teach an **administration regime where contraception is achieved without hormone-free phases, breaks or scheduled withdrawal bleeds, over the entire period of contraceptive use.** Contrary to the allegations of the Opposition Division, this is not the case for E2, nor for any other prior art document cited against the opposed patent.

5

# Wyeth

1.9    As to the purported lack of novelty of the subject matter of the Main Request with respect to E2, the Decision provides the following reasoning:

> "Der Argumentation des Patentinhabers, dass das Merkmal "ununterbrochen" den beanspruchten Gegenstand von Dokument E2 unterscheidet, wird aus folgenden Gründen nicht gefolgt: In den ersten 110 Tagen der Verabreichung besteht der einzige Unterschied zwischen dem beanspruchten Gegenstand und der Verwendung aus Dokument E2 in der gemäß Dokument E2 **geplanten** Unterbrechung gefolgt von einer **geplanten** Wiederaufnahme.
> **Wie die Anwenderin während der ersten 110 Tagen plant, mit der Verwendung fortzufahren, ist abhängig von verschiedenen individuellen Entscheidungen und als technisches Merkmal nicht geeignet.**
> Bei **rein formaler Betrachtung** der Offenbarung aus dem Stand der Technik ist der Begriff "ununterbrochen" so zu interpretieren, dass er "ununterbrochen während 110 Tagen" einschließt."
> (Emphasis added in bold letters added by us.)

> (English translation: "The argumentation of the patent proprietor that the feature "uninterrupted" distinguished the claimed subject matter from document E2 cannot be followed for the following reasons: During the first 110 days of administration the only difference between the claimed subject matter and the use of document E2 is the, according to document D2, **planned** interruption followed by a **planned** resumption.
> **How the user plans to continue with the use during the first 110 days depends on different individual decisions and is not suitable as technical feature.**
> Upon **purely formal considerations** of the disclosure of the prior art the term "uninterrupted" is to be interpreted in such a way that it encompasses "uninterrupted during 110 days".)

We submit the above reasoning is completely at odds with the principles of how novelty of the subject matter of a claim is to be assessed under the EPC. Rather than analyzing whether document E2 **clearly and unambiguously** discloses an administration regime where contraception is achieved without hormone-free intervals, the Opposition Division offers theoretical considerations as to what the hypothetical users of the teaching of E2 might or might not be planning on doing. These considerations have

6

# Wyeth

no actual basis in E2, which **consistently advises the skilled reader to take breaks in the course of the entire period of contraceptive use** (see, e.g., page 3, lines 36-41 ("followed by 3-10 days of no administration"); page 3, lines 45-50 ("followed by an administration free interval of 3 to 10 days"); and claim 1 ("following by non-administration for a period of 3-10 days") of E2). Thus, the considerations of the Opposition Division represent **pure speculation.**

1.10    To engage in speculation is obviously not appropriate in connection with the objective comparison of the disclosure content of a prior art document to the claimed invention required under Article 54 EPC. As the Opposition Division itself stated in the Decision, how the (hypothetical) user might plan (in private) to continue with the use is not a suitable criterion for the evaluation of novelty. This is also clear, e.g., from decisions T 158/96 and T 943/93, which rejected approaches towards the evaluation of novelty that rely upon speculation and hypothetical possibilities (see the Case Law of the Boards of Appeal, Fifth Edition, December 2006, item I.C.2.1). **The decisive question is rather as to what document E2 clearly and unambiguously teaches.** The Opposition Division has failed to point to any passage in E2, which clearly and unambiguously teaches that there should be no breaks in the course of the contraceptive use. This is not surprising, since such passages do not exist. The Opposition Division's attempt to replace this deficiency by speculations as to what the users of the method of E2 might or might not be planning in private is completely inappropriate to establish a lack of novelty, and should be rejected by the Board.

1.11    The Decision also explicitly indicates that the Opposition Division relied upon "purely formal considerations" ("rein formale Betrachtung") when concluding that the term "uninterrupted" is to be construed as encompassing "uninterrupted during 110 days". Thus, by its own admission the Opposition Division apparently did not attempt to put the claim language in context or approach it from the point of view of the person skilled in the relevant art in order to arrive at a technically sensible construction. Rather, it apparently considered the claim language in isolation and from a purely formalistic point of view. Again, this is not an appropriate way of construing a patent claim under the EPC. As explained in the Case Law of the Boards of Appeal, Fifth Edition, December 2006:

> "*The skilled person, when considering a claim, should rule out interpretations which are illogical or **which do not make technical***

# Wyeth

*sense. He should try, with synthetical propensity, ie building up rather than tearing down, to arrive at an interpretation of the claim which is **technically sensible** and **takes into account the whole disclosure of the patent** (Art. 69 EPC). The patent must be construed **by a mind willing to understand**, not a mind desirous of misunderstanding (**T 190/99**; confirmed inter alia in **T 437/98, T 1084/00, T 920/00, T 552/00, T 500/01, T 749/03, T 859/03, T 1241/03).*** (See item II.B.5.1; emphasis added by us.)

Had the Opposition Division tried to apply the above principles, rather than relying on an acontextual and purely formalistic interpretation of the terms used in the claim, it would have found that the extended cycle regime of E2, which as shown above explicitly requires hormone free intervals of 3-10 days, could not be reasonably considered to be "uninterrupted" in the sense of claim 1 of the Main Request.

1.12    In order to further support the conclusion of an alleged lack of novelty of the subject matter of the Main Request vis-à-vis E2, the Decision additionally contains the following reasoning:

*"Es besteht außerdem bei einer von Beginn an **nur für kurze Zeit geplanten** Verhütung keinerlei Unterschied zwischen der Verwendung nach Anspruch 1 und Dokument E2. Diese **Untergruppe von kurzfristigen Anwenderinnen ist in Dokument E2 offenbart** und fällt unter den vorliegenden Anspruch 1 des Streitpatents. Anspruch 1 aus Dokument E2 führt zwar eine begrenzte Dauer der Nicht-Verabreichung von 3-10 Tagen an, **Beispiel 1 aus Dokument E2 erwähnt jedoch in keiner Weise die Wiederaufnahme nach dieser Zeit. In jedem Fall offenbart Anspruch 7 die ununterbrochene Gabe während 80 Tagen, ohne eine begrenzte Zeit ohne Hormongabe zu fordern."***
(Emphasis added by us.)

(English translation: "Furthermore, in the case of contraception **planned for only a short period of time** there is no difference between the use according to claim 1 and document E2. **This subgroup of short-term users is disclosed in document E2** and falls within present claim 1 of the opposed patent. It is true that claim 1 of document E2 refers to a limited duration of non-administration of 3-10 days. However, **Example 1 of document E2 does not mention in any way the resumption after this period.**

# Wyeth

> **In any event, claim 7 discloses uninterrupted administration during 80 days, without requiring a limited period of time without hormone administration.**")

It is noted that the above reasoning once again starts from considerations regarding a hypothetical "contraception **planned** for only a short period of time". As explained above and below, such considerations represent an entirely inappropriate way of approaching the issue of novelty, as they rely on speculation rather than the actual disclosure content of E2.

1.13    Furthermore, the Opposition Division is simply <u>factually wrong</u> when alleging that E2 disclosed in Example 1 a subgroup of short-term users who would not resume administration after stopping the initial administration. Example 1 is obviously an Example of the invention described in E2, which invention relates to an extended cycle regime explicitly requiring breaks of 3-10 days between cycles, as explained further below. It is completely illogical to suggest that Example 1 of E2 discloses uninterrupted administration, since this would be contrary to the invention, which it seeks to exemplify.

1.14    In fact, contrary to the allegations in the Decision Example 1 of E2 does describe resumption of hormone administration after the non-treatment period. As explained in E2 at page 4, lines 39-47:

> *"The studies begin with spontaneous menstruation in a pretreatment control cycle. At the onset of the next spontaneous menses, alternatively, they are assigned to receive on cycle day one an ultra low dose oral contraceptive for either 60 consecutive days, **followed by 3 non-treatment days** or 84 consecutive days, **followed by 7 non-treatment days. These regimens are continued through three treatment cycles**. The study concludes with each group of primates being followed during a post-treatment spontaneous ovarian menstrual cycle.*
>
> *Femoral blood is collected daily and the serum frozen for subsequent RIA of estradiol, progesterone, FSH and LH in the pretreatment and post-treatment cycles and every 3rd day during **all three treatment cycles**, except daily **through the "pill free" interval.***" (Emphasis added by us.)

# Wyeth

It is clear from the above explanations that the treatment regime to be performed according to Example 1 of E2 entails at least two administration free intervals of 3 days and 7 days between administration phases of 60 consecutive days and 84 consecutive days, respectively. Thus, Example 1 explicitly requires interruptions in the course of the entire contraceptive use (which interruptions are, by the way, consistent with the remainder of the teaching of E2). Accordingly, document E2 cannot be said to anticipate the uninterrupted administration regime referred to in claim 1 of the Main Request.

1.15    Finally, the Opposition Division is also factually wrong when alleging that claim 7 of E2 disclosed uninterrupted administration during 80 days without requiring a limited period of time without hormone administration. The Board will note that claim 7 of E2 depends from claim 1, which in turn explicitly provides for a period of non-administration of 3-10 days. This period of non-administration is, of course, to be read into dependent claim 7. The proprietor has quite some difficulties to understand how the Opposition Division could ignore simple principles of patent law like this in the course of rendering its decision.

2.    _Auxiliary Requests 1 and 2_

2.1    The Opposition Division based its rejection of Auxiliary Request 1 for a purported lack of novelty vis-à-vis E2 on the following reasoning:

> "Der Argumentation von P wird aus folgenden Gründen nicht gefolgt: Da die "gesamte Verabreichungsdauer" nicht weiter definiert ist, fällt auch die **gesamte Verabreichungsdauer von 110 Tagen** (Dokument E2) darunter und nimmt somit den vorliegenden Anspruch neuheitsschädlich vorweg. (Emphasis added by us.)
>
> (English translation: "The argumentation of P cannot be followed for the following reasons: Since the "entire administration period" is not further defined, an **entire administration period of 110 days** (document E2) is also encompassed and therefore anticipates the present claim.")

As to the rejection of Auxiliary Request 2 with respect to E2, the following reasoning is provided:

10

# Wyeth

Das zusätzliche Merkmal "wobei der Verabreichungszeitraum mehrere Monate umfasst" kann nicht als unterscheidendes Merkmal dienen, da auch der Verabreichungszeitraum aus Dokument E2 (60-110 Tage) mehrere Monate umfasst."

(English translation: "The additional feature "wherein the administration period comprises several months" cannot serve as a distinguishing feature, since the administration period of document E2 (60-110 days) likewise comprises several months.")

The above reasoning is obviously based on the same erroneous approach to evaluate novelty, which we already criticized in connection with the discussion of novelty of the Main Request.

2.2    Moreover, it represents further striking examples of an acontextual claim construction by a "mind desirous of misunderstanding". Specifically, the claim feature that the administration be one which is uninterrupted over the entire administration period of the contraceptive ("die über den gesamten Verabreichungszeitraum des Kontrazeptionsmittels ununterbrochen erfolgt") is apparently interpreted as if it could encompass several "entire administration periods" interrupted by periods of non-administration. This is clearly an interpretation, which does not make any technical sense.

2.3    Moreover, no skilled reader of E2 would seriously call one of the several phases of 60-110 consecutive days within the overall administration regime taught be E2 an "entire administration period", as the Opposition Division suggested, since these phases are preceded and/or followed by further scheduled pill free intervals and phases of hormone administration. The problem is therefore not that the term "entire administration phase" is not further defined, as the Opposition Division insinuated. Rather, the problem is that the Opposition Division chose to adopt a construction of the claim and the prior art disclosure, which has nothing to do with the understanding of the skilled addressee of the Patent. Contrary to the findings of the Opposition Division, the subject matter of claim 1 of Auxiliary Requests 1 and 2 is therefore novel over E2.

3.    _Auxiliary Requests 3 and 4_

# Wyeth

Auxiliary Requests 3 and 4 are identical to Auxiliary Requests 3 and 4 filed with our letter of 30 November 2006 in preparation of oral proceedings before the Opposition Division. They are filed herewith, and relied upon, in case the Board unexpectedly feels unable to follow our arguments regarding novelty of the Main Request or Auxiliary Requests 1 and 2.

4.    *The Discussion of Compliance with Rule 29(2) EPC*

4.1    As will be apparent from item 27 of the Minutes and item 5.6 of the Grounds for the Decision, the Opposition Division engaged in a discussion regarding the compliance of claim 5 of Auxiliary Request 3 with Rule 29(2) EPC during the oral hearing of 30 January 2007, and also made this an aspect of its Decision.

4.2    While we are confident that claim 5 of Auxiliary Request 3 (or the corresponding claims of the other Requests submitted herewith) meets the requirements of Rule 29(2) EPC, we nevertheless strongly object to the fact that the appellant/proprietor found itself in a position of having to defend that claim during oral proceedings with respect to this provision of the Implementing Regulations to the EPC. We furthermore strongly object to the fact that the Opposition Division discussed compliance with this provision in its Decision. **Rule 29(2) EPC is _not_ available as a ground of opposition.** The appellant/proprietor should therefore not have been burdened with having to defend the claim at issue vis-à-vis this provision, nor should it have been made part of the legal framework on which the Decision is based. In our view, the fact that the Opposition Division allowed a discussion of Rule 29(2) EPC during the oral hearing represents a substantial procedural violation, which justifies reimbursement of the appeal fee under Rule 67 EPC.

4.    *Other Remarks*

Under item 5.2.2 the Decision summarizes the proprietor's oral submission regarding clarity of the reference to "9 Monate" (9 months) in claim 1 of Auxiliary Request 3 as follows:

> "Da in der Beschreibung der Begriff "Monate" anders gebraucht wird als „Zyklen" wäre es nach Ansicht von P eindeutig, dass unter diesem Begriff ein Kalendermonat zu verstehen wäre."

90

# Wyeth

(English translation: Since in the description the term "months" is used differently compared to "cycles" it would be clear according to P that this term would have to be understood as calendar month.")

For the record, this "summary" does not accurately reflect our actual submission during the oral hearing.  Due to a misunderstanding on the part of the proprietors representatives, the Opposition Division may indeed have initially had the impression that according to the proprietor's interpretation the above claim feature referred to calendar months.  Subsequently, the proprietor's representatives made clear, however, that the reference to 9 months in claim 1 of Auxiliary Request 3 would have been understood by the skilled artisan to mean cycle months.  This is also acknowledged in the Minutes of the Oral Proceedings (see page 4, 2nd paragraph thereof), but has apparently been overlooked by the Opposition Division in the course of preparing the written Grounds of the Decision.

Yours faithfully

S K Mannion (Dr)
European Patent Attorney
GA 45314

**Encl**
Main Request
Auxiliary Request 1
Auxiliary Request 2
Auxiliary Request 3
Auxiliary Request 4



EPO - Munich
39
1 2.Feb. 2008

The European Patent Office
Erhardtstrasse 27
80469 München

February 12, 2008

European Patent No. 1 011 682 (Appl. No. 98 954 135.4)
Appeal T 819/07 – 3.3.02
Proprietor: Wyeth
Opponent/Appellant: Akzo Nobel N.V.
Wyeth Ref: AM-101403
Our Ref.: WYE11186ADV

Patents
Trademarks
Designs

df-mp
Fünf Höfe
Theatinerstraße 16
80333 Munich
Germany

Phone +49 89 210296-0
Fax +49 89 210296-33

info@df-mp.com
www.df-mp.com

H. Ulrich Dörries [1][2][3][4]
Dr. sc. nat., Dipl.-Biol.

David Molnia [1][2][3][6][7]
M.S. Elec. Eng., B.S. Physics

Sandra Pohlman [1][4]
B.S. Biology

Michael Eder [1][2][3][4]
Dr. sc. nat., Dipl.-Chem.

Holger Schimmel [2][3][4]
Dr. rer. nat., Dipl.-Ing.

Giuditta Biagini [1][8]
Dott. Chim. (IT)

Oliver Schulz [2][3][4]
Dipl.-Phys.

Hilary Pioro [2][3][6][7]
Dr. rer. nat., M.A. Biology

Further to the Communication of August 2, 2008 we herewith provide Wyeth's comments to Opponent/Appellant Akzo Nobel's (hereinafter "Akzo") Grounds of Appeal. Reference is made to the Power of Attorney submitted on January 10, 2006 by which the undersigned has been authorized to act in these proceedings on behalf of the proprietor.

Please kindly continue to direct correspondence relating to this case to Wyeth Pharmaceuticals via their Taplow address.

I.     **Requests**

1.     We maintain our previous request that the Decision to Maintain the Patent in Amended Form of 29 March 2007 (hereinafter referred to as "the Decision"), which issued in respect of European Patent 1 011 682 (hereinafter referred to as "the Patent") be set aside, that the opposition be rejected, and that the Patent be maintained on the basis of the Main Request, or failing that, on the basis of the Auxiliary Requests 1-4 which were enclosed with our appeal brief dated July 30, 2007.

2.     We also maintain our conditional request for oral proceedings according to Article 116 EPC in case the Board is of the opinion that the Main Request cannot serve as a basis for the maintenance of the Patent.

Page 1 of 14

1 European Patent Attorney
2 European Trademark Attorney
3 European Design Attorney
4 Patentanwalt
5 Solicitor (England & Wales)
6 U.S. Patent Attorney
7 U.S. Patent Agent
8 Consulente in Brevetti

## II.    Introductory Remarks

### 1.    *The Opponent's/Appellants "Summary" of the Background Art*

1.1    In their summary of the background of the invention (page 2 of their Grounds of Appeal), Akzo allege that

> *"it has long been known that a woman can avoid her period by omitting the pill-free period for as long as she deems necessary"* (page 2, the section entitled "Background"; emphasis added).

This statement is obviously incorrect, as the discussion of the prior art in our previous and present submissions show.

1.2    Combined oral contraceptives (COCs) of the type as claimed in the Patent had always been given in cycles of 28 days, with 7 days pill free intervals to mimic the normal menstrual cycle (see, e.g., the statement in D1 at page 86, 1st full paragraph, lines 7-8, according to which the pill-free week was "the norm"). There was no regulatory approved COC at the priority date with an extended cycle regime. Any experiments with extended cycles were done off-label (see page 2, penultimate paragraph of the document with the heading "Division of Reproductive and Urologic Drug Products" within the collection of documents submitted as D15).

1.3    Women and their gynaecologists had indeed experimented off-label with various ways of moving or postponing the withdrawal bleeds, or omitting them every now and then, in case of side-effects associated therewith. However, it was common ground amongst practitioners, and recommended by them, that the best approach would be to maintain the 28 day cycle regime, and at most to tricycle in case of severe side effects of the withdrawal bleed, or in certain gynaecological or psychiatric conditions.

1.4    This is confirmed, e.g., by the statements in D10, page 110, item 4.27, where it is explained that *"it would seem wise only to cut out the gap between packets when there are good indications"*, i.e., the indications listed in Table 4.2. These include severe side effects of the withdrawal bleed or certain gynaecological or psychiatric conditions, such as endometriosis and epileptic fits. Item 4.27 also states the "tricycling regimen" is then preferred. We also refer to D13, item 13 (*"we recommended tricycling as a compromise"*) and to D1, page 87, 1st paragraph (*"One possible compromise is the concept of tricycling"*). Also instructive of the thinking amongst practitioners at the time is the statement under item 4.29 of D10, where it is recommended that if a woman experiences breakthrough bleeding with tricycling, she should go back to bicycling.

1.5    There were no contrary indications from trials with COCs indicating that the concerns expressed, e.g., in D1, D10 or D13, regarding extended cycle lengths would be unfounded.

1.6    Akzo rely upon D19 to back up their misleading summary of the state of the art. However, D19 does not represent prior art, nor were the statements quoted therein made before the priority date. Thus, D19 cannot possibly be considered as representing the state of the art as of the priority date of the opposed patent.

dfmp

1.7     In fact, when the author of D19, Dr. Leslie Miller, is quoted as saying in 2006 (9 years after the priority date of the Patent) that *"[i]t's not a new idea"*, it is at best unclear whether she refers to the three-months regimen of Barr's Seasonale® or the uninterrupted administration of Wyeth's Anya/Lybrel that eliminates a woman's period altogether, since both are mentioned in the preceding paragraph.

1.8     Either way it is correct that by the time this statement was made the idea was not new as this statement was made more than 9 years after the priority date of the Patent and, after all, more than 7 years after the publication of the application underlying it; and still more than 3 years after the publication of Dr. Miller's own work regarding an uninterrupted administration regime (see D9).

1.9     Moreover, when Dr. Miller says *"[f]emale doctors have always known you can skip your period on the pill"*, she is in any event most likely referring to bicycling or tricycling rather than to an uninterrupted administration regime of the kind as claimed in the Patent. (See again D10 and D13.) Thus, Akzo has no support for its suggestion that women would have felt it was appropriate to omit the pill-free period for as long as they deemed necessary. On the contrary, all prior art documents and declarations of record confirm that tricycling would have been the maximum cycle extension that would have been considered acceptable at the time.

2.     *The Relevance of D9 and D21*

2.1     Akzo say that D21 (relating to Wyeth's product "Anya") had *"no relevance to any request"*. We disagree. Anya is, of course, a COC in accordance with all pending claim requests. Also, the discussion in Akzo's appeal brief as to whether or not the product license was indicative of an inventive step over the prior art is quite off the mark. Akzo cannot seriously argue that D21 does not demonstrate contraceptive safety, efficacy, and an acceptable level of side effects in respect of a representative composition of the claims of any of the requests on file. Otherwise, the Finnish authorities would have hardly granted the product license (the same applies, of course, to the US authorities, which granted a product license for Lybrel; see D23).

2.2     The same applies to D9, which relates to another COC composition representative of the pending claims. Thus, Akzo's unsupported criticism that there was an insufficient experimental basis regarding the technical effect is not justified.

III.     **Compliance of Auxiliary Request 3 with Art. 123(2) EPC**

1.     Akzo suggest that the claims as upheld by the Opposition Division (which correspond to the current Auxiliary Request 3) extend beyond the content of the application underlying the Patent as originally filed. We disagree.

2.     Auxiliary Requests 3 and 4 merely include features of granted claims 4 and 5 into claim 1, respectively. Akzo had failed to rely upon Article 100(c) EPC as one of the initial grounds of opposition. The issue was not raised until the oral hearing of January 30, 2007. (In their submission of

**dfmp**

December 13, 2006, Akzo suggested that *"all Patentee's requests currently on the record"* lacked novelty vis-à-vis D19; a violation of Articles 100(c) and 123(2) EPC was, however, not argued.) Thus, the alleged addition of matter via claim 1 of Auxiliary Request 3 should only be discussed in these proceedings, if it is *prima facie* relevant (see G 10/91, O.J. EPO 1993, 420). We believe the criterion of *prima facie* relevance is not fulfilled in this case.

3.    In any event, there is no problem under Articles 100(c) and 123(2) EPC with claim 1 of Auxiliary Request 3. In this regard, it may be useful to consider the EPO's practice regarding the admissibility of the introduction of features from Examples into the claims.

4.    For instance, in decision T 201/83, it was held that

> *"[a]n amendment of a concentration range in a claim for a mixture, such as an alloy, is allowable on the basis of a particular value described in a specific example, provided the skilled man could have readily recognised this value as <u>not so closely associated with the other features of the example as to determine the effect of that embodiment of the invention as a whole in a unique manner and to a significant degree</u>."* (See the Headnote of the decision; emphasis added.)

Thus, in this decision, the Board came to the conclusion that the amendment of the concentration range for a component of a claimed alloy was allowable on the basis of a value described in a specific example, since the skilled person could have readily recognized that this value was not so closely associated with the other features of the example as to determine the effect of that embodiment of the invention to a significant degree. The new claim limitation based on this value was thus held to be derivable from the original documents.

5.    All of the Examples in the Patent refer to administration periods of 9 months or longer, 7 of them (Examples 2-8) specify 12 months or longer. Since the claim feature in claim 1 of Auxiliary Request 3 that the administration period <u>comprises</u> 9 months (*"wobei der Verabreichungszeitraum 9 Monate umfasst"*) can be based on all examples, it is obviously not closely associated with the other features of the examples and would be understood to be universally suitable in the context of the uninterrupted administration regime according to the invention, specifically since the claimed COC composition is clearly intended for long-term administration (see also para. [0020] of the Patent, which corresponds to the paragraph bridging pages 8 and 9 of the application as filed).

## IV.    Inventive Step (Art. 100(a) In Connection with Art. 56 EPC)

*1.    The Teaching of The Alleged Closest Prior Art D1*

1.1    Akzo allege that D1 is *"the most promising springboard for discussing the alleged invention"*. Thus, Akzo's choice of D1 as closest prior art is apparently not dictated by any desire to fairly identify the most appropriate starting point for arriving at the claimed invention. Rather, their focus on D1 seems to be dictated by their hindsight approach of the discussion of inventive step based upon this document. An objective analysis of the disclosure content of D1, however, makes clear that this document actually teaches away from the invention.

dfmp

1.2    We are not convinced that D1 is really the appropriate starting point for the inventive step discussion. It is stated on the cover of D1 that it is *"[t]he most complete & up-to-date guide for women today"* (emphasis added). It was thus not written for the skilled person but for the users of oral contraceptives. Needless to say that it is the skilled person who is the relevant addressee for the question of what the disclosure content of a document for the purposes of evaluating either novelty or inventive step actually is. Furthermore, D1 does not disclose extended cycles in the context of a specific formulation. D3-D6 are much more specific in this regard. Nevertheless, we are happy to discuss the issue of inventive step from the point of view of D1.

1.3    It is nevertheless interesting to note that D1 serves a dual function in the Opponent's arguments. On the one hand, it is relied upon as common general knowledge, and at the same time it is labelled as closest prior art in the context of inventive step. This seems to be somewhat inconsistent.

1.4    We submit the skilled person reading D1 would understand that this document *inter alia* tried to avoid raising concerns amongst those users who had occasionally missed, or were considering to occasionally miss the monthly withdrawal bleed.

1.5    The skilled person would, however, know, e.g., from D10, paragraph 4.26 on page 109, and paragraph 4.27 on page 110; or from D12, second column on page 128 in the 3rd paragraph of the summary (*"selecting formulations with the lowest risk of breakthrough bleeding"*) that practitioners would not generally recommend missing out the pill-free interval, and in case of severe side effects, at most recommended tricycling. (See also Prof. Guillebaud's statements in D13.)

1.6    Akzo heavily rely on pages 84-87 of D1. However, these passages simply fail to suggest an uninterrupted administration according to the invention, i.e., administration of a low estrogen COC with no pill-free intervals over the entire period of use.

1.7    Having regard to the actual disclosure of pages 84-87 of D1: the corresponding passages of D1 speak of "moving periods", not omitting them altogether. For instance, in the paragraph bridging pages 84 and 85, it is stated:

> *"If you are taking a monophasic pill, and you would like your withdrawal bleed to occur <u>a few days, or a week, late,</u> just continue to take pills until it becomes convenient to have a bleed, <u>and then stop</u>. To prevent <u>a</u> period you have only to miss out your pill-free week and carry on with the next packet."* (Emphasis added.)

Consistent with that, D1 merely speaks (in the context of triphasic pills) of *"postponing"* withdrawal bleeds in the following paragraph, and further explains in respect of withdrawal bleeds that it was safe *"to move them around"*. Thus, D1 clearly teaches to maintain the pill-free interval, even though it states that they can be postponed to a certain extent.

1.8    Page 86 (*"Why have withdrawal bleeds at all?"*) contains mere theoretical considerations and speculations as to what would happen if one took the pill "continuously" (the result would be, e.g., a



greater hormone load; see the end of the first full paragraph). It is, however, not a teaching to actually do it.

1.9    Also, with the background of the recommended standard 28 day cycles in mind, the use of the term "continuously" at page 86 would <u>not</u> have been understood to mean that one should not have breaks between intervals of extended administration. Notably, D1 does not speak of uninterrupted administration, in contrast to claim 1.

1.10    Page 86 refers the users of oral contraceptives to potential health risks of a significantly larger dose of hormones. While this is done in a somewhat mild way in order not to evoke too much concern amongst those users who had occasionally missed, or were planning to occasionally miss the monthly withdrawal bleed, the skilled practitioner at the time would <u>not</u> have understood this paragraph as a recommendation to completely avoid pill-free intervals in view of his/her knowledge about possible patient compliance problems and potentially significant health risks associated with extending cycles.

1.11    The two "quotes" at pages 86 and 87 of D1 are obviously fictitious. More importantly, the first one speaks of "occasional stops", i.e., pill-free intervals during the overall administration period, which is consistent with the conclusion that the skilled reader would not equate "continuously" as used in D1 with "ununterbrochen" (uninterrupted) as used in claim 1 of the Patent. The second "quote", at page 87, is apparently about treating epileptic fits, not about contraception. Neither of the two "quotes" teaches or suggests uninterrupted administration for contraceptive purposes, let alone uninterrupted administration of a COC of the kind referred to in the claims of the Patent.

1.12    What D1 then actually recommends to do in practice when a woman suffers from the side-effects related to the pill-free week is tricycling; see page 87. This would be consistent with the skilled readers understanding what the consensus amongst practitioners was (see above). As the name already indicates, tricycling is <u>not</u> an administration regime that is "ununterbrochen" (uninterrupted), but one that again includes cycles and pill-free weeks.

1.13    The reference to endometriosis at page 87 does not refer to the use of an oral contraceptive for any contraceptive purpose, but for the purpose of treating endometriosis; see item 4.99 of D20, which demonstrates that COCs were used to "*[c]ontrol endometriosis as maintenance after first-line treatment (progestagen-dominant brand, best using the tricycle regimen (see Qs 4.28 and 4.210))*". (Emphasis added.) The claimed invention, in turn, relates to an administration regime for contraceptive purposes. It does not matter in this regard whether or not the treatment of endometriosis may "inherently" achieve reduced bleeding.

1.14    Moreover, D20 recommends tricycling for endometriosis, thus again showing that "continuous" administration according to D1 would <u>not</u> be understood to mean "without any pill-free intervals". See also item 4.210 of D20, which shows that the recommended pill is a brand such as Eugynon 30 or Microgynon 30, i.e., a pill containing <u>30</u> µg ethinyl estradiol (EE).

1.15    While on page 87 of D1 some gynaecological conditions and indications are mentioned where the woman is advised to reduce the number of pill free intervals, D1 then goes on to put this in the context of health advantages of the pill free interval, and, as mentioned above, compromises by

**dfmp**

suggesting that tricycling is the better approach (page 87, last sentence of the 3rd paragraph and the paragraph entitled "Tricycling").

1.16    Akzo *inter alia* emphasize the statement at page 87 of D1 that *"[a]ny woman may tricycle, if she wishes so"*. This does not mean, however, that any woman should tricycle with any pill, as Akzo suggest. In fact, Dr. Szarewski (upon whose statements Akzo repeatedly rely in their appeal brief) explains in her declaration D8 that, unlike in the case of Loestrin 30, i.e., a pill with excellent cycle control, she would never have suggested, e.g., Loestrin 20 for tricycling due to its known poor cycle control (see items 10 and 11 of D8). Thus, contrary to Akzo's allegations, D1 would not have been understood by the skilled person to invariably recommend tricycling with any pill. Moreover in E25, Dr. Szarewski stated that she would expect Mercilon to tricycle better than Loestrin 20, but again in D3 patients on extended cycles experienced much higher breakthrough bleeding on Mercilon than on Femodeen (a pill with a higher dosage of estrogen).

1.17    In any event, tricycling does not represent uninterrupted administration throughout the entire administration period. Rather, it provides for scheduled pill-free intervals within extended phases of pill-intake. This is quite different from the use claimed in the Patent.

1.18    To summarize, D1 does not disclose or suggest (let alone recommend) a regimen of uninterrupted use (without pill free intervals) across the whole administration period, but at most recommends tricycling in case the monthly withdrawal bleed is experienced as inconvenient or associated with severe side effects. Moreover, it does not teach or suggest using comparatively low doses of estrogen combined with progestogen in the context of any of the extended cycle regimes described therein. Therefore, the claimed invention is not only novel but also unobvious over D1.

2.    *The Technical Problem*

2.1    Akzo suggest that it remained unclear what the technical problem was in the present case and accuse the Proprietor of confusing the issues by referring *"at random"* to withdrawal bleeding, breakthrough bleeding, spotting and intermenstrual bleeding. We do not believe this criticism is justified. It rather seems that it is Akzo who seek to confuse the issues by taking several of the proprietor's written statements out of context and insinuating that they related to 10 (!) independent aspects of a (correspondingly complex) technical problem that allegedly had not been solved (see the debate on pages 7 and 8 of Akzo's appeal brief)

2.2    It does not seem to be necessary, however, to address the above criticism in more detail, since it has nothing to do with the technical problem on which the Opposition Division based its analysis of inventive step in the Decision (which incidentally exactly corresponds to the problem proposed by the proprietor; cf. page 17, last paragraph and page 18, middle paragraph of the Grounds for the Decision attached to the Interlocutory Decision of March 29, 2007).

2.3    In particular, the technical problem on which the Opposition Division based its decision was simply the provision of an oral contraceptive associated with high contraceptive reliability and reduced intermenstrual bleeding (see again page 18, middle paragraph of the Grounds for the Decision). It will be appreciated that this definition is fully consistent with the way the technical problem is set out in the

dfmp

Patent (see paragraph [0012] thereof, which speaks of ensuring high contraceptive reliability and excluding intermenstrual bleeding).

2.4     Akzo criticize the comparison of the data of D21 ((Anya), D9 (Miller et al.), and D15 (Seasonale®) in the three tables submitted by the proprietor during the oral hearing on January 30, 2007 (see page 9, 1st full paragraph of the appeal brief; the tables are submitted herewith again for the Board's convenience). They argue the comparison of the percentages of patients experiencing amenorrhea (i.e., the complete absence of bleeding) between Anya/Lybrel (D21) and Seasonale® (D15) was not valid, since the last 84 days in the Seasonale® study had been compared to the last 28 days (pill pack 13) of Anya/Lybrel (note that the appeal brief apparently confuses in this regard the percentage values for Seasonale® and Anya/Lybrel). This criticism lacks any substance. The percentage of amenorrhea experienced in the case of Seasonale® (9-16%) was constant in each of the 4 cycles of 91 days (see page 56 of the "Clinical Review" within the collection of papers filed as D15). The percentage of incidences of amenorrhea demonstrated in D21, in contrast, was consistently significantly higher than that even after pill pack 3 (3x28=84 days; 27%), and certainly after pill pack 7 (7x28=196 days; 45%) and pill pack 13 (13x28=364 days; 59%). It is evident from this comparison that the degree of amenorrhea observed with Anya/Lybrel was not only comparable but actually consistently higher than that observed with Seasonale®.

2.5     Akzo also say that Table 3 submitted during the hearing did not show any data regarding Anya. However, Table 3 does show that the number of overall bleeding days observed in the Miller study of D9 (page 657, Table 2), which also relates to a COC in accordance with the claims of the Patent, was consistently lower than that observed with Seasonale® (see page 54 of the "Clinical Review" within the collection of papers filed as D15).

2.6     Akzo's appeal brief subsequently provides a variety of speculations as to why D9 *"might not"* show that the problem of intermenstrual bleeding is being handled. One point that is raised is the alleged high drop-out rate in the study of D9. However, as discussed previously D9 reports only few drop-outs of the continuous arm of the study, which were actually considerably lower in number than in the monthly arm of the study (see Figure 1 and the comments on page 659, right column, 1st full paragraph of D9). Thus, there is no reason to assume that the results in the continuous arm could not be fairly compared to those in the monthly arm of the study. Moreover, the study of D9 clearly demonstrates that at least for a very significant part of the study group, the problem of intermenstrual bleeding was indeed effectively handled.

2.7     Another speculative criticism against D9 advanced in the appeal brief is based on the FDA papers relating to the tri-cycle product Seasonale® (submitted as D15). Akzo note in this regard that D2 relates to Seasonale® and submit the first instance decision by which this patent was revoked. It is unclear, however, what this has to do with the present case. We therefore respectfully ask that D26 be rejected by the Board under Article 114(2) EPC for being filed late, since it lacks the relevance required to be admitted to the proceedings at this stage.

2.8     Akzo subsequently discuss at quite some length statements in D15 relating to the problem of breakthrough bleeding. We have difficulties to see the point of this debate. The administration regime and the composition of Seasonale® are quite different from the claimed invention. Possible breakthrough bleeding problems observed with Seasonale® therefore do not *per se* provide an

indication that the data in D9 (or in D21 and the Patent itself) would not be reliable. Akzo's allegations to the contrary obviously amount to mere speculation.

2.9     The same applies to Akzo's attempts to rely upon statements by Prof. Guillebaud and Dr. Szarewski. The fact that prior to the priority date of the Patent they would have expected low estrogen COCs to cause problems with cycle control upon prolonged administration is certainly evidence for the unobviousness of the claimed invention, but of course not an indication that there is something wrong with the impressive results reported in D9 (or D21) regarding the (low) incidences of breakthrough bleeding.

2.10     The appeal brief refers to the discussion of the median and the mean in our submission of January 17, 2007. It then points to the fact that D21, which relates to a study with a large number of participants, also refers to the median and argues that the statements by the proprietor were self-contradicting. This is not the case, however. While we did say that the median is arguably a more appropriate indicator of central tendency of a study particularly when the sample size is relatively small, we did not say that the median was necessarily inappropriate in respect of larger studies. For the further evaluation of the relevance of D15 for the significance of the data in D9 we refer for the sake of brevity to the discussion at pages 3 and 4 of our submission of January 17, 2007, which shows that Akzo's arguments in this regard are once again purely speculative. (This is also clear from the wording used in the appeal brief: "... the median *might not be sufficient* for proper representation of the data"; emphasis added.)

2.12     Akzo include a table comparing the data on discontinuation due to unacceptable bleeding upon administration of 7 different products (see pages 11 and 12 of the appeal brief). The goal is apparently to show that the degree of discontinuation due to unacceptable bleeding was much higher with Anya compared to all other COCs. However, the discontinuation data in the table cannot be fairly compared, and thus, cannot support Akzo's case. The discontinuation rates regarding Seasonale®, Seasonale® Ultra-Lo, Nordette, and Levlite Seasonale were obtained in a trial from which women with a history of abnormal bleeding had been excluded. As the Medical Officer noted, *"this exclusion potentially enriches the population resulting in less irregular bleeding"* (see page 25 of the "Clinical Review" within the materials of D15). In the study of D21, in contrast, *"[w]omen with a history of breakthrough bleeding and/or spotting were not excluded"* (see page 7, third paragraph of D21).

2.13     Moreover, it does not make much sense to compare drop-out rates of Anya to drop-out rates that may have been observed with Nordette or Levlite, since unlike Seasonale, the latter COCs are not administered on the basis of an extended cycle regime but in the form of the classic cycles of 28 days, with 7 days pill free intervals.

2.14     In any event, as explained above, the discussion of drop-out rates does not take away the fact that D21 demonstrates for at least a very significant number of the participants of the study that the problem of intermenstrual bleeding was indeed effectively handled.

2.15     Akzo's reference to E23 (i.e., the US approval documents for Lybrel) is likewise not helpful to support their case. The document states that the convenience of having no scheduled menstrual bleeding should be weighed against the inconvenience of unscheduled bleeding. While unscheduled



bleeding may thus not be avoided in every woman taking Anya/Lybrel, it is certainly effectively and sufficiently suppressed in a very large number of the users, as evidenced by D9 and D21.

2.16    Akzo allege that the specification fails to disclose whether after, for example, 9 months the regimen according to the invention is to be continued or stopped, and that it was inevitable that there is a pill-free period after which the regimen can be resumed. This allegedly leads to an *"obvious modification of the known tricycling regimen"*. We do not see the significance of this discussion, since the "obvious modification", which Akzo seems to envisage is not an administration regime in accordance with the invention (which relates to "uninterrupted" administration, i.e., administration without any pill-free intervals). Likewise, a cyclic administration regime with extended cycles up to 9 months in length would, of course, not at all be an "obvious modification" vis-à-vis the prior art, since the prior art would have taught away from cycle extensions going any further than tricycling, as explained in detail above.

3.    *The Claimed Solution is Unobvious*

3.1    The solution as claimed according to all requests relates to low estrogen COC compositions administered according to an uninterrupted administration regime, i.e., the withdrawal bleed is omitted altogether throughout the entire period of administration. This solution is entirely unobvious in view of the prior art and the skilled practitioner's thinking around the time of the priority date of the Patent.

3.2    As to the complete omission of the withdrawal bleed, we have already explained earlier herein that COCs had always been given in cycles of 28 days. Moreover, all safety data had been gathered with products administered according to this classic treatment regime (see page 109, item 4.26, point 5 of D10). In fact, it was common ground amongst practitioners not to omit the withdrawal bleed associated with the pill-free interval, and in case of side-effects associated with the withdrawal bleed, extend at best to tricycling (see again the statements in D10, items 4.26 and 4.27-4.29; and D13, items 13-17).

3.4    Having weighed the advantages and disadvantages of extended cycle regimes in general, tricycling is also the extended cycle regime recommended by D1, so that this document clearly teaches away from the claimed invention (see again page 87 of D1). Akzo's reliance on the reference in D1 to a "period-free life" does not change this conclusion. In context, the fictitious "quote" at pages 86, last paragraph reads:

"<u>I stop occasionally</u>, when it suits me, but <u>otherwise</u> I live a period free life." (Emphasis added)

Thus, the above fictitious "quote" does not relate to an uninterrupted administration regime at all, but rather envisages (possibly extended) administration cycles interrupted by pill-free intervals.

3.5    In connection with the evaluation of inventive step, it should also be kept in mind that there was no approved COC with an extended cycle regime and no contrary indication from trials with COCs indicating that the concerns expressed, e.g., in D10 or D13 regarding extended cycle lengths would be unfounded.

dfmp

3.6    Such concerns would have included worries with the increased overall yearly drug-load that would be associated with increasing cycle length (see, e.g., D15, page 7, 2nd paragraph of the document entitled "Approved Labelling"; and page 3 of Seasonale Proposed Labeling "Risks of Taking Oral Contraceptives"; see also D10, page 109, item 4.2.6, No. 4). Even in 2004, the FDA Regulatory Review Officer in charge of the Seasonale TV adverts indicated that reducing the number of PFI per year would be considered problematic by practitioners because of the increased drug load associated with reducing pill free intervals (see page 4, penultimate paragraph of D17).

3.7    In this regard, the differences in overall hormonal load upon administration of Anya (or the composition of D9) and D1 and D3-D7 should be noted. Anya contains 90 µg levonorgestrel (LNG) and 20 µg ethinyl estradiol (EE) and is administered according to a continuous administration regime without any pill-free intervals. Anya thus results in a lower daily dose and lower cumulative dose per year of both LNG and EE compared to known extended-use COC and normal cycle COC products containing 150 µg LNG and 30 µg EE, as will be apparent from the following Table:

| Parameter | Anya/Lybrel | Nordette | Seasonale® |
|---|---|---|---|
| Regimen | Continuous uninterrupted | 21-Day cyclic | Extended cycle |
| Active tablets / intervals | 28/pill pack | 21/28 Day cycle | 84/91 Day interval |
| Active tablets / year | 364 | 273 | 336 |
| Dose/tablet LNG (µg) | 90 | 150 | 150 |
| Dose/tablet EE (µg) | 20 | 30 | 30 |
| Tablet dose / year LNG mg) | 32.76 | 40.95 | 50.40 |
| Tablet dose / year EE (mg) | 7.28 | 8.19 | 10.08 |

Akzo argue that the goal of reducing the hormone burden had not been achieved by the claimed invention vis-à-vis Mercilon (see page 8, 1st full paragraph of the appeal brief). However, Mercilon is a 20 µg EE product that would not have been recommended or considered for any extended cycle regimens. Thus, we believe the comparison in the above table is more appropriate in the context of discussing the inventive merit of the comparatively low estrogen compositions and their administration according to the Patent.

3.8    On the other hand, it was well understood in the art that lower doses of estrogen would often be associated with breakthrough bleeding. For example, in D3 more breakthrough bleeding was observed with 20 µg EE/150 µg desogestrel (Mercilon) than with 30 µg EE/75 µg gestodene. It is therefore quite absurd for Akzo to contest (as they do at page 14, 2nd paragraph of the appeal brief) that D3 teaches away from the claimed invention.

3.9    Consistent with the findings in D3 on the effect of differences in EE content, Dr. Szarewski confirms in paragraph 11 of D8 that Loestrin 20 was a pill, which gives very poor cycle control as compared to Loestrin 30. Similarly, D1 explains that in respect of Loestrin 20, breakthrough bleeding is *almost universal*, which is why *"this pill has never been very popular"* (see page 53, line 21 of D1).

**dfmp**

3.10     When Dr. Szarewski states in D25 (item 9 thereof) that she would expect Mercilon to tricycle well as it was associated with less breakthrough bleeding than Loestrin 20, it must be noted that this is not consistent with the common general knowledge at the time regarding this product. In particular, D1 confirms that both Mercilon and Loestrin 20 were known to cause problems with breakthrough bleeding ("BTB") even when administered according to a schedule with "normal" cycles (see page 52, penultimate paragraph of D1). Moreover, as indicated above, Mercilon showed poor cycle control compared to Femodeen in the extended cycles of D3.

3.11     In view of the above, an uninterrupted (no pill-free interval) administration of combined hormone contraceptives containing only up to 20 µg EE (or equivalent) would have been doubly unobvious to the skilled person applying his/her common general knowledge, both in view of D1 and in view of D1 taken together with D3. Similar considerations apply to combinations of D1 with any of D4-D7 as will be explained below.

3.12     In particular, D3 (which discloses a single bicycled regimen) shows high levels of breakthrough bleeding. The skilled person would have no motivation to omit the pill free interval altogether and extend the administration because his/her expectation would have been poor control of breakthrough bleeding from the start which deteriorates with continued administration to significant breakthrough bleeding levels (see again D8, paragraph 9).

3.13     D4, D5 and D6 also disclose extended cycle regimens using combined oral contraceptive pills containing 30 µg of EE. In order to work inside the scope of Claim 1 the skilled person would have to both omit the pill free interval and reduce the EE content by a third to 20 µg. Where is the motivation to make these two radical changes? There is no information which would provide the skilled man with an expectation that breakthrough bleeding could be minimised by omitting the withdrawal bleed altogether.

3.14     In fact, D4-D6 already report an increase in breakthrough bleeding as a result of extending the cycle (see, e.g., the abstracts of D4 and D5, and the last paragraph of D6), so they anyway teach away from an uninterrupted administration regime. Moreover, further decreasing the EE content, and thereby, even further increasing the risk of breakthrough bleeding would be contra-indicated.

3.15     We also refer again to Prof. Guillebaud's book D10 (see page 111, item 4.29) wherein it is recommended to go from tricycling back to bicycling in cases of spotting. The alternative mentioned is a "stronger pill", i.e., more estrogen. Thus, going to an uninterrupted administration regime with a lower estrogen pill would have been entirely counter-intuitive.

3.16     D1 itself certainly does not provide the motivation to arrive at the claimed solution either, as it points to breakthrough bleeding problems with low dose pills, as mentioned above. Also, at best D1 promotes tricycling "as a compromise", but certainly does not suggest an uninterrupted administration regime.

3.17     Finally, D7 explores the acceptability of extended cycle regimens up to 84 days. If at any time a woman experienced breakthrough bleeding the cycle length was reduced (see page 180, right column of D7). We therefore do not see how the disclosure of D7 could make it obvious to the skilled person to continue the administration past 84 days and omit the pill free interval altogether.

3.18    To summarize, the subject matter of Claim 1 is based on an inventive step because the prior art does not disclose or provide any information which would lead the skilled person to expect that uninterrupted regimens as claimed would be suitable to solve the technical problem defined above.

3.19    Finally, we note that the first tricycling regime was published in 1977 (see D11). If the claimed invention was as obvious as the Opponent suggests, we are wondering why it took about 20 years (i.e., the priority date of the Patent) until somebody made a step forward regarding avoiding the problems associated with the withdrawal bleed, i.e., the inventor of the Patent.

4.    *Claim 5 of Auxiliary Request 3 is Likewise Unobvious*

4.1    We do not understand Akzo's reasoning regarding inventive step of independent claim 5 of Auxiliary Request 3. Akzo recite various passages from D1 and D7 which make it plausible that the problem of treating premenstrual syndrome (PMS) would be solved by the continuous uninterrupted administration regime according to the Patent. Subsequently, the Opposition Division's conclusion that it was plausible that this problem had been solved is criticized as being erroneous. We believe this reasoning is self-contradictory.

4.2    Insofar as Akzo suggest that the treatment of PMS via the continuous uninterrupted administration regime according to the Patent was obvious vis-à-vis D1, or D7, we agree with the Opposition Division that the administration regimes referred to in the claims are wholly unobvious vis-à-vis these references. For the sake of brevity, we refer to our previous discussion of the disclosure content of these documents which similarly applies to claim 5 of Auxiliary Request 3.

**V.    Sufficiency (Art. 100(b) in Connection with Art. 83 EPC)**

1.    In our previous submissions, we pointed to the case law of the Boards of Appeal of the EPO according to which the burden of proof for an alleged lack of sufficiency of disclosure is on the opponent (see again decisions T 182/89; T 242/92; and T 998/97). We also referred to decision T 19/90 according to which a finding of lack of sufficiency of disclosure can only be based upon serious doubts, substantiated by verifiable facts. Akzo's submissions in the appeal brief regarding sufficiency of disclosure once again utterly fail to comply with the requirements that were *inter alia* established by the above decisions.

2.    For instance, Akzo criticize that there was no example in the Patent regarding transdermal and depot administration. Akzo do not, however, provide any compelling reason as to why the skilled person would not be able to implement the uninterrupted administration regime referred to in the claim also with these administration routes, or why routine methods of extrapolation and/or testing would fail to allow adjusting the hormone concentrations also in these case in order to achieve reliable contraception. It is also not apparent why the control of intermenstrual bleeding achieved with oral administration should not be readily achievable via transdermal or depot administration.

3.    Akzo also suggest that the skilled person would not be able to adjust the progestogen concentration to achieve effective contraception and control of intermenstrual bleeding when choosing



5 or 10 µg EE. However, this allegation is neither supported by any evidence nor plausible, since the skilled person could easily test different concentrations by routine methods and furthermore rely on the dosage recommendations in the Examples of the Patent, not only in respect of the oral administration route, but also in the case of transdermal or depot administration.

4.    Akzo also suggest that the technical effect of the invention could not be achieved with EE dosages lower than 20 µg EE and refer to the higher drop-out rates observed with Seasonale Ultra-Lo compared to the 30 µg EE Seasonale product. However, as explained above there is no evidence for abnormally high drop-out rates for the uninterrupted COC administration in accordance with the Patent, as in the case of Anya. Regardless of drop-out rates D9 and D21 demonstrate effective contraceptive efficacy and excellent control of intermenstrual bleeding for at least a very significant fraction of the users. Akzo's suggestion that this might be restricted to formulations with 20 µg EE is pure speculation, which cannot be a basis to effectively challenge sufficiency of disclosure of the claimed invention.

5.    The appeal brief criticizes the reference in claim 1 of Auxiliary Request 3 to "9 months" as not being defined. We have already explained in our appeal brief that the skilled person would understand the reference to 9 months to mean 9 cycle months. In any event, Akzo's submissions regarding the above feature amount to a criticism of the term's clarity. An alleged lack of clarity is, however, not available as an attack against the above claim language.

6.    Claim 5 of Auxiliary Request 3 is also attacked for an alleged lack of sufficiency. Akzo state in this regard that

> "*there is no proof* ...[]... *that the regimen can be continued rather than cycling after 3 or 4 packs, and keep its alleged advantages because the study was stopped after 84 days*". (Emphasis added.)

However, it would have been the Opponent's duty to prove that contrary to the (reasonable) extrapolation made and conclusions drawn by the regulatory authorities from the 3 pack substudy (reported at page 12 of D21) a reduction in cycle-related symptoms would not also be seen upon longer uninterrupted administration. Akzo's submission in this regard also seems to be quite inconsistent with their arguments made in respect of inventive step, where they suggested that it was obvious that extended administration regimes would have a positive effect on PMS.

7.    In sum, Akzo's submissions regarding the alleged lack of sufficiency of disclosure are not persuasive.

Yours faithfully

Dr. H. Ulrich Dörries
European Patent Attorney

**Encl**
Copy of Tables 1-3 submitted during Oral Proceedings on January 30, 2007

Page 14 of 14
105

# EXHIBIT   16

Welcome to epoline®

European Patent Office

Home | Contact | Deutsch | English | Français | Legal Notices

Register Plus | Schedule of Fees | EBD

Help | Log in

## Extract from the Register of European Patents

EP1011682

EP1011682 - HORMONAL CONTRACEPTIVE - Wyeth

- About this file
- Legal Status
- Event History
- Citations
- Patent Family
- All Documents (207)
  - Search/Examination (63)
  - Opposition (114)
  - Appeal (30)
  - Sent by the EPO (57)
  - Received by the EPO (145)

⊕ Advanced Search

Search Results

Download Selected Documents

Print

Open in esp@cenet®

Terms of Use

Help

⚠ **Database down**

The images database is currently unavailable. It can be accessed during our office working hours only. These are: Monday to Friday (except public holidays), 08.00 to 18.00 hrs CET. You can, however, continue to search bibliographic, patent family and legal status data.

Search: | Publication No. | EP1011682 | Search

Open recent: | | Open

| ☐ | Date ▾ | Document Title | Procedure | No. of Pages |
|---|---|---|---|---|
| ☑ | 20/02/2008 | Forwarding of submissions to parties | Appeal | 1 |
| ☑ | 12/02/2008 | Letter relating to Appeal Procedure | Appeal | 14 |
| ☑ | 12/02/2008 | Non-Patent Literature cited during the appeal procedure | Appeal | 1 |
| ☑ | 29/11/2007 | Term extension: YES/NO | Appeal | 2 |
| ☑ | 23/11/2007 | Fax relating to Appeal procedure | Appeal | 2 |
| ☑ | 14/08/2007 | Letter relating to Appeal Procedure | Appeal | 12 |
| ☑ | 14/08/2007 | Claims | Appeal | 2 |
| ☑ | 14/08/2007 | Claims | Appeal | 2 |
| ☑ | 14/08/2007 | Claims | Appeal | 2 |

Welcome to epoline®

| | Date | Description | Type | | Count |
|---|---|---|---|---|---|
| ☑ | 14/08/2007 | Claims | Appeal | | 2 |
| ☑ | 14/08/2007 | Claims | Appeal | | 2 |
| ☐ | 09/08/2007 | Forwarding of submissions to parties | Appeal | | 1 |
| ☐ | 02/08/2007 | Setting time limit for reply to appeal (inter partes) | Appeal | | 2 |
| ☐ | 31/07/2007 | Letter relating to Appeal Procedure | Appeal | | 17 |
| ☐ | 31/07/2007 | Non-Patent Literature cited during the appeal procedure | Appeal | | 137 |
| ☐ | 31/07/2007 | Non-Patent Literature cited during the appeal procedure | Appeal | | 45 |
| ☐ | 31/07/2007 | Non-Patent Literature cited during the appeal procedure | Appeal | | 10 |
| ☐ | 31/07/2007 | Non-Patent Literature cited during the appeal procedure | Appeal | | 3 |
| ☐ | 31/07/2007 | Non-Patent Literature cited during the appeal procedure | Appeal | | 20 |
| ☐ | 31/07/2007 | Non-Patent Literature cited during the appeal procedure | Appeal | | 9 |
| ☐ | 30/07/2007 | Fax relating to Appeal procedure | Appeal | | 25 |
| ☐ | 29/07/2007 | Fax relating to Appeal procedure | Appeal | | 17 |
| ☐ | 02/06/2007 | Letter relating to Appeal Procedure | Appeal | | 1 |
| ☐ | 01/06/2007 | Communication of the file number to the appellant | Appeal | | 2 |
| ☐ | 28/05/2007 | Notice of appeal | Appeal | | 2 |
| ☐ | 24/05/2007 | Communication of the file number to the appellant | Appeal | | 2 |
| ☐ | 21/05/2007 | Processing of an appeal | Appeal | | 1 |
| ☐ | 18/05/2007 | Notice of appeal | Appeal | | 1 |
| ☐ | 18/05/2007 | Notice of appeal | Appeal | | 1 |
| ☐ | 18/05/2007 | Payment of fees and costs | Appeal | | 1 |
| ☐ | 21/04/2007 | Acknowledgement of a document | Opposition | | 1 |
| ☐ | 13/04/2007 | Advice of delivery | Opposition | | 1 |
| ☐ | 10/04/2007 | Acknowledgement of a document | Opposition | | 1 |
| ☐ | 29/03/2007 | Interlocutory decision in opposition proceedings | Opposition | | 2 |
| ☐ | 29/03/2007 | Internal form - Opposition/addressees | Opposition | | 1 |
| ☐ | 29/03/2007 | Grounds for the decision (Annex) | Opposition | | 22 |
| ☐ | 29/03/2007 | Scanned annex to a communication - opposition procedure | Opposition | | 7 |
| ☐ | 29/03/2007 | Scanned annex to a communication - opposition procedure | Opposition | | 2 |
| ☐ | 29/03/2007 | Scanned annex to a communication - opposition procedure | Opposition | | 2 |
| ☐ | 29/03/2007 | Scanned annex to a communication - opposition procedure | Opposition | | 2 |

Welcome to epoline®

| | | | | |
|---|---|---|---|---|
| ☐ | 29/03/2007 | Scanned annex to a communication - opposition procedure | Opposition | 2 |
| ☐ | 29/03/2007 | Druckexemplar | Opposition | 7 |
| ☐ | 29/03/2007 | Provision of a copy of the minutes of oral proceedings | Opposition | 12 |
| ☐ | 05/02/2007 | Written submission in preparation to/during oral proceedings | Opposition | 6 |
| ☐ | 05/02/2007 | Non-patent literature cited during the opposition procedure | Opposition | 1 |
| ☐ | 05/02/2007 | Non-patent literature cited during the opposition procedure | Opposition | 4 |
| ☐ | 05/02/2007 | Non-patent literature cited during the opposition procedure | Opposition | 66 |
| ☐ | 30/01/2007 | Information about the result of oral proceedings | Opposition | 1 |
| ☐ | 30/01/2007 | Minutes of the oral proceedings (Opposition Division) | Opposition | 9 |
| ☐ | 30/01/2007 | Documents for the maintenance of the patent as amended | Opposition | 1 |
| ☐ | 30/01/2007 | Any annexes (other than citation) to an opposition letter | Opposition | 1 |
| ☐ | 30/01/2007 | Description | Opposition | 2 |
| ☐ | 22/01/2007 | Written submission in preparation to/during oral proceedings | Opposition | 1 |
| ☐ | 22/01/2007 | Authorisation of representative | Opposition | 1 |
| ☐ | 19/01/2007 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 17/01/2007 | Written submission in preparation to/during oral proceedings | Opposition | 6 |
| ☐ | 17/01/2007 | Non-patent literature cited during the opposition procedure | Opposition | 1 |
| ☐ | 17/01/2007 | Non-patent literature cited during the opposition procedure | Opposition | 4 |
| ☐ | 17/01/2007 | Non-patent literatur  cited during the opposition procedure | Opposition | 66 |
| ☐ | 16/01/2007 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 10/01/2007 | Written submission in preparation to/during oral proceedings | Opposition | 1 |
| ☐ | 10/01/2007 | Authorisation of representative | Opposition | 1 |
| ☐ | 02/01/2007 | Request for change of representative | Opposition | 1 |
| ☐ | 02/01/2007 | Authorisation of representative | Opposition | 1 |
| ☐ | 02/01/2007 | Annexes filed during the procedure of transfer of rights | Opposition | 1 |
| ☐ | 02/01/2007 | Annexes filed during the procedure of transfer of rights | Opposition | 11 |
| ☐ | 18/12/2006 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 15/12/2006 | Brief communication - Opposition proceedings | Opposition | 1 |

Welcome to epoline®

| | Date | Description | | Count |
|---|---|---|---|---|
| ☐ | 13/12/2006 | Written submission in preparation to/during oral proceedings | Opposition | 1 |
| ☐ | 13/12/2006 | Non-patent literature cited during the opposition procedure | Opposition | 2 |
| ☐ | 11/12/2006 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 11/12/2006 | Written submission in preparation to/during oral proceedings | Opposition | 6 |
| ☐ | 11/12/2006 | Claims | Opposition | 2 |
| ☐ | 11/12/2006 | Claims | Opposition | 2 |
| ☐ | 11/12/2006 | Claims | Opposition | 2 |
| ☐ | 11/12/2006 | Claims | Opposition | 2 |
| ☐ | 11/12/2006 | Claims | Opposition | 2 |
| ☐ | 07/12/2006 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 07/12/2006 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 05/12/2006 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 01/12/2006 | Written submission in preparation to/during oral proceedings | Opposition | 5 |
| ☐ | 01/12/2006 | Non-patent literature cited during the opposition procedure | Opposition | 1 |
| ☐ | 01/12/2006 | Non-patent literature cited during the opposition procedure | Opposition | 1 |
| ☐ | 01/12/2006 | Non-patent literature cited during the opposition procedure | Opposition | 6 |
| ☐ | 01/12/2006 | Non-patent literature cited during the opposition procedure | Opposition | 2 |
| ☐ | 01/12/2006 | Non-patent literature cited during the opposition procedure | Opposition | 330 |
| ☐ | 30/11/2006 | Written submission in preparation to/during oral proceedings | Opposition | 5 |
| ☐ | 30/11/2006 | Written submission in preparation to/during oral proceedings | Opposition | 6 |
| ☐ | 30/11/2006 | Claims | Opposition | 2 |
| ☐ | 30/11/2006 | Claims | Opposition | 2 |
| ☐ | 30/11/2006 | Claims | Opposition | 2 |
| ☐ | 30/11/2006 | Claims | Opposition | 2 |
| ☐ | 30/11/2006 | Claims | Opposition | 2 |
| ☐ | 30/05/2006 | Acknowledgement of a document | Opposition | 1 |
| ☐ | 27/05/2006 | Advice of delivery | Opposition | 1 |

Welcome to epoline®

| | Date | Description | Type | No. |
|---|---|---|---|---|
| ☐ | 26/05/2006 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 24/05/2006 | Acknowledgement of a document | Opposition | 1 |
| ☐ | 19/05/2006 | Request for interpreters during oral proceedings | Opposition | 1 |
| ☐ | 16/05/2006 | Summons to attend oral proceedings | Opposition | 1 |
| ☐ | 16/05/2006 | Summons to attend oral proceedings | Opposition | 1 |
| ☐ | 16/05/2006 | Annex to the communication | Opposition | 6 |
| ☐ | 06/04/2006 | Preparation for oral proceedings | Opposition | 2 |
| ☐ | 23/12/2004 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 21/12/2004 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 16/12/2004 | Reply of the patent proprietor to the notice(s) of opposition | Opposition | 14 |
| ☐ | 16/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 6 |
| ☐ | 16/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 8 |
| ☐ | 16/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 9 |
| ☐ | 16/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 5 |
| ☐ | 16/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 4 |
| ☐ | 16/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 4 |
| ☐ | 16/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 6 |
| ☐ | 16/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 22 |
| ☐ | 13/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 8 |
| ☐ | 13/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 9 |
| ☐ | 13/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 5 |
| ☐ | 13/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 4 |
| ☐ | 13/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 4 |
| ☐ | 13/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 6 |
| ☐ | 13/12/2004 | Non-patent literature cited during the opposition procedure | Opposition | 22 |
| ☐ | 13/12/2004 | Reply of the patent proprietor to the notice(s) of opposition | Opposition | 14 |
| ☐ | 18/10/2004 | Request for extension of time limit | Opposition | 1 |
| ☐ | 11/10/2004 | Request for extension of time limit | Opposition | 1 |
| ☐ | 04/10/2004 | Grant of extension of time limit (opposition procedure) | Opposition | 1 |
| ☐ | 04/10/2004 | Brief communication - Opposition proceedings | Opposition | 1 |
| ☐ | 04/10/2004 | Request for extension of time limit | Opposition | 1 |

Welcome to epoline®

| | Date | Description | Type | No. |
|---|---|---|---|---|
| ☐ | 27/09/2004 | Request for extension of time limit | Opposition | 1 |
| ☐ | 02/08/2004 | Grant of extension of time limit (opposition procedure) | Opposition | 1 |
| ☐ | 02/08/2004 | Brief communication to applicant/representative | Opposition | 1 |
| ☐ | 02/08/2004 | Request for extension of time limit | Opposition | 1 |
| ☐ | 26/07/2004 | Request for extension of time limit | Opposition | 1 |
| ☐ | 02/04/2004 | Communication of a notice of opposition and request to file observations | Opposition | 1 |
| ☐ | 02/04/2004 | Notice of further oppositions to opponent(s) | Opposition | 1 |
| ☐ | 17/02/2004 | Brief communication to applicant/representative | Opposition | 1 |
| ☐ | 16/02/2004 | Communication of a notice of opposition - first information to patent proprietor | Opposition | 1 |
| ☐ | 06/02/2004 | Notice of opposition | Opposition | 7 |
| ☐ | 06/02/2004 | Non-patent literature cited during the opposition procedure | Opposition | 8 |
| ☐ | 06/02/2004 | Patent document cited during the opposition procedure | Opposition | 6 |
| ☐ | 06/02/2004 | Non-patent literature cited during the opposition procedure | Opposition | 1 |
| ☐ | 06/02/2004 | Non-patent literature cited during the opposition procedure | Opposition | 12 |
| ☐ | 06/02/2004 | Non-patent literature cited during the opposition procedure | Opposition | 2 |
| ☐ | 06/02/2004 | Non-patent literature cited during the opposition procedure | Opposition | 1 |
| ☐ | 06/02/2004 | Non-patent literature cited during the opposition procedure | Opposition | 4 |
| ☐ | 05/02/2004 | Notice of opposition | Opposition | 7 |
| ☐ | 27/08/2003 | Refusal of request for correction after grant | Search/Examination | 1 |
| ☐ | 14/08/2003 | Request for correction | Search/Examination | 1 |
| ☐ | 14/08/2003 | Description | Search/Examination | 1 |
| ☐ | 01/08/2003 | Communication of the registration of a transfer | Search/Examination | 1 |
| ☐ | 01/08/2003 | Request for correction | Search/Examination | 3 |
| ☐ | 31/07/2003 | Request concerning the applicant/representative | Search/Examination | 1 |
| ☐ | 31/07/2003 | Annexes filed during the procedure of transfer of rights | Search/Examination | 2 |
| ☐ | 22/07/2003 | Request for transfer of rights | Search/Examination | 4 |
| ☐ | 18/07/2003 | Request for transfer of rights | Search/Examination | 4 |
| ☐ | 15/07/2003 | Request for transfer of rights | Search/Examination | 4 |
| ☐ | 04/07/2003 | Communication of amended entries | Search/Examination | 2 |
| ☐ | 04/07/2003 | Notification of termination of representative's authorisation | Search/Examination | 1 |

Welcome to epoline®

| | Date | Description | Category | Count |
|---|------|-------------|----------|-------|
| ☐ | 20/06/2003 | Request for change of representative | Search/Examination | 1 |
| ☐ | 23/04/2003 | Decision to grant a European patent | Search/Examination | 2 |
| ☐ | 08/04/2003 | General enquiry | Search/Examination | 1 |
| ☐ | 13/02/2003 | Filing of the translations of the claims | Search/Examination | 2 |
| ☐ | 13/02/2003 | Translation of the claims | Search/Examination | 1 |
| ☐ | 13/02/2003 | Translation of the claims | Search/Examination | 2 |
| ☐ | 09/01/2003 | Communication about intention to grant a European patent | Search/Examination | 4 |
| ☐ | 09/01/2003 | Bibliographic data of the European patent application | Search/Examination | 1 |
| ☐ | 09/01/2003 | Druckexemplar | Search/Examination | 16 |
| ☐ | 16/12/2002 | Documents for grant of a patent | Search/Examination | 2 |
| ☐ | 24/10/2002 | Reply to examination report | Search/Examination | 3 |
| ☐ | 24/10/2002 | Claims | Search/Examination | 2 |
| ☐ | 24/10/2002 | Description | Search/Examination | 1 |
| ☐ | 24/10/2002 | Description | Search/Examination | 1 |
| ☐ | 12/09/2002 | Consultation by telephone/in person (with time limit) | Search/Examination | 1 |
| ☐ | 12/09/2002 | Result of consultation by telephone/in person | Search/Examination | 2 |
| ☐ | 28/08/2002 | Reply to examination report | Search/Examination | 4 |
| ☐ | 28/08/2002 | Description | Search/Examination | 10 |
| ☐ | 28/08/2002 | Claims | Search/Examination | 2 |
| ☐ | 28/08/2002 | Description | Search/Examination | 12 |
| ☐ | 28/08/2002 | Non-patent literature cited during the opposition procedure | Search/Examination | 3 |
| ☐ | 03/07/2002 | Examination report | Search/Examination | 1 |
| ☐ | 03/07/2002 | Annex to the communication | Search/Examination | 3 |
| ☐ | 31/05/2002 | Reply to examination report | Search/Examination | 5 |
| ☐ | 31/05/2002 | Claims | Search/Examination | 2 |
| ☐ | 31/05/2002 | Description | Search/Examination | 11 |
| ☐ | 31/05/2002 | Description | Search/Examination | 11 |
| ☐ | 31/05/2002 | Non-patent literature cited during the opposition procedure | Search/Examination | 5 |
| ☐ | 06/03/2002 | Examination report | Search/Examination | 1 |
| ☐ | 06/03/2002 | Annex to the communication | Search/Examination | 2 |
| ☐ | 20/02/2002 | Reply to examination report | Search/Examination | 1 |

Welcome to epoline®

| | | | |
|---|---|---|---|
| ☐ | 19/12/2001 | Reply to examination report | Search/Examination | 2 |
| ☐ | 19/12/2001 | Claims | Search/Examination | 2 |
| ☐ | 19/12/2001 | Patent document cited during the examination procedure | Search/Examination | 5 |
| ☐ | 23/11/2001 | Examination report | Search/Examination | 1 |
| ☐ | 23/11/2001 | Annex to the communication | Search/Examination | 1 |
| ☐ | 12/11/2001 | Request for accelerated examination | Search/Examination | 1 |
| ☐ | 07/08/2001 | Document concerning representation | Search/Examination | 1 |
| ☐ | 17/05/2000 | Notification on forthcoming publication of bibliographic data | Search/Examination | 1 |
| ☐ | 10/03/2000 | Request for entry into the European phase | Search/Examination | 5 |
| ☐ | 10/03/2000 | Description | Search/Examination | 17 |
| ☐ | 10/03/2000 | Claims | Search/Examination | 4 |
| ☐ | 10/03/2000 | Claims | Search/Examination | 4 |
| ☐ | 10/03/2000 | Abstract | Search/Examination | 1 |
| ☐ | 15/02/2000 | Annexes to the international preliminary examination report | Search/Examination | 4 |
| ☐ | 15/02/2000 | Copy of the international preliminary examination report | Search/Examination | 8 |
| ☐ | 05/10/1999 | International publication (Pamphlet) | Search/Examination | 2 |
| ☐ | 05/10/1999 | Copy of the international search report | Search/Examination | 8 |
| ☐ | 28/05/1999 | Invitation to pay additional fees (for internal ISA use) | Search/Examination | 6 |
| ☐ | 26/04/1999 | Priority document | Search/Examination | 24 |
| ☐ | 08/03/1999 | International publication (Pamphlet) | Search/Examination | 23 |

**Total Number of Pages: 1469**

# EXHIBIT   17

# EXHIBIT  REDACTED
# IN  ITS  ENTIRETY

# EXHIBIT  18



Am101403
09/02/08

April 16, 2008

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

Wyeth Pharmaceuticals Inc.
500 Arcola Road
Collegeville, PA 19426

Wyeth Pharmaceuticals Inc.
5 Giralda Farms
Madison, NJ 07940

Re:    **Notice of Certification Under 21 U.S.C. § 355(j)(2)(B) (§ 505(j)(2)(B)) of Federal Food, Drug and Cosmetic Act) and 21 C.F.R. § 314.95 Sandoz, Inc.'s Ethinyl Estradiol; Levonorgestrel Oral Tablets, 0.02 mg; 0.09 mg Sandoz, Inc.'s ANDA 90-262**

Dear Sir or Madam:

Sandoz, Inc. ("Sandoz") of 506 Carnegie Center, Suite 400, Princeton, NJ 08540, U.S.A., hereby gives notice to the NDA holder and/or listed patent owner for the reference listed drug that the FDA has received an Abbreviated New Drug Application ("ANDA") for Ethinyl Estradiol; Levonorgestrel oral tablets, 0.02mg; 0.09mg ("the Sandoz Product"), which contains data or information from required bioequivalence and/or bioavailability studies.

The FDA has assigned the Sandoz ANDA the number 90-262.

Sandoz, by submitting its ANDA, seeks to obtain approval to engage in commercial manufacture, use and sale of the Sandoz Product prior to the expiration of the following U.S. Patent(s), which is/are listed in *Approved Drug Products with Therapeutic Equivalence Evaluation* (the "Orange Book") as having the indicated expiration date:

Page 2 of 10

| Patent No. | Patent Owner | Patent Expiry | PEDs expiry |
|---|---|---|---|
| 6,500,814 | Wyeth Pharmaceuticals | Sep. 3, 2018 | n/a |

The purpose of this communication is to provide the notice and information required by 21 U.S.C. §355(j)(2)(B)(i) and/or (ii) (Sections 505(j)(2)(B)(i) and/or (ii) of the Food, Drug and Cosmetics Act) and to inform you that the Sandoz ANDA contains a certification under 21 U.S.C. §355(j)(2)(A)(vii)(IV), which asserts that the claims of said U.S. Patent No. 6,500,814 will not be infringed by the manufacture, use or sale of the Sandoz Product.

A Detailed Statement of the factual and legal basis for Sandoz's opinion that the Listed Patent will not be infringed by the manufacture, use or sale of the Sandoz Product is attached hereto.

Anticompetitive Behavior Warning

Please be warned of the following. It is an antitrust violation to assert a patent known not to be infringed. *Loctite v. Ultraseal*, 781 F.2nd 861 (Fed. Cir. 1985). As such, the attached Detailed Statement has outlined in the necessary detail that your patent is not, and cannot be, infringed by the subject matter described in the Sandoz ANDA. As such, your pursuit of an infringement action may be deemed to be an antitrust violation. In addition, it is an antitrust violation to assert a patent known not to be valid. *Handgards v. Ethicon*, 601 F.2nd 986 (9th Cir. 1979). If you launch any patent infringement lawsuit, either now or later, Sandoz may pursue the appropriate remedies against you, including seeking fees, costs, and sanctions for potential violations of Rule 11 (of the Civil Procedure Rules), exceptional case and frivolous suit statutes under the patent laws, and for violations of the antitrust laws, plus any remedy the court deems fit to award.

Reservation of Legal Rights

We reserve the right to allege the same, similar, different or new theories of non-infringement and/or invalidity and nothing in this Notice Letter or Detailed Statement shall be construed as to limit our rights to make any allegation in any subsequent litigation regarding any issue.

Relevant Contact Information

If you have any inquiries concerning this notice or for any service of process or legal information, please contact:

Stephen R. Auten, Esq.
c/o Sandoz Inc.
506 Carnegie Center
Suite 400
Princeton, NJ 08540
(609) 627-8500
(609) 627-8636

Page 3 of 10

Very truly yours,

Srinivasa Rao, Pharm.D.
Director, Regulatory Affairs
Sandoz, Inc.

Attachment:

1.    Detailed Statement

**SANDOZ, INC.'S DETAILED STATEMENT OF THE FACTUAL AND LEGAL BASES
FOR ITS OPINION THAT U.S. PATENT NO. 6,500,814 IS INVALID,
UNENFORCEABLE AND/OR NOT INFRINGED BY THE MANUFACTURE, USE,
SALE OR OFFER FOR SALE OF THE SANDOZ PRODUCT.**

The following constitutes Sandoz's detailed statement of the factual and legal basis for its belief that U.S. Patent No. 6,500,814 is invalid, unenforceable, and/or not infringed by the manufacture, use, sale or offer for sale of Sandoz's Ethinyl Estradiol; Levonorgestrel oral tablets, 0.02 mg; 0.09 mg (the "Sandoz Product"). This detailed statement will not preclude Sandoz from advancing any other grounds for invalidity, unenforceability, and/or non-infringement, or any other claim construction, as to the Listed Patent in the event of litigation.

Please be advised that Sandoz considers the information in this statement to be confidential, is disclosing this information solely to comply with 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.95, and requests that this information be protected from disclosure to third parties by means consistent with its own standards for protecting its own confidential information. THIS CONFIDENTIALITY APPLIES TO THIS STATEMENT, WHICH MAY NOT, AND SHOULD NOT, BE ATTACHED TO ANY COMPLAINT OR OTHER PUBLICLY AVAILABLE DOCUMENT. *See Biovail Labs., Inc. v. Anchen Pharms., Inc.*, 463 F.Supp.2d 1073, 1083 (C.D. Cal. 2006).

## I.   THE SANDOZ PRODUCT

The Sandoz Product is Ethinyl Estradiol; Levonorgestrel oral tablets, 0.02 mg; 0.09 mg. Sandoz intends to market this product for the prevention of pregnancy in women who elect to use oral contraceptives as a method of contraception.

## II.   FACTUAL AND LEGAL BASIS FOR NONINFRINGEMENT AND/OR INVALIDITY

### A.   Non-Infringement

The first step in the assessment of patent infringement is to construe the claim terms, which is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 116 S.Ct. 1384 (1996). Whether a product infringes a claim requires a two-step analysis. First, the claims must be interpreted. Second, the properly-interpreted claims must be compared to the accused product. *Markman*, 116 S. Ct. at 1393; *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed. Cir. 1996). To literally infringe a claim, the accused product must practice every limitation in the claim. *Texas Instrum.*, 90 F.3d at 1563.

A product may infringe a patent under the doctrine of equivalents if it contains elements equivalent to each claimed element of the patented invention. Depending upon the facts of a given case, such element-by-element equivalency may be established by proof of insubstantial differences in the role played by elements of the claim and the accused product, or by proof that an accused element performs substantially the same function, in substantially the same way, to produce substantially the same result as the claimed element of the patented invention. *Warner-*

*Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); *see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950).

The doctrine of equivalents is also subject to the ancillary doctrine of prosecution history estoppel, which acts to limit infringement by otherwise equivalent products or processes. *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211 (Fed. Cir. 1995).

Furthermore, the doctrine of equivalents is constrained by the prior art. *Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677 (Fed. Cir. 1990). The doctrine does not permit a patent claim to encompass subject matter that could not have been patented. Id. ("[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims."); *see also Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) (the doctrine of equivalents does not permit coverage of obvious or "trivial" variations of the prior art).

### B.  Invalidity

A patent is presumed valid. 35 U.S.C. § 282. This presumption places the burden of persuasion on the party challenging validity. *Smithkline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 885 (Fed. Cir. 1988). "[T]he presumption is one of law, not fact, and does not constitute 'evidence' to be weighed against a challenger's evidence." *Avia Group Int'l, Inc. v. L.A. Gear Calif. Inc.*, 853 F2d 1557, 1562 (Fed. Cir. 1988). The burden is "especially difficult" when the party asserting invalidity relies only upon prior art that was considered by the PTO. *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1990). "Where the [PTO] has considered a piece of prior art, and issued a patent notwithstanding that prior art, a court owes some deference to the PTO's decision." *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1572 (Fed. Cir. 1992) (citation omitted). Even in such a case, the presumption can be overcome if the party challenging validity establishes invalidity by clear and convincing evidence. *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1096 (Fed. Cir. 1985).

#### i.  Anticipation

Invalidity of a patent claim may be established under the legal doctrine of anticipation. 35 U.S.C. § 102. A determination that a claimed invention is anticipated requires a showing that each feature (element) of a claim is found, either expressly or under principles of inherency, in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device, product, or method. *Electro Med. Sys. S.A. v. Cooper Life Sciences*, 34 F.3d 1048 (Fed. Cir. 1994); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559 (Fed. Cir. 1992). A feature is inherent in a prior art reference when it naturally (and always) occurs as a consequence of following the teachings of the reference. *Schering Corp. v. Geneva Pharms. Inc.*, 339 F.3d 1373 (Fed. Cir. 2003). Additional references may be relied upon, to explain terminology in the anticipating reference (*In re Baxter Travenol Labs*, 952 F.2d 388 (Fed. Cir. 1991), to show that the anticipating reference is enabling (*In re Donohue*, 766 F.2d 531 (Fed. Cir. 1985); or to show that a characteristic not disclosed expressly in the reference is nonetheless inherent. *Schering Corp.*, 339 F.3d at 1379.

### ii.  Obviousness

A patent is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).  The following inquiries are pertinent to resolving this issue: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; and (3) the difference between the prior art and the claims at issue. *Graham*, 383 U.S. at 17. Obviousness is not determined in hindsight in view of the invention in question.  Instead, prior art is considered by the hypothetical artisan at a time just before the invention was made. *Al-Site Corp. v. VSI Int'l*, 174 F.3d 1308, 132 (Fed. Cir. 1999).

A reference must be considered for all that is taught—disclosures that diverge and teach away from the invention as well as disclosures that point toward and teach the invention. *See In re Dow Chemical Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988).  A reference teaches away if it would have led a person skilled in the art in a direction different from that taken by the inventor. *Monarch Knitting Mach. Corp. v. Sulzer Morat Gmbh*, 139 F.3d 877, 885 (Fed. Cir. 1998).  "The degree of teaching away will of course depend on the particular facts; in general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by" the inventor. *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).  It is impermissible to select only those portions of a reference that support a given position and exclude other parts necessary to the full appreciation of what the reference fairly teaches. *Bausch & Lomb, Inc. v. Barnes-Hind*, 796 F.2d 443, 448 (Fed. Cir. 1986).

The United States Supreme Court has clarified certain aspects of the obviousness analysis, particularly with respect to the Federal Circuit's requirement that there be a "teaching suggestion, or motivation" to combine the teachings of two or more separate references.  In *KSR Int'l Co. v. Teleflex, Inc.*, 127 S.Ct. 1727 (2007), the Court expressly rejected a rigid requirement for a motivation to combine, stating:

> [t]he obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents.  The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way.

*KSR*, 127 S.Ct. at 1741.  The Court further stated:

> [i]n determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls.  What matters is the objective reach of the claim.  If the claim extends to what is obvious, it is invalid under §103.  One of the ways in which a patent's subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims.

*KSR*, 127 S.Ct. at 1741-42.  Instructing that the obviousness analysis should not be limited by

Page 7 of 10

looking only at the problem that the patentee was trying to solve, the Court stated:

> [t]he question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art. Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.

*KSR*, 127 S.Ct. at 1742. The Court noted that in some instances, the fact that it may have been "obvious to try" to make a claimed invention may be dispositive:

> [w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under §103.

*Id.*

When examining the obviousness of a compound and/or a method of using that compound, structural similarity alone may be sufficient to give rise to an expectation that two compounds with similar structures will have similar properties. *In re Merck*, 800 F.2d 1091 (Fed. Cir. 1986), *citing*, *In re Payne*, 606 F.2d 303, 313 (C.C.P.A. 1979). Structural similarity between a claimed compound and prior art compounds creates a *prima facie* case of obviousness. *In re Dillon*, 919 F.2d 688 (Fed. Cir. 1990). The burden then falls on an applicant to rebut that *prima facie* case. *Id.* at 693. A rebuttal or counter-argument can consist of test data showing that the claimed compounds possess unexpectedly improved properties from the prior art compounds. All evidence of the properties of the claimed and prior art compounds must be considered in determining the ultimate question of patentability.

The "discovery," however, that the claimed compound possesses a property not disclosed in the prior art does not by itself defeat a *prima facie* case. *In re Dillon*, 919 F.2d at 693. *See also, In re Merck*, 800 F.2d at 1099, where the Federal Circuit stated:

> [t]he core of it is that, while there are some differences in degree between the properties of amitrptyline and imipramine, the compounds expectedly have the same type of biological activity. In the absence of evidence to show that the properties of the compounds differed in such an appreciable degree that the difference was really unexpected, we do not think that the Board erred in its determination that appellant's evidence was insufficient to rebut the *prima facie* case.

Evidence of secondary considerations, if present, must be considered in determining obviousness, but there must be a nexus between such evidence and the merits of the claimed invention. *Graham*, 383 U.S. at 17. The existence of such evidence, however, does not control the obviousness determination. *Richardson-Vicks v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir.

Page 8 of 10

1997). Examples of secondary considerations are commercial success, copying, prior failure of others, licenses under the patent, a long-standing need for the invention, unexpected results, skepticism by others in the art, and contemporaneous development by others. *Graham*, 383 U.S. at 17-18; *DMI, Inc.*, 802 F.2d at 425. Commercial success is not a relevant factor in determining obviousness where others were legally barred from practicing the invention. *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1376-77 (Fed. Cir. 2005).

III.    **U.S. PATENT NO. 6,500,814**

U.S. Patent No. 6,500,814 ("the '814 patent") was filed on September 3, 1998 and issued on December 31, 2002 with a patent term expiration date of September 3, 2018. The '814 patent is assigned to Wyeth Pharmaceuticals and names Rolf-Dieter Jensch of Constance, Germany as inventor.

The '814 patent contains 3 claims, 2 of which are independent and are reproduced below:

> 1. A method for hormonal contraception, comprising:
> administering orally, transdermally or via depot to a mammal in need
> thereof, for a continuous and uninterrupted administration period
> of greater than 110 days, a contraceptive product comprising:
> a gestagen selected from the group consisting of progesterone,
> chlormadinone acetate, norethisterone acetate, cyproterone
> acetate, desogestrel, and levonorgestrel; and
> an estrogen selected from the group consisting of ethinyl estradiol,
> mestranol, estradiol, estriol, estrone, and estrane;
> wherein said gestagen and said estrogen are present in said
> contraceptive product at unchanged dosages throughout the
> administration period, and when said estrogen is ethinyl estradiol,
> the dosage of said ethinyl estradiol is not greater than 20 µg per
> day.
>
> 3. A method for continuous suppression of the menstrual cycle,
> comprising:
> administering orally, transdermally or via depot to a mammal in need
> thereof, for a continuous and uninterrupted administration period
> of greater than 110 days, a contraceptive product comprising:
> a gestagen selected from the group consisting of progesterone,
> chlormadinone acetate, norethisterone acetate, cyproterone
> acetate, desogestrel, and levonorgestrel; and
> an estrogen selected from the group consisting of ethinyl estradiol,
> mestranol, estradiol, estriol, estrone, and estrane;
> wherein said gestagen and said estrogen are present in said
> contraceptive product at unchanged dosages throughout the
> administration period, and wherein the dosage of ethinyl estradiol
> is not greater than 20 µg per day, such that the menstrual cycle is

continuously suppressed throughout the administration period.

## IV.   THE '814 PATENT IS INVALID AS OBVIOUS

The '814 patent is invalid under 35 U.S.C. § 103 as obvious over U.S. Patent No. 5,898,032 ("the '032 patent") in view of Coutinho et al., *Conception*, 51, 355-58 (1995), Hamerlynck et al., *Contraception*, 35, 199-205 (1987), and/or Loudon et al., *British Medical Journal*, 487-90 (1977).

The '032 patent teaches a method of female contraception, administered orally or transdermally, using a combination of progestin and estrogen for 60 to 110 consecutive days, which is characterized by a reduced number of withdrawal menses per year. The '032 patent also teaches that the progestin may be 0.024-10 mg norethindrone acetate (aka norethisterone acetate) and that the estrogen may be 5-35 µg ethinyl estradiol. Furthermore, the '032 patent teaches that "[h]aving fewer menstrual intervals can enhance lifestyles and convenience."

Additional prior art, such as the Hamerlynck and Loudon references, also report studies designed to lengthen and/or minimize menses for social reasons. Hamerlynck reported a study using levonorgestrel and ethinyl estradiol in which menses was postponed two months for reasons involving holidays, sports, and exams. Loudon reported a study using lynoestrenol and ethinyl estradiol in which menses was reduced to once every three months. Loudon also reported that the women subjects welcome the reduction in the number of periods with associated freedom from menstruation and premenstrual symptoms

Moreover, Coutinho reported a study using levonorgestrel and ethinyl estradiol for continuous contraceptive administration for a period of one year. Thus, one skilled in the art would readily combine these teachings to provide a constant dosage of a gestagen and an estrogen over a sustained uninterrupted period lasting for at least as long as one year. The '814 patent claims fall squarely within this prior art range.

Therefore, the '814 patent is obvious and therefore invalid and unenforceable over the '032 patent in combination with the Hamerlynck, Loudon, and/or Coutinho references.

## SUMMARY

For the reasons stated above, all of the claims of the '814 patent are invalid, unenforceable, and/or not infringed, either literally or under the doctrine of equivalents, by the manufacture, use, or sale of the Sandoz Product. Sandoz reserves the right to allege the same, similar, different or new theories of invalidity, unenforceability, and/or non-infringement and nothing in this Detailed Statement shall be construed as to limit our rights to make any allegation in any subsequent litigation regarding any issue.

Page 10 of 10

Srinivasa Rao, Pharm.D.
Director, Regulatory Affairs
Sandoz, Inc.

# EXHIBIT  19

# United States Patent [19]

## Hughes et al.

[11]  **3,959,322**

[45] *May 25, 1976

[54]  **SYNTHESIS OF 13-ALKYL-GON-4-ENES**

[75]  Inventors: **Gordon Alan Hughes; Herchel Smith**, both of Wayne, Pa.

[73]  Assignee: **Herchel Smith, Bryn Mawr, Pa.**

[ * ]  Notice: The portion of the term of this patent subsequent to Nov. 26, 1991, has been disclaimed.

[22]  Filed: **Aug. 11, 1964**

[21]  Appl. No.: **388,820**

### Related U.S. Application Data

[63]  Continuation-in-part of Ser. No. 337,823, Jan. 15, 1964, which is a continuation-in-part of Ser. No. 228,384, Oct. 4, 1962, Pat. No. 3,850,911, which is a continuation-in-part of Ser. Nos. 57,904, Sept. 23, 1960, abandoned, and Ser. No. 91,341, Feb. 24, 1961, abandoned, and Ser. No. 137,535, Sept. 12, 1961, abandoned, and Ser. No. 195,000, May 15, 1962, abandoned, and Ser. No. 196,557, May 16, 1962, abandoned.

[52]  U.S. Cl............................ **260/397.4;** 260/239.5; 260/239.55 R; 260/239.55 C; 260/239.57; 260/397.3; 260/397.5; 424/243; 260/570.5 C; 260/570.8 R; 260/590 R; 260/618 D; 260/618 R; 260/570.5 R; 260/590 C

[51]  Int. Cl.².......................................... **C07J 71/00**

[58]  Field of Search ....... Machine Searched Steroids

[56]  **References Cited**

### OTHER PUBLICATIONS

Applezweig – Steroid Drugs pp. 566–569 (1962).
Djerassi – Steroid Reactions p. 276 (1963).

*Primary Examiner*—Elbert L. Roberts
*Attorney, Agent, or Firm*—Gordon W. Hueschen; Vito Victor Bellino; Robert Wiser

[57]  **ABSTRACT**

The preparation of 13-methylgon-4-enes and novel 13-polycarbonalkylgon-4-enes by a new total synthesis is described. 13-Alkylgon-4-enes having progestational, anabolic and androgenic activities are prepared by forming a tetracylic gonane structure unsaturated in the 1,3,5(10),9(11) and 14-positions, selectively reducing in the B- and C-rings, and converting the aromatic A-ring compounds so-produced to gon-4-enes by Birch reduction and hydrolysis.

**48 Claims, 5 Drawing Figures**

U.S. Patent    May 25, 1976    Sheet 1 of 2    3,959,322

FIG I

FIG.2

FIG.3

FIG.4

FIG.5

3,959,322

1

# SYNTHESIS OF 13-ALKYL-GON-4-ONES

This application is a continuation-in-part of our prior-filed copending application Ser. No. 337,823, filed Jan. 15, 1964, in turn a continuation-in-part of Ser. No. 228,384, filed Oct. 4, 1962, now U.S. Pat. No. 3,850,911, issued Nov. 26, 1974, which in turn is a continuation-in-part of our prior-filed copending applications, Ser. Nos. 57,904, filed Sept. 23, 1960; 91,341, filed Feb. 24, 1961; 137,535, filed September 12, 1961; 195,000, filed May 15, 1962; and 196,557, filed May 16, 1962, all now abandoned.

This invention relates to compositions of matter classified in the art of chemistry as substituted unsaturated gonane derivatives, and to processes for making and using such compositions.

In describing the invention, reference will be made in the following specification to the annexed drawings, wherein:

FIG. 1 illustrates schematically the reaction sequence for preparing a 13-alkylgon-4-ene, specifically 13β,17α-diethyl-17β-hydroxygon-4-en-3-one.

FIG. 2 illustrates schematically the mineral acid hydrolysis of a 13-alkylgona-2,5(10)-diene to a 13-alkylgon-4-ene, specifically 13β-ethyl-3-methoxygona-2,5(10)-dien-17-one to 13β-ethylgon-4-en-3,17-dione.

FIG. 3 illustrates schematically the reaction sequence for preparing a 13,17-dialkylgon-4-en-17-ol from a 13-alkylgona-2,5(10)-dien-17-one, specifically 13β,17α-diethyl-17β-hydroxygon-4-en-3-one from 3-methoxy-13β-ethylgona-2,5(10)-dien-17-one.

FIG. 4 illustrates schematically the reaction sequence for preparing a 13-alkyl-17-alkynylgon-4-en-17-ol from a 13-alkylgona-2,5(10)-dien-17-one, specifically 13β-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one from 13β-ethyl-3-methoxygona-2,5(10)-dien-17-one.

FIG. 5 illustrates schematically the reaction sequence for preparing an ester of a 13-alkyl-17-hydroxygon-4-ene from a 13-alkylgona-2,5(10)-dien-17-ol, specifically the decanoate ester of 13β-ethyl-17β-hydroxygon-4-en-3-one from 13β-ethyl-3-methoxygona-2,5(10)-dien-17β-ol.

The invention sought to be patented in a principal composition aspect is described as residing in the concept of a gon-4-ene nucleus having attached thereto in the 13-position a monovalent polycarbonalkyl radical.

The tangible embodiments of the composition aspect of the invention possess the inherent general physical properties of being white crystalline solids, are substantially insoluble in water and are generally soluble in polar solvents such as dimethylacetamide. Examination of compounds produced according to the hereinafter described process reveals, upon ultraviolet and infrared spectrographic analysis, spectral data supporting the molecular structures herein set forth. The aforementioned physical characteristics, taken together with the nature of the starting materials and the mode of synthesis, confirm the structure of the compositions sought to be patented.

The tangible embodiments of the invention possess the inherent applied use characteristics of exerting qualitatively varying hormonal effects in animals as evidenced by pharmacological evaluation according to standard test procedures. Such tangible embodiments show androgenic, anti-estrogenic, progestational, blood lipid effects, and anabolic actions, salt retention, salt excretion and central nervous system effects. This

2

finding indicates their usefulness in the treatment of amenorrhea, dysmenorrhea, ovulation block and contraception, functional uterine bleeding, arteriosclerosis, hormone dependent tumors, infertility, pregnancy maintenance, habitual abortion, weight gain and nitrogen retention, growth stimulation, post operative recovery, healing of wounds, and healing of burns. In particular, it has been established that alterations of the natural steroid structure made possible by our discovery result not merely in a change of degree of hormonal activity, but, as a result of the separation of types of hormonal activity, alter in an unexpected way its basic nature so that a desirable hormone effect is maximized and an undesirable hormone effect is minimized. Furthermore, said tangible embodiments possess the use characteristic of being intermediates for the preparation of compositions exerting hormonal effects as evidenced by standard test procedures.

The invention sought to be patented in a sub-generic composition aspect is described as residing in the concept of a 13,17-dialkyl-17-hydroxygon-4-en-3-one (FIG. 1, XV), of which a specific embodiment, 13β,17α-diethyl-17β-hydroxygon-4-en-3-one, is hereinafter described.

The tangible embodiments of said sub-generic composition aspect possess the use characteristic of varying hormone effects in animals as evidenced by pharmacological evaluation by standard test procedures. In clinical tests, said specific embodiment has demonstrated high anabolic potency and unexpected separation of anabolic and androgenic activities.

The invention sought to be patented in a second sub-generic composition aspect is described as residing in the concept of a 13-alkyl-17-alkynyl-17-hydroxygon-4-en-3-one (FIG. 4, XX), of which a specific embodiment wherein the alkyl group is 13β-ethyl and the alkynyl group is 17α-ethynyl is hereinafter described.

The tangible embodiments of said second sub-generic composition aspect possess the use characteristic of varying hormone effects in animals, as evidenced by pharmacological evaluation by standard test procedures, and in particular have demonstrated a high progestational activity, coupled with an unexpected separation of activities.

The invention sought to be patented in a third sub-generic composition aspect is described as residing in the concept of a 17 ester of a 13-alkyl-17-hydroxygon-4-en-3-one (FIG. 5, XXIII), of which a specific embodiment in which the alkyl group is 13β-ethyl and the ester is the decanoate ester is hereinafter described.

The tangible embodiments of said third sub-generic composition aspect possess the use characteristic of varying hormone effects in animals, as evidenced by pharmacological evaluation by standard test procedures, and in particular in certain instances long-acting anabolic effects accompanied by unexpected separation of activities.

The invention sought to be patented, in a principal process of making the compositions aspect, is described as residing in the concept of the sequence of reactions including: converting a compound having a 5-phenyl-pent-1-yne nucleus, ring-unsubstituted in at least one position ortho to the point of chain attachment, by means of a Mannich-type reaction, to its acetylenic amine derivative; hydrating the acetylenic linkage to form a 3-keto compound; reacting such 3-keto substrate compound with a nucleophilic 2-monovalent alkyl-1,3-dioxocyclopentano compound under Michael

3,959,322

| 3 | 4 |

condensation conditions to attach the cyclopentano compound through its 2-position carbon atom to the 1-position carbon atom of the 3-keto compound; treating the bicyclic triketone formed in the preceding step with an acidic dehydrating agent thereby to effect a double cyclodehydration to form a 1,3,5(10),8,14-pentadehydro-13-alkylgonane; selectively saturating the 14(15) double bond of said gonane with hydrogen in the presence of a catalyst; thereafter saturating the 8(9) double bond of the compound resulting from the preceding step; partially reducing the A-ring double bonds and the 17-carbonyl group to 17-hydroxymethylene; and, thereafter converting the so-reduced compound to a 4-dehydro-13-alkyl-17-hydroxygonane.

The invention sought to be patented in a second process aspect, as illustrated in annexed FIG. 2, is described as residing in the concept of a reaction comprising hydrolyzing a compound with a gona-2,5(10)-diene-17-one nucleus, having attached thereto in the 13-position a monovalent polycarbon-alkyl radical (XVI), under strong conditions, i.e. heat, mineral acid, to obtain a compound with a gon-4-en-3-one nucleus having attached thereto in the 13-position a monovalent polycarbonalkyl radical (XVII).

The invention sought to be patented in a third process aspect, as illustrated in annexed FIG. 3, is described as residing in the concept of a sequence of reactions including: treating a compound with a gona-2,5(10)-dien-17-one nucleus having attached thereto in the 13-position a monovalent polycarbon-alkyl radical (XVIII) with an alkyl Grignard reagent or metal alkyl to obtain a compound with a 17α-alkylgona-2,5(10)-dien-17-ol nucleus having attached thereto in the 13-position a monovalent polycarbon-alkyl radical (XIV), and hydrolyzing said product with mineral acid to obtain a compound with a 17α-alkyl-17β-hydroxygon-4-en-3-one nucleus having attached thereto in the 13-position a monovalent polycarbon-alkyl radical (XV).

The invention sought to be patented in a fourth process aspect, as illustrated in annexed FIG. 4, is described as residing in the concept of a sequence of reactions including: treating a compound with a gona-2,5(10)-dien-17-one nucleus having attached thereto in the 13-position a monovalent polycarbon-alkyl radical (XV) with an organometallic derivative of a 1-alkyne to obtain the corresponding 17α-alkynylgona-2,5(10)-dien-17-ol having attached thereto in the 13-position a monovalent polycarbon radical (XIX), and hydrolyzing said product with mineral acid to obtain a 17α-alkynyl-17-β-hydroxygon-4-en-3-one having attached thereto in the 13-position a monovalent polycarbon-alkyl radical (XX).

The invention sought to be patented in a fifth process aspect, as illustrated in annexed FIG. 5, is described as residing in the concept of a sequence of reactions including: treating a compound with a gona-2,5(10)-dien-17-ol nucleus having attached thereto in the 13-position a monovalent polycarbonalkyl radical (XXI) with mineral acid to obtain a compound with a 17-hydroxygon-4-en-3-one nucleus having attached thereto in the 13-position a monovalent polycarbon-alkyl radical (XXII), and esterifying the hydroxy group to obtain the corresponding 17-ester (XXIII).

The manner of making the chemical compounds, which are the starting materials for use in making the compounds of the invention, and for use in the processes of making of the invention, are illustrated in

co-pending application Ser. No. 228,384 filed Oct. 4, 1962.

The manner and process of making and using the invention will now be generally described so as to enable a person skilled in the art of chemistry to make and use the same, as follows:

Referring now to FIG. 1, wherein the compounds are assigned Roman numerals for identification schematically, the sequence of reactions involved in the synthesis of a specific embodiment, namely, 13β,17α-diethyl-17β-hydroxygon-4-en-3-one, is illustrated. 3-(m-Methoxyphenyl)propanol (I) is heated with phosphorus tribromide in benzene after dropwise addition in the cold to form 3-(m-methoxyphenyl)propyl bromide (II). This halogen compound (II) dissolved in tetrahydrofuran is condensed with sodium acetylide in liquid ammonia to obtain 5-(m-methoxyphenyl)-1-pentyne (III). Compound III is allowed to stand under nitrogen with water, 30% formalin, acetic acid, diethylamine, dioxan, and cuprous chloride at a 70°C for about 12 hours, whereby there is obtained 1-diethylamino-6-(m-methoxyphenyl)-2-hexyne (IV), which is in turn hydrated in the presence of a mercury salt and sulfuric acid to form 1-diethylamino-6-(m-methoxyphenyl)-3-hexanone (V). The ketamine (V) may eliminate diethylamine on distillation to give the vinyl ketone 6-m-methoxyphenyl)-1-hexen-3-one (VI). Either the ketamine (V) or the ketone (VI), or mixtures thereof, is then reacted with 2-ethyl-1,3-cyclopentanedione (VII) under Michael condensation conditions, e.g. refluxing in methanolic potassium hydroxide to form 2-ethyl-2-[6-(m-methoxyphenyl)-3-oxohexyl]-1,3-cyclopentanedione (VIII).

Compound VIII is then cyclodehydrated at the reflux temperature of a solvent, such as benzene, in the presence of a dehydrating acid, such as p-toluene sulfonic acid, to effect simultaneous ring closures to give the tetracyclic compound 13β-ethyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (IX). The 14-unsaturation of Compound IX is then selectively hydrogenated in the presence of a metal catalyst, such as 2% palladized calcium carbonate, to form 13β-ethyl-3-methoxygona-1,3,5(10),8-tetraen-17-one (X). Ethynylation at the 17-position of Compound X with lithium acetylide in dimethylacetamide gives 13βethyl,17α-ethynyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol (XI). The ethynyl group of Compound XI is then selectively hydrogenated to ethyl, as in the presence of a supported palladium catalyst, to produce 13β,17α-diethyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol (XII), which is then converted to 13β,17α-diethyl-3-methoxygona-1,3,5(10)-trien-17β-ol (XIII) by alkali metal reduction in liquid ammonia, to provide the normal gonane configuration of 9,8-8,14-14,13 exocyclic substituents, namely trans-anti-trans.

By alkali metal reduction in liquid ammonia in the presence of a proton donor, such as ethanol (Birch reduction), Compound XIII is converted to 13β,17α-diethylgona-2,5(10)-dien-17β-ol (XIV). By hydrolysis in the presence of mineral acid, Compound XIV is then converted to 13β,17α-diethyl-17β-hydroxygon-4-en-3-one (XV).

The compound 13β,17α-diethyl-17β-hydroxygon-4-en-3-one, when administered to humans, is strongly anabolic as measured by weight gain, and shows virtually no androgenicity at therapeutic dose levels. Consistent effects on appetite stimulation are present and

3,959,322

| 5 | 6 |

beneficial effects upon dermatitis and ichthyosis of mongols have been noted.

To form another specific embodiment of this invention, referring to FIG. 4, Compound XVI, 13β-ethyl-3-methoxygona-2,5(10)-dien-17-one is treated with an alkali metal acetylide in liquid ammonia to convert it to 13β-ethyl-17α-ethynyl-3-methoxygona-2,5(10)-dien-17β-ol (XIX). Compound XIX is then converted to 13β-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one (XX).

When administered orally, this compound, 13β-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one, demonstrates unexpected high progestational activity accompanied by a separation of undesirable hormone effects found in the natural steroids.

Referring to FIG. 5, a third specific embodiment of the invention, 13β-ethyl-17β-hydroxygon-4-en-3-one decanoate ester (XXIII), is formed by esterification of 13β-ethyl-17β-hydroxygon-4-en-3-one (XXII), obtained by mineral acid hydrolysis of 13β-ethyl-3-methoxygona-2,5(10)-dien-17β-ol (XXI). Compond XXI is obtained from 13β-ethyl-3-methoxygona-2,5(10)-dien-17-one, by reduction with a complex metal hydride, or alternatively from Compound X, FIG. 1, 13β-ethyl-3-methoxygona-1,3,5(10),8-tetraen-17-one, by complex metal hydride reduction to form 13β-ethyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol, and then alkali metal in liquid ammonia reduction to obtain 13β-ethyl-3-methoxygona-1,3,5(10)-trien-17β-ol, followed by alkali metal in liquid ammonia reduction in the presence of a proton donor to form the before-mentioned Compound XXI.

The compound 13β-ethyl-17β-hydroxygon-4-en-3-one decanoate ester (XXIII) is a long acting anabolic agent with unexpected enhancement of anabolic activity accompanied by a decrease in androgenic activity.

While the hereinbefore described processes produce novel and steroidal-like compounds which have an unnatural substituent at the 13-position, it is apparent that the novel and valuable processes of the invention offer a unique feasible route to the corresponding natural steroids if the nucleophilic compound used in the Michael condensation step is 2-methyl-1,3-cyclopentanedione.

The aromatic ring of the phenylpropanol (FIG. I, I) used as the starting material for the preparation of the compositions and initial preparations of the invention may have one or more substituents, provided, however, at least one position ortho to the position of propanol-chain attachment is unsubstituted so that cyclodehydration to form a cyclic structure can eventually be effectuated. To activate such ortho position for said subsequent ring closure, a para-directing group (referring to electrophilic aromatic substitution) such as hydroxy, acyloxy, alkoxy, amino, alkylamino, or acyl-amino is a necessary substituent on the aromatic ring. The group may be present initially or may be introduced later but before ring closure, either directly, or by conversion from a meta-directing group such as nitro. After the tetracyclic structure has been formed, substituents can be introduced into the aromatic A-ring which are not limited as above; however, if such substituted compound is to undergo a reduction, the group is preferably one not sensitive to reduction. After the A-ring has been reduced, the substituents on said A-ring may be the same as those originally present, or substituents to which they may be converted, such as ketonic oxygen, dialkoxy, alkylenedioxy, alky-

lenethioxy, and alkylenedithio; or groups introducible by known processes, such as halogen or alkyl. For the processes of the invention and except for the limitations expressed in this specification, variations of the substituents on the A-ring of the fully formed tetracyclic structures, or on the intermediate leading thereto, are full equivalents of each other.

The carbon atom to which the phenyl group of the starting propanol (I) is attached can be substituted, as, for example, with an alkyl group, such as methyl or ethyl. Moreover, this atom, to which the phenyl group is attached in Compound I, need not necessarily be carbon. It can be a hetero atom which would not interfere with subsequent catalytic reductions, for example, oxygen or nitrogen. This atom will appear in the tetracyclic structures of the invention in the 6-position, and it will be apparent, may be, in the case of the nitrogen, substituted with hydrogen or an alkyl group.

The 2-carbon atom of the starting phenyl-propanol (I) can also be substituted, as, for example, with an alkyl group, such as methyl and ethyl, and, as such, be unchanged throughout the subsequent synthesis. In the tetracyclic structures of the invention this carbon atom will appear in the 7-position.

For the processes of the invention and except for the limitations expressed in this specification, variations of the B-ring on the fully formed tetracyclic structures, or on the intermediates leading thereto, are full equivalents of each other.

In the Michael reaction step, the 3-keto substrate compound can be a 6-phenyl-1-hexen-3-one, or alternatively, a 6-phenyl-3-hexanone having attached to the 1-position a group which will eliminate with hydrogen to form a 6-phenyl-1-hexen-3-one under Michael conditions. Thus, a 3-keto compound with a 1-dialkylamino substituent or its quaternary salt, a 1-halo substituent or a 1-hydroxy substituent will react with the nucleophilic compound to form the Michael product. The nucleophilic compound can be a carbocyclic 1,3-dione of varying ring size, as, for example, a five-membered ring, a six-membered ring, etc., ultimately forming a corresponding five-membered, a six-membered, etc., D-ring in the tetracyclic structure. The 1,3-cyclodione may also contain a hetero atom at positions other than position 2, thereby to provide a heterocyclic D-ring in the tetracyclic structure. Acyclic nucleophilic compounds can be use in conducting the Michael reaction step and the open-chain of the resulting product thereafter ring-closed to form a cyclic D-ring.

For the processes of the invention, and except for the limitations expressed in this specification, variations of the D-ring on the fully formed tetracyclic structure, or on the intermediate leading thereto, are full equivalents of each other.

When the nucleophilic compound is 2-methyl-1,3-cyclopentanedione, the invention provides a unique total synthesis for natural steroids: the hydrogens at the 8-position, 9-position, and 14-position being β, α, and α, respectively, as in the natural steroids. Thus such valuable therapeutic substances as 19-nortestosterone are made available from easily obtainable and relatively simple and inexpensive starting materials.

Moreover, by varying the group at the 2-position of the nucleophilic Michael condensation reactant, the invention provides a way to produce compounds resembling the natural steroids save at the 13-position. Thus, by varying the substituent at the 2-position of the

3,959,322

7

1,3-cyclopentanedione, alkyl groups of varying chain length such as, for example, ethyl, isopropyl, cetyl, etc., may be introduced to form the gonane correspondingly substituted at the 13-position. Further, gonanes may be prepared wherein the 13-position is substituted with any organic radical. Thus, but without limiting the generality of the foregoing, an aralkyl, cycloalkylalkyl, or a polycarbon-alkylene bridge bearing a hyroxy-, amino-, or alkylamino- substituent can readily be placed in the 13-position, and from such compounds other variations of the 13-position substituent can be prepared, as haloalkyls from hydroxyalkyls, or quaternary salts, amides, etc. from aminoalkyls.

For the processes of the invention and except for the limitations expressed in this specification, variations at the 13-position of the fully formed tetracyclic structures or on the intermediates leading thereto are the full equivalents of the claimed 13-position polycarbon-alkyl substituents, having physiological activity of the same type.

In any of the intermediate structures or in the tetracyclic structures of the invention having either an aromatic, partially reduced, or totally reduced A-ring, wherein the 17-position, or position corresponding thereto in the gonane nucleus, is carbonyl, the carbonyl group can be converted to a group such as hydroxymethylene by lithium aluminum hydride reduction; to acyloxymethylene by esterification of the hydroxymethylene group so formed; to alkoxymethylene by etherification of the hydroxymethylene group; to alkyl-hydroxymethylene by addition of the appropriate organo-metallic reagent to the carbonyl; or to alkynylhydroxymethylene by addition of the appropriate alkali metal acetylide in a suitable inert solvent; all in the known manners. The carbonyl group may also be ketalized or thioketalized by treating with the appropriate alcohol or glycol in a suitable solvent under acidic conditions, as in the presence of an acid such as sulfuric acid, p-toluene sulfonic acid, or boron trifluoride etherate, with heating where necessary, according to the known art.

The specific reactions involved in the processes of the invention will now be considered, as follows, reference being made to the drawings for typifying compounds:

The vinyl ketones (VI) of the invention are prepared by elimination of dialkylamine from the corresponding dialkylaminoethyl aminoketones (V), obtained by hydration of the acetylenic linkage in an acetylenic amine (IV). The acetylenic amines (IV) can be themselves prepared by a Mannich reaction from the corresponding acetylene (III) with formaldehyde and a dialkylamine. The hydration can be carried out, for example, in aqueous sulfuric acid with mercuric sulfate as a catalyst. The corresponding quaternary salts, which may also be used in the subsequent Michael condensation, can be obtained by quaternization of the corresponding acetylenic dialkylaminoethyl amine, followed by hydration; or by quaternization of the ketoamine. The vinyl ketones can be prepared from these derivatives by the above elimination reaction. Thus the ketoamine or its quaternary salt can be treated with a base for this purpose, for example, with sodium hydroxide or a sodium alkoxide.

The vinyl ketones (VI) and dialkylamino ketones (V) are condensed with a nucleophilic compound under Michael reaction conditions. Thus the condensation can be carried out by bringing the two reagents to-

8

gether in solution in the presence of a base, for example, pyridine, triethylamine, diethylamine, sodium hydroxide, or sodium methoxide, and heating as required. The nature and amount of base employed in the condensation reaction will depend upon the particular reagents used. Where the vinyl ketone derivative employed is a keto-amine and dialkylamine is eliminated in the reaction, no added base may be required. Where the compound is a 2-alkylcyclopentane-1,3-dione (VII), the compound to be condensed with it is preferably a vinyl ketone, and the dione is used in excess of the molecular equivalent quantity. Suitable solvents are hydrocarbons, such as benzene, and anhydrous alcohols, such as methanol. If the reaction is carried out in benzene under refluxing conditions, water formed in the condensation may be azeotroped out of the reaction mixture with a Dean-Stark type trap.

As hereinbefore noted, monocyclodehydration of the C-ring is accomplished by an internal aldol condensation. The cyclodehydration can therefore be carried out using conditions generally applicable for an aldol condensation, i.e., in the presence of an acid or basic catalyst such as NaOH, p-toluene sulfonic acid, triethylamine benzoate, aluminum tertiary butoxide, and the like, either at room temperature or accompanied by heating if necessary. In most instances, we prefer to carry out the cyclic dehydration at the boiling point of the solvent to permit azeotropic removal of the water formed during the course of the reaction, inasmuch as the aldol reaction is an equilibrium one. Preferred as solvents are the low boiling anhydrous aromatic hydrocarbons, such as benzene and xylene. C-ring closure occurs regardless of the nature of the substitution on the aromatic ring.

The reduction of the 8(14) unsaturation in the tricyclic compounds is carried out by catalytic hydrogenation either at room temperature or above. It is found that when hydrogen and a palladium-on-charcoal catalyst are used, the hydrogen introduced at the carbon 14-position is principally in the configuration trans to the group attached at the 13-position. By whatever mechanism the hydrogen at the 8-position is introduced, it can on treatment with an acid or base take up the most stable configuration, i.e., the position trans to the other newly introduced hydrogen, by equilibrating through keto-enol tautomerism with the adjacent keto group. Thus the second hydrogen atom can be made to take up the β-configuration when the first is α.

The B-ring closure is brought about under acidic conditions. Suitable are strong acids such as sulfuric, hydrochloric, p-toluene sulfonic, etc. in solvents such as benzene, toluene, anhydrous alcohol, etc. The reaction is generally carried out at room temperature or below since heat may promote the formation of an aromatic B-ring. The preferred treatment is with methanolic hydrochloric acid at room temperature. As hereinbefore noted, it has been found that the ease of B-ring closure of the compounds of the invention to form tetracyclic compounds is affected by the nature of the substituent present on the preformed aromatic A-ring, and that subsequent cyclization is easier to carry out when the preformed aromatic A-ring contains a substituent which activates the position at which cyclization is to occur. Where a compound is to be used directly for B-ring closure, it will in practice be one containing such a substituent. Those substituents which cause subsequent B-ring closure to occur readily are substituents para to the position of ring closure which are groups

3,959,322

9

that in electrophilic aromatic substitution activate an aromatic ring and are predominantly o- and p- directing; for example, the hydroxy or alkoxy group.

The double cyclodehydration is brought about by dissolving a compound typified by Compound VIII in benzene containing a catalytic amount of p-toluene sulfonic acid and boiling the mixture under a Dean-Stark trap until two equivalents of water have been collected, or alternatively, by treating the same triketone with polyphosphoric acid at room temperature or slightly above until ring closure is complete.

The selective hydrogenation of the gona-8,14-dienes typified by Compound IX is carried out by means of 2% palladized calcium carbonate. As hereinbefore noted, surprisingly, the catalytic hydrogenation results in addition of hydrogen to the 14-double bond in such a way as to give the "natural" stereochemical configuration; that is, the hydrogen adds at 14-trans to the alkyl at 13. Selective reduction of the 14-ethylenic linkage is achieved by use of catalyst-solvent combination which shows adequate selectivity, and stopping the hydrogenation when the theoretical amount of hydrogen has reacted. Solvents showing selectivity in this regard are the nonprotonic solvents, that is, hydrocarbons and ethers; benzene, toluene, naphtha, dioxan, dibutyl ether, and diethyl ether are examples of suitable nonprotonic solvents. On the other hand, protonic solvents such as acetic acid and ethanol appear to be largely non-selective.

It has been found that a moderately active Raney nickel catalyst provides good selectivity in a suitable solvent. If a Raney nickel catalyst of low activity is employed, the hydrogenation may be too slow to be useful; on the other hand, a vigorous catalyst shows poor selectivity and some saturation of the 8,9-ethylenic bond may occur simultaneously with the hydrogenation at the 14,15-position.

If desired, other moderately active hydrogenation catalysts may be used instead of Raney nickel; for example, palladium on barium sulfate or on an alkaline earth metal carbonate or on charcoal have all been found suitable in this selective hydrogenation.

Saturation at the 8- or at the 9(11)-position of the tetracyclic structures must be stereospecific to obtain the natural type of exocyclic substituent configuration as noted supra. Such a sufficiently stereospecific reduction can be in general effected by the action of an alkali metal (sodium, potassium, or lithium) in liquid ammonia to the normal steroid configuration hydrogen at the respective carbons. Preferably this type of reduction is carried out in the presence of a primary or secondary aromatic amine, for instance aniline, p-toluidine, or diphenylamine, as this can improve the yield of the desired product. The reduction can also be carried out in the presence of a more reactive proton donor; in this instance, the reduction of the ethylenic linkage occurs with a simultaneous reduction of the aromatic ring to give a 1,4-dihydrophenyl group.

The reduction of 9-dehydro compounds can also be effected by catalytic hydrogenation, as this has been discovered to be sufficiently stereospecific for production of the desired trans-anti-trans compounds of normal configuration.

While the tetracyclic compounds in this specification and the appended examples are named to describe the configuration corresponding to that of the natural steroids, it is to be understood that unless otherwise indicated, the product of each of the given manipulative

10

procedures is a racemic mixture which contains said named compound and its enantiomorph.

Representative formulations embodying specific compositions of this invention follow:

A pharmaceutical tablet for use as an oral anabolic agent consists of the following ingredients:

|  | mg |
|---|---|
| 13β,17α-Diethyl-17β-hydroxygon-4-en-3-one | 5 |
| Carboxymethylcellulose (viscosity 400 cps) | 15 |
| Lactose powder | 25 |
| Redried corn starch | 25 |
| Magnesium stearate powder | 4 |
| Calcium silicate powder | q.s. |
|  | 200 |

A capsule for use as an oral anabolic agent contains, in encapsulating gelatin, the following ingredients:

|  | mg |
|---|---|
| 13β,17α-Diethyl-17β-hydroxygon-4-en-3-one | 5 |
| Finely divided silica lubricant | 5 |
| Magnesium stearate powder | 5 |
| Powdered corn starch | 113 |
| Lactose powder | q.s. |
|  | 245 |

An anabolic agent suspension for oral use consists of the following ingredients per 5 cc:

|  | mg |
|---|---|
| 13β,17α-Diethyl-17β-hydroxygon-4-en-3-one | 5.0 |
| Magnesium aluminum silicate (thickening agent) | 37.5 |
| Carboxymethylcellulose of low viscosity | 37.5 |
| Polyoxyethylene sorbitan monolaurate | 50.0 |
| Glycerin | 250.0 |
| Sucrose | 2000.0 |
| Methyl p-hydroxybenzoate | 5.0 |
| Propyl p-hydroxybenzoate | 1.0 |
| Flavor and distilled water | q.s. |

An anabolic agent suspension for parenteral use consists of the following ingredients per cc:

|  | mg |
|---|---|
| 13β,17α-Diethyl-17β-hydroxygon-4-en-3-one | 0.5 |
| Benzyl alcohol | 10.0 |
| Sodium chloride | 90.0 |
| Polyoxyethylene sorbitan monooleate | 4.0 |
| Sodium carboxymethylcellulose | 5.0 |
| Water for injection | q.s. |

Pediatric drops for use as an anabolic agent consist of the following ingredients per drop (0.05 cc):

|  | mg |
|---|---|
| 13β,17α-Diethyl-17β-hydroxygon-4-en-3-one | 0.500 |
| Magnesium aluminum silicate (thickening agent) | 0.375 |
| Polyoxyethylene sorbitan monolaurate | 0.500 |
| Disodium phosphate heptahydrate | 0.375 |
| Citric acid monohydrate | 0.060 |
| Glycerin | 1.250 |
| Methyl p-hydroxybenzoate | 0.025 |
| Propyl p-hydroxybenzoate | 0.005 |
| Butyl p-hydroxybenzoate | 0.020 |
| Distilled water | 0.015 |
| Sodium saccharin | 0.013 |
| Sorbitol and flavor | q.s. |

A long-acting anabolic agent tablet consists of the following ingredients:

|  | mg |
|---|---|
| 13β,17α-Diethyl-17β-hydroxygon-4-en-3-one | 5 |
| Water-insoluble acid carboxyvinyl polymer of acrylic acid copolymerized with 0.75–2% of polyallyl sucrose (the Carbopol 934 of | |

3,959,322

| 11 | | 12 |

-continued

| U.S. Pat. 2,909,462) | 150 |
| Magnesium stearate powder | 2 |
| Lactose | q.s. |

A long-acting anabolic agent suspension for parenteral use consists of the following ingredients per cc:

| | mg |
| 13β-Ethyl-17β-hydroxygon-4-en-3-one 17-decanoate | 0.5 |
| Benzyl alcohol | 10.0 |
| Sodium chloride | 90.0 |
| Polyoxyethylene sorbitan monooleate | 4.0 |
| Sodium carboxymethylcellulose | 5.0 |
| Water for injection | q.s. |

A progestational agent tablet consists of the following ingredients:

| | mg |
| 13β-Ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one | 5 |
| Spray dried lactose | 75 |
| Methocel (400 cps) | 12 |
| Powdered stearic acid | 6 |
| Talc | 2 |

Pharmaceutically acceptable carriers can be either solid or liquid. Solid form preparations include powders, tablets, dispersible granules, capsules, cachets, and suppositories. A solid carrier can be one or more substances which may also act as diluents, flavoring agents, solubilizers, lubricants, suspending agents, binders or tablet-disintegrating agents: it can also be an encapsulating material. In powders the carrier is a finely divided solid which is in admixture with the finely divided compound. In the tablets the compound is mixed with carrier having the necessary binding properties in suitable proportions and compacted in the shape and size desired. The powders and tablets preferably contain from 5 or 10 to 99% of the active ingredient. Suitable solid carriers are magnesium carbonate, magnesium stearate, talc, sugar, lactose, pectin, dextrin, starch, gelatin, tragacanth, methyl cellulose, sodium carboxymethylcellulose, a low melting wax, and cocoa butter. The term "preparation" is intended to include the formulation of the compound with encapsulating material as carrier providing a capsule in which the compound (with or without other carriers) is surrounded by carrier, which is thus in association with it. Similarly, cachets are included. Tablets, powders, cachets, and capsules can be used for oral administration.

Liquid form preparations include solutions, suspensions, and emulsions. The compounds are insoluble in water, but can be dissolved in aqueous-organic solvent mixtures that are non-toxic in the amounts used. As an example may be mentioned water-propylene glycol solutions for parenteral injection. Liquid preparations can also be formulated in solution in aqueous polyethylene glycol solutions. Aqueous suspension suitable for oral use can be made by dispersing the finely divided compound in water with viscous material, natural or synthetic gums, resins, etc., for example, gum arabic, ion-exchange resins, methylcellulose, sodium carboxymethylcellulose and other well-known suspending agents.

Preferably the pharmaceutical preparation is in unit dosage form. In such form, the preparation is subdivided in unit doses containing appropriate quantities of the compound: the unit dosage form can be a package preparation, the package containing discrete quantities of preparation, for example, packeted powders of vials or ampules. The unit dosage form can be a capsule, cachet, or tablet itself, or it can be the appropriate number of any of these in packaged form. The quantity of compound in a unit dose of preparation may be varied or adjusted from 1 mg to 100 mg (generally within the range of 2.5 to 25 mg) according to the particular application and the potency of the active ingredient.

The claimed compositions having physiological activity can be incorporated into pharmaceutical formulations including sustained-release agents.

The following examples illustrate the processes and manner of making the compositions of the invention.

EXAMPLE 1

1-Diethylamino-6 -m-methoxyphenylhex-2-yne

Allow 5-m-methoxyphenylpent-1-yne (8 g) to stand for 12 hours at 70°C under nitrogen with water (2.5 cc), trioxan (0.5 g), 30% formalin (5.5 g), diethylamine (4 g), acetic acid (2.75 g), dioxan (25 cc) and cuprous chloride (0.13 g). Make the cooled solution alkaline with 10% aqueous sodium hydroxide and extract with ether; then extract the ether extract with 10% hydrochloric acid: wash the acid extract with ether, make alkaline with 10% aqueous sodium hydroxide, extract with ether, and then wash and dry the ether extract. Distil to obtain 1-diethylamino-6-m-methoxyphenylhex-2-yne (10.6 g, 88%), b.p. 130°–131°C/0.1 mm.

$C_{17}H_{25}N$ Calculated: C, 78.7%; H, 9.7% Found: C, 78.9%; H, 9.6%

To prepare 1-diethylamino-6-m-ethoxyphenyloct-2-yne treat 5-m-ethoxyphenylhept-1-yne (ca. 8 g) according to the manipulative procedure described above.

To prepare 1-diethylamino-6-m-propoxyphenylhex-2-yne treat 5-m-propoxyphenylpent-1-yne (ca. 8 g) according to the manipulative procedure described above.

To prepare 1-diethylamino-6-m-pentoxyphenylhex-2-yne treat 5-m-pentoxyphenylpent-1-yne (ca. 8 g) according to the manipulative procedure described above.

To prepare 1-diethylamino-6-m-cyclopentyloxyphenylhex-2-yne treat 5-m-cyclopentyloxyphenylpent-1-yne (ca. 8 g) according to the manipulative procedure described above.

To prepare 1-diethylamino-6-m-propoxyphenylhep-2-yne treat 5-m-propoxyphenylhex-1-yne (ca. 8 g) according to the manipulative procedure described above.

To prepare 1-diethylamino-6-(3,5-diethoxyphenyl)-hex-2-yne treat 5-(3,5-diethoxyphenyl)pent-1-yne (ca. 8 g) according to the manipulative procedure described above.

To prepare 1-diethylamino-6-(3-ethoxy-4-propoxyphenyl)-hex-2-yne treat 5-(3-ethoxy-4-propoxy)pent-1-yne (ca 8 g) according to the manipulative procedure described above.

To prepare 1-diethylamino-6-(3-ethoxy-4-propoxyphenyl)-hept-2-yne treat 5-(3-ethoxy-4-propoxy)-hex-1-yne (ca. 8 g) according to the manipulative procedure described above.

3,959,322

**13**

## EXAMPLE 2

### 1-Diethylamino-6-phenylhex-2-yne

Maintain 5-phenylpent-1-yne (20 g) for 12 hours at 70° under nitrogen with water (6.2 cc), trioxan (1.2 g), 30% formalin (13.8 g), diethylamine (10 g), acetic acid (6.9 g), dioxan (62 cc) and cuprous chloride (0.35 g). Make the cooled solution alkaline with sodium hydroxide. Extract with ether and extract the ether extract itself with hydrochloric acid. Make the purified aqueous hydrochloride solution thus obtained alkaline again and extract with ether. Dry, evaporate the ether extracts and distil the residue to obtain 1-diethylamino-6-phenylhex-2-yne (27.1 g), b.p. 104-106°/0.2 mm.

$C_{16}H_{23}N$ Calculated: C, 83.8%; H, 10.1% Found: C, 83.9%; H, 10.1%

Prepare 1-diethylamino-6-m-nitrophenylhex-2-yne (1.5 g), b.p. 148°C/0.05 mm, by treating 5-m-nitrophenylpent-1-yne (1.8 g) with water (0.6 cc), trioxan (0.1 g), 30% formalin (1.4 g), diethylamine (1 g), acetic acid (0.7 g), dioxan (6.2 cc) and cuprous chloride (0.03 g) according to the manipulative procedure described above.

## EXAMPLE 3

### 1-Diethylamino-6-m-acetoxyphenylhex-2-yne

Add 5-m-acetoxyphenylpent-1-yne (9.5 g) to a mixture of trioxan (0.5 g), 40% formalin (5.5 g), diethylamine (4 g), acetic acid (2.75 g), dioxan (25 cc), and cuprous chloride (0.13 g) at room temperature. Heat the mixture thus obtained to 70°, to obtain a clear green solution, and maintain under nitrogen at that temperature for 12 hours. Cool and add ice, pour the product into ice-cold saturated potassium bicarbonate and extract the mixture with ether. Wash and dry, evaporate the extracts under reduced pressure and distil to obtain 1-diethylamino-6-m-acetoxyphenylhex-2-yne (9.9 g), b.p. 152°–154°/0.1 mm, as a pale yellow mobile liquid.

## EXAMPLE 4

### 1-Diethylamino-6-(3,4-methylenedioxyphenyl)-hex-2-yne

Add 5-(3,4-methylenedioxyphenyl)pent-1-yne (24.5 g) in dioxan (15 cc) to a mixture of diethylamine (16 g), trioxan (7.2 g) and cuprous chloride (0.3 g) in dioxan (20 cc) and heat the mixture at 100° for 15 hours under an atmosphere of nitrogen. Filter the cooled solution, remove the solvent and distil the residue at 0.1 mm Hg to obtain 1-diethylamino-6-(3,4-methylenedioxyphenyl)-hex-2-yne after a forerun of more volatile material.

Infrared absorption peaks at 6.25, 12.20μ.

## EXAMPLE 5

### 1-Diethylamino-6-(3,4-dimethoxyphenyl)-hex-2-yne

Heat a mixture of 5-(3,4-dimethoxyphenyl)-pent-1-yne (8 g), water (2.5 cc), trioxan (0.5 g), 30% formalin (5.5 g), diethylamine (4 g,), acetic acid (2.75 g), dioxan (25 cc) and cuprous chloride (0.13 g) at 70° for 15 hours. Make the cooled solution alkaline with 10% aqueous sodium hydroxide and collect the product. Wash the ethereal solution with water and extract with 10% hyrochloric acid (3 × 30 cc). Wash the combined aqueous extracts with ether, make it alkaline with 10% sodium hydroxide solution and extract with ether.

**14**

Wash and dry the ethereal solution, evaporate the solvent and distil the residue at 0.1 mm Hg to obtain 1-diethylamino-6-(3,4-dimethoxyphenyl)-hex-2-yne.

Infrared absorption peaks at 6.25, 12.20 μ.

Prepare 1-diethylamine-6-(3,5-dimethylphenyl)-hex-2-yne by treating 5-(3,5-dimethoxyphenyl)pent-1-yne with water, trioxan, 30% formalin, diethylamine, acetic acid, dioxan and cuprous chloride according to the manipulative procedure described above.

## EXAMPLE 6

### 1-Diethylamino-6-(3-methoxyphenyl)-hept-2-yne

Heat a mixture of 5-(3-methoxyphenyl)-hex-1-yne (56.6 g), water (17.5 cc.), 40% formalin (38.5 cc), diethylamine (40 cc), acetic acid (19 cc), dioxan (175 cc) and cuprous chloride (1 g) at 70° for 16 hours in an atmosphere of nitrogen. Make the cooled solution alkaline with 10% aqueous sodium hydroxide and extract twice with ether. Wash the ether extracts with water, filter and extract with 4N hydrochloric acid (3 × 350 cc). Make the acid extracts alkaline with 10% aqueous sodium hydroxide, extract with ether and wash the organic solution with water, brine and dry. Evaporate the solvent and distil the residue to obtain 1-diethylamino-6-(3-methoxyphenyl)-hept-2-yne, 79.5 g, b.p. 135°–140°/0.2 mm Hg $n_D^{25}$ 1.5116.

$C_{18}H_{27}ON$ Calculated: C, 79.07%, H, 9.95% Found: C, 78.99%; H, 9.6%

## EXAMPLE 7

### 1-Diethylamino-5-methyl-6-(m-methoxyphenyl)-hex-2-yne

Heat 5-(m-methoxyphenyl)-4-methyl-pent-1-yne (8 g), trioxan (0.5 g), 30% formalin (5.5 cc), diethylamine (4 g), acetic acid (2.75 g), dioxan ( 25 cc) and cuprous chloride (0.12 g) together at 70° for 15 hours. Make cooled solution alkaline with 10% aqueous sodium hydroxide and extract with ether. Wash the ethereal solution with water and extract with 10% hydrochloric acid (3 × 20 cc). Combine the acid extracts, wash with ether and make alkaline with 10% aqueous sodium hydroxide and extract with ether. Wash the ethereal solution, dry, remove the solvent and distil the residue at 0.1 mm to obtain 1-diethylamino-5-methyl-6-(m-methoxyphenyl)-hex-2-yne.

## EXAMPLE 8

### 1-Diethylamino-6-m-methoxyphenylhexan-3-one and 6-m-Methoxyphenylhex-1-en-3-one

Add mercuric sulphate (0.45 g) to a swirled solution of 1-diethylamino-6-m-methoxyphenylhex-2-yne (8.5 g) in concentrated sulphuric acid (2.5 cc) and water (25 cc). Keep the solution under nitrogen at 75°C for 1 hour, then cool, make basic with 10% aqueous sodium hydroxide, and filter through glass wool to remove mercuric oxide. Extract product with ether and wash and dry the ethereal solution. Remove the solvent to obtain the crude ketoamine 1-diethylamino-6-m-methoxyphenylhexan-3-one, infrared absorption peak at 1710 μ. Distil under reduced pressure with partial elimination of diethylamine, to obtain a mixture of the ketoamine 1-diethylamino-6-m-methoxyphenylhexan-3-one and the vinyl ketone 6-m-methoxyphenylhex-1-en-3-one (7.1 g, ca. 76%), b.p. 140°–145°C/0.1 mm; infrared absorption peaks at 5.85 and 5.95 μ, the ketoamine predominating.

3,959,322

15

Distil a second portion of the crude ketoamine 1-diethylamino-3-m-methoxyphenylhexan-3-one very slowly over a period of 30 minutes through a Vigreux fractionating column 10 cm high and one-inch diameter under reduced pressure to eliminate most of the diethylamine. Dissolve the 6-m-methoxyphenylhex-1-en-3-one obtained (b.p. 114°–114°C/0.7 mm) in ether and wash the ether solution with dilute hydrochloric acid, followed by aqueous sodium bicarbonate and water. Dry and evaporate. Distil the residue to give the pure vinyl ketone as a colorless liquid, b.p. 76°C/0.3 mm.

$C_{13}H_{16}O_2$ Calculated: C, 76.4%; H, 7.9% Found: C, 76.3%; H, 8.0%

Mix a third portion of the crude undistilled 1-diethylamino-6-m-methoxyphenylhexan-3-one (3 g) with methyl iodide (3 g). An exothermic reaction soon develops. After 12 hours wash the mixture with ether to remove unchanged reactants and subject to reduced pressure (15 minutes) to remove ether remaining: the residue is the crude methiodide of the ketoamine (4.6 g).

Infrared absorption peaks at 5.85 $\mu$.

This compound is useful for preparing the novel compositions of this invention which have hormonal activity.

EXAMPLE 9

1-Diethylamino-6-phenylhexan-3-one and
6-Phenylhex-1-en-3-one

Add to a solution of 1-diethylamino-6-phenylhex-2-yne (27.1 g) in concentrated sulphuric acid (7.6 cc) diluted with water (77 cc) at 70° mercuric sulphate (1.6 g), and keep the solution under nitrogen for one hour; cool, make basic with sodium hydroxide solution, and filter through glass wool to remove mercuric oxide. Extract the product with ether and evaporate the washed and dried ethereal solution, leaving crude 1-diethylamino-6-phenylhexan-3-one. Distil under reduced pressure with this ketoamine undergoing partial elimination of diethylamine, to obtain a mixture of the ketoamine, and 6-phenylhex-1-en-3-one (18.9 g), b.p. 96°/0.003 mm.

Infrared absorption peaks at 5.88 and 5.95 $\mu$.

To prepare 1-diethylamino-6-m-ethoxyphenyloctan-3-one and 6-m-ethoxyphenyloct-1-en-3-one hydrate and react 1-diethylamino-6-m-ethoxyphenyloct-2-yne in the presence of mercury salts according to the manipulative procedure set forth above.

To prepare 1-diethylamino-6-m-propoxyphenylhexan-3-one and 6-m-propoxyphenylhex-1-en-3-one hydrate and react 1-diethylamino-6-m-propoxyphenylhex-2-yne in the presence of mercury salts according to the manipulative procedure set forth above.

To prepare 1-diethylamino-6-m-pentoxyphenylhexan-3-one and 6-m-pentoxyphenylhex-1-en-3-one hydrate and react 1-diethylamino-6-m-pentoxyphenylhex-2-yne in the presence of mercury salts according to the manipulative procedure set forth above.

To prepare 1-diethylamino-6-m-cyclopentyloxyphenylhexan-3-one and 6-m-cyclopentyloxyphenylhex-1-en-3-one hydrate and react 1-diethylamino-6-m-cyclopentyloxyphenylhex-2-yne in the presence of mercury salts according to the manipulative procedure set forth above.

To prepare 1-diethylamino-6-m-propoxyphenylheptan-3-one and 6-m-propoxyhept-1-en-3-one hydrate and react 1-diethylamino-6-m-propoxyphenylhept-2-

16

yne in the presence of mercury salts according to the manipulative procedure set forth above.

To prepare 1-diethylamino-6-(3,5-diethoxyphenyl)-hexan-3-one and 6-(3,5-diethoxyphenyl)-hex-1-en-3-one hydrate and react 1-diethylamino-6-(3,5-diethoxyphenyl)hex-2-yne in the presence of mercury salts according to the manipulative procedure set forth above.

To prepare 1-diethylamino-6-(3-ethoxy-4-propoxyphenyl)hexan-3-one and 6-(ethoxy-4-propoxyphenyl)-hex-1-en-3-one hydrate and react 1-diethylamino-6-(3-ethoxy-4-propoxyphenyl)hex-2-yne in the presence of mercury salts according to the manipulative procedure set forth above.

These compounds are useful for preparing the novel compositions of this invention which have hormonal activity.

EXAMPLE 10

1-Diethylamino-6-m-nitrophenylhexan-3-one and
6-m-Nitrophenylhex-1-en-3-one

Hydrate 1-diethylamino-6-m-nitrophenylhex-2-yne (1.5 g) using the procedure of Example 2 with one twentieth of the quantities of reagents. Remove the solvent to obtain crude 1-diethylamino-6-m-nitrophenylhexan-3-one as a clear pale yellow liquid. Distil under reduced pressure, with considerable elimination of diethylamine, to obtain crude 6-m-nitrophenylhex-1-en-3-one (1 g) as a clear pale yellow liquid.

EXAMPLE 11

1-Diethylamino-6-m-hydroxyphenylhexan-3-one

Add mercuric sulphate (0.27 g) rapidly with swirling to a solution of 1-diethylamino-6-m-acetoxyphenylhex-2-yne (3.1 g) in 10% aqueous sulphuric acid (15 cc), and heat the resulting green solution at 75° nitrogen for 1½ hours. After cooling, filter to remove mercuric sulphate and add solid potassium bicarbonate until the product has pH 8.8. Extract the solution with ether. Wash the other extracts with brine made alkaline to pH 8.8, and dry over anhydrous magnesium sulphate. Evaporate the ether at room temperature to obtain as residue crude 1-diethylamino-6-m-hydroxyphenylhexan-3-one as a viscous brown oil (2.4 g), showing infrared absorption at 5.85 $\mu$ indicating the presence of a keto group, together with the characteristic band of a phenolic hydroxy group and the complete absence of a band at 5.68 $\mu$ corresponding to a phenolic acetate group.

This compound is useful for preparing the novel compositions of this invention which have hormonal activity.

EXAMPLE 12

1-Diethylamino-6-m-acetoxyphenylhexan-3-one and
6-m-Acetoxyphenylhex-1-en-3-one

Acetylate the crude 1-diethylamino-6-m-hydroxyphenylhexan-3-one (2.4 g) by adding pyridine (7 cc) and acetic anhydride (3 cc) and allow the mixture to stand overnight at room temperature. Work up the mixture as in the acetylation stage described in the preparation of 5-m-acetoxyphenylpent-1-yne above, to obtain crude 1-diethylamino-6-m-acetoxyphenylhexan-3-one as a viscous brown oil (2.7 g).

Infrared absorption peaks at 5.68 $\mu$ with a shoulder at 5.85 $\mu$ and no appreciable phenolic absorption.

3,959,322

**17**

Distil in a Hickman still at 0.1 mm, with partial elimination of diethylamine, and collect a colorless mobile liquid, b.p. 160°–170°/0.1 mm, which is a mixture (1.8 g) of the ketoamine and 6-m-acetoxyphenylhex-1-en-3-one.

Infrared absorption peaks at 5.68, 5.88, 5.95 μ, the nature of the absorption indicating a predominance of the vinyl ketone in the mixture.

These compounds are useful for preparing the novel compositions of this invention which have hormonal activity.

EXAMPLE 13

1-Diethylamino-6-(3,4-dihydroxyphenyl)hexan-3-one

Add mercuric sulphate (0.27 g) to a swirled solution of 1-diethylamino-6-(3,4-methylenedioxyphenyl)hex-2-yne (3 g) in 10% aqueous sulphuric acid (15 cc) and heat the mixture for 90 minutes at 75° in an atmosphere of nitrogen. Filter the cooled reaction mixture and add solid potassium carbonate to pH 8.5. Extract the product with ether; wash and dry and evaporate the solvent to leave as residue crude 1-diethylamino-6-(3,4-dihydroxyphenyl)hexan-3-one.

Infrared absorption peaks at 5.85 μ.

This compound is useful for preparing the novel compositions of this invention which have hormonal activity.

EXAMPLE 14

1-Diethylamino-6-(3,4-dimethoxyphenyl)hexan-3-one and 6-(3,4-Dimethoxyphenyl)hex-1-en-3-one

Add mercuric sulphate (0.45 g) to a stirred solution of 1-diethylamino-6-(3,4-dimethoxyphenyl)hex-2-yne (8.5 g) in concentrated sulphuric acid (2.5 cc) and water (25 cc) and maintain the solution at 75° for 90 minutes. Make the cooled solution basic with 10% aqueous sodium hydroxide and filter to remove mercuric oxide. Extract the product with ether and wash and dry the ethereal solution. Evaporate the solvent to obtain 1-diethylamino-6-(3,4-dimethoxyphenyl)hexan-3-one as an oily residue.

Infrared absorption peaks (liquid film) 5.85 μ. Slowly distil through a short fractionating column at 0.1 mm Hg to obtain mainly the eliminated product 6-(3,4-dimethoxyphenyl)hex-1-en-3-one.

Infrared absorption peaks (liquid film) 5.95 μ.

This compound is useful for preparing the novel compositions of this invention which have hormonal activity.

EXAMPLE 15

1-Diethylamino-6-(3,5-dimethoxyphenyl)hexan-3-one and 6-(3,5-Dimethoxyphenyl)hex-1-en-3-one

Proceed exactly as described for the preparation of the 3,4-dimethoxy compound above, using 6-(3,5-dimethoxyphenyl)-1-diethyl-aminohex-2-yne (8.5 g), mercuric sulphate (0.45 g), and 10% sulphuric acid (25 cc) to obtain 1-diethylamino-6-(3,5-dimethoxyphenyl)hexan-3-one and 6-(3,5-dimethoxyphenyl)hex-1-en-3-one.

EXAMPLE 16

1-Diethylamino-6-(m-methoxyphenyl)heptan-3-one and 6-(m-Methoxyphenyl)hept-1-en-3-one

Dissolve 1-diethylamino-6-(m-methoxyphenyl)hept-2-yne (13.6 g) in 10% aqueous sulphuric acid (40 cc)

**18**

and stir with mercuric sulphate (0.69 g) for 2 hours at 70°. Filter the cooled solution, make basic with 10% aqueous sodium hydroxide and extract with ether. Wash the ethereal solution with water and brine, and dry (Na₂SO₄). Evaporate the solvent and distil the residue to obtain 1-diethylamino-6-(m-methoxyphenyl)-heptan-3-one which has partially eliminated to 6-(m-methoxyphenyl)hept-1-en-3-one during the distillation, b.p. 145°/12 mm Hg.

Infrared absorption peaks at 5.95 μ.

This compound is useful for preparing the novel compositions of this invention which have hormonal activity.

EXAMPLE 17

1-Diethylamino-6-(m-methoxyphenyl)-5-methylhexan-3-one and 5-Methyl-6-(m-methoxyphenyl)hex-1-en-3-one

Add mercuric sulphate (0.45 g) to a stirred solution of 1-diethylamino-5-methyl-6-(m-methoxyphenyl)hex-2-yne (8 g) in concentrated sulfuric acid (2.5 cc) and water (25 cc) and heat the mixture at 70° for 1½ hours. Filter the coled solution, make basic with 10% aqueous sodium hydroxide and extract with ether. Wash and dry the ethereal solution and evaporate to leave as residue crude 1-diethylamino-6-(m-methoxyphenyl)-5-methyl-hexan-3-one; infrared absorption peaks at 5.85 μ. Slowly distil at 0.1 mm Hg to obtain 5-methyl-6-(m-methoxyphenyl)hex-1-en-3-one; infrared absorption peaks at 5.82 μ.

This compound is useful for preparing the novel compositions of this invention which have hormonal activity.

EXAMPLE 18

2-(6-m-Methoxyphenyl-3-oxohexyl)-2-methylcyclohexane-1,3-dione

Reflux a mixture (9 g) of 1-diethylamino-6-methoxyphenylhexan-3-one and 6-m-methoxyphenyl-hex-1-en-3-one with 2-methylcyclohexane-1,3-dione (4 g) in benzene (46 cc) containing pyridine (3.5 cc) for 15 hours. Wash and dry the cooled solution. Remove the solvent to obtain the triketone 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclohexane-1,3-dione (8.2 g); infrared absorption peaks at 5.88, 5.85, 5.83 μ.

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

EXAMPLE 19

2-(6-m-Methoxyphenyl-3-oxohexyl)-2-methylcyclohexane-1,3-dione

Add to the crude undistilled ketoamine 1-diethylamino-6-(m-methoxyphenyl)hexan-3-one (2.3 g), the material obtained by hydration of the acetylenic amine, 2-methylcyclohexane-1,3-dione (1 g), pyridine (1 cc) and benzene (12 cc), and reflux the mixture for 15 hours. Cool the mixture and filter off unreacted dione, add a little ether to the filtrate, and wash the ethereal solution with acid, and then water, and dry. Evaporate the solvents to obtain as residue crude 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclohexane-1,3-dione (1.7 g).

3,959,322

19             20

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

### EXAMPLE 20

2-(6-m-Methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione

Reflux a mixture (6 g) of 1-diethylamino-6-m-methoxyphenylhexan-3-one and 6-m-methoxyphenyl-hex-1-en-3-one with 2-methylcyclopentane-1,3-dione (2.8 g) in 0.12% dry methanolic potassium hydroxide solution (20 cc) for 12 hours. Remove most of the methanol under reduced pressure and add a mixture (50 cc) of equal volumes of benzene and ether; wash the solution with water, alkali and hydrochloric acid, and dry. Evaporate the solvent to obtain the adduct, the triketone 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione (6.7 g), a viscous brown gum.

To prepare 2-(6-m-methoxyphenyl-3-oxohexyl)-2-n-butylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-methoxyphenylhexan-3-one and 6-m-methoxyphenylhex-1-en-3-one with 2-butylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-(6-m-methoxyphenyl-3-oxohexyl)-2-hydroxypropylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-methoxyphenylhexan-3-one and 6-m-methoxyphenylhex-1-en-3-one with 2-hydroxypropylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-(6-m-ethoxyphenyl-3-oxohexyl)-2-ethylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-ethoxyphenylhexan-3-one and 6-m-ethoxyphenylhex-1-en-3-one with 2-ethylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-(6-m-propoxyphenyl-3-oxohexyl)-2-phenethylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-propoxyphenylhexan-3-one and 6-m-propoxyphenylhex-1-en-3-one with 2-phenethyl-cyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-(6-m-pentyloxyphenyl-3-oxohexyl)-2-isobutylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-pentyloxyphenylhexan-3-one and 6-m-pentyloxyphenylhex-1-en-3-one with 2-isobutylcy-clopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-(6-m-cyclopentyloxyphenyl-3-oxohex-yl)-2-hydroxypropylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-cyclopentyloxyphenyl-hexan-3-one and 6-m-cyclopentyloxyphenylhex-1-en-3-one with 2-hydroxypropylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-phenethylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-hydroxyphenylhexan-3-one and 6-m-hydroxyphenylhex-1-en-3-one with 2-phenethyl-cyclopentane-1,3-dione and dry methanolic potassium

hydroxide solution according to the manipulative procedure described above.

To prepare 2-[6-(3,4-dimethoxyphenyl)-3-oxohex-yl]-2-diethylaminoethylcyclopentane-1,3-dione, treat a mixture of -diethylamino-6-(3,4-dimethoxyphenyl)-hexan-3-one and 6-(3,4-dimethoxyphenyl)hex-1-en-3-one with 2-diethylaminoethylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-[6-(3,5-dimethoxyphenyl)-3-oxohep-tyl]-2-dimethylaminopropylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-(3,5-dimethoxy-phenyl)heptan-3-one and 6-(3,5-dimethoxyphenyl)-hept-1-en-3-one with 2-dimethylaminopropylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-8 6-(3,5-diethoxyphenyl)-3-oxooctyl]-2-n-butylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-(3,5-diethoxyphenyl)octan-3-one and 6-(3,5-diethoxyphenyl)oct-1-en-3-one with 2-butylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-[6-(3-methoxy-4-ethoxyphenyl)-3-oxohexyl]-2-n-propylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-(3-methoxy-4-ethoxy-phenyl)hexan-3-one and 6-(3-methoxy-4-ethoxy-phenyl)hex-1-en-3-one with 2-propylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-(6-m-methoxyphenyl-3-oxohexyl)-2-n-propylcyclopentane-1,3-dione, treat a mixture of 1-diethylaminp-6-m-methoxyphenylhexan-3-one and 6-m-methoxyphenylhex-1-en-3-one with 2-propylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solutin according to the manipulative procedure described above.

To prepare 2-(6-m-acetoxyphenyl-3-oxohexyl)-2-ethylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-acetoxyphenylhexan-3-one and 6-m-acetoxyphenylhex-1-en-3-one with 2-ethylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

To prepare 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-ethylcyclopentane-1,3-dione, treat a mixture of 1-diethylamino-6-m-hydroxyphenyl-hexan-3-one and 6-m-hydroxyphenylhex-1-en-3-one with 2-ethylcyclopentane-1,3-dione and dry methanolic potassium hydroxide solution according to the manipulative procedure described above.

### EXAMPLE 21

2-(6-m-Methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione

Add the crude methiodide of 1-diethylamino-6-m-methoxyphenylhexan-3-one (2.5 g) in methanol (10 cc) ice-cold to a solution obtained by adding 2-methyl-cyclopentane-1,3-dione (0.5 g) to an ice-cold solution of sodium (0.21 g) in methaol (10 cc). Allow the reaction mixture to warm to room temperature and leave for 16 hours, after which add N hydrochloric acid (10 cc) and saturated brine (100 cc), and ether-extract the solution. Evaporate the washed and dried extracts to

3,959,322

**21**

obtain the crude adduct 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione as a gum.

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

### EXAMPLE 22

2-(6-m-Methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione

Reflux 6-m-methoxyphenylhex-1-en-3-one, containing a small amount of 1-diethylamino-6-m-methoxyphenylhexan-3-one (6 g, the material produced by the slow distillation of the latter substance), with 2-methylcyclopentane-1,3-dione (3.5 g) in 0.12% anhydrous methanol in potassium hydroxide (10 cc) for 10 hours. Work up the reaction mixture as described for the preparation of the compound as titled above, to obtain the crude triketone 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione (8 g). Distil a small portion of this at 0.02 mm for analysis.

$C_{19}H_{24}O_4$ Calculated: C, 72.1%; H, 7.65% Found: C, 72.3%; H, 7.45%

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

### EXAMPLE 23

2-(6-m-Methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione

Add sodium (0.05 g) to a 0.12% methanolic potassium hydroxide solution (15 cc). To this solution add 1-bromo-6-m-methoxyphenyl)hexan-3-one (0.9 g) in methaol (5 cc) and 2-methylcyclopentane-1,3-dione (0.4 g), and reflux the mixture for 6 hours. After working up as in the preparation of the title compound in a previous example, obtain the crude Michael adduct 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione as a yellow gum.

This compound is useful as an intermediate for preparing the novel compositons of this invention having hormonal activity.

### EXAMPLE 24

2-(6-m-Methoxyphenyl-3-oxohexyl)-2-ethylcyclohexane-1,3-dione

Reflux 2-ethylcyclohexanc-1,3-dione (30.6 g), pyridine (20 cc), benzene (372 cc) and a mixture of 1-diethylamino-6-m-methoxyphenylhexan-3-one and 6-m-methoxyphenylhex-1-en-3-one (40.3 g, produced by the distillation of the former substance) for 15 hours. Wash the cooled reaction mixture with water, 10% aqueous sulfuric acid, water, 10% aqueous sodium carbonate, water and brine, and filter. Evaporate the solvent to leave as residue 2-(6-m-methoxyphenyl-3-oxohexyl)-2-ethylcyclohexane-1,3-dione, 38.1 g, 56.2%.

This compound is useful as an intermediate for the preparation of the novel compositions of this invention which have hormonal activity.

### EXAMPLE 25

2-(6-m-Methoxyphenyl-3-oxohexyl)-2-ethylcyclopentane-1,3-dione

Reflux a mixture (5.25 g) of 1-diethylamino-6-m-methoxyphenylhexan-3-one and 6-m-methoxyphenyl-hex-1-en-3-one with 2-ethylcyclopentane-1,3-dione

**22**

(3.3 g) in dry 0.12% methanolic solution of potassium hydroxide for 18 hours. Filter the resulting solution, evaporate to dryness and dissolve the residue in ether. Wash the ether solution with alkali, hydrochloric acid, and water, dry and evaporate to obtain as residue the triketone 2-(6-m-methoxyphenyl-3-oxohexyl)-2-ethyl-cyclopentane-1,3-dione (7.1 g) as a gum.

This compound is useful as an intermediate for the preparation of the novel compositions of this invention which have hormonal activity.

### EXAMPLE 26

2-Isopropyl-2-(6-m-methoxyphenyl-3-oxohexyl)cyclopentane-1,3-dione

Condense a mixture (6 g) of 1-diethylamino-6-(m-methoxyphenyl)hexan-3-one and 6-(m-methoxhy-phenyl)hex-1-en-3-one with 2-isopropylcyclopentane-1,3-dione (3 g) using a procedure similar to that described for the condensation of the 2-ethyl compound. Obtain the corresponding triketone, 2-isopropyl-2-(6-m-methoxyphenyl-3-oxohexyl)cyclopentane-1,3-dione (7.2 g) as an uncrystallizable gum.

This compound is useful as an intermediate for the preparation of the novel compositions of this invention which have hormonal activity.

### EXAMPLE 27

2-(6-m-Methoxyphenyl-3-oxoheptyl)-2-ethylcyclopentane-1,3-dione

Reflux a mixture of 6-(m-methoxyphenyl)hept-1-en-3-one and 1-diethylamino-6-)m-methoxypheyl)heptan-3-one (10 g, obtained by slow distillation of the latter substance) with 2-ethylcyclopentane-1,3-dione (7g) in 0.12% methanolic potassium hydroxide solution (40 cc) for 15 hours. Remove most of the methanol under reduced pressure and add a mixture of equal volumes of ether and benzene (50 cc). Wash the solution with 5% aqueous sodium hydroxide, water, 10% hydrochloric acid, and brine, and dry. Evaporate the solvent to leave as residue the triketone adduct 2-(6-m-methoxyphenyl-3-oxoheptyl)-2-ethylcyclopentane-1,3-dione (14 g); infrared absorption peak at 5.80 $\mu$.

This compound is useful as an intermediate for the preparation of the novel compositions of this invention which have hormonal activity.

### EXAMPLE 28

2-Ethyl-2-(6-m-methoxyphenyl-5-methyl-3-oxohexyl)-cyclopentane-1,3-dione

Add a mixture of 1-diethylamino-6-(m-methoxyphenyl)-5-methylhexan-3-one and 5-methyl-6-(m-methoxyphenyl)hex-1-en-3-one (6 g, prepared by slow distillation of the former substance) to 2-ethylcyclopentane-1,3-dione (3.5 g) in 0.12% methanolic potassium hydroxide (10 cc) and heat the mixture under reflux for 6 hours. Remove most of the solvent under reduced pressure and add ether (25 cc) and benzene (25 cc) to the residue. Wash the solution with 5% aqueous sodium hydroxide, water, dilute hydrochloric acid, and brine, and dry. Evaporate the solvent to obtain a viscous brown gum, which is the triketone 2-ethyl-2-(6-m-methoxyphenyl-5-methyl-3-oxohexyl)cyclopentane-1,3-dione.

This compound is useful as an intermediate for preparing the novel compositions of this invention having a hormonal activity.

3,959,322

23

## EXAMPLE 29

### 2-(6-Phenyl-3-oxohexyl)-2-methylcyclohexane-1,3-dione

Reflux the mixture of 1-diethylamino-6-phenylhexan-3-one and 6-phenylhex-1-en-3-one (19 g) with 2-methylcyclohexane-1,3-dione (8.4 g) in benzene (97 cc) containing pyridine (7.4 cc) for 15 hours. Wash and dry the cooled solution. Remove the solvent to obtain the crude triketone 2-(6-phenyl-3-oxohexyl)-2-methylcyclohexane-1,3-dione.

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

## EXAMPLE 30

### 2-(6-m-Nitrophenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione

6-m-Nitrophenylhex-1-en-3-one (1.0 g, containing a small amount of 1-diethylamino-6-m-nitrophenylhexan-3-one) in anhydrous 0.1% methanolic potassium hydroxide (10 cc) with 2-methylcyclopentane-1,3-dione (1.5 g) for 12 hours. Cool the solution, pour into water and ether extract. Wash the extracts with sodium bicarbonate solution, dry and evaporate to obtain a gum (1.3 g). Crystallize by adding ethanol, recrystallize from ethanol to obtain 2-(6-m-nitrophenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione, m.p. 81°–83°C; infrared absorption peaks at 5.70, 5.80, 5.83, 6.54, 7.33 $\mu$ (the first three peaks representing carbonyl groups and the others a nitro group).

This compound is useful as an intermediate for preparing the novel compositons of this invention having hormonal activity.

## EXAMPLE 31

### 2-(6-m-Hydroxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione

Reflux    1-diethylamino-6-m-hydroxyphenylhexan-3-one (0.72 g) with 2-methylcylopentane-1,3-dione)(0.70 g) in 0.12% methanolic potassium hyroxide (5 cc) for 18 hours. Remove the solvent under reduced pressure. Add chloroform (50 cc) and wash the solution in turn with dilute sulfuric acid, saturated aqueous potassium bicarbonate, and brine, dry and evaporate the solvent. The product, an amber gum, is the adduct 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione. Infrared absorption peaks at 2.94, 5.71, 5.83 and 5.87 $\mu$.

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

## EXAMPLE 32

### 2-(6-m-Acetoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione

Reflux a mixture of 6-(m-acetoxyphenyl)-1-diethylaminohexan-3-one and 6-(m-acetoxyphenyl)hex-1-en-3-one (1 g), with 2-methylcyclopentane-1,3-dione (1.5 g) in 0.12% methanolic potassium hydroxide (6 cc) for 18 hours. Remove methanol (2 cc) under reduced pressure and add chloroform (60 cc). Wash the solution in turn with dilute sulfuric acid (25 cc), saturated potassium bicarbonate solution, and brine; dry and evaporate the solvent. The product (0.8 g) is the adduct    2-(6-m-acetoxyphenyl-3-oxohexyl)-2-methyl-

24

cyclopentane-1,3-dione in admixture with some of the corresponding free phenol; infrared absorption: 2.86 to 3.08 (broad low-intensity band), 5.71, 5.81, 5.85, and 8.26 $\mu$.

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

## EXAMPLE 33

### 2-(6-m-Hydroxyphenyl-3-oxohexyl)-2-n-propylcyclopentane-1,3-dione

Heat together 2-n-propylcyclopentane-1.3-dione (13 g), 1-diethylamino-6-m-hydorxyphenylhexan-3-one and 0.12% methanolic potassium hydroxide solution (38 cc) under gentle reflux for 12 hours. Isolate the product to obtain the Michael adduct, 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-n-propylcyclopentane-1,3-dione as a bwown gum (7.18 g).

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

## EXAMPLE 34

### 2-[6-(3,4-Dimethoxyphenyl)-3-oxohexyl]-2-ethylcyclopentane-1,3-dione

Reflux    6-(3,4-dimethoxyphenyl)hex-1-en-3-one, containing a small amount of 6-(3,4-dimethoxyphenyl)-1-diethylaminohexan-3-one (6 g, produced by slow distillation of the latter substance) with 2-ethylcyclopentane-1,3-dione (3.5 g) in 0.12% anhydrous methanolic potassium hydroxide (10 cc) for 10 hours. Remove most of the methanol under reduced pressure, add benzene (25 cc) and ether (25 cc) and wash the solution with water, dilute aqueous potassium hydroxide, dilute hydrochloric acid and water. Dry and evaporate the solvent to give the triketone adduct 2-[6-(3,4-dimethoxyphenyl)-3-oxohexyl]-2-ethylcyclopentane-1,3-dione; infrared absorption (gum) 5.80, 6.25 $\mu$ (split peak).

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

## EXAMPLE 35

### 2-[6-(3,5-Dimethoxyphenyl)-3-oxohexyl]-2-ethylcyclopentane-1,3-dione

Reflux    6-(3,5-dimethoxyphenyl)hex-1-en-3-one, containing a small amount of 6-(3,5-dimethoxyphenyl)-1-diethylaminohexan-3-one (6 g, produced by slow distillation of the latter substance) with 2-ethylcyclopentane-1,3-dione (3.5 g) in 0.12% anhydrous methanolic potassium hydroxide (10 cc) for 10 hours. Work up the reaction mixture as for the preparation of 2-(6-m-acetoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione to obtain 2-[6-(3,5-dimethoxyphenyl)-3-oxohexyl]-2-ethylcyclopentane-1,3-dione as a viscous gum; infrared absorption peaks at 5.80, 6.25 $\mu$ (split peak).

This compound is useful as an intermediate for preparing the novel compositions of this invention having hormonal activity.

3,959,322

**25**

## EXAMPLE 36

### Diethyl 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methyl-3-oxoadipate

Stir a mixture of diethyl 2-methyl-3-oxoadipate (2.3 g, b.p. 111°–112°C/0.2 mm), prepared from 2-methylacetoacetic ester and ethoxycarbonylpropionyl chloride by the method of Cardwell, J. Chem. Soc., 1949, 715, and the methiodide of 1-diethylamino-6-m-methoxyphenylhexan-3-one (4.6 g) in benzene (20 cc) in an ice bath and add a solution of potassium (0.4 g) in ethanol (10 cc) dropwise over one hour. After stirring for a further 4 hours add ether (50 cc) and evaporate the washed and dried ether extracts. Heat the residue at 160°C and 0.2 mm pressure to remove unchanged starting materials. The residual gum is diethyl 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methyl-3-oxoadipate (2.7 g); infrared absorption peaks at 5.78, 5.88, 6.25, 12.82, 14.49 $\mu$.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 37

### 13$\beta$-Methyl-3-methoxy-D-homogona-1,3,5(10),8,14-pentaen-17a-one

Reflux the dicyclic triketone 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclohexane-1,3-dione (2 g) for 2 hours in benzene (35 cc) containing anhydrous toluene-p-sulfonic acid (1 g) using a Dean-Stark trap to remove the water formed. The worked-up product is a solid which one recrystallizes from light petroleum (b.p. 60°–80°) and from methanol to give the diene 13$\beta$-methyl-3-methoxy-D-homogona-1,3,5(10),8,14-pentaen-17a-one (0.5 g), m.p. 135°–137°C; ultraviolet absorption peak at 310 m$\mu$ ($\epsilon$30,000).

$C_{20}H_{22}O_2$ Calculated: C, 81.6%; H, 7.5% Found: C, 81.45%; H, 7.7%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 38

### 13$\beta$-Methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Dissolve the triketone 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione (6.7 g), in dry benzene (100 cc) containing anhydrous toluene-p-sulfonic acid (2.4 g). Reflux the mixture using a Dean-Stark water separator until the equivalent of two molecular proportions of water (0.99 cc) is collected (30 minutes), indicating a double cyclodehydration. Cool and wash to remove acid, and dry. Evaporate the dried solution to obtain a red gum. Distil the gum under reduced pressure (bath temperature 210°, 0.5 mm). Recrystallize the solidified distillate from methanol, giving 13$\beta$-methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (3.9 g), m.p. 115°–116°; ultraviolet absorption peak at 313 m$\mu$ ($\epsilon$35,100). The light absorption is in agreement with the structure assigned.

$C_{18}H_{20}O_2$ Calculated: C, 81.4%; H, 7.2% Found: C, 81.1%; H, 7.0%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

**26**

## EXAMPLE 39

### 13$\epsilon$-Methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Add the crude methiodide of 1-diethylamino-6-m-methoxyphenylhexan-3-one (2.5 g) in methanol (10 cc) ice-cold to a solution obtained by adding 2-methylcyclopentane-1,3-dione (0.5 g) to an ice-cold solution of sodium (0.21 g) in methanol (10 cc). Allow the reaction mixture to warm to room temperature and leave for 16 hours, after which add N hydrochloric acid (10 cc) and saturated brine (100 cc), ether-extracting the washed and dried extracts to obtain crude 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione as a gum; dissolve in benzene (25 cc) containing toluene-p-sulfonic acid (0.4 g) and reflux the mixture for one hour. Cool, add ether (25 cc), and wash, dry, and evaporate the solution. Take up the resulting gum in benzene (5 cc) and adsorb on a column of Fuller's earth (100 g). Elute with a mixture of benzene and light petroleum to obtain a series of fractions, one of which crystallizes (0.04 g). Boil this fraction with methanol and decant the solution from insoluble oil which forms. Reduce the solution in bulk by evaporation, depositing crystals on cooling; recrystallize from methanol to obtain 13$\beta$-methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one, m.p. 111°–113°C; ultraviolet absorption peak at 312 m$\mu$ ($\epsilon$34,800).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 40

### 13$\beta$-Methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

To 2-(6-m-methoxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione (3 g) in benzene (100 cc) add polyphosphoric acid (from orthophosphoric acid, 15 g. and phosphorus pentoxide, 6 g.) and heat the mixture at 90° for 4 minutes under such reduced pressure as the need to control frothing will allow. Cool, add water, and extract the mixture with ether and ethyl acetate; isolate the product from the resulting solution to obtain the colorless crystalline 13$\beta$-methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (2 g), b.p. 115°–116°; ultraviolet absorption peak at 313 m$\mu$ ($\epsilon$35,100).

To prepare 13$\beta$-(3-hydroxypropyl)-3-methoxygona-1,3,5(10),8,14-pentaen-17-one treat 2-(6-m-methoxyphenyl-3-oxohexyl)-2-(3-hydroxypropyl)cyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

To prepare 13$\beta$-phenethyl-3-propoxygona-1,3,5(10),8,14-pentaen-17-one treat 2-(6-m-propoxyphenyl-3-oxohexyl)-2-phenethylcyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

To prepare 13$\beta$-isobutyl-3-pentyloxygona-1,3,5(10),8,14-pentaen-17-one treat 2-(6-m-pentyloxyphenyl-3-oxohexyl)-2-isobutylcyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

To prepare 13$\beta$-(3-hydroxypropyl)-3-cyclopentyloxygona-1,3,5(10),8,14-pentaen-17-one treat 2-(6-m-cyclopentyloxyphenyl-3-oxohexyl)-2-(3-hydroxypropyl)cyclopentane-1,3-dione with polyphosphoric

3,959,322

## 27

acid according to the manipulative procedure described above.

To prepare 13β-phenethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one treat 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-phenethylcyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

To prepare 13β-(2-diethylaminoethyl)-2,3-dimethoxygona-1,3,5(10),8,14-pentaen-17-one treat 2-[6-(3,4-dimethoxyphenyl)-3-oxohexyl]-2-(2-diethylaminoethyl)cyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

To prepare 13β-(3-dimethylaminopropyl)-1,3-dimethoxy-6-methylgona-1,3,5(10),8,14-pentaen-17-one treat 2-[6-(3,5-dimethoxyphenyl)-3-oxoheptyl]-2-(3-dimethylaminopropyl)cyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

To prepare 13β-butyl-1,3-diethoxy-6-ethylgona-1,3,5(10),8,14-pentaen-17-one treat 2-[6-(3,5-diethoxyphenyl)-3-oxooctyl]-2-butycyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

To prepare 13β-propyl-2-ethoxy-3-methoxygona-1,3,5(10),8,14-pentaen-17-one treat 2-[6-(3-methoxy-4-ethoxyphenyl)-3-oxohexyl]-2-propylcyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

To prepare 13β,6-dimethyl-1,3-dimethoxygona-1,3,5(10),8,14-pentaen-17-one treat 2-[6-(3,5-dimethoxyphenyl)-3-oxoheptyl]-2-methylcyclopentane-1,3-dione with polyphosphoric acid according to the manipulative procedure described above.

These compounds have estrogenic activity, lower the blood lipid level, and are useful as intermediates in the preparation of the hormonal compounds of the invention.

### EXAMPLE 41

13β-Methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Heat the tricyclic diketone 5,6,7,8-tetrahydro-4-m-methoxyphenethyl-8-methylindanc-1,5-dione (0.25 g), under nitrogen at 60° with a mixture of orthophosphoric acid (5 cc, S.G. 1.8) and phosphorus pentoxide (3.25 g) for 20 minutes. Work up by means of ether to obtain a partially crystalline product which one takes up in benzene (10 cc) and filters. Recrystallize the residue to obtain the diene 13β-methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (0.6 g), m.p. 110°–112°C; ultraviolet absorption peaks at 310 mμ (ε37,200); infrared absorption peak at 5.78 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 42

13β-Ethyl-3-methoxy-D-homogona-1,3,5(10),8,14-pentaen-17a-one

Add 2-(6-m-methoxyphenyl-3-oxohexyl)-2-ethylcyclohexane-1,3-dione (32.8 g) in benzene (400 cc) to polyphosphoric acid (150 g) in an atmosphere of nitrogen and stir the mixture at 60 ° for 3 hours. Add water, separate thee benzene layer and wash with water until neutral. Dry the solution, remove the solvent, and recrystallize the residue from ethanol to obtain 13β-

## 28

ethyl-3-methoxy-D-homogona-1,3,5(10),8,14-pentaen-17a-one, m.p. 90°–92°; ultraviolet absorption peak at 311 mμ (ε28,500).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 43

13β-Ethyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Reflux the triketone 2-ethyl-2-(6-m-methoxyphenyl-3-oxohexyl)-cyclopentane-1,3-dione (7.1 g), in benzene (150 cc) and toluene-p-sulfonic acid (2 g) until the theoretical amount of water (0.72 cc) for double cyclodehydration has been collected in a Dean-Stark separator. Wash the cooled reaction mixture after removal of solvent under reduced pressure, b.p. ca. 220°/0.01 mm, to obtain an almost colorless glass (5.7 g). Crystallize the glass from methanol containing a little ethyl acetate to obtain pure 13β-ethyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (3.7 g), m.p. 77°–80°; ultraviolet absorption peak at 311 mμ (ε28,000).

$C_{20}H_{22}O_2$ Calculated: C, 81.6%; H, 7.5% Found: C, 81.3%; H, 6.3%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 44

13β-Propyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Condense 2-propylcyclopentane-1,3-dione (13.1 g) in 0.12% methanolic potassium hydroxide solution (90 cc) with 6-m-methoxyphenylhex-1-en-3-one (19.0 g), to obtain crude 2-n-propyl-2-(6-m-methoxyphenyl-3-oxohexyl)cyclopentane-1,3-dione (25.5 g). Submit this Michael condensation product (23.4 g) to double cyclodehydration by heating with toluene-p-sulfonic acid, and distil the product at 200°/10⁻⁴ mm; crystallize the distillate from ethanol to obtain the tetracyclic diene ketone 13β-propyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one, m.p. 82°–84°; ultraviolet absorption peak at 310 mμ (ε24,700).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 45

13β-Isopropyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Reflux the triketone 2-isopropyl-2-(6-m-methoxyphenyl-3-oxohexyl)cyclopentane-1,3-dione (7.2 g) in benzene (150 cc) and toluene-p-sulfonic acid (2 g) until the theoretical amount of water (0.72 cc) for double cyclodehydration has been collected in a Dean-Stark trap. Wash the cooled reaction mixture to remove acid and dry. Remove the solvent to obtain a gum. Distil the gum to obtain a glass (5 g), which one crystallizes from methanol to obtain pure 13β-isopropyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (4.5 g), m.p. 112°–113°.

$C_{21}H_{24}O_2$ Calculated: C, 81.8%, H, 7.8% Found: C, 81.8%; H, 7.6%

3,959,322

**29**

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 46

13$\beta$-Butyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Condense n-butylcyclopentane-1,3-dione (2.8 g) in 0.12% methanolic potassium hydroxide solution (8 cc) with 6-m-methoxyphenylhex-1-en-3-one (5 g) by heating the mixture at 80° for 10 hours. Evaporate the solvent under reduced pressure and heat the residue with toluene-p-sulfonic acid (2 g) in benzene (50 cc) for 45 minutes using a Dean-Stark trap to effect double cyclodehydration. Add ether to the cooled reaction mixture, and evaporate the washed and solution; recrystallize ether solution; recrystallize the residue from ethanol to obtain 13$\beta$-butyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (1.9 g), m.p. 53°–55°; ultraviolet absorption peak at 312 m$\mu$ ($\epsilon$29,200).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 47

13$\beta$-isobutyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Reflux a mixture of crude 2-(6-m-methoxyphenyl-3-oxohexyl)-2-isobutyl-1,3-cyclopentanedione (154.9 g) and anhydrous p-toluene-sulfonic acid (177 g) in 5.2 liters of dry benzene for 3 hours using a Dean-Stark water separator. After cooling, filter the solution, wash, dry, and concentrate to 1/3 of its volume. Then filter through charcoal (Carco, 310 g). Distil the filtrate to obtain a viscous oil, b.p. 283° (bath temperature), 0.01 mm. Recrystallize from methanol-acetone to get 13$\beta$-isobutyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one, m.p. 57°–60°; ultraviolet absorption peak at 312 m$\mu$ ($\epsilon$25,200).

$C_{22}H_{26}O_2$ Calculated: C, 81.9%; H, 8.1% Found : C, 81.6%; H, 8.1%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 48

13$\beta$-Cetyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one

Reflux a mixture of 2-cetylcyclopentane-1,3-dione (10.1 g), 6-m-methoxyphenylhex-1-en-3-one (6.0 g) and 0.02% methanolic potassium hydroxide solution (120 cc) for 26 hours and then cool. Dissolve the residue obtained after removal of solvent under reduced pressure in a mixture of benzene (50 cc) and ether (50 cc), and wash the solution in turn with sodium carbonate solution, 10% aqueous sulfuric acid and water. Remove the solvent by evaporation under reduced pressure to obtain as residue crude 2-cetyl-2-(6-m-methoxyphenyl-3-oxohexyl)-1,3-cyclopentanedione (11.4 g).

Add a solution of this Michael condensate in dry benzene (80 cc) to a mixture of anhydrous toluene-p-sulfonic acid (2.4 g) and dry benzene (80 cc) and reflux the mixture for one hour, using a Dean-Stark water separator, until the equivalent of 2 moles of water (0.75 cc) has been collected. Wash the cooled solution,

**30**

dry, and remove the solvent, leaving a purple oil (10.2 g) which one then distils at about 220°/0.001 mm. Recrystallize the solidified distillate from acetonitrile, to obtain 13$\beta$-cetyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one, m.p. 55°–56°C; ultraviolet absorption peak at 316 m$\mu$ ($\epsilon$24,000).

$C_{34}H_{50}O_2$ Calculated: C, 83.2%; H, 10.3% Found: C, 83.3%; H, 10.3%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 49

13$\beta$-Ethyl-3-methoxy-6-methylgona-1,3,5(10),8,14-pentaen-17-one

Reflux 2-(6-m-methoxyphenyl-3-oxoheptyl)-2-ethyl-cyclopentane-1,3-dione (14 g) with anhydrous toluene-p-sulfonic acid (4 g) in benzene (50 cc) with continuous water separation for 20 minutes. Wash the cooled solution with water, dry, and evaporate the solvent. Distil the residual red gum to obtain 13$\beta$-ethyl-3-methoxy-6-methylgona-1,3,5(10),8,14-pentaen-17-one as a gum; ultraviolet absorption peak at 315 m$\mu$ ($\epsilon$21,000); infrared absorption peak at 5.75 $\mu$.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 50

13$\beta$-Ethyl-3-methoxy-7-methylgona-1,3,5(10),8,14-pentaen-17-one

Dissolve the crude triketone 2-ethyl-2-(6-m-methoxyphenyl-5-methyl-3-oxohexyl)cyclopentane-1,3-dione (3 g) in benzene (50 cc) containing anhydrous toluene-p-sulfonic acid (1.5 g) and reflux the mixture with continuous water separation for 45 minutes. Dilute the cooled solution with ether, and wash with water; dry and evaporate. Distil the red residue at 230° (bath temperature) at 0.02 mm to give 13$\beta$-ethyl-3-methoxy-7-methylgona-1,3,5(10),8,14-pentaen-17-one; infrared absorption peak at 5.78 $\mu$; ultraviolet absorption peak at 310 m$\mu$ ($\epsilon$25,000).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 51

13$\beta$-Methyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one

Reflux 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione (0.5 g), the product of Michael condensation of 2-methylcyclopentane-1,3-dione with 6-m-hydroxyphenyl-1-diethylaminohexan-3-one, for 50 minutes in benzene(30 cc) containing toluene-p-sulfonic acid (0.3 g) using a Dean-Stark trap. Add ether (80 cc) to the cooled product and filter off the resulting insoluble material. Wash the ethereal solution in turn with water, saturated aqueous potassium bicarbonate, and brine, and dry. The product is a deep green gum which one takes up in a small quantity of ether; precipitate the insoluble impurities by the addition of light petroleum and filter off. Evaporate the resulting solution to obtain a crystalline residue, which one takes up in a mixture of benzene (10 cc) and ether (2 cc); adsorb the solution on an activated Fuller's earth (10 g). Elute with benzene to obtain 13$\beta$-methyl-

3,959,322

31

3-hydroxygona-1,3,5(10),8,14-pentaen-17-one (0.19 g), m.p. 225° (decomp.).

$C_{18}H_{18}O_2$ Calculated: C, 81.2%; H, 6.8% Found: C, 80.7%; H, 7.0%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 52

13β-Methyl-3-hydroxy-1,3,5(10),8,14-pentaen-17-one

Allow 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-methyl-cyclopentane-1,3-dione (0.8 g)to stand for 90 minutes at room temperature in benzene (80 cc) containing anhydrous toluene-p-sulfonic acid (5 g). Wash the product with water, followed by aqueous bicarbonate solution, and dry. Remove the solvent by evaporation to obtain a deep green gum; ultraviolet absorption peak at 313 mμ (13,000). When this gum is seeded it becomes solid. Take up the crude material in benzene (15 cc) and absorb the solution on an activated Fuller's earth (30 g); elute with benzene to obtain pale yellow 13β-methyl-3-hydroxy-gona-1,3,5(10),8,14-pentaen-17-one (0.6 g).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of the invention.

### EXAMPLE 53

13β-Methyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one

Reflux 2-(6-m-acetoxyphenyl-3-oxohexyl)-2-methyl-cyclopentane-1,3-dione (0.8 g, the product of Michael condensation of 2-methylcyclopentanedione and a mixture of 6-m-acetoxyphenyl-1-diethylaminohexan-3-one and 6-m-acetoxyphenylhex-1-en-3-one, and containing some of the corresponding free phenolic compound) in benzene (25 cc) with toluene-p-sulfonic acid (0.3 g) for 50 minutes. On cooling add ether (50 cc) and wash the mixture in turn with water, saturated aqueous potassium bicarbonate, and brine; dry over anhydrous magnesium sulfate. The residue after removal of solvent is a purple gum (0.6 g), part of which can be induced to crystallize. Dissolve a portion (0.45 g) of this gum in benzene and adsorb on an activated Fuller's earth (40 g); elute with benzene to obtain 13β-methyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one, which one recrystallizes from diisopropyl ether, m.p. 225°–226°; ultraviolet absorption peak at 312.5 mμ (ε23,000); infrared absorption peaks at 2.99 μ, 5.81 μ, and 8.00μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 54

13β-Methyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one

Place 300 g. of warm polyphosphoric acid in a 1 liter flask fitted with dropping funnel, stirrer and thermometer. Add crude 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-methylcyclopentane-1,3-dione Michael adduct (28.3 g), dissolved by warming in dry benzene (70 cc) dropwise with stirring during 45 minutes to the acid at 40°–50°. Stir the mixture for a further 45 minutes by which time it becomes a very deep red. Add crushed

32

ice with vigorous stirring and extract the resulting mixture with ether (3 × 250 cc). A small quantity of black tar remains insoluble in either phase. Wash the combined extracts with saturated KHCO₃ and brine, and then dry (MgSO₄). Remove the solvent on the rotary evaporator (temperature not greater than 40°) to obtain a bright yellow crystalline solid. Wash by decantation with cold 20% ethyl acetate 60°–80° petroleum ether (20 cc), filter and dry to obtain crude 13β-methyl-3-hydroxy-gona-1,3,5(10),8,14-pentaen-17-one (19.35 g., 77%), m.p. 160°–162° (dec.); ultraviolet absorption peak at 312 mμ, (ε22,200).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 55

13β-Methyl-3-acetoxygona-1,3,5(10),8,14-pentaen-17-one

Mix 13β-methyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17one with pyridine (3 cc) and acetic anhydride (1 cc) and keep at room temperature for 4 hours. Add ethanol (1 cc) and remove low-boiling material under reduced pressure (0.1 mm) to leave a red gum which crystallizes from a mixture of ethyl acetate and light petroleum. Recrystallize from methanol to obtain crystals of 13β-methyl-3-acetoxygona-1,3,5(10),8,14-pentaen-17-one, melting partially at 161°–166° with resolidification at about 220° and finally melting at 260°–265° (decomp.); infrared absorption peaks at 5.75 μ and 8.27 μ, with absence of an absorption band due to a hydroxy group; ultraviolet absorption peak at 307.5 mμ (ε24,000).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 56

13β-Ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one

Reflux 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-ethyl-cyclopentane-1,3-dione (2.6 g) for 30 minutes in benzene (70 cc) containing toluene-p-sulfonic acid (0.38 g), and collect water evolved in the cyclodehydration in a Dean-Stark separator. Work up to obtain a green gum which one dissolves in benzene (30 cc); adsorb the benzene solution on a column of activated Fuller's earth, and elute with benzene to obtain crude 13β-ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one (0.75 g), as pale yellow crystals, m.p. 153°–156°; ultraviolet absorption peak at 313.5 mμ (ε30,300); infrared absorption peaks at 3.99 μ and 5.81 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 57

13β-Ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one

Allow 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-ethylcyclopentane-1,3-dione (8.8 g) to stand 24 hours at room temperature in solution benzene (430 cc) containing anhydrous toluene-p-sulfonic acid (20 g). Work up the product to obtain a deep red and green gum; take up in benzene (50 cc) and adsorb activated Fuller's earth (300 g). Elute with benzene to obtain pale green crys-

**33** **34**

tals of crude 13β-ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one (2.05 g) m.p. 149°–151°, the substance melting to a clear liquid on rapid heating; ultraviolet absorption peak at 314 mµ ($\epsilon$30,000).

This compound has estrogenic activity, lowers the blood lipid level and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 58

13β-Ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one

Add 2-(6-m-hydroxyphenyl-3-oxohexyl)-2-ethylcyclopentane-1,3-dione (28.3 g) in benzene (70 cc) during 45 minutes to polyphosphoric acid (300 g) containing 80% phosphorus pentoxide, and maintain at 40°–50°, with stirring. Stir the reaction mixture for a further 45 minutes during which it develops a deep red coloration. Add crushed ice and extract the product with ether. Evaporate the washed and dried extracts at a temperature not greater than 40° to obtain a bright yellow crystalline solid; wash by decantation with light petroleum containing a small proportion of ether; filter and dry to obtain 13β-ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one (19.35 g), m.p. 160°–162°; ultraviolet absorption peak at 312 mµ ($\epsilon$22,200).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 59

13β-Ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one

Add a solution of 2-(6-m-acetoxyphenyl-3-oxohexyl(-2-ethyl-cyclopentane-1,3-dione (18.0 g) in benzene (40 cc) during 1½ hours to stirred polyphosphoric acid (180 g., containing 80% phosphorus pentoxide) and maintain at 40°–42°. Keep the reaction mixture at this temperature for a further hour with occasional shaking, add ice and water, and extract the product with ether. Evaporate the washed and dried extracts under reduced pressure to obtain a crude solid product (13.4 g), containing 13β-ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one and its 3-acetate in a proportion indicated by spectroscopic analysis to be 7:3; ultraviolet absorption peak at 312 mµ ($\epsilon$12,700).

This 3-hydroxy compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 60

13β-Ethyl-3-acetoxygona-1,3,5(10),8,14-pentaen-17-one

Dissolve 13β-ethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one (2.45 g) in pyridine (7 cc) and acetic anhydride (4 cc) and allow to stand at room temperature for 16 hours. Remove the solvent under reduced pressure, add ethanol (20 cc) and again evaporate the solvent. Recrystallize the residue from ethanol to give a red crystalline solid, m.p. 122°–124°. Filter the solid through 'Florisil' (100 g) with benzene, evaporate the solvent and recrystallize the product from ethanol to obtain 13β-ethyl-3-acetoxygona-1,3,5(10),8,14-pentaen-17-one, m.p. 129°–130°C; ultraviolet absorption

peak at 306 mµ ($\epsilon$25,500), infrared absorption peaks at 5.78 µ, 8.27 µ, and 9.85 µ.

$C_{21}H_{22}O_3$ Calculated: C, 78.25%; H, 6.9% Found: C, 78.4%; H, 6.65%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 61

13β-Propyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one

Cyclodehydrate 2(6-m-hydroxyphenyl-3-oxohexyl)-2-n-propylcyclopentane-1,3-dione (7.18 g) by heating in benzene (210 cc) containing toluene-p-sulfonic acid (0.75 g), to obtain a deep green gum (6.4 g); chromatograph in benzene on a column of activated Fuller's earth, to give a yellow gum. Crystallize from ethanol, and then from a mixture of benzene and light petroleum to obtain 13β-propyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one (0.59 g), m.p. 149°–155° with some premelting at 135°–138°; ultraviolet peak at 313 mµ ($\epsilon$27,000).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 62

13β-Ethyl-2,3-dimethoxygona-1,3,5(10),8,14-pentaen-17-one

Dissolve the crude triketone 2-[6-(3,4-dimethoxyphenyl)-3-oxohexyl]-2-ethylcyclopentane-1,3-dione (6.5 g) in dry benzene (100 cc) containing anhydrous toluene-p-sulfonic acid (2.4 g) and reflux under a Dean-Stark water separator for 45 minutes. Wash the cooled solution with water, sodium carbonate solution, and water, and dry. Evaporate the solvent and distil the red gummy residue at 220° (bath temperature) 0.01 mm. to give a yellow gum; recrystallize from methanol to obtain 13β-ethyl-2,3-dimethoxygona-1,3,5(10),8,14-pentaen-17-one; ultraviolet absorption peak at 314 mµ ($\epsilon$29,000); infrared absorption peaks at 5.84 µ and 8.00 µ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 63

13β-Ethyl-1,3-dimethoxygona-1,3,5(10),8,14-pentaen-17-one

Using the triketone 2-[6-(3,5-dimethoxyphenyl)-3-oxohexyl]-2-ethylcyclopentane-1,3-dione (6.5 g), proceed exactly as described in the preceeding example to obtain 13β-ethyl-1,3-dimethoxygona-1,3,5(10),8,14-pentaen-17-one; infrared absorption peaks at 5.74 µ and 8.00 µ. This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 64

13β-Methyl-3-methoxy-D-homogona-1,3,5(10),8-tetraen-17a-one

To 13β-methyl-3-methoxy-D-homogona-1,3,5(10),8,14-pentaen-17-one (0.3 g) in dioxan (20 cc) add a moderately active Raney nickel catalyst (ca. 0.2 g). Hydrogenate at room temperature and atmo-

3,959,322

35

spheric pressure until 24 cc. hydrogen has been absorbed. Filter off the catalyst and evaporate the filtrate to obtain a solid; recrystallize from a mixture of ethanol and ethyl acetate to obtain the title product (0.15 g), m.p. 120°–150°C. Ultraviolet absorption peak at 275 m$\mu$ ($\epsilon$14,000).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 65

13$\beta$-Methyl-3-methoxygona-1,3,5(10),8-tetraen-17-one

Dissolve 13$\beta$-methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (1 g) in dioxan (33 cc). To the solution add Raney nickel catalyst (ca. 0.5 g) which has been prepared by the method of Pavlic and Adkins, J. Amer. Chem. Soc., 1946, 68, 1471 and allow to stand for 24 hours. Hydrogenate at room temperature and pressure until the theoretical amount of hydrogen (92 cc) for saturation of one ethylenic linkage has been absorbed. Towards the end of this period (5 hours) the rate of hydrogenation drops markedly. Evaporate the solvent after removal of catalyst to obtain a gum which readily crystallizes. Recrystallize once from ethanol to obtain the crude title product (0.69 g), m.p. 110°–120°; ultraviolet absorption peak at 278 m$\mu$ ($\epsilon$14,700).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 66

13$\beta$-Methyl-3-methoxygona-1,3,5(10),8-tetraen-17-one

Shake 13$\beta$-methyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (1 g) in benzene (35 cc) with a 10% palladium on barium sulfate catalyst (0.3 g) in the presence of hydrogen at atmospheric pressure until 90 cc hydrogen has been absorbed. By the end of this period (1-1/2 hours) the rate of hydrogenation will have slowed down. Filter the mixture and evaporate the solvent to obtain a gum which solidifies; recrystallize from ethanol to obtain the title product (0.68 g), m.p. 110°–120°; ultraviolet absorption peak at 278 m$\mu$ ($\epsilon$13,200).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 67

13$\beta$-Ethyl-3-methoxy-D-homogona-1,3,5(10),8-tetraen-17a-one

Shake 13$\beta$-ethyl-3-methoxy-D-homogona-1,3,5(10),8,14-pentaen-17a-one (1.175 g) in tetrahydrofuran (100 cc) with 2% palladium on calcium carbonate (0.5 g., prereduced) in an atmosphere of hydrogen until one molecular equivalent of hydrogen has been absorbed. Filter the catalyst; evaporate the solvent, recrystallize the residue from ethanol to obtain the title product (0.925 g), m.p. 104°–107°; ultraviolet absorption peak at 278 m$\mu$ ($\epsilon$15,680).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

36

EXAMPLE 68

13$\beta$-Ethyl-3-methoxygona-1,3,5(10),8-tetraen-17-one

Dissolve 13$\beta$-ethyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (2 g) in dioxan (50 cc) containing Raney nickel (ca. 0.5 g) of moderate activity and shake with hydrogen until 160 cc., the amount corresponding to one molecular proportion has been absorbed. Recrystallize the isolated product from methanol to obtain the title product (1.2 g), m.p. 110°–125°; ultraviolet absorption peak at 280 m$\mu$ ($\epsilon$13,200).

This compond has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 69

13$\beta$-Propyl-3-methoxygona-1,3,5(10),8-tetraen-17-one

Condense 2-propyl-1,3-cyclopentanedione (13.1 g) in 0.12% methanolic potassium hydroxide solution (90 cc) with 6-m-methoxyphenylhex-1-en-3-one (19.0 g), to obtain crude 2-propyl-2-(6-m-methoxyphenyl-3-oxohexyl)cyclopentane-1,3-dione (25.5 g). Submit this Michael condensation product (23.4 g) to double cyclodehydration; distil the product at 200°/10⁻⁴ mm. and crystallize the distillate from ethanol, to obtain the tetracyclic diene ketone, m.p. 82°–84°; ultraviolet absorption peak at 310 m$\mu$ ($\epsilon$24,700).

Selectively hydrogenate the diene ketone (5 g) in benzene solution with a palladium on calcium carbonate catalyst until sufficient hydrogen has been taken up to saturate the 14,15-ethylenic bond. Isolate the product (3.5 g) as pink crystals from methanol, m.p. 111°–113°.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 70

13$\beta$-Isopropyl-3-methoxygona-1,3,5(10),8-tetraen-17-one

Shake 13$\beta$-isopropyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (2 g) in dioxan (50 cc) with a freshly prepared but moderately active Raney nickel catalyst (ca. 0.5 g) in hydrogen at atmospheric pressure. When, after several hours the theoretical amount of hydrogen for half-hydrogenation (160 cc) has been absorbed, filter off the nickel catalyst and remove the solvent by evaporation. Crystallize the residual gum from methanol to obtain the title product (1.2 g), m.p. 85°–100°C; ultraviolet absorption peak at 280 m$\mu$ ($\epsilon$11,800).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 71

13$\beta$-Butyl-3-methoxygona-1,3,5(10),8-tetraen-17-one

Condense 2-butyl-1,3-cyclopentanedione (2.8 g) in 0.12% methanolic potassium hydroxide solution (8 cc) with 6-m-methoxphenylhex-1-en-3-one (5 g) by heating the mixture at 80° for 10 hours. Evaporate the solvent under reduced pressure and heat the residue with toluene-p-sulfonic acid (2 g) in benzene (50 cc) for 45 minutes using a Dean-Stark trap, to effect double cyclodehydration. Add ether to the cooled reaction

3,959,322

| 37 | 38 |

mixture and evaporate the washed and dried ether solution; recrystallize the residue from ethanol to obtain the tetracyclic diene (1.9 g), m.p. 53°–55°; ultraviolet absorption peak at 312 m$\mu$ ($\epsilon$29,200).

Shake this tetracyclic diene (1.38 g) in benzene (45 cc) in hydrogen at atmospheric pressure with a previously reduced 2% palladium on calcium carbonate catalyst (0.5 g). When 100 cc. hydrogen has been absorbed discontinue the hydrogenation and filter off the catalyst. Evaporate solvent and recrystallize the residue from methanol to obtain the title product (1.02 g), m.p. 105°–108°; ultraviolet absorption peak at 278 m$\mu$ ($\epsilon$16,700).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 72

13$\beta$-Isobutyl-3-methoxygona-1,3,5(10),8-tetraen-17-one

To a pre-reduced suspension of 2% palladium on calcium carbonate catalyst (7.0 g) in benzene (30 cc) add a solution of 13$\beta$-isobutyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (20.0 g) in benzene (500 cc) and hydrogenate the mixture at atmospheric pressure until one mole equivalent of hydrogen is consumed. After the catalyst is removed by filtration, evaporate the solvent to obtain a gum which on crystallization from ethanol affords the title product (17.1 g.; 71%), m.p. 117°–119°; ultraviolet absorption peak at 278 m$\mu$ ($\epsilon$14,560).

To prepare 6,13$\beta$-dimethyl-3-methoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 6,13$\beta$-dimethyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 7,13$\beta$-dimethyl-3-methoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 7,13$\beta$-dimethyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-ethyl-1,3-dimethoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-ethyl-1,3-dimethoxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-ethyl-3-acetoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-ethyl-3-acetoxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-(3-hydroxypropyl)-3-methoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-(3-hydroxypropyl)-3-methoxygona-1,3,5(10),8,14-penta-en-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-ethyl-3-ethoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-ethyl-3-ethoxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-phenethyl-3-propoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-pheneth-yl-3-propoxygona-1,3,5(10),8-tetraen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-isobutyl-3-pentyloxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-isobutyl-3-pentyloxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-(3-hydroxypropyl)-3-cyclopentyloxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-(3-hydroxypropyl)-3-cyclopentyloxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-phenethyl-3-hydroxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-phenethyl-3-hydroxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-(2-dimethylaminoethyl)-2,3-dimethoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-(2-diethylaminoethyl)-2,3-dimethoxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-(3-dimethylaminopropyl)-1-methoxy-3-ethoxy-6-methylgona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-(3-dimethylaminopropyl)-1-methoxy-3-ethoxy-6-methylgona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

To prepare 13$\beta$-propyl-2-ethoxy-3-methoxygona-1,3,5(10),8-tetraen-17-one hydrogenate 13$\beta$-propyl-2-ethoxy-3-methoxygona-1,3,5(10),8,14-pentaen-17-one over a 2% palladium on calcium carbonate catalyst in benzene according to the manipulative procedure described above.

These compounds have estrogenic activity, lower the blood lipid level, and are useful as intermediates in the preparation of the hormonal compounds of the invention.

### EXAMPLE 73

13$\beta$-Cetyl-3-methoxygona-1,3,5(10),8-tetraen-17-one

Hydrogenate 13$\beta$-cetyl-3-methoxygona-1,3,5(10),8,14-pentaen-17-one (2.39 g) in benzene (140 cc) at atmospheric pressure with a previously reduced 2% palladium oxide on calcium carbonate catalyst (0.3 g) until one molecular equivalent of hydrogen has been absorbed. Remove the catalyst and evaporate to obtain a residue which on crystallizes from ethanol to obtain the title product (2.4 g), as colorless crystals, m.p. 54°–56°; ultraviolet absorption peak at 278 m$\mu$ ($\epsilon$11,500).

$C_{34}H_{52}O_2$ Calculated: C, 82.85%; H, 10.65%
Found: C, 82.75%; H, 10.75%

This compound has estrogenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

3,959,322

39                                         40

## EXAMPLE 74

13β-Methyl-3-hydroxygona-1,3,5(10),8-tetraen-
17-one

Hydrogenate                    13β-methyl-3-acetoxygona-
1,3,5(10),8,14-pentaen-17-one (0.05 g), obtained by
the acetylation of 13β-methyl-3-hydroxygona-
1,3,5(10),8,14-pentaen-17-one using pyridine and ace-
tic anhydride in benzene (15 cc) at atmospheric pres-
sure using a 10% palladized charcoal catalyst (0.025
g). Hydrogenation slows down markedly after the req-
uisite quantity of hydrogen for monohydrogenation has
been absorbed. Remove the catalyst by filtration and
evaporate the solvent to obtain as residue the crude
title product.

Immediately take the product up in methanol (4 cc),
add 3N sodium hydroxide solution (1 cc) and shake the
mixture for 20 minutes. Acidify and extract with ether
to obtain a product which one dissolves in benzene and
passes through a column of activated Fuller's earth.
Evaporate the resulting solution and recrystallize the
residue from methanol to obtain the title product, m.p.
225°–227°; ultraviolet absorption peak at 278 mμ
(ε15,300).

This compound has estrogenic activity, lowers the
blood lipid level, and is useful as an intermediate for
preparing the hormonal compounds of this invention.

## EXAMPLE 75

13β-Methyl-3-hydroxygona-1,3,5(10),8-tetraen-
17-one

Shake     13β-methyl-3-hydroxygona-1,3,5(10),8,14-
pentaen-17-one (0.05 g) in benzene (25 cc) in hydro-
gen at atmospheric pressure using a 10% palladized
charcoal catalyst (0.025 g). Hydrogenation becomes
very slow when 1.1 moles hydrogen has been absorbed.
Filter and evaporate to obtain the title product (0.035
g), recrystallize from methanol to get pale blue crystals,
m.p. 225°–228°, melting to a red liquid; ultraviolet
absorption peak at 280 mμ (ε12,000).

This compound has estrogenic activity, lowers the
blood lipid level, and is useful as an intermediate for
preparing the hormonal compounds of this invention.

## EXAMPLE 76

13β-Ethyl-3-hydroxygona-1,3,5(10),8-tetraen-17-one

Hydrogenate                    13β-ethyl-3-hydroxygona-
1,3,5(10),8,14-pentaen-17-one (0.5 g.) in benzene (25
cc.) at atmospheric pressure using a 10% palladized
charcoal catalyst (0.025 g.). After the absorption of 1.1
molar equivalents of hydrogen, hydrogenation be-
comes very slow; remove the catalyst by filtration and
evaporate the filtrate to obtain the title product which
crystallizes from methanol in colorless plates (0.35 g.),
m.p. 235°–9°; ultra-violet absorption peak at 280.5 mμ
(ε15,500).

This compound has estrogenic activity, lowers the
blood lipid level, and is useful as an intermediate for
preparing the hormonal compounds of this invention.

## EXAMPLE 77

13β-Ethyl-3-acetoxygona-1,3,5(10),8-tetraen-17-one

Hydrogenate                    13β-ethyl-3-acetoxygona-
1,3,5(10),8,14-pentaen-17-one (1.8 g.) dissolved in
benzene (25 ml.) at atmospheric pressure in the pres-
ence of 10% palladized charcoal (100 mg.). After 1.1
molar equivalents of hydrogen has been absorbed (ca.
12 hr.) filter off the catalyst, evaporate the filtrate
under reduced pressure and recrystallize the residue
from ethanol. Filter the red product through 'Florisil'
(60 g.) with benzene-petroleum (3:1), remove the sol-
vent and recrystallize the product from ethanol to ob-
tain the title product, m.p. 132.5°–134.5°; ultra-violet
absorption peak at 277 mμ (ε 12,800).

This compound has estrogenic activity, lowers the
blood lipid level, and is useful as an intermediate for
preparing the hormonal compounds of this invention.

## EXAMPLE 78

13β-Propyl-3-hydroxygona-1,3,5(10),8-tetraen-
17-one

Shake     13β-propyl-3-hydroxygona-1,3,5(10),8,14-
pentaen-17-one (0.59 g.) in benzene (30 cc.) with
hydrogen at atmospheric pressure in the presence of a
palladized charcoal catalyst (0.3 g.) until the requisite
amount of hydrogen for selective semihydrogenation
has been absorbed. Filter the catalyst and evaporate
the slvent to obtain a green crystalline material which
one recrystallizes from methanol to obtain the title
product (0.36 g.), m.p. 210°–20°, with much decompo-
sition to a red liquid; ultra-violet absorption peak at
281 mμ (ε 11,800).

This compound has estrogenic activity, lowers the
blood lipid level, and is useful as an intermediate for
preparing the hormonal compounds of this invention.

## EXAMPLE 79

13β-Methyl-3-acetoxygona-1,3,5(10),8-tetraen-
17-one

Hydrogenate                    13β-methyl-3-acetoxygona-
1,3,5(10),8,14-pentaen-17-one (0.05 g., obtained by
the acetylation of 13β-methyl-3-hydroxygona-
1,3,5(10),8,14-pentaen-17-one using pyridine and ace-
tic anhydride) in benzene (15 cc.) at atmospheric pres-
sure using a 10% palladized charcoal catalyst (0.025
g.). Hydrogenation slows down markedly after the req-
uisite quantity of hydrogen for monohydrogenation has
been adsorbed. Remove the catalyst by filtration and
evaporate the solvent, to obtain as residue the crude
title product.

This compound has estrogenic activity, lowers the
blood lipid level, and is useful as an intermediate for
preparing the hormonal compounds of this invention.

## EXAMPLE 80

13β-Methyl-3-methoxy-D-homogena-1,3,5(10),8-tet-
raen-17aβ-ol

Add       13β-methyl-3-methoxy-D-homogona-
1,3,5(10),8-tetraen-17a-one to sodium borohydride (7
g.) in methanol (400 cc.) and reflux for 30 minutes.
Acidify the mixture with 50% aqueous acetic and evap-
orate almost to dryness. Add water and extract the
product with ether. Wash, dry and evaporate the ethe-
real solution and crystallize the residue from ethanol to
obtain the title product, (19 g.), m.p. 83°–6°; ultra-vio-
let absorption peak at 278 mμ (ε 15,800); infrared
absorption peaks at 2.96 μ and 6.22 μ.

To      prepare      7,13β-dimethyl-3-methoxygona-
1,3,5(10),8-tetraen-17β-ol treat 7,13β-dimethyl-3-
methoxygona-1,3,5(10),8-tetraen-17-one with sodium
borohydride according to the manipulative procedure
described above.

3,959,322

41

To prepare 13β-methylgona-1,3,5(10),8-tetraene-3,17β-ol treat 13β-methyl-3-hydroxygona-1,3,5(10),8-tetraen-17-one with sodium borohydride according to the manipulative procedure described above.

To prepare 13β-ethyl-2,3-dimethoxygona-1,3,5(10),8-tetraen-17β-ol treat 13β-ethyl-2,3-dimethoxygona-1,3,5(10),8-tetraen-17-one with sodium borohydride according to the manipulative procedure described above.

To prepare 13β-ethyl-3-ethoxygona-1,3,5(10),8-tetraen-17β-ol treat 13β-ethyl-3-ethoxygona-1,3,5(10),8-tetraen-17-one with sodium borohydride according to the manipulative procedure described above.

To prepare 13β-isobutyl-3-pentyloxygona-1,3,5(10),8-tetraen-17β-ol treat 13β-isobutyl-3-pentyloxygona-1,3,5(10),8-tetraen-17-one with sodium borohydride according to the manipulative procedure described above.

To prepare 13β-(3-dimethylaminopropyl)-1,3-dimethoxygona-1,3,5(10),8-tetraen-17β-ol treat 13β-(3-dimethylaminopropyl)-1,3-dimethoxygona-1,3,5(10),8-tetraen-17-one with sodium borohydride according to the manipulative procedure described above.

These compounds have estrogenic activity, lower the blood lipid level, and are useful as intermediates in the preparation of the hormonal compounds of the invention.

### EXAMPLE 81

13β-Methyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol

Add sodium borohydride (0.5 g.) in ethanol (60 cc.) with stirring to 13-methyl-3-methoxygona-1,3,5(10),8-tetraen-17-one (2.0 g.) in ethanol (150 cc.) at 14°–15°. Leave the mixture at room temperature for 1 hour, acidify with glacial acetic acid and evaporate to dryness under reduced pressure. Treat the residue with water, ether-extract and wash and dry. Evaporate the extracts. Recrystallize the residue from a mixture of methanol (15 cc.) and water (3 cc.) to obtain the title product (0.90 g.), m.p. 110°–2°. A sample sublimes at 110°/10⁻⁴ mm. and has an ultra-violet absorption peak at 277 mμ (ε 14,500).

$C_{19}H_{24}O_2$ Calculated: C, 80.2%; H, 8.5% Found: C, 79.3%; H, 8.4%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 82

13β-Ethyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol

Hydrogenate 13β-ethyl-3-methoxygona-1,3,5(10),8,14-pentaen-17β-ol (0.31 g.) and recrystallize the product from hexane-ethyl acetate to obtain the title product; ultra-violet absorption peak at 280 mμ (ε 15,000).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 83

13β-Ethyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol

Add 13β-ethyl-3-methoxygona-1,3,5(10),8-tetraen-17-one (16.8 g.) to a solution of sodium borohydride (6 g.) in methanol (500 cc.), swirl the mixture which boils

42

spontaneously. When all the material has been added and the reaction has subsided, add acetic acid (15 cc.). Reduce the mixture in volume by evaporation of most of the solvent, add water and extract the product with ether. Evaporate the washed and dried extracts to obtain crude crystalline product (16.8 g.), m.p. 102°–5° on recrystallization from acetonitrile.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of the invention.

### EXAMPLE 84

13β-Ethyl-3-methoxy-D-homogona-1,3,5(10),8-tetraen-17aβ-ol

Reduce 13β-ethyl-3-methoxy-D-homogona-1,3,5(10),8-tetraen-17α-one (20.9 g.) exactly as described for the preparation of the 13β-methyl compound to obtain the title product (20 g.), m.p. 110°–112°; infrared absorption peaks at 2.96 μ and 6.23 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 85

13β-Propyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol

Hydrogenate 13β-propyl-3-methoxygona-1,3,5(10),8,14-pentaen-17β-ol (0.32 g.) and recrystallize the product from hexane-ethyl acetate to obtain the title product; ultra-violet absorption peak at 280mμ (ε15,000).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 86

13β-Propyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol

Add 13β-propyl-3-methoxygona-1,3,5(10),8-tetraen-17-one (3.5 g.) to a solution of sodium borohydride (1.16 g.) in methanol (120 cc.). Heat the reaction mixture to reflux with stirring for 30 minutes. Concentrate the resulting solution, adjust its pH to 6 with aqueous acetic acid and filter off the resulting white precipitate which is the title product, (3.1 g.), m.p. 134°–8°; ultra-violet absorption peak at 278 mμ (ε15,350); infrared showed a band due to hydroxyl but no ketone present.

$C_{21}H_{26}O_2$ Calculated: C, 80.7%; H, 9.0% Found: C, 80.5%; H, 9.0%

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 87

13β-Butyl-3-methoxygona-1,3,5(10),8-tetraen-17β-ol

Add sodium borohydride (12.1 g.) to 13β-butyl-3-methoxygona-1,3-5(10),8-tetraen-17-one (36.2 g.) in ethanol (1200 cc.) and reflux the mixture for 1 hour. On cooling, acidify the mixture with aqueous acetic acid and evaporate to dryness under reduced pressure. Add water to the residue and extract the product with ether. Work up in the usual manner to obtain a residue; recrystallize from hexane to obtain the 13-n-butyl-title product (26.9 g.) m.p. 90°–100°; ultraviolet absorption

3,959,322

43

peak at 279 m$\mu$ ($\epsilon$15,600); infrared absorption peak at 2.88 $\mu$, no absorption in the 5.71–5.88 region.

$C_{22}H_{30}O_2$ Calculated: C, 80.9%; H, 9.3% Found: C, 81.0%; H, 9.0%

This compound possesses estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 88

13$\beta$-Isobutyl-3-methoxygona-1,3,5(10),8-tetraen-17$\beta$-ol

To a stirred solution of sodium borohydride (6.0 g.) in methanol (500 cc. under nitrogen) add 13$\beta$-isobutyl-3-methoxygona-1,3,5(10),8-tetraen-17-one (17 g.). Gently heat the reaction mixture for one minute to initiate the reaction and then allow to stand for one hour at room temperature. After adding cautiously glacial acetic acid (20 cc.), concentrate the solution in vacuo to ⅓ of its volume followed by addition of water. Extract the product with ether. Wash the ethereal solution successively with water, sodium bicarbonate, and water, and dry. Evaporate the ether to obtain 13$\beta$-isobutyl-3-methoxygona-1,3,5(10),8-tetraen-17$\beta$-ol as a gum, (17.0 g.; 99%); ultraviolet absorption peak at 278 m$\mu$ ($\epsilon$14,560).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 89

13$\beta$-Cetyl-3-methoxygona-1,3,5(10),8-tetraen-17$\beta$-ol

Stir a solution of 13$\beta$-cetyl-3-methoxygona-1,3,5(10),8-tetraen-17-one (0.60 g.) and sodium borohydride (0.20 g.) in ethanol (110 cc.) for 2 hours and leave overnight. Reflux with stirring for 2 hours, cool, and add an excess of 50% aqueous acetic acid. Evaporate the mixture to dryness under reduced pressure and partition the residue between ether and water. Work up in the usual manner to get an ether solution of the title product as a gum; infrared absorption peak at 3.37 $\mu$ (hydroxyl) with no band in the 5.71–5.88 m$\mu$ region; ultraviolet absorption peak at 278 m$\mu$.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 90

13$\beta$-Ethylgona-1,3,5(10),8-tetraene-3,17$\beta$-diol

Shake 13$\beta$-ethylgona-1,3,5(10),8,14-tetraene-3,17$\beta$-diol (0.28 g.) in benzene (35 cc.) with 10% palladised charcoal (300 mg.) in an atmosphere of hydrogen until 25 cc. of hydrogen has been absorbed. Filter off the catalyst, evaporate the solvent and recrystallize the residue from methanol to obtain the title product, m.p. 234°–8°; ultraviolet absorption peak at 280 m$\mu$ ($\epsilon$ 41,200).

This compound has estrogenic activity, lowers the blood lipid level and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 91

13$\beta$-Propylgona-1,3,5(10),8-tetraene-3,17$\beta$-diol

Hydrogenate 13$\beta$-propylgona-1,3,5(10),8,14-pentaene-3,17$\beta$-diol (0.31 g.) exactly as described in the previous example to obtain the title product, m.p.

44

210°–218°; ultraviolet absorption peak at 280 m$\mu$ ($\epsilon$12,000).

This compound possesses estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 92

13$\beta$-Ethyl-3,17$\beta$-dimethoxygona-1,3,5(10),8-tetraene

Shake 13$\beta$-ethyl-3,17$\beta$-dimethoxygona-1,3,5(10),8,14-pentaene (1 g.) in benzene (50 cc.) with 2% palladium on calcium carbonate (0.5 g.) in an atmosphere of hydrogen until 1 molar equivalent of hydrogen (85cc.) has been absorbed. Filter the catalyst and evaporate the solvent to obtain the title product, m.p. 94°–7°; ultraviolet absorption peak at 278 m$\mu$ ($\epsilon$16,400.).

This compound possesses estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 93

13$\beta$-Ethyl-3-methoxy-17,17-ethylenedioxygona-1,3,5(10),8tetraene

Hydrogenate 13$\beta$-ethyl-3-methoxy-17,17-ethylenedioxygona-1,3,5(10),8,14-pentaene (2.0 g.) in benzene 70 cc.) at atmospheric pressure using a 5% palladium on calcium carbonate catalyst (0.70 g.). Uptake of hydrogen ceases after 150 cc. has been absorbed. Isolate the product and recrystallize from 95% ethanol to obtain the title product (1.3 g.), m.p. 135°–137°; ultraviolet absorption peak at 2.78 m$\mu$ (15,100).

$C_{22}H_{28}O_3$ Calculated: C, 77.6%; H, 8.3% Found: C, 77.5% H, 8.6%

This compound possesses estrogenic activity and blood lipid lowering activity, and is useful as an intermediate for preparing the hormonal compounds of this invention.

To prepare 6, 13$\beta$-dimethyl-3-methoxy-17,17-ethylenedioxygona-1,3,5(10),8-tetraene hydrogenate 6,13$\beta$-dimethyl-3-methoxy-17,17-ethylenedioxygona-1,3,5-(10), 8,14-pentaene using a 5% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To prepare 13$\beta$-ethyl-1,3-dimethoxy-17,17-ethylenedioxygona-1,3,5-(10),8-tetraene hydrogenate 13$\beta$-ethyl-1,3-dimethoxy-17,17-ethylenedioxygona-1,3,5-(10),8,14-pentaene using a 5% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To prepare 13$\beta$-phenethyl-3-propoxy-17,17-ethylenedioxygona-1,3,5(10),8-tetraene hydrogenate 13$\beta$-phenethyl-3-propoxy-17,17-ethylenedioxygona-1,3,5(10),8,14-pentaene using a 5% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To prepare 13$\beta$-(3-hydroxypropyl)-3-cyclopentyloxy-17,17-ethylenedioxygona-1,3,5(10),8-tetraene hydrogenate 13$\beta$-(3-hydroxypropyl)-3-cyclopentyloxy-17,17-ethylenedioxygona-1,3,5(10),8,14-pentaene using a 5% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

These compounds possess estrogenic and blood lipid lowering activity and are useful as intermediates in the

3,959,322

45

46

preparation of the hormonal compounds of this invention.

## EXAMPLE 94

### 13β-Ethyl-3-methoxy-17,17-(2,2-dimethyl-propylenedioxy)-gona-1,3,5(10),8-tetraene

Shake the 13β-ethyl-3-methoxy-17,17-(2,2-dimethylpropylenedioxy) gona-1,3,5(10),8,14-pentaene (5 g.) in benzene (75 cc.) containing 2% palladised calcium carbonate (1.75 g.) with hydrogen at atmospheric pressure until one molecular equivalent has been absorbed. Recrystalize the product from 95% ethanol to obtain the title product; ultraviolet absorption peak at 276.5 mμ (ε13,500).

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 95

### 13β-Propyl-3-methoxy-17,17-ethylenedioxygona-1,3,5(10), 8-tetraene

Shake 13β-Propyl-3-methoxy-17,17-ethylenedioxygona-1,3,5(10),8,14-pentaene (2.5 g.) in benzene (80 cc.) with hydrogen at atmospheric pressure in the presence of a 2% palladium on calcium carbonate catalyst (0.9 g.); hydrogen uptake ceases after the requisite amount (161 cc.) for monohydrogenation has been absorbed. Filter and evaporate to obtain a gum, which one crystallizes from ethanol to obtain the title product (1.8 g.), m.p. 119°–120°; ultraviolet absorption peak at 278 mμ (ε15,300).

$C_{23}H_{30}O_3$ Calculated: C, 77.9%; H, 8.5% Found: C, 77.7%; H, 8.5%

This compound possesses estrogenic and blood lipid lowering activities and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 96

### 13β, 17α-Diethyl-3-methoxygona-1,3,5-(10),8-tetraen-17β-ol

Shake 13β-ethyl-3-methoxy-17α-ethynylgona-1,3,5(10), 8-tetraen-17β-ol (1.9 g.) in benzene (100 cc.) with hydrogen at atmospheric pressure in the presence of a prereduced 2% palladium on calcium carbonate catalyst (0.6 g.) until no more hydrogen for selective saturation of the ethynyl group has been absorbed. Filter and evaporate the solvent to obtain a crystalline residue which one recrystallizes from methanol, to obtain the title product (1.5 g.), m.p. 139°–140°; ultraviolet absorption peak at 276 mμ (ε15,500); infrared absorption peak at 2.79 μ.

To obtain 13β-cetyl-3-methoxy-17α-ethylgona-1,3,5(10),8-tetraen-17β-ol hydrogenate 13β-cetyl-3-methoxy-17α-ethynylgona-1,3,5(10), 8-tetraen-17β-ol using a prereduced 2% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To obtain 6, 13β-dimethyl-3-methoxy-17α-ethylgona-1,3,5(10), 8-tetraen-17β-ol hydrogenate 6, 13β-dimethyl-3-methoxy-17β-ethynylgona-1,3,5(10),8-tetraen-17β-ol using a prereduced 2% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To obtain 7, 13β-dimethyl-3-methoxy-17β-ethyl-gona-1,3,5(10),8-tetraen-17β-ol hydrogenate 7, 13β-

dimethyl-3-methoxy-17β-ethynylgona-1,3,5(10),8-tetraen-17β-ol using a prereduced 2% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To obtain 13β, 17α-diethyl-2,3-dimethoxygona-1,3,5(10), 8-tetraen-17β-ol hydrogenate 13β-ethyl-2,3-dimethoxy-17α-ethynylgona-1,3,5(10), 8-tetraen-17β-ol using a prereduced 2% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To obtain 13β, 17α-diethyl-3-ethoxygona-1,3,5(10), 8-tetraen-17β-ol hydrogenate 13β-ethyl-3-ethoxy-17α-ethynylgona-1,3,5(10),8-tetraen-17β-ol using a prereduced 2% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To obtain 13β-phenethyl-3-propoxy-17α-ethylgona-1,3,5(10), 8-tetraen-17β-ol hydrogenate 13β-phenethyl-3-propoxy-17α-ethynylgona-1,3,5(10), 8-tetraen-17β-ol using a prereduced 2% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To obtain 13β-(3-hydroxypropyl)-3-cyclopentyloxy-17α-ethylene-1,3,5(10),8-tetraen-17β-ol hydrogenate 13β-(3-hydroxypropyl)-3-cyclopentyloxy-17α-ethynylgona-1,3,5(10),8-tetraen-17β-ol using a prereduced 2% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

To obtain 13β-(2-diethylaminoethyl)-2,3-dimethoxy-17α-ethylgona-1,3,5(10), 8-tetraen-17β-ol hydrogenate 13β-(2-diethylaminoethyl)-2,3-dimethoxy-17α-ethynylgona-1,3,5(10), 8-tetraen-17β-ol using a prereduced 2% palladium on calcium carbonate catalyst according to the manipulative procedure described above.

These compounds possess estrogenic activity, and are useful as intermediates in the preparation of the hormonal compounds of this invention.

## EXAMPLE 97

### 13β-Propyl-3-methoxy-17α-ethylgona-1,3,5(10), 8-tetraen-17β-ol

Shake 13β-propyl-3-methoxy-17α-ethynylgona-1,3,5(10), 8-tetraen-17β-ol (1 g.) in benzene (100 cc.) with hydrogen at atmospheric pressure in the presence of a prereduced 2% palladium on calcium carbonate catalyst (0.35 g.). Hydrogenation is interrupted after the requisite amount of hydrogen for selective saturation of the ethynyl group has been absorbed; filter and evaporate to obtain a residue; crystallize from methanol to obtain the title product (0.5 g.), m.p. 106°–108°; ultraviolet absorption peak at 278 mμ (ε14,700); infrared absorption peak at 2.80 μ.

This compound possesses estrogenic activity, and is useful as an intermediate in the preparation of the hormonal compounds of this invention.

## EXAMPLE 98

### 13β-Butyl-3-methoxy-17α-ethynylgona-1,3,5(10),8-tetraen-17β-ol

Shake 13β-butyl-3-methoxy-17α-ethynylgona-1,3,5(10), 8-tetraen-17β-ol (3.7 g.) in benzene (150 cc.) with hydrogen at atmospheric pressure in the presence of a prereduced 2% palladium on calcium carbonate catalyst (1.2 g.) until the amount of hydrogen required for selective saturation of the ethynyl group has been absorbed. Crystallize the red gum (3.7 g.) ob-

3,959,322

47

tained on filtration and evaporation from methanol to obtain crude product (2.9 g.); a portion is further recrystallized from aqueous acetonitrile to give the pure compound, m.p. 72°–76°; ultraviolet absorption peak at 278 mμ (ε15,600); infrared absorption peak at 2.97 μ.

This compound has estrogenic activity, and is useful in the preparation of the hormonal compounds of this invention.

### EXAMPLE 99

D-Homo-13β-ethyl-3-methoxy-gona-1,3,5(10)-trien-17aβ-ol

Add       D-homo-13β-ethyl-3-methoxy-gona-1,3,5(10),8-tetraen-17aβ-ol (20 g.) in tetrahydrofuran (525 cc.) to liquid ammonia (1500 cc.) and aniline (250 cc.) and add lithium (5 g.) in pieces. After stirring for 1½ hours discharge the blue color by the addition of sodium nitrite followed by water and isolate the product with ether. Recrystallize the product from methanol to obtain D-homo-13β-ethyl-3-methoxy-gona-1,3,5(10)-trien-17aβ-ol (15 g.), m.p. 103°–105° after previous softening; ultraviolet absorption peak at 280 mμ(ε2,800); infrared absorption peaks at 2.96 and 6.23 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 100

13β-n-Propyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol

Add 13β-n-propyl-3-methoxy-gona-1,3,5(10), 8-tetraen-17β-ol (3.1 g.) dissolved in a mixture of tetrahydrofuran (10 cc.) and freshly distilled aniline (60 cc.) to liquid ammonia (160 cc.) and add lithium metal (1.5 g.) in small pieces. Stir the reaction mixture for 3 hours, then quench with solid ammonium chloride (12.5 g.) and take up in water. Ether-extract the product and evaporate the washed and dried extracts to obtain a semisolid residue of crude 13β-n-propyl-3-methoxy-gona-1,3,5(10) -trien-17β-ol (3.1 g.); ultraviolet absorption peak at 279 mμ (ε1,800).

Dissolve the crude material in ether (75 cc.), add heptane (30 cc.) and distill off the ether, filter the small amount of brown flocculent precipitate, and finally cool the filtrate to precipitate the purified product as an off-white solid (2.3 g.), m.p. 141°–143° C.

This compound possesses estrogenic and blood lipid lowering activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 101

13-n-Butyl-3-methoxygona-1,3,5(10)-trien-17β-ol

To 13-n-butyl-3-methoxygona-1,3,5(10), 8-tetraen-17β-ol (0.8 g.) in aniline (20 cc.) and tetrahydrofuran (10 cc.) add liquid ammonia (100 cc.), followed by sodium (0.8 g.) in small pieces during 5 minutes while stirring the mixture. After a further 15 minutes stirring, discharge the blue color with solid ammonium chloride. Work up the product with ether in the usual way, and evaporate the resulting ether solution to leave as residue a gum; take this up in hot methanol (10 cc.), filter a little insoluble material and allow the solution to stand for 12 hours at 0° C. Crystals of 13-n-butyl-3-methoxygona-1,3,5(10)-trien-17β-ol are deposited and filtered off (0.6 g.), m.p. 123°–125° C after previous

48

softening and a little melting at 60°–70° C.; ultraviolet absorption peak at 278 mμ (ε2,100); infrared absorption peaks at 2.86 –2.97 (broad band), 6.21, 7.94, 9.62 μ.

This compound possesses estrogenic and blood lipid lowering activities and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 102

13β-Isobutyl-3-methoxygona-1,3,5(10-trien-17β-ol

Add a solution of 13β-isobutyl-3-methoxygona-1,3,5;(10),8-tetraen-17β-ol (17.0 g.) in dry tetrahydrofuran (125 cc.; distilled) slowly to a mixture of liquid ammonia (680 cc., distilled), aniline (85 cc., distilled) and tetrahydrofuran (125 cc.) with stirring. Then add lithium (7.9 g.) in small portions. After the addition of lithium is completed, stir the blue mixture for another 3 hours. Discharge the blue color by the cautious addition of ammonium chloride followed by warm (50°) water. Extract the crude product with benzene. Wash the extracts with water, hydrochloric acid, (20%) sodium bicarbonate, water and dry. Evaporate the solvent in vacuo to obtain a gum which on crystallization from ether-petroleum ether gives 13β-isobutyl-3-methoxygona-1,3,5(10)-trien-17β-ol (13.0 g.; 76%); m.p. 103°–104° C.; ultraviolet absorption peak at 2.78 mμ (ε1,975); infrared absorption peak at 2.83 μ.

This compound possesses estrogenic and blood lipid lowering activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 103

13β-Ethyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol

To 13β-ethyl-3-methoxy-gona-1,3,5(10),8-tetraen-17β-ol (16.8 g.) dissolved in a mixture of aniline (150 cc.) and tetrahydrofuran (50 cc.) add liquid ammonia (400 cc.). Add lithium metal (6.0 g.) gradually in small pieces during 10 minutes, and stir the blue suspension obtained. After 2 hours, add ammonium chloride (50 g.) to the reaction mixture until a clear solution is obtained; then add water (600 cc.) and ether-extract the mixture. Evaporated the washed and dried extracts to obtain as residue a crystalline solid. Recrystallize from hexane (300 cc.), to obtain 13β-ethyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol (14 g.), m.p. 126°–30°.

This compound possesses estrogenic and blood lipid lowering activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

To obtain 13β-cetyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol treat 13β-cetyl-3-methoxy-gona-1,3,5(10), 8-tetraen-17β-ol with lithium and aniline in liquid ammonia according to the manipulative procedure described above.

To obtain 7,13β-dimethyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol treat 7,13β-dimethyl-3-methoxy-gona-1,3,5(10),8-tetraen-17β-ol with lithium and aniline in liquid ammonia according to the manipulative procedure described above.

To obtain 13β-ethyl-2,3-dimethoxy-gona-1,3,5-(10)-trien-17β-ol treat 13β-ethyl-2,3-dimethoxy-gona-1,3,5(10),8 -tetraen-17β-ol with lithium and aniline in liquid ammonia according to the manipulative procedure described above.

To obtain 13β-ethyl-1,3 -dimethoxy-gona-1,3,5(10)-trien-17β-ol treat 13β-ethyl-1,3-dimethoxy-gona-1,3,5(10),8-tetraen-17β-ol with lithium and aniline in

3,959,322

49

liquid ammonia according to the manipulative procedure described above.

To prepare 13β-ethyl-3-ethoxy-gona-1,3,5 (10)-trien-17β-ol treat 13β-ethyl-3-ethoxy-gona-1,3,5(10),8-tetraen-17β-ol with lithium and aniline in liquid ammonia according to the manipulative procedure described above.

To prepare 13β-phenethyl-3-propoxy-gona-1,3,5(10)-trien-17β-ol treat 13β-phenethyl-3-propoxy-gona-1,3,5(10),8-tetraen-17β-ol with lithium and aniline in liquid ammonia according to the manipulative procedure described above.

To prepare 13β-isobutyl-3-pentyloxy-gona-1,3,5(10)-trien17β-ol treat 13β-isobutyl-3-pentyloxy-gona-1,3,5(10), 8-tetraen-17βol with -ol and aniline in liquid ammonia according to the manipulative procedure described above.

To prepare 13β-(3-hydroxypropyl)-3-cyclopentyloxy-gona-1,3,5(10)-trien-17β-ol treat 13β-(3-hydroxypropyl)-3-cyclopentyloxy-gona-1,3,5(10), 8-tetraen-17β-ol with lithium and aniline in liquid ammonia according to the manipulative procedure described above.

To obtain 13β-(3-dimethylaminopropyl)-3-methoxy-gona-1,3,5(10),8-tetraen-17β-ol treat 13β-(3-dimethylaminopropyl)-3-methoxy-gona-1,3,5(10), 8-tetraen-17β-ol with lithium and aniline in liquid ammonia according to the manipulative procedure described above.

These compounds possess estrogenic and blood lipid lowering activity and are useful as intermediates for preparing the hormonal compounds of this invention.

EXAMPLE 104

13β,17α-Diethyl-3-methoxygona-1,3,5(10)-trien-17β-ol

Shake 13βethyl-3-methoxy-17α-ethylgona-1,3,5(10),9-tetraen-17β-ol (0.3 g.) in ethanol (10 cc.) with 10% palladised charcoal (0.3 g.) in an atmosphere of hydrogen until uptake ceases (25 cc. absorbed). Filter the catalyst and remove the solvent and recrystallize the residue from ethanol to obtain 13β, 17α-diethyl-3-methoxygona-1,3,5(10)-trien-17β-ol (0.11 g.), m.p. 160°–161°.

This compound has estrogenic activity, and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 105

13β-Methyl-3methoxy-D-homogona-2,5(10)-dien-17aβ-ol

Add 13β-methyl-3-methoxy-D-homogona-1,3,5(10)-trien-17aβ-ol (13 g.) in tetrahydrofuran (300 cc.) to liquid ammonia (650 cc.) followed by the addition of lithium (4.3 g.). After stirring for 30 minutes add absolute ethanol dropwise over a period of 1 hour to discharge the blue color. Precipitate the product with water, filter and dry to give 13β-methyl-3-methoxy-D-homogona-2,5(10)-dien-17aβ-ol, m.p. 148°–155°; infrared absorption peaks at 2.98 μ, 5.88 μ and 5.98 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

50

EXAMPLE 106

13β-Ethyl-3-methoxy-D-homogona-2,5(10)-dien-17aβ-ol

Substitute 13β-ethyl-3-methoxy-D-homogona-1,3,5(10)-trien-17aβ-ol for 13β-methyl-3-methoxy-D-homogona-1,3,5(10)-trien-17aβ-ol to give 13β-ethyl-3-methoxy-D-homogona-2,5(10)-dien 17aβ-ol; m.p. 135°–138°; infrared absorption peaks at 3.03, 5.92, 6.01 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 107

13β-Ethyl-3-methoxy-gona-2,5(10)-dien-17β-ol

Add 13β-Ethyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol(0.5) g.) in tetrahydrofuran (50 cc.) to stirred liquid ammonia (150 cc.), followed by lithium foil (0.5 g.) and then add ethanol (6 cc.) during 20 minutes. When the blue color is discharged, add water and work up the product with ether, to yield 13β-ethyl-3-methoxy-g na-2,5(10)-dien-17β-ol as a solid (0.47 g.).

To prepare 13β-ethyl-2,3-dimethoxy-gona-2,5(10)-dien-17β-ol react 13β-ethyl-2,3-dimethoxy-gona-1,3,5(10)-trien-17β-ol in tetrahydrofuran with lithium in liquid ammonia according to the manipulative procedure described above.

To prepare 13β-ethyl-1,3-dimethoxy-gona-1(10),3-dien-17β-ol react 13β-ethyl-1,3-dimethoxy-gona-1,3,5(10)-trien-17β-ol in tetrahydrofuran with lithium in liquid ammonia according to the manipulative procedure described above.

To prepare 13β-ethyl-3-ethoxy-gona-2,5(10)-dien-17β-ol react 13β-ethyl-3-ethoxy-gona-1,3,5(10)-trien-17β-ol in tetrahydrofuran with lithium in liquid ammonia according to the manipulative procedure described above.

To prepare 13β-phenethyl-3-n-propoxy-gona-2,5(10)-dien-17β-ol react 13β-phenethyl-3-n-propoxy-gona-1,3,5(10)-trien-17β-ol in tetrahydrofuran with lithium in liquid ammonia according to the manipulative procedure described above.

To prepare isobutyl-3-n-pentoxy-gona-2,5(10)-dien-17β-ol react 13β-isobutyl-3-n-pentoxy-gona-1,3,5(10)-trien-17β-ol in tetrahydrofuran with lithium in liquid ammonia according to the manipulative procedure described above.

To prepare 13β-(3-hydroxypropyl)-3-cyclopentoxy-gona-2,5(10)-dien-17β-ol react 13β-(3-hydroxypropyl)-gona-1,3,5(10)-trien-17β-ol in tetrahydrofuran with lithium in liquid ammonia according to the manipulative procedure described above.

To prepare 13β-(3-dimethylaminopropyl)-1,3-dimethoxy-gona-1(10),3-dien-17β-ol react 13β-(3-dimethylaminopropyl)-1,3-dimethoxy-gona-1,3,5(10)-trien 17β-ol in tetrahydrofuran with lithium in liquid ammonia according to the manipulative procedure described above.

These compounds have estrogenic acitivty, lower the blood lipid level, and are useful as intermediates in the preparation of the hormonal compounds of the invention.

3,959,322

51

52

## EXAMPLE 108

### 13β-Ethyl-3-methoxy-gona-2,5(10)-dien-17β-ol

To 13β-ethyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol (1.0 g.) in 1-methoxypropan-2-ol (100 cc.) add liquid ammonia (200 cc.), followed by lithium metal (1.2 g.) in small pieces with stirring. After discharge of the blue color add an excess ammonium chloride, followed by water; filter off the crude 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17β-ol and dry, m.p. 98°–104°. No selective ultra-violet absorption beyond 220 mμ; infrared absorption peaks at 3.03, 5.92, 6.01 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 109

### 13β-n-Propyl-3-methoxy-gona-2,5(10)-dien-17β-ol

Dissolve 13β-n-propyl-3-methoxy-gona-1,3,5(10)-dien-17β-ol in a mixture of freshly distilled pyrrole (50 cc.) and liquid ammonia (100 cc.) and then add lithium (1.0 g.) in small pieces as quickly as the production of foam permits. When the blue color is discharged, add excess ammonium chloride, followed by water (100 cc.) Extract the product into ether, wash, dry and evaporate. Recrystallize the residue (0.9 g.), from methanol, to give 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17β-ol (0.65 g.), m.p. 153°–6°; no selective ultra-violet absorption beyond 220 mμ; infrared absorption peaks at 2.91, 5.90, 6.04 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 110

### 13β-Isopropyl-3methoxy-gona-2,5(10)-dien-17β-ol

Add liquid ammonia (100 cc.) to 13β-isopropyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol (0.5 g.) in tetrahydrofuran (50 cc.) followed by lithium metal (0.5 g.), and stir the solution for 10 minutes. Then add ethanol (6 cc.) dropwise. When the blue color is discharged, add water and extract the product with ether. Evaporate the washed and dried extracts to give crude 13β-isopropyl-3-methoxy-gona-2,5(10)-dien-17β-ol (0.5 g.) as colorless gum.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 111

### 13β-n-Butyl-3-methoxy-gona-2,5(10)-dien-17β-ol

Add 13β-n-butyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol (0.5 g.) in a mixture of tetrahydrofuran (5 cc.) and ether (15 cc.) dropwise to a stirred solution of lithium (0.5 g.) in liquid ammonia (60 cc.). After 5 minutes beyond completion of addition, add ethanol (8 cc.) dropwise and when the blue color is discharged, add water and extract the mixture with ether. Work up in the usual way to give 13β-n-butyl-3-methoxy-gona-2,5(10)-dien17β-ol as a crystalline solid, m.p. 135°–9°; infrared absorption peaks at 2.97, 6.25, 6.38 and 8.16 μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 112

### 13β-Ethyl-3-ethoxy-gona-2,5(10)-dien-17β-ol

Heat under reflux 13β-ethyl-3-hydroxy-gona-1,3,5(10)-trien-17β-ol (1.75 g.) and potassium carbonate (3 g.) for six hours with ethanol (40 cc.) and ethyl iodide (20 cc.) in a nitrogen atmosphere. Then concentrate the solution to half its original volume, add water and take the product up in ether. Wash, dry and evaporate the ethereal solution and recrystallize the residue from hexane to give 13β-ethyl-3-ethoxy-gona-1,3,5(10)-trien-17β-ol. Add this product (0.5 g.), tetrahydrofuran (50 cc.) to liquid ammonia (100 cc.) and add lithium (0.5 g.). After stirring for 10 minutes add a mixture of ethanol (6 cc.) and tetrahydrofuran (10 cc.) over a period of 20 minutes, and when the blue color is discharged add water and extract the mixture with ether. Wash, dry and evaporate the ethereal solution and recrystallize the residue from ethanol to give 13β-ethyl-3-ethoxy-gona-2,5(10)-dien-17β-ol. No selective ultra-violet absorption beyond 220 mμ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 113

### 13β-Ethyl-3-n-propoxy-gona-2,5(10)-dien-17β-ol

Use n-propyl iodide (20 cc.) instead of ethyl iodide and proceed exactly as described for the 3-ethoxy compound to give 13β-ethyl-3-n-propoxy-2,5(10)-dien-17β-ol; no selective ultra-violet absorption beyond 220 mμ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 114

### 13β-Methyl-3-methoxy-D-homo-gona-2,5(10)-dien-17a -one

Reflux 13β-methyl-3-methoxy-D-homo-gona-2,5(10)-dien-17aβ-ol (4 g.) under nitrogen in toluene (130 cc.) containing cyclohexanone (40 cc.) and aluminum isopropylate (1.8 g.) for 3 hours. Cool, add water (40 cc.) followed by anhydrous sodium sulphate (40 g.) and filter the mixture. Evaporate the filtrate to dryness, first at 30°/20 mm. then at 50°/0.1 mm. to afford 13β-methyl-3-methoxy-D-homo-gona-2,5(10)-dien-17β-one. Infrared absorption peaks at 5.85, 5.92, 6.01 μ.

This compound has estrogenic activity, lowers the blood lipid levels, and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 115

### 13β-Ethyl-3-methoxy-D-homo-gona-2,5(10)-dien-17a-one

Reflux 13β-ethyl 3-methoxy-D-homo-gona-2,5(10)-dien-17aβ-ol (10 g.) with aluminium isopropylate (8 g.) in dry toluene (450 cc.) and dry cyclohexanone (140 cc.) for 4 hours in an atmosphere of nitrogen. Decompose the cooled solution with water (ca. 25 cc.) and dry by the addition of sodium sulphate. Filter the mixture and remove the solvents first at 20 mm. Hg. and then at 90° 0.2 mm. Hg. Dry the residue over phosphorus pentoxide in a desiccator to give 13β-ethyl-3-methoxy-D-homo-gona-2,5(10)-dien-17a-one   (11.1

3,959,322

53

g.), m.p. 138°–145° C; infrared absorption peaks at 5.88, 6μ.

This compound has estrogenic activity, lowers the blood lipid level, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 116

13βEthyl-3-methoxy-gona-2,5(10)-dien-17-one

Reflux a mixture of 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17β-ol (0.8 g.), aluminium isopropoxide (0.36 g.), toluene (26 cc.) and cyclohexanone (8 cc.) under nitrogen for 3 hours. Allow the solution to cool under nitrogen, add water (5 cc.) and shake the mixture vigorously. Add anhydrous sodium sulphate (5 g.), shake the mixture again, and then allow to stand for 30 minutes. Filter the solution, combine the filtrate with ether-washings of the residue, and evaporate, first at 30°/20 mm., then at 50°/0.1 mm. to leave as a crystalline solid 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17-one; infrared absorption peaks at 5.78, 5.92, 6.01 μ, with no absorption due to hydroxyl.

To prepare 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17-one react 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17β-ol in toluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-isopropyl-3-methoxy-gona-2,5(10)-dien-17-one react 13β-isopropyl-3-methoxy-gona-2,5(10)-dien-17β-ol in toluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-isobutyl-3-methoxy-gona-2,5(10)-dien-17-one react 13β-isobutyl-3-methoxy-gona-2,5(10)-dien-17β-ol in toluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-ethyl-3-ethoxy-gona-2,5(10)-dien-17-one react 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17β-ol in toluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-ethyl-3-n-propoxy-gona-2,5(10)-dien-17-one react 13β-ethyl-3-n-propoxy-gona-2,5(10)-dien-17β-ol intoluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-ethyl-2,3-dimethoxy-gona-2,5(10)-dien-17-one react 13β-ethyl-2,3-dimethoxy-gona-2,5(10)-dien-17βol in toluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-ethyl-1,3-dimethoxy-gona-1(10),3-dien-17-one react 13β-ethyl1,3-dimethoxy-gona-1(10),3-dien-17β-ol in toluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-phenethyl--n-propoxy-gona-2,5(10)-dien-17-one react 13β-phenethyl-3-n-propoxy-gona-2,5(10)-dien-17β-ol intoluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-isobutyl-3-n-pentoxy-gona-2,5(10)-dien-17-one react 13β-isobutyl-3-n-pentoxy-gona-2,5(10)-dien-17β-ol in toluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

54

To prepare 13β-(3-hydroxypropyl)-3-cyclopentoxy-gona-2,5(10)-dien-17-one react 13β-(3-hydroxy-propyl)-3-cyclopentoxy-gona-2,5(10)-dien-17-ol in toluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

To prepare 13β-(3-dimethylaminopropyl)-1,3-dimethoxy-gona-1(10),3-dien-17-one react 13β-(3-dimethylaminopropyl)-1,3-dimethoxy-gona-1(10), 3-dien-17β-ol intoluene with cyclohexanone and aluminium isopropoxide according to the manipulative procedure described above.

These compounds have estrogenic activity and are useful as intermediates in the preparation of the hormonal compounds of the invention.

### EXAMPLE 117

13β-n-Propyl-3-methoxy-gona-2,5(10)-dien-17-one

Reflux 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17β-ol (3.0 g.) with aluminium isopropoxide in toluene and cyclohexanone according to the conditions of Oppenauer oxidation. Isolate and recrystallize the product from methanol to give 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17-one (2.0 g.), m.p. 128°–31° C. with softening at 125°.

$C_{21}H_{30}O_2$ Calculated: C, 80.2 H, 9.6% Found: C, 80.0 H, 9.55%

This compound has estrogenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 118

13β-n-Butyl-3-methoxy-gona-2,5(10)-dien-17-one

Reflux 13β-n-butyl-3-methoxy-gona-2,5(10)-dien-17β-ol (8 g.) in toluene (450 cc.) containing cyclohexanone (120 cc.) and aluminium isopropoxide (5 g.) under nitrogen for 4 hours. Cool, and add water (15 cc.) dropwise, followed by anhydrous sodium sulphate. Filter the mixture, wash the residue with ether and combine the filtrate and washings, dry and evaporate finally at 90°/1.05 mm. to give 13β-n-butyl-3-methoxy-gona-2,5(10)-dien-17-one (6.0 g.), m.p. 124°–128°, (from methanol); infrared absorption peaks at 5.80, 6.02 μ.

This compound has estrogenic activity, and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 119

13βMethyl-3-methoxy-17a
α-ethynyl-D-homo-gona-2,5(10)-dien-17aβ-ol

Add a solution of 13β-methyl-3-methoxy-D-homogoria-2,5(10) diene-17a-one (6.5 g.) in dimethylacetamide (50 cc.) to a stirred suspension of lithium acetylide (4.25 g.) in dioxane (25 cc.), ethylene diamine (1 cc.), and dimethylacetamide (25 cc.) in an atmosphere of acetylene. After stirring for 20 hours pour the mixture onto crushed ice (500 g.) and extract with benzene. Wash, dry and evaporate the extracts and recrystallize the residue from ethanol to give 13β-methyl-3-methoxy-17a α-ethynyl-D-homogona-2,5(10)-dien-17aβ-ol; infrared absorption peaks at 2.88, 3.05, 5.90, 6.01 μ.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

3,959,322

55

## EXAMPLE 120

13β-Ethyl-3-methoxy-17α-ethynyl-D-homo-gona-2,5(10)-dien-17aβ-ol

Dissole 13β-ethyl-3-methoxy-D-homo-gona-2,5(10)-dien-17-one (8.8 g.) in dimethylacetamide (70 cc.) and add a suspension of lithium acetylide (10 g.) in ethylenediamine-dioxan (1:1 60 cc.). Then pass acetylene over the surface of the stirred mixture for 15 hours. Decompose the reaction mixture by pouring onto ice, collect the product in ether and evaporate the washed, dried ether solution to give 13β-ethyl-3-methoxy-17aα-ethynyl-D-homo-gona-2,5(10)-dien-17aβ-ol; m.p. 118°–124° (7 g.) 74%. Infrared absorption peaks at 2.85, 3.06, 5.90, 6.0 μ.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 121

13β-Ethyl-3-methoxy-17α-ethynyl-gona-2,5(10)-dien-17β-ol

Add a suspension of lithium aluminium acetylide (obtained by passing excess acetylene through a solution of lithium aluminium hydride (2.0 g.). in tetrahydrofuran (25 cc.) with stirring to 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17-one (0.6 g.) in tetrahydrofuran (5 cc.). After standing for 18 hours, add ether (40 cc.) followed by the careful dropwise addition of water until effervescence ceases. Add anhydrous mangesium sulphate (10 g.) and filter the solution and evaporate the filtrate under reduced pressure to give 13β-ethyl-3-methoxy-17α-ethynyl-gona-2,5(10)-dien-17β-ol 0.6. g. Infrared absorption peaks at 2.80, 3.05, 4.59, 6.00 μ.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 122

13β-Ethyl-3-methoxy-17α-propynyl-gona-2,5(10)-dien-17βol

Add 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17one (10 g.) to a solution of propynyl magnesium bromide (prepared from magnesium (6 g.) and ethyl bromide (25 g.) in tetrahydrofuran (500 cc.) and propyne). Stir the mixture for 6 hours under reflux, cool and decompose the water (100 cc.). Add "Celite", filter the resultant sludge and wash the residue thoroughly with ether. Separate the organic phase in the filtrate, wash, dry and evaporate. Reflux the product in methanol for 20 minutes, cool and filer to give 13β-ethyl-3-methoxy-17α-propynyl-gona-2,5(10)-dien-17β-ol (9.5 g.), m.p. 158°–61° after softening at 144°; infrared absorption peaks at 2.90, 3.08, 4.50, 5.88, 6.00 μ; no selective ultra-violet absorption beyond 220 mμ.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 123

13β-Ethyl-3-methoxy-17α-allyl-gona-2,5(10)-dien-17β-ol

Dissolve 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17-one in tetrahydrofuran (100 cc.) and allyl bromide (11.5 g.), and add the solution dropwise to a refluxing suspension of magnesium (1 g.) in allyl bromide (0.6

56

g.) and tetrahydrofuran (50 cc.). Allow the mixture to reflux for 6 hours, and then add water (100 cc.) to the cooled solution followed by enough "Celite" to make a thick paste. Filter the mixture, wash the residue thoroughly with ether and separate the organic phase from the filtrate, wash, dry and evaporate the ether solution and crystallize the residue from methanol to give 13β-ethyl-3-methoxy-17 α-allyl-gona-2,5 (10)-dien-17β-ol (3.8 g.); infrared absorption peaks at 3.03, 5.88, 6.01, 6.10 μ; no selective ultraviolet absorption beyond 220 mμ.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 124

13β-Ethyl-3-methoxy-17α-(2-isobutenyl)-gona-2,5(10)-dien-17β-ol

Add a suspension of 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17-one (4 g.) in ether (500 cc.) and methallyl chloride (8 g.). to a Grignard solution, prepared from methallyl chloride (8 g.) and magnesium (20 g.) in ether (100 cc.), at such a rate that gentle reflux is maintained. Reflux the mixture for 4 hours and then decompose the cooled solution with water (ca. 100 cc.). Add "Celite", filter the resultant pasty mass and wash the residue thoroughly with ether. Separate the organic phase from the filtrate, wash, dry and evaporate, and recrystallize the residue from methanol to give 13β-ethyl-3-methoxy-17α-(2-isobutenyl)gona-2,5(10)-dien-17β-ol (4 g.). Infrared absorption peaks at 2.86, 5.88, 6.01, 6.10 μ; no selective ultraviolet absorption beyond 220 mμ.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 125

13β-n-Propyl-3-methoxy-17α-ethynyl-gona-2,5(10)-dien-17β-ol

Add a solution of 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17one (1.74 g.) in dry tetrahydrofuran (25 cc.) slowly to a stirred suspension of acetylene dimagnesium bromide (from magnesium, 0.36 g.) in tetrahydrofuran. After completion of the reaction decompose the Grignard complex with saturated ammonium chloride solution (100 cc.), and work up the product by means of ethyl acetate, purify by chromatography on neutral alumina, and recrystallize from methanol to give 13β-n-propyl-3-methoxy-17α-ethynyl-gona-2,5(10)-dien-17β-ol (0.33 g.), m.p. 91°–6° (decomp.); infrared absorption peaks at 3.77, 3.03, 5.88, 5.99 μ (a hydroxyl, a methine group and a dihydro -anisole system).

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 126

13β-n-Propyl-3-methoxy-17α-allyl-gona-2,5-(10)-dien-17β-ol

Warm allyl bromide (4.5 cc.) with magnesium turnings (107 g.) in ether (40 cc.) and then add 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17-one (2 g.) in ether (70 cc.) containing allyl bromide (2.5 cc.) slowly with stirring. Reflux the mixture with stirring for 3

3,959,322

57      58

hours, and to the cooled mixture add aqueous sodium potassium tartrate and extract the product with ether. Wash, dry and evaporate the extracts to give a residue which is mainly 13β-n-propyl-3-methoxy-17α-allyl-gona-2,5(10)-dien-17β-ol.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 127

13β-n-Propyl-3-methoxy-17α-propynyl-gona-2,5(10)-dien-17β-ol

Add a solution of 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17-one (7.5 g.) in tetrahydrofuran (250 cc.) with stirring under nitrogen to propynyl magnesium bromide (from ethyl magnesium bromide 39 g. and propyne in tetrahydrofuran (500 cc.). Reflux the mixture with stirring for 3 hours, and on cooling add saturated aqueous ammonium chloride (120 cc.) and extract the product obtained from the washed, dry extracts with ether. Dissolve the residue in boiling methanol and store for 18 hours at −10°. Filter off the crystalline deposit to yield 13β-n-propyl-3-methoxy-17α-propynyl-gona-2,5(10)-dien-17β-ol (6.9 g.), m.p. 104°–111°.

To prepare 13β-n-propyl-3-methoxy-17α-methyl-gona-2,5(10)-dien-17β-ol treat 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17-one with methyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β-isobutyl-3-methoxy-17α-ethyl-gona-2,5(10)-dien-17β-ol treat 13β-isobutyl-3-methoxy-gona-2,5(10)-dien-17-one with ethyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β-isobutyl-3-methoxy-17α-methyl-gona-2,5(10)-dien-17β-ol treat 13β-isobutyl-3-methoxy-gona-2,5(10)-dien-17-one with methyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β, 17α-di-ethyl-3-ethoxy-gona-2,5(10)-dien-17β-ol treat 13β-ethyl-3-ethoxy-gona-2,5(10)-dien-17-one with ethyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β-ethyl-3-n-propoxy-17α-methyl-gona-2,5(10)-dien-17β-ol treat 13β-ethyl-3-n-propoxy-gona-2,5(10)-dien-17-one with methyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β, 17α-diethyl-2,3-dimethoxy-gona-2,5(10)-dien-17β-ol treat 13βethyl-2,3-dimethoxy-gona-2,5(10)-dien-17one with ethyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β-ethyl-1,3-dimethoxy-17α-methyl-gona-1(10),3-dien-17β-ol treat 13β-ethyl-1,3-dimethoxy-gona-1(10), 3-dien-17-one with methyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β-phenethyl-3-n-propoxy-17α-ethyl-gona-2,5(10)-dien-17β-ol treat 13β-phenethyl-3-n-propoxy-gona-2,5(10)-dien-17-one with ethyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β-isobutyl-3-n-pentoxy-17α-methyl-gona-2,5(10)-dien-17β-ol treat 13β-isobutyl-3-n-pen-

toxy-gona-2,5(10)-dien-17-one with methyl magnesium bromide according to the manipulative procedure described above.

To prepare 13β-(3-hydroxypropyl)-3-cyclopentoxy-17α-ethyl-gona-2,5(10)-dien-17β-ol treat 13β-(3-hydroxypropyl)-3-cyclopentoxy-gona-2,5(10)-dien-17-one with ethyl magnesium bromide according to the manuipulative procedure described above.

To prepare 13β-(3-dimethylaminopropyl)-1,3-dimethoxy-17α-methyl-gona-1(10),3-dien-17βol treat 13β-(3-dimethylaminopropyl)-1,3-dimethoxy-gona-1(10), 3-dien-17-one with methyl magnesium bromide according to the manipulative procedure described above.

These compounds are useful as intermediates for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 128

13β-n-Propyl-3-methoxy-17α-(1-methallyl)-gona-2,5(10)-dien-17β-ol

Add a solution of 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17-one (3.1 g.) in ether (130 cc.) with stirring under nitrogen to crotyl magnesium bromide (from crotyl bromide, 13.5 g., and magnesium, 9.7 g.) in ether. Reflux the mixture for 4 hours, and leave at room temperature overnight. Add saturated aqueous ammonium chloride (70 cc.) and extract the product with ether. Wash, dry and evaporate the extracts to yield 13β-n-propyl-3-methoxy-17α-(1-methallyl)-gona-2,5(10)-dien-17β-ol; infrared absorption peak at 11.0μ.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 129

13β-n-Propyl-3-methoxy-17α-(2-methallyl)-gona-2,5(10)-dien-17β-ol

Employ the method of the previous example but react 13β-n-propyl-3-methoxygona-2,5(10)-dien-17-one (3.66 g. with 2-methallyl magnesium chloride (from the metal, 8.76 g. and 2-methallyl chloride, 10.9 g.). Purify the crude product by extraction with boiling methanol to afford a residue of 13β-n-propyl-3-methoxy-17α-(2-methally)-gona-2,5(10)-dien-17β-ol (3.87 g.), m.p. 135°–140°; infrared absorption peaks at 2.87, 5.90, 6.00, 6.09 μ.

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 130

13β-n-Butyl-3-methoxy-17α-ethynyl-gona-2,5(10)-dien-17β-ol

Add a solution of 13β-n-butyl-3-methoxy-gona-2,5(10)-dien-17-one (2 g.) in dimethylacetamide (200 cc.) slowly to a suspension of lithium carbide (2.5 g.) in dimethylacetamide (50 cc.) at 0° in an atmosphere of nitrogen. Stir the mixture at room temperature for 48 hours, cool to 0° and decompose by the dropwise addition of water (100 cc.). Add water and extract with ether to give after removal of the solvent, 13β-n-butyl-3-methoxy-17α-ethynyl-gona-2,5(10)-dien-17β-ol (1.8 g.) as a gum; infrared absorption peaks at 2.95, 3.05, 5.90, 5.99 μ.

3,959,322

59 | 60

This compound is useful as an intermediate for preparing the novel compositions of this invention which have hormonal activity.

## EXAMPLE 131

### 13β-Methyl-D-homo-17a-hydroxy-gon-4-en-3-one

Add 13β-methyl-D-homo-3-methoxy-gona-2,5(10)-dien-17a-ol (0.7 g.) in dioxane (20 cc.) with stirring to methanol (20 cc.) containing 11N hydrochloric acid (2.7 cc.) and water (1 cc.). Continue stirring for 2 hours, add water and extract the mixture with ether. Evaporate the washed and dried extracts, dissolve the residue in benzene and chromatograph on Florex to give 13β-methyl-D-homo-17a-hydroxy-gon-4-en-3-one; ultra-violet absorption peak at 242 mµ (ε17,000); infrared absorption peaks at 3.03, 5.92, 6.01 µ.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 132

### 13β-Ethyl-D-homo-17a-hydroxy-gon-4-en-3-one

Substitute 13β-ethyl-D-homo-3-methoxy-gona-2,5(10)-dien-17a-ol for 13β-methyl-D-homo-3-methoxy-gona-2,5(10)-dien-17a-ol to give 13β-ethyl-D-homo-17a-hydroxy-gon-4-en-3-one; ultra-violet absorption peak at 242mµ (ε17,000); infrared absorption peaks at 3.03, 5.92, 6.01 µ.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 133

### 13β-Ethyl-17β-hydroxy-gon-4-en-3-one

Add 13β-ethyl-3-methoxy-gona-1,3,5(10)-trien-17β-ol (0.5 g.) in 100 ml. of tetrahydrofuran to 150 ml. of liquid ammonia, followed by 0.5 g. of lithium foil, and stir the mixture for 10 minutes. Add ethanol (6 ml.) and tetrahydrofuran (10 ml.) over a period of 20 minutes. After disappearance of the blue color add water, extract the mixture well with ether and evaporate the washed and dried ether extract. Dissolve the crystalline residue in 50 ml. of methanol and reflux for 30 minutes with 30 ml. of 3N HCL. Remove most of the methanol under reduced pressure, and extract the residue with ether. Chromatograph the ether extract on alumina. Use benzene-ether (1:1) to elute 13-β-ethyl-17β-hydroxy-gon-4-en-3-one; m.p. 152°–55° C.

$C_{19}H_{26}O_2$ Calculated: C, 79.1% H, 9.8% Found: C, 79.25% H, 9.65%

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 134

### 13β--Ethyl-17β-hydroxy-gon-4-en-3-one

Dissolve 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17β-ol (0.47 g.) in hot methanol (25 cc.). Add 3N hydrochloric acid (15 cc.) and keep the mixture at 70° C. under nitrogen for 1 hour. Add water and work up with ether and chromatograph the resulting gum on activated alumina (40 g.). Elute with ether to give a fraction (0.2 g.) which on recrystallization from light petroleum gives 13β-ethyl-17β-hydroxy-gon-4-en-

3-one; m.p. 153°–5° C; ultra-violet absorption peak at 240 mµ (ε 16,300).

$C_{19}H_{26}O_2$ Calculated: C, 79.1% H, 9.8% Found: C,79.2% H, 9.7%

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 135

### 13β-Ethyl-17β-hydroxy-gon-4-en-3-one

Add to 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17β-ol (1.0 g.) in methanol (50 cc.), 3N hydrochloric acid (20 cc.); shake the mixture for 2 hours, pour into water, and extract the product with ether. Work up in the usual way and take up the resulting gum in benzene and chromatograph on neutral alumina. Elute with ether to give a crystalline material and recrystallize from a mixture of ether and pentane to yield 13β-ethyl-17β-hydroxy-gon-4-en-3-one (0.5 g.), m.p. 144°–7°; ultra-violet absorption peak at 240 mµ (ε15,500); infrared absorption peaks at 2.94, 6.06, 6.23 µ.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

To prepare 13β-cetyl-17β-hydroxy-gon-4-en-3-one treat 13β-cetyl-3-methoxy-gona-2,5(10)dien-17β-ol with methanolic hydrochloric acid according to the manipulative procedure described above.

To prepare 13β-ethyl-2-methoxy-17β-hydroxy-gon-4-en-3-one treat 13β-ethyl-2,3-dimethoxy-gona-2,5(10)-diene-17β-ol with methanolic hydrochloric acid according to the manipulative procedure described above.

To prepare 13β-phenethyl-17β-hydroxy-gon-4-en-3-one treat 13β-phenethyl-3-methoxy-gona-2,5(10)-diene-17β-ol with methanolic hydrochloric acid according to the manipulative procedure described above.

To prepare 13β-(3-hydroxypropyl)-17β-hydroxy-gon-4-en-3-one treat 13β-(3-hydroxypropyl)-3-methoxy-gona-2,5(10)-diene-17β-ol with methanolic hydrochloric acid according to the manipulative procedure described above.

To prepare 13β-(3-dimethylaminopropyl)-1-oxo-17β-hydroxy-gona-3-one treat 13β-(3-dimethylaminopropyl)-1,3-dimethoxy-gona-1(10),3-diene-17β-ol with methanolic hydrochloric acid according to the manipulative procedure described above.

These compounds possess androgenic and anabolic activity and are useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 136

### 13β-Ethyl-17β-hydroxy-gon-4en-3-one

Stir 13β-ethyl-17β-hydroxy-gon-5(10)-en-3-one (300 mg.) for 2 hours under nitrogen at room temperature with methanol (10 cc.)-11N hydrochloric acid (0.5 cc.)-water (0.3 cc.). Add sodium bicarbonate (2 g.) and ether (50cc.), filter the mixture, evaporate the ether and recrystallize the residue from ethyl acetate-ether to give 13β-ethyl-17β-hydroxy-gon-4-en-3-one (0.2 g.), m.p. 147°–149°; ultraviolet absorption peak at 242 mµ (ε 17,600); infrared absorption peaks at 2.78, 2.90, 6.02, 6.17.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

3,959,322

<table>
<tr><td>

**61**

### EXAMPLE 137

#### 13β-Ethyl-17β-hydroxy-gon-4-en-3-one

Add sodium borohydride (200 mg.) in ethanol (25 cc.) to 13β-ethyl-gon-4-en-3,17-dione (1 g.) in ethanol (50 cc.) at 8°. After 15 minutes add an excess of acetic acid and evaporate the solution to dryness under reduced pressure. Add water, collect the product in ether, and after this work up in the usual manner, recrystallize from a mixture of ether and pentane to obtain 13β-ethyl-17β-hydroxy-gon-4-en-3-one; ultraviolet absorption peak at 240 mμ (ε15,500); infrared absorption peaks at 2.94, 6.06, 6.23.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 138

#### 13β-Propyl-17β-hydroxy-gon-4-en-3-one

Add 3N hydrochloric acid (1 cc.) to a solution of 13β-n-propyl-3-methoxy-gona-2,5(10)-dien-17β-ol (0.61 g.) in boiling methanol (70 cc.) and cool the mixture immediately and allow to stand for 4½ hours. Pour the product into water (300 cc.) and extract the mixture with ether; work up in the usual way to give as residue an amorphous solid (0.6 g.). Crystallize this solid from a mixture of ether and hexane. Take up the resulting solid in benzene (20 cc.) and chromatograph on a column of neutral alumina. Elute the product with ether and recrystallize from a mixture of ether and hexane to obtain 13β-n-propyl-17β-hydroxy-gon-4-en-3-one (0.08 g.), mp. 126°–7°; ultraviolet absorption peak at 240 mμ (ε15,000); infrared absorption peaks at 2.92, 6.01, 6.20 μ. Evaporation of the mother liquors gives a second, polymorphic, form of the same substance (0.17 g.), m.p. 144°–5° , having ultraviolet and infrared spectra identical with the first material; a mixture of the two forms has m.p. 144°–5°.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 139

#### 13β-n-Propyl-17β-hydroxy-gon-4-en-3-one

By substituting an equivalent amount of 13β-n-propyl-17β-hydroxy gon-5(10)-en-3-one for 13β-ethyl-17β-hydroxy-gon-5(10)-en-3-one in example 136, there is obtained 13β-n-propyl-17β-hydroxy-gon-4-en-3-one; infrared absorption peaks at 2.92, 6.01, 6.20 μ; ultraviolet peak at 240 mμ (ε15,000).

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 140

#### 13β-Isopropyl-17β-hydroxy-gon-4-en-3-one

Dissolve 13β-isopropyl-3-methoxy-gona-2,5(10)-dien-17β-ol in methanol (36 cc.), concentrated hydrochloric acid (2.4 cc.) and water (1.6 cc.) and allow the mixture to stand at room temperature for 2 hours. Add water and collect the product in ether. Wash, dry and evaporate the ethereal solution and chromatograph the residue on alumina (30 g.). Elute with benzene containing 30% ether and evaporate the solvent to obtain 13β-isopropyl-17β-hydroxy-gon-4-en-3-one as a gum;

</td><td>

**62**

infrared absorption peak at 5.99 μ; ultraviolet absorption peak at 240 mμ (ε12,000).

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 141

#### 13μ-n-Butyl-17β-hydroxy-gon-4-en-3-one

Shake 13β-n-butyl-3-methoxy-gona-2,5(10)-dien-17β-ol (0.49 g.) with concentrated hydrochloric acid (1.2 cc.) in water (0.8 cc.) and methanol (18 cc.) until solution is complete. Allow to stand 2 hours at room temperature, pour the mixture into water and extract the product with ether. Evaporate the washed and dried ether extracts and recrystallize the solid from a mixture of ethyl acetate and ether to obtain the title compound (0.32 g.), m.p. 169°–70°; ultraviolet absorption peak at 240 mμ (ε17,000); infrared absorption peaks at 2.92, 6.01 μ.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 142

#### 13β-Isobutyl-17β-hydroxy-gon-4-en-3-one

Add to a mixture of concentrated hydrochloric acid (4.8 cc.), water (3.2 cc.) and methanol (.72 cc.) 13β-isobutyl-3-methoxy-gona-2,5(10)-dien-17β-ol (2.0 g.). Heat the resulting solution on a steam bath for 30 minutes with stirring. Cool to room temperature, dilute the solution with water (160 cc.) and extract with ether. Wash the ethereal solution with water, sodium bicarbonate, and water, dry over anhydrous sodium sulfate. Filter and remove the solvent under reduced pressure to give a gum. Recrystallize from ethyl acetate to obtain the title compound (0.8 g., 43%, m.p. 124.0°–125.5°; ultraviolet absorption peak at 240 mμ (ε18,200).

$C_{21}H_{32}O_2$ Calculated: C, 79.7%, H, 10.2% Found: C, 79.5%; H, 10.0%

This compound has estrogen antagonistic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 143

#### 13β, 17α-Diethyl-17β-hydroxy-gon-4-en-3-one

Dissolve 13β, 17αdiethyl-gon-5-en-3, 17β-diol (0.1 g.) in acetone (30 cc.) and add a few pieces of solid carbon dioxide. Add 8N-chromic acid dropwise until the color of the solution remains reddish orange (3 drops) and then add isopropanol (1 cc.) Shake the mixture for 5 minutes with 10% aqueous sodium hydroxide (50 cc.) and then add benzene (30 cc.) and remove the organic layer. Wash the organic layer thoroughly with brine and dry over $Na_2SO_4$ . Remove the solvent and triturate the residue with ether to give a crystalline precipitate. Recrystallize from ether to obtain the title compound, m.p. 138°–142° undepressed on admixture with authentic material.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

</td></tr>
</table>

3,959,322

63 | 64

## EXAMPLE 144

### 13β-Ethyl-17β-methoxy-gon-4-en-3-one

Add 13β-ethyl-3, 17β-dimethoxy-gona-2,5(10)-diene (0.8 g.) in tetrahydrofuran (5 cc.) to methanol (72 cc.) in an atmosphere of nitrogen and add a mixture of hydrochloric acid (4.8 cc.) and water (3.2 cc.). Add a further 10 cc. of tetrahydrofuran and after 1 hour dilute the solution with water and extract with ether. Wash, dry and evaporate the ethereal extracts and chromatograph the residue on neutral alumina. Remove impurities by elution with benzene. Wash the column with ether, evaporate the eluate and recrystallize the residue from hexane to obtain the title compound (0.2 g.), m.p. 117°–119°; ultraviolet absorption ξ max. 240 mμ (ε15,800); infrared spectrum (KBr disc) 6.0, 6.2, 8.8, 9.05 μ.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 145

### 13β-Ethyl-gon-4-en-3,17-dione

Add 13β-ethyl-3-methoxy-gona-2,5(10)-dien-17-one (12.9 g.) with stirring under nitrogen to methanol (300 cc.) containing 11N hydrochloric acid (20 cc) and water (13 cc.). Stir two hours and add sodium bicarbonate (21 g.) portionwise. Filter the mixture and evaporate and filtrate to dryness. Recrystallize the residue from ethyl acetate (75 cc.) to obtain the title compound (10 g.), m.p. 158°–161° C; ultraviolet absorption peak at 240 mμ (ε17,800); infrared absorption peaks at 5.78, 6.00, 6.17 μ.

$C_{19}H_{26}O_2$ Calculated: C, 79.76%; H, 9.15% Found: C, 80.0%; H, 9.0%

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 146

### 13β-Ethyl-gon-4-en-3,17-dione

Add 13β-ethyl-gon-5(10)-en-3,17-dione (1 g.) with stirring under nitrogen to methanol (25 cc.) containing 11N hydrochloric acid (1.75 cc.) and water (1.1 cc.). Stir for 2 hours, add sodium bicarbonate (1.75 g.) and filter the mixture. Evaporate the filtrate to dryness and recrystallize the residue from ethyl acetate to obtain the title compound; ultraviolet absorption peak at 240 mμ (ε17,800); infrared absorption peaks at 5.78, 6.00, 6.17 μ.

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 147

### 13β-Ethyl-gon-4-en-3,17-dione

Heat 13β-ethyl-3-methoxy-17,17-ethylenedioxy-gona-2,5(10)-diene (0.1 g.) in glacial acetic acid (2.5 cc.) and water (1 cc.) on a steam bath for 20 minutes, bring finally to boiling and allow to cool. Add aqueous sodium bicarbonate to neutralize the solution and ether extract the product. Wash, dry and evaporate the ether extracts to furnish a residue (0.065 g.); crystallize from a mixture of acetone and light petroleum to obtain the title compound (0.01 g.), m.p. 154°–5°; ultraviolet absorption peak at 239 mμ (ε15,000); infrared absorption peaks at 5.75, 5.96 μ.

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 148

### 13β-Methyl-D-homo-17aβ-(3-phenylpropionoxy)-gon-4-en-3-one

Add 3-phenylpropionyl chloride (1 cc.) in benzene (3 cc.) to 13β-methyl-D-homo-17aβ-hydroxy-gon-4-en-3-one (1 g.) in pyridine (3.5 cc.) at −20°. Keep the mixture overnight at −10°, add crushed ice and extract the mixture with ether-benzene (1:1). Wash the extracts in turn with 2N aqueous potassium hydroxide, water, 2N hydrochloric acid, and brine, and dry. Evaporate the solvent to give a residue. Dissolve the residue in benzene and chromatograph on silica gel to obtain the title compound; infrared absorption peaks at 5.80, 5.99 μ.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 149

### 13β-Ethyl-D-homo-17aβ-(3-phenylpropionoxy)-gon-4-en-3-one

Substitution of 13β-ethyl-D-homo-17aβhydroxy-gon-4-en-3-one for 13β-methyl-D-homo-17aβhydroxy-gon-4-en-3-one in the preceding example gives the title compound; infrared absorption peaks at 5.78, 5.99 μ.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 150

### 13β-Ethyl-17β-acetoxy-gon-4-en-3-one

Add acetyl chloride (1 cc.) in benzene 95 cc.) to 13β-ethyl-17β-hydroxy-gon-4-en-3-one (1.5 g.) in pyridine (5 cc.) at −20°. Keep the mixture at −10° for 18 hours, work up and recrystallize the product from methanol to obtain the title compound (0.9 g.); ultraviolet absorption peak at 240 mμ (ε16,700); infrared absorption peaks at 5.75, 5.99 μ.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

To prepare 13β-ethyl-17β-propionoxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with propionyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-hexanoyloxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with hexanoyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-heptanoyloxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with heptanoyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-octanoyloxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with octanoyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-lauroyloxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with lauroyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-myristoyloxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one

3,959,322

65 66

with myristoyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-palmitoyloxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with palmitoyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-oleoyloxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with oleoyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-cyclohexylacetoxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with cyclohexylacetyl chloride according to the manipulative procedure described above.

To prepare 13β-ethyl-17β-2-phenylpropionoxy-gon-4-en-3-one treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one with 2-phenylpropionyl chloride according to the manipulative procedure described above.

### EXAMPLE 151

13β-Ethyl-17β-isovaleroyloxy-gon-4-en-3-one

Keep 13Δ-ethyl-17Δ-hydroxy-gon-4-en-3-one (6 g.) with isovaleroyl chloride (7.2 g.) in pyridine at room temperature for 20 hours. Add aqueous sodium bicarbonate and extract the product with ether. Wash, dry and evaporate the extracts and purify the residue by chromatography upon neutral alumina. Distill at 200°–230°/.01 mm. and crystallize from hexane to obtain the title compound, m.p. 82°–89°; ultraviolet absorption peak at 240 m$\mu$ ($\epsilon$15,650); infrared absorption peaks at 5.76, 5.99, 6.18 $\mu$.

$C_{24}H_{36}O_3$ Calculated: C, 77.4%; H, 9.7%. Found: C, 77.1%; H, 9.7%.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 152

13β-Ethyl-17β-decanoyloxy-gon-4-en-3-one

Add decanoyl chloride (1.9 g.) to 13β-ethyl-17β-hydroxy-gon-4-en-3-one (1.3 g.) in pyridine (12.5 cc.) and allow the mixture to stand at room temperature overnight. Pour the mixture in 2N hydrochloric acid and extract with ether. Wash, dry and evaporate the extracts and recrystallize the residue from benzene-hexane to give the title compound (1.0 g.), m.p. 97°–97.5°; ultraviolet absorption peak at 239 m$\mu$ ($\epsilon$16,500); infrared absorption peaks at 5.74, 5.99, 6.17 $\mu$.

$C_{29}H_{46}O_3$ Calculated: C, 78.7%; H, 10.5%. Found: C, 78.7%; H, 10.5%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 153

13β-Ethyl-17β-(undec-10-enoyloxy)-gon-4-en-3-one

Add undec-10-enoyl chloride (2 g.) in benzene (6 cc.) to 13β-ethyl-17β-hydroxy-gon-4-en-3-one in pyridine (6 cc.) at −15°. Keep the mixture at −10° for 17 hours, add to water and extract with benzene. Wash, dry and evaporate the extracts and recrystallize the residue from ethanol to obtain the title compound, m.p. 87°–88°; ultraviolet absorption peak at 240 m$\mu$ ($\epsilon$17,000); infrared absorption peaks at 5.79, 6.00, 6.20 $\mu$.

$C_{30}H_{46}O_3$ Calculated: C, 79.2%, H, 10.2%. Found: C, 79.0% H, 10.0%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 154

13β-Ethyl-17β-(3-cyclopentylpropionoxy)-gon-4-en-3-one

Add 3-cyclopentylpropionyl chloride (2 g.) in benzene (6 cc.) to 13β-ethyl-17β-hydroxy-gon-4-en-3-one (2 g.) in pyridine (6 cc.) at −15°. Keep the mixture at −10° for 17 hours, work up and recrystallize the product from methanol to give the title compound, m.p. 88°–89°; ultraviolet absorption peak at 241 m$\mu$ ($\epsilon$17,000); infrared absorption peaks at 5.80; 6.00, 6.18 $\mu$.

$C_{27}H_{39}O_3$ Calculated: C, 78.8%; H, 9.55%. Found: C, 78.5%; H, 9.65%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 155

13β-Ethyl-17β-hemisuccinoyloxy-gon-4-en-3-one

Reflux 13β-ethyl-17β-hydroxy-gon-4-en-3-one (1.5 g.) with succinic anhydride (1.0 g.) in pyridine (10 cc.) for 2 hours. Cool the mixture and pour into an excess of 4N hydrochloric acid and extract the mixture with ether-chloroform. Wash the extract with 2N HCl, dilute with ether and exhaustively extract with aqueous sodium bicarbonate. Acidify the bicarbonate extracts and extract the product with chloroform. Recrystallize it twice from chloroform-ether to obtain the title compound, (0.8 g.), m.p. 179°–182°; ultraviolet absorption peak at 239 m$\mu$($\epsilon$15,600); infrared absorption peaks at 5.81, 6.02, 8.13 $\mu$.

$C_{23}H_{32}O_5$ Calculated: C, 71.1%, H, 8.3%. Found: C, 71.0%; H, 8.2%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 156

13β-Ethyl-17β-benzoyloxy-gon-4-en-3-one

Treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one (2 g.) in pyridine (20 cc.) with benzoyl chloride (3 cc.) in benzene (10 cc.) at −10°. Keep the mixture at that temperature for 18 hours and then pour into 2N hydrochloric acid (200 cc.). Extract the product with ether and wash, dry and evaporate the extracts. Triturate the residue with a mixture of ether and hexane. Filter the crystalline material obtained and dissolved in benzene and purify by chromatography on neutral alumina. Recrystallize from a mixture of ethyl acetate and hexane to give the title compound, m.p. 141°–9°; ultraviolet light absorption peak at 237 m$\mu$($\epsilon$27,300).

$C_{26}H_{32}O_3$ Calculated: C, 79.55%; H, 8.2%. Found: C, 79.3%; H, 8.0%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

3,959,322

67 | 68

## EXAMPLE 157

17β-Ethyl-17β-phenylacetoxy-gon-4-en-3-one

Add phenylacetyl chloride (1.5 cc.) in benzene (4.5 cc.) to 13β-ethyl-17β-hydroxy-gon-4-en-3-one (1.5 g.) in pyridine (5 cc.) at −18°. Keep the mixture at −10° for 16 hours, add ice-water and extract the product with ether. Wash, dry and evaporate the extracts to a residue and chromatograph on neutral alumina to obtain a crystalline product and recrystallise from methanol to obtain the title compound, m.p. 143°–145°; ultraviolet absorption peak at 240 mμ (ε16,300); infrared absorption peaks at 5.75, 6.00 μ.

This compound has androgenic and anabolic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 158

13β-Ethyl-17β-(3-phenylpropionoxy)-gon-4-en-3-one

Add 13β-ethyl-17β-hydroxy-gon-4-en-3-one (0.11 g.) in dry pyridine (0.35 cc.) at −20° to 3-phenylpropionyl chloride (0.11 g.) in benzene (0.3 cc.). Keep this at −10° for 16 hours, add ice-cold water and extract with a mixture of equal volumes of ether and benzene. Wash the extracts in turn with 2N potassium hydroxide solution, water, 2N hydrochloric acid solution, and brine, and dry. Evaporate solvent to give a residue and recrystallise from a mixture of ether and ethyl acetate to obtain the title compound (0.10 g.), m.p. 135°–40°; infrared absorption peaks at 5.81, 5.99, 8.51, 13.3, 14.3 μ, showing no absorption due to hydroxyl.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 159

13β-Ethyl-17β-nicotinoyloxy-gon-4-en-3-one

Reflux 13β-ethyl-17β-hydroxy-gon-4-en-3-one (1 g.) with nicotinic anhydride (2 g.) in pyridine (20 cc.) for 3 hours. Cool, add water, evaporate the mixture to dryness and extract with benzene. Wash, dry and evaporate the extracts to a residue and recrystallise from methanol to obtain the title compound; ultraviolet absorption peak at 239 mμ (ε20,000); infrared absorption peaks at 5.81, 6.00, 6.28 μ.

$C_{25}H_{31}NO_3$ Calculated: C, 76.3%; H, 7.9%; N, 3.6%. Found: C, 76.1%; H, 7.9%; N, 3.7%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 160

13β-Propyl-17β-benxoyloxy-gon-4-en-3-one

Esterify 13β-propyl-17β-hydroxy-gon-4-en-3-one (2.5 g.) with benzoyl chloride (2.0 g.). Purify the product by chromatography on Florex and recrystallize from ethyl acetate to obtain the title compound, m.p. 198°–200°; ultraviolet absorption peak at 240 mμ (ε25,000); infrared absorption peaks at 5.84, 6.00 μ.

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 161

13β-Propyl-17β-(3-phenylpropionoxy)-gon-4-en-3-one

Add 3-phenylpropionyl chloride (2.9 g.) in benzene (10 cc.) to 13β-propyl-17β-hydroxy-gon-4-en-3-one (2.5 g.) in pyridine at −10°. Pour the mixture into ice water and extract with benzene-ether. Wash, dry and evaporate the extracts to a gum and purify by chromatography upon Florex. Recrystallize from ethyl acetate-hexane to obtain the title compound, m.p. 104°–108°. **Ultraviolet absorption peak at 240 mμ (ε16,000); infrared absorption peaks at 5.76, 6.00 μ.**

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 162

13β-Butyl-17β-(3-phenylpropionoxy)-gon-4-en-3-one

Cool 13β-butyl-17β-hydroxy-gon-4-en-3-one (0.10 g.) in pyridine (0.3 cc.) to −20° and add 3-phenylpropionyl chloride (0.10 g.) in benzene (0.3 cc.). Stir the mixture at −10° for 16 hours, add ice-cold water, ether (15 cc.) and benzene (15 cc.). Separate the organic layers and wash in turn with 2N sodium hydroxide solution, water and brine, and dry. Evaporate the solvent to an uncrystallizable gum, and take up in a little benzene and filter through neutral alumina (5 g.), then wash with more benzene. Evaporate the resulting benzene solution to obtain the title compound as a gum (0.085 g.); infrared absorption peaks at 5.78, 5.99, 13.3, 14.3 μ, with no absorption due to hydroxyl.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 163

13β-Isobutyl-17β-(3-phenylpropionoxy)-gon-4-en-3-one

Add 3-phenylpropionyl chloride (.5 g.) in benzene (1.5 cc.) with swirling to 13β-isobutyl-17β-hydroxy-gon-4-en-3-one (.5 g.) in pyridine (2 cc.) at −20°. Store the mixture at −10° for 18 hours, add water and extract the product with ether. Wash, dry and evaporate the extracts to give a residue and recrystallize from methanol to give the title compound, m.p. 101°–106°; ultraviolet absorption peak at 240 mμ (ε15,300); infrared absorption peaks at 5.75, 5.95 μ.

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 164

13β-Ethyl-3,3-ethylenedithio-gon-4-en-17β-ol

Treat 13β-ethyl-17β-hydroxy-gon-4-en-3-one (0.47 g.) in methanol (5 cc.) and ethanedithiol (0.25 cc.) with boron trifluoride etherate (0.25 cc.). Allow the mixture to stand at room temperature for 15 minutes, cool to 0°, filter the precipitate and wash with cold methanol to obtain the title compound, (0.38 g.), m.p. 167°–169°.

$C_{21}H_{32}OS_2$ Calculated: C, 69.2%; H, 8.85%. Found: C, 69.1%; H, 8.9%.

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

3,959,322

69

70

## EXAMPLE 165

13$\beta$-Methyl-D-homo-17a$\alpha$-ethynyl-17a$\beta$-hydroxy-gon-4-en-3-one

Add 13$\beta$-methyl-D-homo-3-methoxy-17a$\alpha$-ethynyl-gona-2,5(10)-diene-17a$\beta$-ol (0.7 g.) in dioxane (20 cc.) with stirring to methanol (20 cc.) containing 11N hydrochloric acid (2.8 cc.) and water (1.6 cc.). Stir at room temperature for 2 hours, add water and extract the mixture with ether. Evaporate the washed and dried extracts to give a residue and dissolve in benzene and chromatograph on Florex to obtain the title compound; infrared absorption peaks at 2.97, 3.03, 6.02 $\mu$.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 166

13$\beta$-Methyl-D-homo-17a$\alpha$-ethyl-17a$\beta$-hydroxy-gon-4-en-3-one

Add 13$\beta$-methyl-D-homo-3-methoxy-17a$\alpha$-ethyl-gona-2,5(10)-diene-17a$\beta$-ol (0.6 g.) in dioxane (20 cc.) with stirring to methanol (20 cc.) containing 11N hydrochloric acid (2.4 cc.) and water (1.6 cc.). Stir for 2 hours at room temperature, add water and extract the mixture with ether. Wash, dry and evaporate the extracts to give a residue and recrystallize from ethyl acetate to obtain the title compound; ultra violet absorption peak at 240 m$\mu$ (15,000); infrared absorption peaks at 2.86, 6.01 $\mu$.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compound of this invention.

## EXAMPLE 167

13$\beta$-Ethyl-D-homo-17a$\alpha$-ethynyl-17a$\beta$-hydroxy-gon-4-en-3-one

Dissolve 13$\beta$-ethyl-D-homo-3-methoxy-17a$\alpha$-ethynyl-gona-2,5(10)-diene-17a$\beta$-ol (3.5 g.) in methanol (180 cc.) containing hydrochloric acid (12 cc.) and water (8 cc.). After 2 hours at room temperature add water and extract the mixture with ether. Wash, dry and evaporate the organic extract and recrystallize the residue from ethyl acetate to obtain the title compound 1.95 g., m.p. 171°–4°. Ultra violet absorption peak at 240 m$\mu$ (∊17,400); infrared absorption peaks at 2.99, 3.1, 6.03 $\mu$.

$C_{22}H_{30}O_2$ Calculated: C, 80.94%; H, 9.26%. Found: C, 80.73%; H, 9.35%.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 168

13$\beta$,17a$\alpha$-Diethyl-17a$\beta$-hydroxy-D-homo-gon-4-en-3-one

Dissolve 13$\beta$,17a$\alpha$-diethyl-3-methoxy-D-homo-gona-2,5(10)-dien-17a$\beta$-ol (3.5 g.) in methanol (135 cc.) containing water (6 cc.) and hydrochloric acid (9 cc.). Stir the mixture for 1 hour and then pour into brine and extract with ether. Evaporate the washed and dried ether extracts and recrystallize the residue from acetone-hexane to obtain the title compound 2.225 g., m.p. 153°–155°. Ultra violet absorption peak at 240 m$\mu$ (∊16,320); infrared absorption peaks at 2.92, 6.03 $\mu$.

$C_{22}H_{34}O_2$ Calculated: C, 79.95%; H, 10.36%. Found: C, 79.93%; H, 10.34%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 169

13$\beta$-Ethyl-17$\alpha$-methyl-17$\beta$-hydroxy-gon-4-en-3-one

Heat a solution of 13$\beta$-ethyl-3-methoxy-17$\alpha$-methyl-gona-2,5(10)-dien-17$\beta$-ol (0.5 g.) in methanol (55 cc.) under nitrogen to boiling and add 3N hydrochloric acid (0.6 cc.). Allow the solution to cool to room temperature and keep under nitrogen for 3 hours; then add water and extract the mixture with ether. Evaporate the washed and dried extracts and recrystallise the residue from a mixture of ether and hexane, and subsequently from benzene, to yield the title compound as a benzene solvate. Remove the benzene by drying at 100° for 7 hours to obtain the free compound (0.2 g.), m.p. 128°–9°. Ultraviolet absorption peak at 240m$\mu$ (∊16,200). Infrared absorption peaks at 2.95, 6.01 $\mu$.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 170

13$\beta$-Ethyl-17$\alpha$-ethynyl-17$\beta$-hydroxy-gon-4-en-3-one

To 13$\beta$-ethyl-3-methoxy-17$\alpha$-ethynyl-gona-2,5(10)-dien-17$\beta$-ol (0.7 g.) in methanol (36 cc.) add water (1.6 cc.) and concentrated hydrochloric acid (2.4 cc.). After standing at room temperature for 2 hours, add ether and evaporate the washed and dried ethereal solution to yield a gum. Dissolve the gum in benzene (5 cc.) and absorb the solution on an activated Fuller's earth (50 g.). Elute with light petroleum containing increasing proportions of benzene to yield a crystalline by-product; then elute with benzene containing a small proportion of ether to yield a crystalline product. Recrystallise the latter from ethyl acetate, to obtain the title compound (0.11 g.), m.p. 203°–6°; infrared absorption peaks at 2.97, 3.03, 6.02 $\mu$.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 171

13$\beta$-Ethyl-17$\alpha$-vinyl-17$\beta$-hydroxy-gon-4-en-3-one

Shake 13$\beta$-ethyl-17$\alpha$-ethynyl-17$\beta$-hydroxy-gon-4-en-3-one (0.5 g.) in pyridine (20 cc.) containing a 2% palladium-calcium carbonate catalyst (150 mg.) with hydrogen at atmospheric pressure until one molecular equivalent of hydrogen has been absorbed. Recrystallise the product twice from ether-hexane and dry for 4 hours at 65°/.005 mm. to yield the title compound, m.p. 108°–111°; ultraviolet absorption peak at 240 (∊15,200); infrared absorption peak at 10.9$\mu$.

$C_{21}H_{30}O_2$ Calculated: C, 80.2%; H, 9.6%. Found: C, 80.4%; H, 9.7%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## EXAMPLE 172

13$\beta$,17$\alpha$-Diethyl-17$\beta$-hydroxy-gon-4-en-3-one

Add 13$\beta$,17$\alpha$-diethyl-3-methoxy-gona-2,5(10)-dien-17$\beta$-ol (0.29 g.) to 15 cc. of a solution prepared by

3,959,322

71

mixing concentrated hydrochloric acid (2.4 cc.) water (1.6 cc.) and methanol (36 cc.). Shake the mixture for 10 minutes, during which time the solid dissolves. After 2 hours pour the solution into water (50 cc.) and extract the mixture with ether. Wash, dry and evaporate the extracts and recrystallise the residue (0.255 g.) from a mixture of ethyl acetate and light petroleum, to yield the title compound (0.196 g.), m.p. 139°–41°. Ultraviolet absorption peak at 240 mμ (ε15,000). Infrared absorption peaks at 2.86, 6.01 μ.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 173

13β-Ethyl-17α-propynyl-17β-hydroxy-gon-4-en-3-one

Suspend 13β-ethyl-3-methoxy-17α-propynyl-gona-2,5(10)-dien-17β-ol in methanol (36 cc.) and stir with concentrated hydrochloric acid (2.4 cc.). water (1.6 cc.) and dioxane (10 cc.) until dissolution is complete, and then for a further 20 minutes. Precipitate the product by the addition of water, filter, wash and dry. Recrystallise from ethyl acetate-hexane to yield the title compound, m.p. 124°–5°; infrared absorption peaks at 3.03, 4.55, 6.02 μ; ultraviolet absorption peak at 240 mμ (ε15,600).

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 174

13β-Ethyl-17α-(2-propenyl)-17β-hydroxy-gon-4-en-3-one

Suspend 13β-ethyl-3-methoxy-17α-(2-propenyl)-gona-2,5(10)-dien-17β-ol in methanol (72 cc.), concentrated hydrochloric acid (4.8 cc.) and water (3.2 cc.) in an atmosphere of nitrogen. Add dioxane (20 cc.) and stir the mixture until dissolution is complete, and then for a further 20 minutes. Add water and extract the mixture with ether. Wash the ethereal solution with saturated sodium bicarbonate solution and water, and dry. Evaporate the solvent to obtain the title compound; infrared absorption peaks at 2.94, 6.02, 6.19 μ. Ultraviolet absorption peak at 240 mμ (ε15,600).

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 175

13β-Ethyl-17α-n-propyl-17β-hydroxy-gon-4-en-3-one

Keep a solution of 13β-ethyl-3-methoxy-17α-n-propyl-gona-2,5(10)-dien-17β-ol(0.53 g.) in a mixture of methanol (22.5 cc.), 12N hydrochloric acid (1.5 cc.), and water (1.5 cc.) under nitrogen for 2½ hours at room temperature. Then add ice-water (75 cc.), filter off the precipitated solid and dissolve in ether (50 cc.), wash, dry and evaporate the ether solution, to yield a solid residue. Recrystallise the residue repeatedly from ethyl acetate, to obtain the title compound (0.23 g.), m.p. 132°–4.5°. Ultraviolet absorption peak at 240 mμ (ε15,900); infrared absorption peaks at 2.92, 6.02, 6.18 μ.

$C_{79}H_{34}O_2$ Calculated: C, 79.5%; H, 10.4%. Found: C, 79.8%; H, 10.2%.

72

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 176

13β-Ethyl-17α-(2-isobutenyl)-17β-hydroxy-gon-4-en-3-one

Suspend 13β-ethyl-3-methoxy-17α-(2-isobutenyl)-gona-2,5(10)-dien-17β-ol (1.5 g.) in methanol (36 cc.), concentrated hydrochloric acid (2.4 cc.). water (1.6 cc.) and dioxane (10 cc.). When the material has dissolved, add water, filter the precipitate and again stir with methanol (36 cc.), concentrated hydrochloric acid (2.4 cc.) and water (1.66 cc.) for 20 minutes. Then gradually add water and filter the precipitate; wash with water, dry and crystallise from ethyl acetate-hexane and then from acetonitrile to yield the title compound (2 g.); infrared absorption peaks at 2.90, 6.01, 6.20, 11.3 μ; ultraviolet absorption peak at 240 mμ (ε16,800).

This compound has estrogen antagonistic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 177

13β-n-Propyl-17α-methyl-17β-hydroxy-gon-4-en-3-one

Shake 13β-n-propyl-3-methoxy-17α-methyl-gona-2,5(10)-dien-17β-ol (1.0 g.) with 44 cc. of an aqueous methanolic hydrochloric acid solution and stir for 2 hours; then pour the product into water and work up with ether. Purify by chromatography on silica gel (elute with ether), and recrystallise from a mixture of ethyl acetate and hexane to obtain the title compound (0.35 g.), m.p. 134°–5.5°; ultraviolet absorption peak at 240 mμ (ε18,100); infrared absorption peak at 6.02 μ.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 178

13β-n-Propyl-17α-ethynyl-17β-hydroxy-gon-4en-3-one

Shake 13β-n-propyl-3-methoxy-17β-ethynyl-gona-2,5(10)-dien-17-ol (0.31 g.) with a solution prepared by mixing concentrated hydrochloric acid (0.81 cc.), water (0.54 cc.) and methanol (12.15 cc.), until the solid dissolves. After addition of water, work up with ether, purify by recrystallization from cyclohexane to obtain the title compound (0.1 g.), m.p. 149°–50.5°; ultraviolet absorption peak at 240 mμ (ε15,700); infrared absorption peaks at 2.99, 3.06, 6.04, 6.16 μ.

$C_{22}H_{30}O_2$ Calculated: C, 80.9%; H, 9.3%. Found: C, 81.0%; H, 9.31%.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

EXAMPLE 179

13β-n-Propyl-17α-vinyl-17β-hydroxy-gon-4-en-3-one

Hydrogenate 13β-n-propyl-17α-ethynyl-17β-hydroxy-gon-4-en-3-one (0.5 g.) to yield the title compound (.425 g.), m.p. 94°–97°; ultraviolet absorption peak at 240 mμ (ε15,600); infrared absorption peak at 10.9 μ.

3,959,322

73

$C_{22}H_{32}O_2$ Calculated: C, 80.4%; H, 9.8%; Found: C, 81.1%; H, 9.9%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 180

13β-n-Propyl-17α-ethyl-17β-hydroxy-gon-4-en-3-one

Stir a mixture of 13β-n-propyl-3-methoxy-17α-ethyl-gona-2,5(10)-dien-17β-ol (0.8 g.) in tetrahydrofuran (20 cc.), methanol (50 cc.), 12N hydrochloric acid (3.3 cc.) and water (2.2 cc.) at room temperature for 2 1/2 hours and then pour into sodium chloride solution; extract the mixture with ether and wash, dry and evaporate the extracts. Dissolve the crystalline residue obtained (0.8 g.) in a mixture (25 cc.) of equal volumes of benzene and hexane and chromatograph on silica gel; elute with a mixture of equal volumes of benzene and chloroform to yield a crystalline material. Recrystallise this product from a mixture of benzene and light petroleum, to give a benzene solvate, m.p. 93°–5°; and then recrystallise this material from a mixture of hexane and ·ethyl acetate to obtain the solvent free product, 13β-n-propyl-17α-ethyl-17β-hydroxy-gon-4-en-3-one    (0.2 g.), m.p. 98°–100°; ultraviolet absorption peak at 240 mμ (ε 15,700); infrared absorption peaks at 2.92, 6.02, 6.18 μ.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 181

13β-n-Propyl-17α-propynyl-17β-hydroxy-gon-4-en-3-one

Stir    13β-n-propyl-3-methoxy-17α-propynyl-gona-2,5(10)-dien-17β-ol (2.5 g.) under nitrogen with methanol (135 cc.) containing 11N hydrochloric acid (9cc.) and water (6 cc.). After two hours add isopropyl alcohol (35 cc.) and continue stirring for a further 30 minutes. Add the mixture to brine and extract the product with ether. Evaporate the washed and dry extracts to a glass, dissolve in benzene and chromatograph on Florex. Elute with benzene containing 5% ether and re-crystallise the product so obtained from ethyl acetate-hexane to yield the title compound, m.p. 182°–184°; ultraviolet absorption peak at 240 mμ (ε16,700).

$C_{23}H_{32}O_2$ Calculated: C, 81.1%; H, 9.5%. Found: C, 80.95%; H, 9.4%

This compound has progestational and estrogen antagonistic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 182

13β-n-Propyl-17α-allyl-17β-hydroxy-gon-4-en-3-one

Stir    13β-n-propyl-3-methoxy-17α-allyl-gona-2,5(10)-dien-17β-ol (0.77 g.) under nitrogen in isopropyl alcohol (25 cc.) containing 11N hydrochloric acid (2.5 cc.) and water (1.6 cc.) for 2.5 hours. Filter the mixture, add to brine and extract the product with ether. Evaporate the washed and dry extracts and purify the residue by chromatography on Florex and by recrystallisation from ethyl acetate to obtain the title compound, m.p. 135°–137°; ultraviolet absorption peak at 241.5 mμ (ε17,500); infrared absorption peaks at 2.95, 6.02, 6.18 μ.

74

$C_{23}H_{34}O_2$ Calculated: C, 80.65%; H, 10.0%. Found: C, 80.4%; H, 9.8%.

This compound has progestational anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 183

13β,17α-Di-n-propyl-17β-hydroxy-gon-4-en-3-one

Stir    13β,17α-di-n-propyl-3-methoxy-gona-2,5(10)-dien-17β-ol (1.07 g.) under nitrogen in methanol (50 cc.) containing water (2.5 cc.) and 11N hydrochloric acid (3.5 cc.) at room temperature for 2 hours. Then add water and extract the product with ether. Evaporate the washed and dry extracts and purify the residue by chromatography on alumina, by repeated recrystallization from ethyl acetate, and by sublimation at 145°/.003 mm. to obtain the title compound, (.34 g.), m.p. 147°–49°. Ultraviolet absorption peak at 241.5 mμ (ε16,600); infrared absorption peaks at 2.91, 6.02, 6.19 μ.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 184

13β-n-Propyl-17α(1-methallyl)-17β-hydroxy-gon-4-en-3-one

Stir    13β-n-propyl-3-methoxy-17α(1-methallyl)-gona-2,5(10)-dien-17β-ol (1.5 g.) under nitrogen with methanol (90 cc.) containing 11N hydrochloric acid (9 cc.) and water (6 cc.). Add the mixture to brine and extract the product with ether. Evaporate the washed and dried extracts to yield the title compound; ultraviolet absorption peak at 240 mμ (ε13,500); infrared absorption peak at 11.0 μ.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 185

13β-n-Propyl-17α-(2-methallyl)-17β-hydroxy-gon-4-en-3-one

Employ the method of Example 184 to hydrolyse 13β-n-propyl-3-methoxy-17α-(2-methallyl)-gona-2,5(10)-dien-17β-ol. Purify the product by chromatography on Florex and recrystallisation from ethyl acetate to afford the title compound, m.p. 141.5°–143.5°; ultraviolet absorption peak at 241 mμ (ε16,700); infrared absorption peaks at 2.87, 6.01, 6.18 μ.

$C_{24}H_{36}O_2$ Calculated: C, 80.85%; H, 10.2%. Found: C, 80.8%; H, 9.9%.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 186

13β-n-Butyl-17αethynyl-17β-hydroxy-gon-4-en-3-one

Hydrolyse    13β-n-butyl-3-methoxy-17α-ethynyl-gona-2,5(10)-dien-17β-ol (2 g.) by the method of Example 184 and purify the product by chromatography on Florex and by recrystallization from ether-hexane to afford the title compound (.71 g.), m.p. 159°–163°; ultraviolet absorption peak at 240 mμ (ε15,900); infrared absorption peaks at 6.00 μ.

$C_{23}H_{32}O_2$ Calculated: C, 81.1%; H, 9.5%. Found: C, 80.8%/ H, 9.3%.

3,959,322

## 75

The compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 187

#### 13β-n-Butyl-17α-ethyl-17β-hydroxy-gon-4-en-3-one

Keep a solution of 13β-n-butyl-3-methoxy-17α-ethylgona-2,5(10)-dien-17β-ol (1.05 g.) in a mixture of tetrahydrofuran (15 cc.), methanol (54 cc.), 12N hydrochloric acid (3.6 cc.) and water (2.4 cc.) for 2 hours at room temperature and then pour into brine (350 cc.). Work up with ether and dissolve the product, a gum (1.0 g.), in a mixture of light petroleum and benzene (25 cc.) and chromatograph on silica gel. Elute with benzene containing a small proportion of ether to give a crystalline by-product (0.1 g.); subsequently elute with a mixture of ether, benzene and chloroform (in the proportions 5:4:1 by volume) to yield a crystalline product. Recrystallize the latter from hexane, and subsequently from hexane containing a little ethyl acetate to obtain the title compound (0.23 g.), m.p. 78°–80°; ultraviolet absorption peak at 240 mμ (ε14,700); infrared absorption peaks at 2.88, 6.00, 6.18 μ.

This compound has anabolic, androgenic and estrogen antagonistic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 188

#### 13β,17αDiethyl-17β-hydroxy-gon-4-en-3-one

Treat 13β,17α-diethyl-17β-hydroxy-gon-5(10)-en-3-one (12.2 g.) with a solution of methanol (442 cc.), water (22 cc.) and concentrated hydrochloric acid (30 cc.) and allow the mixture to stand at room temperature for 2 hours. Precipitate the product by the addition of water, extract the reaction mixture with ether and wash the ethereal solution with 10% aqueous sodium carbonate, brine and dry (MgSO₄). Evaporate the solvent and recrystallize the residue from acetonitrile to give the title compound 7.9 g. (64.8%), m.p. 144°–5°; infrared absorption 2.92, 6.0, 6.2 μ; ultraviolet absorption λmax. 240 mμ (ε15,680).

$C_{21}H_{32}O_3$ Calculated: C, 79.86%; H, 10.04%. Found: C, 79.70%; H, 10.19%.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 189

#### 13β-Ethyl-17α-ethynyl-17β-hydroxy-gon-4-en-3-one

Stir 13β-ethyl-17α-ethynyl-17β-hydroxy-gon-5(10)-en-3-one (0.1 g.) with a mixture of methanol (36 cc.), water (1.6 cc.) and concentrated hydrochloric acid (2.4 cc.) for 1 hour. Add water and extract the mixture with ether. Wash, dry and evaporate the ethereal solution and recrystallize the residue from ether-hexane to obtain the title compound, m.p. 203°–6° undepressed on admixture with authentic material. Infrared spectrum 3.05, 3.5, 6.05, 9.4 μ.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

## 76

### EXAMPLE 190

#### 13β,17α-Diethyl-17β-hydroxy-gon-4-en-3-one

Add 13β-ethyl-17α-ethynyl-17β-hydroxy-gon-4-en-3-one (1 g.) in benzene (15 cc.) and ethanol (5 cc.) to a pre-reduced suspension of 2% palladium on calcium carbonate (0.3 g.) in benzene (10 cc.) and shake the mixture in an atmosphere of hydrogen until 163 cc. (2.1 moles) of hydrogen has been absorbed. Filter off the catalyst, evaporate the solvent and shake the product (0.55 g.) in methanol (10 cc.) with a solution of sodium metabisulphite (1.7 g.) in water (8 cc.) for 5 minutes. Add water, extract the mixture with ether; wash, dry and evaporate the ethereal solution and recrystallize the product from acetone to obtain the title compound (0.4 g.), m.p. 144° undepressed on admixture with authentic material; infrared spectrum 2.9, 6.0, 6.18; ultraviolet spectrum max. 241 mμ (ε17,250).

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 191

#### 17β-Ethyl-17α-ethynyl-17β-hydroxy-gon-4-en-3-one

Treat 13β-ethyl-3-ethoxy-17α-ethynyl-gona-3,5-dien-17β-ol (0.1 g.) with a mixture of methanol (10 cc.) and 50% hydrochloric acid (1 cc.) and allow the mixture to stand at room temperature for 1 hour. Add water, filter off the precipitated product and recrystallize frm ethyl acetate-hexane to yield the title compound, identical with authenic material by mixed melting point determination and comparison of infrared spectra.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 192

#### 13β,17α-Diethyl-17β-hydroxy-gonan-3-one

Dissolve 13β-ethyl-17α-ethynyl-17β-hydroxy-gon-4-en-3-one (1.5 g.) in ethanol (50 cc.) and shake with 10% palladium on charcoal (0.9 g.) in an atmosphere of hydrogen will uptake of hydrogen ceases. Filter off the catalyst, evaporate the solvent and recrystallize the reside from ether-hexane to afford title compound, m.p. 192°–196°.

$C_{21}H_{34}O_2$ Calculated: C, 79.19%; H, 10.76% Found: C, 79.4%; H, 10.43%

This compound has estrogen antagonistic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 193

#### 13β-Ethyl-3-methoxy-17α-ethynyl-17β-acetoxy-gona-1,3,5(10)-triene

Shake 13β-ethyl-3-methoxy-17α-ethynyl-gona-3,5(10)-trien-17β-ol (1.1 g.) with toluene-p-sulphonic acid (0.3 g.) and acetic anhydride (10 cc.) until the solution is homogenous and then allow to stand at room temperature for 12 hours. Decompose the reaction mixture by stirring with water containing a little pyridine and extract with ether. Wash the ethereal solution with water, 2N aqueous sodium hydroxide, water, dilute hydrochloric acid, brine and dry (MgSO₄). Evaporate the solvent and dissolve the crystalline residue in benzene and filter through a short column of alumina.

3,959,322

## 77

Recrystallize the product from methanol-ethyl acetate to obtainn the title compound 0.98 g., m.p. 178°–182°; infrared absorption peaks at 3.02, 5.75 μ.

This compound has estrogenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 194

#### 13β-Ethyl-3-methoxy-17α-dibromoacetyl-17β-acetoxy-gona-1,3,5(10)-triene

Dissolve 13β-ethyl-3-methoxy-17α-ethynyl-17β-acetoxy-gona-1,3,5(10)-triene (0.6 g.) in tertiary butanol (25 cc.) and water (0.4 cc.) and add N-bromoacetamide (0.55 g.). Allow the mixture to stand for 15 hour, then add water (10 cc.), cool to 0° and allow to stand for 3 hours. Filter the precipitated product, wash with aqueous methanol and dry to obtain the title product (0.72 g.), m.p. 85°–92°.

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 195

#### 13β-Ethyl-3-methoxy-17α-acetyl-17β-acetoxy-gona-1,3,5(10)-triene

Heat 13β-ethyl-3-methoxy-17α-dibromacetyl-17β-acetoxy-gona-1,3,5(10)-triene (0.7 g.) in acetic acid (27 cc.) and water (2.7 cc.) with sodium acetate (0.7 g.) and zinc dust (0.99 g.) at 100° for 15 minutes with stirring. Filter the mixture, add water to the filtrate and filter the precipitated product. Dry the residue and recrystallize from ethyl acetate-methanol to obtain the title product (0.25 g.), m.p. 144°–8°; infrared absorption peaks at 5.8, 5.9 μ.

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 196

#### 13β-Ethyl-17β-acetylgon-4-en-3-one

Add 13β-ethyl-3-methoxy-17α-acetyl-17β-acetoxy-gona-1,3,5(10)-triene (0.24 g.) in dioxan (5 cc.) to a stirred solution of lithium (0.15 g.) in liquid ammonia (100 cc.). After 30 minutes add methanol (8 cc.) followed by lithium (0.5 g.) in small pieces. Add water, extract with ether and work up to a gum (0.218 g.). Reflux this product with 4N hydrochloric acid (5 cc.) and methanol (8 cc.) for 15 minutes. Add water, extract with ether, work up and dissolve the resulting gum in acetone (30 cc.) containing anhydrous magnesium sulphate (0.5 g.) and add 8N-chromic acid dropwise with swirling until the solution assumes a permanent yellowish-orange color. Add excess isopropanol and evaporate the solution almost to dryness. Add water, extract with ether, wash, dry and evaporate the organic solution, filter the product through alumina with benzene-ether and recrystallize the product from ethyl acetate to obtain the title product (0.072 g.), m.p. 138°–142°; infrared absorption peaks at 5.9, 6 μ.

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of the invention.

### EXAMPLE 197

#### 13β-Ethyl-gon-4-en-   β-ol

Add 13β-ethyl-3,3-ethylenedithio gon-4-en-17β-ol in ether (5 cc.) and tetrahydrofuran (2 cc. to a stirred solution of liquid ammonia (50 cc.) and add sodium

## 78

(0.5 g.) in pieces and then add ethanol dropwise to discharge the blue color. Add ammonium chloride and water, extract with ether and wash, dry and evaporate the organic solution. Recrystallize the residue from light petroleum, b.p. 60°–80°, to obtain 13β-ethyl-gon-4-en-17β-ol, m.p. 118°–120°.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 198

#### 13β-Ethyl-gon-4-n-17-one

Dissolve 13β-ethyl-gon-4-en-17β-ol (0.29 g.) in acetone (40 cc.) and 8N-chromic acid dropwise with stirring until the solution become permanently orange and then add isopropanol (3 cc.) and evaporate the solution to small bulk (ca. 5 cc.). Add water and extract the mixture with ether. Wash, dry and evaporate the ethereal solution to obtain 13β-ethyl-gon-4-en-17-one (0.24 g.), m.p. 101°–102° C. Purify by recrystallization from methanol to obtain the pure product, m.p. 102.5°–103.5° C.

$C_{19}H_{28}O$ Calculated: 83.8%; H, 10.4% Found: 83.55%; H, 10.7%

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 199

#### 13β-Ethyl-17α-allyl-gon-4-en-17-ol

Reflux magnesium (0.36 g.) and allyl bromide (0.15 cc.) in dry ether (10 cc.) for 15 minutes and then add 13β-ethyl-gon-4-en-17-one (0.9 g.) in ether (40 cc.) containing allyl bromide (2.9 cc.). Reflux the mixture for 3 hours and treat the cooled solution with aqueous ammonium chloride. Extract the product with ether and wash the ethereal solution with water, brine and dry (MgSO₄). Evaporate the solvent and recrystallize the residue from methanol to obtain 13β-ethyl-17α-allyl-gon-4-en-17β-ol (0.97 g.), m.p. 88.5°–91° C. Recrystalline further from ether-hexane to obtain the pure product, m.p. 92°–94° C.

$C_{22}H_{34}O$ Calculated: C, 84.0%; H, 10.9% Found: C, 84.4%; H, 10.9%

This compound has progestational activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 200

#### 13β-n-Propyl-3,3-ethylenedithio-gon-4-en-17β-ol

Treat 13β-n-propyl-17β-hydroxy-gon-4-en-3-one (6 g.) in acetic acid (15 cc.) with ethane dithiol (1.75 cc.) followed by boron trifluoride etherate (1.75 cc.). Allow the mixture to stand at room temperature for 15 minutes then pour into water and filter. Recrystallize the residue from methanol to obtain the title product, (6.05 g.), m.p. 165°–166.5° C. Recrystallize further to obtain the pure compound, m.p. 167°–168.5° C.

$C_{22}H_{34}OS_2$ Calculated: C, 69.8%; H, 9.05%; S, 16.9% Found: C, 69.6%; H, 8.9%; S, 16.5%

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 201

#### 13β-n-Propyl-gon-4-en-17β-ol

Add 13β-n-propyl-3,3-ethylenedithio-gon-4-en-17β-ol (5.8 g.) in tetrahydrofuran (40 cc.) and ether (20

3,959,322

79

cc.) with stirring to a solution of sodium (3 g.) in liquid ammonia (250 cc.). Add more sodium (3 g.) in pieces over 30 minutes followed by the dropwise addition of ethanol to discharge the blue color. Add water, extract with ether and wash, dry and evaporate the organic extracts. Recrystallize the product from ether-hexane to obtain the title product (4.5 g.), m.p. 115°–119° C.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 202

#### 13β-n-Propyl-gon-4-en-17-one

Add 8N chromic acid dropwise with stirring to a solution of 13β-n-propyl-gon-4-en-17β-ol in acetone (100 cc.) until the solution becomes permanently orange. Add isopropanol (10 cc.) and potassium carbonate (5 g.), filter and evaporate the filtrate to dryness. Filter the residue in benzene-ether (1:1) through neutral alumina (20 g.), evaporate and recrystallize the product from methanol to obtain 13β-n-propyl-gon-4-en-17-one. Recrystallize from ether-hexane to obtain the pure product, m.p. 89°–90° C.

$C_{20}H_{30}O$ Calculated: C, 83.3; H, 10.6% Found: C, 83.9; H, 10.5%

This compound is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 203

#### 13β-n-Propyl-17α-ethynyl-gon-4-en-17β-ol

Add 13β-n-propyl-gon-4-en-17-one (1.5 g.) in dimethylacetamide (50 cc.) to a stirred suspension of lithium acetylide (40 cc. of a 15% solution in dioxan-triethylamine) and pass a slow stream of acetylene through the stirred solution for 40 hours. Pour the mixture into iced water and extract with ether. Wash and dry the ethereal solution and evaporate to dryness. Recrystallize the product twice from methanol and once from hexane to obtain the title product, m.p. 118°–119° C.

$C_{22}H_{32}O$ Calculated: C, 84.55%; H, 10.3% Found: C, 84.8%; H, 10.4%

This compound has progestational activity and is useful for preparing the hormonal compounds of this invention.

### EXAMPLE 204

#### 13β-n-Propyl-17α-allyl-gon-4-en-17β-ol

Reflux magnesium (0.36 g.) and allyl bromide (1.5 cc.) in ether (15 cc.) for 15 minutes and then add a solution of 13β-n-propyl-gon-4-en-17-one in ether (10 cc.) and allyl bromide (2.9 cc.). Reflux for 3 hours and treat the cooled solution with aqueous ammonium chloride. Extract the mixture with ether and wash, dry, and evaporate the ethereal solution. Recrystallize the residue from methanol and then from hexane to obtain 13β-n-propyl-17α-allyl-gon-4-en-17β-ol, m.p. 90°–92° C.

$C_{23}H_{36}O$ Calculated: C, 84.1%; H, 11.1% Found: C, 84.15%; H, 11.1%

This compound has progestational activity and is used as an intermediate for preparing the hormonal compounds of this invention.

80

### EXAMPLE 205

#### 13β,17α-Diethyl-gon-4-en-3,17β-diol

Add 13β,17α-diethyl-17β-hydroxy-gon-4-en-3-one (10 g.) in tetrahydrofuran (100 cc.) and ether (100 cc.) to a stirred suspension of lithium aluminum hydride (5 g.) in ether (1000 cc.). Reflux the mixture for 2 hours, cool and decompose excess reagent by cautiously adding water. Separate the organic phase, wash, dry and evaporate to obtain the title product (10 g.), m.p. 110°–122° C.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 206

#### 13β,17α-Diethyl-3-acetoxy-gon-4-en-17β-ol

Allow 13β,17α-diethyl-gon-4-en-3,17β-diol (3 g.) in pyridine (30 cc.) and acetic anhydride (3cc.) to stand for 12 hours at 0° C. Evaporate the solvents under reduced pressure at less than 50° C. and crystallize the residue from ether-hexane to obtain the title product (2.43 g.), m.p. 85°–100° C.

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 207

#### 13β,17α-Diethyl-gon-4-en-17β-ol

Add 13β,17α-diethyl-3-acetoxy-gon-4-en-17β-ol (1.35 g.) in ether (50 cc.) to a stirred solution of lithium (0.5 g.) in redistilled ethylamine (100 cc.). Stir the mixture for 15 minutes and decompose excess reagent with sodium nitrite. Allow the ethylamine to evaporate and add sodium sodium sulphate (10 g.) and ether (200 cc.). Evaporate the filtered ethereal solution and recrystallize the residue from ether-hexane to give the title product, m.p. 96°–112° C. Chromatograph on neutral alumina, eluting with benzene containing 5% ether and recrystallize from ether to obtain the pure compound, m.p. 117.5°–118.5° C.

$C_{21}H_{34}O$ Calculated: C, 83.4%; H, 11.3% Found: C, 83.5%; H, 11.3%

This compound has anabolic and androgenic activity and is useful as an intermediate for preparing the hormonal compounds of this invention.

### EXAMPLE 208

#### dl-13-Ethyl-17-ethynylgon-4-en-17β-ol

Stir 13-ethylgon-4-en-17-one (2.1 g) with lithium acetylide (4.5 g) in dimethylacetamide (60 ml) for 60 hours. Recrystallize twice from methanol to obtain the title compound (1.13 g), m.p. 106°–108°. Chromatograph on neutral alumina (35 g) and recrystallize from methanol and then from ether-hexane to obtain an analytical sample with m.p. 109°–110°; infrared absorption peaks at 2.8 $\mu$, 3.6 $\mu$.

$C_{21}H_{30}O$ Calculated: C, 84.51%; H, 10.13% Found: C, 84.43%; H, 9.86%

This compound has progestational activity.

### EXAMPLE 209

#### dl-17α-Allyl-17-hydroxy-13-propylgon-4-en-3-one

Treat dl-3-methoxy-13-propylgona-2,5(10)-dien-17-one (2.0 g) with allyl magnesium bromide to obtain a glass that is a mixture of dl-17α-allyl-3-methoxy-13-

3,959,322

81

propylgona-2,5(10)-dien-17-ol (minor component) and the Δ$^{5(10)}$-3-keto and Δ$^4$-3-keto compounds (major component). Hydrolyze the mixture (in two portions) with hydrochloric acid-isopropanol-water, then chromatograph and crystallize the resultant crude product to obtain the title compound (22% from the starting material), m.p. 135°–137°; ultraviolet absorption peak at 241.5 mμ (ε17,470), infrared maxima at 2.95 μ (OH), 6.03 μ, 6.18 μ (α,β-unsaturated carbonyl), 10.93 μ (R-CH=CH₂).

C₂₃H₃₄O₂ Calculated: C, 80.65%; H, 10.01% Found: C, 80.39%; H, 9.77%

This compound has progestational activity.

EXAMPLE 210

dl-3-(17β-Hydroxy-3-oxo-13-propylgon-4-en-17α-yl)propionic acid, γ-lactone

Add dl-17α-ethynyl-3-methoxy-13-propylgona-1,3,5(10)-trien-17β-ol (8.7 g) in tetrahydrofuran (200 ml) with stirring to 3 moles of ethereal methyl magnesium bromide (100 ml). Stir the mixture, distil until the boiling point of the distillate reaches 63°. Keep the mixture at reflux with stirring for 21 hours and add the cooled mixture with swirling to solid carbon dioxide (ca. 1 kg). After 1.5 hours acidify the mixture with sulfonic acid and extract with ether. Extract the ether solution with aqueous sodium hydrogen carbonate and acidify the extracts to obtain dl-3-(17β-hydroxy-3-methoxy-13-propylgona-1,3,5(10)-trien-17α-yl)-prop-2-ynoic acid. Recycle the neutral material to obtain further acid. Hydrogenate this acid (4.3 g) in ethanol (100 ml) containing 5% palladized charcoal (3 g). Add the product (3.05 g), m.p. 183°–191°, to sodium hydroxide (0.32 g) in methanol and evaporate the resulting solution to dryness. Reduce the product with lithium (5 g) in liquid ammonia (300 cc)-tetrahydrofuran (50 cc)-t-butanol (50 cc). Keep the product at room temperature for two hours in methanol (50 ml)-water (10 ml)-concentrated hydrochloric acid (5 ml). Purify the product by sublimation, chromatography and recrystallization from acetone to obtain the title compound, m.p. 197°–199.5°, λ max. 240.5 mμ (ε16,800); infrared absorption peaks at 5.67, 6.01, and 6.21 μ.

C₂₃H₃₂O₃ Calculated: C, 77.5%; H, 9.05% Found: C, 76.6%; H, 8.95%

This compound has aldosterone blocking activity.

EXAMPLE 211

dl-17β-Hydroxyestr-4-en-3-one 3-phenylpropionate

(dl-19-Nortestosterone 3-phenylpropionate)

Dissolve dl-17β-hydroxyestr-4-en-3-one (0.3 g) in pyridine (1 ml) cooled to −15°. Allow the mixture to stand at −10° for 15 hours. Pour into water and extract with benzene. Wash the organic extracts successively with 10% aqueous sodium hydroxide, 10% hydrochloric acid, water, and brine. Dry over sodium sulfate and evaporate. Filter the residue through a short column of alumina with benzene and recrystallize from ethyl acetate-light petroleum ether to obtain the title compound, m.p. 120°–122°; ultraviolet absorption peak at 241 mμ (ε16,900), infrared maxima at 5.8 μ, 6.05 μ.

This compound has anabolic activity.

82

EXAMPLE 212

dl-17α-Chloroethynyl-17-hydroxy-13-propylgon-4-en-3-one

Treat dl-3-methoxy-13-propylgona-2,5(10)-dien-17-one (8.0 g) in ether (250 cc) with chloroethynyl lithium prepared from methyl lithium (5.53%, .35 M) (100 cc) and dichloroethylene (16.9 g, .175 M) in ether. Stir for twenty hours under nitrogen. Wash, dry and evaporate the ether layer. Triturate the residue with hot methanol (225 cc) to obtain dl-3-methoxy-17α-chloroethynyl-17-hydroxy-13-propylgona-2,5(10)-diene (2.5 cc), m.p. 110°–116°, λ max. CHCl₃4.55, 5.94, 6.04 μ.

Hydrolyze crude dl-3-methoxy-17α-chloroethynyl-17-hydroxy-13-propyl-gona-2,5(10)-diene with water (4 cc), methanol (90.0 cc), HCl (6.0 cc) and isopropanol (10 cc) under nitrogen. Pour into brine and extract with ether. Chromatograph the crude product on Florex (200 g). Elute with 5% ether-95% benzene and recrystallize from ethyl acetatehexane to obtain the title compound (1.10 g), m.p. 179°–181°C; λ max. KBr 2.90, 4.53, 6.03 μ; λ max. EtOH 240 mμ (ε16,900).

C₂₂H₃₂ClO₂ Calculated: C, 73.21%; H, 8.10%; Cl, 9.82% Found: C, 73.51%; H, 8.19%; Cl, 9.9%

This compound has progestational activity.

EXAMPLE 213

dl-17α-Chloroethynyl-13-ethyl-17-hydroxygon-4-en-3-one

Carry out an Oppenauer oxidation on dl-13-ethyl-3-methoxygona-2,5(10)-dien-17β-ol (70 g) in the usual manner to obtain dl-13-ethyl-3-methoxygona-2,5(10)-dien-17-one (58 g, 83% yield). Combine this material with a further 5.5 g. of dl-13-ethyl-3-methoxygona-2,5(10)-dien-17-one. Prepare a solution of approximately 0.5 mole of lithium chloroacetylide in ether in the following manner. Transfer, under nitrogen, a solution of methyl lithium (23.6 g) in ether (406 g) to a 2-liter, 3-necked flask equipped with dry-ice condenser. Cool in ice to 0°. Add trans-dichloroethylene (60 g) dropwise with stirring. Allow the resultant mixture to come to room temperature before adding the steroid.

Add the enol ether as a slurry in tetrahydrofuran (500 ml) to the solution of lithium chloroacetylide in ether. Stir the steadily darkening solution for 2 hours, then work up by addition of ice water (500 ml), followed by extraction in the usual manner. Evaporate the solvent and triturate the residue with hot methanol to obtain 17α-chloroethynyl-13-ethyl-3-methoxygona-2,5(10)-dien-17β-ol (73 g).

Dissolve 17α-chloroethynyl-13-ethyl-3-methoxygona-2,5(10)-dien-17β-ol (60 g) in the minimum volume of tetrahydrofuran and add to a stirred mixture of methanol (720 ml), concentrated hydrochloric acid (48 ml), and water (32 ml). Stir until all the precipitated material has dissolved. Stir the mixture for a further 30 minutes, when the title compound will begin to crystallize out. Then slowly add water (2 liters) to precipitate the rest of the product, filter off, wash thoroughly with distilled water, and partially dry in a desiccator. Take up the crude material in hot ethyl acetate and charcoal with Norit (30 g). This treatment will remove almost all the color. Evaporate the solvent and crystallize the material from methanol (400 ml) and water (130 ml) to obtain the title compound (54 g);

3,959,322

83 | 84

infrared absorption peak at 5.75 μ. Crystallize further from methanol (300 ml) and water (100 ml) to obtain an analytical sample (43 g) with m.p. 186°–189°; ultraviolet absorption peak at 240 mμ (ε16,100); infrared maxima at 3.05 μ, 4.6 μ, 6.05 μ.

$C_{19}H_{27}ClO_2$ Calculated: C, 72.71%; H, 7.85%; Cl, 10.22% Found: C, 72.75%; H, 7.77%; Cl, 10.20%

This compound has progestational activity.

EXAMPLE 214

dl-6-Dibromomethylene-13-ethylgon-4-ene-3,17-dione
and
dl-13-Ethyl-6-methylgon-4-ene-3,17-dione

React dl-13-ethyl-3-methoxygona-2,5(10)-dien-17β-ol (50.2 g) according to the Oppenauer oxidation procedure to obtain dl-13-ethyl-3-methoxygona-2,5(10)-dien-17-one, m.p. 126°–143°; no aromatic system shown by ultraviolet absorption, infrared absorption peaks (potassium bromide) at 5.78 μ, 6.09 μ, 6.18 μ. Treat dl-13-ethyl-3-methoxygona-2,5(10)-dien-17-one with hydrochloric acid in aqueous methanol to obtain dl-13-ethylgon-4-ene-3,17-dione (25.6, 54% from dl-13-ethyl-3-methoxygona-2,5(10)-dien-17β-ol), m.p. 156°–157.5°; ultraviolet absorption peak in 95% ethanol at 240.5 mμ (15,900), infrared maxima (potassium bromide) at 5.77 μ, 5.98 μ. Recrystallize dl-13-ethylgon-4-ene-3,17-dione (1.0 g) three times from ethyl acetate to obtain 484 mg., 157°–159.5°; ultraviolet absorption peak (95% ethanol) at 240 mμ (ε17,200), infrared maxima (potassium bromide) at 5.77 μ, 5.98 μ.

React dl-13-ethylgon-4-ene-3,17-dione (5.0 g) in dioxane with ethyl orthoformate and toluene-p-sulfonic acid at room temperature for 3 hours to obtain 4.12 g. (75%) of dl-3-ethoxy-13-ethylgona-3,5-dien-17-one; ultraviolet absorption peak (95% ethanol) at 242 mμ (ε12,150), infrared absorption peak (potassium bromide) at 5.78 μ.

Stir at room temperature dl-3-ethoxy-13-ethylgona-3,5-diene-17-one (1.88 g) with carbon tetrabromide (4.0 g) in collidine (17.5 ml) and pyridine (2.5 ml) for 40 hours. Filter off the solid and wash with a little pyridine. Acidify the filtrate with cold dilute hydrochloric acid and extract the product into ether. Wash, dry, and concentrate the ethereal solution to approximately 10 ml. Add pyridine (50 ml) and heat at 100° for 30 minutes under nitrogen. Cool and acidify the solution and extract with ether. Evaporate the washed, dried ethereal extracts and crystallize the residue from ether to obtain dl-6-dibromomethylene-13-ethylgon-4-ene-3,17-dione (1.44 g). Purify by chromatography on deactivated alumina (40 g), eluting with benzene-petroleum ether (1:1) to obtain 0.862 g. (29%), m.p. 149–153°. Recrystallize from tetrahydrofuran-ether to obtain the analytical sample, m.p. 163.5°–165.5°; ultraviolet absorption peak at 249 mμ (ε10,540), 283-288 mμ (ε6,650); infrared maxima (chloroform) at 5.78 μ, 5.99 μ, 6.21 μ, 6.38 μ.

$C_{20}H_{24}Br_2O_2$ Calculated: C, 52.65%; H, 5.30%; Br, 35.0 Found: C, 52.85%; H, 5.08%; Br, 32.8%

Hydrogenate dl-6-dibromomethylene-13-ethylgon-4-ene-3,17-dione for 2 hours in the presence of dioxane and triethylamine, using 2% palladium-strontium carbonate as a catalyst. Filter off the catalyst, acidify the filtrate with 1N hydrochloric acid, and allow to stand for one hour. Extract with ether and triturate with methanol to obtain crystals of starting material (100

mg). Concentrate the liquors to obtain 86 mg. of crystals; ultraviolet absorption peak (95% ethanol) 241.5 mμ (ε13,950). Chromatograph on a column of deactivated neutral alumina, eluting with benzene-petroleum ether (1:1) to obtain dl-13-ethyl-6-methylgon-4-ene-3,17-dione (26 mg), m.p. 141°–149°; ultraviolet absorption peak (95% ethanol) at 242.5 mμ (ε15,450), infrared maxima (potassium bromide) at 5.78 μ, 6.00 μ.

EXAMPLE 215

dl-13-Ethyl-17β-(2-hydroxyethoxy)gon-4-en-3-one, benzoate

Prepare a solution of ether (100 ml), aluminum chloride (13.3 g) and lithium aluminum hydride (15 ml. of a 1 M solution). Stir for 20 minutes. Add to a cool solution of dl-13-ethyl-3-methoxygona-1,3,5(10)-trien-17-one, cyclic ethylene ketal (17.1 g) in ether (1,000 ml). Stir the reaction mixture and cool in an ice-water bath for 4 hours. Dilute with 2 N sulfuric acid until a clear solution results. Separate the ether layer, wash with saturated sodium bicarbonate solution, and evaporate. Treat the residue with ethanol (200 ml), concentrated hydrochloric acid (5 ml) and water (10 ml) on a steam bath for 30 minutes. Evaporate, then recrystallize from ethanol to obtain dl-13-ethyl-17β-(2-hydroxyethoxy)-3-methoxygona-1,3,5(10)-triene (8.1 g), m.p. 131°–132°; ultraviolet absorption peak at 278 mμ (ε2,130), infrared maximum at 2.93 μ.

$C_{23}H_{32}O_3$ Calculated: C 76.70%; H, 9.36% Found: C, 76.81%; H, 9.35%

Dissolve dl-13-ethyl-17β-(2-hydroxyethoxy)-3-methoxygona-1,3,5(10)-triene (4.0 g) in 1-methoxy-2-propanol (60 ml), tetrahydrofuran (120 ml) and liquid ammonia (300 ml). Gradually add lithium (4.0 g) with stirring over a period of one hour. Add ammonium chloride (8.0 g) and water. Filter, wash and dry the resulting precipitate. Dissolve the product in tetrahydrofuran (300 ml) and liquid ammonia (300 ml) and treat with lithium (4.0 g). Stir for one hour. Add absolute ethanol, then water. Filter the resulting precipitate and wash it with water to obtain dl-13-ethyl-17β-(2-hydroxyethoxy)-3-methoxygona-2,5(10)-diene (3.4 g); essentially no ultraviolet absorption at the 280 mμ region, infrared absorption maxima at 2.91 μ, 5.89 μ, 6.0 μ.

Suspend dl-13-ethyl-17β-(2-hydroxyethoxy)-3-methoxygona-2,5(10)-diene (1.7 g) in methanol (100 ml), concentrated hydrochloric acid (8 ml) and water (5 ml) and stir the suspension for two hours under nitrogen. Dilute the clear solution with water and separate the product with ether. Wash the organic layer with a saturated sodium bicarbonate solution and dry over magnesium sulfate. Evaporate the ether to obtain a gum, dl-13-ethyl-17β-(2-hydroxyethoxy)gon-4-en-3-one (1.39 g); ultraviolet absorption peak at 240 mμ (ε13,200), infrared maxima at 2.95 μ, 6.0 μ.

Treat a solution of dl-13-ethyl-17β-(2-hydroxyethoxy)gon-4-en-3-one (1.3 g) in pyridine (6 ml) with benzoyl chloride (1.3 moles) at –10°. Keep the reaction mixture at –10° for 16 hours. Pour over ice and separate the product with ether. Wash the organic layer consecutively with 2 N hydrochloric acid, 2 N sodium hydroxide, water, and brine, then dry over magnesium sulfate. Evaporate the solvent, chromatograph the gum on neutral alumina, and elute with benzene-ethyl acetate to obtain the title compound (800 mg); ultraviolet

3,959,322

## 85

absorption peak at 233 m$\mu$ ($\epsilon$25,500), infrared maxima at 5.8 $\mu$, 5.98 $\mu$.

$C_{28}H_{36}O_4$ Calculated: C, 77.03%; H, 8.31% Found: C, 77.44%; H, 8.59% This compound has anabolic activity.

### EXAMPLE 216

#### dl-17$\beta$-Hydroxyestr-4-en-3-one

Dissolve dl-3-methoxyestra-2,5(10)-dien-17$\beta$-ol (0.84 g) in methanol (18 ml) containing concentrated hydrochloric acid (1.2 ml) and water (0.8 ml) and allow the mixture to stand at room temperature for 15 hours. Add water and extract the mixture with ether. Wash, dry and evaporate the ethanol solution and dissolve the residue in a little benzene. Filter through a column of alumina (25 g) with benzene-ether (7.3). Evaporate the eluates and recrystallize the residue from ether-hexane to obtain the title compound (372 mg), m.p. 123°–124.5° or in an alternate form, m.p. 131°–132°; ultraviolet absorption maximum at 241 m$\mu$ ($\epsilon$16,600); infrared absorption peaks at 6$\mu$, 7.9 $\mu$, 9.4 $\mu$.

$C_{18}H_{26}O_2$ Calculated: C, 78.8%; H, 9.55% Found: C, 79.08%; H, 9.54% This compound has anabolic activity.

### EXAMPLE 217

#### dl-13-Ethylgon-4-ene-3,17-dione, 17-cyclic ethylene ketal

Add dl-13-ethyl-17,17-ethylenedioxy-3-methoxygona-1,3,5(10)-triene (0.35 g) in tetrahydrofuran (20 ml) to a stirred solution of lithium (0.5 g) in liquid ammonia (100 ml). Stir the mixture for 5 minutes and then add ethanol (10 ml) dropwise. When the blue color is discharged, add saturated aqueous ammonium chloride and collect the product in ether. Evaporate the solvent and crystallize the residue from ethanol. Dissolve the product in ethanol (30 ml) and tetrahydrofuran (5 ml) and stir with oxalic acid dihydrate (0.45 g) in water (6 ml) for one hour. Add excess 20% aqueous potassium hydroxide, water and collect the product in ether. Wash, dry and evaporate the ethereal solution and filter the residue through a Florex column with benzene-ether (9:1). Recrystallize the product from heptane to obtain the title compound (105 mg), m.p. 129-131°; ultraviolet absorption peak at 240 m$\mu$ ($\epsilon$16,000), infrared maxima at 6.0 $\mu$, 6.2 $\mu$, 8.6 $\mu$.

$C_{21}H_{30}O_4$ Calculated: C 76.32%; H, 9.15% Found: C, 76.47%; H, 9.04% This compound has estrogen antagonistic activity.

### EXAMPLE 218

#### dl-13-Ethyl-17$\alpha\beta$-hydroxy-17a-methyl-D-homogon-4-en-3-one

Reflux dl-13-ethyl-3-methoxy-D-homogona-1,3,5(10),8-tetraen-17a-one (13.3 g) for 8 hours with 3 M methyl magnesium bromide (200 ml) in benzene and recrystallize from methanol to obtain 9.2 g. of the Grignard product, dl-13-ethyl-17a-methyl-17a-hydroxy-D-homogona-1,3,5(10),8-tetraene; ultraviolet absorption peak at 276 m$\mu$ ($\epsilon$15,500), infrared analysis indicating no remaining carbonyl band. Reduce the 8,9-double bond with lithium (1.5 g), liquid ammonia (450 ml), tetrahydrofuran (170 ml) and aniline (30 ml) to obtain the crude D-homo estradiol methyl ether (8.0 g), m. p. 153-163°; ultraviolet absorption peak at 280

## 86

m$\mu$ ($\epsilon$,314). Reduce further with lithium and ethanol in liquid ammonia to obtain dl-13-ethyl-3-methoxy-17a-methyl-17a-hydroxy-D-homogona-2,5(10)-diene (7.2 g), m.p. 175°–180°. Hydrolyze dl-13-ethyl-3-methoxy-17a-methyl-17a-hydroxy-D-homogona-2,5(10)-diene with hydrochloric acid-methanol-water. Carefully chromatograph on 300 g. Grade III neutral alumina and recrystallize from ethyl acetate-hexane to obtain the title compound (3.35 g), m.p. 129.5°–130.5°; ultraviolet absorption peak at 242 m$\mu$ ($\epsilon$17,100).

$C_{21}H_{32}O_2$ Calculated: C, 79.70%; H, 10.19% Found: C, 79.99%; H, 10.08% This compound has progestational and anabolic activities.

### EXAMPLE 219

#### dl-17a $\beta$-Hydroxy-13-propyl-D-homogon-4-en-3-one

Dissolve 2-propylcyclohexane-1,3-dione (36.3 g) in benzene (400 cc) containing pyridine (21.2 cc). Add 6-m-methoxyphenylhex-1-en-3-one (43.2 g) and reflux the solution over night. Cool the reaction mixture, wash with water, aqueous sodium carbonate, and 10% aqueous sulfuric acid, dry and remove the solvents under reduced pressure to obtain 2-(6-m-methoxyphenyl-3-oxohexyl)-2-propylcyclohexane-1,3-dione.

Heat 2-(6-m-methoxyphenyl-3-oxohexyl)-2-propyl-cyclohexane-1,3-dione (43.0 g) in benzene (400 cc) with polyphosphoric acid (250 g) for three hours at 60° with vigorous stirring. Add ice water (400 cc) and separate the benzene layer. Extract the water with ether, combine the organic layers; wash, dry and evaporate. Recrystallize this residue from ethanol (250 cc) to obtain dl-3-methoxy-13-propyl-D-homogona-1,3,5(10),8,14-pentaen-17a-one (27.6 g), m.p. 86°–89°C, $\lambda$ max. KBr 5.87 $\mu$, 6.25 $\mu$; $\lambda$ max. EtOH 312 m$\mu$ ($\epsilon$24,300).

$C_{22}H_{28}O_2$ Calculated: C, 81.95%; H, 8.13% Found: C, 82.11%; H, 8.18%

Hydrogenate dl-3-methoxy-13-propyl-D-homogona-1,3,5(10),8,14-pentaen-17a-one (27.6 g) dissolved in tetrahydrofuran (250 cc) over 2% Pd/CaCO$_3$ (7.0 g). Uptake of one mole requires 15 minutes. Filter, remove solvent and boil with 95% ethanol (250 cc). Filter to obtain dl-3-methoxy-13-propyl-D-homogona-1,3,5(10),8-tetraen-17a-one (25.5 g), m.p. 146-148°C; $\lambda$ max. EtOH 277 m$\mu$ ($\epsilon$16,130).

$C_{22}H_{28}O_2$ Calculated: C, 81.42%; H, 8.69% Found: C, 81.30%; H, 8.62%

Reflux dl-3-methoxy-13-propyl-D-homogona-1,3,5(10),8-tetraen-17a-one (20 g) in ethanol (250 cc) with sodium borohydride (7.0 g) for one hour. Make acid with 50% aqueous acetic acid, add water (500 cc), filter, wash and recrystallize from ethanol (250 cc) to obtain dl-3-methoxy-13-propyl-D-homogona-1,3,5(10),8-tetraen-17a $\beta$-ol (16.0 g), m.p. 122°–124°, $\lambda$ max. KBr 3.02 $\mu$, 6.25 $\mu$; $\lambda$ max. EtOH 275 m$\mu$ ($\epsilon$16,325).

$C_{22}H_{30}O_2$ Calculated: C, 80.92%; H, 9.27% Found: C, 80.74%; H, 9.81%

Add dl-3-methoxy-13-propyl-D-homogona-1,3,5(10),8-tetraen-17a $\beta$-ol (16.0 g) dissolved in tetrahydrofuran (900 cc) and aniline (100 cc) to liquid ammonia (900 cc) containing tetrahydrofuran (250 cc). Add lithium metal (1.0 g), stir for one hour and discharge the blue color by addition of water. Extract the product with ether, remove aniline by shaking with dilute hydrochloric acid, and wash, dry and evaporate the solvent. Recrystallize twice from methanol to ob-

3,959,322

87

tain dl-3-methoxy-13-propyl-D-homogona-1,3,5(10)-triene-17a β-ol (13.0 g), m.p. 123-125°, λ max. EtOH 280 mμ (ε1,900).

$C_{22}H_{32}O_2$ Calculated: C, 80.43%; H, 9.82% Found: C, 80.33%; H,9.90%

Treat dl-3-methoxy-13-propyl-D-homogona-1,3,5(10)-trien-17a β-ol (13.0 g) dissolved in tetrahydrofuran (240 cc) and liquid ammonia (500 cc) with lithium metal (3.5 g). Stir 1.5 hours, discharge the blue color by dropwise addition of absolute ethanol, add water and filter the crude product. Triturate with methanol (110 cc) to obtain dl-3-methoxy-13-propyl-D-homogona-2,5(10)-dien-17a β-ol (11.4 g), m.p. 150-157°, λ max. KBr 3.09 μ, 5.90 μ, 6.0 μ.

Hydrolyze dl-3-methoxy-13-propyl-D-homogona-2,5(10)-dien-17a β-ol (1.4 g) with methanol (80 cc), concentrated hydrochloric acid (6.0 cc) and water (4.0 cc) and isolate the product. Recrystallize from ethyl acetate to obtain the title compound (0.80 g), m.p. 150°-152°, λ max. KBr 3.0 μ, 6.04 μ; λ max. EtOH 240 mμ (ε16,300).

$C_{21}H_{32}O_2$ Calculated: C, 79.70%; H, 10.19% Found: C, 79.60%; H, 10.10% This compound has anabolic activity.

EXAMPLE 220

dl-17β-Hydroxyestr-4-en-3-one, acetate

Add sodium borohydride (8.5 g) to 3-methoxyestra-1,3,5(10),8-tetraen-17-one (40 g) in ethanol (500 ml) and reflux the mixture for 90 minutes. Acidify the cooled solution with acetic acid, add water and extract with benzene. Wash, dry and evaporate the organic extract to obtain dl-3-methoxyestra-1,3,5(10),8-tetraen-17β-ol (37.5 g), m.p. 130°-133°; ultraviolet absorption peak at 280 mμ (ε16,100); infrared maxima at 3.1 μ, 3.58 μ, 6.25 μ, 6.4 μ, 6.7 μ

Add dl-3-methoxyestra-1,3,5(10),8-tetraen-17β-ol (37.5 g) in tetrahydrofuran (350 ml) to a stirred solution of liquid ammonia (1 liter) and aniline (45 ml). Add lithium (2 g), stir for 30 minutes, and then add ammonium chloride (20 g) followed by water. Extract with ether-benzene (1:1) and wash the organic solution with water, excess 3N hydrochloric acid, water and dry. Evaporate the solvent and recrystallize the residue from ethyl acetate-hexane to obtain dl-3-methoxyestra-1,3,5(10)-trien-17β-ol (12 g), m.p. 121-124°; ultraviolet absorption peak at 278 mμ (ε1,810); infrared maxima at 3.0 μ, 6.2 μ, 6.75 μ.

Add dl-3-methoxyestra-1,3,5(10)-trien-17β-ol (1.3 g) in tetrahydrofuran (40 ml) to a stirred solution of lithium (1.3 g) in liquid ammonia (100 ml). After 15 minutes add ethanol (20 ml) dropwise and when the blue color is discharged add ammonium chloride and water and extract the mixture with ether. Wash, dry and evaporate the ethereal solution and recrystallize the residue from ethanol-hexane to obtain dl-3-methoxyestra-2,5(10)-dien-17β-ol (0.84 g), m.p. 120-123°; infrared absorption maxima at 3.25 μ, 5.8 μ, 6 μ.

Dissolve the foregoing alcohol in ether, add 25% hydrochloric acid. Stir the mixture at room temperature for 15 minutes and add crushed ice. Evaporate the washed and dried ether layer and recrystallize the residue from ether-hexane containing a little ethyl acetate to obtain dl-17β-hydroxyestr-4-en-3-one, m.p. 121-123°, λ max. 241 mμ (ε17,000). Acetylate the foregoing alcohol with acetic anhydride in pyridine and recrystallize the product from ether-light petroleum to

88

obtain the ester, m.p. 113-114°, λ max. 242 mμ (ε17,600).

$C_{20}H_{28}O_3$ Calculated: C, 75.9%; H, 8.9% Found: C, 76.0%; H, 8.8% This compound has anabolic activity.

EXAMPLE 221

dl-3-(13-Ethyl-17β-hydroxy-3-oxogon-4-en-17α-yl)propionic acid, γ-lactone

Add 13-ethyl-17α-ethynyl-3-methoxygona-1,3,5(10)-trien-17β-ol (20 g) in tetrahydrofuran with stirring to refluxing 3M ethereal methylmagnesium bromide (240 ml)-tetrahydrofuran (300 ml). Pass gaseous carbon dioxide into the cooled mixture for 22 hours. Add the mixture to crushed ice, acidify with dilute sulfuric acid, remove most of the tetrahydrofuran under reduced pressure and extract the mixture with ether. Extract the ethereal solution with aqueous sodium carbonate and acidify the extracts. Filter off the crude dl-3-(13-ethyl-17β-hydroxy-3-methoxygona-1,3,5(10)-trien-17α-yl)prop-2-ynoic acid, m.p. 172°-173°. Recrystallize an aliquot from methanol to obtain pure substance, m.p. 173°-174° (gas evolution).

$C_{23}H_{28}O_4$ Calculated: C, 75.0%; H, 7.7% Found: C, 74.9%; H, 7.4%

Hydrogenate the foregoing acid (3.7 g) in ethanol (100 ml) over 10% palladized charcoal (1 g) until hydrogen uptake ceases. Recrystallize the product from ethyl acetate-hexane to obtain dl-3-(13-ethyl-17β-hydroxy-3-methoxygona-1,3,5(10)-trien-17α-yl)propionic acid, γ-lactone, m.p. 174°-175°, infrared absorption peak at 5.67 μ.

$C_{23}H_{30}O_3$ Calculated: C, 77.9%; H, 8.5% Found: C, 77.6%; H, 8.4%

Reflux the foregoing lactone with triethylamine (180 ml) and sodium hydroxide (1.0 g) in water (33 ml) overnight. Evaporate the mixture to dryness and treat residue with a solution of tert-butyl alcohol (100 ml), 1-methoxy-2-propanol (200 ml) and liquid ammonia (600 ml). Add lithium (5.0 g) and after 40 minutes add ammonium chloride (40 g) followed by water. Acidify with cold hydrochloric acid (18%) in the presence of ice and filter off the precipitate. Add the dried material (2.4 g) to methanol (110 ml), concentrated hydrochloric acid (5 ml) and water (5 ml) and stir for 1 hour. Dilute with water and filter the precipitate. Recrystallize the dried material from ethyl acetate-hexane to obtain 1.1 g. of the title product; m.p. 214°-215°; ultraviolet absorption peak at 240 mμ (ε17,100).

$C_{22}H_{30}O_3$ Calculated: C, 77.15%; H, 8.83% Found: C, 77.20%; H, 8.61%

EXAMPLE 222

dl-13-Ethyl-17β-hydroxy-17-(1-hydroxyethyl)gon-4-en-3-one

Reduce dl-13-ethyl-17α-acetyl-17-hydroxy-3-methoxygona-1,3,5(10)-triene, acetate (1.0 g) in lithium aluminum hydride and ether to produce a gum, dl-13-ethyl-17β-hydroxy-17-(1-hydroxyethyl)-3-methoxygona-1,3,5(10)-triene (0.9 g); infrared absorption peak very strong at 2.9 μ (OH band). Reduce dl-13-ethyl-17β-hydroxy-17-(1-hydroxyethyl)-3-methoxygona-1,3,5(10)-triene (0.9 g) with tetrahydrofuran (60 ml), liquid ammonia (150 ml), lithium (700 mg) and absolute ethanol, and filter to obtain a crystalline solid, dl-13-ethyl-17β-hydroxy-17-(1-hydroxyethyl)-3-methoxygona-2,5(10)-diene (0.70 g), m.p. 152°-161°; ultraviolet analysis indicating no remaining

3,959,322

**89**

aromatic system, infrared maxima at 3.0 $\mu$, 5.9 $\mu$, 6.0 $\mu$.

Hydrolyze dl-13-ethyl-17β-hydroxy-17-(1-hydroxyethyl)-3-methoxygona-2,5(10)-diene (0.70 g) in hydrochloric acid-methanol-water. Recrystallize from ethyl acetate to obtain the title compound (0.36 g), m.p. 159°-164°; ultraviolet absorption peak at 240 m$\mu$ (ε15,230), infrared absorption peaks at 3.0 $\mu$ (strong), 6.05 $\mu$.

$C_{21}H_{32}O_3$ Calculated: C, 75.85%; H, 9.70% Found: C, 76.12%; H, 9.78% This compound has progestational activity.

### EXAMPLE 223

dl-17-Hydroxy-17α-ethynylestr-4-en-3-one, acetate

Treat dl-17-hydroxy-17α-ethynylestr-4-en-3-one (1 g) with acetic anhydride (10 ml) and toluene-p-sulfonic acid (0.1 g) and heat at 90° for 1 hour. Pour the cooled solution into water, neutralize with sodium bicarbonate and extract with ether. Wash, dry and evaporate to obtain dl-17-ethynylestra-3,5-diene-3,17β-diol, diacetate; infrared absorption maxima at 3$\mu$, 5.7$\mu$, 5.75$\mu$.

Hydrolyze dl-17-ethynylestra-3,5-diene-3,17β-diol, diacetate (0.4 g) in methanol (60 ml) and tetrahydrofuran (10 ml) with 2% methanolic potassium hydroxide at 0° for one hour. Pour into water, neutralize with dilute hydrochloric acid and extract with ether. Wash, dry and evaporate the ethereal solution and chromatograph the product on ethyl acetate washed alumina. Recrystallize the product from ether-light petroleum ether to obtain the title compound (0.3 g), m.p. 153°-155°; ultraviolet absorption peak at 240 m$\mu$ (ε16,400); infrared absorption maxima at 3.1 $\mu$, 3.45 $\mu$, 5.22 $\mu$, 6.0 $\mu$.

$C_{22}H_{28}O_2$ Calculated: C, 77.65% H, 8.29% Found: C, 78.1%; H, 8.47%

This compound has progestational activity.

### EXAMPLE 224

dl-17α-(3-Diethylamino-1-propynyl)-13-ethylgon-4-en-17-ol

Stir a suspension of 1.1 g. of dl-17α-ethynyl-13-ethylgon-4-en-17-ol, 12 ml. of dioxane, 0.6 ml. of water, 0.6 ml. of formaldehyde (40% in water), 0.5 ml. of diethylaniline, 0.4 ml. of acetic acid, and 20 mg. of cuprous chloride for 22 hours at 60°. Pour into ice, basify with sodium hydroxide and extract with ether. Mix the residue with a solution of aqueous hydrochloric acid and acetic acid and extract with ether. Basify the aqueous layer with aqueous potassium hydroxide and filter off the product. Recrystallize from 35 ml. of methanol to obtain 900 mg. of the desired product; m.p. 149°-150°.

$C_{26}H_{41}NO$ Calculated: C, 81.40%; H, 10.77%; N, 3.65% Found: C, 81.44%; H, 10.81%; N, 3.63%

This compound has antiinflammatory activity.

### EXAMPLE 225

dl-13-Ethyl-17-ethynylgon-4-en-3,17β-diol-3-acetate

Add sodium borohydride (1.0 g) to 13-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one (1.0 g) in ethanol (100 ml) and allow the mixture to stand for two hours. Decompose excess reagent with acetic acid and remove most of the solvent under reduced pressure. Dissolve the product in ether and water, and wash, dry and

**90**

evaporate the ethereal solution. Dissolve the residue in pyridine (5 ml) and acetic anhydride (5 ml) and after three hours remove the solvents under vacuum. Add ether, wash, dry and evaporate the ethereal solution and recrystallize the residue from ethyl acetate-methanol to obtain the title compound (0.42 g), m.p. 168°-170°.

$C_{23}H_{32}O_3$ Calculated: C, 77.49%; H, 9.05% Found: C, 77.12%; H, 9.35%

This compound has progestational activity.

### EXAMPLE 226

dl-13-Ethyl-17β-(tetrahydropyran-2-yloxy)gon-4-en-3-one

Add with swirling a solution of p-toluenesulfonic acid (14 mg) in benzene (0.8 mole) to dl-17β-hydroxy-13-ethylgon-4-en-3-one (450 mg) in 2,3-dihydropyran (3 ml). After two hours, neutralize the reaction mixture with methanolic sodium hydroxide. Add water, together with some methanol, scratch the mixture and allow it to stand at 0° for about 70 hours. Filter to obtain the title compound (100 mg), m.p. 148°-152°; infrared absorption peaks at 6.0 $\mu$, 6.2 $\mu$, 9.02 $\mu$, 9.42 $\mu$, 9.68 $\mu$, 9.85 $\mu$, 10.25 $\mu$ (no hydroxyl band).

$C_{24}H_{36}O_3$ Calculated: C, 77.31%; H, 9.74% Found: C, 77.15%; H, 9.52%

This compound has anabolic activity.

### EXAMPLE 227

dl-13-Ethyl-17α-ethynyl-17-hydroxy-6α-methylgon-4-en-3-one

Reflux dl-13-ethyl-3-methoxy-6-methylgona-2,5(10)-dien-17β-ol (5.5 g) in toluene (200 cc) and cyclohexanone (70 cc) with aluminum isopropoxide (4.0 g) for 2.5 hours. Add water and anhydrous sodium sulfate, filter and isolate the crude product. Triturate with ice cold methanol to obtain dl-13-ethyl-3-methoxy-6-methylgona-2,5(10)-dien-17-one (3.6 g), m.p. 118°-125°, λ max. KBr 5.78 $\mu$, 5.90 $\mu$, 6.0 $\mu$. An analytical sample recrystallized from methanol has m.p. 163°-166°.

Stir dl-13-ethyl-3-methoxy-6-methylgona-2,5(10)-dien-17-one (3.6 g) in dimethylacetamide (35 cc) in a stream of acetylene for one-half hour. Add lithium acetylide-ethylenediamine (2.7 g) and stir for four hours. Pour into ice water, extract with ether and isolate the dl-13-ethyl-3-methoxy-17α-ethynyl-17β-hydroxy-6-methylgona-2,5(10)-diene as a gum (3.5 g), λ max. NaCl 2.90 $\mu$, 3.05 $\mu$, 5.90 $\mu$, 6.03 $\mu$.

Stir dl-13-ethyl-3-methoxy-17α-ethynyl-17-hydroxy-6-methylgona-2,5(10)-diene (3.5 g) in methanol (90 cc) containing hydrochloric acid (60 cc) and water (4.0 ml) under nitrogen for one hour. Isolate the crude product, chromatograph on Florex (150 g) and recrystallize from ethyl acetate-hexane to obtain the title compound (0.60 g), m.p. 148°-151°, λ max. CHCl$_3$ 2.55 $\mu$, 3.05 $\mu$, 6.01 $\mu$; λ max. EtOH 240 m$\mu$ (ε15,000).

$C_{22}H_{30}O_2$ Calculated: C, 80.92%; H, 9.26% Found: C, 81.01%; H, 9.56%

This compound has progestational activity.

3,959,322

## 91

### EXAMPLE 228

13-Ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one, 2′-tetrahydropyranyl ether

Keep 13-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one (0.5 g) in dihydropyran (5 ml)-benzene (0.8 ml) containing toluene-p-sulfonic acid (14 mg. of the hydrate) over night. Add ether and aqueous sodium bicarbonate. Evaporate the washed and dried ether solution. Purify the product by chromatography on alumina and recrystallize from hexane to obtain the title substance (0.22 g), m.p. 145°–150°.

$C_{26}H_{36}O_3$ Calculated: C, 78.4%; H, 9.15% Found: C, 78.7%; H, 9.0%

This compound has progestational activity.

### EXAMPLE 229

17α-Chloroethynyl-13-ethyl-17β-hydroxygon-4-en-3-one, 2′-tetrahydropyranyl ether

Keep 17α-chloroethynyl-13-ethyl-17β-hydroxygon-4-en-3-one (0.5 g) in 2,3-dihydropyran (5 ml)-benzene (0.8 ml) containing toluene-p-sulfonic acid (14 mg of the hydrate) over night, then add ether and aqueous sodium bicarbonate. Purify the product by recrystallization from hexane to obtain the title substance, m.p. 125°–131°.

$C_{26}H_{35}O_3Cl$ Calculated: C, 72.45%; H, 8.2%; Cl, 8.2% Found: C, 72.4%; H, 8.1%; Cl, 8.2%

This compound has progestational activity.

### EXAMPLE 230

13,17α-Diethyl-17β-hydroxygon-4-en-3-one, 2′-tetrahydropyranyl ether

Keep 13,17α-diethyl-17β-hydroxygon-4-en-3-one (0.5 g) in 2,3-dihydropyran (5 ml)-benzene (0.8 ml) containing toluene-p-sulfonic acid overnight, then add ether and aqueous sodium bicarbonate. Purify the product by chromatography on alumina to obtain the title substance.

This compound has anabolic activity.

### EXAMPLE 231

dl-13-Ethyl-17β-hydroxy-6α-methylgon-4-en-3-one

Reflux 2-(6-m-methoxyphenyl)-3-oxoheptyl-2-ethyl-cyclopentane-1,3-dione (53.3 g) in benzene (600 cc) with p-toluenesulfonic acid monohydrate (15 g) using a water separator. Wash, dry and evaporate the benzene solution and distil the residual gum at .003 mm./180°–200°C. Obtain the dl-3-methoxy-6-methyl-13-ethylgona-1,3,5(10),8,14-pentaen-17-one as an orange gum (38.0 g), λ max. EtOH 311 mμ (ε27,200).

Reflux 2-(6-m-methoxyphenyl)-3-oxoheptyl-2-ethyl-cyclopentane-1,3-dione (39.7 g) in benzene (500 cc) with p-toluenesulfonic acid monohydrate (11.0 g) using a water separator. After removal of two moles of water, add ethylene glycol (50 cc) and reflux the solution 16 hours. Wash, dry and evaporate the benzene solution and dissolve the residue in hexane. Filter the solution several times through Florex, remove the solvent and recrystallize the residue from ethanol to obtain the dl-3-methoxy-6-methyl-17,17-ethylenedioxy-13-ethylgona-1,3,5(10),8,14-pentaene (16.8 g), m.p. 116°–119°. Recrystallize a small portion to obtain an analytical sample, m.p. 120°–122°C, λ max. EtOH 312 mμ (ε31,000).

## 92

Monohydrogenate dl-3-methoxy-6-methyl-17,17-ethylenedioxy-13-ethylgona-1,3,5(10),8,14-pentaene (15.3 g) in benzene (300 cc) in the presence of 2% Pd/CaCO₃ (5.0 g). Filter, remove the benzene under reduced pressure and recrystallize from 95% ethanol (110 cc) to yield the dl-3-methoxy-6-methyl-17,17-ethylenedioxy-13-ethylgona-1,3,5(10),8-tetraene (11.0 g), m.p. 122°–124°, diamond shaped plates, λ max. EtOH 280 mμ (ε15,140).

Add dl-3-methoxy-6-methyl-17,17-ethylenedioxy-13-ethylgona-1,3,5(10),8-tetraene (11.0 g) in tetrahydrofuran (160 cc) to liquid ammonia (600 cc) containing tetrahydrofuran (170 cc) and aniline (30 cc). Add lithium (0.6 g) in small portions and stir for two hours. Add solid ammonium chloride followed by water and extract with ether. Isolate the product which crystallizes on scratching, λ max. EtOH 280 mμ (ε1,975). To obtain an analytical sample recrystallize from isopropanol m.p. 130°–134°C.

Suspend the foregoing dl-3-methoxy-17,17-ethylenedioxy-6-methyl-13-ethylgona-1,3,5(10)-triene (9.0 g) in methanol (200 cc) and concentrated hydrochloric acid (5.0 cc) and heat on the steam bath for 15 minutes. Remove the solvent under vacuum, partition the residue between ether and aqueous sodium bicarbonate and isolate the product. Recrystallize from methanol to obtain the dl-3-methoxy-6-methyl-13-ethylgona-1,3,5(10)-trien-17-one (7.29 g), m.p. 115°–123°C. Recrystallize a small portion to obtain an analytical sample, m.p. 123°–127°C, λ max. EtOH 280 mμ, λ max. KBr 5.75 μ.

$C_{21}H_{28}O_2$ Calculated: C, 80.73%; H, 9.03% Found: C, 80.43%; H, 8.96%

Dissolve dl-3-methoxy-6-methyl-13-ethylgona-1,3,5(10)-trien-17-one (7.0 g) in methanol (300 cc) and treat with sodium borohydride (3.0 g). After spontaneous reflux ceases, make acid with 50% aqueous acetic acid (20 cc). Pour into brine, extract with acid and isolate the dl-3-methoxy-17β-hydroxy-6-methyl-13-ethylgona-1,3,5(10)-triene (6.8 g), m.p. 150°–160°C, λ max. KBr 3.05, 6.45 μ.

$C_{21}H_{30}O_2$ Calculated: C, 80.21%; H, 9.61% Found: C, 80.8%; H, 9.40%

Add dl-3-methoxy-17β-hydroxy-6-methyl-13-ethylgona-1,3,5(10)-triene (6.80 g) in tetrahydrofuran (200 cc) to liquid ammonia (800 cc) containing tetrahydrofuran (250 cc). Add lithium metal (3.5 g) portionwise and stir the solution for 1.75 hours. Discharge the blue color by dropwise addition of absolute ethanol over 0.25 hours followed by water (2,000 cc). Filter, wash and dry to obtain the dl-3-methoxy-17β-hydroxy-6-methyl-13-ethylgona-2,5(10)-diene (6.5 g), m.p. 176°–182°, λ max. KBr 3.05, 5.90 μ, 6.0 μ, no absorption in the ultraviolet above 220 mμ.

Stir dl-3-methoxy-17β-hydroxy-6-methyl-13-ethylgona-2,5(10)-diene (1.0 g) in methanol (54 cc) containing concentrated hydrochloric acid (3.6 cc) and water (2.4 cc) under nitrogen for 1.5 hours. Pour into brine, extract with ether and isolate the crude product. Chromatograph on Grade I neutral alumina (50 g) and recrystallize from ether-hexane to obtain the title compound (0.30 g), m.p. 127°–130°, λ max. KBr 2.98 μ, 6.03 μ; λ max. EtOH 240 mμ (ε16,500).

$C_{20}H_{30}O_2$ Calculated: C, 79.42%; H, 10.00% Found: C, 79.57%; H, 9.87%

This compound has progestational activity.

3,959,322

**93**

EXAMPLE 232

dl-13-Ethyl-17-ethynylgon-4-en-3,17β-diol, 3-propionate

Add sodium borohydride (0.8 g) to 13-ethyl-17-ethynyl-17β-hydroxygon-4-en-3-one (1.7 g) in ethanol (100 ml) and allow the mixture to stand for 15 hours. Dilute the mixture with water and extract with ether. Wash, dry and evaporate the ethereal solution and dissolve the residue in pyridine (5 ml) and propionic anhydride (5 ml). After 2 hours add ice and water and extract the mixture with ether. Wash the ethereal extract with water, 10% aqueous sodium hydroxide, water, 10% hydrochloric acid, and brine and dry. Evaporate the solvent and recrystallize the product from ethyl acetate to obtain the title compound (0.5 g), m.p. 153°–156°.

$C_{24}H_{34}O_3$ Calculated: C, 77.8%; H, 9.25% Found: C, 77.63%; H, 9.16%

This compound has progestational activity.

EXAMPLE 233

dl-13-Ethyl-17α-ethynyl-17-hydroxy-6α-methylgon-4-en-3-one and

dl-13,17α-Diethyl-17-hydroxy-6α-methylgon-4-en-3-one

Dissolve 2-ethyl-2-(6-m-methoxyphenyl-6-methyl-3-oxohexyl)-1,3-cyclopentanedione (39.7 g) in benzene (500 ml) and reflux with p-toluenesulfonic acid in water (11.0 g). Remove 2 moles of water, add ethyleneglycol (50 ml) and reflux the solution overnight (16 hours). After working up by the usual procedure, filter repeatedly through Florex in hexane. Recrystallize from ethanol to obtain dl-13β-ethyl-3-methoxy-6-methyl-17,17-ethylenedioxygona-1,3,5(10),8,14-pentaene (16.8 g), m.p. 120°–122°; ultraviolet absorption peak at 312 mμ, no infrared absorption in the ketone region.

Hydrogenate dl-13β-ethyl-3-methoxy-6-methyl-17,17-ethylenedioxygona-1,3,5(10),8,14-pentaene (15.3 g) in benzene (300 ml) with 2% palladiated strontium carbonate (5.0 g). The uptake of 1,040 ml. will require 10 minutes. Work up in the usual manner, then recrystallize from 95% ethanol (110 ml) to obtain dl-13β-ethyl-3-methoxy-6-methyl-17,17-ethylenedioxygona-1,3,5(10),8-tetraene (11.0 g. of diamond-shaped plates; 71.8% yield), m.p. 122°–124°; ultraviolet absorption peak at 280 mμ (ε15,140).

Add dl-13-ethyl-3-methoxy-6-methyl-17,17-ethylenedioxygona-1,3,5(10),8-tetraene (11.0 g) in tetrahydrofuran (160 ml) to liquid ammonia (600 ml) containing tetrahydrofuran (170 ml) and aniline (30 ml). Then add lithium (0.6 g) in small portions and stir for 2 hours. Work up in the usual way to obtain dl-13-ethyl-3-methoxy-6-methyl-17,17-ethylenedioxygona-1,3,5(10)-triene as a gum (9.5 g) that will crystallize on scratching. Recrystallize from isopropanol to obtain a product with m.p. 130°–134°; ultraviolet absorption peak at 280 mμ (ε1,976), no infrared absorption in the ketone region.

Suspend dl-13-ethyl-3-methoxy-6-methyl-17,17-ethylenedioxygona-1,3,5(10)-triene (9.0 g) in methanol (200 ml) and concentrated hydrochloric acid (5 ml). Heat the mixture on a steam bath for 15 minutes. Remove the solvent under vacuum and partition the residue between ether and aqueous sodium bicarbon-

**94**

ate. Remove the organic solvents and dry to obtain a gum. Recrystallize from methanol to obtain dl-13-ethyl-3-methoxy-6-methylgona-1,3,5(10)-trien-17-one (7.29 g), m.p. 115°–123°. Recrystallize from methanol to obtain an analytical sample with m.p. 123°–127°; ultraviolet absorption peak at 280 mμ (ε2,190), infrared maximum (potassium bromide) at 5.75 μ.

$C_{21}H_{28}O_2$ Calculated: C, 80.73%; H, 9.03% Found: C, 80.43%; H, 8.96%

Dissolve dl-13-ethyl-3-methoxy-6-methylgona-1,3,5(10)-trien-17-one (7.0 g) in methanol (300 ml) and treat with sodium borohydride (3.0 g). After spontaneous reflux ceases, acidify the reaction mixture with 50% acetic acid (20 ml). Work up by the usual procedures to obtain dl-13-ethyl-3-methoxy-6-methylgona-1,3,5(10)-trien-17β-ol (6.8 g), m.p. 158°–160°; infrared absorption peaks (potassium bromide) at 3.05 μ, 6.45 μ.

$C_{21}H_{30}O_2$ Calculated: C, 80.21%; H, 9.61% Found: C, 80.13%; H, 9.40%

Add dl-13-ethyl-3-methoxy-6-methylgona-1,3,5(10)-trien-17β-ol (6.80 g) in tetrahydrofuran (200 ml) to ammonia (800 ml) containing tetrahydrofuran (250 ml). Add lithium (3.5 g) and stir the solution for 1.75 hours. Discharge the blue color by dropwise addition of ethanol over a period of 0.25 hour. Add water. Filter and dry the product, dl-13-ethyl-3-methoxy-6-methylgona-2,5(10)-dien-17β-ol (6.5 g), m.p. 176°–182°; infrared absorption peaks (potassium bromide) at 3.05 μ, 5.90 μ, 6.0 μ, no selective ultraviolet absorption above 220 mμ.

Dissolve dl-13-ethyl-3-methoxy-6-methylgona-2,5(10)-dien-17β-ol (5.5 g) in toluene (200 ml) containing cyclohexanone (70 ml) and treat with aluminum isopropoxide (4.0 g) in toluene (50 ml). Reflux under nitrogen for 2.5 hours, then add water (10 ml) followed by anhydrous sodium sulfate (5 g). Stir the suspension for 0.5 hour, filter, and wash the filter cake with benzene. Remove the solvents and concentrate the residue at 100° under vacuum (.02 mm). Triturate the crystalline residue with ice-cold methanol to obtain dl-13β-ethyl-6-methyl-3-methoxygona-2,5(10)-dien-17-one (3.6 g), m.p. 118°–125°; infrared absorption peaks (potassium bromide) at 5.78 μ, 5.90 μ, 6.00 μ, no selective ultraviolet absorption above 220 mμ.

Dissolve dl-13-ethyl-6-methyl-3-methoxygona-2,5(10)-dien-17-one (3.6 g) in dimethylacetamide (35 ml) and stir in a stream of acetylene for 0.5 hour. Add solid lithium acetylide-ethylenediamine (2.7 g) and stir the solution for 4 hours. Pour the reaction mixture onto ice, extract with ether, wash the ether layer with water, dry, and evaporate to obtain dl-13-ethyl-3-methoxy-6-methyl-17α-ethynyl-17-hydroxygona-2,5(10)-diene (3.5 g) as a gum; infrared absorption peaks (sodium chloride) at 2.90 μ, 3.05 μ, 5.90 μ, 6.03 μ.

Dissolve dl-13-ethyl-3-methoxy-6-methyl-17α-ethynyl-17-hydroxygona-2,5(10)-diene (3.5 g) in methanol (90 ml) containing concentrated hydrochloric acid (6.0 ml) and water (4.0 ml). Stir the solution under nitrogen for one hour. Work up in the usual fashion. Chromatograph on Florex (150 g), then recrystallize from ether-hexane to obtain dl-13-ethyl-17α-ethynyl-17-hydroxy-6α-methylgon-4-en-3-one (0.60 g), m.p. 148°–151°; ultraviolet absorption peak at 240 mμ (ε15,300). infrared maxima (chloroform) at 2.55 μ, 3.05 μ, 6.01 μ.

$C_{22}H_{30}O_2$ Calculated: C, 80.92%; H, 9.25% Found: C, 81.01%; H, 9.56%

3,959,322

95

This compound has progestational activity.

Hydrogenate dl-13-ethyl-17α-ethynyl-17-hydroxy-6α-methylgon-4-en-3-one (0.15 g) in benzene (20 ml) with 2% palladized strontium carbonate (25 mg.) Recrystallize from ether to obtain dl-13,17α-diethyl-17-hydroxy-6β-methylgon-4-en-3-one (0.03 g); infrared absorption peaks at 2.95 μ, 6.04 μ, 6.20 μ..

This compound has anabolic activity.

### EXAMPLE 234

dl-13-Ethyl-17αα-chloroethynyl-17aβ-hydroxy-D-homogon-4-en-3-one

Dissolve dl-13-ethyl-3-methoxy-D-homogona-2,5(10)-dien-17aβ-ol (20.5 g) in toluene (350 cc) and cyclohexanone (100 cc) and azeotrope under nitrogen to remove water. Add aluminum isopropoxide (16.0 g) in toluene (50 cc) and reflux for two hours. Cool, add water (20 cc), stir for 15 minutes and add anhydrous sodium sulfate (40 g). Filter and isolate the crude product by concentration under vacuum. Triturate with boiling methanol (200 cc), filter and dry to obtain dl-13-ethyl-3-methoxy-D-homogona-2,5(10)-dien-17a-one (18.0 g), m.p. 135°–140°, λ max. KBr 5.87 μ, 6.0 μ.

Dilute methyl lithium (94.6 g, .218 M) in ether with ether (200 cc) and cool to 0°. Add cis-dichloroethylene (11.0 g, .109 M) over one hour. Add dl-13-ethyl-3-methoxy-D-homogona-2,5(10)-dien-17a-one (12.0 g) suspended in ether (250 cc). Stir at room temperature for one hour, cool in an ice bath and add saturated aqueous ammonium chloride (250 cc) dropwise. Separate, wash, dry and evaporate the ether layer and triturate the crystalline residue with boiling methanol (100 cc). Filtrate gives dl-13-ethyl-17aα-chloroethynyl-3-methoxy-D-homogona-2,5(10)-dien-17aβ-ol (13.0 g), m.p. 120°–126°C, λ max. KBr 3.0 μ, 4.54 μ, 5.90 μ, 5.99 μ.

Suspend dl-13-ethyl-17aα-chloroethynyl-3-methoxy-D-homogona-2,5(10)-dien-17aβ-ol (13.0 g) in methanol (180 cc), water (8.0 cc) and concentrated hydrochloric acid (12.0 cc), and stir under nitrogen. Add tetrahydrofuran (15 cc) and dioxane (15 cc) to effect solution. Pour into brine, extract with ether and isolate the crude product. Recrystallize from ethyl acetate (100 cc) and hexane (70 cc) to obtain the title compound (7.4 g), m.p. 204°–206°C, λ max. KBr. 2.90, 4.52, 6.0 μ; λ max. EtOH 240 mμ (ε16,820).

$C_{22}H_{29}O_2Cl$ Calculated: C, 73.21%; H, 8.10%; Cl, 9.82% Found: C, 73.48%; H, 8.10%; Cl, 9.6%

This compound has progestational activity.

### EXAMPLE 235

dl-13,17α-Diethylgon-4-en-3,17-diol ,3-propionate

Treat dl-13,17α-diethylgon-4-en-3,17-diol (1.0 g) in pyridine (25 ml) with propionic anhydride (2 ml) and allow to stand at room temperature for 14 hours. Evaporate the solvents under reduced pressure to give the title compound as a glass (1.18 g), infrared absorption peaks at 2.93 μ, 5.80 μ and 6.0 μ.

$C_{24}H_{38}O_3$ Calculated: C, 76.96%; 10.23% Found: C, 76.40%; 10.70%

This compound has anabolic activity

96

### EXAMPLE 236

dl-13-Ethyl-17aβ-hydroxy-D-homogon-4-en-3-one

Add dl-13-ethyl-D-homo-3-methoxygona-1,3,5(10)-trien-17aβ-ol (24.4 g) in tetrahydrofuran (200 cc) to liquid ammonia (1,000 cc) containing tetrahydrofuran (300 cc). Add lithium metal (7.0 g) portionwise and stir for 1.5 hours. Add absolute ethanol dropwise until the blue color is discharged, followed by water. Boil the precipitated solid with methanol (200 cc) and chill. Filter and dry the dl-13-ethyl-D-homo-3-methoxygona-2,5(10)-dien-17-aβ-ol (20.5 g), m.p. 141°–143°, λ max. KBr 3.05, 5.88, 5.97 μ.

Hydrolyze dl-13-ethyl-3-methoxy-D-homogona-2,5(10)-dien-17aβ-ol (1.30 g) in methanol (90 cc), concentrated hydrochloric acid (6.0 cc) and water (4.0 cc). Isolate the product and recrystallize from ethyl acetate to obtain the title compound (0.55 g), m.p. 144°–146°, λ max. KBr 2.95, 6.04 μ; λ max. EtOH 240 mμ (ε16,360).

$C_{20}H_{30}O_2$ Calculated: C, 79.43%; H, 10.00% Found: C, 79.20%; H, 9.93%

This compound has anabolic and progestational activities.

### EXAMPLE 237

dl-17aβ-Hydroxy-13-propyl-D-homogon-4-en-3-one,3-phenylpropionate

Add phenylpropionyl chloride (0.90 g) in benzene (5.0 cc) to a solution of dl-17aβ-hydroxy-13-propyl-D-homogon-4-en-3-one (0.80 g) in pyridine (5.0 cc), chilled to −15°C. Allow the reaction mixture to stand at −10°C for 16 hours, then at room temperature for one hour. Pour into ice water, extract with ether and isolate the crude product. Recrystallize from ethyl acetate-hexane to obtain the title compound (0.45 g) m.p. 166°–169°C, λmax. KBr 5.78, 5.98 μ; λmax. EtOH 240 mμ (ε16,900).

$C_{30}H_{40}O_3$ Calculated: C, 80.31%; H, 8.99% Found: C, 79.98%; H, 8.64%

### EXAMPLE 238

dl-17aβ-Hydroxy-13-propyl-D-homogon-4-en-3-one, decanoate

Add decanoyl chloride (0.90 g) in benzene (5.0 cc) to dl-17aβ-hydroxy-13-propyl-D-homogon-4-en-3-one (0.80 g) in pyridine (5.0 cc), chilled to 15°C. Allow the reaction mixture to stand at −10° for 16 hours, then at room temperature for one hour. Pour into ice water, extract with ether and isolate the crude product. Recrystallize from hexane to obtain the title compound (0.375 g), m.p. 55°–58°C, λmax. KBr 5.78, 5.98 μ; λmax. EtOH 240 mμ (ε15,250).

$C_{31}H_{50}O_3$ Calculated: C, 79.0%; H, 10.70% Found: C, 78.95%; H, 10.60%

### EXAMPLE 239

dl-13β-Ethyl-17β-hydroxy-7-methylgon-4-en-3-one

Reflux dl-13-ethyl-17β-hydroxygon-4-en-3-one (3.0 g) with acetic anhydride (45 cc), acetyl chloride (24 cc) and pyridine (2.4 cc) for three hours. Take to dryness under reduced pressure and partition the residue between benzene-ether and water. Triturate the crude product with hot ether to obtain dl-3,17-diacetoxy-13-ethylgona-3,5-diene (3.125 g), m.p. 148°–156°; λmax.

3,959,322

**97**

KBr 5.68, 5.78, 6.0, 6.11 $\mu$; λmax. EtOh 238 m$\mu$ (ε19,500).

Add dl-13-ethyl-3,17-dihydroxygona 3,5-diene, diacetate (1.0 g) dissolved in acetone (20 cc) to a solution of acetone (86 cc), pyridine (.59 ml), sodium acetate (2.72 cc), water (27.2 cc) and acetic acid (2.72 cc). Chill to 0° and add N-bromosuccinimide (0.5 g). Stir for three hours at a temperature between +5 and −5°. Pour into ice-cold brine (800 cc) and extract with ether. Wash and dry the ether layer and concentrate, deepening the temperature below +15°. Add calcium carbonate (3.0 g) and dimethylformamide (70 cc) and distil off residual ether. Reflux one hour, cool and filter; wash the cake with ether. Pour the filtrate into brine and extract with ether. Recrystallize from ethyl acetate-hexane to obtain dl-13-ethyl-17β-acetoxygona-4,6-dien-3-one (0.475 g), m.p. 163°–177°, λmax. KBr 5.77, 6.0 $\mu$; λmax. EtOH 283 m$\mu$ (ε24,370).

$C_{21}H_{28}O_3$ Calculated: C, 76.80%; H, 8.59% Found: C, 76.51%; H, 8.58%

Add dl-13-ethyl-17β-acetoxygona-4,6-dien-3-one (2.0 g) in tetrahydrofuran (30 cc) to tetrahydrofuran (20 cc) containing 3 moles methyl magnesium bromide (16 cc) and cuprous chloride (299 mg) at 0°. Stir for 20 minutes and pour into ice-cold brine saturated with hydrogen chloride. Extract with ether and chromatograph on Grade 2.5 neutral alumina. To obtain the title compound, recrystallize from ethyl acetate-hexane (0.56 g), m.p. 152°–154°; λmax. KBr 2.98, 6.02 $\mu$; λmax. EtOH 242 m$\mu$ (ε16,730).

$C_{20}H_{30}O_2$ Calculated: C, 79.43%; H, 10.00% Found: C, 79.11%; H, 9.92%

This compound has antiestrogenic activity.

## EXAMPLE 240

dl-13,17α-Diethyl-17-hydroxygon-4-en-3-one, acetate

Reflux dl-13,17α-Diethyl-17-hydroxygon-4-en-3-one (3.0 g) with acetic anhydride (48 cc), acetyl chloride (24 cc) and pyridine (2.4 cc) for two hours. Take the reaction mixture to dryness under reduced pressure and partition the residue between benzene-ether and water. Wash, dry and evaporate the organic layer to obtain the crude dl-13,17α-diethyl-3,17-dihydroxygona-3,5-diene, diacetate. To obtain an analytical sample, triturate the crystalline crude product with ether, filter and wash with hexane, m.p. 122°–125°C; λmax. KBr 5.71, 5.78, 6.0 $\mu$; λmax. EtOH 238 m$\mu$ (ε18,200).

$C_{25}H_{36}O_4$ Calculated: C, 74.96%; H, 9.06% Found: C, 74.64%; H, 9.10%

Dissolve dl-13,17α-diethyl-3,17-dihydroxygona-3,5-diene, diacetate (3.0 g) in tetrahydrofuran (70 cc) and methanol (70 cc), and chill the solution to 0°C. Add ice-cold 2% potassium hydroxide in methanol (200 cc) and stir the solution under nitrogen for one hour. Pour into brine, make acid with 10% aqueous hydrochloric acid and extract with ether. Wash, dry and evaporate the organic layer and triturate the crystalline residue with ice-cold ether to obtain the title compound (1.45 g), m.p. 121°–123°C; λmax. KBr 5.80, 5.99 $\mu$; λmax. EtOH 240 m$\mu$ (ε17,925).

$C_{23}H_{34}O_3$ Calculated: C, 77.05%; H, 9.56% Found: C, 76.60%; H, 9.18%

This compound has antiestrogenic activity.

**98**

## EXAMPLE 241

dl-13-Ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one, acetate

Reflux dl-13-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one (1.0 g) for one and one-half hours with acetic anhydride (16 cc), acetyl chloride (8.0 cc) and pyridine (0.8 cc). Remove the liquids under reduced pressure and partition the dry crystalline residue between benzene-ether and water. Wash the organic solvents under reduced pressure and triturate the residue with ice-cold ether to provide dl-13-ethyl-17α-ethynyl-3,17-dihydroxygona-3,5-diene, diacetate (0.725 g) m.p. 144°–150°C; λmax. KBr. 3.09, 5.67, 5.77 $\mu$; λmax. EtOH 236 m$\mu$ (ε19,300).

$C_{25}H_{30}O_4$ Calculated: C, 75.72%; H, 8.11% Found: C, 75.28%; H, 7.86%

Dissolve dl-13-ethyl-17α-ethynyl-3,17-dihydroxygona-3,5-diene, diacetate (0.34 g) in methanol (60 cc) and tetrahydrofuran (10 cc) and chill to 0°C. Add 2% potassium hydroxide in methanol (20 cc) and stir the solution under nitrogen for one hour. Pour into brine, make acid with 10% aqueous hydrochloric acid and extract with ether. Wash the ether with 5% sodium bicarbonate, water and brine. Dry the organic layer and remove the solvent under reduced pressure. Recrystallize the residue from a small amount of ether to provide the title compound (0.200 g), m.p. 162°–164°; λmax. KBr 3.1, 5.72, 6.02 $\mu$; λmax. EtOH 240 m$\mu$ (ε18,185).

$C_{23}H_{30}O_3$ Calculated: C, 77.91%; H, 8,53% Found: C, 77.46%; H, 8.29%

This compound has progestational activity.

## EXAMPLE 242

dl-13-Ethyl-17α-chloroethynyl-17-hydroxygon-4-en-3-one, acetate

Reflux dl-13-ethyl-17α-chloroethynyl-17-hydroxygon-4-en-3-one (3.0 g) for two hours with acetic anhydride (48 cc), acetyl chloride (24 cc) and pyridine (2.4 cc). Take the reaction mixture to dryness under reduced pressure and partition the residue between benzene-ether and water. Wash, dry and evaporate the organic phase to obtain the crude dl-13-ethyl-17α-chloroethynyl-3,17-dihydroxygona-3,5-diene, diacetate. Obtain an analytical sample by triturating this crystalline residue with cold ether and washing with hexane, m.p. 177°–180° (d) λmax. KBr 4.50, 5.70, 5.75, 6.0 $\mu$; λmax. EtOH 236 m$\mu$ (ε18,800).

$C_{25}H_{31}O_4Cl$ Calculated: C, 69.67%; H, 7.25% Found: C, 69.93%; H, 7.26%

Dissolve dl-13-ethyl-17α-chloroethynyl-3,17-dihydroxygona-3,5-diene, diacetate (3.0 g) in tetrahydrofuran (70 cc) and methanol (70 cc) and cool to 0°–5° under nitrogen. Add 2% potassium hydroxide in methanol (200 cc) and stir for one hour. Pour into brine, make acid with 10% aqueous hydrochloric acid and extract with ether. Wash, dry and evaporate the ether and dissolve the residue in 10% petroleum ether-90% benzene and filter through Grade III neutral alumina (100 g). Remove the solvent and recrystallize the residue from ether-hexane to provide the title compound (1.275 g), m.p. 185°–187°; λmax. KBr 4.52, 5.75, 6.0 $\mu$; λmax. EtOH 240 m$\mu$ (ε16,900).

$C_{23}H_{29}O_3Cl$ Calculated: C, 71.03%; H, 7.52% Found: C, 71.03%; H, 7.69%

This compound has progestational activity.

3,959,322

99                            100

## EXAMPLE 243

### dl-17β-Hydroxy-17α-ethynylestr-4-en-3-one

Dissolve dl-3-methoxyestra-2,5(10)-dien-17β-ol (4 g) in cyclohexanone (40 ml) and toluene (140 ml) and add a solution of aluminum isopropoxide (4 g) in toluene (56 ml). Reflux in an atmosphere of nitrogen for two hours and cool. Add water (7.5 ml), shake, and then dry by adding sodium sulfate (10 g). Filter and evaporate under vacuum and recrystallize the residue from methanol to obtain dl-3-methoxyestra-2,5(10)-dien-17-one (3.5 g); m.p. 116°–118°; infrared absorption maxima at 5.76 μ, 5.9 μ, 6.01 μ.

Add a solution of dl-3-methoxyestra-2,5(10)-dien-17-one (3.5 g) in dimethylacetamide (100 ml) to a suspension of lithium acetylide (3.7 g) in dioxane (25 ml) and dimethylacetamide (20 ml). Stir for three hours, pour on to ice water (200 g) and extract with ether. Wash, dry, and evaporate the ethereal solution and recrystallize the residue from methanol to obtain dl-17α-ethynyl-3-methoxyestra-2,5(10)-dien-17β-ol (2 g), m.p. 160°–164°; infrared absorption maxima at 2.95 μ, 3.15 μ, 5.9 μ, 6.0 μ.

Dissolve dl-17α-ethynyl-3-methoxyestra-2,5(10)-dien-17β-ol (1 g) in methanol (20 ml) containing concentrated hydrochloric acid (1.2 ml) and water (0.8 ml) and stir for one hour. Add water (250 ml) and extract with ether. Wash, dry and evaporate the ethereal solution and recrystallize the residue from ethyl acetate-ether to obtain the title compound (0.63 g), m.p. 173°–174.5°; ultraviolet absorption peak at 240 mμ (ε17,500); infrared absorption maxima at 3.05 μ, 6.05 μ.

$C_{20}H_{26}O_2$ Calculated: C, 80.49%; H, 8.76% Found: C, 80.41%, H, 8.82%

This compound has progestational activity

## EXAMPLE 244

### dl-17α-Ethyl-17-hydroxyestr-4-en-3-one

Add solid lithium acetylide-ethylenediamine complex (9.5 g) to 3-methoxyestra-1,3,5(10),8-triaen-17-one (10 g) in dimethylacetamide (100 ml), stir the mixture for 15 hours and then pour into ice water. Extract with ether-benzene (1:1), and wash, dry and evaporate the organic extract. Recrystallize the residue from methanol to obtain dl-17α-ethynyl-3-methoxyestra-1,3,5(10),8-tetraen-17-ol (2.8 g), m.p. 133°–137°; infrared absorption peaks at 3.1 μ, 6.25 μ.

Add dl-17α-ethynyl-3-methoxyestra-1,3,5(10),8-tetraen-17-ol (7 g) in benzene (75 ml) to a suspension of prehydrogenated 2% palladised calcium carbonate (3 g) in benzene (50 ml), and shake in an atmosphere of hydrogen until two molecular equivalents of hydrogen (1.030 ml) have been absorbed. Filter the catalyst, evaporate the solvent and recrystallize the residue twice from methanol to obtain dl-17α-ethyl-3-methoxyestra-1,3,5(10),8-tetraen-17-ol (4.5 g), m.p. 105°–120°; ultraviolet absorption maximum 278 mμ (ε12,000); infrared absorption peaks at 295 μ, 6.25 μ.

Add dl-17α-ethyl-3-methoxyestra-1,3,5(10),8-tetraen-17-ol (3 g) in tetrahydrofuran (50 ml) to lithium (0.8 g) in aniline (8 ml) and liquid ammonia (200 ml). Stir for two hours, decompose by adding ammonium chloride and water, and extract with ether. Wash, dry and evaporate the organic extract, and crystallize from ethyl acetate-hexane to obtain dl-17α-ethyl-3-methox-

yestra-1,3,5(10)-trien-17β-ol (2 g), m.p. 133°–135°; ultraviolet absorption maximum at 279 mμ (ε2,120).

Add dl-17α-ethyl-3-methoxyestra-1,3,5(10)-trien-17-ol (2 g) in ether (55 ml) to distilled liquid ammonia (180 ml), and add lithium (1 g) to the stirred solution. After 45 minutes add ethanol (15 ml) and ether (15 ml) dropwise followed by ammonium chloride and water. Extract with ether, wash, dry, evaporate, and recrystallize the residue from ether to obtain dl-17α-ethyl-3-methoxyestra-2,5(10)-dien-17-ol (1.4 g), m.p. 131°–134°.

Stir dl-17α-ethyl-3-methoxyestra-2,5(10)-dien-17-ol (1.4 g) with concentrated hydrochloric acid (2.4 ml) in water (1.6 ml) and methanol (36 ml) for two hours. Add water, extract with ether and wash, dry and evaporate the ethereal solution. Recrystallize the product from ethyl acetate-ether to obtain the title compound (0.63 g), m.p. 173°–174.5°; ultraviolet absorption maximum at 240 mμ (ε17,500).

$C_{20}H_{26}O_2$ Calculated: C, 80.5%; H, 8.7% Found: C, 80.4%; H, 8.8%

This compound has anabolic activity.

## EXAMPLE 245

### dl-13-Ethyl-17β-hydroxy-17α-(1-hydroxyethyl)gon-4-en-3-one

Reduce dl-13-ethyl-17α-acetyl-17β-hydroxy-3-methoxygona-1,3,5(10)-triene (1 g) with lithium aluminum hydride in ether to dl-13-ethyl-17-(1-hydroxyethyl)-17β-hydroxy-3-methoxygona-1,3,5(10)-triene. Reduce this alcohol (0.9 g) with lithium (0.7 g) and ethanol in liquid ammonia (150 cc)-tetrahydrofuran (60 cc) to dl-13-ethyl-17β-hydroxy-17α-(1-hydroxyethyl)-3-methoxygona-2,5(10)-diene. Hydrolyse this substance with methanolic hydrochloric acid and recrystallize the product from ethyl acetate to obtain the title substance, m.p. 159°–164°, λmax. 240 mμ (ε15,230).

$C_{21}H_{32}O_3$ Calculated: C, 75.85%; H, 9.7% Found: C, 76.1%, H, 9.8%

This compound has progestational activity.

## EXAMPLE 246

### 13-Ethyl-17β-hydroxygon-4-en-3-one, 2′-tetrahydropyranyl ether

Add 2 drops of concentrated hydrochloric acid to 13-ethyl-17β-hydroxygon-4-en-3-one (0.5 g), 2,3-dihydropyran (5 ml), and ether (3 ml). Keep the mixture for 3 days at room temperature then dilute it with ether and add sodium bicarbonate. Recrystallize the product from hexane to obtain the title substance, m.p. 110–140°.

$C_{24}H_{36}O_3$ Calculated: C, 77.4%; H, 9.7% Found: C, 77.15%; H, 9.5%

This compound has anabolic activity.

## EXAMPLE 247

### dl-13-Ethyl-17β-(2-hydroxyethoxy)gon-4-en-3-one, benzoate

Stir a solution of 4.0 g. of dl-13-ethyl-17β-(2-hydroxyethoxy)-3-methoxygona-1,3,5(10)-triene, 300 ml. of tetrahydrofuran, and 300 ml. of liquid ammonia. Add 4.0 g. of lithium and stir for one hour. Discolor with absolute alcohol, add water and filter off the precipitate; infrared peaks at 2.91, 5.89, 6.00 μ.

3,959,322

**101**

Stir a suspension of 1.7 g of the foregoing enol ether, 100 ml. of methanol, 8 ml. of conc. hydrochloric acid, and 5 ml. of water for 2 hours. Dilute with water and extract the material with ether. Evaporate the ether to obtain a gum.

Treat a solution of 1.3 g. of this crude material in 6 ml. of pyridine with 1.3 ml. of benzoyl chloride a −10°. Keep the solution at −10° for 22 hours, then pour it over ice and extract the mixture with ether. Chromatograph the product on alumina. Elute with benzene-ethyl acetate to obtain the title substance; infrared peaks at 5.80, 5.98 μ.

$C_{28}H_{36}O_4$ Calculated: C, 77.03%, H, 8.31% Found: C, 77.44%; H, 8.59%

This compound has anabolic activity.

EXAMPLE 248

dl-17β-Ethoxy-13-ethylgon-4-en-3-one

Reflux a suspension of 5.0 g. of dl-13-ethyl-3-methoxygona-1,3,5(10)-trien-17β-ol and 3.83 g. of sodium hydride (50% in oil) for 1.5 hours in xylene (100 ml). Add 14.5 ml. of ethyl iodide and reflux for 22 hours. Acidify with 2N hydrochloric acid and extract the material with benzene. Chromatograph the residue on alumina (Grade I neutral). Elute the product with benzene-ether (1:1). Recrystallize the product from 60 ml. of methanol to obtain dl-17β-ethoxy-13-ethyl-3-methoxygona-1,3,5(10)-triene (2.3 g); m.p. 74°–77°C.

$C_{22}H_{32}O_2$ Calculated: C, 80.44%; H, 9.83% Found: C, 80.73%; H, 10.09%

Add 2.0 g. of lithium to a suspension of 2.0 g of dl-17β-ethoxy-13-ethyl-3-methoxygona-1,3,5(10)-triene, 90 ml. of 1,2-dimethoxyethane, 100 ml. of 1-methoxy-2-propanol, and 300 ml. of ammonia while stirring. Treat with 2.0 g. of ammonium chloride and water, filter off the precipitate and add it to 80 ml. of methanol, 4 ml. of water, and 5 ml. of conc. hydrochloric acid. Stir for one hour and dilute with water. Extract the product with ether and recrystallize it successively from methanol-water and petroleum ether-ether to obtain the title substance m.p. 95°–97°; ultraviolet peak at 244 mμ (15,900); infrared peak a 6.0 μ.

$C_{21}H_{32}O_2$ Calculated: C, 79.70%, H, 10.19% Found: C, 79.90%, H, 10.38%

This compound has progestational and anabolic activities.

EXAMPLE 249

dl-13-Ethyl-17β-(1-hydroxy-2,2,2-trichloroethoxy)-gon-4-en-3-one

Add 2.9 g. of dl-13-ethyl-17β-hydroxygon-4-en-3-one to a solution of 1.9 g. of chloral hydrate in 10 ml. of benzene at 5°C. Keep the mixture overnight at this temperature. Filter off the product and recrystallize it successively from ethyl acetate and petroleum ether-benzene to obtain the title substance, m.p. 175°–176°; ultraviolet peak at 240 mμ (ε17,500); infrared peaks at 3.10, 6.05, 6.20 μ.

$C_{21}H_{29}Cl_3O_3$ Calculated: C, 57.87%; H, 6.71%; Cl, 24.41% Found: C, 57.82%; H, 6.64% pl Cl, 24.2%

This compound has anabolic and progestational activities.

**102**

EXAMPLE 250

dl-13-Ethyl-17β-(1-hydroxy-2,2,2-trichloroethoxy)-gon-4-en-3-one, acetate

Keep a solution of 1.5 g. of 13-ethyl-17β-(1-hydroxy-2,2,2-trichloroethoxy)gon-4-en-3-one in acetic anhydride (5 ml) and pyridine (5 ml) for 3 days. Evaporate the solvent afterwards and reflux the residue and methanol for a few minutes. Cool and filter off the title substance (1.2 g); m.p. 183°–183°; ultraviolet peak a 240 mμ (ε17,500).

$C_{23}H_{31}Cl_3O_4$ Calculated: C, 57.81%; H, 6.54%; Cl, 22.26% Found: C, 57,76%; H, 6.37%; Cl, 22.2%

This compound has anabolic and progestational activities.

EXAMPLE 251

dl-13-Ethyl-17β-propoxygon-4-en-3-one

Reflux a suspension of 5.0 g. of dl-13-ethyl-3-methoxygona-1,3,5(10)-triene-17β-ol, 100 mg. of xylene, and 3.9 g. of sodium hydride (50% in mineral oil) for 1.5 hours. Add 14.5 ml. of allyl bromide and reflux for 22 hours. Make the reaction mixture acidic with dilute hydrochloric acid and extract the organic layer with sodium bicarbonate solution. Chromatograph the residue on alumina (Grade I neutral) in hexane and eluate the product with ether to obtain dl-17β-allyloxy-13-ethyl-3-methoxygona-1,3,5(10)-triene.

Hydrogenate 3.0 g. of dl-17β-allyloxy-13-ethyl-3-methoxygona-1,3,5(10)-triene in 100 ml. of benzene and 1.0 g. of 10% palladized charcoal at atmospheric pressure. Filter off the catalyst and recrystallize the residue from methanol to obtain 2.3 g. of the desired product, m.p. 83°–84°C; λmax. 279 (ε2,010).

$C_{23}H_{34}O_2$ Calculated: C, 80.65%; H, 10.01% Found: C, 80.42%; H, 9.80%

Treat a suspension of 1.5 g. of dl-13-ethyl-3-methoxy-17β-propoxygona-1,3,5(10)-triene, 75 ml. of 1,2-dimethoxyethane, 75 ml. of 1-methoxy-2-propanol, and 300 ml. of liquid ammonia with 5.0 g. of lithium. When the reaction ends add 1.5 g. of ammonium chloride and water. Collect the precipitate of dl-13-ethyl--3-methoxy-17β-propoxygona-2,5(10)-diene, and add it to a solution of 50 ml. of methanol, 5 ml. of conc. hydrochloric acid, and 4 ml. of water. Stir for 0.5 hours. Filter off a small amount of insoluble material. Add water to clean solution and extract with ether. Recrystallize from ether-petroleum ether to obtain the title product, m.p. 88°–89°; ultraviolet peak at 242 mμ (ε16,600); infrared peaks at 6.00, 6.19μ.

$C_{22}H_{34}O_2$ Calculated: C, 79.95%; H, 10.37% Found: C, 80.02%; H, 10.20%

This compound has anabolic activity.

EXAMPLE 252

dl-17-Chloroethynyl-13-ethylgon-4-en-3,17β-diol

Stir a solution of (5.0 g) dl-17-chloroethynyl-17β-hydroxy-13-ethylgon-4-en-3-one and 150 ml. of absolute alcohol (ice-bath), add 2.0 g. of sodium borohydride and continue to stir three hours at room temperature. Add acetic acid and water and extract with ether. Wash the ether solution with sodium bicarbonate solution. Evaporate the solvent to obtain 5.0 g. of the title product; no infrared absorption in the 6 μ region.

This compound has pituitary-blocking activity.

3,959,322

## 103

### EXAMPLE 253

#### dl-17-Chloroethynyl-13-ethylgon-4-ene-3,17β-diol, 3-acetate

Treat a mixture of 2.0 g. of dl-17-chloroethynyl-13-ethylgon-4-ene-3,17β-diol, 10 mg. of pyridine with 15 ml. of acetic anhydride. Keep the solution overnight at room temperature, and then pour it into ice-water; acidify with 2 N hydrochloric acid and extract with ether. Evaporate the ether and crystallize residue from methanol-water to obtain about 900 mg. of desired product, m.p. 156°–160°; infrared peaks at 2.90, 4.54, 5.80, 6.00 μ.

$C_{23}H_{31}O_3Cl$ Calculated: Cl, 9.09% Found: Cl, 9.01% This compound has progestational activity.

### EXAMPLE 254

#### dl-17β-(2-Diethylaminoethoxy)-13-ethylgon-4-en-3-one, citrate

Stir a solution of 100 ml. of ether, 13.3 g. aluminum chloride and 15 ml. of lithium aluminum hydride (1 molar solution) for 40 minutes. Add a solution of 17.1 g. of dl-13-ethyl-17,17-ethylenedioxy-3-methoxygona-1,3,5(10)-triene in 1 liter of ether and stir for 4 hours. Dilute with 2 N sulfuric acid until clear solution results. Separate the ether layer and evaporate the solvent. Treat residue with 20 ml. of ethanol, 5 ml. of conc. hydrochloric acid, and 10 ml. of water on steam bath for 30 minutes. Crystallize the product from ethanol to obtain 8.1 g. dl-13-ethyl-17β-(2-hydroxyethoxy)-3-methoxygona-1,3,5(10)-triene; m.p. 131°–132°.

$C_{22}H_{32}O_3$ Calculted: C, 76.70%; H, 9.36% Found: C, 76.81%; H, 9.35%

Stir a cooled solution of 344 mg. of dl-13-ethyl-17β-(2-hydroxyethoxy)-3-methoxygona-1,3,5(10)-triene in 2 ml. of pyridine (acetone-dry ice bath) and add dropwise 0.14 ml. of methanesulfonyl chloride. After 2 hours bring reaction mixture to room temperature. Mix with ice and water and a few drops of methanol to obtain a crystalline precipitate. Recrystallize this to obtain dl-13-ethyl-17β-(2-hydroxyethoxy)-3-methoxygona-1,3,5(10)-triene methane sulfonate from methanol (310 mg); m.p. 104°.

$C_{23}H_{34}O_5S$ Calculated: C, 65.37%; H, 8.11%; S, 7.60% Found: C, 65.62%; H, 8.22 %, S, 7.85%

Reflux a suspension of 2.3 g. of the foregoing ester with 50 ml. of diethylamine for 6 hours. Evaporate the solvent and treat the residue with aqueous acetic acid. Extract the non-basic fraction with ether. Basify the acidic layer and separate the product with ether. Recrystallize from methanol-water to obtain dl-13-ethyl-17β-(2-diethylaminoethoxy)-3-methoxygona-1,3,5(10)-triene; m.p. 66°–67°.

$C_{26}H_{41}NO_2$ Calculated: C, 78.14%; H, 10.34%; N, 3.51% Found: C, 77.85%; H, 10.3%; N, 3.52%

Add 3.0 g. of lithium to a stirred solution of 4.0 g. of 17β-(2-diethylaminoethoxy)-13-ethyl-3-methoxygona-1,3,5(10)-triene, 200 ml. of morpholine, 200 ml. of tetrahydrofuran, 100 ml. of 1-methoxy-2-propanol, and 500 ml. of liquid ammonia. Treat with 25.0 g. of ammonium chloride and water and extract with ether to obtain 3.0 g. of dl-13-ethyl-17β-(2-diethylaminoethoxy)-3-methoxygona-2,5(10)-diene.

Add 50 ml. methanol, 5 ml. of conc. hydrochloric acid and 4 ml. of water to the foregoing enol ether and stir for 2 hours. Add sodium hydroxide solution (10%) and extract product with ether. Purify product by chromatography on alumina (Grade I neutral). Evaporate the methanol eluate, dissolve the residue in 100 ml. of ether and add 650 mg. of citric acid hydrate in 600 ml. of ether to the solution. Filter precipitate to obtain the title product (0.9 g).

$C_{31}H_{49}NO_9$ Calculated: N, 2.42% Found: N, 2.61%

## 104

### EXAMPLE 255

#### dl-13-Ethyl-17α-ethynyl-17β-hydroxy-7α-methylgon-4-en-3-one

Reflux dl-13-ethyl-17β-hydroxy-7α-methylgon-4-en-3-one (1.35 g) in benzene (100 ml) with ethylene glycol (10 cc) and p-toluene-sulfonic acid hydrate (67 mg) for 6 hours using a water separator. Wash, dry and evaporate the solvent to obtain the dl-13-ethyl-3,3-ethylenedioxy-17β-hydroxy-7α-methylgon-5and 5(10)-ene, as a gum, λmax. NaCl 2.90 μ.

Subject dl-13-ethyl-3,3-ethylenedioxy-17β-hydroxy-7α-methylgon-5 and 5(10)-ene (1.4 g) to Oppenauer oxidation by refluxing in the presence of toluene (50 cc), cyclohexanone (10 cc) and aluminum isopropoxide (0.80 g) for 3.5 hours.

Isolate the dl-13-ethyl-3,3-ethylenedioxy-7α-methylgon-5 and 5(10)-ene-17-one as a gum by addition of water (0.5 cc), sodium sulfate anhydrous (6.0 g), filtration and concentration under high vacuum, λmax. NaCl 2.9, 5.75, 5.85 μ.

Dissolve dl-13-ethyl-3,3-ethylenedioxy-7α-methylgon-5 and 5(10)-en-17-one (1.3 g) in dimethylacetamide (50 cc) and stir in a stream of acetylene in the presence of lithium acetylide-ethylenediamine (1.0 g) for two hours. Add ice, extract with ether and isolate the crude dl-13-ethyl-3,3-ethylendioxy-17α-ethynyl-17β-hydroxy-7α-methylgon-5 and 5(10)-ene (0.8 g). Infrared spectral data indicate no ketone remaining.

Dissolve crude dl-13-ethyl-3,3-ethylenedioxy-17α-ethynyl-17-hydroxy-7α-methylgon-5 and 5(10)-ene (0.8 g) in methanol (50 cc), hydrochloric acid (3.0 cc) and water (2.0 cc), and stir under nitrogen for 1.5 hours. Pour into brine, extract with ether and isolate the crude product as a crystalline solid, m.p. 170°–175°. Chromatograph on Florex XXS (40.0 g) and recrystallize from ethyl acetate-hexane to obtain the title compound (0.550 g), m.p. 182°–184°C, λmax. KBr 3.0, 3.1, 4.80, 6.09 μ.

$C_{22}H_{30}O_2$ Calculated: C, 80.92%; H, 9.26% Found: C, 80.62%; H, 9.13%

### EXAMPLE 256

#### dl-13-Ethyl-17β-(2-dimethylaminoethoxy)gon-4-en-3-one

Stir a solution of 860 mg. of sodium amide in 15 ml. of benzene and add 3.0 g. of dl-13-ethyl-3-methoxygona-1,3,5(10)-trien-17β-ol in 35 ml. of benzene. Heat for 2 hours at 70°–83°. Cool to room temperature and add 1.58 g. of N,N-dimethylamino-2-chloroethane hydrochloride and reflux for 16 hours. Pour over ice and acidify reaction mixture with 2 N hydrochloric acid. Extract with ether and basify the aqueous layer with 15% sodium hydroxide. Isolate material with ether. Evaporate the ether to obtain dl-13-ethyl-17β-(2-dimethylaminoethoxy)-3-methoxygona-1,3,5(10)-triene.

Add to a solution of 400 mg. of dl-13-ethyl-17β-(2-dimethylaminoethoxy-3-methoxygona-1,3,5(10)-triene, 75 ml. of tetrahydrofuran, and 120 ml. of liquid ammonia, 500 mg. of lithium while stirring for 3 hours.

3,959,322

**105**

Add absolute alcohol until the reaction mixture turns colorless. Add 6.0 g. of ammonium chloride and water, and filter off the precipitate.

Stir this material with a solution of 12 ml. of methanol and 1 ml. of 2 N hydrochloric acid for one hour. Basify with 10% sodium hydroxide and collect the precipitate. Recrystallize the product from methanol-water to obtain the title compound, m.p. 87°–88°.

$C_{23}H_{37}O_2N$ Calculated: C, 76.83%; H, 10.37%; N, 3.90% Found: C, 76.69%; H, 10.22%; N, 4.06%

### EXAMPLE 257

17α-Chloroethynyl-13β-ethyl-17-heptanoyloxygon-4-en-3-one

Add a 2% solution of methanolic potassium hydroxide (120 cc.) to a solution of 17α-chloroethynyl-3,17-diheptanoyloxy-13β-ethylgona-3,5-diene (3.5 g.) in methanol (360 cc.) at 0° in an atmosphere of nitrogen and stir the mixture at 0° for 2 hours. Pour the solution into saturated brine and isolate the product with ether. Dissolve the resultant gum in benzene containing a little ether and filter through a column of neutral alumina. Evaporate the solvent to obtain the title compound (3.7 g.) as a gum.

### EXAMPLE 258

17β-Acetoxy-17-chloroethynyl-13β-ethylgon-4-en-3-one

Add a 2% solution of methanolic potassium hydroxide (200 cc.) to a solution of 17α-chloroethynyl-3,17β-diacetoxy-13β-ethylgona-3,5-diene (2.5 g.) in methanol (70 cc.) and tetrahydrofuran (70 cc.) at 0° under nitrogen and stir the mixture at 0° for 1 hour. Pour the solution into brine, acidify the resulting suspension with 10% hydrochloric acid and isolate the product with ether. Dissolve the product in benzene containing a small amount of light petroleum and filter the solution through a column of neutral alumina. Evaporate the solvent and recrystallise the residue from ether-hexane to obtain the title product (1.27 g.), m.p., 185°–187°; ultraviolet absorption peaks at 240 mμ (ε16,900); infrared absorption peaks at 4.5, 5.75, 6 μ.

$C_{23}H_{29}O_3$ Cl Calculated: C, 71.0%; H, 7.5% Found: C, 71.0%; H, 7.7%

### EXAMPLE 259

17α-Chloroethynyl-13β-ethyl-17-heptanoyloxygon-4-en-3-ol

Add excess sodium borohydride to a solution of 17α-chloroethynyl-13β-ethyl-17-heptanoyloxygon-4-en-3-one (0.59 g.) in methanol. Stir at 25° for two hours, then add 50% aqueous acetic acid (10 cc.) and pour into brine. Isolate the product with ether to give the title compound (0.5 g.): infrared absorption peaks at 2.95, 3.9, 3.99, 4.5, 5.75, 7.99 μ

### EXAMPLE 260

17β-Acetoxy-17α-chloroethynyl-13β-ethylgon-4-en-3-ol

Add lithium aluminum tri-tert-butoxide hydride (0.5 g.) to a solution of 17β-acetoxy-17α-chloroethynyl-13β-ethylgon-4-en-3-one (0.5 g.) in tetrahydrofuran (20 cc.). Allow to stand for 16 hours, then add water (1 cc.) and filter. Evaporate the filtrate to obtain the title product (0.45 g.) as a gum; infrared absorption peaks at 2.99, 4.5, 5.75 μ.

**106**

### EXAMPLE 261

17α-Chloroethynyl-3β,17-diacetoxy-13β-ethylgon-4-ene

Dissolve 17β-acetoxy-17α-chloroethynyl-13β-ethylgon-4-en-3β-ol (0.45 g.) in dry pyridine (20 cc.) and acetic anhydride (1 cc.) and allow the solution to stand at 25° for 16 hours. Pour the mixture into water, acidify with dilute hydrochloric acid and isolate the product with ether. Recrystallise from ether to obtain the title compound (0.2 g.), m.p. 144°–145°; infrared absorption peaks at 4.55, 5.75, 5.8 μ.

$C_{25}H_{33}O_4Cl$ Calculated: C, 69.5%; H, 7.5%; Cl 8.2% Found: C, 69.6%; H, 7.6%; Cl 8.2%

### EXAMPLE 262

3-Acetoxy-17α-chloroethynyl-13β-ethyl-17β-heptanoyloxygon-4-ene

Add acetyl chloride (0.12 g.) in benzene (4 cc.) to a solution of 17α-chloroethynyl-13β-ethyl-17-heptanoyloxygon-4-en-3-ol (0.5 g.) in pyridine (5 cc.) and stir the mixture for 20 hours. Add water to the cooled mixture and then pour into brine and extract the title product by means of benzene as a gum (0.2 g.); infrared absorption peaks at 4.55, 5.75, 6.0 μ.

### EXAMPLE 263

17α-Chloroethynyl-13β-ethylgon-4-ene-3β,17β-diol 3β-hemisuccinate

Add succinic anhydride (1 g.) to a solution of 17α-chloroethynyl-13β-ethylgon-4-ene-3β,17β-diol (0.8 g.) in pyridin (25 cc.), stir the mixture for 3 days and then pour into water (100 cc.). Allow to stand for 5 minutes, then acidify with dilute hydrochloric acid and isolate the product with ether. Recrystallise from acetone-hexane to obtain the title compound (0.5 g.), as a hexane solvate m.p. 155°–157°, infrared absorption peaks at 2.99, 4.55, 5.85 μ.

$C_{25}H_{33}O_5$ Cl·C$_6$H$_{14}$ Calculated: C, 69.7%; H, 8.9% Found: C, 70.1%; H, 8.3%

Obtain the sodium hemisuccinate by treating the compound in acetone with sodium bicarbonate m.p. 160°–170° (decomp.)

### EXAMPLE 264

17α-Chloroethynyl-13β-ethyl-17β-heptanoyloxygon-4-ene

Dissolve 17α-chloroethynyl-13β-ethylgon-4-ene-3β,17β-diol (1 g.) in pyridine (1 cc.) and n-heptanoic anhydride (1.1 cc.), allow the mixture to stand for 24 hours, pour into water and stir for 2 hours. Acidify the mixture with dilute sulphuric acid and stir for a further 2 hours. Isolate the product with ether and recrystallise from methanol to obtain the title product (0.65 g.), m.p. 142°–144°.

### EXAMPLE 265

17α-Chloroethynyl-13β-ethylgon-4-ene-3β,17β-diol

Add lithium aluminum tri-tert-butoxide hydride (2.2 g.) to a cooled solution of 17α-chloroethynyl-13β-ethylgon-4-en-3-one (2.2 g.) in tetrahydrofuran (100 cc.) and stir the mixture with cooling for 2 hours and then allow to stand for 16 hours at 25°. Add water and dilute hydrochloric acid and isolate the product with ether. Recrystallise from ether-light petroleum to obtain the title compound (0.8 g.), m.p. 120°–124°.

3,959,322

**107**

### EXAMPLE 266

3β-Acetoxy-17α-chloroethynyl-13β-ethylgon-4-en-17β-ol

Dissolve 17α-chloroethynyl-13β-ethylgon-4-ene-3β,17β-diol (1.4 g.) in pyridine (7 cc.) 28 and acetic anhydride (10.5 cc.) and allow to stand for 16 hours. Add dilute hydrochloric acid and isolate the product with ether. Recrystallise from aqueous methanol to obtain the title compound (0.8 g.), m.p. 163°–165°.

$C_{23}H_{35}O_3$ Cl Calculated: C, 70.8%; H, 7.75%; Cl, 9.1% Found: C, 70.6%; H, 7.9%, Cl, 9.0%

### EXAMPLE 267

17α-Chloroethynyl-3,17β-diacetoxy-13β-ethylgona-3,5-diene

Reflux 17α-chloroethynyl-13β-ethylgon- 4-en-17β-ol-3-one (3.0 g.) with acetic anhydride (48 cc.), acetyl chloride (24 cc.) and pyridine (2.4 cc.) for 2 hours and then evaporate to dryness under reduced pressure. Add water, benzene and ether and wash, dry, and evaporate the organic phase. Triturate the residue with cold ether, filer and wash with hexane to obtain the title compound m.p. 177°–180°, ultraviolet absorption at 236 mμ (∊18,800); infrared absorption peaks at 4.5, 5.65, 5.75, 6 82 .

### EXAMPLE 268

17α-Chloroethynyl-3,17β-diheptanoyloxy-13β-ethylgona-3,5-diene

Heat a mixture of 17α-chloroethynyl-13β-ethylgon-4-en-17β-ol (3 g.), n-heptanoic anhydride (50 cc.), pyridine (2.4 cc.) and n-heptanoyl chloride (25 cc.) at 100° for 3-½ hours. Filter the cooled solution and distil off the remaining acylating agent and pyridine at 0.5 mm. to give the title compound (3.7 g.). Recrystallise from methanol to obtain a waxy solid m.p. 56°–65°, infrared absorption peaks at 3.99, 6.5, 5.75 μ.

The subject matter which the applicants regard as their invention is particularly pointed out and distinctly claimed as follows:

**1.** A chemical compound having a gon-4-ene nucleus, said nucleus having attached thereto, in the 13-position, a polycarbon-alkyl radical having 2 to about 16 carbon atoms; said compound containing at least 19 and up to a maximum of 40 carbon atoms in its carbon-carbon skeleton.

**2.** A compound of claim 1 which is a 13-polycarbon-alkyl-17-alkyl-17β-hydroxygon-4-en-3-one.

**3.** A compound of claim 1 which is 13β, 17α-diethyl-17β-hydroxygon-4-en-3-one.

**4.** A compound of claim 1 which is a 13-polycarbon-alkyl-17-alkynyl-17β-hydroxygon-4-en-3-one.

**5.** A compound of claim 1 which is 13β-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one.

**6.** A compound of claim 1 which is 13β-ethyl-17α-chloroethynyl-17β-hydroxygon-4-en-3-one.

**7.** A compound of claim 1 which is a 13-polycarbon-alkyl-17β-hydroxygon-4-en-3-one-17-ester.

**8.** A compound of claim 1 which is 13β-ethyl-17β-hydroxygon-4-en-3-one 17-decanoate.

**9.** A process for preparing a compound having a 17α-alkyl-17β-hydroxygon-4-en-3-one nucleus substituted in the 13-position by a polycarbon-alkyl radical, comprising: (a) treating a compound having a gona-2,5(10)-dien-17-one nucleus substituted in the 13-posi-

**108**

tion by a monovalent polycarbon-alkyl radical with an alkyl Grignard reagent to obtain as the product a compound having a 17β-alkylgona-2,5(10)-diene-17α-ol nucleus, and (b) hydrolyzing said product in the presence of a mineral acid.

**10.** A process for preparing a compound having a 17α-alkynyl-17β-hydroxygon-4-en-3-one nucleus substituted in the 13-position by a polycarbon-alkyl radical, comprising: (a) treating a compound having a gona-2,5(10)-dien-17-one nucleus substituted in the 13-position by a polycarbon-alkyl radical with an alkali metal acetylide, and (b) hydrolyzing the product with mineral acid.

**11.** A process for preparing a 4-dehydro-13-alkyl-17-hydroxygonane comprising: (a) converting a compound having a 5-phenylpent-1-yne nucleus, ring unsubstituted in at least one position ortho to the point of chain attachment, to its acetylene amine derivative by means of a Mannich reaction; (b) hydrating the acetylenic linkage to form a 3-keto compound; (c) condensing said 3-keto compound with a 2-alkyl-1,3-dioxocyclopentano compound under Michael reaction conditions; (d) cyclodehydrating the Michael reaction product in the presence of an acid to form a 1,3,5(10),8,14-pentadehydro-13-alkylgonane; (e) selectively saturating the 14(15) double bond of said gonane with hydrogen in the presence of a catalyst to obtain a 1,3,5(10),8-tetradehydro-13-alkylgonane, (f) partially reducing the A-ring and reducing the 17-oxo group to 17-hydroxy under Birch reduction conditions; and (h) hydrolyzing the product with mineral acid.

**12.** A compound of the formula

where R represents a polycarbon lower alkyl group.

**13.** A compound of the formula

wherein R is selected from the group consisting of hydrogen and lower alkanoyl.

**14.** A compound of the formula

3,959,322

**109**

**110**

**32.** A compound of claim 1 which is a 13β-ethyl-17α-ethynyl-gon-4-en-3-one-17β-ol or its 17-lower-alkanoate.

**33.** A compound of claim 1 which is a 13β-ethyl-17α-ethynyl-gon-4-en-3-one-17β-ol or its 17-acetate.

**34.** A compound of claim 1 which is a 13β-polycarbonalkyl-17-alkynyl-17β-hydroxygon-4-en-3-one or its 17-lower alkanoate.

**35.** A compound of claim 1 which is a 13β-ethyl-17-alkynyl-17β-hydroxygon-4-en-3-one or its 17-lower-alkanoate.

**36.** A compound of claim 1 which is a 13β-ethyl-17-alkynyl-17β-hydroxygon-4-en-3-one or its 17-acetate.

**37.** A compound of claim 1 which is a 13β-polycar-bonalkyl-17-alkynyl-17β-hydroxy steriod or its 17-low-er-alkanoate having a gon-4-ene carbon-carbon skele-ton.

**38.** A compound of claim 1 which is a 13β-ethyl-17-alkynyl-17β-hydroxy steroid or its 17-lower-alkanoate having a gon-4-ene carbon-carbon skeleton.

**39.** A compound of claim 1 which is a 13β-ethyl-17-alkynyl-17β-hydroxy steroid or its 17-acetate having a gon-4-ene carbon-carbon skeleton.

**40.** A compound of claim 1 which is a 13β-ethyl-17-ethynyl-17β-hydroxy steroid or its 17-acetate having a gon-4-ene carbon-carbon skeleton.

**41.** A compound of claim 1 which is a 13β-polycar-bonalkyl-17α-alkynyl-17β-hydroxy steroid or its 17-lower-alkanoate, having a gon-4-ene nucleus and a 3-substituent selected from the group consisting of oxo, hydroxy, and a group convertible thereto by hydrolysis.

**42.** A compound of claim 1 which is a 13β-ethyl-17α-ethynyl-17β-hydroxy steroid or its 17-lower-alkanoate having a gon-4-ene nucleus and a 3-substituent selected from the group consisting of oxo, hydroxy, and a group convertible thereto by hydrolysis.

**43.** A compound of claim 1 which is a 13β-ethyl-17α-ethynyl-17β-hydroxy steroid or its 17-acetate having a gon-4-ene nucleus and a 3-substituent selected from the group consisting of oxo, hydroxy, and a group con-vertible thereto by hydrolysis.

**44.** A compound of claim 1 which is a compound of the formula:

**15.** A compound of claim 1 which is 13β-ethyl-17-acetylgon-4-en-3-one.

**16.** A compound of claim 1 which is 13β-ethyl-17-ethynylgon-4-en-17β-ol.

**17.** A compound of claim 1 which is 13β-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one, 2′-tetrahy-dropyranyl ether.

**18.** A compound of claim 1 which is 13β-ethyl-17α-chloroethynyl-17β-hydroxygon-4-en-3-one, 2′-tetrahy-dropyranyl ether.

**19.** A compound of claim 1 which is 13β-ethyl-17α-ethynyl-17β-hydroxygon-4-en-3-one, acetate.

**20.** A compound of claim 1 which is 13β-ethyl-17α-chloroethynyl-17-hydroxygon-4-en-3-one, acetate.

**21.** A compound of claim 1 which is 17-chloroethy-nyl-13β-ethylgon-4-ene-3,17β-diol, 3-acetate.

**22.** A compound of claim 1 which is 13β-ethyl-17α-ethynylgon-4-en-3,17β-diol, 3-acetate.

**23.** A compound of claim 1 which is 3(13-ethyl-17β-hydroxy-3-oxogon-4-en-17α-yl)propionic acid, γ-lac-tone.

**24.** A compound of claim 4 which is 17α-chloroethy-nyl-17-hydroxy-13β-n-propylgon-4-en-3-one.

**25.** A compound of claim 4 which is 17α-chloroethy-nyl-13β-ethyl-17-hydroxygon-4-en-3-one.

**26.** A compound of claim 4 which is 13β-ethyl-17α-ethynyl-17-hydroxy-6α-methylgon-4-en-3-one.

**27.** A compound of claim 4 which is 13β-n-propyl-17α-ethynyl-17β-hydroxygon-4-en-3-one.

**28.** A compound of the formula

wherin R represents an alkyl radical having from 2 to 16 carbon atoms, and $R_1$ represents a member selected from the group consisting of hydrogen and the acyl radical of an organic caboxylic acid having from 1 to 18 carbon atoms selected from the group consisting of alkanoic, alkenoic, cycloalkylalkanoic and arylalk-anoic acids.

**29.** A compound selected from the group consisting of 13-polycarbonalkyl-17α-substituted-17β-hydrox-ygona-4-en-3-one and 17β-alkanoyl esters thereof, wherein the 17α-position substituent is a halogenated unsaturated hydrocarbon radical.

**30.** A compound as defined in claim 29, wherein the halogenared unsaturated hydrocabon radical in the 17α-position is haloethynyl.

**31.** A compound as defined in claim 30, wherein the 13-polycarbonalkyl substituent is ethyl.

wherein R is selected from the group consisting of oxo, hydroxy, and a group convertible thereto by hydrolysis.

**45.** A compound of claim 1 wherein the polycarbon alkyl radical in the 13-position is ethyl.

**46.** A compound of claim 1, having a substituent in the 17-position linked to said 17-position through a carbon bond, thus being a part of said carbon-carbon skeleton, said 17-substituent containing a maximum of 4 carbon atoms.

**47.** A compound of claim 46 wherein an alpha-ethy-nyl group is present in the 17-position.

**48.** A compound of claim 47 wherein an acetoxy or hydroxy group is also present at the 17-position.

\* \* \* \* \*

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. : 3,959,322

DATED : May 25, 1976                    Page 1 of 2

INVENTOR(S) : Gordon Alan Hughes; Herchel Smith

It is certified that error appears in the above–identified patent and that said Letters Patent are hereby corrected as shown below:

On the Title Page insert:

--[30] Foreign Application Priority Data:

| | | |
|---|---|---|
| September 25, 1959 | Great Britain | 32619/59 |
| September 25, 1959 | Great Britain | 32620/59 |
| February 19, 1960 | Great Britain | 5897/60 |
| September 25, 1959 | Great Britain | 32621/59 |
| February 19, 1960 | Great Britain | 5899/60 |
| February 19, 1960 | Great Britain | 5898/60 |
| February 29, 1960 | Great Britain | 7029/60 |
| September 22, 1960 | Great Britain | 32671/60 |
| November 25, 1960 | Great Britain | 40557/60 |
| November 25, 1960 | Great Britain | 40558/60 |
| November 25, 1960 | Great Britain | 40559/60 |
| November 25, 1960 | Great Britain | 40560/60 |
| November 25, 1960 | Great Britain | 40561/60 |
| September 22, 1960 | Great Britain | 32670/60 |
| February 13, 1961 | Great Britain | 5254/61 |
| February 13, 1961 | Great Britain | 5255/61 |
| February 24, 1961 | Great Britain | 6864/61 |
| June 22, 1961 | Great Britain | 22637/61 |
| June 22, 1961 | Great Britain | 22638/61 |
| September 15, 1961 | Great Britain | 33251/61 |
| October 19, 1961 | Great Britain | 37616/61 |
| October 19, 1961 | Great Britain | 37617/61 |

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :   3,959,322

DATED       :   May 25, 1976                    Page 2 of 2

INVENTOR(S) :   Gordon Alan Hughes; Herchel Smith

It is certified that error appears in the above–identified patent and that said Letters Patent are hereby corrected as shown below:

```
October 19, 1961      Great Britain      37618/61
May 10, 1963          Great Britain      18497/63
May 10, 1963          Great Britain      18498/63
August 14, 1963       Great Britain      32064/63--
```

Signed and Sealed this

Second Day of March 1982

[SEAL]

Attest:

Attesting Officer

GERALD J. MOSSINGHOFF

Commissioner of Patents and Trademarks