## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WYETH,

       *Plaintiff,*

    v.

WATSON LABORATORIES, INC. *and*
WATSON PHARMACEUTICALS, INC.,

       *Defendants.*

Civil Action No. 08-cv-00145-JJF

**REDACTED PUBLIC VERSION**

---

## EXHIBITS TO DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO WYETH'S MOTION TO DISQUALIFY KENYON & KENYON LLP AND AMY HULINA AS COUNSEL FOR DEFENDANTS
## VOLUME VI OF VII

Richard K. Herrmann (I.D. #405)
Mary B. Matterer (I.D. #2696)
Amy Arnott Quinlan (I.D. #3021)
MORRIS JAMES LLP
500 Delaware Ave., Ste. 1500
Wilmington, DE 19801-1494
Tel: (302) 888-6960
mmatterer@morrisjames.com

*Attorneys for Defendants*

OF COUNSEL
John W. Bateman
C. Kyle Musgrove
Nicholas J. Nowak
Thomas M. Huff
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
(202) 220-4200

Originally filed: June 30, 2008
Public version filed: July 9, 2008

# EXHIBIT   28

03-16-01

AM100226
Patent



Commissioner for Patents
Box Patent Application
Washington, DC 20231

<u>NEW APPLICATION FOR TRANSMITTAL</u>

Transmitted herewith for filing is the patent application of the following Inventor(s):
James H. Pickar;

For:  Hormone Replacement Therapy.

1.  Papers enclosed which are required for a filing date under 35 CFR 1.53(b):
   - ☒ Pages of specification – 16 pages
   - ☐ Sequence Listing –      pages on:
       - ☐ CD Rom or CD-R (2 copies); or
       - ☐ paper
   - ☒ Pages of claims – 7 pages
   - ☒ Page(s) of abstract – 1 pages
   - ☒ Sheets of drawing – 3 pages
       - ☒ Formal
       - ☐ Informal

2.  Additional papers enclosed
   - ☐ Information Disclosure Statement
   - ☐ Form PTO-1449
   - ☐ Citations
   - ☐ Declaration of Biological Deposit
   - ☐ Computer Readable Form of Sequence Listing
   - ☐ Declaration Under 37 CFR 1.821(f)
   - ☒ Other:  Application Data Sheet

3.  Declaration
   - ☒ Enclosed and executed by all inventor(s)
   - ☐ Not enclosed or not executed by all inventor(s)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

<u>CERTIFICATE OF MAILING 37 CFR §1.10</u>

I hereby certify that this paper and the documents referred to as enclosed therein are being
deposited with the United States Postal Service on the date written below in an envelope as
"Express Mail Post Office to Addressee" Mailing Label Number EM474057516 addressed to the
Commissioner for Patents, Box Patent Application, Washington, DC 20231.

March 15, 2001
Date

Roxanne L. Kelly

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

AM100226
Patent

4.  Assignment
    An assignment of the invention to:

        American Home Products Corporation
        Five Giralda Farms
        Madison, NJ 07054-0874

☐   was made in the prior application and recorded in PTO on         , Reel         ,
    Frame        .
☐   is attached under separate Recordation Form Cover Sheet.
☒   will follow.

5.  Filing Fee Calculation

| CLAIMS | | | |
|---|---|---|---|
| (1)<br><br>FOR | (2)<br><br>NUMBER FILED | (3)<br><br>NUMBER EXTRA x RATE | | (4)<br><br>BASIC FEE |
| | | | | $710.00 |
| TOTAL CLAIMS | 68 | 48 | x  $   18.00 | 864.00 |
| INDEPENDENT CLAIMS | 12 | 9 | x  $   80.00 | 720.00 |
| MULTIPLE DEPENDENCY FEE | 0 | | $    0 | 0 |
| | | **Total Filing Fee:** | | 2294.00 |

6.  Method of Payment of Fees:
    Charge American Home Products Corporation Deposit Account No. 01-1425 in the amount
    of $2294.00 .
    A duplicate of this transmittal is attached.

7.  Instructions as to Overpayment:
    Credit any overpayment to Deposit Account No. 01-1425.

8.  General Authorization:
    During the pendency of this application treat any reply requiring a petition for extension of
    time for its timely submission as containing a request therefor for the appropriate length of
    time. The Commissioner is hereby authorized to charge all required extension of time fees
    during the entire pendency of this application to Deposit Account No. 01-1425.

2                          Page 2 of 3

AM100226
Patent

9.  Authorization to Charge Additional Fees
    ☒   The Commissioner is hereby authorized to charge the following additional fees by this paper and during the entire pendency of this application to Deposit Account No. 01-1425
    ☒   37 CFR 1.16(a), (f), or (g) filing fees
    ☒   37 CFR 1.16(b), (c), and (d) presentation of extra claims
    ☒   37 CFR 1.16(e) surcharge for filing the basic filing fee and/or declaration on a date later than the filing date of the application.
    ☒   37 CFR 1.17 application processing fees

10. Relate back (35 USC 119(e))
    ☐   Amend the Specification by inserting before the first line the sentence:

    —This application claims priority from copending provisional application(s) serial number 60/268,607, filed on February 14, 2001 and 60/190,630, filed March 20, 2000.

11. Request and Certification Under 35 U.S.C 122(b)(2)(B)(i).
    ☐   A request not to publish this application and certification under 35 U.S.C. 122(b)(2)(B)(i) is attached.

12. Correspondence Address and Telephone Number

SEND CORRESPONDENCE TO:
Customer Number: 25291

Bar Code:



25291
PATENT .TRADEMARK OFFICE

DIRECT ALL TELEPHONE CALLS TO:
Name:  Arnold S. Milowsky
Tel. No. (610) 902-2635

13. ☒   Return Receipt Postcard is attached.

_(signature)_     3/15/01
Arnold S. Milowsky

Reg. No. 35,288

American Home Products Corporation
Patent Law Department
Five Giralda Farms
Madison, NJ 07940-0874
Tel. No. (973) 683-2130

3        Page 3 of 3

INVENTOR INFORMATION

Inventor One Given Name ::        James H.
Family Name ::                    Pickar
Name Suffix ::

Postal Address Line One ::        816 Crum Creek Road
Postal Address Line Two ::
City ::                           Springfield
State/Province ::                 Pennsylvania
Country ::                        USA
Postal or Zip Code ::             19064
Citizenship ::                    USA


CORRESPONDENCE INFORMATION

Name Line One ::                  Egon E. Berg
Name Line Two ::                  American Home Products Corporation
Address Line One ::               Patent Law Department
Address Line Two ::               Five Giralda Farms
City ::                           Madison
State/Province ::                 New Jersey
Postal or Zip Code ::             07940

Telephone ::                      (610) 902-2635
Fax ::                            (610) 688-0273
E-Mail ::                         milowsa@war.wyeth.com


APPLICATION INFORMATION

Title Line One ::                 Hormone Replacement Therapy
Title Line Two ::
Title Line Three ::
Title Line Four ::

Total Drawing Sheets ::           0
Formal Drawings ::                0

Application Type ::               Utility
Docket Number ::                  AM100226

4                                 1

REPRESENTATIVE INFORMATION

```
Registration Number One ::      21,117
Registration Number Two ::      35,152
Registration Number Three ::    36,126
Registration Number Four ::     35,288
Registration Number Five ::     33,432
Registration Number Six ::      27,472
Registration Number Seven ::    41,204
Registration Number Eight ::    41,148
```

CONTINUITY INFORMATION

```
This application is a ::         Claims Benefit of

>Application One::               60/268,607
Filing Date::                    February 14, 2001
Patent Number::

which :                          Claims Benefit of

>>Application Two:               60/190,630
Filing Date::                    March 20,2000
Patent Number::
```

5                        2

5ED1:0CO:ASM
AM100226
PATENT

- 1 -

## HORMONE REPLACEMENT THERAPY

5       This application claims the benefit of U.S. Provisional Application No. 60/268,607, filed February 14, 2001, and U.S. Provisional Application No. 60/190,630, filed March 20, 2000.

BACKGROUND

10      This invention relates to methods and pharmaceutical compositions for providing hormone replacement therapy in perimenopausal, menopausal, and postmenopausal women through the continuous administration of combinations of conjugated estrogens and medroxyprogesterone acetate.

15      Menopause is generally defined as the last natural menstrual period and is characterized by the cessation of ovarian function, leading to the substantial diminution of circulating estrogen in the bloodstream. Menopause is usually identified, in retrospect, after 12 months of amenorrhea. It is not a sudden event, but is often preceded by a time of irregular menstrual cycles prior to eventual cessation

20      of menses. Following the cessation of menstruation, the decline in endogenous estrogen concentrations is typically rapid. There is a decrease in serum estrogens from circulating levels ranging from 40-250 pg/mL of estradiol and 40-170 pg/mL of estrone during ovulatory cycles to less than 15 pg/mL of estradiol and 30 pg/mL of estrone in postmenopausal women.

25

As these estrogens decline during the time preceding (perimenopause) and following the menopause (postmenopause), various physiological changes may result, including vulvar and vaginal atrophy causing vaginal dryness, pruritus and dyspareunia, and vasomotor instability manifested as hot flushes. Other menopausal

30      disturbances may include depression, insomnia, and nervousness. The long-term physiologic effects of postmenopausal estrogen deprivation may result in significant morbidity and mortality due to increase in the risk factors for cardiovascular disease and osteoporosis. Menopausal changes in blood lipid levels, a major component of the pathogenesis of coronary heart disease (CHD), may be precursors to increased

5ED2:0CO:ASM
AM100226
PATENT

- 2 -

incidence of ischemic heart disease, atherosclerosis, and other cardiovascular disease. A rapid decrease in bone mass of both cortical (spine) and trabecular (hip) bone can be seen immediately after the menopause, with a total bone mass loss of 1% to 5% per year, continuing for 10 to 15 years.

5

Estrogen replacement therapy (ERT) is beneficial for symptomatic relief of hot flushes and genital atrophy and for prevention of postmenopausal osteoporosis. ERT has been recognized as an advantageous treatment for relief of vasomotor symptoms. There is no acceptable alternative to estrogen treatment for the atrophic

10    changes in the vagina; estrogen therapy increases the vaginal mucosa and decreases vaginal dryness. Long term ERT is the key to preventing osteoporosis because it decreases bone loss, reduces spine and hip fracture, and prevents loss of height. In addition, ERT has been shown to be effective in increasing high density lipoprotein-cholesterol (HDL-C) and in reducing low density lipoprotein cholesterol

15    (LDL-C), affording possible protection against CHD. ERT also can provide antioxidant protection against free radical mediated disorders or disease states. Estrogens have also been reported to confer neuroprotection, and inhibit neurodegenerative disorders, such as Alzheimer's disease (see U.S. Patent 5,554,601, which is hereby incorporated by reference). The following table contains

20    a list of estrogen preparations currently available.

7

5ED3:0CO:ASM
AM100226
PATENT

- 3 -

## Estrogen replacement therapies available in the United States and/or Europe

| Generic Name | Brand Name | Strength |
|---|---|---|
| **Oral estrogens** | | |
| Conjugated equine estrogens (natural) | Premarin | 0.3, 0.625, 0.9, 1.25, 2.5 mg |
| Conjugated estrogens (synthetic) | Cenestin | 0.625, 0.9 mg |
| Esterified estrogens (75-80% estrone sulfate 6-15% equilin sulfate derived from plant sterols) | Estratab | 0.3, 0.625, 1.25, 2.5 mg |
| Estropipate (Piperazine estrone sulfate) | Ogen Ortho-Est | 0.625, 1.25, 2.5 mg |
| Micronized estradiol | Estrace | 0.5, 1.0, 2.0 mg |
| Raloxifene (selective estrogen receptor modulator) | Evista | 60 mg |
| Esterified estrogens and methylestosterone | Estratest | 1.25 mg esterified estrogen and 2.5 mg methyltestosterone |
| | Estratest HS | 0.625 mg esterified estrogen and 1.25 mg methyltestosterone |
| Estradiol valerate | Climaval | 1 mg, 2 mg |
| Estradiol | Elleste Solo | 1 mg, 2 mg |
| Estradiol | Estrofem | 2 mg |
| Estradiol | Estrofem Forte | 4 mg |
| Piperazine esterone sulfate | Harmogen | 1.5 mg |
| Combination: Estrone | Hormonin | 1.4 mg |
| Estradiol | | 0.6 mg |
| Estriol | | 0.27 mg |
| Estradiol valerate | Progynova | 1 mg, 2 mg |
| Estradiol | Zumenon | 1 mg,  2 mg |
| **Transdermal estrogens** | | |
| Estradiol | Alora (twice weekly) Climara (weekly) Estraderm (2x weekly) Fem Patch (weekly) Vivelle (twice weekly) | 0.025, 0.0375, 0.05, 0.075, 0.1  mg of estradiol released daily (dose options for various products) |
| Estradiol | Dermestril | 25, 50, 100 μg |
| Estradiol | Estraderm | 25, 50, 100 μg |
| Estradiol | Evorel (Systen) | 25, 50, 75, 100 μg |
| Estradiol | Fematrix | 40, 80 μg |
| Estradiol | Menorest | 25, 37.5, 50, 75 μg |
| Estradiol | Progynova TS And TS Forte (Climara) | 50, 100 μg |
| **Vaginal estrogens** | | |
| Conjugated equine estrogens | Premarin vaginal cream | 0.625 mg/g |
| Dienestrol | Ortho dienestrol cream | 0.1   mg/g |
| Estradiol | Estring | 7.5 μg |
| Estropipate | Ogen vaginal cream | 1.5 mg/g |
| Micronized estradiol | Estrace vaginal cream | 1.0 mg/g |

5

   To minimize the occurrence of estrogen-related side effects and to maximize the benefit-risk ratio, the lowest dose effective in relief of symptoms and prevention of osteoporosis should be used.  Although ERT reduces the relative risk (RR) for ischemic heart disease (RR, 0.50) and osteoporosis (RR, 0.40), the relative risk of

10 endometrial cancer for postmenopausal women with a uterus may be increased.

8

5ED4:0CO:ASM
AM100226
PATENT

- 4 -

There are extensive clinical data showing that the relative risk of endometrial cancer can be reduced by the addition of a progestin, either sequentially or continuously. The addition of a progestin to estrogen therapy prevents estrogen-induced endometrial proliferation.   Continuous combined hormone replacement therapy
5   (HRT), with appropriate doses of daily estrogen and progestin, has been shown to be effective in relieving vaginal atrophy and vasomotor symptoms, preventing postmenopausal osteoporosis, and reducing the risk of endometrial cancer by prevention of endometrial hyperplasia.  The following table contains a list of some currently available oral combination HRT products.

10

### Oral Combination HRT Products

| Brand Name | Estrogen/Progestin | Strengths |
| --- | --- | --- |
| Activelle | Estradiol<br>Norethisterone acetate (NETA) | 1 mg<br>0.5 mg |
| Climagest | Estradiol valerate (Climaval)<br>Norethisterone (NET) | 1 or 2 mg<br>1 mg days 17-28 |
| Cyclo Progynova | Estradiol valerate<br>Levonorgestrel | 1 or 2 mg, days 1-21<br>250 or 500 µg, days 2-21 |
| Elleste Duet | Estradiol<br>Norethisterone acetate | 1 or 2 mg<br>1 mg days 17-28 |
| Femoston | Estradiol<br>Dydrogesterone | 1 or 2 mg<br>10 or 20 mg |
| Kliogest | Estradiol<br>Norethisterone acetate | 2 mg<br>1 mg |
| Improvera | Piperazine estrone sulfate<br>Medroxyprogesterone acetate (MPA) | 1.5 mg<br>10 mg, days 17-28 |
| Nuvelle | Estradiol valerate (Progynova)<br>Levonorgestrel | 2 mg<br>75 µg, days 17-28 |
| Premphase | Conjugated estrogens<br>MPA | 0.625 mg<br>5.0 mg |
| Prempro | Conjugated estrogens<br>MPA | 0.625 mg<br>2.5 or 5.0 mg |
| Trisequens<br>And<br>Trisequens Forte | Estradiol<br>Norethisterone | 2 or 4 mg, days 1-22<br>1 mg, days 23-28<br>1 mg, days 13-22 |
| Ortho-Prefest | Estradiol<br>Nogestimate | 1.0 mg, days 1-6<br>0.09 mg, days 4-6 |
| Femhrt 1/5 | Ethinyl estradiol<br>Norethindrone acetate | 1.0 mg<br>5 µg |

9

5ED5:0CO:ASM
AM100226
PATENT

- 5 -

Since it is possible that progestins ameliorate of the favorable estrogen effects on lipids and may potentially impair of glucose tolerance, it is desirable, and an objective to find the lowest dose estrogen plus progestin HRT product, which also minimizes or eliminates endometrial hyperplasia. In addition, a major factor affecting a woman's decision to start and to continue taking HRT is vaginal bleeding, and many women would prefer a bleed-free product. Therefore, another objective is to provide the lowest effective dose which provides an acceptable bleeding pattern. Doses as low as NETA 0.5 mg, NET 0.35 mg, MPA 2.5 mg, levonorgesterel 0.25 mg, and dydrogesterone 5 mg have been used previously in continuous uninterrupted HRT regimens.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows the mean number of hot flushes per day in patients receiving PREMARIN plus MPA combinations or placebo.

FIG. 2 shows the mean severity of hot flushes in patients receiving PREMARIN plus MPA combinations or placebo.

FIG. 3 shows the percentage of patients with amenorrhea in patients receiving PREMARIN plus MPA combinations or placebo.

DESCRIPTION OF THE INVENTION

The purpose of this invention is to provide the significant benefits of a commercially successful HRT product, such as PREMPRO (0.625 mg conjugated equine estrogens, USP plus 2.5 mg MPA), while lowering the dosage of MPA below that which has previously been demonstrated to be effective, and preferably also lowering the dosage of the conjugated estrogens. This invention provides a method of treating or inhibiting menopausal or postmenopausal disorders in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises providing to said woman, continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens (natural or synthetic) and a daily dosage of about 1.5 medroxyprogesterone acetate (MPA). The dosage is preferably provided as a pharmaceutical composition for use in treating menopausal or postmenopausal disorders which comprises a combination of conjugated estrogens and a dosage of about 1.5 mg MPA. This invention further provides a

10

5ED6:0CO:ASM
AM100226
PATENT

- 6 -

pharmaceutical pack containing the daily dosage units of conjugated estrogen and MPA for continuous daily administration.

Conjugated estrogens refer to estrogenic steroidal substances in which one or more functional groups (typically hydroxyl groups) on the steroid exists as a
5    conjugate (typically a sulfate or glucuronide). The conjugated estrogens may be a single conjugated estrogen, or may consist of mixtures of various conjugated estrogens. Numerous conjugated estrogens are described in the literature or are commercially available that are capable of being formulated for use in this invention either as a unitary estrogen, or may be mixed together with other synthetic and/or
10    natural estrogens.

Conjugated estrogens may also contain other steroidal or non-steroidal compounds, which may, or may not, contribute to the overall biological effect. Such compounds include, but are not limited to, unconjugated estrogens, androstanes, and pregnanes. Preferred conjugated estrogens for use in this invention are
15    PREMARIN (conjugated equine estrogens, USP) and CENESTIN (synthetic conjugated estrogens, A).

PREMARIN (conjugated estrogens tablets, USP) for oral administration contains a mixture of estrogens obtained exclusively from natural sources, occurring as the sodium salts of water-soluble estrogen sulfates blended to represent the
20    average composition of material derived from pregnant mares' urine. It is a mixture of sodium estrone sulfate and sodium equilin sulfate, and at least the following 8 concomitant components, also as sodium sulfate conjugates: 17α-dihydroequilin, 17α-estradiol, Δ8,9-dehydroestrone, 17β-dihydroequilin, 17β-estradiol, equilenin, 17α-dihydroequilenin, and 17β-dihydroequilenin. The make up of PREMARIN of
25    PREMARIN is currently being analyzed, and other components are in the process of being identified and characterized. PREMARIN is indicated in the treatment of moderate to severe vasomotor symptoms associated with the menopause; treatment of vulvar and vaginal atrophy; and prevention of osteoporosis, as well as other indications approved for estrogen products.

30    CENESTIN (synthetic conjugated estrogens, A) tablets for oral administration contain a blend of 9 synthetic estrogenic substances: sodium estrone sulfate, sodium 17α-dihydroequilin sulfate, sodium 17α-estradiol sulfate, sodium equilenin sulfate, sodium 17α-dihydroequilenin sulfate, sodium equilin sulfate, sodium 17β-dihydroequilin sulfate, sodium 17β-estradiol sulfate, sodium 17α-dihydroequilenin

11

5ED7:0CO:ASM
AM100226
PATENT

- 7 -

sulfate. CENESTIN is indicated in the treatment of moderate to severe vasomotor symptoms associated with the menopause.

　　　　PREMARIN, CENESTIN, and medroxyprogesterone acetate are all available from commercial sources (Wyeth-Ayerst - PREMARIN and medroxyprogesterone

5　　acetate; Duramed - CENESTIN). It is preferred that the dosage of MPA is about 1.5 mg per day. It is preferred that the conjugated estrogen constituent is PREMARIN. It is preferred that the dosage of PREMARIN is about 0.625 mg per day or less, and is more preferred that the dosage of PREMARIN is either about 0.45 mg per day or about 0.30 mg per day.

10　　　　As used in accordance with this invention, the term "menopausal or postmenopausal disorder" refers to conditions, disorders, or disease states that are at least partially caused by the decreased estrogen production occurring during the perimenopausal, menopausal, or post-menopausal stages of a woman's life. Such disorders typically include, but are not limited to, one or more of, vaginal and vulvar

15　　atrophy, vasomotor instability, urinary incontinence, and increased risk of developing osteoporosis, cardiovascular disease, and diseases related to the oxidative damage from free radicals. As used herein, menopausal also includes conditions of decreased estrogen production that may be surgically, chemically, or be caused by a disease state which leads to premature diminution or cessation of ovarian function.

20　　　　The term "daily" means that the dosage is to be administered at least once daily. The frequency may is preferred to be once daily, but may be more than once daily, provided that any specified daily dosage is not exceeded.

　　　　The term "combination" of conjugated estrogens and MPA means that the daily dosage of each of the components of the combination is administered during

25　　the treatment day. The components of the combination are preferably administered at the same time; either as a unitary dosage form containing both components, or as separate dosage units; the components of the combination can be administered at different times during the day, provided that the desired daily dosage is achieved.

　　　　The term "continuous and uninterrupted" means that there is no break in the

30　　treatment regimen, during the treatment period. Thus, "continuous, uninterrupted administration" of a combination, means that the combination is administered at least once daily during the entire treatment period. It is expected that the treatment period for the combination of conjugated estrogens and MPA will be for at least 30 days, preferably 120 days, and most preferably as long term treatment, and possibly

5ED8:0CO:ASM
AM100226
PATENT

- 8 -

indefinite, as one of the primary reasons for administering combinations of conjugated estrogens and MPA is to treat or inhibit menopausal or postmenopausal disorders. Treatment periods also may vary depending on the symptoms to be treated. For example, for the treatment of vasomotor symptoms, it is preferred that

5    the treatment may last from one month to several years, depending on the severity and duration of the symptoms. Physician evaluation along with patient interaction will assist the determination of the duration of treatment. For the treatment or inhibition of osteoporosis, it is preferred that the treatment period could last from six months to a number of years, or indefinitely.

10    This invention, also covers short term treatments or treatments of a finite term, that may be less than the 30 day preferred treatment period. It is anticipated that a patient may miss, or forget to take, one or a few dosages during the course of a treatment regimen, however, such patient is still considered to be receiving continuous, uninterrupted administration.

15    The term "fixed daily dosage" means that the same dosage is given every day during the treatment period. It is preferred that the MPA is given in a fixed daily dosage of about 1.5 mg, with an appropriate dose of conjugated estrogens, preferably equivalent to about 0.45 mg or about 0.30 PREMARIN. One aspect of this invention also covers situations in which a fixed daily dosage of the conjugated

20    estrogens plus MPA combination is not given every day during the treatment period. For example, the dosage of a patient may need to be adjusted (either up or down), to achieve the desired effect during the middle of a treatment period.

The term "providing," with respect to providing a dosage of one or both of the components of this invention, means either directly administering such a component

25    of this invention, or administering a prodrug, derivative, or analog which will form the equivalent amount of the component within the body.

It is preferred that the conjugated estrogens plus MPA combinations of this invention are provided orally. The specific dosages of conjugated estrogens plus MPA combinations of this invention that are disclosed herein are oral dosages.

30

The ability of the conjugated estrogens plus MPA combinations of this invention to treat or inhibit menopausal or postmenopausal disorders was confirmed in a double blind clinical study of postmenopausal women using combinations of PREMARIN plus MPA, or placebo. In this study, patients received continuous and

13

5ED9:0CO:ASM
AM100226
PATENT

- 9 -

uninterrupted treatment for 13 cycles (1 year).  The relief of vasomotor symptoms, prevention of endometrial hyperplasia, and effects on lipids, vaginal bleeding were measured throughout the study.  Additionally, the effect on bone mineral density was evaluated in patients who received continuous and uninterrupted treatment for up to

5    26 cycles (2 years).

Vasomotor instability is a menopausal or postmenopausal disorder which is often manifested as hot flushes.  In the clinical study described above, relief of vasomotor symptoms was analyzed in a subset of patients who experienced at least an average of 7-8 moderate-to-severe hot flushes per day during the 7-day period

10   just prior to the initiation of treatment in this study.  The results obtained are summarized in the tables below.  The first table shows the mean number of flushes, and the second table shows the mean daily severity of the flushes.  These results are also shown in FIGS. 1 and 2.

15           Mean Number (± S.E.) of Hot Flushes Per Day

| Week | Placebo | Treatment Group | | |
|------|---------|-----------------|------|------|
|      |         | 0.625 P + 2.5 M* | 0.45 P + 1.5 M | 0.3 P + 1.5 M |
| 1 | 9.41 ± 0.81 | 9.50 ± 0.73 | 9.99 ± 0.79 | 10.60 ±0.76 |
| 2 | 8.55 ± 0.80 | 6.38 ± 0.72 | 6.98 ± 0.80 | 6.88 ± 0.74 |
| 3 | 8.51 ± 0.76 | 4.47 ± 0.69 | 4.47 ± 0.76 | 4.62 ± 0.71 |
| 4 | 8.09 ± 0.72 | 3.38 ± 0.66 | 3.23 ± 0.72 | 3.84 ± 0.67 |
| 8 | 7.10 ± 0.65 | 1.55 ± 0.61 | 1.49 ± 0.65 | 2.41 ± 0.60 |
| 12 | 5.36 ± 0.55 | 1.16 ± 0.49 | 0.94 ± 0.53 | 1.13 ± 0.50 |

*Daily dosages of P (PREMARIN) and M (MPA).

20

Mean Severity (± S.E.) of Hot Flushes

| Week | Placebo | Treatment Group | | |
|------|---------|-----------------|------|------|
|      |         | 0.625 P + 2.5 M* | 0.45 P + 1.5 M | 0.3 P + 1.5 M |
| 1 | 2.10 ± 0.10 | 2.08 ± 0.09 | 2.14 ± 0.10 | 2.07 ± 0.10 |
| 2 | 2.06 ± 0.13 | 1.75 ± 0.12 | 1.78 ± 0.13 | 1.73 ± 0.12 |
| 3 | 1.97 ± 0.14 | 1.36 ± 0.13 | 1.42 ± 0.15 | 1.48 ± 0.14 |
| 4 | 2.03 ± 0.15 | 1.07 ± 0.14 | 1.21 ± 0.15 | 1.45 ± 0.14 |
| 8 | 1.75 ± 0.16 | 0.54 ± 0.14 | 0.70 ± 0.16 | 0.87 ± 0.14 |
| 12 | 1.57 ± 0.16 | 0.51 ± 0.14 | 0.51 ± 0.16 | 0.56 ± 0.14 |

25         *Daily dosages of P (PREMARIN) and M (MPA).

As shown in both tables and Figures, all dosages of PREMARIN plus MPA

30   reduced the number and severity of hot flushes experienced by the women in this clinical study compared with women taking placebo.  All differences from placebo were significant (p < 0.05) by weeks 3-4.  It was unexpected, however, that the lower

14

5ED10:0CO:ASM
AM100226
PATENT

- 10 -

dosages of PREMARIN (0.45 and 0.3 mg) and MPA (1.5 mg), would rapidly reduce the number and severity of hot flushes to the same extent as the higher dose combination containing 0.625 mg PREMARIN plus 2.5 mg MPA.

5       Vaginal atrophy is a common menopausal or postmenopausal disorder leading to vaginal dryness, pruritus, and dyspareunia. Vaginal atrophy results from a sloughing of vaginal epithelial cells which are not replaced, leading to a thinning of the vaginal lining. The effects of the lower dose conjugated estrogen plus MPA regimens on vaginal atrophy were evaluated by comparing the vaginal maturation index of superficial cells at baseline, and after cycles 6 and 13 of treatment. The vaginal maturation index is a measure of the number of superficial vaginal epithelial cells. An increase (positive number) in the vaginal maturation index indicates a reversal (successful treatment) of vaginal atrophy. The following table summarizes the results obtained.

Vaginal Maturation Index for Superficial Cells - Median Change from Baseline

| Treatment Group | Cycle 6 | Cycle 13 |
| --- | --- | --- |
| 0.625 P + 2.5 M* | 10 | 10 |
| 0.45 P + 1.5 M | 10 | 10 |
| 0.3 P + 1.5 M | 10 | 10 |
| Placebo | 0 | 0 |

*Daily dosages of P (PREMARIN) and M (MPA).

These data show that all the evaluated dosages of conjugated estrogens plus MPA provided significant ($p < 0.001$) improvement in the vaginal maturation index versus placebo, demonstrating their ability to successfully treat or inhibit vaginal atrophy. It is notable that the lower dosages of conjugated estrogens plus MPA were as equally as effective as the 0.625 mg PREMARIN plus 2.5 mg MPA dosage in facilitating the growth of the vaginal superficial cells.

As HRT using estrogens alone has been shown to increase the relative risk of endometrial hyperplasia in postmenopausal women with a uterus, the incidence of endometrial hyperplasia was evaluated in the clinical study for patients treated with PREMARIN plus MPA treated groups and placebo. Two independent pathologists evaluated endometrial biopsies in a blinded fashion. A patient was considered to have endometrial hyperplasia if both of the primary pathologists agreed on the

15

5ED11:0CO:ASM
AM100226
PATENT

- 11 -

diagnosis. If they disagreed, a third pathologist was consulted, and the diagnosis of hyperplasia was based on the diagnosis of the majority. The following table summarizes the results obtained after 13 cycles of treatment.

5

Percent of Patients Developing Endometrial Hyperplasia

| Treatment Group (Dosage)* | No. Hyperplasias | No. Patients/Group | Hyperplasia Rate (%) |
|---|---|---|---|
| Placebo | 0 | 261 | 0.00 |
| PREMARIN/MPA (0.625/2.5) | 0 | 278 | 0.00 |
| PREMARIN/MPA (0.45/1.5) | 1 | 272 | 0.37 |
| PREMARIN/MPA (0.3/1.5) | 1 | 272 | 0.37 |

* All dosages are in mg/day

10

These results showed that that the use of conjugated equine estrogens/MPA at a dosage of 0.625/2.5 mg/day effectively prevented the development of endometrial hyperplasia. The results also show the unexpected result that lowering the dosage of MPA to 1.5 mg/day in PREMARIN plus MPA combinations, also continued to effectively inhibit the development of endometrial hyperplasia. The difference between the results obtained in the 1.5 mg MPA treatment groups and 2.5 mg MPA treatment groups was not statistically significant.

15

In providing an HRT regimen that will be acceptable to menopausal or postmenopausal women, it is highly desirable that the regimen produce a high rate of amenorrhea, as most of these women prefer a product which does not cause spotting or breakthrough bleeding. The following table shows the percent of women experiencing amenorrheic cycles at during cycles 1, 3, 6, 9, and 13.

20

Percent Cycles of Amenorrhea

| Cycle | Treatment Group | | | |
|---|---|---|---|---|
| | Placebo | 0.625 P + 2.5 M | 0.45 P + 1.5 M | 0.3 P + 1.5 M |
| 1 | 91.1 | 51.3 | 71.1 | 75.2 |
| 3 | 96.4 | 54.9 | 70.3 | 80.4 |
| 6 | 91.8 | 68.4 | 72.8 | 85.1 |
| 9 | 93.6 | 70.8 | 80.5 | 86.6 |
| 13 | 95.2 | 77.4 | 79.8 | 88.4 |

*Daily dosages of P (PREMARIN) and M (MPA).

25

The results show that greater than 90 percent of women receiving placebo were amenorrheic throughout the study. While the percent of amenorrheic women

5ED12:0CO:ASM
AM100226
PATENT

- 12 -

receiving daily dosages of 0.625 mg PREMARIN plus 2.5 mg MPA is satisfactory, as measured by the commercial success of PREMPRO (0.625 mg conjugated equine estrogens plus 2.5 mg MPA), lowering the dosages of PREMARIN to either 0.45 mg or 0.3 mg and MPA to 1.5 mg, produced an equal, if not significantly better (0.3 mg
5  PREMARIN plus 1.5 mg MPA) percent of women achieving amenorrhea, while still maintaining the other benefits of HRT. Additionally, as shown in the above table, and in FIG. 3, a higher percentage of amenorrhea was achieved more rapidly with the lower dose combinations.

10      It is well known that the addition of progestins to ERT regimens may ameliorate some of the beneficial cardioprotective effects conferred by the estrogen, or even produce deleterious effects on the lipid levels. In this study total cholesterol (TC), HDL, $HDL_2$, and LDL levels were measured. There was a general dose-response trend between treatment groups, that showed more favorable lipid profiles
15  with higher doses of PREMARIN and lower doses of MPA. Patients receiving 0.625 mg PREMARIN + 2.5 mg MPA had slight reductions in TC, significant increases in HDL and $HDL_2$, and significant decreases in levels of LDL. The 0.45 mg PREMARIN plus 1.5 mg MPA dosage produced a similar favorable profile (but of less magnitude) to 0.625 mg PREMARIN + 2.5 mg MPA treated women. Women treated with 0.3 mg
20  PREMARIN plus 1.5 mg MPA had a less favorable lipid profile (TC, HDL, $HDL_2$ and LDL), than women treated, with 0.625 mg PREMARIN plus 2.5 mg MPA, however, this profile was still better than those receiving placebo.

During the study, adverse events were recorded and analyzed. Treatment emergent adverse events were consistent with those seen with hormone therapy.
25  With the exception of breast pain, the side effect profile was comparable between the PREMARIN plus MPA treatment groups. Women receiving the daily dosage of 0.3 mg PREMARIN plus 1.5 mg MPA experienced significantly less breast pain than the women taking 0.625 mg PREMARIN plus 2.5 mg MPA.

30      In summary the results of the clinical study demonstrated that conjugated estrogen HRT regimens containing dosages of 1.5 mg/day of MPA were equally effective in treating menopausal or postmenopausal disorders as the regimens containing the higher dose of 2.5 mg MPA (0.625 mg PREMARIN plus 2.5 mg MPA, in particular). Higher rates of amenorrhea were also achieved more rapidly..

17

5ED13:0CO:ASM
AM100226
PATENT

- 13 -

Additionally, less breast tenderness was observed in women taking 0.3 mg PREMARIN plus 1.5 mg MPA, than in women taking the commercially available 0.625 mg PREMARIN plus 2.5 mg MPA combination.

5      It is well known that a rapid decrease in bone mass of both cortical (spine) and trabecular (hip) bone can be seen immediately after the menopause, with a total bone mass loss of 1% to 5% per year, continuing for 10 to 15 years. In the clinical study described above, bone mineral density (BMD) was determined using dual energy x-ray absorptiometry (DEXA) measurements of the lumbar spine (L2-L4), 10    femoral neck, trochanter, and total body. BMD measurements were made at least twice pre-study (7-14 days apart but not to exceed 3 weeks), during cycles 6, 13, 19, and twice during cycle 26 (7-14 days apart but not to exceed 3 weeks). The final visit results (cycle 26) are summarized in the table below.

15

Percent BMD Change ( ± S.E.) From Baseline at Final Visit

| Treatment Group | Lumbar Spine | Femoral Neck | Trochanter | Total Body |
|---|---|---|---|---|
| Placebo | -2.63 ± 0.37[+] | -1.97 ± 0.46[+] | 0.82 ± 0.58 | -1.56 ± 0.17[+] |
| 0.625 P + 2.5 M* | 3.77 ± 0.37[+,#] | 1.67 ± 0.46[+,#] | 4.05 ± 0.59[+,#] | 0.96 ± 0.18[+,#] |
| 0.45 P + 1.5 M | 2.45 ± 0.37[+,#] | 1.43 ± 0.47[++,#] | 3.60 ± 0.59[+,#] | 0.56 ± 0.18[+,#] |
| 0.3 P + 1.5 M | 1.77 ± 0.36[+,#] | 1.51 ± 0.44[+,#] | 4.66 ± 0.56[+,#] | 0.55 ± 0.17[+,#] |

\*   Daily dosages of P (PREMARIN) and M (MPA).
[+]   Statistically significant ($p < 0.001$) change from baseline.
20   [++]  Statistically significant ($p = 0.004$) change from baseline.
[#]   Statistically significant ($p < 0.001$) difference from placebo.

The results showed that all dosages of PREMARIN plus MPA significantly increased the BMD versus baseline and placebo in the lumbar spine, femoral neck, 25    trochanter, and total body demonstrating that combinations of conjugated estrogens plus MPA inhibited or retarded bone demineralization. These data also show that combinations of conjugated estrogens plus MPA actually increased the bone mineral density relative to pre-study baseline levels, and also relative to patients receiving placebo.

30

Based on the results observed in the clinical study described above, it has been found that the continuous and uninterrupted administration of a combination

18

5ED14:0CO:ASM
AM100226
PATENT

- 14 -

conjugated estrogens plus a dosage of about mg per of medroxyprogesterone acetate is useful in treating or inhibiting menopausal or postmenopausal disorders in perimenopausal, menopausal, or postmenopausal women.  More particularly, the combinations described herein are useful in treating or inhibiting vaginal or vulvar

5    atrophy; atrophic vaginitis; vaginal dryness; pruritus; dyspareunia; dysuria; frequent urination; urinary incontinence; urinary tract infections; vasomotor symptoms, including hot flushes, myalgia, arthralgia, insomnia, irritability, and the like; inhibiting or retarding bone demineralization; increasing bone mineral density; and treating or inhibiting osteoporosis.

10    The combinations of this invention also exert a cardioprotective effect in perimenopausal, menopausal, and postmenopausal women, and are therefore useful in lowering cholesterol, triglycerides, Lp(a), and LDL levels; inhibiting or treating hypercholesteremia; hyperlipidemia; cardiovascular disease; atherosclerosis; peripheral vascular disease; restenosis, and vasospasm; and inhibiting vascular wall

15    damage from cellular events leading toward immune mediated vascular damage.

The combinations of this invention are antioxidants, and are therefore useful in inhibiting disorders or disease states which involve free radicals.  More particularly, the combinations of this invention are useful in treating or inhibiting free radical involvement in the development of cancers, central nervous system disorders,

20    Alzheimer's disease, bone disease, aging, inflammatory disorders, peripheral vascular disease, rheumatoid arthritis, autoimmune diseases, respiratory distress, emphysema, prevention of reperfusion injury, viral hepatitis, chronic active hepatitis, tuberculosis, psoriasis, systemic lupus erythematosus, amyotrophic lateral sclerosis, aging effects, adult respiratory distress syndrome, central nervous system trauma

25    and stroke, or injury during reperfusion procedures.

The combinations of this invention are useful in treating or inhibiting dementias, neurodegenerative disorders, and Alzheimer's disease; providing neuroprotection or cognition enhancement.

30    The conjugated estrogens and medroxyprogesterone acetate described in this invention can be either formulated as separate tablets or as a unitary combination tablet.

Either of the components or the combination may be formulated neat or may be combined with one or more pharmaceutically acceptable carriers for

5ED15:0CO:ASM
AM100226
PATENT

- 15 -

administration.    For example, solid carriers include starch, lactose, dicalcium phosphate, microcrystalline cellulose, sucrose and kaolin, while liquid carriers include sterile water, polyethylene glycols, non-ionic surfactants and edible oils such as corn, peanut and sesame oils, as are appropriate to the nature of the active

5    ingredient and the particular form of administration desired. Adjuvants customarily employed in the preparation of pharmaceutical compositions may be advantageously included, such as flavoring agents, coloring agents, preserving agents, and antioxidants, for example, vitamin E, ascorbic acid, BHT and BHA.

   The preferred pharmaceutical compositions from the standpoint of ease of

10    preparation and administration are solid compositions, particularly tablets and hard-filled or liquid-filled capsules.  Oral administration of the compounds is preferred.

   Conjugated estrogens and MPA can be formulated in a number of ways to provide a single combination dosage form.    Conjugated estrogens can be

15    incorporated within the core of a compressed tablet and the progestin can be placed in an overcoating consisting of a compressed, film or sugar coat, as described in U.S. Patent 5,547,948, which is hereby incorporated by reference.  The tablets described in U.S. Patent 5,547,948 are suitable for formulation of the conjugated estrogens and MPA described in this invention as a unitary tablet.  U.S. Patent

20    5,908,638, which is hereby incorporated by reference, also describes combination tablets which are suitable for formulation of the conjugated estrogens and MPA described in this invention as a unitary tablet.

   Conjugated estrogens may be formulated in a core containing the conjugated estrogens, and several components including alcohol, hydroxypropyl methyl

25    cellulose, lactose monohydrate, magnesium stearate, and starch.  The core can be covered with a coating made from components such as ethylcellulose, and triethyl citrate.

   Both components can be incorporated in the compressed tablet core or in a tablet coating formulated to maintain drug stability and provide adequate oral

30    bioavailability.  For example, the progestin can be micronized.

   Conjugated estrogens can be incorporated in granules, spheroids or other multiparticulate forms, and, if necessary, coated to provide adequate stability. These multiparticulates can be combined, in the appropriate proportions, with a powder

5ED16:0CO:ASM
AM100226
PATENT

- 16 -

blend, granulation or multiparticulates containing the progestin and incorporated into hard gelatin capsules.

5      This invention also provides a pharmaceutical does pack, containing any number of daily pharmaceutical dosage units. Preferably, and conventionally, the pack contains 28 tablets or multiples thereof. The pack should indicate that the dosage units are to be taken consecutively on a daily basis until the treatment period has ended, or until the pack has been completed. The next pack should be started on the next consecutive day. For combinations containing a unitary dosage tablet
10     containing both conjugated estrogens and MPA, it is preferable that the pack contain one tablet corresponding to each day of administration. For combinations containing separate dosage units of conjugated estrogens and MPA, it is preferable that each one tablet of each correspond to each given day's administration, as indicated on the pill pack.

21

5ED17:0CO:ASM
AM100226
PATENT

- 17 -

CLAIMS

1.    A method of treating or inhibiting menopausal or postmenopausal disorders in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

2.    The method according to claim 1, wherein the conjugated estrogens is conjugated equine estrogens, USP.

3.    The method according to claim 2, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

4.    The method according to claim 3, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

5.    The method according to claim 4, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

6.    The method according to claim 1, wherein the conjugated estrogens is synthetic conjugated estrogens, A.

7.    A method of treating or inhibiting vasomotor symptoms in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

8.    The method according to claim 7, wherein the conjugated estrogens is conjugated equine estrogens, USP.

9.    The method according to claim 8, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

22

5ED18:0CO:ASM
AM100226
PATENT

- 18 -

10.    The method according to claim 9, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

11.    The method according to claim 10, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

12.    The method according to claim 8, wherein the vasomotor symptom is hot flushes.

13.    The method according to claim 7, wherein the conjugated estrogens is synthetic conjugated estrogens, A.

14.    The method according to claim 13, wherein the vasomotor symptom is hot flushes.

15.    A method of inhibiting or retarding bone demineralization or treating or inhibiting osteoporosis in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

16.    The method according to claim 15, wherein the conjugated estrogens is conjugated equine estrogens, USP.

17.    The method according to claim 16, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

18.    The method according to claim 17, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

19.    The method according to claim 18, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

20.    A method of treating or inhibiting vaginal or vulvar atrophy; atrophic vaginitis; vaginal dryness; pruritus; dyspareunia; dysuria; frequent urination; urinary incontinence; urinary tract infections in a perimenopausal, menopausal, or

23

5ED19:0CO:ASM
AM100226
PATENT

- 19 -

postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

5

21.    The method according to claim 20, wherein the conjugated estrogens is conjugated equine estrogens, USP.

22.    The method according to claim 21, wherein the daily dosage of conjugated
10    equine estrogens is between about 0.625 mg and about 0.3 mg.

23.    The method according to claim 22, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

15    24.    The method according to claim 23, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

27.    A method of lowering cholesterol, triglycerides, Lp(a), or LDL levels; inhibiting or    treating    hypercholesteremia;    hyperlipidemia;    cardiovascular    disease;
20    atherosclerosis; peripheral vascular disease; restenosis, vasospasm; or inhibiting vascular wall damage from cellular events leading toward immune mediated vascular damage, in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens
25    and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

28.    The method according to claim 27, wherein the conjugated estrogens is conjugated equine estrogens, USP.

30    29.    The method according to claim 28, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

30.    The method according to claim 29, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.
35

24

5ED20:0CO:ASM
AM100226
PATENT

- 20 -

31.    The method according to claim 30, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

32.    A method of treating or inhibiting free radical involvement in the development of cancers, central nervous system disorders, Alzheimer's disease, bone disease, aging, inflammatory disorders, peripheral vascular disease, rheumatoid arthritis, autoimmune diseases, respiratory distress, emphysema, prevention of reperfusion injury, viral hepatitis, chronic active hepatitis, tuberculosis, psoriasis, systemic lupus erythematosus, amyotrophic lateral sclerosis, aging effects, adult respiratory distress syndrome, central nervous system trauma and stroke, or injury during reperfusion procedures in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

33.    The method according to claim 32, wherein the conjugated estrogens is conjugated equine estrogens, USP.

34.    The method according to claim 33, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

35.    The method according to claim 34, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

36.    The method according to claim 35, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

37.    A method of treating or inhibiting dementias, neurodegenerative disorders, and Alzheimer's disease; providing neuroprotection or cognition enhancement in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

38.    The method according to claim 37, wherein the conjugated estrogens is conjugated equine estrogens, USP.

25

5ED21:0CO:ASM
AM100226
PATENT

- 21 -

39.    The method according to claim 38, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

5    40.    The method according to claim 39, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

41.    The method according to claim 40, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

10    42.    A pharmaceutical composition for use in treating menopausal or postmenopausal disorders, which comprises conjugated estrogens, a dosage of about 1.5 mg medroxyprogesterone acetate, and a pharmaceutical carrier.

15    43.    The composition according to claim 42, wherein the conjugated estrogens is conjugated equine estrogens, USP.

44.    The composition according to claim 43, wherein the dosage of conjugated equine estrogens, USP is about 0.45 mg.

20    45.    The composition according to claim 43, wherein the dosage of conjugated equine estrogens, USP is about 0.30 mg.

46.    A pharmaceutical oral dosage unit which comprises which comprises
25    conjugated estrogens, a dosage of about 1.5 mg of medroxyprogesterone acetate, and a pharmaceutical carrier.

47.    The dosage unit according to claim 46, wherein the conjugated estrogens is conjugated equine estrogens, USP.
30    48.    The dosage unit according to claim 47, wherein the medroxyprogesterone acetate is micronized.

49.    The dosage unit according to claim 47, wherein the dosage of conjugated
35    equine estrogens, USP is about 0.45 mg.

26

5ED22:0CO:ASM
AM100226
PATENT

- 22 -

50.    The dosage unit according to claim 47, wherein the dosage of conjugated equine estrogens, USP is about 0.30 mg.

51.    A method of minimizing or reducing levels of breast pain in a woman
5    receiving hormone replacement therapy, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

10    52.    The method according to claim 51, wherein the conjugated estrogens is conjugated equine estrogens, USP.

53.    The method according to claim 52, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.
15
54.    The method according to claim 53, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

55.    The method according to claim 54, wherein the daily dosage of conjugated
20    equine estrogens, USP is about 0.3 mg.

56.    A method of minimizing spotting or breakthrough bleeding; or achieving amenorrhea in a woman receiving hormone replacement therapy, which comprises orally providing to said woman continuously and uninterruptedly over the treatment
25    period, a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

57.    The method according to claim 56, wherein the time for minimizing spotting or breakthrough bleeding or achieving the onset of amenorrhea is hastened.
30
58.    The method according to claim 57, wherein the conjugated estrogens is conjugated equine estrogens, USP.

59.    The method according to claim 58, wherein the daily dosage of conjugated
35    equine estrogens is between about 0.625 mg and about 0.3 mg.

27

5ED23:0CO:ASM
AM100226
PATENT

- 23 -

60.    The method according to claim 59, wherein the daily dosage of conjugated equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

61.    The method according to claim 60, wherein the daily dosage of conjugated
5    equine estrogens, USP is about 0.3 mg.

62.    A method of increasing bone mineral density in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period,
10    a combination of conjugated estrogens and a daily dosage of about 1.5 mg of medroxyprogesterone acetate.

63.    The method according to claim 62, wherein the conjugated estrogens is conjugated equine estrogens, USP.
15
64.    The method according to claim 63, wherein the daily dosage of conjugated equine estrogens is between about 0.625 mg and about 0.3 mg.

65.    The method according to claim 64, wherein the daily dosage of conjugated
20    equine estrogens, USP is between about 0.45 mg and about 0.3 mg.

66.    The method according to claim 65, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

25    67.    The pharmaceutical composition according to claim 42, wherein the conjugated estrogens is synthetic conjugated estrogens, A.

68.    The pharmaceutical dosage unit according to claim 46, wherein the conjugated estrogens is synthetic conjugated estrogens, A.
30

28

5ED24:0CO:ASM
AM100226
PATENT

- 24 -

ABSTRACT

This invention relates to methods and pharmaceutical compositions for providing hormone replacement therapy in perimenopausal, menopausal, and postmenopausal women through the continuous administration of combinations of conjugated estrogens and medroxyprogesterone acetate.

5



FIG.1



FIG.2



FIG.3

● $06/15/01$ ●                    $1617$

AM100226
Patent

**RECEIVED**

JUN 2 0 2001

TECH CENTER 1600/2900

Assistant Commissioner for Patents
Washington, DC 20231

<u>INFORMATION DISCLOSURE STATEMENT</u>

This Information Disclosure Statement is herewith submitted herewith of the following Inventor:
James H. PICKAR.

For:     HORMONE REPLACEMENT THERAPY.

1.    <u>Preliminary Statements</u>
      In accordance with 37 CFR 1.97 and 1.98, Applicants submit herewith patents,
      publications, or other information of which they are aware, which they believe may be
      material to the examination of this application and in respect of which there may be a duty
      to disclose in accordance with 37 CFR 1.56. This Information Disclosure Statement is not
      to be construed as a representation that: (i) a search has been made; (ii) the information is
      material to the examination of this application; (iii) additional information material to the
      examination of this application does not exist; (iv) the information, protocols, results and
      the like reported by third parties are accurate or enabling; or (v) the information constitutes
      prior art to the subject invention.

2.    ☐  Previously Cited Information
         No copy of the patents, publications or other information cited on the attached form
         PTO-1449 is enclosed because it has been previously cited by or submitted to the
         Office in a prior application which is relied upon for an earlier filing date under 35
         USC 120. Prior application is Serial Number        filed on        of        for

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

CERTIFICATE OF MAILING 37 CFR §1.10

I hereby certify that this paper and the documents referred to as enclosed therein are being
deposited with the United States Postal Service on the date written below in an envelope as
"Express Mail Post Office to Addressee" Mailing Label Number EM474055492US addressed to
the Commissioner for Patents, Washington, DC 20231.

6-14-01                          John R. Barker
Date                             John R. Barker

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

AM100226
Patent

3. ☒ Newly Cited Information
A legible copy of the patents, publications or other information cited on the attached form PTO-1449 is enclosed, except that no copy of a pending U.S. application is enclosed.

4. ☐ Concise Explanation
Documents cited above which are not in the English Language
a. ☐ have been explained in the specification.
b. ☐ have an abstract (or other concise explanation) in English enclosed or, if readily available, a translation into English of the document is enclosed.

5. Form PTO-1449 (3 sheets) is enclosed in duplicate.

Arnold S. Milowsky
June 14, 2001
Reg. No. 35,288

American Home Products Corporation
Patent Law Department
Five Giralda Farms
Madison, NJ 07940-0874
Tel. No. (610) 902-2635

34                    Page 2 of 2

| FORM PTO-1449 (REV. 2-32) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. AM100226 | SERIAL NO. 09/808,878 |
|---|---|---|---|
| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT (Use several sheets if necessary) | APPLICANT James H. Pickar | RECEIVED |
| | | FILING DATE March 15, 2001 | GROUP JUN 2 0 2001 |

OIPE JUN 1 4 2001 PATENT & TRADEMARK OFFICE

TECH CENTER 1600/29

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | | | | | | | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AA | R | E | 3 | 6 | 2 | 4 | 7 | 7/99 | Plunkett et al. | | | |
| | AB | 5 | 8 | 2 | 7 | 8 | 4 | 3 | 10/98 | Koninckx | | | |
| | AC | | | | | | | | | | | | |
| | AD | | | | | | | | | | | | |
| | AE | | | | | | | | | | | | |
| | AF | | | | | | | | | | | | |
| | AG | | | | | | | | | | | | |
| | AH | | | | | | | | | | | | |
| | AI | | | | | | | | | | | | |
| | AJ | | | | | | | | | | | | |
| | AK | | | | | | | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | AQ | Udoff et al., Obstetrics & Gynecology, *86(2)*, 1985, 306-316 |
| | AR | A.O. Mueck, Archives of Gynecology and Obstetrics, *260*, 1997, 446 |
| | AS | Noyes et al., Primary Care, *17(3)*, Sept. 1990, 647-666 |
| | AT | Young et al., Drugs, *33*, 1987, 95-106 |
| | AU | Lobo, J. Clin. Endocrinology and Metabolism, *73(5)*, 1991, 925-930 |
| | AV | Huppert, Medical Clinics of North America, *71(1)*, Jan. 1987, 23-39 |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

| FORM PTO-1449<br>(REV. 2-32) | U.S. DEPARTMENT OF COMMERCE<br>PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO.<br><br>AM100226 | SERIAL NO.<br><br>09/808,878 |
|---|---|---|---|
| | INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT<br><br>(Use several sheets if necessary) | APPLICANT<br><br>James H. Pickar | |
| | | FILING DATE<br><br>March 15, 2001 | GROUP |

RECEIVED JUN 2 0 2001 TECH CENTER 1600/290

OIPE JUN 14 2001 PATENT & TRADEMARK OFFICE

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | | | | | | |
| | AB | | | | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | AQ | Maheux, Human Reproduction, 11(Supp.3), 1996, 43-50 |
| | AR | Ettinger, Annals of Internal Medicine, 106(1), 1987, 40-45 |
| | AS | Recker, Annals of Internal Medicine, 130(11), 1999, 897-904 |
| | AT | Webber et al., Maturitas, 19, 1994, 13-23 |
| | AU | Melis et al., Bone and Mineral, 19(Suppl.), 1992, S49-S56 |
| | AV | Agnusdei et al., Osteoporosis International, 5, 1995, 462-466 |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

36

| FORM PTO-1449 (REV. 2-32) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. AM100226 | SERIAL NO. 09/808,878 |
|---|---|---|---|
| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT (Use several sheets if necessary) | APPLICANT James H. Pickar | RECEIVED |
| | | FILING DATE March 15, 2001 | GROUP JUN 2 0 2001 |

*(stamp: OIPE JUN 1 4 2001 PATENT & TRADEMARK OFFICE)*

*TECH CENTER 1600/290*

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | | | | | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | AA | | | | | | | | | | |
| | AB | | | | | | | | | | |
| | AC | | | | | | | | | | |
| | AD | | | | | | | | | | |
| | AE | | | | | | | | | | |
| | AF | | | | | | | | | | |
| | AG | | | | | | | | | | |
| | AH | | | | | | | | | | |
| | AI | | | | | | | | | | |
| | AJ | | | | | | | | | | |
| | AK | | | | | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | | | | | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | | | | | |
| | AM | | | | | | | | | | | |
| | AN | | | | | | | | | | | |
| | AO | | | | | | | | | | | |
| | AP | | | | | | | | | | | |

## OTHER DOCUMENTS  (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | AQ | Mizunuma et al., Maturitas, 27, 1997, 69-76 |
| | AR | Gallagher et al., Am. J. Medicine, 90, Feb. 1991, 171-178 |
| | AS | Chen, Maturitas, 27 (Suppl. 1), 1997, 119 |
| | AT | Chen et al., Bone, 16(1)(Suppl.), Jan. 1995, 201S |
| | AU | |
| | AV | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

EXAMINER:  Initial if citation considered, whether or not citation is in conformance with MPEP 609.  Draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.



**RECEIVED**

Docket No: AM100226
JUN 22 2001 Patent

TECH CENTER 1600/2900

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re Application of: | James H. Pickar | | |
| Serial No.: | 09/808,878 | Group Art No.: | |
| Filed: | March 15, 2001 | Examiner: | |
| For: | HORMONE REPLACEMENT THERAPY | | |
| Confirmation No.: | | | |
| Customer Number: | 25291 | | |

Assistant Commissioner for Patents
Washington, DC 20231

### INFORMATION DISCLOSURE STATEMENT

Dear Sir:

This Information Disclosure Statement is being filed to replace the one filed on June 14, 2001, which did not properly identify the patent application by Serial Number and Filing Date. This Information Disclosure Statement is identical in every other aspect.

1.  Preliminary Statements
    In accordance with 37 CFR 1.97 and 1.98, Applicants submit herewith patents, publications, or other information of which they are aware, which they believe may be material to the examination of this application and in respect of which there may be a duty to disclose in accordance with 37 CFR 1.56. This Information Disclosure Statement is not to be construed as a representation that: (i) a search has been made; (ii) the information is material to the examination of this application; (iii) additional information material to the examination of this application does not exist; (iv) the information, protocols, results and the like reported by third parties are accurate or enabling; or (v) the information constitutes prior art to the subject invention.

---

**CERTIFICATE OF MAILING 37 CFR §1.10**

I hereby certify that this paper and the documents referred to as enclosed therein are being deposited with the United States Postal Service on the date written below in an envelope as "Express Mail Post Office to Addressee" Mailing Label Number EM474055529US addressed to the Assistant Commissioner for Patents, Washington, DC 20231.

6-18-01                          _____
Date                             John R. Barker

---

Docket No: AM100226
Patent

2.   Identification of Time of Filing
     This Information Disclosure Statement
     a.   ☒   is filed within three months of the filing date of the application.
     b.   ☐   is filed before the mailing date of a first Office Action on the merits.
     c.   ☐   is filed before the mailing date of a first Office Action after the filing of a
              request for continued examination under 37 CFR 1.114.
     d.   ☐   is filed after the period specified in 2(a), 2(b) or 2(c) above, but before the
              mailing date of a final action under 37 CFR 1.311. This statement includes a
              certification under 37 CFR 1.97(e) or the fee set forth in 37 CFR 1.17(p).
     e.   ☐   is filed after the mailing date of a final action or Notice of Allowance but
              before payment of the issue fee. This statement includes (i) a certification
              under 37 CFR 1.97(e), and (ii) the fee set forth in 37 CFR 1.17(p).

3.   ☐   Certification under 37 CFR 1.97(e)
         The undersigned attorney certifies

     a.   ☐   that each item of information contained in the Information Disclosure
              Statement was cited in a communication from a foreign patent office in a
              counterpart foreign application not more than three months prior to the filing
              of the statement, or
     b.   ☐   that no item of information contained in the Information Disclosure Statement
              was cited in a communication from a foreign patent office in a counterpart
              foreign application or, to the knowledge of the person signing the certification
              after making reasonable inquiry, was known to any individual designated in
              37 CFR 1.56(c) more than three months prior to the filing of the statement.
     c.   ☐   The undersigned attorney certifies that each item of information contained in
              the Information Disclosure Statement was cited in a communication from a
              foreign patent office in a counterpart foreign application and was not received
              by any individual designated in 37 CFR 1.56(c) more than thirty (30) days
              prior to the filing of the statement.

     ☒   Newly Cited Information
         A legible copy of the patents, publications or other information cited on the attached
         form PTO 1449 is enclosed, except that no copy of a pending U.S. application is
         enclosed.

     ☐   Previously Cited Information
         No copy of the patents, publications or other information cited on the attached form
         PTO-1449 is enclosed because it has been previously cited by or submitted to the
         Office in a prior application which is relied upon for an earlier filing date under
         35 USC 120.
         Prior application is Serial Number          , filed on          of          for          .

Docket No: AM100226
Patent

☐ Concise Explanation
Documents cited above which are not in the English Language
a. ☐ have been explained in the specification.
b. ☐ have an abstract (or other concise explanation) in English enclosed or if
readily available a translation into English of the document is enclosed.

Form PTO-1449 is enclosed in duplicate.

☐ Fees
☐ Fee for filing under 37 CFR 1.97(c) or (d)     Fee:     $0.00

Method of Payment of Fees:
Charge American Home Products Corporation Deposit Account No. 01-1425
in the amount of $0.00
A duplicate of this statement is enclosed.

Instructions as to Overpayment/Underpayment:
Credit any overpayment and charge any underpayment to Deposit Account No. 01-1425.

Arnold S. Milowsky
June 18, 2001
Reg. No. 35,288

American Home Products Corporation
Patent Law Department
Five Giralda Farms
Madison, NJ 07940-0874
Tel. No. (610) 902-2635

40
IdsPendingApp.dot – Rev 2/01     Page 3 of 3   Information Disclosure Statement–Pend



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address:    COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 09/808,878 | 03/15/01 | PICKAR                          J | AM100226 |

HM12/0913

EGON E. BERG
AMERICAN HOME PRODUCTS CORPORATION
PATENT LAW DEPARTMENT
FIVE GIRALDA FARMS
MADISON NJ 07940

| EXAMINER |
|---|
| BAHAR, M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | 4 |

DATE MAILED:        09/13/01

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

41

PTO-90C (Rev. 2/95)
*U.S. GPO: 2000-473-000/44602

1- File Copy

| | Application No. | Applicant(s) |
|---|---|---|
| ***Offic  Action Summary*** | 09/808,878 | PICKAR, JAMES H. |
| | Examiner | Art Unit |
| | Mojdeh  Bahar | 1617 |

-- Th  *MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Peri  d f  r Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☐ Responsive to communication(s) filed on _____ .

2a) ☐ This action is **FINAL**.   2b) ☒ This action is non-final.

3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disp  sition of Claims**

4) ☒ Claim(s) <u>*1-68*</u> is/are pending in the application.

    4a) Of the above claim(s) <u>*1-6 and 15-68*</u> is/are withdrawn from consideration.

5) ☐ Claim(s) _____ is/are allowed.

6) ☒ Claim(s) <u>*7-14*</u> is/are rejected.

7) ☐ Claim(s) _____ is/are objected to.

8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.

10) ☐ The drawing(s) filed on _____ is/are:  a) ☐ accepted or b) ☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

11) ☐ The proposed drawing correction filed on _____ is: a) ☐ approved b) ☐ disapproved by the Examiner.

    If approved, corrected drawings are required in reply to this Office action.  .

12) ☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All b) ☐ Some * c) ☐ None of:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

14) ☒ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

    a) ☐ The translation of the foreign language provisional application has been received.

15) ☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

| | |
|---|---|
| 1) ☒ Notice of References Cited (PTO-892) | 4) ☐ Interview Summary (PTO-413) Paper No(s). _____ . |
| 2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948) | 5) ☐ Notice of Informal Patent Application (PTO-152) |
| 3) ☒ Information Disclosure Statement(s) (PTO-1449) Paper No(s) _____ . | 6) ☐ Other:  . |

U.S. Patent and Trademark Office
PTO-326 (Rev. 04-01)   Office Action Summary   Part of Paper No. 4

Application/Control Number: 09/808,878                                   Page 2
Art Unit: 1617

### *Election/Restrictions*

Restriction to one of the following inventions is required under 35 U.S.C. 121:

I.   Claims 1-6, drawn to a method of treating or inhibiting menopausal or
     postmenopausal disorders, classified in class 514, subclass 178.

II.  Claims 7-14, drawn to a method of treating or inhibiting vasomotor symptoms
     classified in class 514, subclass 178.

III. Claims 15-19, drawn to a method of inhibiting or retarding bone demineralization,
     classified in class 514, subclass 178.

IV.  Claims 20-24, drawn to a method of treating vaginal atrophy, classified in class
     514, subclass 178.

V.   Claims 27-31, drawn to a method of treating cardiovascular disease, classified in
     class 514, subclass 178.

VI.  Claims 32-36, drawn to a method of treating or inhibiting free radical movement,
     classified in class 514, subclass 178.

VII. Claims 37-41, drawn to a method of treating dementia, classified in class 514,
     subclass 178.

VIII. Claims 42-50 and 67-68, drawn to a pharmaceutical composition, classified in
     class 514, subclass 178.

IX.  Claims 51-55, drawn to a method of decreasing breast pain, classified in class
     514, subclass 178.

X.   Claims 56-61, drawn to a method of decreasing spotting, classified in class 514,
     subclass 178.

43

XI.    Claims 62-66, drawn to a method of increasing bone mineral density, classified in

class 514, subclass 178.

The inventions are distinct, each from the other because of the following reasons:

Inventions VIII and I-VII, IX-XI are related as product and process of use.  The

inventions can be shown to be distinct if either or both of the following can be shown: (1) the

process for using the product as claimed can be practiced with another materially different

product or (2) the product as claimed can be used in a materially different process of using that

product (MPEP § 806.05(h)).  In the instant case, the process of treating cardiovascular disease

and its underlying conditions including atherosclerosis and hypercholesterolemia can be

practiced with another materially different product such as pravastatin, Angiotensin Converting

Enzyme inhibitors, e.g., captopril and enalopril.  Bone demineralization can be treated by

calcium supplements, breast pain can be treated by using analgesics, for example.

Inventions I-VII and IX-XI are unrelated.  Inventions are unrelated if it can be shown that

they are not disclosed as capable of use together and they have different modes of operation,

different functions, or different effects (MPEP § 806.04, MPEP § 808.01).  In the instant case the

inventions have different functions.

Because these inventions are distinct for the reasons given above and have acquired a

separate status in the art because of their recognized divergent subject matter, restriction for

examination purposes as indicated is proper.

### *Specie Election*

Claims 1-14, 20-24, 27-41 are generic to a plurality of different disclosed

patentably distinct disorders.  Applicant is required under 35 U.S.C. 121 to elect a single

44

disclosed species, even though this requirement is traversed. The treatment of each represents a

separate field of medical technology having a separate field of search. The search for treatment

of all menopausal and postmenopausal disorders is therefore an undue burden on the office.

Note that the search is not limited to patent files.

During a telephone conversation with Arnold S. Milowsky on August 27, 2001, a

provisional election was made with traverse to prosecute the invention of Group II, claims 7-14

and hot flushes as the elected specie. Affirmation of this election must be made by applicant in

replying to this Office action. Claims 1-6 and 15-68 are withdrawn from further consideration

by the examiner, 37 CFR 1.142(b), as being drawn to a non-elected invention.

Claims 7-14 are examined on the merits in so far as they read on the elected invention.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

Claims 7-14 are rejected under 35 U.S.C. 103(a) as being unpatentable over Plunkett et

al. (USPN 4,826,831, RE 36,247)

Plunkett et al. (USPN 4,826,831) teaches a method of treating hot flushes comprising

administering continuously and uninterruptedly both progestogen and estrogen in daily dosage

units, see claim 1 and col.9 lines 34-40 in particular. Plunkett et al. (USPN 4,826,831) also

teaches conjugated equine estrogen/medroxyprogesterone as one of the estrogen/progestogen

combinations useful in its method, see claims 3, 5 and 8. Plunkett teaches the minimum and

Application/Control Number: 09/808,878　　　　　　　　　　　　　　Page 5
Art Unit: 1617

maximum dosages for medroxyprogesterone to be 1 mg/day and 15 mg/day respectively, see

claim 4 in particular. Plunkett teaches the dosage range for Ethinyl estradiol to be between 0.005

and 0.020 mg/day, and the dosage range of quinestranol to be between 0.005 and 0.020 mg/day,

see claim 5.

　　　　One of ordinary skill in the art would have been motivated to employ any of the

estrogen/progestogen combinations taught in Plunkett in a method of treating hot flushes because

they are known to be useful in methods of treating menopausal disorders including hot flushes.

　　　　Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Mojdeh Bahar whose telephone number is (703) 305-1007. The

examiner can normally be reached on (703) 305-1007 from Monday to Friday from 9:00 a.m. to

5:00 p.m.

　　　　If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Minna Moezie, J.D., can be reached on (703) 308-4612. The fax phone number for

the organization where this application or proceeding is assigned is (703) 308-4556.

　　　　Any inquiry of a general nature or relating to the status of this application or proceeding

should be directed to the receptionist whose telephone number is (703) 308-1235.

　　　　Mojdeh Bahar
　　　　Patent Examiner
　　　　September 7, 2001

RUSSELL TRAVERS
PRIMARY EXAMINER
GROUP 1200

46

* IPS reference

| Notice of References Cited | Application/Control No. 09/808,878 | Applicant(s)/Patent Under Reexamination PICKAR, JAMES H. | |
|---|---|---|---|
| | Examiner Mojdeh Bahar | Art Unit 1617 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification | |
|---|---|---|---|---|---|---|
| * | A | US-4,826,831 | 05-1989 | Plunkett at al. | -- | -- |
| | B | US- | | | | |
| | C | US- | | | | |
| | D | US- | | | | |
| | E | US- | | | | |
| | F | US- | | | | |
| | G | US- | | | | |
| | H | US- | | | | |
| | I | US- | | | | |
| | J | US- | | | | |
| | K | US- | | | | |
| | L | US- | | | | |
| | M | US- | | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No. 4

01/30/01

| FORM PTO-1449 (REV. 2-32) | U.S. DEPARTMENT OF COMMERCE PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. AM100226 | SERIAL NO. 09/808,878 |
|---|---|---|---|
| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT (Use several sheets if necessary) | APPLICANT James H. Pickar | |
| | | FILING DATE March 15, 2001 | GROUP |

*(stamp:) IPE JC... JUN 1 8 2001 PATENT & TRADEMARK OFFICE*

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | | | | | | |
| | AB | | | | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | | |
|---|---|---|---|
| | AQ | Maheux, Human Reproduction, *11(Supp.3)*, 1996, 43-50 | 7 |
| | AR | Ettinger, Annals of Internal Medicine, *106(1)*, 1987, 40-45 | 8 |
| | AS | Recker, Annals of Internal Medicine, *130(11)*, 1999, 897-904 | 9 |
| | AT | Webber et al., Maturitas, *19*, 1994, 13-23 | 10 |
| | AU | Melis et al., Bone and Mineral, *19(Suppl.)*, 1992, S49-S56 | 11 |
| | AV | Agnusdei et al., Osteoporosis International, *5*, 1995, 462-466 | 12 |
| | | | 13 |

| EXAMINER | DATE CONSIDERED |
|---|---|
| *(signature)* | 07/06/01 |

EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609. Draw

Page 3 of 3

JUN 18 2001

TECH CENTER 1600/2900

| FORM PTO-1449<br>(REV. 2-32) | U.S. DEPARTMENT OF COMMERCE<br>PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO.<br><br>AM100226 | SERIAL NO.<br><br>09/808,878 |
|---|---|---|---|
| | INFORMATION DISCLOSURE<br>STATEMENT BY APPLICANT<br><br>(Use several sheets if necessary) | APPLICANT<br><br>James H. Pickar | |
| | | FILING DATE<br><br>March 15, 2001 | GROUP |

## U.S. PATENT DOCUMENTS

| EXAMINER<br>INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE<br>IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | | | | | | |
| | AB | | | | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | |
|---|---|---|
| | AQ | Mizunuma et al., Maturitas, 27, 1997, 69-76 |
| | AR | Gallagher et al., Am. J. Medicine, 90, Feb. 1991, 171-178 |
| | AS | Chen, Maturitas, 27 (Suppl. 1), 1997, 119 |
| | AT | Chen et al., Bone, 16(1)(Suppl.), Jan. 1995, 201S |
| | AU | |
| | AV | |

| EXAMINER<br>49 | DATE CONSIDERED<br><br>07/06/81 |
|---|---|

EXAMINER: Initial if citation considered, whether or not citation is in conformance with MPEP 609. Draw

JUN 2 2 2001
Page 1 of 3
TECH CENTER 1600/2900

| FORM PTO-1449 DEPARTMENT OF COMMERCE (REV. 2-32) PATENT AND TRADEMARK OFFICE | ATTY. DOCKET NO. AM100226 | SERIAL NO. 09/808,878 |
|---|---|---|
| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | APPLICANT James H. Pickar | |
| (Use several sheets if necessary) | FILING DATE March 15, 2001 | GROUP |

## U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | | | | | | | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AA | R | E | 3 | 6 | 2 | 4 | 7 | 7/99 | Plunkett et al. | | | |
| | AB | 5 | 8 | 2 | 7 | 8 | 4 | 3 | 10/98 | Koninckx | | | |
| | AC | | | | | | | | | | | | |
| | AD | | | | | | | | | | | | |
| | AE | | | | | | | | | | | | |
| | AF | | | | | | | | | | | | |
| | AG | | | | | | | | | | | | |
| | AH | | | | | | | | | | | | |
| | AI | | | | | | | | | | | | |
| | AJ | | | | | | | | | | | | |
| | AK | | | | | | | | | | | | |

## FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | | | | | | | |
| | AM | | | | | | | |
| | AN | | | | | | | |
| | AO | | | | | | | |
| | AP | | | | | | | |

## OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, Etc.)

| | | | |
|---|---|---|---|
| | AQ | | Udoff et al., Obstetrics & Gynecology, 86(2), 1985, 306-316 |
| | AR | | A.O. Mueck, Archives of Gynecology and Obstetrics, 260, 1997, 446 |
| | AS | | Noyes et al., Primary Care, 17(3), Sept. 1990, 647-666 |
| | AT | | Young et al., Drugs, 33, 1987, 95-106 |
| | AU | | Lobo, J. Clin. Endocrinology and Metabolism, 73(5), 1991, 925-930 |
| | AV | | Huppert, Medical Clinics of North America, 71(1), Jan. 1987, 23-39 |

| EXAMINER | DATE CONSIDERED |
|---|---|
| 50 | 09/04/01 |

"Express Mail" mailing label number    302329027US

Date of Deposit    December 1, 2001

I hereby certify that this paper or fee is being deposited with the United
States Postal Service "Express Mail Post Office to Addressee" service
under 37 CFR 1.10 on the date indicated above and is addressed to
Assistant Commissioner for Patents, Washington, DC, 20231.

Roxanne L. Kelly
Name of Person Mailing Paper or Fee

Roxanne L. Kelly
Signature of Person Mailing Paper or Fee

AM100226
PATENT

OIPE
DEC 1 3 2001
PATENT & TRADEMARK

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of:  Pickar, J.

| | |
|---|---|
| Serial No.: 09/808,878 | Confirmation No.: 5270 |
| Filed:    March 15, 2001 | Examiner:    Bahar |
| For:    Hormone Replacement Therapy | Art Unit: 1617 |

Assistant Commissioner for Patent
Washington, D.C.  20231

RECEIVED
DEC 2 7 2001
TECH CENTER 1600/2900

### AMENDMENT UNDER RULE 111

Sir:

### In the Claims:

Please **add** the following new claim:

Claim 69.    The method according to claim 10, wherein the daily dosage of conjugated equine estrogens, USP is about 0.45 mg.

### Remarks:

Claims 1-68 are in the application.  Claims 7-14 stand rejected and Claims 1-6 and 15-68 are withdrawn from consideration for covering non-elected subject matter.  New Claim 69 is being added and reads on the elected subject matter.  After entry of this response, Claims 1-69 will remain in the application with Claims 1-6, and 15-68 being withdrawn from consideration.

### Restriction Requirement

Claims 1-68 are subject to a restriction requirement in which the applicants were required to select among eleven restriction groups based on method of use. The applicants were also required to elect a single species (disorder) within the elected group for examination.  In a telephonic conversation with the Examiner on August 27, 2001, the applicant elected restriction Group II (treatment or inhibition of vasomotor symptoms; Claims 7-14) and elected hot flushes as the species for examination.  The applicant hereby confirms this election, and reserves his right to

12/21/2001 EABUBAK1 00000076 011425    09808878
01 FC:103        18.00 CH

51







12-20-01

Docket No: AM100226
Patent

RECEIVED
DEC 2 7 2001
TECH CENTER 1600/2900

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re of Application of:    James H. Pickar

Serial No.:    09/808,878    Group Art No.:    1617

Filed:    March 15, 2001    Examiner:    M. Bahar

For:    Hormone Replacement Therapy

Confirmation No.:    5270

Customer Number:    25291

Assistant Commissioner for Patents
Washington, DC 20231

Sir:

## AMENDMENT TRANSMITTAL LETTER

1.    Enclosed please find the following documents for the above-identified application:

Response to Office Action mailed on September 13, 2001.

---

### CERTIFICATE OF MAILING 37 CFR §1.10

I hereby certify that this paper and the documents referred to as enclosed therein are being deposited with the United States Postal Service on the date written below in an envelope as "Express Mail Post Office to Addressee" Mailing Label Number ET302329027US addressed to the Commissioner for Patents, Washington, DC 20231.

December 13, 2001
Date

Roxanne L. Kelly

---

Docket No:  AM100226
Patent

2.    Fee calculation

| CLAIMS AS AMENDED | | | | |
|---|---|---|---|---|
| (1)<br><br><br><br>FOR | (2)<br>CLAIMS REMAINING AFTER AMENDMENT | (3)<br>HIGHEST NUMBER PAID FOR | (4)<br><br>NUMBER EXTRA x RATE | (5)<br><br>ADDITIONAL FEE |
| TOTAL CLAIMS | 69 | 68 | 1      x  $    18.00 | 18.00 |
| INDEPENDENT CLAIMS | 12 | 12 | 0      x  $    84.00 | 0.00 |
| MULTIPLE DEPENDENCY FEE | | | $    280.00 | |
| | | | Total Amendment Fee: | $18.00 |

⊠    Please charge American Home Products Corporation Deposit Account No. 01-1425 in the amount of $18.00.

The Commissioner is hereby authorized to charge any additional fees required by this paper, including the enclosed documents, and during the entire pendency of this application and to credit any excess amounts paid to Deposit Account No. 01-1425.  A copy of this letter is enclosed for use by the Deposit Account Branch.

Respectfully submitted,

Arnold S. Milowsky
Attorney for Applicants
Reg. No. 35,288

American Home Products Corporation
Patent Law Department
Five Giralda Farms
Madison, NJ 07940-0874
Tel. No. (610) 902-2635



AM100226
PATENT

prosecute the non-elected subject matter in subsequent divisional application pursuant to 35 USC 121.

### Newly Added Claim

Claim 69 has been added, and covers the use of the combination of medroxyprogesterone acetate at a dosage of about 1.5 mg and conjugated estrogens, USP at a dosage of about 0.45 mg for the treatment or inhibition of vasomotor symptoms. Basis for this claim is provided in the tables on page 9 of the specification, and in Figures 1 and 2 of the application. This claim is clearly covered by the elected subject matter, and it is requested that this claim be examined with the elected subject matter. No new or additional examination is necessary because of the addition of this claim.

### Rejection under 35 USC 103

Claims 7-14 stand rejected under 35 USC 103 as being obvious over Plunkett [US 4,826,831, Re 36,247; references to this document (including column and line numbers) in this response will be made using Re 36,247]. For the reasons provided below, the applicants respectfully traverse this rejection and request reconsideration.

The overriding law in determining whether a claimed invention is obvious over the prior art requires that an analysis must be undertaken based on several factual inquiries which include: "(1) the scope and content of the prior art; (2) the difference between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and objective evidence of nonobviousness, if any." In re O'Farrell 7 U.S.P.Q.2d 1673, 1680 (1988) (citing Graham v. John Deere Co. 383 U.S. 1, 17-18 (1966)). An analysis of the prior art in relation to the claimed invention is provided below.

Applicant's Claims 7-14 cover a method-of-treating or inhibiting vasomotor symptoms comprising providing the continuous administration (28 days per 28-day cycle) of a combination of conjugated estrogens, and a daily dosage of about 1.5 mg of medroxyprogesterone acetate (Claim 7). Dependent claims provide dosage ranges of between about 0.625 and about 0.3 mg conjugated estrogens (Claim 9); between about 0.45 and about 0.3 mg conjugated estrogens (Claim 10), and about

54                                      - 2 -



0.3 mg conjugated estrogens (Claim 11). New claim 69 covers a dosage of about 0.45 mg conjugated estrogens. Claims 12 and 14 cover hot flushes specifically.

Claims 7-14 stand rejected as being obvious over US Re 36,247 (hereinafter referred to as Plunkett). Plunkett discloses a method of hormone treatment for menopausal or postmenopausal disorders by the continuous administration of estrogen and progestin combinations. Such treatment is commonly referred to as hormone replacement therapy (HRT).

It is well established case law that the prior art must be considered for everything it teaches, and not just specific aspects that it describes. The teaching of the prior art as a whole must be considered. (See, *EWP Corp v. Reliance Universal, Inc.,* 225 USPQ 20.) "A reference must be considered not only for what it expressly teaches, but also for what it fairly suggests." (*In re Burckel,* 201 USPQ 67). Plunkett discloses a plethora of estrogens and progestins that can be combined to treat numerous disorders. The estrogens disclosed are provided in Table 1A. Specifically the following twenty estrogens are described as being useful in the estrogen plus progestin combination for treating menopausal or post menopausal disorders: estradiol, estradiol-17β, estradiol valerate, conjugated equine estrogens, estrene, piperazine estrone sulfate, estriol, estriol succinate, polyestriol phosphate, ethinyl estradiol, mestranol, quinestrol, stilbestrol, stilbestrol dipropionate, diethylstilbestrol, chlorotrianiscos, benzoestrol, hexoestrol, and methallenostril.

Table 1B specifically discloses seventeen progestins to choose that are useful in the continuous HRT regimens: levo-norgestrel, dl-norgestrel, norethindrone, norethindrone acetate, dydrogesterone, medroxyprogesterone acetate, norethynodrel, allylestrenol, lynoestrenol, quingestanol, medrogestone, norgestrienone, dimentisterone, ethisterone, cyproterone acetate, chlormadinone acetate, and megestrol acetate.

Plunkett also provides ranges of dosage minimums and maximums, and preferred dosages for the estrogens and progestins listed. In the tables for conjugated equine estrogens, Plunkett lists the minimum dosage as 0.3 mg, the maximum dosage as 2.5 mg, and 0.6 mg as the preferred dosage. For

55                                           - 3 -

AM100226
PATENT

medroxyprogesterone acetate, Plunkett provides the minimum dosage as 1 mg, the maximum dosage as 15 mg, and the preferred dosage as 2.5 mg.

Column 6, line 46 of Plunkett further provides "Any of the suitable estrogens and progestogens (particularly those listed in the foregoing tables) may be combined with one another in the quantities recited to give estrogen/progestogen combinations within the purview of the invention."

From reading Plunkett, one skilled in the art could choose from many thousands of different combinations of estrogens and progestins that are useful in treating HRT, all at varying dosage ranges.

Plunkett also provides a list of twenty "especially preferred" combinations which include (see column 6, line 53): estradiol/levonorgestrel; estradiol 17β/levonorgestrel; estradiol valerate/levonorgestrel; conjugated equine estrogens/levonorgestrel; estradiol/dl norgestrel; estradiol 17β/dl norgestrel; estradiol valerate/dl norgestrel; conjugated equine estrogens/dl norgestrel; estradiol/norethindrone; estradiol 17β/norethindrone; estradiol valerate norethindrone; conjugated equine estrogens/norethindrone; estradiol/norethindrone acetate; estradiol 17β/notethindrone acetate; estradiol valerate/norethindrone acetate; conjugated equine estrogens/norethindrone acetate; estradiol/medroxyprogesterone acetate; estradiol 17β/ medroxyprogesterone acetate; estradiol valerate/ medroxyprogesterone acetate; and conjugated equine estrogens/ medroxyprogesterone acetate.

Of these thousands of possible combinations of estrogens and progestins, Plunkett only provides data for a single combination in which a study was conducted using a regimen of 1 mg/day 17β-estradiol plus 75 μg/day dl norgestrel. No data were provided for any combinations of conjugated estrogens plus medroxyprogesterone acetate.

Applicant's claimed subject matter represents a narrow species within the extremely broad genus of estrogens and progestins disclosed by Plunkett. It is well established that a species is patentable within a prior art genus absent teaching that

56                          - 4 -



AM100226
PATENT

would motivate one skilled in the art to make the applicant's invention. In a case similar to the applicant's, the court in *In re Baird* held that a genus of a patent covering an estimated 100 million compounds did not render obvious a species that was encompassed by the genus, where there was nothing in the patent that does not describe or suggest the species itself, and therefore does not motivate its selection. (29 USPQ2d 1550). Similarly, the court in *In re Jones* held that the claimed novel (aminoethoxy)ethanol salt of dicamba cannot be held to be prima facie obvious in view of a prior art patent which disclosed dicamba in free acid, ester, and salt forms. (21 USPQ2d 1941).

As applied to the instant case, applicant's claimed invention is a species covered by Plunkett that is not specifically taught or suggested. As discussed above, Plunkett discloses a multitude of estrogen plus progestin combinations, all at different dosage ranges. Even the preferred combinations number 20, and all at different dosage ranges. The working example given did not exemplify the components of the applicant's combination, but rather exemplified 17β estradiol plus dl norgestrel. The applicants submit that there if no motivation provided within Plunkett to choose their specific combination. The disclosure is huge, the working example does not teach or suggest the use of a combination of conjugated estrogens plus medroxyprogesterone acetate, the applicant's dosages are significantly lower than the preferred dosages in Plunkett's tables.

All of the applicant's claims require a dosage of about 1.5 mg of medroxyprogesterone acetate. This dosage is <u>sixty-six percent</u> below the preferred dosage of medroxyprogesterone acetate provided in Table 1B of Plunkett (2.5 mg). With respect to applicant's Claims 10, 11, and 69, the dosage of conjugated estrogens (0.45 and 0.3 mg) is between <u>thirty-three and one hundred percent</u> lower than the preferred dosage of conjugated estrogens listed in Table 1A of Plunkett (0.6 mg). Accordingly, the applicants submit that there is nothing in Plunkett that would motivate the applicant to choose the <u>specific</u> combination of estrogen and progestin, at the <u>specific</u> dose range covered by the applicant's claims. Based on the broad disclosure in Plunkett, it would take undue experimentation for one skilled in the art to arrive at the applicant's claimed invention. At best, it would be obvious to try the applicant's claimed combination, however, it has long been held that obvious to try is

57                                         - 5 -




AM100226
PATENT

not a proper standard for rejection under 35 USC 103. Reconsideration is respectfully requested.

In summary, Claims 69 has been added, and the rejection of Claims 7-14 has been addressed. Accordingly, the applicants respectfully request reconsideration of the rejections, allowance of Claims 7-14 and 69, and passage of the case to issue.

Respectfully submitted,

Arnold S. Milowsky
Reg. No. 35,288

Dated: December 13, 2001

Telephone: (610) 902-2635

58                    - 6 -

  

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/808,878 | 03/15/2001 | James H. Pickar | AM100226 | 5270 |

7590    03/12/2002

Egon E. Berg
American Home Products Corporation
Patent Law Department
Five Giralda Farms
Madison, NJ  07940

| EXAMINER |
|---|
| BAHAR, MOJDEH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 03/12/2002

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 07-01)

59

| *Offic*  *Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 09/808,878 | PICKAR, JAMES H. |
| | Examiner | Art Unit |
| | Mojdeh  Bahar | 1617 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on 13 December 2001 .

2a)☒ This action is FINAL.    2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) 1-69 is/are pending in the application.

    4a) Of the above claim(s) 1-6 and 15-68 is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) 7-14 and 69 is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

11)☐ The proposed drawing correction filed on _____ is: a)☐ approved b)☐ disapproved by the Examiner.

    If approved, corrected drawings are required in reply to this Office action.

12)☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____ .

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

14)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

    a) ☐ The translation of the foreign language provisional application has been received.

15)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☐ Information Disclosure Statement (PTO-1449) Paper No(s) _____ .

4)☐ Interview Summary (PTO-413) Paper No(s). _____ .
5)☐ Notice of Informal Patent Application (PTO-152)
6)☐ Other: .

Application/Control Number: 09/808,878                                     Page 2
Art Unit: 1617

## DETAILED ACTION

Applicant's amendment and response to the first office action of September 13, 2001,

submitted December 13, 2001 (Paper No. 5) is acknowledged.

This application contains claims 1-6 and 15-68 drawn to an invention nonelected with

traverse in Paper No. 5.  A complete reply to the final rejection must include cancelation of

nonelected claims or other appropriate action (37 CFR 1.144) See MPEP § 821.01.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the
> manner in which the invention was made.

Claims 7-14 and 69 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Plunkett et al. (USPN 4,826,831, RE 36,247)

Plunkett et al. (USPN 4,826,831) teaches a method of treating hot flushes comprising

administering continuously and uninterruptedly both progestogen and estrogen in daily dosage

units, see claim 1 and col.9 lines 34-40 in particular.  Plunkett et al. (USPN 4,826,831) also

teaches conjugated equine estrogen/medroxyprogesterone as one of the estrogen/progestogen

combinations useful in its method, see claims 3, 5 and 8. Plunkett teaches the minimum and

maximum dosages for medroxyprogesterone to be 1 mg/day and 15 mg/day respectively, see

claim 4 in particular.  Plunkett teaches the dosage range for Ethinyl estradiol to be between 0.005

61

Application/Control Number: 09/808,878                                    Page 3
Art Unit: 1617

and 0.020 mg/day, and the dosage range of quinestranol to be between 0.005 and 0.020 mg/day,

see claim 5.

One of ordinary skill in the art would have been motivated to employ any of the

estrogen/progestogen combinations taught in Plunkett in a method of treating hot flushes because

they are known to be useful in methods of treating menopausal disorders including hot flushes.


### Response to Arguments

Applicant's arguments regarding the non-obviousness of the claims have been considered

but are not persuasive to remove the obviousness rejection. Applicant first argues that the prior

art, Plunkett, discloses 20 estrogens and 17 progestins that can be combined. Applicant further

argues that Plunkett provides a list of 20 "especially preferred" combinations. Applicant asserts

that these disclosed species would give rise to "thousands of possible combinations of estrogens

and progestins." Note that Plunkett exemplifies the exact estrogen-progestin combination herein,

see in particular col.7 as well as claim 8.

Secondly, applicant refers to *In re Baird* as a case analogous to the case at bar. 29

USPQ2d 1550 (CAFC 1994). Note that the case at bar is distinguishable from *In re Baird* in that

the exact estrogen-progestin combination claimed herein is *exemplified* by the prior art at col.7 as

well as in claim 8. In *Baird* the court held that "disclosure of a generic formula that may

encompass claimed compound does not, *without more*, render compound obvious." Note that

Plunkett teaches **more than** a generic combination, it specifically teaches the estrogen-progestin

combination claimed herein.

62

Application/Control Number: 09/808,878　　　　　　　　　　　　　　　Page 4
Art Unit: 1617

Thirdly, applicant argues that the dosage of the estrogen-progestin combination herein is lower than that of Plunkett. Note that the claimed 1.5 mg of medoxyprogesterone is within 1 mg-15 mg, the range taught in Plunkett see claim 4 in particular. Similarly the claimed dosage of 0.3 and 0.45 of conjugated estrogens falls within Plunkett's range of 0.300 mg to 2.5 mg, see Table IA, col.4.

**THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the mailing date of this final action.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Mojdeh Bahar whose telephone number is (703) 305-1007. The examiner can normally be reached on (703) 305-1007 from Monday to Friday from 9:00 a.m. to 5:00 p.m.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Minna Moezie, J.D., can be reached on (703) 308-4612. The fax phone number for the organization where this application or proceeding is assigned is (703) 308-4556.

63

 

Application/Control Number: 09/808,878                                    Page 5
Art Unit: 1617

Any inquiry of a general nature or relating to the status of this application or proceeding

should be directed to the receptionist whose telephone number is (703) 308-1235.

Mojdeh Bahar
Patent Examiner
September 7, 2001

MINNA MOEZIE, J.D.
SUPERVISORY PATENT EXAMINER
TECHNOLOGY CENTER 1600

64



OIPE
SEP 05 2002
PATENT & TRADEMARK OFFICE

**RECEIVED**

SEP 10 2002

TECH CENTER 1600/2900

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| APPLICANT(S) | : | PICKAR, J. |
| SERIAL NO. | : | 09/808,878 |
| FILED | : | March 15, 2001 |
| TITLE | : | HORMONE REPLACEMENT THERAPY |
| ART UNIT | : | 1617 |
| EXAMINER | : | M. Bahar |

Assistant Commissioner
  for Patents
Washington, D.C. 20231

## AMENDMENT

Sir:

Pursuant to the filing of the Request for Continued Examination (RCE), please amend the above-referenced application as set forth below.

## IN THE CLAIMS

Please cancel claims 8, 9, 10, 13 and 14.

Please amend claims 7, 11, 12 and 69 as set forth below:

7.    (Amended) A method of treating or inhibiting vasomotor symptoms in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated equine estrogens, USP and a daily dosage of about 1.5 mg of medroxyprogesterone acetate, wherein the daily dosage of conjugated equine estrogens is between about 0.45 mg and about 0.3 mg.

11.    (Amended) The method according to claim 7, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

65

12.     (Amended) The method according to claim 7, wherein the vasomotor symptom is hot flushes.

69.     (Amended) The method according to claim 7, wherein the daily dosage of conjugated equine estrogens, USP is about 0.45 mg.

## REMARKS

Claims 1-7, 11, 12, and 15-69 are now pending in the above-referenced application. Applicant acknowledges that claims 1-6 and 15-68 have been withdrawn from consideration pursuant to the election made by Applicant in the Amendment under Rule 111, dated December 13, 2001. Applicant has rewritten claim 10 in independent form (as claim 7) and respectfully requests allowance of this claim and any claim dependent thereon.

In the Office Action mailed March 12, 2002, Claims 7-14 and 69 were rejected under 35 U.S.C. § 103 as allegedly unpatentable over U.S. Patent No. 4,826,831, Re 36,247 (hereinafter, "Plunkett"). In order to expedite prosecution of this application, Applicant has cancelled claims 8-10, 13 and 14, and has rewritten claim 10 (now designated claim 7) in independent form. Applicant does not acquiesce in the rejection of the canceled claims, and reserves the right to pursue such subject matter in other applications. In rejecting claims 7-14 and 69, the Examiner relies on the reference in Plunkett to combining conjugated equine estrogens ("CEE") with medroxyprogesterone acetate ("MPA"), listed among nineteen other possible estrogen/progestin combinations. Plunkett also claims such a combination in the context of a cyclical administration of estrogen, in addition to a continuous uninterrupted combined administration of estrogen and progestin. (See Plunkett, claim 8).

The pending claims of the present application are drawn specifically to continuously and uninterruptedly providing a daily using a dosage of about 1.5 mg MPA in combination with a dosage of between about 0.3 and about 0.45 mg CEE, USP. This specific dosage of MPA in combination with CEE is nowhere specified in Plunkett. In particular, Plunkett does not describe or suggest a daily dosage of about 1.5 mg MPA at all, much less in combination with the claimed dosage of CEE.

2

66

Plunkett describes 0.600 mg as the preferred dosage of CEE (Plunkett, Table 1A) and 2.5 mg as the preferred dosage of MPA (Plunkett, Table 1B) - dosages which are far higher than the 1.5 mg of MPA and the about 0.3 to about 0.45 mg of CEE claimed in the present application. Indeed, as described in the application, it was unexpectedly demonstrated by clinical studies that providing a daily dosage of 1.5 mg MPA in combination with CEE in the claimed ranges would effectively inhibit the development of endometrial hyperplasia. It was furthermore unexpected that the claimed dosage combination of CEE and MPA rapidly reduced the number and severity of hot flushes to essentially the same extent as a much higher dose combination containing 0.625 mg CEE and 2.5 mg MPA.

The findings from the clinical studies provide evidence for a therapeutic role for MPA beyond endometrial protection, when lower dosages of CEE are used. (See Utian et al., Fertility & Sterility, 75(6):1065-1079 (2001)). This new evidence suggests that dosages of CEE combined with MPA, along the lines of the invention, may be better than equivalent dosages of unopposed CEE for vasomotor symptom relief. These results are in contrast with prior studies with the most common dosages of CEE, which reported no additional effect of MPA on vasomotor symptom relief. (See Greendale et al., Obstet. Gynecol., 92:982-988 (1998)). While not wishing to be bound by theory, at low CEE dosages, MPA may enhance the efficacy of CEE in relieving vasomotor symptoms. Thus, Applicant's invention may create a significant benefit for a patient while reducing the risks.

In rejecting a claim under 35 U.S.C. § 103(a), the Examiner bears the initial burden of presenting a prima facie case of obviousness. In re Rijckaert, 9 F.3d 1531, 1532, 28 U.S.P.Q.2d 1955, 1956 (Fed. Cir. 1993). To establish prima facie obviousness, the prior art reference(s) must teach or suggest all of the claim limitations. In re Royka, 490 F.2d 981, 180 U.S.P.Q. 580 (C.C.P.A. 1974). Because Plunkett does not teach, or suggest, using 1.5 mg MPA in combination with about 0.3 to about 0.45 mg CEE for relief of vasomotor symptoms of menopause, it is respectfully submitted that Plunkett does not render claim 7 obvious.

Moreover, it is respectfully submitted that In re Fine, supra, makes plain that the Office Action's generalized assertions that it would have been obvious to modify the reference does not properly support a § 103 rejection. It is respectfully submitted that the

3

Office Action reflects an inappropriate "obvious to try" standard, and therefore does not reflect the proper evidence to support an obviousness rejection based on the references relied upon. In particular, the Court in the case of In re Fine stated that:

> The PTO has the burden under section 103 to establish a *prima facie* case of obviousness. It can satisfy this burden only by showing some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references. This it has not done. . . .
>
> . . . .
>
> Instead, the Examiner relies on hindsight in reaching his obviousness determination. . . . One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention.

In re Fine, 5 U.S.P.Q.2d at 1598 to 1600 (citations omitted; italics in original).

That is exactly the case here, since it is believed and respectfully submitted that the Office Action offers no evidence, but only conclusory hindsight, reconstruction and speculation.

There is no evidence that Plunkett provides the features and benefits specified by the invention of claim 7. Specifically, Plunkett does not recognize the importance of balancing the dosages of MPA and CEE at any levels, much less that the selection of 1.5 mg MPA would provide the beneficial results achieved in combination with about 0.3 to about 0.45 mg CEE. It is therefore respectfully submitted that claim 7 is allowable for these reasons.

Claims 11, 12 and 69 depend from claim 7, and it is respectfully submitted that Plunkett does not render obvious these dependent claims for at least the same reasons given above in support of the patentability of claim 7.

Attached hereto is a marked-up version of the changes made to the claims by the current Amendment. The attached page is captioned "**Version with Markings to Show Changes Made.**"

4

Applicant has been contacted by a third party regarding the inventorship of this application. The third party has stated that he believes himself to be an inventor of subject matter disclosed in the application. Applicant has investigated the inventorship of the subject matter disclosed in this application and has undertaken an initial exchange of documents and information with the third party. Pursuant to its investigation on this matter, Applicant has determined that James Pickar and Michael S. Dey, employees of Wyeth, are the joint inventors of this application and that Mr. Dey previously was inadvertently omitted as an inventor. Concurrently with filing the RCE and this Amendment, Applicant is submitting a petition to correct the inventorship of this application under 37 C.F.R. § 1.48(a) by adding Mr. Dey as an inventor. Based on the information gathered to date, Applicant does not believe that the third party is an inventor of the subject matter claimed herein. Applicant has requested a written statement from the third party detailing the reasons why the third party believes he may be an inventor. To date, the third party has not provided such a statement. While Applicant believes that the third party is not an inventor of the subject matter claimed in the application, Applicant plans to make an additional submission to the PTO with further details after undertaking additional investigation, so that the PTO, pursuant to 35 U.S.C. § 116, may provide its determination regarding the inventorship of the application. Applicant will again seek the third party's written submission and will provide such to the PTO when obtained.

It is therefore respectfully submitted that all pending claims are allowable. All issues raised by the Examiner having been addressed, reconsideration and allowance of the claims are respectfully requested. If for any reason the Examiner believes that contact with Applicant's attorney would advance prosecution, he is invited to contact the undersigned at the telephone number given below.

Respectfully Submitted,

Dated: 9/5/02

Telephone: (610) 902-2635

By:_____

Arnold S. Milowsky
Reg. No. 35,288

5

69

Application Serial No. 09/808,878

## VERSION WITH MARKINGS TO SHOW CHANGES MADE

7.    (Amended) A method of treating or inhibiting vasomotor symptoms in a perimenopausal, menopausal, or postmenopausal women in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated equine estrogens, USP and a daily dosage of about 1.5 mg of medroxyprogesterone acetate, wherein the daily dosage of conjugated equine estrogens is between about 0.45 mg and about 0.3 mg.

11.    (Amended) The method according to claim [10] 7, wherein the daily dosage of conjugated equine estrogens, USP is about 0.3 mg.

12.    (Amended) The method according to claim [8] 7, wherein the vasomotor symptom is hot flushes.

69.    (Amended) The method according to claim [10] 7, wherein the daily dosage of conjugated equine estrogens, USP is about 0.45 mg.

6

70



SEP 0 5 2002

RECEIVED
SEP 1 0 2002
TECH CENTER 1600/2900

**U.S. DEPARTMENT OF COMMERCE**
**PATENT AND TRADEMARK OFFICE**

| SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT | Docket Number: AM100226 | | |
|---|---|---|---|
| Application Number 09/808,878 | Filing Date March 15, 2001 | Examiner M. Bahar | Art Unit 1617 |
| Invention Title HORMONE REPLACEMENT THERAPY | | Inventor(s) James H. PICKAR | |

Assistant Commissioner
for Patents
Washington D.C. 20231

I hereby certify that this paper and the documents referred to as enclosed therein are being deposited with the United States Postal Service on the date written below in an envelope as "Express Mail Post Office to Addressee" Mailing Label Number ET302327715US addressed to the Commissioner for Patents, Box RCE, Washington, DC 20231

*Roxanne S. Kelly*
Roxanne L. Kelly

*September 5, 2002*
Date

1. In accordance with the duty of disclosure under 37 C.F.R. § 1.56 and in conformance with the procedures of 37 C.F.R. §§ 1.97 and 1.98 and M.P.E.P. § 609, attorney for Applicant hereby brings the following references to the attention of the Examiner. The references are listed on the attached modified PTO form 1449. It is respectfully requested that the information be expressly considered during the prosecution of this application, and that the references be made of record therein and appear among the "References Cited" on any patent to issue therefrom.

2. A copy of each patent, publication or other information listed on the modified PTO form 1449 is enclosed, except as otherwise indicated on the modified PTO form 1449.

3. It is believed that no fees are due in connection with this Information Disclosure Statement. However, should any fees be due, the Commissioner is authorized to charge Deposit Account No. 01-1425 for such fees. A duplicate copy of this communication is enclosed for charging purposes.

Dated:   September 5, 2002

By: _____
Arnold S. Milowsky
Reg. No. 35,288

Telephone: (610) 902-2635

71

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

| PETITION TO CORRECT INVENTORSHIP UNDER 37 C.F.R. §1.48(a) | Docket Number: AM100226 | | |
|---|---|---|---|
| Application Number 09/808,878 | Filing Date March 15, 2001 | Examiner M. Bahar | Art Unit 1617 |
| Invention Title HORMONE REPLACEMENT THERAPY | Inventor(s) PICKAR, J. | | |

Address to:
Assistant Commissioner
 for Patents
Washington D.C. 20231

I hereby certify that this paper and the documents referred to as enclosed therein are being deposited with the United States Postal Service on the date written below in an envelope as "Express Mail Post Office to Addressee" Mailing Label Number ET302327715US addressed to the Commissioner for Patents, Box RCE, Washington, DC 20231

*Roxanne J. Kelly*
Roxanne L. Kelly

*September 5, 2002*
Date

## PETITION TO CORRECT INVENTORSHIP UNDER 37 C.F.R. § 1.48(a)

Applicant hereby petitions to correct the inventorship of the above-identified application under 37 C.F.R. § 1.48(a) by adding the following previously unnamed person as an inventor of this application:

**Michael S. Dey**
**47 Righters Mill Road**
**Narberth, Pennsylvania 19072**
**Citizenship: United States**

As required by 37 C.F.R. § 1.48(a), Applicants hereby attach the following:

(1)   A statement from **Michael S. Dey** that the error in inventorship occurred without deceptive intent on his part;

(2)   A declaration executed by the actual inventors; and

(3)   Written consent of the assignee, **Wyeth**.

(4)   Certificate Under 37 C.F.R. 3.73 (b) with attached Assignment.

Please charge the appropriate fee of **$130.00** as set forth in 37 C.F.R. § 1.17 to the Deposit Account of Wyeth, Deposit Account No. 01-1425. Applicants hereby authorize that any additional charges or credits be charged to this account as well. A duplicate copy of this paper is attached.

Dated: September 5, 2002                    By: _____

                                            Arnold S. Milowsky (Reg. No. 35,288)

Telephone: (610) 902-2635

73

[AM100226]

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| APPLICANT(S) | : | PICKAR, J. |
| SERIAL NO. | : | 09/808,878 |
| FILED | : | March 15, 2001 |
| TITLE | : | HORMONE REPLACEMENT THERAPY |
| ART UNIT | : | 1617 |
| EXAMINER | : | M. Bahar |

### STATEMENT OF INVENTORSHIP

The inventorship error of failing to include MICHAEL S. DEY as an inventor of the above-identified patent occurred without any deceptive intention on the part of myself or MICHAEL S. DEY.

Dated: _8/30/02_

_____
JAMES H. PICKAR

74

[AM100226]

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| APPLICANT(S) | : | PICKAR, J. |
| SERIAL NO. | : | 09/808,878 |
| FILED | : | March 15, 2001 |
| TITLE | : | HORMONE REPLACEMENT THERAPY |
| ART UNIT | : | 1617 |
| EXAMINER | : | M. Bahar |

## STATEMENT OF INVENTORSHIP

I, MICHAEL S. DEY, declare that I am a joint inventor in the above-identified patent. The inventorship error of failing to include myself as a joint inventor of the above-identified patent occurred without any deceptive intention on the part of myself or the joint inventor, JAMES H. PICKAR.

Dated: _Aug 30, 2002_                              _Michael S Dey_
                                                   MICHAEL S. DEY

[AM100226]

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| APPLICANT(S) | : | PICKAR, J. |
| SERIAL NO. | : | 09/808,878 |
| FILED | : | March 15, 2001 |
| TITLE | : | HORMONE REPLACEMENT THERAPY |
| ART UNIT | : | 1617 |
| EXAMINER | : | M. Bahar |

**CONSENT OF ASSIGNEE TO CHANGE OF INVENTORSHIP
IN PATENT APPLICATION PURSUANT TO 37 C.F.R. §§ 1.48 AND 3.73(b)**

Pursuant to 37 C.F.R. §§ 1.48 and 3.73(b), Wyeth, a corporation, hereby states that it is the assignee of the entire right, title and interest in the application, identified above, by virtue of a chain of title from the original named inventor to the current assignee, as shown below:

1. **Assignment**
   From: James H. Pickar
   To:    American Home Products Corporation
   The document was recorded in the Patent Office at Reel 012116, Frame 0261.

2. **Name Change**
   From: American Home Products Corporation
   To:    Wyeth
   The document was recorded in the Patent Office at Reel 012828, Frame 0928.

Wyeth hereby consents to the amendment of the inventorship of U.S. Patent Application No. 09/808,878, filed March 15, 2001, adding Michael S. Dey as coinventor, as requested in the accompanying papers. The undersigned (whose title is supplied below) is empowered to sign this statement on behalf of the assignee.

Date: September 4, 2002

Signature

Gale F. Matthews
Name

Assistant Secretary
Title

76

 

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/808,878 | 03/15/2001 | James H. Pickar | AM100226 | 5270 |

7590          10/01/2002

Egon E. Berg
American Home Products Corporation
Patent Law Department
Five Giralda Farms
Madison, NJ  07940

| EXAMINER |
|---|
| BAHAR, MOJDEH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 10/01/2002      *10*

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 07-01)

77

| ***Office Action Summary*** | **Application No.** 09/808,878 | **Applicant(s)** PICKAR, JAMES H. |
|---|---|---|
| | **Examiner** Mojdeh Bahar | **Art Unit** 1617 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>05 September 2002</u> .

2a)☐ This action is **FINAL.**    2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-7,11,12 and 15-69</u> is/are pending in the application.

    4a) Of the above claim(s) <u>1-6 and 15-68</u> is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>7,11,12 and 69</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

11)☐ The proposed drawing correction filed on _____ is: a)☐ approved b)☐ disapproved by the Examiner.

    If approved, corrected drawings are required in reply to this Office action.

12)☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____ .

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

14)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

    a) ☐ The translation of the foreign language provisional application has been received.

15)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

| | |
|---|---|
| 1)☐ Notice of References Cited (PTO-892) | 4)☐ Interview Summary (PTO-413) Paper No(s). _____ . |
| 2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948) | 5)☐ Notice of Informal Patent Application (PTO-152) |
| 3)☒ Information Disclosure Statement (PTO-1449) Paper No(s) <u>9</u> . | 6)☐ Other: . |

Application/Control Number: 09/808,878                                    Page 2
Art Unit: 1617

## DETAILED ACTION

### Continued Examination Under 37 CFR 1.114

A request for continued examination under 37 CFR 1.114, including the fee set forth in

37 CFR 1.17(e), was filed in this application after final rejection. Since this application is

eligible for continued examination under 37 CFR 1.114, and the fee set forth in 37 CFR 1.17(e)

has been timely paid, the finality of the previous Office action has been withdrawn pursuant to

37 CFR 1.114. Applicant's submission filed on 5 September 2002 has been entered.

Claims 1-6 and 15-68 drawn to an invention non-elected with traverse in Paper No. 5.

Claims 7, 11, 12 and 69 are examined herein in so far as they read on the elected specie of hot

flashes.

### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

Claims 7, 11, 12 and 69 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Plunkett et al. (USPN RE 36,247).

Plunkett et al. (USPN RE 36,247) teaches a method of treating hot flashes comprising

administering continuously and uninterruptedly both progestogen and estrogen in daily dosage

units, see claims 21-34, col. 3, lines 51-59 and col.8 lines 62-64 in particular. Plunkett et al.

(USPN RE 36,247) also teaches conjugated equine estrogen/medroxyprogesterone as one of the

estrogen/progestogen combinations useful in its method, see claims 21-34. Plunkett teaches the

79

Application/Control Number: 09/808,878                    Page 3
Art Unit: 1617

minimum and maximum dosages for medroxyprogesterone and conjugated equine estrogens to

be 1 mg/day and 15 mg/day and 0.300 and 2.5 mg/day (preferred dosage of 0.300-0.600 mg)

respectively, see claims 34-35, see also Table 1A, col.4, in particular.

Plunkett et al. does not particularly teach the dosages of conjugated equine

estrogen/medroxyprogesterone claimed herein.

It would have been obvious to one of ordinary skill in the art at the time the invention

was made to employ conjugated equine estrogen/medroxyprogesterone in the specific dosages

claimed herein in a method of treating hot flashes.

One of ordinary skill in the art would have been motivated to employ conjugated equine

estrogen/medroxyprogesterone in the specific dosages claimed herein in a method of treating hot

flashes because they (dosages herein) fall within the therapeutic ranges of the conjugated equine

estrogen/medroxyprogesterone taught by the prior art. Optimization of amounts is within the

purview of the Skilled Artisan, and is therefore obvious absent evidence to the contrary. No such

evidence is seen.

### *Response to Arguments*

Applicant's arguments filed September 5, 2002 have been fully considered but they are

not persuasive. Applicant first argues that "Plunkett does not describe daily dosage of about 1.5

mg MPA at all." Plunkett teaches that MPA can be employed at a minimum dosage of 1.0 mg

and maximum dosage of 15 mg. Note that the claimed dosage herein, 1.5 mg, falls within the

Plunkett range. Applicant further argues that the dosage of CEE taught in the prior art is far

higher than the amount claimed herein. Note that the claimed dosage herein, 0.3-0.45 mg of

CEE, falls within the dosage range of Plunkett, 0.300-0.600 mg, see claim 35 of Plunkett.

80

Application/Control Number: 09/808,878                                    Page 4
Art Unit: 1617

Applicant draws the examiner's attention to data presented in the specification showing

the efficacy of the dosages herein versus that of the common daily dosages of Premarin and

MPA. Note that in order to overcome obviousness applicant must demonstrate unexpected

results in comparison with the closest prior art, i.e., Plunkett. No such comparative data has been

provided.

In response to applicant's argument that the examiner's conclusion of obviousness is

based upon improper hindsight reasoning, it must be recognized that any judgment on

obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning. But so

long as it takes into account only knowledge which was within the level of ordinary skill at the

time the claimed invention was made, and does not include knowledge gleaned only from the

applicant's disclosure, such a reconstruction is proper. See *In re McLaughlin*, 443 F.2d 1392,

170 USPQ 209 (CCPA 1971).

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Mojdeh Bahar whose telephone number is (703) 305-1007. The

examiner can normally be reached on (703) 305-1007 from Monday to Friday from 9:00 a.m. to

5:00 p.m.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Sreeni Padmanabhan, can be reached on (703) 305-1877. The fax phone number for

the organization where this application or proceeding is assigned is (703) 308-4556.

Any inquiry of a general nature or relating to the status of this application or proceeding

should be directed to the receptionist whose telephone number is (703) 308-1235.

Mojdeh Bahar
Patent Examiner

81                                                          SREENI PADMANABHAN
                                                           PRIMARY EXAMINER    9|24|12

Application/Control Number: 09/808,878

Art Unit: 1617

September 16, 2002

Page 5

82

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | ATTY. DOCKET NO. AM100226 | SERIAL NO. 09/808226 |
| | APPLICANT James H. Pickar | |
| | FILING DATE March 15, 2001 | GROUP |

**U. S. PATENT DOCUMENTS**

| EXAMINER INITIAL | PATENT NUMBER | PATENT DATE (MM/DD/YY) | NAME | CLASS | SUBCLASS | FILING DATE* |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| EXAMINER INITIAL | DOCUMENT NUMBER | DATE (MM/DD/YY) | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**OTHER DOCUMENTS**

| EXAMINER INITIAL | | AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC. |
|---|---|---|
| MS | 1 | Giraud et al., Am. J. Obstet. Gynecol., *174(6)*, June 1996, 1708-1718 |
| | 2 | Sumino et al., Atherosclerosis, *148(2000)*, 189-195 |
| | 3 | Wolfe et al., Metabolism, *44(3)*, March 1995, 410-417 |
| M | 4 | Greendale et al., Obstet. Gynecol., *92(6)*, December 1998, 982-988 |

| EXAMINER | DATE CONSIDERED  09/52 |
|---|---|

EXAMINER: Initial if citation considered, whether or not citation is in conformance with M.P.E.P. 609; draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

83

RECEIVED
SEP 1 0 2002
TECH CENTER 1600/2900

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | ATTY. DOCKET NO. AM100226 | SERIAL NO. 09/808,878 |
|---|---|---|
| | APPLICANT James H. Pickar | |
| | FILING DATE March 15, 2001 | GROUP |

**U. S. PATENT DOCUMENTS**

| EXAMINER INITIAL | PATENT NUMBER | PATENT DATE (MM/DD/YY) | NAME | CLASS | SUBCLASS | FILING DATE* |
|---|---|---|---|---|---|---|
| MD | 5,547,948 | 08/20/1996 | Barcomb | | | |
| | 5,759,576 | 06/02/1998 | Barcomb | | | |
| MD | 5,759,577 | 06/02/1998 | Barcomb | | | |
| | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| EXAMINER INITIAL | DOCUMENT NUMBER | DATE (MM/DD/YY) | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | TRANSLATION NO |
|---|---|---|---|---|---|---|---|
| MD | EP 0 309 263 A1 | 03/29/89 | EP | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**OTHER DOCUMENTS**

| EXAMINER INITIAL | | AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC. |
|---|---|---|
| MD | | Wolfe et al., Am. J. Obstet. Gynecol., *178(4)*, April 1998, 787-792 |
| | | Wolfe et al., Maturitas, *33(2)*, 1999, 153-161 |
| | | Goisis, Minerva Ginecologica, *21*, 1969, 193-197 |
| MD | | MacLennan et al., Med. J. of Australia, *159*, July 1993, 102-106 |

| EXAMINER | DATE CONSIDERED 09/02 |
|---|---|

EXAMINER: Initial if citation considered, whether or not citation is in conformance with M.P.E.P. 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

84

OIPE
JC96
SEP 0 5 2002
PATENT & TRADEMARK OFFICE

RECEIVED
SEP 1 0 2002
TECH CENTER 1600/2900

| | | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | **ATTY. DOCKET NO.** AM100226 | **SERIAL NO.** 09/808,878 |
| | **APPLICANT** James H. Pickar | |
| | **FILING DATE** March 15, 2001 | **GROUP** |

**U. S. PATENT DOCUMENTS**

| EXAMINER INITIAL | PATENT NUMBER | PATENT DATE (MM/DD/YY) | NAME | CLASS | SUBCLASS | FILING DATE |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**FOREIGN PATENT DOCUMENTS**

| EXAMINER INITIAL | DOCUMENT NUMBER | DATE (MM/DD/YY) | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**OTHER DOCUMENTS**

| EXAMINER INITIAL | | AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC. |
|---|---|---|
| ML | 9 | Genant et al., Annals of Internal Med., 97, 1982, 699-705 |
| | 10 | Lindsay et al., Obstet. Gynecol., 63(6), June 1984, 759-763 |
| MV | 11 | Utian et al., Fertility Sterility, 75(6), June 2001, 1065-1079 |

| EXAMINER | DATE CONSIDERED 09/02 |
|---|---|

EXAMINER: Initial if citation considered, whether or not citation is in conformance with M.P.E.P. 609; draw line through citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

85



01855/115
(f rmerly AM100226)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| Applicants | : | PICKAR, J.; DEY, M. | **RECEIVED** |
| Serial No. | : | 09/808,878 | |
| Filed | : | March 15, 2001 | APR 1 0 2003 |
| Title | : | HORMONE REPLACEMENT THERAPY | **TECH CENTER 1600/2900** |
| Art Unit | : | 1617 | |
| Examiner | : | M. Bahar | |

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner for Patents, Washington, D.C. 20231 on

Date: _April 1, 2003_

Signature: _Thomas McClef_

Thomas J. Meloro (Reg. No. 33,538)

Commissioner for Patents
Washington, D.C. 20231

### SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

1.     In accordance with the duty of disclosure under 37 C.F.R. § 1.56 and in conformance with the procedures of 37 C.F.R. §§ 1.97 and 1.98 and M.P.E.P. § 609, attorneys for Applicant hereby bring the following reference to the attention of the Examiner. The references are listed on the attached modified PTO Form No. 1449. It is respectfully requested that the information be expressly considered during the prosecution of this application, and that the reference be made of record therein and appear among the "References Cited" on any patent to issue therefrom.

2.     A copy of each patent, publication or other information listed on the modified PTO form 1449 is enclosed.

3.     The Commissioner is hereby authorized to charge payment of the 37 C.F.R. §1.17(p) (submission of an information disclosure statement under §1.97(c)) fee of **$180.00** and any additional fees that may be required to the deposit account of **Kenyon & Kenyon**, deposit account number **11-0600**.

Respectfully submitted,

KENYON & KENYON

Dated: _April 1, 2003_

_Thomas McClef_

Thomas J. Meloro
Reg. No. 33,538

86   One Broadway
New York, N.Y. 10004
(212) 425-7200



[AM100226]

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| APPLICANT(S) | : | PICKAR, J.; DEY, M. |
| SERIAL NO. | : | 09/808,878 |
| FILED | : | March 15, 2001 |
| TITLE | : | HORMONE REPLACEMENT THERAPY |
| ART UNIT | : | 1617 |
| EXAMINER | : | M. Bahar |

RECEIVED
TECH CENTER 1600/2900
APR 1 0 2003

Assistant Commissioner
for Patents
Washington, D.C. 20231

I hereby certify that this correspondence is being deposited with the
United States Postal Service as first class postage as first class
mail in an envelope addressed to: Commissioner for Patents,
Washington, D.C. 20231, on

Date ___4/1/03___

Signature ___Elzabeth Violet___

KENYON & KENYON

## RESPONSE

Sir:

This paper addresses the Office Action mailed October 1, 2002. Also

submitted herewith is a Declaration under 37 C.F.R. § 1.132 of Rogerio A. Lobo, M.D.

Reconsideration and allowance of the above-identified application are respectfully requested

in view of the declaration and the following remarks.

Accompanying this response is a timely request for a three month extension of

time under C.F.R. § 1.136, for a period up to and including April 1, 2003.

## REMARKS

Claims 7, 11, 12 and 69 are now pending in the above-referenced application.

Claims 7, 11, 12 and 69 were rejected under 35 U.S.C. § 103 as allegedly

unpatentable over U.S. Patent No. 4,826,831, Re 36,247 (hereinafter, "Plunkett"). In

rejecting claims 7, 11, 12 and 69, the Examiner relied on the reference in Plunkett to combine

87

conjugated equine estrogens ("CEE") with medroxyprogesterone acetate ("MPA"), and

specifically pointed to claims 21-34, which claim methods using combinations of estrogens

and progestins over broad dosage ranges.   Plunkett provides lists of possible estrogens and

progestins. Tables 1A and 1B disclose twenty estrogens and seventeen progestins

respectively and recite the maximum, minimum and preferred dosage levels for each.

Plunkett lists CEE/MPA as one of twenty possible estrogen/progestin combinations. (Col. 6

line 46 - Col. 7 line 14).

Applicant's claims are drawn specifically to a method of treating or inhibiting

vasomotor symptoms comprising continuously and uninterruptedly providing a daily

dosage of about 1.5 mg MPA in combination with a dosage of between about 0.3 and about

0.45 mg CEE, USP. As the Examiner noted, "Plunkett et al. does not particularly teach the

dosages of conjugated equine estrogen/medroxyprogesterone claimed herein." (Office

Action, p. 3). There is nothing in Plunkett to teach or suggest the selection of 1.5 mg MPA

for the treatment of vasomotor symptoms in combination with about 0.3 to about 0.45 mg

CEE.

The Examiner states that Applicant has not provided any data demonstrating

unexpected results in comparison with Plunkett. As discussed below, the Examiner has not

even met the initial burden of presenting a prima facie case of obviousness as required by the

case law. Moreover, Applicant respectfully disagrees that Applicant has not provided data

demonstrating unexpected results. Plunkett describes 0.600 mg as the preferred dosage of

CEE (Table 1A) and 2.5 mg as the preferred dosage of MPA (Table 1B).   This preferred

combination of CEE and MPA represents the closest teaching within Plunkett to the

Applicant's claimed invention. This preferred combination essentially has become the

2

88

standard, commercially available dosage -- 0.625 mg CEE in combination with 2.5 mg MPA ("PREMPRO").  Thus, Applicant properly has provided data in the application from a clinical study showing unexpected results of the claimed invention of lower dosages of CEE and MPA in comparison with the preferred dosages of CEE and MPA disclosed in Plunkett. Applicant submits herewith a Declaration under 37 C.F.R. § 1.132 of Rogerio A. Lobo, M.D. to further support its showing of unexpected results.

It was understood by those skilled in the art for the past 20 years that 0.625 mg CEE was the minimum required to relieve vasomotor symptoms ("hot flushes") (Lobo Declaration ¶ 8).   The dosage of 2.5 mg was understood as the minimum amount needed to oppose 0.625 mg CEE and protect the endometrium.  A double blinded clinical study, the Women's Health, Osteoporosis, Progestin, Estrogen study ("H.O.P.E. study"), was conducted to evaluate the safety and efficacy of lower dosages of CEE and MPA with the standard dosages. The H.O.P.E. study unexpectedly demonstrated that providing a much lower daily dosage of 1.5 mg MPA in combination with 0.45 or 0.30 mg CEE reduced the number and severity of hot flushes to essentially the same extent as the standard, commercially available dose combination of 0.625 mg CEE and 2.5 mg MPA. (Lobo Declaration ¶ 14).  It was expected by those skilled in the art that there may be a dose response, such that the lower combination doses of CEE and MPA would exhibit some effect in reducing the number and severity of hot flushes, but far less of an effect than the standard dose of 0.625 mg CEE plus 2.5 mg MPA. (Lobo Declaration ¶ 12).   The results of the H.O.P.E. study confounded those expectations.

3

Additionally, the H.O.P.E. study demonstrated that at these particular low dosage combinations, MPA has an additive effect on the relief of vasomotor symptoms. (Lobo Declaration ¶ 15).  Previous studies showed that MPA had no additive effect on vasomotor relief when the common dose of 0.625 mg CEE was used.  (See Greendale et al., Obstet. Gynecol., 92:982-988 (1998)).  The H.O.P.E. study surprisingly demonstrated that at these low doses MPA may contribute to ameliorating vasomotor symptoms.  (Lobo Declaration ¶ 15).  Plunkett does not teach that an additive vasomotor effect is exhibited by the low dose of 1.5 mg MPA to the lower doses of about 0.30 to 0.45 mg CEE.

The H.O.P.E. study also demonstrated that providing a daily dosage of 1.5 mg MPA effectively inhibited the development of endometrial hyperplasia when opposing the lower doses, 0.30 to 0.45 mg CEE.  (Lobo Declaration ¶ 16).  The effect of the endometrium was not significantly different with these lower dosages than the standard combination containing 2.5 mg MPA.  Prior to the H.O.P.E. study, the dosage of MPA necessary to provide endometrial protection with lower dosages of CEE was unknown.  (Lobo Declaration ¶ 16).

Applicant also maintains that the Examiner has not even met the initial burden of presenting a prima facie case of obviousness.  In re Rijckaert, 9 F.3d 1531, 1532, 28 U.S.P.Q.2d 1955, 1956 (Fed. Cir. 1993).  To establish prima facie obviousness, the prior art reference(s) must teach or suggest all of the claim limitations.  In re Royka, 490 F.2d 981, 180 U.S.P.Q. 580 (C.C.P.A. 1974).  Because Plunkett does not teach, or suggest, using 1.5 mg MPA in combination with about 0.3 to about 0.45 mg CEE for relief of vasomotor symptoms of menopause, it is respectfully submitted that Plunkett does not render claim 7

4

obvious. Plunkett discloses thousands of possible estrogen/progestin combinations. The preferred dosages of MPA and CEE that Plunkett discloses are much higher than the dosages claimed in the present invention. It would not have been obvious at the time of the invention to select the lower dosage combinations claimed herein. Applicant respectfully submits that the Office Action employs a reconstruction based upon improper hindsight reasoning. In re Fine, 837 F.2d 1071, 1075 (Fed. Cir. 1988). At best, it would have been obvious to try the Applicant's claimed combination, but it has long been held that "obvious to try" is not the appropriate standard. Therefore, the Office Action does not reflect the proper evidence to support an obviousness rejection based on the reference relied upon. In any event, as discussed above, in order to facilitate prosecution, the accompanying Lobo Declaration, submitted under 37 C.F.R. § 1.132, is believed to demonstrate convincingly the unexpected results obtained with Applicants' invention.

Claims 11, 12 and 69 depend from claim 7, and it is respectfully submitted that Plunkett does not render obvious these dependent claims for at least the same reasons given above in support of the patentability of claim 7.

5

It is respectfully submitted that all pending claims are allowable. All issues raised by the Examiner having been addressed, reconsideration and allowance of the claims are respectfully requested. If for any reason the Examiner believes that contact with Applicant's attorney would advance prosecution, he is invited to contact the undersigned at the telephone number given below.

Respectfully submitted,

Dated: *April 1, 2003*

Thomas J. Meioro
Reg. No. 33,538

Kenyon & Kenyon
One Broadway
New York, N.Y. 10004
(212) 425-7200

6

92

[AM100226]

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| APPLICANT(S) | : | PICKAR, J., DEY M. |
| SERIAL NO. | : | 09/808,878 |
| FILED | : | March 15, 2001 |
| TITLE | : | HORMONE REPLACEMENT THERAPY |
| ART UNIT | : | 1617 |
| EXAMINER | : | M. Bahar |

Assistant Commissioner
  for Patents
Washington, D.C. 20231

## DECLARATION UNDER 37 C.F.R. § 1.132

SIR:

I, ROGERIO A. LOBO, M.D., declare as follows:

1.    I am currently a Professor of Obstetrics & Gynecology at the Department of Obstetrics and Gynecology, Columbia University in New York, New York, and I served as Rappleye Professor and Chairman of the Department of Obstetrics and Gynecology from 1995 until July 2002. I received a medical degree from Georgetown University Medical School in 1974. I completed an internship from 1974 to 1975 and a residency from 1975 to 1978 at the University of Chicago, Department of Obstetrics & Gynecology. I was a Clinical Research Fellow at the University of Southern California Medical Center in Los Angeles, California from 1978 to 1980.

2.    From 1978 until 1995, I held a number of academic medical positions at the University of Southern California, Los Angeles, California. From 1978 to 1980, I was a Clinical Instructor, Division of Reproductive Endocrinology and Infertility, Department of

93



Obstetrics and Gynecology. I was an Assistant Professor, Department of Obstetrics & Gynecology from 1980 to 1984, an Associate Professor from 1984 to 1988, and a Professor from 1988 to 1995. From 1984 to 1995, I was Chief and Director of the Division of Reproductive Endocrinology and Infertility.

3.    In the past twenty-three years, I have been an author or co-author of at least 313 papers published in peer-reviewed journals, 99 book chapters and 314 abstracts, and have been an editor of 25 books. Many of these publications are in the area of the menopause and treatments of the symptoms of menopause including hormone replacement therapy. (See, e.g., Rogerio A. Lobo, ed., <u>Treatment of the Postmenopausal Woman: Basic and Clinical Aspects</u> (2d ed., Philadelphia, PA: Lippincott Williams & Wilkins 1999)).

4.    I am a member of a number of professional societies, including the International Menopause Society and the North American Menopause Society. I have served as a consultant to and have served on the editorial board of numerous medical journal specializing in obstetrics and gynecology, including *Obstetrics and Gynecology*, *The Journal of Reproductive Medicine* and *Fertility and Sterility*. Additional acts about my background and qualifications including a list of my publications are set forth in my curriculum vitae, attached as Exhibit A.

5.    My private practice consists of gynecology with a focus on the treatment of premenopausal, menopausal and postmenopausal women. I have also participated in a number of clinical studies evaluating various treatments, including hormone replacement therapy, for the symptoms of menopause including hot flushes and decreased bone density.

6.    By way of background, menopause generally refers to the cessation of the menses and ovarian function. In other words, the ovaries no longer produce estrogen. Approximately one-third of a woman's life is spent in the estrogen-deficient postmenopausal

state. Symptoms of estrogen deficiency include hot flushes, vaginal atrophy, depression, decrease in bone mass and changes in blood lipid levels, which may be precursors to cardiovascular diseases. Conjugated equine estrogens ("CEE") have been prescribed for over 50 years to treat these symptoms. However, for a woman with an intact uterus, estrogen therapy has been shown to increase the risk of endometrial hyperplasia (abnormalities in the cells that are a precursor to endometrial carcinoma) and endometrial carcinoma (endometrial cancer). The risk is substantially reduced when a progestin is administered concurrently.

       7.     The Postmenopausal Estrogen/Progestin Interventions (PEPI) trial demonstrated that estrogen-progestin combinations protect against endometrial hyperplasia. (See The Writing Group for the PEPI Trial, "Effects of hormone replacement therapy on endometrial histology in postmenopausal women. The Postmenopausal Estrogen/Progestin Interventions (PEPI) Trial," JAMA 275(5):370-5 (1996)). The PEPI trial involved 596 healthy postmenopausal women aged 45 to 74 years at seven clinical centers in the U.S. from 1987 to 1993. The women were randomly assigned to one of five treatment groups: (1) a placebo; (2) 0.625 mg CEE daily; (3) 0.625 mg CEE daily plus 10 mg of a progestin, medroxyprogesterone acetate ("MPA") for 12 days per month; (4) 0.625 mg CEE daily plus 2.5 mg MPA daily[1]; or (5) 0.625 mg of estrogen daily plus 200 mg of a natural (micronized) progesterone for 12 days per month. A large proportion of women with a uterus who received unopposed 0.625 mg CEE developed endometrial hyperplasia. However, the addition of a progestin, 2.5 mg MPA, to the 0.625 mg CEE provided protection of the endometrium.

       8.     For the past 20 years, 0.625 mg CEE has been accepted as the standard dosage of estrogen necessary to relieve the symptoms of menopause, including hot flushes

---

[1]    This is the regimen used in PREMPRO, Wyeth's commercially-marketed combination low dose hormone replace therapy.

and bone loss. (See, e.g., Lindsay et al., <u>Obstetrics and Gynecology</u>, 63:759-763 (1984)).

The dosage of 2.5 mg of MPA has been recognized as the minimum amount needed to

oppose 0.625 mg CEE and protect the endometrium. This combination of 0.625 mg CEE

plus 2.5 mg MPA daily has been the most commonly prescribed hormone replacement

therapy regimen in the United States. (See Archer et al., <u>Fertility and Sterility</u>, 75:1080-1087

(2001)).

       9.     A double blind clinical study of postmenopausal women was

conducted using combinations of conjugated equine estrogens ("CEE") and the progestin,

medroxyprogesterone acetate ("MPA"). Patients received continuous and uninterrupted

treatment for 13 or 26 cycles. This study is referred to as the Women's Health, Osteoporosis,

Progestin, Estrogen study ("H.O.P.E. study"). The study was conducted at 57 centers across

the United States and included 2,673 healthy postmenopausal women aged 40 to 65. I

worked with other scientists and doctors to develop the clinical protocol for the H.O.P.E.

study and was involved as a trial investigator.

       10.    The objectives of the H.O.P.E. study were to evaluate the safety and

efficacy of lower doses of Premarin and MPA in reducing the incidence of endometrial

hyperplasia, relieving menopausal symptoms and maintaining an acceptable metabolic

profile. Another sub-part of the study focused on bone mineral density and was conducted

over a 26 cycle period.

       11.    The doses used in the H.O.P.E. study consisted of eight regimens

administered daily: (1) 0.625 mg CEE; (2) 0.45 mg CEE; (3) 0.3 mg CEE; (4) 0.625 mg CEE

plus 2.5 mg MPA ("PREMPRO"); (5) 0.45 mg CEE plus 2.5 mg MPA; (6) 0.45 mg CEE plus

1.5 mg MPA; (7) 0.3 mg CEE plus 1.5 mg MPA; and (8) a placebo.

       12.    It was conventional wisdom that the dose of 0.625 mg CEE was the

minimum effective dose to relieve vasomotor symptoms ("hot flushes"). I and others

expected that the study would show that there would be a dose response such that the lower

combination doses of CEE and MPA would have some effect in reducing the number and

severity of hot flushes compared with the placebo, but far less of an effect than the standard

dose of CEE 0.625 plus 2.5 mg MPA. In fact, I and others were interested in seeing the

results of the various lower doses, but doubted the study was worth the economic effort.

13.     Relief of vasomotor symptoms was analyzed in patients who

experienced at least an average of 7 to 8 moderate-to-severe hot flushes per day during the 7-

day period just prior to the initiation of treatment in this study.

14.     It was very surprising and unexpected that the data from the H.O.P.E.

study demonstrated that all doses of CEE and MPA reduced the number and severity of hot

flushes experienced by the women in this study compared with women taking placebo. It

was unexpected that providing a daily dosage of 1.5 mg MPA in combination with the lower

doses, 0.45 or 0.30 mg, CEE, rapidly reduced the number and severity of hot flushes to the

same extent as the much higher and commercially available dose combination containing

0.625 mg CEE and 2.5 mg MPA.

15.     Moreover, at these particular low doses of 1.5 mg MPA, an additive

effect of vasomotor symptom relief is seen. The H.O.P.E. study demonstrated that dosages of

CEE and MPA may be better than equivalent dosages of unopposed CEE for vasomotor

symptom relief. Previous studies with various dosages of CEE showed no additive effect of

MPA on vasomotor relief. (See Greendale et al., Obstetrics and Gynecology, 92:982-988

(1998)). Instead, the presence of MPA was thought to be merely prophylactic (to prevent

endometrial cancer). The H.O.P.E. study surprisingly demonstrated that at these low doses

MPA may contribute to ameliorating the vasomotor symptoms.

97                                 5

16.     Prior to the H.O.P.E. study, the dosage of MPA necessary to provide endometrial protection with lower dosages of CEE was unknown.  We entered unchartered waters in conducting the H.O.P.E. study as to the endometrial risk posed by the lower daily dosage combinations of 0.45 or 0.3 mg CEE and 1.5 mg MPA.  The endometrial biopsies[2] evaluated as part of the H.O.P.E. study demonstrated that providing a daily dosage of 1.5 mg MPA effectively inhibited the development of endometrial hyperplasia when opposing the lower doses, 0.45 or 0.30 mg, CEE.  These biopsy results were not statistically different from the higher dose hormone replacement therapy combination containing 2.5 mg MPA. .

17.     The prior art Plunkett patent cited by the examiner is directed to combinations of various estrogens and progestins.  Plunkett lists a myriad of such combinations over a variety of dosage ranges, in both cyclic and continuous regimes.  There is nothing in the Plunkett patent that teaches one skilled in the art to select the combination of 1.5 mg MPA and about 0.3 to about 0.45 mg CEE for relief of vasomotor symptoms of menopause from the thousands of possible estrogen-progestin combinations.

18.     The preferred dosages of MPA and CEE that Plunkett discloses are 2.5 mg MPA and 0.600 mg CEE.  These dosages are much higher than the dosages claimed in the present invention -- 1.5 mg MPA and about 0.3 to about 0.45 mg CEE.

19.     Plunkett does not teach the importance of balancing the dosages of MPA and CEE, particularly at very low doses.  Specifically, Plunkett does not teach that the selection of 1.5 mg MPA would provide relief of vasomotor symptoms achieved in combination with about 0.3 to about 0.45 mg CEE

20.     Further, Plunkett does not teach that an additive vasomotor effect is exhibited by the low dose of MPA to the lower doses of CEE (0.3 to about 0.45 mg CEE).

---

[2]     An endometrial biopsy is a cell sample of the endometrium taken to evaluate whether any abnormal cells exist.

21.     In conclusion, the results of the H.O.P.E. study unexpectedly demonstrated that the combinations of a daily dosage of 1.5 mg MPA with 0.3 or 0.45 mg CEE are effective in treating vasomotor symptoms.  In my opinion, these dosage combinations would not have been obvious at the time of the invention to relieve vasomotor symptoms.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the patent or any reexamination certificate issued therefor.

Dated: _____                    _____

                                         ROGERIO A. LOBO, M.D.

99                          7

[AM100226]

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT(S)    :    PICKAR, J., DEY M.

SERIAL NO.    :    09/808,878

FILED    :    March 15, 2001

TITLE    :    HORMONE REPLACEMENT THERAPY

ART UNIT    :    1617

EXAMINER    :    M. Bahar

RECEIVED
APR 10 2003
TECH CENTER 1600/2900

Assistant Commissioner
  for Patents
Washington, D.C. 20231

## ASSOCIATE POWER OF ATTORNEY

I, Arnold S. Milowsky, an Attorney of Record in the captioned patent application, hereby appoint the following attorneys as Associate Attorneys of Record with full power to prosecute the above-identified patent application and to transact all business in the United States Patent and Trademark Office in connection therewith:

James Galbraith, Reg. No. 28,509

Thomas J. Meloro, Reg. No. 33,538

All correspondence related to this application should be sent to:

Thomas J. Meloro
KENYON & KENYON
One Broadway
New York, New York 10004
Telephone: (212) 425-7200
Facsimile: (212) 425-5288

Respectfully submitted,

Date: March 20, 2003    By:_____

Arnold S. Milowsky
Reg. No. 35,288

100

FROM KENYON&KENYON NYC                    (THU) 5. 29' 03 19:08/ST. 19:08/NO. 4864789096 P  2

[AM100226]

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT(S)      :      PICKAR, J.; DEY, M:

SERIAL NO.        :      09/808,878

FILED             :      March 15, 2001

TITLE             :      HORMONE REPLACEMENT THERAPY

ART UNIT          :      1617

EXAMINER          :      M. Bahar

Assistant Commissioner
for Patents
Washington, D.C. 20231

I hereby certify that this correspondence is being deposited with the United States Postal Service ... first class mail in an envelope addressed to: Commissioner for Patents, Washington, D.C. 20231. on

Date 4/1/03

Signature *Elizabeth Volek*

KENYON & KENYON

## RESPONSE

Sir:

This paper addresses the Office Action mailed October 1, 2002. Also submitted herewith is a Declaration under 37 C.F.R. § 1.132 of Rogerio A. Lobo, M.D. Reconsideration and allowance of the above-identified application are respectfully requested in view of the declaration and the following remarks.

Accompanying this response is a timely request for a three month extension of time under C.F.R. § 1.136, for a period up to and including April 1, 2003.

## REMARKS

Claims 7, 11, 12 and 69 are now pending in the above-referenced application.

Claims 7, 11, 12 and 69 were rejected under 35 U.S.C. § 103 as allegedly unpatentable over U.S. Patent No. 4,826,831, Re 36,247 (hereinafter, "Plunkett"). In rejecting claims 7, 11, 12 and 69, the Examiner relied on the reference in Plunkett to combine

101

Received from < 2124255288 > at 5/29/03 7:07:12 PM [Eastern Daylight Time]



KENYON
&
KENYON
Intellectual Property Law

One Broadway
New York, NY 10004-1050
212.425.7200
Fax 212.425.5288

## Fax Transmission

From:        Monica E. Zombori          Date:    May 29, 2003

Direct Dial:   212.908.6373             Fax:     212.425.5288

Client/Matter: 01855/115                Total number of pages:
                                        (including cover)

*Please deliver to:*

| Name | Company | Fax | Phone |
|------|---------|-----|-------|
| Examiner M. Bahar | U.S. Patent and Trademark Office | 703-746-5235 | 703-305-1007 |

FOR:
U.S. Patent Apl. Serial No.                  09/808,878
~~International~~ Filing Date:                March 15, 2001

DOCUMENTS:
Re-sending copy of Response to Office Action only, and Declaration (w/o exhibits). The
Response sent in the previous fax had some pages out of order. Please refer to ~~the~~ copy of the
Response.                                                          *This*

If you need anything additional, please do not hesitate to contact us.

X Original will not follow □ Original will follow by □ Regular Mail  □ Overnight Delivery  □ Hand Delivery

The information contained in this facsimile transmission, including any attachments, is subject to the attorney-client privilege, the attorney work product privilege or is confidential information intended only for the use of the named recipient. If the reader of this Notice is not the intended recipient or the employee or agent responsible for delivering this transmission to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone , so that we may arrange for its return or destruction at our cost. Thank you.

New York   Washington, DC   Silicon Valley   www.kenyon.com

Received from < 2124255288 > at 5/29/03 7:07:12 PM [Eastern Daylight Time]

FROM KENYON&KENYON NYC                    (THU) 5. 29' 03 19:09/ST. 19:08/NO. 4864789096 P  3

conjugated equine estrogens ("CEE") with medroxyprogesterone acetate ("MPA"), and specifically pointed to claims 21-34, which claim methods using combinations of estrogens and progestins over broad dosage ranges.  Plunkett provides lists of possible estrogens and progestins. Tables 1A and 1B disclose twenty estrogens and seventeen progestins respectively and recite the maximum, minimum and preferred dosage levels for each. Plunkett lists CEE/MPA as one of twenty possible estrogen/progestin combinations. (Col. 6 line 46 - Col. 7 line 14).

Applicant's claims are drawn specifically to a method of treating or inhibiting vasomotor symptoms comprising continuously and uninterruptedly providing a daily dosage of about 1.5 mg MPA in combination with a dosage of between about 0.3 and about 0.45 mg CEE, USP. As the Examiner noted, "Plunkett et al. does not particularly teach the dosages of conjugated equine estrogen/medroxyprogesterone claimed herein." (Office Action, p. 3). There is nothing in Plunkett to teach or suggest the selection of 1.5 mg MPA for the treatment of vasomotor symptoms in combination with about 0.3 to about 0.45 mg CEE.

The Examiner states that Applicant has not provided any data demonstrating unexpected results in comparison with Plunkett. As discussed below, the Examiner has not even met the initial burden of presenting a prima facie case of obviousness as required by the case law. Moreover, Applicant respectfully disagrees that Applicant has not provided data demonstrating unexpected results. Plunkett describes 0.600 mg as the preferred dosage of CEE (Table 1A) and 2.5 mg as the preferred dosage of MPA (Table 1B). This preferred combination of CEE and MPA represents the closest teaching within Plunkett to the Applicant's claimed invention. This preferred combination essentially has become the

2

103

standard, commercially available dosage -- 0.625 mg CEE in combination with 2.5 mg MPA ("PREMPRO"). Thus, Applicant properly has provided data in the application from a clinical study showing unexpected results of the claimed invention of lower dosages of CEE and MPA in comparison with the preferred dosages of CEE and MPA disclosed in Plunkett. Applicant submits herewith a Declaration under 37 C.F.R. § 1.132 of Rogerio A. Lobo, M.D. to further support its showing of unexpected results.

It was understood by those skilled in the art for the past 20 years that 0.625 mg CEE was the minimum required to relieve vasomotor symptoms ("hot flushes") (Lobo Declaration ¶ 8).   The dosage of 2.5 mg was understood as the minimum amount needed to oppose 0.625 mg CEE and protect the endometrium.  A double blinded clinical study, the Women's Health, Osteoporosis, Progestin, Estrogen study ("H.O.P.E. study"), was conducted to evaluate the safety and efficacy of lower dosages of CEE and MPA with the standard dosages. The H.O.P.E. study unexpectedly demonstrated that providing a much lower daily dosage of 1.5 mg MPA in combination with 0.45 or 0.30 mg CEE reduced the number and severity of hot flushes to essentially the same extent as the standard, commercially available dose combination of 0.625 mg CEE and 2.5 mg MPA. (Lobo Declaration ¶ 14).  It was expected by those skilled in the art that there may be a dose response, such that the lower combination doses of CEE and MPA would exhibit some effect in reducing the number and severity of hot flushes, but far less of an effect than the standard dose of 0.625 mg CEE plus 2.5 mg MPA. (Lobo Declaration ¶ 12).  The results of the H.O.P.E. study confounded those expectations.

3

Additionally, the H.O.P.E. study demonstrated that at these particular low dosage combinations, MPA has an additive effect on the relief of vasomotor symptoms. (Lobo Declaration ¶ 15). Previous studies showed that MPA had no additive effect on vasomotor relief when the common dose of 0.625 mg CEE was used. (See Greendale et al., Obstet. Gynecol., 92:982-988 (1998)). The H.O.P.E. study surprisingly demonstrated that at these low doses MPA may contribute to ameliorating vasomotor symptoms. (Lobo Declaration ¶ 15). Plunkett does not teach that an additive vasomotor effect is exhibited by the low dose of 1.5 mg MPA to the lower doses of about 0.30 to 0.45 mg CEE.

The H.O.P.E. study also demonstrated that providing a daily dosage of 1.5 mg MPA effectively inhibited the development of endometrial hyperplasia when opposing the lower doses, 0.30 to 0.45 mg CEE. (Lobo Declaration ¶ 16). The effect of the endometrium was not significantly different with these lower dosages than the standard combination containing 2.5 mg MPA. Prior to the H.O.P.E. study, the dosage of MPA necessary to provide endometrial protection with lower dosages of CEE was unknown. (Lobo Declaration ¶ 16).

Applicant also maintains that the Examiner has not even met the initial burden of presenting a prima facie case of obviousness. In re Rijckaert, 9 F.3d 1531, 1532, 28 U.S.P.Q.2d 1955, 1956 (Fed. Cir. 1993). To establish prima facie obviousness, the prior art reference(s) must teach or suggest all of the claim limitations. In re Royka, 490 F.2d 981, 180 U.S.P.Q. 580 (C.C.P.A. 1974). Because Plunkett does not teach, or suggest, using 1.5 mg MPA in combination with about 0.3 to about 0.45 mg CEE for relief of vasomotor symptoms of menopause, it is respectfully submitted that Plunkett does not render claim 7

4

obvious.  Plunkett discloses thousands of possible estrogen/progestin combinations.  The preferred dosages of MPA and CEE that Plunkett discloses are much higher than the dosages claimed in the present invention.  It would not have been obvious at the time of the invention to select the lower dosage combinations claimed herein.  Applicant respectfully submits that the Office Action employs a reconstruction based upon improper hindsight reasoning.  In re Fine, 837 F.2d 1071, 1075 (Fed. Cir. 1988).  At best, it would have been obvious to try the Applicant's claimed combination, but it has long been held that "obvious to try" is not the appropriate standard.  Therefore, the Office Action does not reflect the proper evidence to support an obviousness rejection based on the reference relied upon.  In any event, as discussed above, in order to facilitate prosecution, the accompanying Lobo Declaration, submitted under 37 C.F.R. § 1.132, is believed to demonstrate convincingly the unexpected results obtained with Applicants' invention.

Claims 11, 12 and 69 depend from claim 7, and it is respectfully submitted that Plunkett does not render obvious these dependent claims for at least the same reasons given above in support of the patentability of claim 7.

5

106

FROM KENYON&KENYON NYC                    (THU) 5. 29' 03 19:10/ST. 19:08/NO. 4864789096 P  7

It is respectfully submitted that all pending claims are allowable.  All issues raised by the Examiner having been addressed, reconsideration and allowance of the claims are respectfully requested.  If for any reason the Examiner believes that contact with Applicant's attorney would advance prosecution, he is invited to contact the undersigned at the telephone number given below.

Respectfully submitted,

Dated: *April 1, 2003*

Thomas J. Meloro
Reg. No. 33,538

Kenyon & Kenyon
One Broadway
New York, N.Y. 10004
(212) 425-7200

6

107

Received from < 2124255288 > at 5/29/03 7:07:12 PM [Eastern Daylight Time]

FROM KENYON & KENYON                    (THU) 5. 29' 03 17:44/ST. 16:57/NO. 4864790548 P106

01855/115
(formerly AM100226)

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicants | : | PICKAR, J.; DEY, M. |
| Serial No. | : | 09/808,878 |
| Filed | : | March 15, 2001 |
| Title | : | HORMONE REPLACEMENT THERAPY |
| Art Unit | : | 1617 |
| Examiner | : | M. Bahar |

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner for Patents, Washington, D.C. 20231 on

Date: _April 1, 2003_

Signature: _Thomas J. Meloro_

Thomas J. Meloro (Reg. No. 33,538)

Commissioner for Patents
Washington, D.C. 20231

## SUPPLEMENTAL INFORMATION DISCLOSURE STATEMENT

1.      In accordance with the duty of disclosure under 37 C.F.R. § 1.56 and in conformance with the procedures of 37 C.F.R. §§ 1.97 and 1.98 and M.P.E.P. § 609, attorneys for Applicant hereby bring the following reference to the attention of the Examiner. The references are listed on the attached modified PTO Form No. 1449. It is respectfully requested that the information be expressly considered during the prosecution of this application, and that the reference be made of record therein and appear among the "References Cited" on any patent to issue therefrom.

2.      A copy of each patent, publication or other information listed on the modified PTO form 1449 is enclosed.

3.      The Commissioner is hereby authorized to charge payment of the 37 C.F.R. §1.17(p) (submission of an information disclosure statement under §1.97(c)) fee of **$180.00** and any additional fees that may be required to the deposit account of **Kenyon & Kenyon**, deposit account number **11-0600**.

Respectfully submitted,

KENYON & KENYON

_Thomas J. Meloro_

Thomas J. Meloro
Reg. No. 33,538

Dated: _April 1, 2003_

One Broadway
New York, N.Y. 10004
(212) 425-7200

108

UNITED STATES DEPARTMENT OF COMMERCE
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARK
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| | | | |

| EXAMINER |
|---|
| |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | 11 |

DATE MAILED:

## INTERVIEW SUMMARY

All participants (applicant, applicant's representative, PTO personnel):

(1) _A. Milowsky_                    (3) _R. Lobo_

(2) _T. Molero / M. Paddock_          (4) _M. Bahar_

Date of Interview: _06/03/03_

Type: ☐ Telephonic  ☐ Televideo Conference  ☒ Personal (copy is given to ☐ applicant ☐ applicant's representative).

Exhibit shown or demonstration conducted: ☒ Yes ☐ No   If yes, brief description: _____
_PEP1 Trial article by Greendale_

Agreement ☐ was reached. ☒ was not reached.

Claim(s) discussed: _all pending claims_

Identification of prior art discussed: _Plunkett US RE 36,247_

Description of the general nature of what was agreed to if an agreement was reached, or any other comments: _Whether unexpected result of the combination of MPA / CEE in the doses claimed herein would overcome the obviousness rejection? Dr. Lobo discussed the unexpected nature of the doses herein. The scope of the claims e.g. vasomotor vs. hot flashes and the particular hosts were discussed. Written response faxed to Examiner will be considered._

( A fuller description, if necessary, and a copy of the amendments, if available, which the examiner agreed would render the claims allowable must be attached. Also, where no copy of the amendments which would render the claims allowable is available, a summary thereof must be attached.)

☐ It is not necessary for applicant to provide a separate record of the substance of the interview.

Unless the paragraph above has been checked to indicate to the contrary. A FORMAL WRITTEN REPLY TO THE LAST OFFICE ACTION IS NOT WAIVED AND MUST INCLUDE THE SUBSTANCE OF THE INTERVIEW. (See MEPEP Section 713.04). If a reply to the last Office action has been filed, APPLICANT IS GIVEN ONE MONTH FROM THIS INTERVIEW DATE TO FILE A STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.

Examiner Note: You must sign this form unless it is an attachment to another form.

FORM PTOL-413 (REV. 2-98)

_06/03/03_

109

**Manual of Patent Examining Procedure, Section 713.04 Substance of Interview must Be Made of Record**

Except as otherwise provided, a complete written statement as to the substance of any face-to-face or telephone interview with regard to an application must be made of record in the application, whether or not an agreement with the examiner was reached at the interview.

## §1.133 Interviews
* * * * *

(b) In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111 and 1.135. (35 U.S.C. 132)

§ 1.2. Business to be transacted in writing. All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete a two-sheet carbon interleaf Interview Summary Form for each interview held after January 1, 1978 where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks in neat handwritten form using a ball point pen. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, pointing out typographical errors or unreadable script in Office actions and the like, or resulting in an examiner's amendment that fully sets forth the agreement are excluded from the interview recordation procedures below.

The Interview Summary Form shall be given an appropriate paper number, placed in the right hand portion of the file, and listed on the "Contents" list on the file wrapper. In a personal interview, the duplicate copy of the Form is removed and given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephonic interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication.

The Form provides for recordation of the following information:
– Application Number of the application
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (personal or telephonic)
– Name of participant(s) (applicant, attorney or agent, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the claims discussed
– An identification of the specific prior art discussed
– An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). (Agreements as to allowability are tentative and do not restrict further action by the examiner to the contrary.)
– The signature of the examiner who conducted the interview
– Names of other Patent and Trademark Office personnel present.

The Form also contains a statement reminding the applicant of his responsibility to record the substance of the interview.

It is desireable that the examiner orally remind the applicant of his obligation to record the substance of the interview in each case unless both applicant and examiner agree that the examiner will record same. Where the examiner agrees to record the substance of the interview, or when it is adequately recorded on the Form or in an attachment to the Form, the examiner should check a box at the bottom of the Form informing the applicant that he need not supplement the Form by submitting a separate record of the substance of the interview.

It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview:

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner. The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he feels were or might be persuasive to the examiner,
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.

Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant one month from the date of the notifying letter to complete the reply and thereby avoid abandonment of the application (37 CFR 1.135(c) ).

## Examiner to Check for Accuracy

Applicant's summary of what took place at the interview should be carefully checked to determine the accuracy of any argument or statement attributed to the examiner during the interview. If there is an inaccuracy and it bears directly on the question of patentability, it should be pointed out in the next Office letter. If the claims are allowable for other reasons of record, the examiner should send a letter setting forth his or her version of the statement attributed to him. If the record is complete and accurate, the examiner should place the indication "Interview record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

110



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/808,878 | 03/15/2001 | James H. Pickar | AM100226 | 5270 |

7590          09/10/2003

Egon E. Berg
American Home Products Corporation
Patent Law Department
Five Giralda Farms
Madison, NJ 07940

| EXAMINER |
|---|
| BAHAR, MOJDEH |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

DATE MAILED: 09/10/2003

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 07-01)

111

| _Office Action Summary_ | Application N . | Applicant(s) |
|---|---|---|
| | 09/808,878 | PICKAR, JAMES H. |
| | Examin r | Art Unit |
| | Mojdeh Bahar | 1617 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**P riod for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>07 April 2003</u> .

2a)☒ This action is **FINAL.**    2b)☐ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-7,11,12 and 15-69</u> is/are pending in the application.

4a) Of the above claim(s) <u>1-6 and 15-68</u> is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>7,11,12 and 69</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

11)☐ The proposed drawing correction filed on _____ is: a)☐ approved b)☐ disapproved by the Examiner.

If approved, corrected drawings are required in reply to this Office action.

12)☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All b)☐ Some * c)☐ None of:

1.☐ Certified copies of the priority documents have been received.

2.☐ Certified copies of the priority documents have been received in Application No. _____ .

3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

* See the attached detailed Office action for a list of the certified copies not received.

14)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

a) ☐ The translation of the foreign language provisional application has been received.

15)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO-1449) Paper No(s) <u>15,17</u>.

4)☐ Interview Summary (PTO-413) Paper No(s). _____ .

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: .

112

Application/Control Number: 09/808,878                                    Page 2

Art Unit: 1617

## DETAILED ACTION

Applicant's response filed April 7, 2003 and the declaration submitted under 37 CFR

1.132 with attached references are acknowledged.

This application contains claims 1-6 and 15-68 drawn to an invention nonelected with

traverse in Paper No. 5. A complete reply to the final rejection must include cancelation of

nonelected claims or other appropriate action (37 CFR 1.144) See MPEP § 821.01.

Claims 7, 11, 12 and 69 are examined herein in so far as they read on the elected specie

of hot flashes.

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

Claims 7, 11, 12 and 69 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Plunkett et al. (USPN RE 36,247).

Plunkett et al. (USPN RE 36,247) teaches a method of treating hot flashes comprising

administering continuously and uninterruptedly both progestogen and estrogen in daily dosage

units, see claims 21-34, col. 3, lines 51-59 and col.8 lines 62-64 in particular. Plunkett et al.

(USPN RE 36,247) also teaches conjugated equine estrogen/medroxyprogesterone as one of the

estrogen/progestogen combinations useful in its method, see claims 21-34. Plunkett teaches the

minimum and maximum dosages for medroxyprogesterone and conjugated equine estrogens to

113

Application/Control Number: 09/808,878                                        Page 3
Art Unit: 1617

be 1 mg/day and 15 mg/day and 0.300 and 2.5 mg/day (preferred dosage of 0.300-0.600 mg)

respectively, see claims 34-35, see also Table 1A, col.4, in particular.

Plunkett et al. does not particularly teach the dosages of conjugated equine

estrogen/medroxyprogesterone claimed herein.

It would have been obvious to one of ordinary skill in the art at the time the invention

was made to employ conjugated equine estrogen/medroxyprogesterone in the specific dosages

claimed herein in a method of treating hot flashes.

One of ordinary skill in the art would have been motivated to employ conjugated equine

estrogen/medroxyprogesterone in the specific dosages claimed herein in a method of treating hot

flashes because they (dosages herein) fall within the therapeutic ranges of the conjugated equine

estrogen/medroxyprogesterone taught by the prior art.  Optimization of amounts is within the

purview of the Skilled Artisan, and is therefore obvious absent evidence to the contrary.  No such

evidence is seen.

### *Response to Arguments*

Applicant's arguments filed April 7, 2003 have been fully considered but they are not

persuasive. Applicant first argues that "there is nothing in Plunkett to teach or suggest the

selection of 1.5 mg MPA for the treatment of vasomotor symptoms in combination with about

0.3 to about 0.45 mg CEE." Note that Plunkett teaches that MPA can be employed at a

minimum dosage of 1.0 mg and maximum dosage of 15 mg.  Note that the claimed dosage

herein, 1.5 mg, falls within the Plunkett range.  Note also that the claimed dosage herein, 0.3-

0.45 mg of CEE, falls within the dosage range of Plunkett, 0.300-0.600 mg, see claim 35 of

Plunkett.

114

Applicant draws the examiner's attention to data presented in the specification showing

the efficacy of the dosages herein versus that of the common daily dosages of Premarin and

MPA. Note that in order to overcome obviousness applicant must demonstrate unexpected

results in comparison with the closest prior art, i.e., Plunkett. No such comparative data has been

provided. Applicant states that the closest example in Plunkett is a regimen comprising 0.600

mg CEE and 2.5 mg MPA. The specification on page 9 provides a comparative example

between 0.625 mg of CEE, and not 0.600 mg of CEE. Furthermore the data presented does not

constitute unexpected results because according to the applicant's remarks, the data shows

similar efficacy of the following regimens: 0.625 CEE/2.5 MPA, 0.45 CEE/1.5 MPA, 0.30

CEE/1.5 MPA. Some data points are overlapping in both number and severity of hot flushes.

Assuming *arguendo* that lower doses of MPA and CEE claimed herein yield similar therapeutic

results, then the teachings of the prior art is confirmed. Plunkett teaches a wide range of

CEE/MPA as effective in treating hot flushes. Therefore the showing on page 9 of the

specification indeed confirms the teachings of the prior art that the entire range disclosed in

Plunkett is effective in treating hot flushes.

Analyzing the data, one can observe/conclude the following:

The data provided compares 0.625 mg of CEE and 2.5 mg of MPA to 0.45 mg of CEE

and 1.5 mg of MPA and 0.3 mg of CEE and 1.5 mg of MPA. Note that at 12 weeks the three

regimens seem to yield comparable results, whereas at 8 weeks the higher doses of CEE yield

much better results. The data presented is thus not clear because the skilled artisan cannot

ascertain the efficacy of one regimen over the other. Further note that since the doses of both

CEE and MPA are different in the Tables presented on page 9 (i.e., both CEE and MPA doses

115

are lowered simultaneously from second column to third and forth column), the additive effects

of the drugs, if any cannot be ascertained.

In response to applicant's argument that the examiner's conclusion of obviousness is

based upon improper hindsight reasoning, it must be recognized that any judgment on

obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning. But so

long as it takes into account only knowledge which was within the level of ordinary skill at the

time the claimed invention was made, and does not include knowledge gleaned only from the

applicant's disclosure, such a reconstruction is proper. See *In re McLaughlin*, 443 F.2d 1392,

170 USPQ 209 (CCPA 1971).

The declaration of Dr. Lobo submitted under 37 CFR 1.132 has been carefully considered,

but is not persuasive to remove the obviousness rejection herein.

First, in paragraph 7, Dr. Lobo describes the conclusion of the PEPI trial which in short

concludes that the co-administration of MPA and CEE provided protection of the endometrium.

Note that the prior art reference herein teaches the co-administration of MPA with CEE.

Secondly, in paragraph 8, Dr. Lobo states that in the past 20 years 0.625 mg of CEE and

2.5 mg of MPA has been recognized as the standard dosage. In support of this proposition Dr.

Lobo refers to two articles, namely Lindsay et al., and Archer et al. Note that the teachings of

Archer et al. are not relevant since the article was published after the filing date of the instant

application. Note that a showing of unexpected results should be based on what would have

been unexpected at the time of filing of an application. In regards to Lindsay et al. please note

that the minimum effective dosage taught in Lindsay et al. is the minimum effective dose of

estrogen in prevention of postmenopausal bone loss, Not hot flushes. Therefore this reference

116

Application/Control Number: 09/808,878                                    Page 6
Art Unit: 1617

does not support Dr. Lobo's proposition. Moreover, note the Plunkett et al., a patent issued in the

last 20 years contradicts this very proposition since it teaches ranges of CEE/MPA that

encompass the dosage claimed herein.

In paragraph 15, Dr. Lobo's declaration further states that Greendale et al. has taught no

additive effect of MPA in relief of vasomotor symptoms. In response to applicant's argument

that the references fail to show certain features of applicant's invention, it is noted that the

features upon which applicant relies (i.e., the additive effect of MPA in relief of vasomotor

symptoms) are not recited in the rejected claim(s). Although the claims are interpreted in light of

the specification, limitations from the specification are not read into the claims. See *In re Van

Geuns*, 988 F.2d 1181, 26 USPQ2d 1057 (Fed. Cir. 1993). Also note that there is no showing of

this additive effect in the instant case. Moreover, as stated in the art, the instant combination

composition is taught in the prior art. Therefore the declaration does not clearly and

convincingly show unexpected benefits residing in the dosage regimen of CEE/MPA herein

**THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event,

117

Application/Control Number: 09/808,878                                    Page 7
Art Unit: 1617

however, will the statutory period for reply expire later than SIX MONTHS from the mailing

date of this final action.

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Mojdeh Bahar whose telephone number is (703) 305-1007. The

examiner can normally be reached on (703) 305-1007 from Monday to Friday from 9:00 a.m. to

5:00 p.m.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Sreeni Padmanabhan, can be reached on (703) 305-1877. The fax phone number for

the organization where this application or proceeding is assigned is (703) 308-4556.

Any inquiry of a general nature or relating to the status of this application or proceeding

should be directed to the receptionist whose telephone number is (703) 308-1235.

Mojdeh Bahar
Patent Examiner
September 16, 2002

SREENI PADMANABHAN
PRIMARY EXAMINER  9/5/03

118

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT | Attorney Docket No. | Serial No. | |
|---|---|---|---|
| | 01855/115 | 09/808,878 | |
| Form PTO-1449 | Applicants: | Filing Date: | |
| | PICKAR et al. | March 15, 2001 | |
| | Examiner: | Art Unit: | |
| | M. Bahar | 1617 | |

**RECEIVED** APR 10 2003 TECH CENTER 1600/2900

### U. S. PATENT DOCUMENTS

| EXAMINER INITIAL | REF. NO. | PATENT NUMBER | PATENT DATE | NAME | CLASS | SUBCLASS | FILING DATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

### FOREIGN PATENT DOCUMENTS

| EXAMINER INITIAL | REF. NO. | COUNTRY | DOCUMENT NUMBER | DATE | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

### OTHER DOCUMENTS

| EXAMINER INITIAL | REF. NO. | AUTHOR, TITLE, DATE, PERTINENT PAGES, ETC. |
|---|---|---|
| | | The Writing Group for the PEPI Trial, "Effects of hormone replacement therapy on endometrial histology in postmenopausal women. The Postmenopausal Estrogen/Progestin Interventions (PEPI) Trial," *JAMA* 275(5):370-5 (1996) |
| | | Archer et al., *Fertility Sterility*, 75:1080-1087 (2001) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Examiner | Date Considered |
|---|---|
| | |

EXAMINER: <u>Initial if citation</u> considered, whether or not citation is in conformance with M.P.E.P. 609; draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

119



RECEIVED

JAN 1 6 2004

TECH CENTER 1600/2900

01855/115
(formerly AM100226)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| APPLICANT(S) | : | PICKAR, J.; DEY, M. |
| SERIAL NO. | : | 09/808,878 |
| FILED | : | March 15, 2001 |
| TITLE | : | HORMONE REPLACEMENT THERAPY |
| ART UNIT | : | 1617 |
| EXAMINER | : | M. Bahar |

I hereby certify that this correspondence is being deposited with the United States Postal Service with sufficient postage as first class ma in an envelope addressed to: Mail Stop_____

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-14 on

Date: Jan 9, 2004

Signature: _____

RESPONSE

Sir:

This response addresses the Office Action mailed September 10, 2003. Also

submitted herewith is a Second Declaration under 37 C.F.R. § 1.132 of Rogerio A. Lobo, M.D.

Reconsideration and allowance of the above-identified application are respectfully requested in view

of the declaration and the following remarks.

Accompanying this response is a timely request for a one month extension of time

under C.F.R. § 1.136.

**REMARKS**

Claims 7, 11, 12 and 69 are now pending in the above-referenced application.

Claims 7, 11, 12 and 69 were rejected under 35 U.S.C. § 103 as allegedly

unpatentable over U.S. Patent No. 4,826,831, Re 36,247 (hereinafter, "Plunkett"). This rejection

respectfully is traversed.

120

01855/115
(formerly AM100226)

Applicants' claims are drawn specifically to a method of treating or inhibiting vasomotor symptoms comprising continuously and uninterruptedly providing a daily dosage of about 1.5 mg MPA in combination with a dosage of between about 0.3 and about 0.45 mg CEE, USP. The Examiner acknowledged that "Plunkett et al. does not particularly teach the dosages of conjugated equine estrogen/medroxyprogesterone claimed herein." (Office Action, p. 3). Applicants maintain that there is nothing in Plunkett to teach or suggest the selection of 1.5 mg MPA for the treatment of vasomotor symptoms in combination with about 0.3 to about 0.45 mg CEE.

The Examiner stated that Applicants have not provided any data demonstrating unexpected results in comparison with Plunkett. As discussed below, Applicants respectfully submit that the initial burden of a prima facie case of obviousness has not been established. Moreover, Applicants respectfully disagree that Applicants have not provided data demonstrating unexpected results. Applicants have provided data in the specification and submitted a Declaration under 37 C.F.R. 1.132 of Rogerio A. Lobo, M.D. on April 1, 2003 to further support their showing of unexpected results of Applicants' claimed invention over Plunkett. Applicants submit herewith a Second Declaration under 37 C.F.R. 1.132 of Rogerio A. Lobo, M.D which provides further evidence concerning Applicants' invention.

Plunkett describes 0.600 mg as the preferred dosage of CEE (Table 1A) and 2.5 mg as the preferred dosage of MPA (Table 1B). This preferred combination of CEE and MPA represents the closest teaching within Plunkett to the Applicants' claimed invention. The Examiner noted that the example on page 9 of the specification compares the claimed invention to a combination using a dosage of *0.625 mg CEE*, and not *0.600 mg*, as disclosed in Plunkett. (Office Action, p. 4). However, the difference between these two CEE dosages, 0.025 mg or 2.5

121                                    2

01855/115
(formerly AM100226)

hundredths of a milligram, does not provide a meaningful difference when compared to Applicants' invention. (Second Lobo Declaration ¶ 3). For purposes of treating or inhibiting vasomotor symptoms, one skilled in the art would consider a daily dosage of 0.600 mg CEE to be clinically equivalent to a dosage of 0.625 mg CEE. (Second Lobo Declaration ¶ 3). Thus, Applicants properly have provided data in the application from a clinical study showing unexpected results of the claimed invention of lower dosages of CEE and MPA in comparison with the preferred dosages of CEE and MPA disclosed in Plunkett. (Second Lobo Declaration ¶ 3). The combination of preferred dosages in Plunkett essentially has become the standard, commercially available dosage - - 0.625 mg CEE in combination with 2.5 mg MPA ("PREMPRO").

The Examiner has stated that the data on page 9 does not constitute unexpected results, because the data shows similar efficacy in treating vasomotor symptoms between the standard commercially available regimen, 0.625 mg CEE/2.5 mg MPA, and the lower dosage regimens claimed herein, 0.45 mg CEE/1.5 mg MPA and 0.30 mg CEE/1.5 mg MPA. (Office Action, p. 4). The examiner further noted some data points are overlapping in both numbers and severity of hot flushes for these regimens. However, these similar therapeutic results are precisely what was unexpected to one skilled in the art. The results of the study reported on page 9 unexpectedly demonstrated that providing a much lower daily dosage of 1.5 mg MPA in combination with 0.45 or 0.30 mg CEE reduced the number and severity of hot flushes to essentially the same extent as the standard, commercially available dose combination of 0.625 mg CEE and 2.5 mg MPA. (Second Lobo Declaration ¶ 6). It was expected by one skilled in the art that the lower combination doses of CEE and MPA may exhibit *some effect* in reducing the number and severity of hot flushes, but *far less of an effect* than the standard dose of 0.625 mg

122                                    3

01855/115
(formerly AM100226)

CEE plus 2.5 mg MPA. (Lobo Declaration ¶ 12). Applicants respectfully submit that the Examiner

improperly has inferred that to demonstrate unexpected results, the lower dosages must show better

results than the preferred dosages in Plunkett. The first Declaration under 37 C.F.R. § 1.132 of

Rogerio A. Lobo, M.D. demonstrates that it was a surprising and unexpected result from the

Women's Health, Osteoporosis, Progestin, Estrogen study ("H.O.P.E. study") study that a daily

dose of 1.5 mg MPA in combination with the lower doses, 0.45 mg or 0.30 mg, of CEE, rapidly

reduced the number and severity of hot flushes to the same extent as the higher dose combinations

of 0.625 mg CEE and 2.5 mg MPA. (Lobo Declaration ¶ 14).[1] Applicants submit that

disregarding such evidence is not appropriate.

The Examiner has stated that because the lower dosage combinations yielded

similar therapeutic results with the standard commercially available combination, the Applicants

confirmed the teachings of Plunkett that the entire range is effective in treating hot flushes. (Office

Action, p. 4). Respectfully, Applicants submit that the Examiner has applied the incorrect standard.

Applicants are required to compare their claimed invention with the closest species/teaching

disclosed in the prior art. Applicants have made such a comparison and have demonstrated the

unexpected results of their invention over Plunkett. Furthermore, Applicants did not confirm the

entire ranges of Plunkett are effective in treating hot flushes. Rather, Applicants showed results for

the particular low dosage combinations of CEE and MPA claimed herein.

---

[1] It should be noted that the claimed dosage of 1.5 mg of MPA is sixty-six percent below
the preferred dosage of 2.5 mg MPA provided in Plunkett. (Table 1B). The dosages of CEE are
between thirty-three and one hundred percent lower than the preferred dosage of 0.6 provided in
Plunkett. (Table 1A).

4

01855/115
(formerly AM100226)

The Examiner further stated that the data on page 9 showed that at week 12 the three regimens seemed to yield comparable results, whereas at 8 weeks the higher doses of CEE yielded much better results. (Office Action, p. 4). The Examiner concluded that the skilled artisan purportedly cannot ascertain the efficacy of one regimen over the other. (Office Action, p. 4). However, the results inform the skilled artisan that the lower dosage combinations of the invention were as effective in decreasing the number and severity of hot flushes as the standard commercially available higher dosage combination, to essentially the same degree. (Second Lobo Declaration ¶ 5). This result is contrary to what would have been expected. (Second Lobo Declaration ¶ 6).

The Examiner appears to dismiss Dr. Lobo's expert opinion that 0.625 mg has been accepted in the art as the minimum dosage of estrogen necessary to relieve the vasomotor symptoms. (Lobo Declaration ¶10). Similarly, the Examiner appears to dismiss Dr. Lobo's evidence that the combination of 0.625 mg of CEE plus 2.5 mg of MPA has been the most commonly prescribed combination hormone replacement therapy (Lobo Declaration ¶10), based on the reference to Archer et al. which was published a couple months after the subject application. However, Dr. Lobo made these statements based not only on these cited references, but also based on his knowledge as a practicing physician in the field. Dr. Lobo has extensive experience in treating women for symptoms of menopause, including hot flushes, and has knowledge of what others skilled in the art prescribed for their patients. Additionally, Dr. Lobo also submits herewith additional references published prior to the date of application that support these statements. (Second Lobo Declaration ¶ 2).

5

124

01855/115
(formerly AM100226)

The Examiner correctly noted that the reference, The Writing Group for the PEPI

Trial, "Effects of hormone replacement therapy on endometrial histology in postmenopausal women.

The Postmenopausal Estrogen/Progestin Interventions (PEPI) Trial," JAMA 275(5):370-5 (1996),

teaches the co-administration of MPA with CEE to provide protection of the endometrium. (Lobo

Declaration ¶ 7). However, the reference does not teach the two specific, low dose combinations

of CEE plus MPA claimed herein. In the PEPI trial, the women were randomly assigned to one of

five treatment groups: (1) a placebo; (2) 0.625 mg CEE daily; (3) 0.625 mg CEE daily plus 10 mg

of MPA for 12 days per month; (4) 0.625 mg CEE daily plus 2.5 mg MPA daily; or (5) 0.625 mg

CEE daily plus 200 mg of a natural (micronized) progesterone for 12 days per month. (Lobo

Declaration ¶ 7). The reference teaches that the addition of 2.5 mg MPA to the 0.625 mg CEE

provided protection of the endometrium.

The Examiner concluded that there is no showing of an additive effect of MPA in

the specification and in Dr. Lobo's declaration. (Lobo Declaration ¶ 15). The Examiner noted that

because the dosages of CEE and MPA in the tables on page 9 are lowered simultaneously from the

second column to the third and forth column, the additive effects of the drugs, if any, cannot be

ascertained. (Office Action, pp. 4-5). Applicants respectfully submit that this is incorrect. The

tables on page 9 report the mean number and severity of hot flushes. The second, third and fourth

columns represent the results for the treatment group receiving 0.625 mg CEE/2.5 mg of MPA,

0.45 mg CEE/1.5 mg MPA and 0.3 mg CEE/1.5 mg CEE respectively. The MPA dosage is the

same in the third and fourth columns, while the CEE dosage is lowered. The results in columns

6

125

01855/115
(formerly AM100226)

three and four are comparable and show that when the CEE dosage is lowered and the MPA

dosage is kept at 1.5 mg, the number and severity of hot flushes are reduced to essentially the same

extent. This offers some evidence of the additive effect of MPA at low dosages of CEE.

The Examiner is correct that Applicants do not specifically recite the additive effect of MPA

in the claims. The H.O.P.E. study was not specifically designed to demonstrate such an effect.

However, Greendale et al. taught that previous studies showed that MPA had no additive effect on

vasomotor relief when much higher dosages of MPA and much higher dosages of CEE were used.

(See Greendale et al., Obstet. Gynecol., 92:982-988 (1988)). Specifically, Greendale reported

studies using the following regimens: (1) placebo; (2) 0.625 mg CEE daily; (3) 0.625 mg CEE daily

plus 2.5 mg MPA daily; (4) 0.625 mg CEE daily plus 10 mg MPA for 12 days per month; and (5)

0.625 mg CEE daily plus 200 mg micronized progesterone for 12 days per month. Greendale et al.

reported that there was "convincing evidence" that regimens using CEE plus MPA were not more

effective than CEE alone against vasomotor symptoms. One skilled in the art believed that MPA

had merely a prophylactic effect (to prevent endometrial cancer). However, the H.O.P.E. study

unexpectedly demonstrated that at the particular low dose of 1.5 mg MPA, may contribute

vasomotor relief in combination with the lower dosages of 0.3 or 0.45 mg CEE. These results are

preliminary evidence that there is a therapeutic role for MPA beyond endometrial protection when

lower dosages of CEE are used. These results have not been statistically proven, but illustrate an

unexpected trend, which may be explained by the additive effect of MPA at low dosages.

7

126

01855/115
(formerly AM100226)

Applicants also maintain that the Examiner has not even met the initial burden of presenting a prima facie case of obviousness. In re Rijckaert, 9 F.3d 1531, 1532, 28 U.S.P.Q.2d 1955, 1956 (Fed. Cir. 1993). To establish prima facie obviousness, the prior art reference(s) must teach or suggest all of the claim limitations. In re Royka, 490 F.2d 981, 180 U.S.P.Q. 580 (C.C.P.A. 1974). Because Plunkett does not teach, or suggest, using 1.5 mg MPA in combination with about 0.3 to about 0.45 mg CEE for relief of vasomotor symptoms of menopause, it is respectfully submitted that Plunkett does not render claim 7 obvious. Plunkett discloses thousands of possible estrogen/progestin combinations. The preferred dosages of MPA and CEE that Plunkett discloses are much higher than the dosages claimed in the present invention. It would not have been obvious at the time of the invention to select the lower dosage combinations claimed herein. Applicants respectfully submit that the Office Action employs a reconstruction based upon improper hindsight reasoning. In re Fine, 837 F.2d 1071, 1075 (Fed. Cir. 1988). Plunkett's statement that "the maximum, minimum and preferred dosage levels for the respective estrogens and progestogens in the foregoing combinations are recited in the tables" invites one of skill to try a multitude of combinations within the aforementioned ranges. (Col. 7, lines 7-14). At best, it would have been obvious to try the Applicants' claimed combination, but it has long been held that "obvious to try" is not the appropriate standard. Therefore, the Office Action does not reflect the proper evidence to support an obviousness rejection based on the reference relied upon. In any event, as discussed above, in order to facilitate prosecution, the Declaration and Second

8

01855/115
(formerly AM100226)

Declaration of Dr. Lobo, submitted under 37 C.F.R. § 1.132, are believed to demonstrate

convincingly the unexpected results obtained with Applicants' invention.

Claims 11, 12 and 69 depend from claim 7, and it is respectfully submitted that

Plunkett does not render obvious these dependent claims for at least the same reasons given above

in support of the patentability of claim 7.

It is respectfully submitted that all pending claims are allowable. All issues raised by

the Examiner having been addressed, reconsideration and allowance of the claims are respectfully

requested. If for any reason the Examiner believes that contact with Applicants' attorney would

advance prosecution, she is invited to contact the undersigned at the telephone number given below.

Respectfully submitted,

Dated: Jan 9, 2004

Thomas J. Meloro
Reg. No. 33,538

Kenyon & Kenyon
One Broadway
New York, N.Y. 10004
(212) 425-7200

9

128



RECEIVED

JAN 1 6 2004

TECH CENTER 1600/2900

01855/115
(formerly AM100226)

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT(S)      :      PICKAR, J., DEY M.

SERIAL NO.        :      09/808,878

FILED             :      March 15, 2001

TITLE             :      HORMONE REPLACEMENT THERAPY

ART UNIT          :      1617

EXAMINER          :      M. Bahar

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## SECOND DECLARATION UNDER 37 C.F.R. § 1.132

SIR:

I, ROGERIO A. LOBO, M.D., declare as follows:

1.      The statements made in my Declaration Under 37 C.F.R § 1.132

submitted on April 1, 2003 are incorporated herein, including information regarding my background

and qualifications and my curriculum vitae attached as Exhibit A thereto.

2.      For the past 20 years, the dosage of 0.625 mg CEE has been accepted as

the minimum dosage of estrogen necessary to relieve the symptoms of menopause, including hot

flushes and bone loss.  (See, e.g., Sobel NB, Obstetrics and Gynecology Clinics of North

America, 21:299-319 (1994) (describing 0.625 mg as the standard dose of conjugated estrogen)

(Ex. A hereto); Kronenberg F, Chapter 9: Hot Flashes, in Rogerio A. Lobo, ed., Treatment of the

Postmenopausal Woman: Basic and Clinical Aspects, New York, NY: Raven Pres, at 109 (1994))

("The most commonly used regimen for treating hot flashes in the United States is 0.625 to 1.25 mg

of oral conjugated equine estrogen (Premarin)") (Ex. B hereto).  The dosage of 2.5 mg of MPA has
129

been recognized as the minimum amount needed to oppose 0.625 mg CEE and protect the

endometrium. This combination of 0.625 mg CEE plus 2.5 mg MPA daily has been the most

commonly prescribed combination estrogen-progestin hormone replacement therapy regimen in the

United States. (See, e.g., Kreling D, et al., Prescription Drug Trends: A Chartbook Update, Menlo

Park, CA: Kaiser Family Foundation, at 51 (2000)) (Ex. C hereto).

      3.      The preferred dosage of CEE that Plunkett discloses is 0.600 mg CEE. Page 9 of

Applicants' application compares the claimed invention to a combination using 0.625 mg CEE.

The difference between the dosages of 0.600 mg CEE and 0.625 mg CEE is not a meaningful

difference when compared to Applicants' invention. For purposes of treating or inhibiting

vasomotor symptoms, one skilled in the art would consider a daily dosage of 0.600 mg CEE to be

clinically equivalent to a dosage of 0.625 mg CEE. Therefore, Applicants provided comparative

results of its claimed invention with the preferred dosages of MPA and CEE that Plunkett discloses.

      4.      The results on page 9 of Applicants' application describe some of the

results obtained in the Women's Health, Osteoporosis, Progestin, Estrogen study ("H.O.P.E.

study"). Relief of vasomotor symptoms was analyzed in patients who experienced at least an

average of 7 to 8 moderate-to-severe hot flushes per day during the 7-day period just prior to the

initiation of treatment in this study. The results on page 9 reflect the results of 4 of the 8 regimens

used in the H.O.P.E. study administered daily: (1) 0.625 mg CEE plus 2.5 mg MPA

("PREMPRO"); (2) 0.45 mg CEE plus 1.5 mg MPA; (3) 0.3 mg CEE plus 1.5 mg MPA; and (4)

a placebo. The first table on page 9 shows the mean number of hot flushes. The second table

shows the mean daily severity of the flushes. These results are also shown in Figures 1 and 2.

      5.      The results on page 9 of Applicants' application show that all doses of CEE

plus MPA reduced the mean number and mean severity of hot flushes experienced by the women in

the clinical study compared with taking placebo. The mean daily number and mean severity of hot

130                        2

flushes in the lower dosage groups were not significantly different than the mean number and mean

severity of the much higher and commercially available dose combination containing 0.625 mg CEE

and 2.5 mg MPA.   These results demonstrated that the combinations of 1.5 mg MPA with the

lower doses, 0.45 or 0.30 mg, CEE, were as effective in rapidly reducing the number and severity

of hot flushes to essentially the much higher and commercially available dose combination containing

0.625 mg CEE and 2.5 mg MPA.

6.    The results on page 9 of Applicants' application were contrary to what would

have been expected to those skilled in the art.  The results surprisingly and unexpectedly

demonstrated that all doses of CEE and MPA reduced the number and severity of hot flushes

experienced by the women in this study compared with women taking placebo.   It was unexpected

that providing a daily dosage of 1.5 mg MPA in combination with the lower doses, 0.45 or 0.30

mg, CEE, rapidly reduced the number and severity of hot flushes to the same extent as the much

higher and commercially available dose combination containing 0.625 mg CEE and 2.5 mg MPA.

7.    The H.O.P.E. study demonstrated that dosages of CEE and MPA may be

better than equivalent dosages of unopposed CEE for vasomotor symptom relief.  Previous studies

with various dosages of CEE showed no additive effect of MPA on vasomotor relief.  (See

Greendale et al., Obstetrics and Gynecology, 92:982-988 (1998)).   Greendale et al. reported

studies using the following regimens: (1) placebo; (2) 0.625 mg CEE daily; (3) 0.625 mg CEE daily

plus 2.5 mg MPA daily; (4) 0.625 mg CEE daily plus 10 mg MPA for 12 days per month; and (5)

0.625 mg CEE daily plus 200 mg micronized progesterone for 12 days per month.  Greendale et al.

reported that there was "convincing evidence" that regimens using CEE plus MPA were not more

effective than CEE alone against vasomotor symptoms.  However, the H.O.P.E. study

unexpectedly demonstrated that at the particular low dose of 1.5 mg, MPA may contribute

vasomotor relief in combination with the lower dosages of 0.3 or 0.45 mg CEE.  These results are

131                                              3

preliminary evidence that there is a therapeutic role for MPA beyond endometrial protection when lower dosages of CEE are used. The H.O.P.E. study surprisingly demonstrated that at these low doses MPA may contribute to ameliorating the vasomotor symptoms.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the patent or any reexamination certificate issued therefor.

Dated: __12/15/03__        _____
                           ROGERIO A. LOBO, M.D.

132                        4

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

OIPE
NOV 1 4 2005
PATENT & TRADEMARK OFFICE

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| APPLICANTS | : | PICKAR, J., DEY M. |
| SERIAL NO. | : | 09/808,878 |
| FILING DATE | : | March 15, 2001 |
| FOR | : | HORMONE REPLACEMENT THERAPY |
| EXAMINER | : | Shengjun Wang |
| GROUP ART UNIT | : | 1617 |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## SUBSTITUTE APPEAL BRIEF

Appellants respectfully submit this Substitute Appeal Brief pursuant to 37 C.F.R. § 41.31 in support of their appeal from the final rejection in this application. Appellants note that they filed a Request for Oral Hearing on Appeal on April 29, 2004, requesting an oral hearing in connection with this Appeal.

### Real Party in Interest

The real party in interest is the assignee of record, Wyeth.

### Related Appeals and Interferences

There are no other appeals or interferences known to the Appellants, or to the Assignee or the Assignee's legal representatives involved in the prosecution of this application that will directly affect or be directly affected by or have a bearing on the Board's decision in this appeal.

133                                    1

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

### Status of Claims

Application serial no. 09/808,878 was originally filed with 68 claims. During prosecution, claims 1-6 and 15-68 were withdrawn in response to a restriction requirement. Claim 69 was added. Subsequently, claims 8-10 and 13-14 were canceled, and claims 7, 11, 12, and 69 were amended. Claims 7, 11, 12, and 69 are pending and stand rejected under 35 U.S.C. §103(a). Appellants appeal the rejection of all pending claims. The appealed claims are reproduced in Appendix A of this brief.

### Status of Amendments

No amendments were filed subsequent to final rejection.

### Summary of Claimed Subject Matter

Independent claim 7 and dependent claims 11-12 and 69 are pending in this application.

Independent claim 7 recites a method of treating or inhibiting vasomotor symptoms (*See*, specification, ¶ 0026) in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens, USP and a daily dosage of about 1.5 mg of medroxyprogesterone acetate (*See*, specification, ¶ 0011 and original claim 7), wherein the daily dosage of conjugated equine estrogens is between about 0.45 mg and about 0.3 mg (*See*, specification, ¶¶ 0022 and 0026-0028; and original claim 10).

Claim 11 depends from claim 7 and recites that the daily dosage of conjugated equine estrogens, USP is about 0.3 mg (*See*, specification, ¶¶ 0022 and 0026-0028; Figures 1 and 2; and original claim 11).

Claim 12 depends from claim 7 and recites that the vasomotor symptom is hot flushes (*See*, specification, ¶¶ 0026-0028; Figures 1 and 2; and original claim 12).

Claim 69 depends from claim 7 and recites that the daily dosage of conjugated equine estrogens, USP is about 0.45 mg (*See*, specification, ¶¶ 0022 and 0026-0028 and Figures 1 and 2) .

134                                        2

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

### Grounds of Rejection to be Reviewed on Appeal

Claims 7, 11, 12, and 69 are subject to a final rejection under 35 U.S.C. § 103(a) as being unpatentable over U.S. Pat. No. 4,826,831 (Re 36,247) to Plunkett (referred to herein as "Plunkett").

### Argument

### 1.    Summary of Argument

In the final Office Action mailed September 10, 2003 (hereinafter "Office Action"), the Examiner rejected claims 7, 11, 12 and 69 of the present application under 35 U.S.C. § 103(a) as being unpatentable over Plunkett. The pending claims of the present application are directed to the continuous and uninterrupted administration of a daily dosage of about 1.5 mg MPA in combination with a dosage between about 0.3 and about 0.45 mg CEE, USP. Plunkett lists a myriad of combinations of various estrogens and progestins in a variety of dosage ranges, in both cyclic and continuous regimens. However, Plunkett does not teach or suggest to one skilled in the art to select the combination of 1.5 mg MPA and about 0.3 to about 0.45 mg CEE for relief of vasomotor symptoms of menopause. Moreover, Plunkett does not describe or suggest a daily dosage of about 1.5 mg MPA at all, much less in combination with the claimed dosage of CEE.

In rejecting the claims under 35 U.S.C. § 103(a), the Examiner bears the initial burden of presenting a *prima facie* case of obviousness. *In re Rijckaert*, 9 F.3d 1531, 1532, 28 U.S.P.Q.2d 1955, 1956 (Fed. Cir. 1993). To establish *prima facie* obviousness, the prior art must teach or suggest all limitations of a claimed invention. See MEP § 2143.03 and *In re Royka*, 490 F.2d 981, 180 U.S.P.Q. 580 (C.C.P.A. 1974). Appellants respectfully submit that the Examiner has failed to establish a *prima facie* case of obviousness because Plunkett does not teach or suggest the selection of about 1.5 mg MPA in combination with about 0.3 to about 0.45 mg CEE for the treatment of vasomotor symptoms. Of the myriad of possibilities within the disclosed genus, Plunkett selects a preferred dose of 2.5 mg of MPA and a preferred dose of 0.600 mg CEE – dosages that are far higher than the 1.5 mg of MPA and the about 0.3 to about 0.45 mg of CEE claimed in the present invention. The evidence of record demonstrates that one skilled in the art would not have been motivated to employ lower dosage with any reasonable expectation of success. The record

135                                    3

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

evidence also demonstrates that Plunkett does not suggest the specific combination of Appellants' invention.

Furthermore, Appellants have demonstrated that the present invention achieves unexpected results in comparison to the closest prior art. In addition to the data provided in the specification, the Appellants submitted two declarations under 37 C.F.R. § 1.132 by Rogerio A. Lobo, M.D., a Professor of Obstetrics & Gynecology at the Department of Obstetrics and Gynecology at Columbia University, in support of their showing of unexpected results of the claimed invention over Plunkett. (Declaration under 37 C.F.R. §1.132, dated April 1, 2003, attached as Exhibit 1; and Second Declaration under 37 C.F.R. §1.132, dated December 15, 2003, attached as Exhibit 2). The unrefuted declarations of Dr. Lobo establish that the standard daily regimen of 0.625 mg CEE in plus 2.5 mg MPA was considered the minimum effective dosage for relieving vasomotor symptoms. Appellants have demonstrated that the claimed low dose regimen unexpectedly is equally effective at relieving hot flushes. (See Lobo Declaration ¶ 14 and Second Lobo Declaration ¶ 5). Moreover, since the closest species disclosed by Plunkett (0.6 mg CEE plus 2.5 mg MPA) is clinically equivalent to the higher standard dosage, Applicants' demonstration of unexpected results is equally applicable over the Plunkett regimen.

## 2.    Plunkett

Plunkett, the sole reference cited against Appellants' claims, is directed to a broad genus of HRT. In describing estrogen/progestin combination therapy, Plunkett discloses a plethora of estrogens and progestins that can be combined to treat numerous disorders. Specifically, the following *twenty* estrogens are described as being useful in the estrogen plus progestin combination for treating menopausal or post menopausal disorders: estradiol, estradiol-17beta, estradiol valerate, conjugated equine estrogens, estrene, piperazine estrone sulfate, estriol, estriol succinate, polyestriol phosphate, ethinyl estradiol, mestranol, quinestrol, stilbestrol, stilbestrol dipropionate, diethylstilbestrol, chlorotrianiscos, benzoestrol, hexoestrol, and methallenstril. (Plunkett, Table 1A).

Table 1B of Plunkett specifically discloses the following *seventeen* progestins that may be useful in the continuous HRT regimens: levo-norgestrel, dl-norgestrel, norethindrone, norethindrone acetate, dydrogesterone, medroxyprogesterone acetate,

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

norethynodrel, allylestrenol, lynoestrenol, quingestanol, medrogestone, norgestrienone, dimentisterone, ethisterone, cyproterone acetate, chlormadinone acetate, and magestrol acetate.

Tables 1A and 1B of Plunkett also provide ranges of dosage minimums and maximums, and preferred dosages for the estrogens and progestins listed.  For conjugated equine estrogen, Plunkett lists the minimum dosage as 0.3 mg, the maximum dosage as 2.5 mg, and 0.6 mg as the preferred dosage.  For medroxyprogesterone acetate, Plunkett provides the minimum dosage as 1 mg, the maximum dosage as 15 mg, and the preferred dosage as 2.5 mg.  Plunkett further provides that "[a]ny of the suitable estrogens and progestogens (particularly those listed in the foregoing tables) may be combined with one another in the quantities recited to give estrogen/progestogen combinations within the purview of the invention." (Col. 6, lines 46-50).

Plunkett also provides a list of *twenty* "especially preferred" combinations of estrogen and progestins, only one of which is conjugated equine estrogen with medroxyprogesterone acetate.  (col. 6, line 53 - col. 7, line 10).  Furthermore, of the thousands of possible combinations of estrogens and progestins, Plunkett only provides data for a single combination in which a study was conducted using a daily regimen of 1 mg 17beta-estradiol plus 75 µg dl-norgestrel.  Plunkett does not provide any data for any combinations of conjugated estrogens in combination with medroxyprogesterone acetate.

### 3.    The Claimed Invention is Not Obvious in View of Plunkett

#### a)    The Relevant Legal Standards

The Examiner bears the initial burden of factually supporting any *prima facie* conclusion of obviousness.  *See* MPEP §2142.  To establish a *prima facie* case of obviousness, the following three criteria must be met: (1) there must be some suggestion or motivation, either in the references or in the knowledge generally available to one skilled in the art, to modify the reference or to combine reference teachings; (2) there must be a reasonable expectation of success; and (3) the prior art must teach or suggest all elements of the claimed invention.  *In re Vaeck*, 947 F.2d 488, 20 U.S.P.Q.2d 1438 (Fed. Cir. 1991); and *In re Royka*, 490 F.2d 981, 180 U.S.P.Q. 580 (C.C.P.A. 1974).  Furthermore, the teaching or suggestion to make the

137                                        5

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

claimed combination and the reasonable expectation of success must both be found in the prior art, and not based on the applicant's disclosure. *In re Vaeck*, 947 F.2d 488, 20 U.S.P.Q.2d 1438 (Fed. Cir. 1991).

A claim is considered obvious under 35 U.S.C. §103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. §103. The Supreme Court has set forth the following four so-called *Graham* factors to be considered when determining obviousness: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any secondary indicia of nonobviousness. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1996).

Thus, the obviousness test is not only three elements of primary consideration (scope and content of the prior art, differences between the prior art and the claims at issue, and the level of ordinary skill in the pertinent art), but also evidence of secondary considerations when such evidence is present. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984), *cert. denied*, 471 U.S. 1065 (1985). Secondary considerations include unexpected results, commercial success of the invention, whether the invention solved a long felt need, copying the invention by others in the field, and failure of others to solve the problem that the inventor solved. When unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared to the closest prior art. *In re Baxter Travenol Labs.*, 952 F.2d 388, 392 (Fed. Cir. 1991).

### b) Plunkett Does Not Teach or Suggest Appellants' Claimed Invention

Appellants respectfully submit that the Examiner has not met her burden of establishing a *prima facie* case of obviousness. Plunkett does not teach each and every element of the claimed invention, and does not provide any suggestion or motivation to use the claimed lower dosage amount of CEE and MPA. (*See* Lobo Declaration ¶17-20). Moreover, at the time of the invention, one of ordinary skill in the art would not have had any reasonable expectation of success by using a lower

138                                    6

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

dosage regimen. As described by Dr. Lobo, the unexpected results showing that a regimen of 1.5 mg MPA in combination with about 0.3 mg to about 0.45 mg CEE reduced the number and severity of hot flushes were contrary to what would have been expected by those skilled in the art. (*See* Lobo Declaration ¶6).

In considering the broad disclosure of Plunkett, one skilled in the art would have to perform undue experimentation to arrive at Appellants' particular low dose combination among the vast possibilities contemplated by Plunkett. Obviousness can only be established if the prior art and/or the knowledge generally available to one of ordinary skill in the art explicitly or implicitly teaches, suggests or motivates those skilled in the art to produce the claimed invention. "The test for an implicit showing is what the combined teachings, knowledge of one ordinary skill in the art, and the nature of the problem to be solved as a whole would have suggested to those of ordinary skill in the art." *In re Kotzab*, 217 F.3d 1365, 1370, 55 U.S.P.Q.2d 1313, 1317 (Fed. Cir. 2000). *See also In re Jones*, 958 F.2d 347, 21 U.S.P.Q.2d 1941 (Fed. Cir. 1992). Appellants respectfully submit that neither Plunkett nor the knowledge generally available to those skilled in the art at the time of the invention suggested or motivated a skilled artisan to use the particular low dose combination claimed by Appellants.

As discussed above, Plunkett discloses a myriad of estrogens and progestins that can be combined to treat numerous disorders. Of the thousands of possibilities with the disclosed genus, Plunkett discloses of 0.600 mg CEE and 2.5 mg of MPA as the preferred doses. (Tables 1A and 1B). Appellants' claims require a dose of about 0.3 to about 0.45 mg CEE and a dose of about 1.5 mg MPA. When the claimed invention is compared with Plunkett's preferred dosage (which is the closest disclosed species), Plunkett's regimen recites a dose of CEE that is between 33% and 100% higher than Appellants' regimen, and a dose of MPA that is 66% higher than Appellants' regimen. Moreover, it is well established that a species is patentable within a prior art genus absent a motivation for one skilled in the art to make the claimed invention. *See, e.g., In re Baird*, 29 U.S.P.Q.2d 1550 (Fed. Cir. 1994); and *In re Jones*, 21 U.S.P.Q.2d 1941 (Fed. Cir. 1992). Nothing in Plunkett, including the closest disclosed species, teaches or suggests the low dose combination claimed by the Appellants.

139                                    7

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

Furthermore, as described by Dr. Lobo, those skilled in the art considered the commercial regimen of 0.625 mg CEE plus 2.5 mg MPA as the standard dosage of estrogen and MPA necessary to relieve the symptoms of menopause, including hot flushes and bone loss. (Lobo Declaration ¶ 8). Indeed, Dr. Lobo states that the results of the study set forth on page 9 of the specification, showing that the lower doses of CEE and MPA reduced the number and severity of hot flushes, were contrary to what would have been expected by those skilled in the art. (Lobo Declaration ¶ 6). Accordingly, the teachings of the prior art and the knowledge generally available in the art would not have suggested to those skilled in the art that the use of 1.5 mg MPA in combination with about 0.3 mg to about 0.45 mg CEE would have been reasonably successful in providing relief of vasomotor symptoms of menopause.

Moreover, even assuming *arguendo* that it would have been *obvious to try* Appellants' low dose combination, as the Examiner has suggested, this is not the appropriate standard to use in reaching an obviousness determination. *See In re Fine*, 837 F.2d 1071, 1075-76, 5 U.S.P.Q.2d at 1598-1600 (Fed. Cir. 1988). The Federal Circuit in *In re Fine* stated that:

> The PTO has the burden under section 103 to establish a prima facie case of obviousness. It can satisfy this burden only by showing some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references. This it has not done . . . .
>
> \*        \*        \*
>
> Instead, the Examiner relies on hindsight in reaching his obviousness determination . . . . One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention.

*Id.*

It is respectfully submitted that the Examiner offers no evidence, but only conclusory, hindsight speculation in support of her position of obviousness. However, when applying 35 U.S.C. §103, the prior art reference must be viewed without the benefit of impermissible hindsight vision afforded by the claimed invention. *See Hodosh v. Block Drug Co., Inc.*, 786 F.2d 1136, 1143 n.5, 229 U.S.P.Q. 182, 187 n.5 (Fed. Cir. 1986); and MPEP §2141. In this instance, the unrefuted evidence provided by the Appellants shows that optimization of the dosage

140

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

amounts was not obvious to one of skill in the art because the selected Plunkett regimen was accepted as the minimum dosage necessary to provide relief from hot flushes. (*See* Lobo Declaration ¶ 8).

### c) Appellants Have Demonstrated Unexpected Results Over the Closest Prior Art

The Appellants respectfully submit that even assuming *arguendo* that the Examiner had established a *prima facie* case of obviousness, the evidence provided by the Appellants clearly rebuts the *prima facie* case by showing that the claimed invention possesses unexpectedly improved properties. The Appellants have provided data demonstrating unexpected results over the closest prior art. Evidence of unexpected properties may be in the form of a direct or indirect comparison of the claimed invention with the closest prior art which is commensurate in scope with the claims. *See In re Boesch*, 617 F.2d 272, 205 U.S.P.Q. 215 (C.C.P.A. 1980). *See also* MPEP §716.02(d)-§716.02(e).

The pending application provides data setting forth some of the results of a double blind clinical study of postmenopausal women using combinations of PREMARIN (conjugated estrogens tablets, USP) plus MPA, or placebo. (*See* Pages 8-9). The results of the study reported on page 9 of the specification surprisingly and unexpectedly demonstrated that providing a much lower daily dosage of 1.5 mg MPA in combination with 0.45 or 0.30 mg CEE reduced the number and severity of hot flushes to essentially the same extent as the standard, commercially available dose combination of 0.625 mg CEE and 2.5 mg MPA. (Second Lobo Declaration ¶6).

As explained by Dr. Lobo, for the past 20 years, the dosage of 0.625 mg CEE has been accepted as the minimum dosage of estrogen necessary to relieve the symptoms of menopause, including vasomotor symptoms. Furthermore, the dosage of 2.5 mg of MPA has been recognized as the minimum amount needed to oppose 0.625 mg CEE and to protect the endometrium. This daily dosage combination of 0.625 mg CEE plus 2.5 mg MPA has been the most commonly prescribed combination estrogen-progestin hormone replacement therapy regimen in the United States. (*See* Second Lobo Declaration ¶ 2).

The closest species disclosed by Plunkett, which is 0.600 mg CEE plus 2.5 mg MPA, is equivalent to the commonly prescribed higher dosage regimen, 0.625 mg

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

CEE plus 2.5 mg MPA. Although there is a slight variation in the dosage of CEE, one skilled in the art would consider a daily dosage of 0.625 mg CEE to be clinically equivalent to a dosage of 0.600 mg CEE for the purposes of treating vasomotor symptoms. (*See* Second Lobo Declaration ¶ 3). Because the commonly prescribed regimen (0.625 mg CEE in combination with 2.5 mg MPA) and the closest species disclosed in Plunkett are equivalent, Appellant's demonstration of unexpected results over the commonly prescribed regimen is equally applicable to show unexpected results over the Plunkett regimen.

As set forth in Dr. Lobo's first declaration, he worked with other scientists and doctors to develop the clinical protocol for the study reported on page 9 of the specification, referred to as the Women's Health, Osteoporosis, Progestin, Estrogen study ("H.O.P.E. study"), and was involved as a trial investigator. (Lobo Declaration ¶ 9). In the H.O.P.E. study, patients received continuous and uninterrupted treatment for 13 to 26 cycles, consisting of the following eight regimens administered daily: (1) 0.625 mg CEE; (2) 0.45 mg CEE; (3) 0.3 mg CEE; (4) 0.625 mg CEE plus 2.5 mg MPA ("PREMPRO"); (5) 0.45 mg CEE plus 2.5 mg MPA; (6) 0.45 mg CEE plus 1.5 mg MPA; (7) 0.3 mg CEE plus 1.5 mg MPA; and (8) a placebo. (Lobo Declaration ¶ 11).

The results from the H.O.P.E. study surprisingly and unexpectedly demonstrated that all doses of CEE and MPA reduced the number and severity of hot flushes experienced by the women in this study compared with women taking placebo. (Lobo Declaration ¶ 14). Specifically, it was unexpected that providing a daily dosage of 1.5 mg MPA in combination with the lower doses, 0.45 or 0.30 mg, CEE, rapidly reduced the number and severity of hot flushes to the same extent as the much higher and commercially available dose combination containing 0.625 mg CEE and 2.5 mg MPA. (Lobo Declaration ¶ 14).

Moreover, the H.O.P.E. study further unexpectedly showed an additive effect of MPA at low doses. Prior studies using various dosages of CEE had demonstrated that MPA had no additive effect in relieving vasomotor symptoms, and the presence of MPA was thought to be merely prophylactic (Lobo Declaration ¶ 15). That is, it was thought that CEE plus MPA was no more effective in relieving hot flushes as compared to CEE alone. However, the H.O.P.E. study surprisingly demonstrated that the particular low dose of 1.5 mg MPA may contribute vasomotor relief in

142

10

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

combination with the lower dosages of 0.3 or 0.45 mg CEE. Thus, Appellants' invention unexpectedly contradicts the accepted view by demonstrating the additive effect of MPA at low dosages.

The Appellants respectfully disagree with the Examiner's position that the data provided on page 9 of the specification does not constitute unexpected results because the data presented shows similar efficacy in treating vasomotor symptoms between the standard commercially available regimen, 0.625 mg CEE/2.5 mg MPA, and the lower dosage regimens claimed herein, 0.45 mg CEE/1.5 mg MPA and 0.30 mg CEE/1.5 mg MPA. (Office Action, p. 4). The Examiner further noted that some of the data points overlap in both number and severity of hot flushes. However, these similar therapeutic results that are reported on page 9 of the specification are precisely what was unexpected to one skilled in the art.

As explained in Dr. Lobo's declarations, prior to the Appellants' invention, one skilled in the art would expect that a low dose regimen would have *some effect* in reducing the number and severity of hot flushes. However, a skilled artisan would have expected *far less of an effect* than the standard dose of 0.625 mg CEE plus 2.5 mg MPA. (Lobo Declaration ¶ 12 and Second Lobo Declaration ¶ 6). In fact, Dr. Lobo and others skilled in the art doubted that a study of low dose regimens was worth the economic effort. (Lobo Declaration ¶ 12). Despite the presumption that the standard regimen was the minimum effective dose, Appellants demonstrated that the low dose regimen was *equally effective* at relieving hot flushes. (Lobo Declaration ¶ 14 and Second Lobo Declaration ¶ 5).

Appellants also respectfully disagree with the Examiner's assertions that because the lower dosage combinations yielded similar therapeutic results as with the standard commercially available combination, the Appellants have confirmed the teachings of Plunkett that the entire range is effective in treating hot flushes. Appellants are required to compare their claimed invention with the closest species disclosed in the prior art. *See* MPEP §2144.08(II)(A)(2) ("the closest disclosed species or subgenus in the prior art reference should be identified and compared to that claimed."). In Plunkett, the closest species is 0.600 mg CEE in combination with 1.5 mg MPA. Applicants have made such a comparison and have demonstrated unexpected results over Plunkett. Appellants respectfully submit that contrary to the

143                                   11

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

Examiner's position, they do not confirm the efficacy of the entire Plunkett genus, but rather only demonstrate the efficacy of the claimed low dose regimen.

The Examiner states that Dr. Lobo's declaration does not clearly and convincingly show unexpected benefits residing in the claimed dosage regimen. Appellants respectfully disagree. Dr. Lobo's statements are not only based on cited references, but are also based on his knowledge as a practicing physician in the field. Dr. Lobo has extensive experience in treating women for symptoms of menopause, including hot flushes, and has knowledge of what other skilled in the art prescribed for their patients. Thus, the evidence provided by Dr. Lobo should be given a great deal of weight in the determination of patentability of the pending claims.

## Conclusion of Argument

It is respectfully submitted that the Examiner has not made a *prima facie* case of obviousness because Plunkett, the sole reference cited against the Appellants' claims, does not teach or suggest the selection of about 1.5 mg MPA in combination with about 0.3 to about 0.45 mg CEE, as recited in the appealed claims. Furthermore, the unrefuted evidence provided in the specification and by Dr. Lobo convincingly demonstrates the unexpected results obtained with Appellants' invention. Accordingly, Appellants respectfully submit that the rejection of the appealed claims should be reversed.

Attorney Docket No. 01855/115
Application Serial No. 09/808,878

### Fee Authorization

In the original appeal brief, filed October 19, 2004, the Commissioner was authorized to charge the fee for the Appeal Brief and any other fees necessary for the consideration of this appeal. No additional fees are believed to be due for submission of this Substitute Appeal Brief. If, however, any required fees are due, please charge the required fees to Kenyon & Kenyon Deposit Account No. 11-0600.

Respectfully submitted,

Dated: November _14_, 2005

Thomas J. Meloro
Reg. No. 33,538

KENYON & KENYON
One Broadway
New York, NY 10004
Tel: (212) 425-7200
Fax: (212) 425-5288

145

13



 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/808,878 | 03/15/2001 | James H. Pickar | AM100226 | 5270 |

| 26646        7590        02/24/2006 | EXAMINER |
|---|---|
| KENYON & KENYON LLP | WANG, SHENGJUN |
| ONE BROADWAY | |

| NEW YORK, NY  10004 | ART UNIT | PAPER NUMBER |
|---|---|---|
| | 1617 | |

DATE MAILED: 02/24/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**MAILED**

**FEB 2 4 2006**

**GROUP 1600**

## BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES

Application Number: 09/808,878
Filing Date: March 15, 2001
Appellant(s): PICKAR, JAMES H.

---

Thomas J. Meloro
_For Appellant_

## EXAMINER'S ANSWER

This is in response to the appeal brief filed November 14 appealing from the Office action

mailed September 10, 2003.

147

Application/Control Number: 09/808,878                                    Page 2
Art Unit: 1617

### *(1)* (1) Real Party in Interest

A statement identifying by name the real party in interest is contained in the brief.

### (2) Related Appeals and Interferences

The examiner is not aware of any related appeals, interferences, or judicial proceedings which will directly affect or be directly affected by or have a bearing on the Board's decision in the pending appeal.

### (3) Status of Claims

The statement of the status of claims contained in the brief is correct.

### (4) Status of Amendments After Final

The appellant's statement of the status of amendments after final rejection contained in the brief is correct.

### (5) Summary of Claimed Subject Matter

The summary of claimed subject matter contained in the brief is correct.

### (6) Grounds of Rejection to be Reviewed on Appeal

The appellant's statement of the grounds of rejection to be reviewed on appeal is correct.

### (7) Claims Appendix

The copy of the appealed claims contained in the Appendix to the brief is correct.

### (8) Evidence Relied Upon

The following is a listing of the evidence (e.g., patents, publications, Official Notice, and admitted prior art) relied upon in the rejection of claims under appeal.

148

US Patent Re. 36,247        Plunkett et al.        July 6, 1999

### (9) Grounds of Rejection

The following ground(s) of rejection are applicable to the appealed claims:

Claims 7, 11, 12 and 69 are rejected under 35 U.S.C. 103(a) over Plunkett d a1.

These rejections are fully set forth in prior office action mailed September 10, 2003, and

reiterated in full below.

### (10) Response to Argument

Claims 7, 11, 12 and 69 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Plunkett d a1. (USPN RE 36,247).

Plunkett et a1. (USPN RE 36,247) teaches a method of treating hot flashes comprising

administering continuously and uninterruptedly both progestogen and estrogen in daily dosage

units, see claims 21-34, col. 3, lines 51-59 and co1.8 lines 62-64 in particular. Plunkett d al.

(USPN RE 36,247) also teaches conjugated equine estrogen/medroxyprogesterone as one of the

estrogen/progestogen combinations useful in its method, see claims 21-34. Plunkett teaches the

minimum and maximum dosages for medroxyprogesterone (MPA) and conjugated equine

estrogens (CEE) to be 1 mg/day and 15 mg/day, and 0.300 mg/day and 2.5 mg/day, respectively,

and the preferred dosages are 1-2.5 gm (MPA) and 0.300-0.600 mg (ECC) respectively, see

claims 34-35, see also Table IA, co1.4, in particular.

Plunkett et a1. does not particularly teach the dosages of conjugated equine

estrogen/medroxyprogesterone claimed herein.

It would have been obvious to one of ordinary skill in the art at the time the invention

was made to employ conjugated equine estrogen/medroxyprogesterone in the specific dosages

149

claimed herein in a method of treating hot flashes.

One of ordinary skill in the art would have been motivated to employ conjugated equine estrogen/medroxyprogesterone in the specific dosages claimed herein in a method of treating hot flashes because they (dosages herein) fall within the therapeutic ranges of the conjugated equine estrogen/medroxyprogesterone taught by the prior art. Optimization of amounts is within the purview of the Skilled Artisan, and is therefore obvious absent evidence to the contrary. No such evidence is seen.

Appellants' arguments have been fully considered but they are not persuasive.

*A prima facie case of obviousness has been established.* Appellants first argue that prima facie case of obviousness has not been established. Particularly, appellants ague "there is nothing in Plunkett to teach or suggest the selection of 1.5 mg MPA for the treatment of vasomotor symptoms in combination with about 0.3 to about 0.45 mg CEE." Note that Plunkett teaches that MPA can be employed at minimum dosage of 1.0 mg and maximum dosage of 15 mg, and preferred range of 1-2.5 mg/day (claim 32). Note that the claimed dosage herein, 1.5 mg/day, fails within the preferred range. Note also that the claimed dosage herein, 0.3-0.45 mg of CEE, falls within the dosage range of 0.300-0.600 mg disclosed by Plunkett. It would have been prima facie obvious to one of ordinary skill in the art to use 1.5 mg/day of MPA and 0.3-0.45 mg/day of CEE because the amounts herein are within the relatively narrow range disclosed in the prior art.

*The objective evidences on the record are not sufficient to overcome the obviousness.* Appellant draws the examiner's attention to data presented in the specification showing the efficacy of the dosages herein versus that of the "common daily dosages" of Premarin and MPA.

Note that in order to overcome obviousness appellant must demonstrate unexpected and

significant results in comparison with the closest prior art, i.e., Plunkett. No such comparative

data has been provided. Appellants state that the closest example in Plunkett is a regimen

comprising 0.600 mg CEE and 2.5 mg MPA. The specification on page 9 provides a comparative

example between 60.625 mg of CEE, and not 0.600 mg of CEE. Furthermore, the data presented

does not constitute unexpected results because according to appellants' remarks, the data shows

similar efficacy of the following regimens: 0.625 CEE/2.5 MPA, 0.45 CEE/1.5 mg MPA, 0.30

CEE/1.5 MPA. Some data points are overlapping in both number and severity of hot flushes.

Assuming arguendo that lower dose of MPA and CEE claimed herein yield similar therapeutical

results, then the teachings of the prior art is confirmed. Plunkett teaches a wide range of

CEE/MPA as effective in treating hot flushes. Therefore, the showing on page 9 of the

specification indeed confirms the teachings of the prior art that the entire range disclosed in

Plunkett is effective in treating hot flushes.

The two declarations of Dr. Lobo submitted under 37 CFR 1.132 have been fully

considered, but are not persuasive to remove the obvious rejection herein. Dr. Lobo asserts that

conventional accepted combination treatment of conjugated equine

estrogen/medroxyprogesterone is 0.625 mg/2.5 mg daily, and such amounts have been accepted

as the minimum effective amounts. Therefore, the lower dosage (0.3 to 0.54 mg/1.5 mg) as

claimed in the application would have not been expected to be effective in view of the

conventional accepted dosage.

The assertion is not persuasive. Note the Plunkett et al., a patent issued in the past 20

years contradicts this very proposition since it teaches ranges of CEE/MPA that encompass the

Application/Control Number: 09/808,878                                    Page 6
Art Unit: 1617

dosage claimed herein, with 0.6 mg/2.5 mg as the up limit of the preferred embodiments. The

claimed amounts are within the range disclosed in the prior art. It is noted that the range are

relatively narrow, and what appellants proved is nothing more than what is expected according

the cited prior art. As to the alleged unexpected additive or synergistic effect of MPA and CEE,

it is noted that Plunkett et al. particularly teach the combination of MPA/CEE. Further, the fact

that applicant has recognized another advantage which would flow naturally from following the

suggestion of the prior art cannot be the basis for patentability when the differences would

otherwise be obvious. See *Ex parte Obiaya*, 227 USPQ 58, 60 (Bd. Pat. App. & Inter. 1985).

For the above reasons, it is believed that the rejections should be sustained.


   **(11) Related Proceeding(s) Appendix**

   No decision rendered by a court or the Board is identified by the examiner in the Related

Appeals and Interferences section of this examiner's answer.


   For the above reasons, it is believed that the rejections should be sustained.

Application/Control Number: 09/808,878                                    Page 7
Art Unit: 1617

     Respectfully submitted,

Shengjun Wang          SHENGJUN WANG
Primary Examiner       PRIMARY EXAMINER
Art Unit 1617


Conferees:
Sreeni Padmanabhan

                                  SAN-MING HUI
                                  PRIMARY EXAMINER


Egon E. Berg
American Home Products Corporation
Patent Law Department
Five Giralda Farms
Madison, NJ 07940

                                  SREENI PADMANABHAN
                                SUPERVISORY PATENT EXAMINER

153

Wyeth Pharmaceuticals
P.O. Box 8299
Philadelphia, PA 19101-8299

RECEIVED
CENTRAL FAX CENTER

MAY 0 2 2006

# Wyeth

# FACSIMILE

Date:        May 2, 2006

Number of pages (including cover):  3

To:    United States Patent Office

Fax:    571 273 8300

☐             ☐

From:    Arnold S. Milowsky

Department:    Law Department - Patent Section

Telephone:    (484) 865 8615

Fax:        (484) 865 8782

☐ Please reply asap   ☐ Please comment

**Remarks:**

Re:  James H. Pickar and Michael S. Dey
Application No.:  09/808,878
Filed:  March 15, 2001
Confirmation No. 5270

Attached please find the following document:

POWER OF ATTORNEY BY ASSIGNEE OF ENTIRE INTEREST
(REVOCATION OF PRIOR POWERS)

This transmission is intended for the addressee only and may be attorney-client privileged and/or contain information that is confidential and/or proprietary to Wyeth. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of the information contained in this facsimile is unauthorized and strictly prohibited. If you have received this facsimile in error, please notify this office immediately by telephone call to the sender above so we can arrange for the destruction or return of the document to Wyeth at no cost to you. Thank you.

PAGE 1/3 ' RCVD AT 5/2/2006 3:22:53 PM [Eastern Daylight Time] ' SVR:USPTO-EFXRF-3/4 ' DNIS:2738300 ' CSID:4848658782 ' DURATION (mm-ss):01-32

154

AM100226
Patent

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re of Application of: | James H. Pickar and Michael S. Dey | | |
| Application No.: | 09/808,878 | Group Art No.: | 1617 |
| Filed: | March 15, 2001 | Examiner: | S. Wang |
| For: | Hormone Replacement Therapy | | |
| Confirmation No.: | 5270 | | |

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

RECEIVED
CENTRAL FAX CENTER

MAY 0 2 2006

### POWER OF ATTORNEY BY ASSIGNEE OF ENTIRE INTEREST
### (REVOCATION OF PRIOR POWERS)

As assignee of record of the entire interest of the above identified application

### REVOCATION OF PRIOR POWERS OF ATTORNEY

all powers of attorney previously given are hereby revoked and

### NEW POWER OF ATTORNEY

the following attorney(s) and/or agent(s) are hereby appointed to prosecute and transact all business in the Patent and Trademark Office connected therewith:

All practitioners associated with Customer Number 60949

Please send all correspondence related to this matter to:    Customer Number 60949

Please direct telephone calls related to this matter to:                Name:  William T. King
                                                                                                    Tel No. 484 865 8613

AM100226
Patent

Assignee of Entire Interest:
Wyeth
Patent Law Department
Five Giralda Farms
Madison, NJ 07940

Assignment from Inventors: James H. Pickar
Recorded in PTO on August 27, 2001
Reel 012116/Frame 0261

Assignment from Inventors: Michael S. Dey
Recorded in PTO on April 27, 2006
Reel 017538/Frame 0869

### CERTIFICATION UNDER 37 CFR §3.73 (b)

The undersigned has reviewed the recordation information for the patent application identified above and, to the best of undersigned's knowledge and belief, title is in the assignee identified above.

The undersigned (whose title is supplied below) is empowered to sign this certificate on behalf of the assignee.

I hereby declare that all statements made herein of my own knowledge are true, and that all statements made on information and belief are believed to be true; and further, that these statements are made with the knowledge that willful false statements, and the like so made, are punishable by fine or imprisonment, or both, under Section 1001, Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the

Date: May 2, 2006

William L. King
Assistant Secretary

156

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371 (c) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 09/808,878 | 03/15/2001 | James H. Pickar | AM100226 |

**CONFIRMATION NO. 5270**

26646
KENYON & KENYON LLP
ONE BROADWAY
NEW YORK, NY 10004


*OC000000018748159*

Date Mailed: 05/10/2006

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 05/02/2006.

• The Power of Attorney to you in this application has been revoked by the assignee who has intervened as provided by 37 CFR 3.71. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

YNEZ JALECO
PTOSS (703) 305-0677

OFFICE COPY

157



**UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371 (c) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 09/808,878 | 03/15/2001 | James H. Pickar | AM100226 |

**CONFIRMATION NO. 5270**

60949
WYETH/FINNEGAN HENDERSON, LLP
901 NEW YORK AVENUE, NW
WASHINGTON, DC 20001-4413

*OC000000018748186*

Date Mailed: 05/10/2006

## NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 05/02/2006.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

_____

YNEZ JALECO
PTOSS (703) 305-0677

OFFICE COPY

158



*IZW*
*AF*

PATENT
Customer No. 60,949
Attorney Docket No. 1142.0378-00

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Application of: | ) |
| | ) |
| James H. PICKAR et al. | ) Group Art Unit: 1617 |
| | ) |
| Application No.: 09/808,878 | ) Examiner: Shengjun WANG |
| | ) |
| Filed: March 15, 2001 | ) |
| | ) |
| For: HORMONE REPLACEMENT | ) Confirmation No.: 5270 |
| THERAPY | ) |

**Attention: Mail Stop Appeal Brief-Patents**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

### REPLY BRIEF UNDER RULE § 41.41

Pursuant to 37 C.F.R. § 41.41, Appellants present this Reply to the Examiner's

Answer dated February 24, 2006. If any fees are required in connection with the filing

of this paper, Appellants request that the required fees be charged to Deposit Account

No. 06-0916.

### I.    Status of Rejection

In response to the Appeal Brief filed November 14, 2005 the Office has

maintained the rejection of claims 7, 11, 12, and 69 under 35 U.S.C. § 103(a) as being

unpatentable over Plunkett et al. (U.S. Patent No. 4,826,831 (RE 36,247)) ("Plunkett").

159

II.    **Response to Office's Arguments**

Appellants maintain their position that, for the reasons of record and for the additional reasons set forth below, a *prima facie* case of obviousness has not been established, and even if it has been established, Appellants have demonstrated that the claimed invention achieves unexpected and surprising results.

A.    <u>The Examiner's Answer Fails to Provide Motivation for Optimizing Teachings of Plunkett et al.</u>

In the Answer, the Examiner asserts:

> One of ordinary skill in the art would have been motivated to employ conjugated equine estrogen/medroxyprogesterone in the specific dosages claimed herein in a method of treating hot flashes because they (dosages herein) fall within the therapeutic ranges of the conjugated equine estrogen/medroxyprogesterone taught by the prior art [Plunkett et al.]. Optimization of amounts is within the purview of the Skilled Artisan, and is therefore obvious absent evidence to the contrary. No such evidence is seen.

Examiner's Answer at 4. In making this statement, the Office fails to explain what **in the prior art** would suggest or motivate a person of ordinary skill in the art to optimize the teachings of Plunkett et al. when the reference already discloses "preferred" dosages for a series of estrogens and progestins. More specifically, the Office has not explained why a person of ordinary skill in the art would ignore the explicitly preferred dosages listed of 0.600 mg/day for conjugated equine estrogens (CEE) (col. 4, line 65) and of 2.5 mg/day for medroxyprogesterone acetate (MPA)(col. 5, line 50) in order to arrive at the claimed dosages of about 0.45 mg/day to about 0.3 mg/day for CEE and 1.5 mg/day for MPA. The case law requires such as explanation: "Even when obviousness is

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

based on a single prior art reference, there must be a showing of a suggestion or

motivation to modify the teachings of that reference." *In re Kotzab,* 217 F.3d 1365,

1370 (Fed. Cir. 2000).

**B.    The Examiner's Answer Fails to Address Explicit Disclosure in the Art That Teaches Away From Appellants' Claimed Invention**

Moreover, the Office has not addressed the fact that both the Plunkett et al.

reference applied in the rejection, as well as the contemporary literature cited in the

Lobo Declarations, actually teach away from Appellants' claimed dosages. The range

reported in Plunkett et al. Table 1A for conjugated equine estrogens is 0.300 to 2.5

mg/day, with a preferred dose of 0.600 mg/day. Col. 4, line 65. The reported range for

medroxyprogesterone acetate is 1 to 15 mg/day with a preferred dose of 2.5 mg/day.

Col. 5, line 50. One cannot seriously dispute that, in designating the preferred amounts,

Plunkett et al. taught that those particular amounts *were* the optimal amounts. After all,

"preferred" means chosen "as more desirable or more valuable." American Heritage

College Dictionary, p. 1078, 3rd ed., 1997.

The Office's rejection, however, assumes that a person of ordinary skill reading

the Plunkett et al. disclosure of the preferred and optimal dosages of estrogens and

progestins would somehow be motivated to find some *other* optimal amounts, even

though the optimal amounts were already disclosed. Indeed, the disclosed preferred

amounts taught away from the claimed dosages. "A prior art reference must be

considered in its entirety, i.e., as a <u>whole</u>, including portions that would lead away from

the claimed invention." MPEP § 2141.02 (emphasis in original) (citing *W.L. Gore &*

161                                3

*Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 220 USPQ 303 (Fed. Cir. 1983)).

Here, there is no need for anyone skilled in the art to seek to find the optimal dosages

within the disclosed ranges since, while reading Plunkett et al., a person of ordinary skill

in the art would recognize the "preferred" dosages as the optimal ones. That disclosure

of "preferred" dosages of 0.600 mg of CEE and 2.5 mg of MPA would teach away from

"optimizing" the dosages to arrive at a dosage regimen of about 0.3 to about 0.45 mg of

CEE and about 1.5 mg of MPA, as recited in Appellants' claimed methods.

Other evidence of record confirms that the preferred dosages recited in Plunkett

et al. were actually considered to be the **minimally effective** dosages for treating hot

flushes by those of ordinary skill in the art, and thus would have taught away from

Appellants' claimed dosage scheme. For example, the Second Declaration of Rogerio

A. Lobo, M.D. states:

> For the past 20 years, the dosage of 0.625 mg CEE
> [conjugated equine estrogen] has been accepted as the
> **minimum dosage** of estrogen necessary to relieve the
> symptoms of menopause, including hot flushes and bone
> loss. (See, e.g., Sobel NB, <u>Obstetrics and Gynecology
> Clinics of North America</u>, 21: 299-319 (1994) (describing
> 0.625 mg as the standard dose of conjugated estrogen) (Ex.
> A hereto); Kronenberg F., Chapter 9: Hot Flashes, in
> Rogerio A. Lobo, ed., <u>Treatment of the Postmenopausal
> Woman: Basic and Clinical Aspects</u>, New York, NY: Raven
> Press, at 109 (1994)) ("The most commonly used regimen
> for treating hot flashes in the United States in 0.625 to 1.25
> mg of oral conjugated equine estrogen (Premarin)")(Ex. B
> hereto). The dosage of 2.5 mg of MPA
> [medroxyprogesterone acetate] has been recognized as the
> **minimum amount needed** to oppose 0.625 mg CEE and
> protect the endometrium. This combination of 0.625 mg
> CEE plus 2.5 mg MPA daily has been the most commonly
> prescribed combination estrogen-progestin hormone
> replacement therapy in the United States. (See, e.g.,

162                                        4

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

Kreling, D., et al., <u>Prescription Drug Trends: A Chartbook Update</u>, Menlo Park, CA: Kaiser Family Foundation, at 51 (2000))) (Ex. C hereto).

Pages 1-2, ¶ 2 (emphasis added); *see also* First Lobo Declaration, pages 3-4, ¶ 8.

Proceeding contrary to accepted wisdom in the art is evidence of nonobviousness that

must be considered. *In re Hedges,* 783 F.2d 1038, 228 USPQ 685 (Fed. Cir. 1986);

MPEP § 2145. Here, Appellants have provided objective evidence that the claimed

invention represents a complete break from accepted wisdom in the art concerning the

minimally acceptable dosage scheme for treating hot flushes with combination

estrogen/progetin hormone replacement therapy. That accepted wisdom, along with the

teaching of preferred dosages in Plunkett et al., teaches away from Appellants' claimed

methods. Accordingly, the Office has failed to establish a *prima facie* case of

obviousness of Appellants' claimed methods.

### C.    The Examiner's Answer Fails Appreciate the Evidence of Unexpected Results

In addressing Appellants' data, which sets forth the results of a double blind

clinical study of postmenopausal women using various combinations of PREMARIN®

plus MPA, or placebo (*see* Specification, pages 8-11), the Office asserts:

> [T]he data presented does not constitute unexpected results because according to appellants' remarks, the data shows similar efficacy of the following regimens: 0.625 CEE/2.5 MPA, 0.45 CEE/1.5 MPA, 0.30 CEE/1.5 MPA. Some data points are overlapping in both number and severity of hot flushes.

Examiner's Answer at 5. Apparently, the Office's position is that because there is a

*similarity* in results for the three dosage schemes, there is no showing of unexpected

163                                    5

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

results. However, the similarity in results is achieved by using lesser amounts of the

active ingredients and was, therefore, surprising. Indeed, the similar results obtained

with differing amounts of active ingredients evidenced that the claimed dosage scheme

possessed an "unexpected superiority in potency which itself is conclusive of

nonobviousness." *See In re Lunsford,* 357 F.2d 380, 380, 148 USPQ 716 (CCPA

1966).

Moreover, there is no requirement that, for unexpected results to be shown, there

must be an *increase* in relative activity between the data point representing the closest

prior art (here, 0.625 CEE/2.5 MPA) and the claimed invention (here, 0.45 CEE/1.5

MPA, 0.30 CEE/1.5 MPA). *See In re Chupp,* 816 F.2d 643, 646, 2 USPQ2d 1437 (Fed.

Cir. 1987) ("To be patentable, a compound need not excel over prior art compounds in

all common properties.") Where a person of ordinary skill in the art would have

expected any difference in results, a showing of similarity is evidence of unexpected

results that must be considered. *See In re Orfeo,* 440 F.2d 439, 441, 169 USPQ 487

(CCPA 1971) ("As long as there is a question of obviousness, no matter how trivial that

question may seem, we think appellants have the right to have considered the Rule 132

affidavit which allegedly shows new and unexpected results.") While a change in

activity can be evidence of unexpected results, the "absence of [a] property which a

claimed invention would have been expected to possess based on the teachings of the

prior art is evidence of unobviousness" as well. *See* MPEP 716.02(a) (citing *Ex Part*

*Mead Johnson & Co.,* 227 USPQ 78 (Bd. Pat. App. & Interf. 1985)).

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

Here, the claimed invention is a method of treating or inhibiting vasomotor symptoms, such as hot flushes. The method comprises orally providing a daily dosage of a combination of between about 0.45 mg and about 0.3 mg per day of CEE and about 1.5 mg of MPA. Plunkett et al. describes estrogen/progestin combination therapy for treatment of numerous disorders. Numerous estrogens and progestins are described as being useful, but the Office relies on Plunkett et al.'s recitation in Table 1A of a dosage of CEE from 0.300 to 2.5 mg/day, with a preferred dose of 0.600 mg/day, and a dosage of MPA of from 1 to 15 mg/day with a preferred dose of 2.5 mg/day. Those preferred dosages have been confirmed as the minimally effective dosages for treating hot flushes in the Lobo Declarations and the supporting literature mentioned above.[1] Thus, a person of ordinary skill in the art reading this disclosure of Plunkett et al. would have expected a *decrease* in the art-recognized minimal dosage to result in a *decrease* in activity, *i.e.,* would have expected a dose-dependant response. In fact, Dr. Lobo has stated with respect to the testing described in Appellants' specification:

> I and others expected that the study would show that there would be a dose response such that the lower combination doses of CEE and MPA would have some effect in reducing the number and severity of hot flushes compared with the placebo, but far less of an effect than the standard dose of CEE 0.625 plus 2.5 mg MPA.

First Lobo Declaration, pages 4-5, ¶12.

---

1    Dr. Lobo has explained hat "[f]or purposes of treating or inhibiting vasomotor symptoms, one skilled in the art would consider a daily dosage of 0.600 mg CEE to be clinically equivalent to a dosage of 0.625 mg CEE." Second Lobo Declaration, page 2, ¶ 3.

The results set forth in the specification, however, have been interpreted by a person of ordinary skill in the art as "very surprising and unexpected" in that they show, not a dose-dependant *decrease* in activity, but a *similarity* in activity. *See* First Lobo Declaration, page 5, ¶14. The fact that there was *no decrease* in activity when a person of ordinary skill in the art would have expected a dose dependant response represents the "absence of [a] property which [the] claimed invention would have been expected to possess based on the teachings of the prior art." *See id.; see also In re Waymouth,* 499 F.2d 1273, 1276, 182 USPQ 290 (CCPA 1974) (reversing Board's obviousness rejection in view of unexpected results showing difference in kind, rather than degree, of claimed critical range even where results showed operability over ranges outside claimed range). Additionally, the fact that Appellants have demonstrated an unexpected increase in potency for the claimed dosage scheme "is conclusive of nonobviousness." *See In re Lunsford,* 357 F.2d 380, 380, 148 USPQ 716 (CCPA 1966). Thus, the fact that the claimed method results in a similarity, rather than a decrease, in activity is truly surprising and unexpected and is sufficient to overcome the rejection of the pending claims over Plunkett et al.

## III.    Conclusion

Accordingly, Appellants respectfully request that the rejection be reversed and withdrawn and that claims 7, 11, 12, and 69 be allowed.

Please grant any extensions of time required to enter this reply brief and charge any additional required fees to our Deposit Account No. 06-0916.

166                             8

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

Respectfully submitted,

Dated: May 23, 2006

Robert D. Bajefsky
Reg. No. 25,387

167                                    9

The opinion in support of the decision being entered today was <u>not</u> written
for publication and is <u>not</u> binding precedent of the Board.

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## BEFORE THE BOARD OF PATENT APPEALS
## AND INTERFERENCES

_____

*Ex parte* JAMES H. PICKAR

_____

Appeal 2006-3012
Application 09/808,878
Technology Center 1600

_____

HEARD December 14, 2006

_____

Before MILLS, GRIMES, and LINCK, *Administrative Patent Judges.*

GRIMES, *Administrative Patent Judge.*

DECISION ON APPEAL

This appeal involves claims to a hormone replacement therapy for
menopausal women, which the examiner has rejected as obvious. We have
jurisdiction under 35 U.S.C. § 134. We affirm.

BACKGROUND

As "estrogens decline during the time preceding (perimenopause) and
following the menopause (postmenopause), various physiological changes
may result, including . . . vasomotor instability manifested as hot flushes."

MAILED

JAN 3 1 2007

U.S. PATENT AND TRADEMARK OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

168

Appeal No. 2006-3012
Application No. 09/808,878

(Specification 1.) "Estrogen replacement therapy (ERT) is beneficial for symptomatic relief of hot flushes." (*Id.* at 2.)

ERT may increase the relative risk of endometrial cancer. (*Id.* at 3.) "There are extensive clinical data showing that the relative risk of endometrial cancer can be reduced by the addition of a progestin, either sequentially or continuously." (*Id.* at 4.) "Continuous combined hormone replacement therapy (HRT) . . . has been shown to be effective in relieving . . . vasomotor symptoms." (*Id.*) PREMPRO is a commercially available combination HRT product (*id.*) that contains 0.625 mg of conjugated equine estrogens USP and 2.5 mg of medroxyprogesterone acetate (MPA) (*id.* at 5).

The specification discloses that administering either 0.45 mg or 0.3 mg of conjugated equine estrogens (a.k.a. PREMARIN) in combination with 1.5 mg of MPA "reduce[s] the number and severity of hot flushes to the same extent as the higher dose combination containing 0.625 mg PREMARIN plus 2.5 mg MPA." (*Id.* at 9-10.) The specification characterizes this result as unexpected. (*Id.* at 9, line 32.)

## DISCUSSION

1. CLAIMS

Claims 7, 11, 12, and 69 are pending and on appeal. Claim 7, the only independent claim, reads as follows:

7.    A method of treating or inhibiting vasomotor symptoms in a perimenopausal, menopausal, or postmenopausal woman in need thereof, which comprises orally providing to said woman continuously and uninterruptedly over the treatment period, a combination of conjugated estrogens, USP and a daily dosage of about 1.5 mg of medroxyprogesterone acetate, wherein the daily dosage of conjugated equine estrogens is between about 0.45 mg and about 0.3 mg.

169                                    2

Appeal No. 2006-3012
Application No. 09/808,878

Appellant has not argued the claims separately. Therefore, claims 11, 12, and 69 will stand or fall with claim 7. 37 CFR § 41.37(c)(1)(vii).

Claim 7 is directed to a method of hormone replacement therapy. The claimed method comprises administering a daily dosage of about 1.5 mg of MPA and about 0.3 to 0.45 mg of conjugated equine estrogens "continuously and uninterruptedly over the treatment period." The specification defines "continuous and uninterrupted" to mean at least once-daily administration with no break in the treatment regimen during the treatment period. Page 7, lines 29-32.

2. OBVIOUSNESS

Claims 7, 11, 12, and 69 stand rejected under 35 U.S.C. § 103 as obvious in view of Plunkett.[1] The Examiner reasons that Plunkett "teaches a method of treating hot flashes comprising administering continuously and uninterruptedly both progestogen and estrogen in daily dosage units." (Answer, page 3.) The Examiner points out that Plunkett teaches the specific combination of MPA and conjugated equine estrogens (CEE) and teaches dosage ranges of 0.3 to 2.5 mg/day for CEE and 1 to 15 mg/day for MPA. (*Id.*) The Examiner also characterizes as "preferred" Plunkett's disclosed dosages of 1 to 2.5 mg/day of MPA and 0.300 to 0.600 mg/day of CEE. (*Id.*, citing "claims 34-35 [sic, 32 and 35].")

The Examiner acknowledges that Plunkett does not teach the specific dosage combination recited in the instant claims, but concludes:

> One of ordinary skill in the art would have been motivated to employ conjugated equine estrogen/medroxyprogesterone in the

---

[1] Plunkett et al., Re. 36,247, issued Jul. 6, 1999.

Appeal No. 2006-3012
Application No. 09/808,878

> specific dosages claimed herein in a method of treating hot
> flashes because they (dosages herein) fall within the therapeutic
> ranges of the conjugated equine estrogen/medroxyprogesterone
> taught by the prior art. Optimization of amounts is within the
> purview of the Skilled Artisan, and is therefore obvious absent
> evidence to the contrary.

(*Id.* at 4.)

We agree with the Examiner that Plunkett's teachings would have made the method of claim 7 prima facie obvious. Plunkett does not specifically disclose a method of controlling hot flushes by administering 1.5 mg/day of MPA in combination with 0.3 to 0.45 mg/day of CEE. However, Plunkett teaches a method of controlling hot flushes (col. 3, ll. 51-53) by "continuously and uninterruptedly administering a progestogen and an estrogen" (col. 3, ll. 8-9). One "especially preferred combination[ ]" is conjugated equine estrogen and medroxyprogesterone acetate (col. 6, l. 53; col. 7, ll. 10-11), the same compounds recited in claim 7.

Plunkett discloses dosages of conjugated equine estrogens ranging from a minimum of 0.300 mg/day to a maximum of 2.5 mg/day; 0.600 mg/day is disclosed as preferred (col. 4, l. 65). Plunkett discloses dosages of MPA ranging from a minimum of 1 mg/day to a maximum of 15 mg/day; 2.5 mg/day is disclosed as preferred (col. 5, l. 50). Plunkett claims methods involving administering less than the "preferred dosage" of MPA or conjugated equine estrogens. See claim 32 (about 1 to about 2.5 mg/day MPA); claim 35 (about 0.300 to about 0.600 mg/day CEE); and claim 42 (about 2.5 mg/day MPA and about 0.300 mg/day CEE). Thus, Plunkett discloses dosage ranges for those compounds that encompass the dosages

171                                    4

Appeal No. 2006-3012
Application No. 09/808,878

recited in claim 7 and teaches specific dosage ranges that are less than the
disclosed "preferred" dosages.

Finally, Plunkett teaches that patients should be given only as much
hormone as necessary to achieve the desired result (col. 4, ll. 1-5):

> The actual unit dosages are selected according to conventionally
> known methods, e.g. body weight of patient and biological
> activity of the hormones, with the ultimate goal of producing the
> desired result with the minimum quantities of hormones.

Thus, Plunkett directs those skilled in the art to use the minimum
dosage needed to produce the desired effect. We agree with the examiner
that these teachings would have suggested to those of ordinary skill in the art
a method of treating hot flushes by continuously administering about
1.5 mg/day of MPA in combination with about 0.3 to 0.45 mg/day of CEE;
i.e., the method recited in claim 7.

Appellant argues that Plunkett "does not provide any suggestion or
motivation to use the claimed lower dosage amount of CEE and MPA." (Br.
6.) Appellant also argues that "one skilled in the art would have to perform
undue experimentation to arrive at Appellant's particular low dose
combination among the vast possibilities contemplated by Plunkett." (Id. at
7.) Along the same line, Appellant argues that those skilled in the art would
not have been led to optimize the dosages in Plunkett's method because "in
designating the preferred amounts, Plunkett et al. taught that those particular
amounts *were* the optimal amounts." (Reply Br., page 3.)

This argument is not persuasive. While Plunkett discloses that a
variety of estrogens and progestogens would be suitable for use in the
disclosed method, it describes the specific combination of CEE and MPA as

172                          5

Appeal No. 2006-3012
Application No. 09/808,878

especially preferred. It also provides specific dosage ranges for both CEE
and MPA, and the disclosed dosage ranges encompass the dosages recited in
claim 7. Finally, Plunkett directs the skilled artisan to the lower part of the
disclosed dosage ranges, in its direction to use the minimum amount of
hormones necessary to produce the desired result (col. 4, ll. 1-5) and in its
description of specific dosage ranges that are less than the disclosed
"preferred" dosages (claims 32, 35, and 42).

    We do not agree with Appellant that those skilled in the art would
have considered Plunkett's "preferred" dosages to be the optimal dosages.
Plunkett discloses a range of dosages for each hormone to be used in the
disclosed method and teaches that the actual dosages are selected according
to conventional methods, based on factors including the body weight of the
patient and the biological activity of the hormone. Plunkett specifically
claims methods that comprise administering less than the "preferred"
dosages of both MPA (claim 32) and CEE (claims 34 and 42). Thus, we do
not agree with Appellant's implicit assertion that the only dosage disclosed
by Plunkett that those skilled in the art would have found obvious to use is
the single dosage described as "preferred."

    Appellant also argues that those skilled in the art would have
understood from Plunkett that the "preferred" dosages were thought to be the
minimum effective doses. (Reply Br. 4-5.) Appellant cites the Second Lobo
Declaration as providing evidence that the preferred dosages disclosed by
Plunkett would have been considered the minimum effective dosages. (Br.
8-9; Reply Br. 4-5.) Appellant argues that "[a]ccordingly, the teachings of
the prior art and the knowledge generally available in the art would not have

173                                  6

Appeal No. 2006-3012
Application No. 09/808,878

suggested to those skilled in the art that the use of 1.5 mg MPA in combination with about 0.3 to about 0.45 mg CEE would have been reasonably successful in providing relief of vasomotor symptoms of menopause." (Br. 8.)

The evidence of record does not support Appellant's position that those skilled in the art would have expected the lower dosages of MPA and CEE disclosed by Plunkett to be unsuccessful in controlling hot flushes. The Second Lobo Declaration does not support the weight Appellant puts on it. In that declaration, Dr. Lobo declares that "[f]or the past 20 years, the dosage of 0.625 mg CEE has been accepted as the minimum dosage of estrogen necessary to relieve the symptoms of menopause, including hot flushes and bone loss." ¶ 2. As support for this statement, Dr. Lobo cites Sobel[2] and Kronenberg.[3] These references, however, do not state that 0.625 mg/day of CEE was accepted as the minimum effective dosage.

Sobel states that the *standard* dose of conjugated estrogens was 0.625 mg (page 313). Kronenberg states that the "*most commonly used* regimen for treating hot flashes in the United States is 0.625 to 1.25 mg of oral conjugated equine estrogens (Premarin)" (page 109, emphasis added). A dose that is "standard" or a regimen that is "most commonly used," however, is not necessarily the same as a dosage or regimen that is considered the minimum effective dose. Rather, a standard or most

[2] Sobel, "Progestins in preventative hormone therapy," *Obstetrics and Gynecology Clinics of North America*, Vol. 21, No. 2, pp. 299-319 (1994).
[3] Kronenberg, "Chap. 9 Hot Flashes," in Treatment of the Postmenopausal Woman: Basic and Clinical Aspects, R.A. Lobo (ed.), Raven Press, NY, pp. 97-117 (1994).

174                              7

Appeal No. 2006-3012
Application No. 09/808,878

commonly used dosage represents a commercially marketed product that is designed to be administered to many patients. A dosage intended for administration to many patients would necessarily contain a dosage that is large enough to be effective in a large majority of patients but not so much as to cause side effects or complications in a significant number. As taught by Plunkett, the minimum effective dosage is determined patient-by-patient and depends on factors including the body weight of an individual patient.

In addition, the method of claim 7 only requires administration of CEE and MPA to control hot flushes ("vaosmotor symptoms"). Dr. Lobo's declaration, by contrast, addresses the amount of hormones allegedly thought necessary "to relieve the symptoms of menopause, including hot flushes *and bone loss*." ¶ 2. The amount of hormones required to alleviate hot flushes is not necessarily the same as the amount required to alleviate all of the symptoms of menopause, including bone loss.

Finally, the evidence of record includes Utian.[4] Utian states that "[n]umerous small studies of short duration have found lower doses of various estrogens to be effective in reducing the number and severity of hot flushes, the effect being almost as great as that seen with the most commonly prescribed HRT doses." (Page 1066, left-hand column.) Utian was published after the effective filing date asserted for the present application but cites at least three prior art references in support of the quoted statement.

---

[4] Utian et al., "Relief of vasomotor symptoms and vaginal atrophy with lower doses of conjugated equine estrogens and medroxyprogesterone acetate," *Fertility and Sterility*, Vol. 75, p. 1065-1079 (2001). The co-authors of Utian include inventor James H. Pickar.

175                                    8

Appeal No. 2006-3012
Application No. 09/808,878

In summary, after considering all of the evidence of record, we find
that the weight of the evidence does not support Dr. Lobo's assertion that
0.625 mg/day of CEE was considered the minimum daily dosage required to
control hot flushes at the time the claimed method was made.

Dr. Lobo also states that the "dosage of 2.5 mg of MPA has been
recognized as the minimum amount needed to oppose 0.625 mg CEE and
protect the endometrium." ¶ 2. No evidence is cited to support this
assertion but regardless of its accuracy, Dr. Lobo's declaration does not
address what dosages of MPA would have been expected to be necessary to
oppose CEE at the lower dosages suggested by Plunkett – 0.3 to 0.6 mg/day.

Appellant also asserts that he has provided evidence of unexpected
results to rebut any prima facie case of obviousness. (Br. 9-12; Reply Br.
5-8.) Appellant points to Dr. Lobo's discussion of the "Women's Health,
Osteoporosis, Progestin, Estrogen (H.O.P.E.)" study and the results of that
study that are reproduced in the instant specification. In his first declaration,
Dr. Lobo states:

> I and others expected that the study would show that there
> would be a dose response such that the lower combination
> doses of CEE and MPA would have some effect in reducing the
> number and severity of hot flushes compared with the placebo,
> but far less of an effect than the standard dose of CEE 0.625
> [mg] plus 2.5 mg MPA. In fact, I and others were interested in
> seeing the results of the various lower doses, but doubted the
> study was worth the economic effort.

(First Lobo Declaration, ¶ 12.) Dr. Lobo states that "[i]t was very surprising
and unexpected" that a daily dosage of 1.5 mg MPA combined with 0.3 or

176                                    9

Appeal No. 2006-3012
Application No. 09/808,878

0.45 mg CEE reduced the number and severity of hot flushes to the same extent as 2.5 mg MPA combined with 0.625 mg CEE. (*Id.* at ¶ 14.)

We do not find Dr. Lobo's declarations to outweigh the evidence of obviousness. Dr. Lobo's statements may reflect his own state of mind, but the determination of obviousness is not based on the expectations of any single individual.[5] Rather, obviousness under § 103 is determined based on the expectations of a hypothetical person of ordinary skill in the art fully aware of the state of the prior art. *See In re Rouffet*, 149 F.3d 1350, 1357, 47 USPQ2d 1453, 1457 (Fed. Cir. 1998) ("Obviousness is determined from the vantage point of a hypothetical person having ordinary skill in the art to which the patent pertains. . . . The legal construct also presumes that all prior art references are available to this hypothetical skilled artisan.").

Here, the evidence of record shows that such a person would not have found the results shown in the specification to be unexpected. Utian reports the results of the HOPE study. The results shown in Utian's Figure 1B and Figure 3B appear to correspond to those shown in the instant specification, page 9, lines 15-20 and 20-25, respectively. Utian states that the results of the HOPE study "showed that lower-dosage combinations of CEE and CEE/MPA were effective in decreasing the number and severity of hot flushes. . . . In general, the lower-dosage combinations, especially CEE 0.45/MPA 1.5 and CEE 0.3/MPA 1.5, were as effective for symptom relief

---

[5] We do not find credible Dr. Lobo's statement that his expectations were shared by "others" because Appellant has provided no evidence to support that statement.

Appeal No. 2006-3012
Application No. 09/808,878

as the most commonly prescribed dosage combination of CEE and MPA."
(Page 1073, right-hand column.)

Importantly, Utian expresses no surprise at this result: "These
findings are *consistent with results of previous studies* that examined the
efficacy of lower estrogen dosages for relief of vasomotor symptoms. . . .
The results reported here are especially relevant because they *confirm* the
effectiveness of lower doses of CEE and MPA . . . in the context of a large
clinical trial." (Paragraph bridging pages 1073 and 1074, emphases added.)

Thus, Utian provides evidence that a person of ordinary skill in the art
in the field of hormone replacement therapy would have been aware of
"numerous small studies" showing that low doses of estrogen had been
shown to be effective in treating hot flushes. Utian also provides evidence
that a person of ordinary skill in the art would have found the results of the
HOPE study – and the results reported in the instant specification – to be not
unexpected but "consistent with results of previous studies"; in other words,
expected.

Appellant also argues that "the H.O.P.E. study further unexpectedly
showed an additive effect of MPA at low doses." (Br. 10, citing the First
Lobo Declaration.) In that declaration, Dr. Lobo declares that the "H.O.P.E.
study demonstrated that dosages of CEE and MPA may be better than
equivalent dosages of unopposed CEE for vasomotor symptom relief." ¶ 15.
This result is said to be unexpected because "[p]revious studies with various
dosages of CEE showed no additive effect of MPA on vasomotor relief." *Id.*

178                                11

Appeal No. 2006-3012
Application No. 09/808,878

(citing Greendale[6]). Thus, Dr. Lobo declares that the "H.O.P.E. study surprisingly demonstrated that at these low doses [1.5 mg MPA plus 0.3 or 0.45 mg CEE] MPA may contribute to ameliorating the vasomotor symptoms." *Id.*

We do not find the additive effect of MPA on vasomotor symptoms, in combination with low doses of estrogen, to overcome the prima facie case of obviousness. It is true that Greendale reports that MPA does not contribute to reducing vasomotor symptoms when administered in combination with 0.625 mg of CEE. See, e.g., page 986, last paragraph. It is also true that Utian reports that the results of the HOPE study "suggest that lower doses of CEE combined with MPA may be better than equivalent lower doses of unopposed CEE for vasomotor symptom relief." Page 1074, left-hand column. Thus, this result of the HOPE study might well have been unexpected in comparison to the earlier PEPI study reported by Greendale.

Unexpected results, however, must be established in comparison to the closest prior art. *See In re Baxter-Travenol Labs.*, 952 F.2d 388, 392, 21 USPQ2d 1281, 1285 (Fed. Cir. 1991).

Here, Greendale is not the closest prior art. The embodiment in the prior art that is closest to the claimed method is that of Plunkett's claim 42: 2.5 mg of MPA combined with 0.3 mg of CEE. Thus, the relevant question is *not* whether the combination of claim 7 (1.5 mg MPA and 0.3 - 0.45 mg CEE) is unexpectedly superior to 0.3 - 0.45 mg CEE alone. The relevant

---

[6] Greendale et al., "Symptom relief and side effects of postmenopausal hormones: Results from the Postmenopausal Estrogen/Progestin Interventions Trial," *Obstetrics & Gynecology*, Vol. 92, pp. 982-988 (1998).

179                                    12

Appeal No. 2006-3012
Application No. 09/808,878

question is whether the combination of claim 7 is unexpectedly superior to the prior art combination of 2.5 mg MPA and 0.3 mg CEE. Appellant's evidence provides no comparison to the closest prior art and therefore shows no unexpected properties compared to the closest prior art.

## SUMMARY

The reference relied on by the examiner shows that claim 7 would have been prima facie obvious to those of ordinary skill in the art. Appellant's evidence does not outweigh the evidence of obviousness. We affirm the rejection of claim 7. Claims 11, 12, and 69 fall with claim 7.

No time period for taking any subsequent action in connection with this appeal may be extended under 37 CFR § 1.136(a).

## AFFIRMED

DEMETRA J. MILLS                    )
Administrative Patent Judge         )
                                    )
                                    )
                                    ) BOARD OF PATENT
ERIC GRIMES                         )
Administrative Patent Judge         )  APPEALS AND
                                    )
                                    ) INTERFERENCES
                                    )
NANCY J. LINCK                      )
Administrative Patent Judge         )

180                    13

Appeal No. 2006-3012
Application No. 09/808,878


WYETH/FINNEGAN HENDERSON, LLP
901 NEW YORK AVENUE, NW
WASHINGTON DC 20001-4413



*Af*

PATENT
Customer No. 60,949
Attorney Docket No. 1142.0378-00

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:  )
)
   James H. PICKAR et al.  )  Group Art Unit: 1617
)
Application No.: 09/808,878  )  Examiner:  Shengjun WANG
)
Filed:  March 15, 2001  )
)
For:  HORMONE REPLACEMENT  )  Confirmation No.: 5270
      THERAPY  )

**Attention:  Mail Stop Appeal Brief-Patents**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

### REQUEST FOR REHEARING

Pursuant to 37 C.F.R. § 41.52, Appellants request rehearing and reversal of the Decision on Appeal dated January 31, 2007.

The Board's decision constitutes a new ground for rejection for several reasons. First, in relying on claim 42 of the Plunkett reference as the closest prior art, the Board relied on different portions of the reference, reciting different dosages, than portions of Plunkett relied upon by the Examiner. The Board's shift to claim 42's recited dosage range of 2.5 mg/day of MPA and 0.300 mg.day of CEE as the closest prior art constitutes a new ground of rejection of Appellants' claims, for which Appellants' should be afforded a proper period for response. *See* 37 C.F.R. § 41.50(b). Additionally, the Board raised and relied upon another new rationale for its rejection of Appellants' claims

182

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

over Plunkett. Namely the Board relied on a reference (Utian et al.), which was not addressed by the Examiner in the Examiner's Answer, by Appellants in their Briefs, or by the Board at oral argument, to rebut the evidence of unexpected results presented by Appellants. As with its reliance on claim 42, the Board's reliance on the Utian reference to refute Appellants' arguments constitutes a new ground of rejection, for which Appellants should be given a fair opportunity for response.

Moreover, the Board misapprehended the data in Appellants' specification as allegedly showing that "those skilled in the art would have expected the lower dosages of MPA and CEE disclosed by Plunkett to be *unsuccessful* in controlling hot flushes." (Decision at page 7, lines 6-7, emphasis added.) This misunderstanding of Appellants' position is explicitly refuted by Dr. Lobo's First Declaration as well as Appellants' Reply Brief. Based on this misunderstanding, the Board erred in affirming the Examiner's rejection, and Appellants therefore request reconsideration and reversal of the Board's decision.

Accordingly, Appellants request that: (1) the Board acknowledge that its decision has raised grounds of rejection, and provide Appellants with a fair opportunity for response pursuant to 37 C.F.R. § 41.50(b); and (2) based on the existing record, the Board reconsider its affirmance of the Examiner's rejection related to Appellants' showing of unexpected results in view of the correct interpretation of what a person of ordinary skill in the art would have expected.

183

2

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

A.    **The Board Has Applied a New Ground of Rejection**

    1.    The Board Has Applied a New Ground of Rejection in Relying on Claim 42 as the Closest Prior Art

The Examiner's Answer articulates the obviousness rejection over Plunkett et al.

(Re 36,247), in part, as follows:

> Plunkett teaches the minimum and maximum dosages for medroxyprogesterone (MPA) and conjugated equine estrogens (CEE) to be 1 mg/day and 15 mg/day, and 0.300 mg/day and 2.5 mg/day, respectively, and the preferred dosages are 1-2.5 mg (MPA) and 0.300-0.600 mg (CEE) respectively, **see claims 34-35**, see also Table IA, col. 4, in particular.

(Page 3, emphasis added.)  The Examiner's Answer further alleges that a prima facie

case of obviousness has been established, in part, by stating:

> Note that Plunkett teaches that MPA can be employed at a minimum dosage of 1.0 mg and maximum dosage of 15 mg and **preferred range of 1-2.5 mg/day (claim 32)**.  Note also that the claimed dosage herein, 0.3-0.45 mg of CEE, falls within the dosage range of 0.300-0.600 mg disclosed by Plunkett.

(Page 4, emphasis added.)  The Examiner's Answer then alleges that the evidence of

record is not sufficient to overcome the obviousness rejection, stating, in part:

> Note that in order to overcome obviousness appellant must demonstrate unexpected and significant results in comparison with **the closest prior art**, i.e., Plunkett.  No such comparative data has been provided.  **Appellants state that the closest example in Plunkett is a regimen comprising 0.600 mg CEE and 2.5 mg MPA.  The specification on page 9 provides a comparative example between 60.625 [sic 0.625] mg of CEE, and not 0.600 mg of CEE.**

184                                      3

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

(Page 5, emphasis added.)  Nowhere in the Examiner's Answer or in the rejections that preceded it did the Examiner mention claim 42 of Plunkett or the specific dosages recited in that claim.

The Board, however, in affirming the Examiner's rejection over the Plunkett reference, relies on claim 42.  *See* Board decision, page 4, third from last line; page 6, line 15.  Significantly, the Board criticizes Appellants' showing of unexpected results by arguing that Appellants did not compare the claimed method to the closest prior art, *i.e.,* claim 42:

> Here, Greendale [who reported the PEPI study] is not the closest prior art, The embodiment in the prior art that is closest to the claimed method is that of Plunkett's claim 42: 2.5 mg of MPA combined with 0.3 mg of CEE.

(Page 12.)  As noted at oral argument, Appellants have never had an opportunity to respond to a rejection based on the "embodiment" of claim 42, since the Examiner never relied upon that embodiment.  That fact alone demonstrates that the Board decision constitutes a new ground of rejection and Appellants should be allowed to present evidence rebutting that rejection.

The situation is similar to that of *In re Kumar,* 418 F.3d 1361 (Fed. Cir. 2005), where the Board in affirming the examiner's obviousness rejection over a single reference, relied upon its own calculations of various particle size ranges.  The Federal Circuit, in vacating and remanding the case, pointed out:

> When a rejection for obviousness is based on overlapping values in the prior art, identification of the values deemed to overlap is material to the rejection.

185

*Id.* at 1367.  The court concluded that the Board's decision based on the new calculated values constituted a new ground of rejection, in part, because the overlapping values were not identified in the examiner's rejection but only for the first time in the Board's decision.  As the court stated:

> In calculating the overlapping values, the Board found facts not found by the examiner regarding the differences between the prior art and the claimed invention, which in fairness required an opportunity for response.

*Id.* at 1368.  The court relied upon *In re Waymouth,* 486 F.2d 1058, 1060-61 (CCPA 1973), for the proposition that "a new rejection [has] occurred where the examiner and the board [reject] a claim for different reasons." *Kumar,* 418 F.3d at 1368.

In the instant case, particularly, where there is evidence of unexpected results in the original specification, identification of what the PTO considers to be the closest prior art is material to the rejection.  Likewise, where the Examiner's Answer and the Board provide different rationales for rejecting the claims and criticizing Appellants' evidence of unexpected results, there has been a new ground of rejection, which deserves a full and fair opportunity for response.  *See id.*  Accordingly, Appellants request that the Board acknowledge the new ground of rejection so that Appellants may be afforded the opportunities available under 37 C.F.R. § 41.50(b).

2.    The Board Has Applied a New Ground of Rejection in Relying on the Utian Reference to Refute Appellants' Showing of Unexpected Results

Besides relying on a different dosage range as the closest prior art, the Board decision constitutes a new ground of rejection in its rationale for rejecting Appellants' assertion that the HOPE study data described in the specification was unexpected.  In

186                                5

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

particular, the Board relies on a reference, Utian et al., which although of record and co-written by one of the named inventors, was not relied upon by the Examiner in the Answer or otherwise. *See* Board decision, pages 8-11. The Board, in particular, relies on a sentence in Utian that concludes that the "findings [of the HOPE study] are *consistent with results of previous studies* that examined the efficacy of lower estrogen dosages for relief of vasomotor symptoms," and then that "[t]he results . . . confirm the effectiveness of lower doses of CEE and MPA . . . in the context of a large clinical trial." *Id.* at page 11, lines 3-8 (emphasizing and quoting Utian, pages 1073-74). Since the Examiner never relied on this reference, Appellants have not had an opportunity to deal with the issue raised for the first time in the Board's decision.

The reliance on Utian represents, perhaps even more clearly than the reliance on claim 42, that the Board in its decision "went off on its own" in considering the Plunkett disclosure, Appellants' claimed method, and evidence of unexpected results. *See Kumar,* 418 F.3d at 1367 (quoting *In re Eynde,* 180 F.2d 1364, 1371 (CCPA 1973). Accordingly, for this additional reason, the Board's decision constitutes a new ground of rejection for which Appellants should be given a full and fair opportunity for response under § 41.50(b).

## B. The Board Has Misunderstood Appellants' Showing of Unexpected Results

In addition to criticizing Appellants' evidence of unexpected results as testing the wrong dosage and as being refuted by Utian, the Board in its decision misapprehends Appellants' position as to what a person of ordinary skill in the art would have expected from using the lower dosages of MPA and CEE disclosed in the Plunkett reference. On

187

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

page 7, lines 5-7, the Board construes Appellants' position as being "that those skilled in the art would have expected the lower dosages of MPA and CEE disclosed by Plunkett to be **unsuccessful** in controlling hot flushes" (emphasis added).

In fact, Dr. Lobo testified in his First Declaration as follows:

> I and others expected that the study would show that there would be a **dose response** such that the lower combination doses of CEE and MPA would have **some effect** in reducing the number and severity of hot flushes compared with the placebo, **but far less of an effect** than the standard dose of CEE 0.625 plus 2.5 mg MPA.

(Pages 4-5, par. 12 (emphasis added); *see also* Reply Brief, page 7.) Regardless of whether the Board finds this statement credible or persuasive (*see* Board decision, page 10), this statement, relied upon in Appellants' Reply Brief, shows that Appellants' position was not that those of skill in the art would have expected the lower dosages to be **unsuccessful** or **ineffective**, as the Board has erroneously understood. Rather, the evidence establishes that those of skill in the art would have expected a **decrease** in the dosage to result in a **decrease** in (not lack of) activity, *i.e.,* would have expected a dose-dependent response. Because, the Board has misapprehended Appellants' position as to what would have been expected by a person of skill in the art, it reached an erroneous conclusion in its obviousness analysis. Accordingly, Appellants request reconsideration and reversal of the decision.

## C.    Conclusion

For all of these reasons, Appellants believe that: (1) the Board's reliance on claim 42 of Plunkett and on the Utian reference constitute a new ground of rejection over

Customer No. 60,949
Application No. 09/808,878
Attorney Docket No. 1142.0378-00

Plunkett, for which Appellants should be given a fair opportunity for response pursuant

to 37 C.F.R. § 41.50(b), and (2) even on the existing record, the Board's decision

incorrectly interpreted Appellants' showing of unexpected results and should therefore

be reversed.

Please grant any extensions of time required to enter this reply brief and charge

any additional required fees to our Deposit Account No. 06-0916.

Respectfully submitted,

Dated: March 30, 2007

Robert D. Bajefsky
Reg. No. 25,387

189                                    8

The opinion in support of the decision being entered today
is *not* binding precedent of the Board.

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

*Ex parte* JAMES H. PICKAR

Appeal 2006-3012
Application 09/808,878
Technology Center 1600

Decided: September 7, 2007

Before DEMETRA J. MILLS, ERIC GRIMES, and NANCY J. LINCK, *Administrative Patent Judges.*

GRIMES, *Administrative Patent Judge.*

## DECISION ON REQUEST FOR REHEARING

Appellant has requested rehearing (reconsideration) of the decision entered January 31, 2007. That decision affirmed the Examiner's rejection of claims 7, 11, 12, and 69 under 35 U.S.C. § 103. We grant Appellant's request to the extent of designating the affirmance a new ground of rejection, but decline to make any substantive change in the previous decision.

190

Appeal 2006-3012
Application 09/808,878

## DISCUSSION

Appellant argues that the previous decision mischaracterizes his position regarding what effect would have been expected from using the lower dosages of MPA and CEE disclosed by Plunkett (Req. Rhg. 6-7). Appellant argues that the First Lobo Declaration states that the lower doses would have been expected to be less effective, not *"unsuccessful* in controlling hot flushes," as we stated in the previous decision.

The cited statement in the previous decision characterized the following argument in the Appeal Brief:

> Dr. Lobo states that the results of the study . . . showing that the lower doses of CEE and MPA reduced the number and severity of hot flushes, were contrary to what would have been expected by those skilled in the art. ([Second] Lobo Declaration ¶ 6). Accordingly, the teachings of the prior art and the knowledge generally available in the art would not have suggested to those skilled in the art that the [claimed dosages] would have been reasonably successful in providing relief of vasomotor symptoms of menopause.

Thus, the statement in the previous decision appears to accurately reflect the argument to which it responded. In any event, Appellant's argument based on the First Lobo Declaration is addressed in a different part of the previous decision (pages 9-11). Appellant's position regarding the allegedly unexpected results was correctly understood and addressed.

Appellant also argues that the affirmance should be designated a new ground of rejection. Appellant points to our identification of Plunkett's claim 42 as the closest prior art (previous decision, at 12) as a rationale that the Examiner had not raised (Req. Rhg. 4-5). Appellant also argues that the Examiner did not rely on Utian, as we did, as evidence that the data in the

191                                    2

Appeal 2006-3012
Application 09/808,878

Specification would not have been considered unexpected (*id.* at 5-6). Appellant argues that, in view of these new rationales, "the Board's decision constitutes a new ground of rejection for which Appellants [sic] should be given a full and fair opportunity for response under § 41.50(b)" (*id.* at 6).

"[T]he ultimate criterion of whether a rejection is considered 'new' in a decision by the board is whether appellants have had fair opportunity to react to the thrust of the rejection." *In re Kronig*, 539 F.2d 1300, 1302 (CCPA 1976). We do not believe that the basis of the affirmance in the decision of January 31, 2007, changed the basic thrust of the rejection.

That said, however, it is true that the Examiner had not identified Plunkett's claim 42 as the closest prior art embodiment. It is also true that Appellant may have submitted different or additional evidence to rebut the rejection if the Examiner had focused attention on that prior art embodiment. Therefore, even though we do not consider it strictly required under the *Kronig* standard, we will designate our affirmance of the Examiner's rejection as a new ground of rejection under 37 C.F.R. § 41.50(b), to give Appellant an opportunity to address the method of Plunkett's claim 42 as the closest prior art embodiment.

Appellant should note, however, that the response must include "an appropriate amendment of the claims so rejected or new evidence relating to the claims so rejected, or both." 37 C.F.R. § 41.50(b). "If the appellant submits an argument without either an appropriate amendment or new evidence as to any of the claims rejected by the Board, it will be treated as a request for rehearing under 37 C.F.R. 41.50(b)(2)." MPEP § 1214.01.

192                                    3

Appeal 2006-3012
Application 09/808,878

## SUMMARY

We grant Appellant's request for rehearing to the extent of designating our affirmance as a new ground of rejection but decline to change any other aspect of the previous decision.

## TIME PERIOD FOR RESPONSE

This decision contains a new ground of rejection pursuant to 37 C.F.R. § 41.50(b) (effective September 13, 2004, 69 Fed. Reg. 49960 (August 12, 2004), 1286 Off. Gaz. Pat. Office 21 (September 7, 2004)). 37 C.F.R. § 41.50(b) provides "[a] new ground of rejection pursuant to this paragraph shall not be considered final for judicial review."

37 C.F.R. § 41.50(b) also provides that the appellant, <u>WITHIN TWO MONTHS FROM THE DATE OF THE DECISION</u>, must exercise one of the following two options with respect to the new ground of rejection to avoid termination of the appeal as to the rejected claims:

> (1) *Reopen prosecution.* Submit an appropriate amendment of the claims so rejected or new evidence relating to the claims so rejected, or both, and have the matter reconsidered by the examiner, in which event the proceeding will be remanded to the examiner. . . .

> (2) *Request rehearing.* Request that the proceeding be reheard under § 41.52 by the Board upon the same record. . . .

## <u>REHEARING GRANTED-IN-PART</u>

lbg

Appeal 2006-3012
Application 09/808,878


WYETH/FINNEGAN HENDERSON, LLP
901 NEW YORK AVENUE, NW
WASHINGTON DC 20001-4413

194                                    5



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/808,878 | 03/15/2001 | James H. Pickar | AM100226 | 5270 |

60949        7590        12/12/2007
WYETH/FINNEGAN HENDERSON, LLP
901 NEW YORK AVENUE, NW
WASHINGTON, DC 20001-4413

| EXAMINER |
|---|
| WANG, SHENGJUN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1617 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/12/2007 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

195

PTOL-90A (Rev. 04/07)

| *Notice of Abandonment* | Application No. | Applicant(s) |
|---|---|---|
| | 09/808,878 | PICKAR, JAMES H. |
| | Examiner | Art Unit |
| | Shengjun Wang | 1617 |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

This application is abandoned in view of:

1. ☐ Applicant's failure to timely file a proper reply to the Office letter mailed on _____.

   (a) ☐ A reply was received on _____ (with a Certificate of Mailing or Transmission dated _____ ), which is after the expiration of the period for reply (including a total extension of time of _____ month(s)) which expired on _____.

   (b) ☐ A proposed reply was received on _____, but it does not constitute a proper reply under 37 CFR 1.113 (a) to the final rejection.

       (A proper reply under 37 CFR 1.113 to a final rejection consists only of: (1) a timely filed amendment which places the application in condition for allowance; (2) a timely filed Notice of Appeal (with appeal fee); or (3) a timely filed Request for Continued Examination (RCE) in compliance with 37 CFR 1.114).

   (c) ☐ A reply was received on _____ but it does not constitute a proper reply, or a bona fide attempt at a proper reply, to the non-final rejection. See 37 CFR 1.85(a) and 1.111. (See explanation in box 7 below).

   (d) ☐ No reply has been received.

2. ☐ Applicant's failure to timely pay the required issue fee and publication fee, if applicable, within the statutory period of three months from the mailing date of the Notice of Allowance (PTOL-85).

   (a) ☐ The issue fee and publication fee, if applicable, was received on _____ (with a Certificate of Mailing or Transmission dated _____), which is after the expiration of the statutory period for payment of the issue fee (and publication fee) set in the Notice of Allowance (PTOL-85).

   (b) ☐ The submitted fee of $_____ is insufficient. A balance of $_____ is due.

       The issue fee required by 37 CFR 1.18 is $_____. The publication fee, if required by 37 CFR 1.18(d), is $_____.

   (c) ☐ The issue fee and publication fee, if applicable, has not been received.

3. ☐ Applicant's failure to timely file corrected drawings as required by, and within the three-month period set in, the Notice of Allowability (PTO-37).

   (a) ☐ Proposed corrected drawings were received on _____ (with a Certificate of Mailing or Transmission dated _____), which is after the expiration of the period for reply.

   (b) ☐ No corrected drawings have been received.

4. ☐ The letter of express abandonment which is signed by the attorney or agent of record, the assignee of the entire interest, or all of the applicants.

5. ☐ The letter of express abandonment which is signed by an attorney or agent (acting in a representative capacity under 37 CFR 1.34(a)) upon the filing of a continuing application.

6. ☐ The decision by the Board of Patent Appeals and Interference rendered on _____ and because the period for seeking court review of the decision has expired and there are no allowed claims.

7. ☒ The reason(s) below:

   The decision by The Board of Patent Appeals and Interferences rendered on September 7, 2007 based on a new ground rejection and because the period for seeking reopen prosecution or request rehearing has expired and there are no allowed claims

**SHENGJUN WANG**
**PRIMARY EXAMINER**

*S. Wang*

Shengjun Wang
Primary Examiner
Art Unit: 1617

Petitions to revive under 37 CFR 1.137(a) or (b), or requests to withdraw the holding of abandonment under 37 CFR 1.181, should be promptly filed to minimize any negative effects on patent term.